IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HOUSTON INDEPENDENT SCHOOL DISTRICT | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 1:19-cv-684-LY |
| | § | |
| TEXAS EDUCATION AGENCY and MIKE MORATH, COMMISSIONER OF EDUCATION, in his official capacity, | § | |
| *Defendants.* | § | |

**DEFENDANTS' MOTION TO DISMISS: APPENDIX**

| Appx. No. | Document |
|---|---|
| Appx.002-005 | First Amended Notice of Special Accreditation Investigation (Jan. 22, 2019) |
| Appx.006-008 | Second Amended Notice of Special Accreditation Investigation (Mar. 24, 2019) |
| Appx.009-189 | HISD's Response to TEA's Preliminary Report and Request for an Informal Review (Aug. 29, 2019) |
| Appx.190-507 | Final SAI Report (Oct. 30, 2019) |
| Appx.508-530 | Appointment of Board of Managers (Nov. 6, 2019) |
| Appx.531-533 | 2018 Accountability Manual, Chapter 10–Hurricane Harvey |



**Texas Education Agency**

Commissioner Mike Morath

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

**Notice of Special Accreditation Investigation-Amended**

**January 22, 2019**

Diana Davila, Board President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

| NO RESPONSE REQUIRED |
| --- |

Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Subject: **Notice of Special Accreditation Investigation**

Dear President Davila and Interim Superintendent Lathan:

This letter serves to notify the Houston Independent School District (HISD) of a Special Accreditation Investigation (SAI) to be conducted by the Texas Education Agency (TEA). The Commissioner of Education has authorized this investigation in response to multiple complaints received by the TEA's Special Investigations Unit (SIU). This investigation will be conducted by the TEA Special Investigations Unit.

**Description of Complaints**

Houston ISD Board of Trustees may have violated The Open Meetings Act by deliberating district business prior to a regularly scheduled board meeting regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent.

**Alleged Violations**
1. Tex. Educ. Code §11.051. Governance of Independent School District
2. Tex. Educ. Code §11.1511 Specific Powers and Duties of the Board
3. Tex. Gov't Code Chapter 551 Open Meetings

**Procedures**

By this notice, The Texas Education Agency has initiated a Special Accreditation Investigation. The agency staff will gather information from a variety of sources. While the agency staff will initiate a preliminary investigation, certain investigative activities will be performed onsite The onsite component may include interviews, observations, inspection, evaluation, and collection of records. Documents submitted to TEA will not be returned to the LEA or disclosed during the preliminary report and final report, except as required by law. This Notice of SAI may be

Houston Independent School District
Audit Working Papers

SAI# INV2019-10-034
Exception TX GOVT CODE §552.116

Appx.002

supplemented or amended as the investigation progresses. A full explanation of the agency's complaint investigation procedures and protocols is enclosed for your reference.

**Documents to be Requested**

Document collection during the onsite investigation will include but not be limited to the following list. Investigators may supplement the list of documents to be collected at any time during the investigation.

1. Board meeting agendas for the past 3 years:
2. Board meeting minutes that coincide with each agenda for the past 3 years;
3. Individual statements from board members regarding their role, goals, and purpose for serving as a trustee. (Include an opinion regarding the current environment of the Board)
4. Archived video of open meetings for the past 3 years;
5. All board member communications, including electronic communications, to other board members for the past 3 years regarding the superintendent or the interim superintendent, including any communications regarding any potential new superintendent or interim superintendent;
6. All electronic communication of board members to superintendent, interim superintendent, and cabinet-level administrators for the past 3 years.

**Potential Witness Interview List**

Interviews conducted during the onsite investigation will include but not limited to the following list. Investigators may amend the list of witnesses to be interviewed at any time during the investigation.

- Grenita Lathan, Interim Superintendent Houston ISD
- Rhonda Skillern-Jones, Board Member
- Jolanda Jones, Board Member
- Anne Sung, Board Member
- Sergio Lira, Board Secretary
- Holly Maria Flynn Vilaseca, First Vice-President
- Elizabeth Santos, Second Vice-President
- Sue Deigaard, Assistant Secretary
- Diana Davila, Board President
- Wanda Adams, Board Member
- Additional district employees and/or persons related to this incident as necessary

**Authority**

This investigation is conducted under the following authority:

> TEC §39.057 (a)(6),(16)

**Referral to Other Agencies**

Houston Independent School District
Audit Working Papers

**Appx.003**

During the course of this investigation, TEA may discover matters that warrant immediate attention or identify concerns that are not within its jurisdiction and authority to address. TEA will make referrals to the proper agency, as deemed necessary.

**Confidentiality and Public Information Requests**

If the school district so chooses upon receipt of a Public Information Request for this document, the district does not have to release this Notice of SAI. Houston ISD can assert the audit workpaper exception on behalf of the Texas Education Agency by requesting an Attorney General opinion and copying the Texas Education Agency in your written request.

Please note, the information gathered for the investigation and the preliminary investigation report are treated as confidential audit working papers and TEA will seek to withhold them from public release in accordance with the Texas Public Information Act.

Because of the sensitive nature of the information required, and in accordance with The Family Education Rights and Privacy Act (FERPA) (20 U.S.C. §123g; 34CFR Part 99), all information will be sent in a secure manner. Documents submitted to TEA will not be returned.

If information will be submitted via email, please contact lead investigator Benito Vasquez to access the TEA secure file sharing. We request the information in electronic format, if possible. Alternatively, you may fax or mail the documents to the following postal mail address or fax number listed below.

**Lead Investigator conducting the onsite SAI:**

Benito Vasquez
Special Investigations Unit
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701
FAX Number: (512) 475-3665

**Additional Investigators conducting the onsite SAI:**

| | |
|---|---|
| Jason Hewitt | Patrice Ocasio |
| Special Investigations Unit | Special Investigations Unit |
| Texas Education Agency | Texas Education Agency |
| 1701 N. Congress Avenue | 1701 N. Congress Avenue |
| Austin, Texas 78701 | Austin, Texas 78701 |
| FAX Number: (512) 475-3665 | FAX Number: (512) 475-3665 |

We request your full cooperation and a timely response to requests in this investigation. Investigator Benito Vasquez will serve as your point of contact; therefore, please direct any questions to him at (512) 463-9464 or Benito.vasquez@tea.texas.gov. Please direct any media inquiries to our Communications Division at (512) 463-9000. Please direct any correspondence or inquiry from the school district's attorney to Chris Jones at 512-463-4533 or by email at Christopher.Jones@tea.texas.gov.

Houston Independent School District
Audit Working Papers

SAI# INV2019-10-034
Exception TX GOVT CODE §552.116
Page 3 of 4

**Appx.004**

Respectfully,


Jason Hewitt, Director
Special Investigations Unit

CC:    Mike Morath, Commissioner of Education, TEA
        A.J. Crabill, Deputy Commissioner, Governance, TEA
        Martin Winchester, Deputy Commissioner, Educator Support, TEA
        Von Byer, General Counsel, TEA
        Chris Jones, Deputy Senior Counsel, TEA
        Jeffrey Cottrill, Deputy Commissioner of Academics TEA
        Chris Cowan, Director of Enforcement and Support, TEA
        A.J. Wilson Salazar, Associate Counsel, Legal Services, TEA
        Hunter Thompson. Director of Governmental Relations, TEA.

Houston Independent School District
Audit Working Papers

SAI# INV2019-10-034
Exception TX GOVT CODE §552.116
Page 4 of 4

Appx.005



**Texas Education Agency**

Commissioner Mike Morath

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

**Notice of Special Accreditation Investigation-Amended**

**March 24, 2019**

Diana Davila, Board President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

| NO RESPONSE REQUIRED |
|---|

Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Subject: **Notice of Special Accreditation Investigation – Amended 3/24/19**

Dear President Davila and Interim Superintendent Lathan:

This letter serves to notify the Houston Independent School District (HISD) of an amended Special Accreditation Investigation (SAI) to be conducted by the Texas Education Agency (TEA). The Commissioner of Education has authorized this *amended* investigation in response to additional information received during the current Special Accreditation Investigation (January 22, 2019) by the TEA's Special Investigations Unit (SIU). This investigation will be conducted by the TEA Special Investigations Unit.

**Description of Complaints**

Houston ISD Board of Trustees may have violated the contract procurement process, competitive bidding, awarding, and management of contracts.

**Alleged Violations**
1. Tex. Educ. Code §11.051. Governance of Independent School District
2. Tex. Educ. Code §44.031. Purchasing Contracts

**Procedures**

By this notice, The Texas Education Agency  has initiated a Special Accreditation Investigation. The agency staff will gather information from a variety of sources. While the agency staff will initiate a preliminary investigation, certain investigative activities will be performed onsite the onsite component may include interviews, observations, inspection, evaluation, and collection of records. Documents submitted to TEA will not be returned to the LEA or disclosed during the preliminary report and final report, except as required by law. This Notice of SAI may be supplemented or amended as the investigation progresses. A full explanation of the agency's complaint investigation procedures and protocols is enclosed for your reference.

Houston Independent School District
Audit Working Papers

SAI# INV2019-10-034
Exception TX GOVT CODE §552.116

Appx.006

**Documents to be Requested**

Investigators will determine list of documents to be collected at a later time during the investigation.

**Potential Witness Interview List**

Investigators will determine list of potential witnesses to be interviewed at a later time during the investigation.

**Authority**

This investigation is conducted under the following authority:

*TEC §39.057 (a)(6),(16)*

**Referral to Other Agencies**

During the course of this investigation, TEA may discover matters that warrant immediate attention or identify concerns that are not within its jurisdiction and authority to address. TEA will make referrals to the proper agency, as deemed necessary.

**Confidentiality and Public Information Requests**

If the school district so chooses upon  receipt of a Public Information Request for this document, the district does not have to release this Notice of SAI.  Houston ISD  can assert the audit workpaper exception on behalf of the Texas Education Agency by requesting an Attorney General opinion and copying the Texas Education Agency in your written request.

Please note, the information gathered for the investigation and the preliminary investigation report are treated as confidential audit working papers and TEA will seek to withhold them from public release in accordance with the Texas Public Information Act.

Because of the sensitive nature of the information required, and in accordance with The Family Education Rights and Privacy Act (FERPA) (20 U.S.C. §123g; 34CFR Part 99), all information will be sent in a secure manner. Documents submitted to TEA will not be returned.

If information will be submitted via email, please contact lead investigator Benito Vasquez to access the TEA secure file sharing. We request the information in electronic format, if possible. Alternatively, you may fax or mail the documents to the following postal mail address or fax number listed below.

**Lead Investigator conducting the SAI:**

Benito Vasquez
Special Investigations Unit
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701
FAX Number: (512) 475-3665

Houston Independent School District                                    SAI# INV2019-10-034
Audit Working Papers                                          Exception TX GOVT CODE §552.116
                                                                              Page **2** of 3

**Appx.007**

**Additional Investigators conducting the SAI:**

| | |
|---|---|
| Jason Hewitt | Patrice Ocasio |
| Special Investigations Unit | Special Investigations Unit |
| Texas Education Agency | Texas Education Agency |
| 1701 N. Congress Avenue | 1701 N. Congress Avenue |
| Austin, Texas 78701 | Austin, Texas 78701 |
| FAX Number: (512) 475-3665 | FAX Number: (512) 475-3665 |

We request your full cooperation and a timely response to requests in this investigation. Investigator Benito Vasquez will serve as your point of contact; therefore, please direct any questions to him at (512) 463-9464 or  Benito.vasquez@tea.texas.gov. Please direct any media inquiries to our Communications Division at (512) 463-9000. Please direct any correspondence or inquiry from the school district's attorney to Chris Jones  at 512-463-4533 or by email at Christopher.Jones@tea.texas.gov.

Respectfully,

Jason Hewitt, Director
Special Investigations Unit

CC:    A.J. Crabill, Deputy Commissioner, Governance, TEA
         Martin Winchester, Deputy Commissioner, Educator Support, TEA
         Von Byer, General Counsel, TEA
         Chris Jones, Deputy Senior Counsel, TEA
         Jeffrey Cottrill, Deputy Commissioner of Standards and Engagement  TEA
         Chris Cowan, Director of Enforcement and Support, TEA
         A.J. Wilson Salazar, Associate Counsel, Legal Services, TEA
         Hunter Thompson, Director of Governmental Relations, TEA.

Houston Independent School District                                    SAI# INV2019-10-034
Audit Working Papers                                          Exception TX GOVT CODE §552.116
                                                                                          Page **3** of 3

Appx.008

# O'HANLON, DEMERATH & CASTILLO

ATTORNEYS & COUNSELORS AT LAW
808 WEST AVE
AUSTIN, TEXAS 78701

TELEPHONE: (512) 494-9949
FACSIMILE: (512) 494-9919

August 26, 2019

Jason Hewitt, Director
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment
&Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

---

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

---

Dear Director Hewitt, Deputy Cottrill, and Texas Education Agency Legal Staff:

This letter is submitted in response to the Preliminary Special Accreditation Investigation Report (hereinafter "Preliminary SAI Report" or "Report") issued by the Texas Education Agency's Division of Governance on August 5, 2019 against the Houston Independent School District ("Houston ISD" or "District").[1]

Although the investigation culminating in TEA's Report lasted more than 6 months, the Report initially required a response from the District by August 15, 2019, a mere 10 days after TEA issued the Report. Attempting to review and respond to the multifarious allegations, findings, and analysis in the Report (along with the voluminous exhibits attached to the Report) would have

---

[1]   The Preliminary SAI Report is attached as **Exhibit 1**.

been completely unrealistic on that timeframe.  Since TEA spent more than six months assembling the Preliminary SAI Report, Houston ISD requested a reasonable 30-day extension.  TEA agreed to extend the deadline by 11 days.

In order to meet this deadline, the undersigned has collaborated with additional counsel who have prepared supplemental reports in response to TEA's Report along with this response to TEA's Preliminary SAI Report ("Response").[2]

### Hearing Demand

Houston ISD respectfully requests that TEA provide an informal review at a hearing conducted by the Commissioner or a hearing examiner in compliance with Chapter 39's statutory requirements.  TEX. EDUC. CODE § 39.058(b) ("Before issuing a report with its final findings, the agency must provide a person or entity the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.").  Houston ISD submits this Response along with the attached exhibits and supplemental responses to be reviewed and considered by the Commissioner or hearing examiner at the informal review hearing.

### Objections to the Evidence Missing from TEA's Report

TEA's own investigation procedures require that any evidence substantiating TEA's allegations be gathered and reported in the preliminary report.  TEA's own investigation procedures require that any evidence that confirms allegations of wrongdoing be included as a part of the preliminary report.[3]  However, much of the evidence that should be attached to the Preliminary SAI Report is inexplicably absent.

---

[2]   These supplemental responses were prepared by Thompson & Horton LLP and Feldman & Feldman PC and are referred to as "**TH Supplemental Response**" and "**FF Supplemental Response**".  These supplemental responses are being submitted to TEA along with this Response.  Both the supplemental responses and evidence attached to these responses are incorporated by reference into this Response.

[3]   Specifically, TEA's Special Investigations Unit Investigation Procedures state the following:

> Evidence substantiating allegations of non-compliance or a violation of state or federal law, rule, or regulation will be gathered and reported in the preliminary investigative report.  If the evidence confirms an allegation of wrongdoing, the evidence will be included as a part of the preliminary and final report submitted to the Commissioner of Education and may be referred to external entities.

The Report contains numerous "statements" that unnamed administrators allegedly provided to TEA's investigators in support of TEA's allegations.  Where is the evidence that these statements actually occurred?  TEA's investigators have included a couple of these statements.[4]  Where then is the evidence of the various other statements described by TEA's investigators?  TEA's investigators have not identified many of the unnamed individuals who allegedly provided these statements or attached any recordings from interviews, declarations or affidavits, signed written statements, or interview notes regarding these alleged statements.  And TEA has not identified the majority of these unnamed administrators so that Houston ISD can evaluate whether they are credible witnesses.  If the statements referred to in TEA's Report truly confirm TEA's allegations, TEA's own rules require that they be attached.  Moreover, basic due process requires that the unnamed accusers must be identified so that Houston ISD can adequately respond to their accusations.

Houston ISD objects to the attempt by TEA's investigators to withhold material evidence regarding the allegations they have leveled against Houston ISD.  Houston ISD hereby requests that the Commissioner or hearing examiner order TEA's investigators to supplement their preliminary report with all evidence (whether written, electronic, or in audio format) regarding these "statements" from unnamed administrators.

Houston ISD is committed to transparency.  If TEA shares this commitment, its investigators should not be withholding material evidence regarding their investigation.

---

[4]    *See, e.g.*, **Exhibit 1**, Preliminary SAI Report, Exh. B (written statement regarding the Trustee Allocation Fund).  The exhibits attached to TEA's Preliminary SAI Report are voluminous and are obviously already in TEA's possession.  Accordingly, instead of attaching those exhibits to Exhibit 1, Houston ISD incorporates by reference all exhibits attached to TEA's Preliminary SAI Report.

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

## Table of Contents

**Table of Contents** ...................................................................................................4

**Executive Summary** ..............................................................................................7

**Introduction** .........................................................................................................12

**Background Information** ......................................................................................13

   A.  Current conditions within Houston ISD ..................................................... 13

      (1)  Curriculum and Instruction ................................................................... 13

      (2)  Finance .................................................................................................17

      (3)  Governance/Training ...........................................................................18

   B.  TEA's "Background Information" demonstrates apparent animus toward board members' constitutional rights ...................................................... 23

**Houston ISD's Response to Allegation One** ......................................................28

   A.  TEA's conclusion that Houston ISD's board members violated TOMA based on informal meetings in less than quorum is wrong as a matter of law. ........................................... 28

   B.  TEA's own fact findings demonstrate that there was no violation of the Texas Open Meetings Act. .................................................................................. 30

      (1)  TEA's Report falsely claims that the motion to hire a new superintendent was made with no prior notice and no public deliberation.........................................................33

      (2)  TEA's Report misquotes the definition of a walking quorum from the Texas Open Meetings 2018 Handbook ...............................................34

      (3)  TEA falsely contends that board members violated TOMA by meeting in groups of less than a quorum.....................................................34

      (4)  TEA willfully misconstrues a statement by Trustee Santos. ...................................35

      (5)  TEA unfairly criticizes board members for not having detailed memories of a meeting that had occurred months before they were interviewed. ...........................................35

**Houston ISD's Response to Allegation Two** ......................................................38

   A.  Individual board members have the inherent right to access information, documents, and records maintained by the District. ...................................................... 38

**Appx.012**

**HOUSTON ISD** - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

B.   TEA's investigators have made numerous findings which, even if they were true,
amount to nothing more than requests for information or communications of
information............................................................................................................40

(1)   Findings 1–4 in TEA's Report regarding Allegation Two are factually inaccurate
and amount to nothing more than an expression of opinion....................................40

(2)   Finding 5 in TEA's Report regarding Allegation Two is factually inaccurate and
amounts to nothing more to an appropriate request to reschedule an agenda item by
a mere two months. .................................................................................................42

(3)   Finding 6 in TEA's Report regarding Allegation Two is factually inaccurate and
describes no exercise of board authority by an individual board member. .............44

(4)   Finding 7 in TEA's Report regarding Allegation Two is factually inaccurate and
does not describe any exercise of board authority by an individual board member..............45

(5)   Finding 8 in TEA's Report regarding Allegation Two amounts to nothing more
than a board member's expression of opinion.........................................................46

(6)   Findings 9–12 in TEA's Report regarding Allegation Two are factually inaccurate
and amount to nothing more than an expression of opinion....................................46

a.   *Electronic Communications from 2016* .....................................................47

b.   *Electronic Communications from 2017* .....................................................51

c.   *Electronic Communications from 2018* .....................................................55

d.   *Electronic Communications from 2019* .....................................................55

**Houston ISD's Response to Allegation Three**.................................................................56

A.   Findings 2 and 3 in TEA's Report under Allegation 3 are pure fiction and fail to
describe any unlawful act by a board member . ......................................................57

(1)   The meeting described in Finding 2 in TEA's Report Regarding TEA Allegation
Three did not happen. ..............................................................................................57

(2)   No Houston ISD board member has knowledge of the incident between two private
individuals described in Finding 3 of TEA's Report Regarding TEA Allegation
Three.........................................................................................................................58

B.   TEA's Conclusions regarding "so-called" Findings 4–12 in TEA's Report Regarding
Allegation Three are based on an incorrect analysis of applicable state law. ...........60

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

**Legal Analysis of the Fundamental Flaws in the Processes and Procedures Utilized by TEA in this Investigation**............................................................................................62

   A.  There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.....................................................................62

   B.  There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.....................................................................64

   C.  Houston ISD demands that TEA comply with the Texas Education Codes and submit this response to the Commissioner or a designated hearing examiner for an informal review of this investigation. .................................................................................64

**Conclusion** ......................................................................................................................65

## Executive Summary

The findings presented in TEA's Report are fundamentally flawed because they resulted from an investigation that began with a predetermined result. This meant that instead of conducting a fair and unbiased investigation, TEA's investigators searched for a problem to use as a pretext for replacing Houston ISD's elected Board of Trustees with an unelected board of managers. Like many school boards in Texas, Houston ISD's Board of Trustees faces many challenging issues, and its board members often disagree about how the District should move forward. But TEA should not have engaged in this pretextual investigation to punish Houston ISD's board members for their public disagreements and political debate. Disagreement is not dysfunction — it is democracy. Despite disagreements, Houston ISD's Board of Trustees has been diligently working to improve the school district and has seen excellent results in recent years.[5] However, this effort has been hampered by an investigation by TEA that appears to be more interested in finding flaws than in finding the truth.

According to the Preliminary SAI Report, TEA initiated this investigation because of a motion made by Trustee Davila at an October 11, 2018 meeting to consider employment of Dr. Abelardo Saavedra as interim superintendent.[6] The Report states this motion was made "without any prior notice or public deliberation".[7] This statement is demonstrably false on both accounts:

- There was prior notice. Pursuant to Texas law, the Board's agenda was posted more than 72 hours before the meeting and stated that the Board would "[c]onsider employment of interim superintendent and employment contract through September 30, 2019."[8]

- There was public deliberation. Houston ISD's board members publicly deliberated on the motion in open session.

The fact that this motion — made *with* proper notice and *with* public deliberation — purportedly prompted TEA's investigation is extremely troubling and indicates that TEA's investigations are

---

[5]    *See infra*, Background Information, Section A, pp. 12–21.

[6]    **Exhibit 1**, Preliminary SAI Report, pp. 1–2.

[7]    **Exhibit 1**, Preliminary SAI Report, p. 2.

[8]    **Exhibit 2**, Board Agenda for the October 11, 2018 Meeting (publicly posted more than 72 hours before the meeting at which the motion was made).

being used to assault basic democratic principles and undermine board members' constitutional rights.[9]

**Allegation One.**  The Report asserts TEA received complaints about an alleged violation of the Texas Open Meetings Act without disclosing who made these complaints.  TEA has produced no evidence of these complaints, so it is unclear whether any complaints were actually made and, if so, by whom.  Nevertheless, to their credit, TEA's investigators did not simply accept these alleged complaints as true and instead interviewed Houston ISD's board members to get a full picture of what happened.  (Unfortunately, the same cannot be said about how TEA's investigators treated other purported complaints from unnamed sources.)  These interviews of board members and of Dr. Saavedra demonstrated that there was no "secret" meeting that occurred with a quorum of board members.[10]  And although the Report repeatedly *asserts* that the board members who met with Dr. Saavedra "acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees,"[11] the Report *fails to identify* a single action that was actually taken outside of a publicly-called meeting.[12]

Simply put, the facts described in the Report establish that Houston ISD's board members did not violate the Texas Open Meetings Act by informally meeting with Dr. Saavedra in groups of less than a quorum.  As one federal court has explained, the Texas Open Meetings Act does not prevent school board members from discussing district issues outside of formal meetings so long as a quorum is not present for such discussions.[13]  Indeed, the federal court noted that limiting informal discussions outside of formal meetings "would seriously impede the board's ability to

---

[9]    *See infra*, Background Information, Section B, pp. 22–25.

[10]   The Report repeated refers to an October 8, 2019 meeting at a public restaurant at which various board members met with Dr. Saavedra, an experienced and well-respected prior superintendent of Houston ISD, as a "secret" meeting.  But this mischaracterization of this meeting is completely unsupported by any evidence.  There was nothing "secret" about this meeting at a public restaurant.  And contrary to the assertions in the Report, the evidence clearly establishes that no District business was conducted at this meeting.  The Report's findings indicate that the board members who met with Dr. Saavedra discussed various issues they were experiencing, but they conducted no District business.  *See* **Exhibit 1**, Preliminary SAI Report, pp. 9–11.

[11]   **Exhibit 1**, Preliminary SAI Report, pp. 2, 12, 14.

[12]   *See* **Exhibit 1**, Preliminary SAI Report, pp. 8–14.

[13]   *Hispanic Education Committee v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227 ("Assuming that trustees met privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action, these conferences are not meetings of the board.").

function."[14]   In the words of that federal judge: "It is for exactly this reason that notice requirements apply only to meetings involving at least a quorum of members."[15]

**Allegation Two.**[16]   TEA's Report also asserts that Houston ISD board members acted individually on behalf of the board "numerous other times, exceeding the scope of their authority in violation of Texas Education Code § 11.051."  But many of the alleged facts in the Report are either unequivocally false or they significantly mischaracterize actual events.  These errors can be readily explained by the lack of a rigorous investigation by TEA's investigators.  TEA's investigators appear to have simply accepted statements by unnamed administrators as true, who are either mistaken about the events they related or intentionally misled investigators.  TEA's investigators failed to give Houston ISD's board members an opportunity to respond to the allegations made by TEA's unnamed sources. TEA's investigators also failed to corroborate these allegations with other witnesses who could have told TEA's investigators that their unnamed sources are unreliable.[17]

TEA's findings regarding its second allegation are plagued by inaccurate and/or fabricated accounts of events.  But the conclusions TEA reaches based on these findings are also infected with a foundational misunderstanding of the law.  A board member cannot exceed his or her authority under Section 11.051 by merely communicating information, expressing opinions, or requesting information.  In this case, all of the emails or accounts of situations presented by TEA as a board "overreach" were merely board members expressing an opinion, communicating information, or requesting information. No board members exceeded their authority by simply communicating information, expressing opinions, and requesting information.

---

[14]   *Id.*

[15]   *Id.*

[16]   This Response generally responds to TEA's contentions regarding Allegation Two and contains specific responses to the factual misstatements and legal misstatements regarding several specific findings in TEA's Report.  The **TH Supplemental Response** contains specific responses to the remainder of these factual misstatements and legal missteps for the appropriate board member or board members..

[17]   For example, TEA's Report recounts a meeting involving an unnamed administrator and four individuals.  This meeting is pure fiction.  TEA's investigators could have easily discovered that this unnamed administrator was providing false information if they had contacted any of these four individuals.  However, TEA's investigators failed to speak with any of these individuals to corroborate the story told by the unnamed administrator.  If they had, they could have easily discovered that this meeting never occurred.  **Exhibit 3**, Davila Declaration, ¶¶ 28–29.

**Allegation Three.**[18]  Lastly, TEA's investigators allege that Houston ISD has violated contract procurement rules while selecting vendors and contractors by adopting the conclusions reached in an "Internal Audit."  It is unclear from TEA asked any licensed attorney to review the Internal Audit.  However, the District asked for two separate and independent legal opinions regarding the Internal Audit — one in May 2015 and the other in June 2016.[19]  Both legal opinions independently concluded that the Internal Audit misinterpreted state law.[20]

None of the findings under Allegation Three demonstrate any violation of state procurement law.  Moreover, many of the factual allegations are simply untrue — likely because TEA's investigators failed to corroborate the one-sided account of events they received.

Based on TEA's factual findings and legal analysis, TEA's investigators arbitrarily and capriciously recommend that the Commissioner of Education lower the District's accreditation status, appoint a conservator, and replace the elected Board of Trustees with an unelected board of managers pursuant to Section 39.057(d) of the Texas Education Code.  Although the first two of these actions would be completely unwarranted based on *this* investigation, the Commissioner has the legal authority to lower the District's accreditation status or appoint a conservator based on a special accreditation investigation if such action is warranted by a proper special accreditation investigation.  However, the Commissioner has no legal authority to replace the Board of Trustees in this case.  The Report's recommendation that the Commissioner appoint a board of managers invites the Commissioner to commit an unlawful act in violation of Section 39A.004 of the Texas Education Code.[21]  The Commissioner has no legal authority to appoint a board of managers in Houston ISD.

The Texas Legislature has recognized that preliminary findings from special accreditation investigations are just that — preliminary.  Accordingly, the Legislature has provided that a school

---

[18]  This Response generally responds to TEA's contentions regarding Allegation Three and contains specific responses to two of the findings under Allegation Three.  The remainder of the factual misstatements and legal errors under Allegation Three are discussed in the TH Supplemental Response.

[19]  These legal opinions are attached as **Exhibit 11** and **Exhibit 12**.

[20]  *See* **Exhibit 11**, **Exhibit 12**.

[21]  Section 39A.004 prohibits the Commissioner from appointing a board of managers unless one of the following is true: (1) the District has a current accreditation status of accredited-warned or accredited-probation (2) the District fails to satisfy any standard under section 39.054(e); or (3) the District fails to satisfy financial accountability standards.  TEX. EDUC. CODE § 39A.004.  None of these is true of Houston ISD.  Houston ISD's current accreditation status is "accredited."  Houston ISD has not failed to satisfy any standard under section 39.054(e).  And Houston ISD has not failed to satisfy any financial accountability standards.

district has the right to have preliminary findings reviewed in good faith by the Commissioner or a designated hearing examiner.[22]

Houston ISD objects to the Report's findings, legal analysis, discussion, conclusions, and proposed corrective measures and sanctions.  Houston ISD expressly requests the appointment of an unbiased hearing examiner to (1) review the Report's findings, legal conclusions, and proposed corrective measures and sanctions and (2) compel TEA's investigators to comply with TEA's investigation procedures by disclosing all of the evidence that allegedly supports their allegations.

In order to address the legal errors and factual misstatements undergirding the faulty findings, analysis, and recommendations in the Report, Houston ISD submits this Response with the attached exhibits in the sincere hope that consistent with the Commissioner's statutory obligation, either the Commissioner or a designated hearing examiner will conduct a good faith review of this investigation to ensure that TEA's investigations are conducted in good faith with transparency.

---

[22]   TEX. EDUC. CODE § 39.058(b).

Houston ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

## Introduction

TEA has asserted three allegations against Houston ISD after allegedly receiving an unidentified number of complaints from individuals hiding behind the cloak of anonymity. But TEA's investigation into these allegations was skewed by fundamental misunderstandings of Texas law and by a failure to fairly investigate by engaging in a balanced investigation.

TEA's first allegation relates to the Texas Open Meetings Act (or "TOMA"). TEA's investigators interviewed board members and requested documents regarding this allegation. But the evidence from these interviews revealed that a quorum did not meet or attempt to take action outside of a formally called meeting. Thus, as a matter of law, there is no TOMA violation because it is not a violation of TOMA for board members to engage in multiple, successive meetings.[23] Despite this, the investigators refused to acknowledge that this first allegation lacks merit and instead attempted to pad the investigation with new allegations.

TEA's investigators added two new allegations that involved criticisms of board members and conducted a one-sided investigation of these allegations. Notably, the investigators did not interview board members or provide the District with notice of a document request. If TEA's investigators were interested in finding the truth, why didn't they corroborate the statements they claim to have received from unnamed witnesses? Why didn't they give Houston ISD time to provide them with the context necessary to place the documents fed to investigators? By failing to get both sides of the story, TEA's investigators ended up recommending findings that either mischaracterize the truth or, in some cases, are pure fiction. Compounding this error, TEA's investigators reach conclusions that are legally wrong, finding violations of law where none exist.

---

[23]  *Hispanic Education Committee*, 886 F. Supp. at 610 ("Assuming that trustees met privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action, these conferences are not meetings of the board.").

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

## Background Information

### A.  Current Conditions Within Houston ISD

TEA's investigators spent a significant amount of time and space including criticisms of former trustees and of conduct that has nothing to do with the current Houston ISD Board of Trustees.   Instead of spending so much time focused on the distant past, TEA's investigators should have spent more time focused on the District's current condition, which shows that Houston ISD is an academically and financially healthy school district with an upward trajectory.

The Commissioner should take the District's current condition into consideration because although the Commissioner could adjust the District's accreditation status "if the commissioner determines that the action is necessary to improve any areas of the district's performance. . . including the district's financial accounting practices."[24]  The Commissioner should not adjust Houston ISD's accreditation status because there are great things happening in the Houston Independent School District.  The following provides a brief list of some of Houston ISD's major recent achievements.

### *(1) Curriculum and Instruction*

Houston ISD is currently an academically healthy school district that has seen excellent improvement in campus performance and student outcomes. The Board of Education's mission is to equitably educate the whole child so that every student graduate with the tools to reach their full potential. Houston ISD's vision is that every child shall have equitable opportunities and equal access to an effective and personalized education in a nurturing and safe environment. Houston ISD is a global district in a global city. The District places an emphasis on ensuring its students graduate ready for the world — possessing the characteristics they need to be successful in college and to compete in today's global workforce.

With an enrollment of over 214,000 students, Houston ISD is the seventh-largest public-school system in the nation and the largest in Texas. The District encompasses 332 square miles within Harris County, Texas including 51% of the current geographic area of the City of Houston and all or part of four other cities and villages. Houston ISD is one of the most ethnically diverse school districts in Texas: 61.2 percent of students are Hispanic, 24 percent are African American,

---

[24]   TEX. EDUC. CODE § 39.057(e).

8.7 percent are White, 4.1 percent are Asian, and 2 percent are of other ethnicities. About 100 different languages are spoken by students throughout the District.

Houston ISD provides services through 280 schools, of which 8 are early childhood centers (pre-kindergarten for four-year-old students), 160 elementary schools (grades K–5), 38 middle schools (grades 6–8), 37 high schools (grades 9–12) and 37 combination/alternative sites. The average age of the District's school buildings is 46 years. The District offers many education programs in addition to general education including special education services, gifted and talented programs, career and technical education, dual language programs, and various magnet programs.

Houston ISD has continued to have academic growth across all content areas as measured by the State's academic accountability system.  This past year academic gains were made at the elementary level improving from 61% to 67% at the "approaches" standard; from 29% to 34% at the "meets" standard; from 12% to 13% at the "masters" standard.  At the middle school level there was consistency with a 64% rating at the "approaches" standard; an increase from 30% to 33% at the "meets" standard; and an increase from 35% to 37% at the "masters standard.  High school students achieved an increase from 69% to 72% at the "approaches" standard; from 41% to 46% at the "meets" standard; and from 9% to 13% at the "masters" standard.  In comparison to the six neighboring school districts which surround Houston ISD's boundaries and have similar demographics, Houston ISD outscores them in overall district index score, in student achievement, and in school progress.

Houston ISD's graduation rates have progressively increased over the last 3 years.  Rates for the relevant years are as follows: Class of 2015 at 89.1%, Class of 2016 at 92.3% and Class of 2017 at 94.3%.[25]

In 2018, 92% of HISD's campuses — 252 out of 275 rated campuses — were rated "Met Standard."

The District showed more growth than the state average in grades 3 through 8 in both reading and math.  The District also illustrated more growth than the state average in Algebra and English I.

For grade levels 3 through 8, Houston ISD showed increases in the percentage of students at or above the "Approaches Grade Level Standard" in reading, math, science, and social students

---

[25] Preliminary data reported by Houston ISD on TEASE system.

(in English and Spanish combined), with the District's reading and math increases exceeding those of the state.

For grade levels 3 through 8, the 2018 District STAAR first administration reading results increased by three percentage points compared to 2017. Changes ranged from no change in seventh grade to a six percentage-point increase in fifth grade. The 2018 district STAAR first administration mathematics results increased by three percentage points compared to 2017. Changes ranged from no change in grade seven to a five percentage-point increase in grades four and eight.

For grade levels 3 through 8 performance at the Meets and Masters Grade Level standards remained the same or increased for all content areas.

The 2018 STAAR End of Course ("EOC") Exam results for all students tested showed improvement in Algebra I, English I, English II, and U.S. History when compared to the Spring 2017 results at the Approaches Grade Level standard. The District's increases in Algebra I and English I exceeded those of the state.

Between 2015 and 2018, the proportion of all students tested performing at or above the Meets Grade Level standard increased for every racial/ethnic group in every subject. These increases included 13 percentage points for African American students on Algebra I EOC exams and 14 percentage points for Hispanic students on U.S. History EOC exams.

Gains made by the "Superintendent's Schools" and "Achieve 180" schools from 2017 to 2018 on the STAAR EOC exams exceeded District and state increases for Algebra I (ranging from six to 14 percentage points) and English II (ranging from six to seven percentage points).

In 2018, although the District did not officially receive an accountability rating as result of Hurricane Harvey, if it had received an accountability rating, the District would have received a "B" rating with 84 out of 100 possible points.

For 2019, the District's overall academic rating increased by 4 points from an 84 to an 88, continuing to excel by maintaining its "B" rating.

A majority of Houston ISD's campuses — 142 campuses overall — received at least one distinction designation from TEA.  And 24 Houston ISD schools earned ALL distinctions.

In 2019, Houston ISD exited nine campuses from the state's "Improvement Required" list.

In 2019, according to the ratings released by TEA, 92 percent of Houston ISD schools (250 out of 271 rated campuses) earned a passing grade. For the first time, all Houston ISD schools received a letter grade under the state's new A–F rating system, which was implemented in 2018. Houston ISD campuses performed extremely well in the state's rating system: 57 Houston ISD campuses earned A's, 78 earned B's, 86 earned C's and 29 earned D's. A minimum grade of "D" is required for a school to receive a passing rating.

Under the A–F system, campuses must receive a grade of "D" or better in order to meet state accountability standards. Based on TEA's accountability system, only 21 HISD schools received an "F" rating for the 2018-2019 school year, including: Ashford, Isaacs, C. Martinez, Northline, Osborne, Robinson, Rucker, Seguin, Smith, Whidby, and Young Elementary Schools; Deady, Edison, E-STEM Central, Fleming, High School Ahead Academy, Key, Sugar Grove, Thomas, and Williams Middle Schools; and Wheatley High School.

If not for the provision introduced into TEA's 2018 Accountability Manual, Houston ISD would have 6 fewer "F" campuses. The provision states that "if a campus receives an 'F' in three of the four domain calculations (Student Achievement, Academic Growth, Relative Performance, Closing the Gaps), the highest scaled score a campus can receive for the overall rating is a 59."

This indicates that the highest score that Osborne and Ashford Elementary Schools; Deady, E-STEM Central, and Edison Middle Schools; and Wheatley High School could earn is a 59, an "F" rating, which puts them in IR status.

Wheatley High School demonstrated tremendous academic progress and earned a passing grade of "D" this year, with a calculated score of 63. But based on the provision, the school could only obtain a maximum score allowed of 59. The district is implementing strategies to ensure Wheatley exits IR in the 2019–2020 school year with a minimum grade of "C".

Additionally, the District has adopted several programs to target high need areas in the District such as ACHIEVE 180. ACHIEVE 180 is a research-based action plan to support, strengthen, and empower underserved and underperforming HISD feeder pattern communities to increase student achievement. These are ten schools that have remained on the state's "Improvement Required" list for five or more years. Thirty school support officers report to the area superintendents. They provide leadership to principals, align resources and support for teachers, and ensure that the district is providing equitable and quality educational opportunities to students. HISD's organization is designed to emphasize teaching and learning, align school goals and programs for sustained improvement, eliminate duplication of services, and maintain compliance with both federal and state requirements.

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

### *(2) Finance*

Houston ISD is currently a financially healthy school district.  The District believes that there is no responsibility as great as that of educating its youth, and all of its efforts lead back to the classroom. Given that the District's academic advancements are dependent upon its fiscal successes, it is imperative that HISD continue to improve upon its reporting proficiencies. The following text cites awards received by the District for financial reporting excellence and the related acknowledgments.

**GFOA Certificate of Achievement:** The Government Finance Officers Association of the United States and Canada ("GFOA") awarded a Certificate of Achievement for Excellence in Financial Reporting to the District for its Comprehensive Annual Financial Report for the fiscal year ended June 30, 2017. This was the 45th consecutive year that the District has achieved this prestigious award. In order to be awarded a Certificate of Achievement, a District must publish an easily readable and efficiently organized comprehensive annual financial report. This report must satisfy both generally accepted accounting principles and applicable legal requirements.

A Certificate of Achievement is valid for a period of one year only. We believe that our current comprehensive annual financial report continues to meet the Certificate of Achievement Program's requirements and we are submitting it to the GFOA to determine its eligibility for another certificate.

**ASBO Certificate of Excellence:** The District received the Association of School Business Officials' ("ASBO") Certificate of Excellence in Financial Reporting for the fiscal year ended June 30, 2017. The District has received this award for 39 consecutive years. This award certifies that the Comprehensive Annual Financial Report substantially conforms to the principles and standards of financial reporting as recommended and adopted by the ASBO.

The District has been able to maintain a healthy financial system even though in August 2017 a major hurricane swept through the District and caused billions of dollars of damage to the City. Hurricane Harvey caused damage to various facilities of the District, ranging from minor damage to complete destruction of certain buildings. The District spent approximately $76 million from the General Fund on repairs. To date, the District has received approximately $40 million in insurance proceeds and has submitted requests for FEMA reimbursement. Additionally, Harvey related flood damage required the closure of four elementary schools. These four schools are being rebuilt at an estimated cost of $126 million using General Fund reserves and Capital Renovation funds derived from tax increment reinvestment zones.

The District has maintained an "A" rating in the TEA's FIRST rating for the last four years. Before that, the District earned all possible points for the 2014-2015 FIRST Report. Prior to 2014-

2015 report, HISD has earned a rating of "Superior Achievement" all but one time  since the creation of the FIRST rating in 2002.  The School Financial Integrity Rating System of Texas ("FIRST"), ensures that Texas public schools are held accountable for the quality of their financial management practices and that they improve those practices. The system is designed to encourage Texas public schools to better manage their financial resources to provide the maximum allocation possible for direct instructional purposes.

### *(3) Governance/Training*

Houston ISD's Board of Trustees have adopted procedures and governance models to help them implement strategies to improve governance and focus on student outcomes.

In 2019, the Board of Trustees adopted the Lone Star Governance Framework. The intention of Lone Star Governance is to provide a continuous improvement model for governing teams (board members in collaboration with their Superintendents) that choose to intensively focus on one primary objective: improving student outcomes. Lone Star Governance accomplishes this intense focus through tailored execution of the five points of the Texas Framework for School Board Development: Vision, Accountability, Structure, Unity, and Advocacy.

Additionally, the Houston ISD Board of Trustees has hired a coach to guide them through this framework.  The Board has also adopted policies regarding time limits on discussion and monitors its progress towards achieving the tenets of the Lonestar Governance framework.  As part of this process the Board has committed to allotting a majority of its time in board meetings to focus on student outcomes amongst other things. Below are the mission, vison, beliefs, constraints, and goals adopted by the Board.

**Mission.**  The Board of Education's mission is to equitably educate the whole child so that every student graduate with the tools to reach their full potential.

**Vision.**  Every child shall have equitable opportunities and equal access to an effective and personalized education in a nurturing and safe environment. Our students will graduate as critical thinkers and problem solvers; they will know and understand how to be successful in a global society.

**Beliefs.**  Houston ISD has adopted the following beliefs that reflect its mission and vision:

- We believe that equity is a/the lens through which all policy decisions are made.

- We believe that there should be no achievement gap among socio-economic groups or children of ethnic diversity.

- We believe that the district must meet the needs of the whole child, providing wraparound services and social and emotional supports.

- We believe our classrooms/schools should be safe, vibrant, joyful spaces where students are guaranteed access to a challenging and deep educational experience.

- We believe that instruction should be customized/personalized to meet the learning needs for each individual child, including students with disabilities, gifted and talented students, and English Language Learners, so they have the support and opportunity they need to flourish.

- We believe that recruitment and retention of qualified and effective personnel are the keys to enhancing the quality of education and increasing student achievement.

- We believe that the community has a right to transparent operations across the district in all schools, departments, and divisions.

- We believe that meaningful engagement with the community is important in all major decision-making.

Houston ISD has adopted the following goals that reflect its mission, vision, and beliefs:

**Goal 1.**  The percentage of students reading and writing at or above grade level as measured by the percent of students at the Meets Grade Level standard on STAAR for grade 3 through English II shall increase by three percentage points annually from 37% to 46% between spring 2017 and spring 2020.

- **Goal Progress Measure 1.1:** End of year reading data collected on the District-wide screener shall annually show a three-percentage point improvement in the percentage of students reading on grade level from 38% to 44% between spring 2018 and spring 2020. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 1.2:** Grades 4 and 7 students shall be assessed in writing in the Fall and Spring; percent of students meeting the grade level standard shall increase at least three percentage points annually from 22% in spring 2018 to 28% in spring 2020. Results will be presented to the board after the fall and spring testing windows.

**Goal 2.**  The percentage of graduates meeting the Global Graduate standards as measured by the College, and Career, Readiness component of the Texas accountability system shall increase

three percentage points annually per year from the 2017 graduates baseline of 52 percent up to 67 percent by 2022.

- **Goal Progress Measure 2.1:** The percentage of students completing (earning a 70 or better) a career and technical education (CTE) course shall be reported for each semester and shall show improvement of 2 percentage points annually from 63.0 percent in Spring 2017 to 69.0 percent in Spring 2020.

- **Goal Progress Measure 2.2:** The percentage of students completing (earning a 70 or better) an Advanced Placement (AP) or International Baccalaureate (IB) course shall be reported for each semester and shall show improvement of 1 percentage point annually from 39.1 percent in Spring 2017 to 42.1 percent in Spring 2020.

- **Goal Progress Measure 2.3:** The percentage of students completing (earning a 70 or better) a dual credit or dual enrollment course shall be reported for each semester and shall show improvement of 1 percentage point annually from 10 percent in spring 2017 to 13 percent in spring 2020.

**Goal 3.**  Among students who exhibit below satisfactory performance on state assessments, the percentage who demonstrate at least one year of academic growth, as measured by the STAAR Progress Measure, shall increase three percentage points annually in reading and in math from 57 percent in spring 2017 to 66 percent in spring 2020.

- **Goal Progress Measure 3.1:** The percentage of students identified as needing intervention in reading on the district's screener who demonstrate growth from the beginning to end of year benchmarks shall increase three percentage points annually from 48% in spring 2018 to 57% in spring 2021. Results will be reported after each testing window.

- **Goal Progress Measure 3.2:** The percentage of students identified as needing intervention in math on the district's screener who demonstrate growth from the beginning to end of year benchmarks shall increase three percentage points annually from 58% in spring 2018 to 67% in spring 2021. Results will be reported after each testing window.

**Goal 4.**  The reading and math performance gap between historically underserved and non-historically underserved student groups, as measured by the average of the percentage-point gaps between economically and non-economically disadvantaged student groups at the Meets Grade Level Standard on STAAR between 1) economically and non-economically disadvantaged student groups, 2) African-American and White student groups, 3) Hispanic and White student groups, 4) English Learners (ELs) and non-English Learners (non-Els), and 5) students receiving special education services and students not receiving special education services, shall annually show a

one-percentage point decrease from an average of 30.3 percentage points in spring 2018 to an average of 27.3 percentage points in spring 2021. Monitoring of student performance for all groups listed above along with the specified gaps will be provided to the board. All student groups should make progress; therefore, if this average gap decreases but the percentage of students at the Meets Grade Level Standard on STAAR for any of the student groups listed in this goal declines, then this goal shall be considered not met.

- **Goal Progress Measure 4.1:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between economically and non-economically disadvantaged students performing at or above benchmark (40th percentile) from 24% to 21% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 4.2:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between English Learners (ELs) and Non-English Learners (Non-ELs) performing at or above benchmark (40th percentile) from 11% to 8% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 4.3:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between students receiving special education services and students not receiving special education services performing at or above benchmark (40th percentile) from 37% to 34% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

Houston ISD has also adopted the following constraints:

**Constraint 1.**   The Superintendent shall not permit the District to operate without a community school and feeder pattern framework, including a definition, processes, and goals.

- **Constraint Progress Measure 1.1:** The District shall launch cohort one of Every Community, Every School with a minimum of 15 schools (5 percent) by the end of the 2017–18 school year and shall increase annually until all schools (100 percent) are served in 2022.

- **Constraint Progress Measure 1.2:** The District shall develop tools for campuses to conduct a needs assessment, to access to a provider database, a data tracker, and

professional development in 2017–18 and shall increase usage annually from 0 percent in Fall 2017 to 100 percent of campuses access the tools and training by 2022.

**Constraint 2.**  The Superintendent shall not require teachers to administer more than two District-created assessments per semester.

- **Constraint Progress Measure 2.1:** The number of District-required, District-created assessments shall not increase from one per semester in fall 2017 to more than two per semester in spring 2020.

**Constraint 3.**  The Superintendent shall not allow struggling schools to operate without highly qualified leaders and teachers in core subjects.[26]

- **Constraint Progress Measure 3.1:** The percentage of campus administrators at struggling schools rated as effective or above shall increase by two percentage points annually from 65 percent in 2017 to 73 percent by 2020.

- **Constraint Progress Measure 3.2:** The percentage of first-year teachers at struggling schools shall decrease by two percentage points annually from 10 percent in 2017 to four percent by 2020.

- **Constraint Progress Measure 3.3:** The percentage of teaching positions at struggling schools held by teachers certified in their assigned subject areas and grade levels shall increase each semester from 99 percent in 2017 until 100 percent is reached and maintained through 2020.

Based on the information presented above, Houston ISD is doing well academically, financially, and the Board of Trustees have been in the process of focusing its attention to student outcomes as can be evidenced by its commitment to the Lone Star Governance Framework and its adoption of goals, goal progress measures, constraints, and constraint progress measures. All of the above information is evidence of a healthy organization that is in no need of state intervention.

---

[26]    Struggling schools include Improvement Required (IR) schools, formerly IR schools, and schools receiving an overall accountability scale score of 65 or less. Teacher qualification should consider certification and experience.

### B. TEA's "Background Information" demonstrates apparent animus toward board members' constitutional rights

The Authors of the Preliminary SAI Report fail to either understand the democratic process or appreciate the parameters of the "Speech and Debate" clauses of both the United States and Texas Constitutions.

In the section of the August 5, 2019 Preliminary SAI Report entitled "Background Information",[27] TEA's staff launches into what can only be described as an *ad hominem* attack upon the decorum with which meetings of Houston ISD Board of Trustees were conducted.  As proof for their allegations, TEA staff use unsubstantiated newspaper comments of outside observers such as a union representative and the Mayor of Houston, Texas relating to the manner in which Houston ISD Board meetings were being conducted.  Additionally, TEA staff cited multiple instances regarding the comments made by board members at public meetings.

In responding to these allegations, Houston ISD will not attempt to deal with each specific allegation set forth in this section of the TEA Report.  No response to the specific allegations is necessary because none of the allegations contained in the "Background Information" portion of the TEA Report appear to be integral to the ultimate conclusions drawn by TEA's,[28] each of which will be discussed below.

At page 7 of the Preliminary SAI Report, TEA Staff complains of the Trustee allocation Fund.  The Report seems to indicate that individual Trustees had full and independent control of equally allocated Bond proceeds in order to address items of need on campuses within their individual Trustee single-member districts.  The TEA finding was that "in August of 2009 the HISD board voted 8-1 to allocate $121.5 million for additional facilities projects in each of the nine trustee's districts. The board members who participated in this vote were former 2009 Board of Trustees, and current Board President Diana Davila. This was called the Trustee Allocation

---

27    **Exhibit 1**, Preliminary SAI Report, pp. 4–7

28    TEA also includes almost a page in the "Background Information" section regarding information from an unnamed senior administrator regarding the Trustee Allocation Fund.  **Exhibit 1**, Preliminary SAI Report, p. 7. Why TEA's investigators included this is anyone's guess — the creation of the Fund is clearly outside the scope of their investigation and was entirely proper.  The Fund was created more than a decade ago and has been used to pay for various projects throughout the District.  Without citing any legal authority, TEA's investigators claim that by approving of the creation of the Fund over a decade ago exceeded their authority.  They are wrong.  Section 11.051 of the Texas Government Code gives the Board of Trustees authority to govern the District.  TEX. EDUC. CODE § 11.051.  And no matter what language was included in the superintendent's contract regarding management of the District, the Texas Legislature has given the Board of Trustees "the exclusive power and duty to govern and oversee the management of the public schools of the" District.  TEX. EDUC. CODE § 11.151.

Fund (TAF)."   As found by TEA "the TAF was funded with residual bond money from the 2007 bonds. The amount of money in the fund totaling $121.5 million was to be split (nine) ways." "The trustees identified how they wanted the funds spent, and a board item was drafted to allocate the fund request from un-allocated to allocated (sic) per the Board vote and approval."  The TEA findings make it clear that in all instances, there was HISD <u>full Board approval</u> for each item of expenditure from the TAF.  Seen in this light, Trustees made individual recommendations for capital projects.  These recommendations were approved in each case by the Board.  By requiring full Board action prior to the approval of individual expenditures, Houston ISD ensured that Board control of the HISD Budget, adopted under Tex. Educ. Code § 44.04 and/or any adopted budget amendments adopted under Tex. Educ. Code § 44.06 were maintained at all times.

Tex. Educ. Code § 11.151(b) provides: The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district.  All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.

The Houston ISD Board of Trustees has the full authority under the aforesaid provision to make whatever allocation of the distribution it saw fit.  In a district as large as Houston ISD with the many capital requirements which are attendant to that size and scale, some methodology to ensure an equitable distribution of capital resources across the entire district would seem to be appropriate.  There was certainly nothing unlawful about the allocation strategy employed by the Houston ISD Board of Trustees in creating the TAF in full cooperation with the District's administration.  It is telling that the TEA report cites no provision of law which would preclude the Board strategy.  That is because there is no such prohibition.  In such instances Tex. Educ. Code § 11.151(b) requires that "the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.   The Preliminary SAI Report ignores the express statutory limitation upon its prerogative.  Finally, it must be noted that the allegations at issue with respect to the TAF are a decade old.  The fact that TEA staff feels compelled to dredge up such old allegations, in an effort to sanction and remove a Board of Trustees which is now composed almost entirely of different individuals would seem to be an act of desperation to reach a pre-ordained result.  Such actions should not be countenanced.

Nevertheless, the self-appointed role which TEA Staff appear to have created for themselves as the arbiter of proper decorum of a publicly elected governmental body is a troubling overreach of regulatory authority.  TEA investigators have not and cannot cite any legal authority granting the Agency any authority to regulate the nature of local debate on matters which come

before the Houston ISD Board of Trustees for discussion and disposition.  To the contrary, interference with local deliberative processes are prohibited by the Constitutions of the United States and the State of Texas.

The Speech or Debate Clause in the United States Constitution states that members of both Houses of Congress

> . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their Respective Houses, and in going to and from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S CONST. art. I, § 6, cl. 1.  The intended purpose of this provision is to prevent the President or other officials of the executive branch from having members arrested on a pretext to prevent them from voting a certain way or otherwise taking actions with which the President might disagree. *See, e.g.*, *Tenney v. Brandhove*, 341 U.S. 367, 377 (1972).

The United States Supreme Court has explained that the speech or debate clause represents the culmination of a long struggle for parliamentary supremacy:

> Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature.

*United States v. Johnson*, 383 U.S. 169, 178 (1966); *see Powell v. McCormack*, 395 U.S. 486, 502 (1969).  The "immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster,* 408 U.S. 501, 507 (1972);  *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1881); *see also Coffin v. Coffin*, 4 Mass. 1, 28 (1808).

The protection of this clause is not limited to words spoken in debate. "Committee reports, resolutions, and the act of voting are equally covered, as are 'things generally done in a session of the House by one of its members in relation to the business before it.'" *Powell v. McCormack,* 395 U.S. 486, 502 (1969) (quoting *Kilbourn v. Thompson,* 103 U.S. 168, 204 (1881)).  So long as legislators or their local equivalents are "acting in the sphere of legitimate legislative activity," they are "protected not only from the consequence of litigation's results but also from the burden of defending themselves." *Tenney*, 341 U.S. at 376–77; *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967);  *Powell v. McCormack*, 395 U.S. 486, 505 (1969).

Similar clauses in many state constitutions protect members of state legislatures in the United States. *See, e.g.*, TEX. CONST. art. III, § 21.  State courts have routinely extended the rights conferred by the state versions of the speech or debate clause to members of the governing bodies of local governments and political subdivisions of the various states.  *See, e.g.*, *Davenport v. Garcia*, 832 S.W.2d 4, 12–13 n.23 (Tex. 1992) (citing *State v. Beno*, 341 N.W.2d 668 (Wis. 1984)).

In Texas, the equivalent of the Speech and Debate Clause is set forth in the Texas Constitution, which provides:

> WORDS SPOKEN IN DEBATE.  No member shall be questioned in any other place for words spoken in debate in either House.  The standard for application of this and similar provisions in the Constitutions appeared to be whether the comments were within the sphere of legitimate legislative activity." *United States v. Brewster,* 408 U.S. 501 (1972).

TEX. CONST. art. III, § 21.  The Speech and Debate Clause in the Texas Constitution is similar to the clause in the United States Constitution.  *Bowles v. Clipp*, 920 S.W.2d 752, 758 (Tex. App.— Dallas 1996, writ denied) (comparing TEX. CONST. art. III, § 21 with U.S. CONST. art. I, § 6).

It is clear the Trustees have general oversight responsibilities towards the management of the District:

> The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the

agency may not substitute its judgment for the lawful exercise of those
powers and duties by the trustees.

TEX. EDUC. CODE § 11.151(b).

The comments which TEA Staff find to be objectionable were made during the course of public debate concerning legitimate and specific functions of the Houston Independent School District.   The fact that these comments might make members of the public or other Trustees feel uncomfortable does not remove the constitutional protections of these comments.   The remarks made by Houston ISD Trustees were privileged remarks made in the course of the performance of their duties.  At public meetings, Trustees are given a forum to make remarks concerning items on the Agenda.

Any content-based objections to board members' speech, amount to nothing less than blatant censorship of the Trustees' free speech rights protected by the First Amendment of the Unites States Constitution and Article I, § 8 of the Texas Constitution.   TEA's criticisms of Trustees for making these comments, or the Board President for not *sua sponte* silencing the Trustees, is another example of TEA's attempt to censor free speech. Each of the Trustee comments cited in the Report was made in the exercise of the Trustees constitutionally protected rights, TEA's after-the-fact criticism of these comments is problematical at best.

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

### Houston ISD's Response to Allegation One

At Allegation One of its Preliminary SAI Report[29] TEA Staff poses the investigative question as follows:

> Did the Houston ISD Board of Trustees exercise decision making powers
> without deliberating in a public quorum of trustees or posting a public
> meeting notice as required by Tex. Gov't. Code Chapter 551 Open
> Meetings?

For both the factual and legal reasons discussed below, the answer to TEA's question is a resounding "no."  TEA's investigators cannot, in good faith, shoehorn the facts of this case into a TOMA violation unless they choose to willfully mischaracterize the evidence, turn a blind eye to their own findings, and ignore the law.

TEA's own findings demonstrate that a quorum of board members did not exercise decision making powers outside of a publicly posted meeting.  TEA's findings show that various board members informally met with a former superintendent of Houston ISD for advice and counsel.  At no time was a quorum present.  No board member exercised decision-making powers.  And no board member attempted to exercise decision-making powers.  There is simply no cognizable violation of the Texas Open Meetings Act in this case.

### A. TEA's conclusion that Houston ISD's board members violated TOMA based on informal meetings in less than quorum is wrong as a matter of law.

The Preliminary SAI Report is founded on the faulty legal premise that TOMA's civil provisions can be violated by successive meetings of less than a quorum of board members.  As a matter of law, TOMA's civil provisions cannot be violated by successive meetings of less than a quorum.[30]  The United States Court of Appeals for the Fifth Circuit has held that TOMA's civil

---

[29]  **Exhibit 1**, Preliminary SAI Report, p. 8

[30]  *Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227, at *4 (5th Cir. 1995) (affirming the district court's opinion and holding that TOMA's civil provisions cannot apply unless a quorum of board members is present); *Hispanic Educ. Comm. v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994) (holding that it did not violate TOMA for Houston ISD board members to meet in several "overlapping clusters" of board members in groups of less than a quorum to discuss a potential superintendent candidate).

provisions cannot be violated by Houston ISD unless at least five board members are present at a meeting:

> The Board consists of nine members. Therefore, to have a quorum and thereby a meeting to which the TOMA would be applicable, at least five members must be present.

*Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227, at *4 (5th Cir. 1995).

In the lower court's decision, which was affirmed by the Fifth Circuit, a federal judge had concluded that Houston ISD board members did not violate TOMA by meeting privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action. *Hispanic Education Committee v. Houston Independent School District*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227. The federal judge explained that informal meetings with less than a quorum of board members allow board members "to have the best information from all sources." *See id.* "Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the board's ability to function." *See id.* "Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business." *See id.* Notice requirements under TOMA "apply only to meetings involving at least a quorum of members." *See id.* "With fewer than a quorum present, nothing can be formally decided; without a formal decision, no act is taken." *See id.* And "[w]ithout action, there is no illegality." *See id.*

In its Preliminary SAI Report, TEA erroneously concludes that Houston ISD's board members violated TOMA by meeting in groups of less than a quorum to engage "in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement" in "two successive meetings."[31] TEA's own fact findings prove that there was no meeting with Dr. Saavedra that was attended by a quorum of board members, so there was no "meeting to which the TOMA would be applicable."[32] Additionally, the prospect of hiring Dr. Saavedra as an interim was not discussed.[33] In the report, TEA states that it "is irreverent [sic]

---

[31]    **Exhibit 1**, Preliminary SAI Report, p. 12.

[32]    *See Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227 at *4.

[33]    *See* **Exhibits 3–5**. TEA asserts that Dr. Saavedra believed that board members wanted to talk to him that day because they wanted to consider him as a replacement for Dr. Lathan. TEA does not indicate how Dr. Saavedra

that there is no evidence that all five trustees were in the meeting with Dr. Saavedra at the same time, as the trustees violate the open meetings act when they deliberate public business outside of a properly posted public meeting through multiple communications each involving fewer than a quorum."[34]   The United States Court of Appeals for the Fifth Circuit disagrees.  That federal appellate court has held that *it is quite relevant* whether or not a quorum attends a meeting because TOMA's civil provisions cannot be violated unless a quorum is present in a meeting.  *Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227, at *4.  TEA's staff concedes, as it must, that is has found no evidence to show that a quorum attended any meeting with Dr. Saavedra.[35]

The Fifth Circuit has also held that enforcement of the criminal conspiracy provision of TOMA in Section 551.143 (which has since been declared unconstitutional and replaced by the Texas Legislature) "is limited to the local prosecutor."  *Id.*  Limiting board members' ability to discuss school district issues with one another in informal meetings of less than a quorum and outside of formal meetings would seriously impede the District's ability to function.  Requiring board members to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.  Restricting the board members' opportunities to inform themselves, to negotiate, to build coalitions, and to propose tentative ideas would be a disservice to the voters and students of Houston ISD.

### B. TEA's own fact findings demonstrate that there was no violation of the Texas Open Meetings Act.

Based on TEA's own findings, there was no violation of the civil provision of the Texas Open Meetings Act in this case because TEA's own findings demonstrate that a quorum of board members did not meet to discuss the potential replacement of the current interim superintendent.  Additionally, TEA's own findings demonstrate that there was no attempt to exercise decision making powers without deliberating in a properly noticed, public meeting.

---

came to this belief.  However, it is clear from TEA's Report that it is not based on anything that was told to Dr. Saavedra.  *See* **Exhibit 1**, Preliminary SAI Report, p. 13 (noting that Dr. Saavedra "concluded that the board members were interested in hiring him to be the new interim superintendent").  Whatever Dr. Saavedra may have assumed, it is undisputed that there was no discussion of hiring him as interim superintendent.  When Dr. Saavedra summarized the issues he discussed with various board members, his summary did not include any discussion of considering him as interim superintendent.  *See* **Exhibit 1**, Preliminary SAI Report, pp. 13–14.

[34]   **Exhibit 1**, Preliminary SAI Report, p. 13.  (Presumably TEA's investigators meant it is "irrelevant", not "irreverent".  Either way, they are mistaken.)

[35]   **Exhibit 1**, Preliminary SAI Report, pp. 12–13.

TEA instigated a Special Accreditation Investigation and sent the District a Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("SAI Notice") dated January 22, 2019.  Apparently, on the same date, TEA issued an amended Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("First Amended SAI Notice") that was substantially similar to the original notice.  Like the original SAI Notice, the First Amended SAI Notice was issued by Jason Hewitt, Director Special Investigations Unit and contained the same described complaint: "Houston ISD Board of Trustees may have violated The Open Meetings Act by deliberating district business prior to a regularly scheduled board meeting regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent."

The complaint described in the SAI Notice and First Amended SAI Notice is not sourced; it is not true; and it is not supported by any evidence.  It's a fishing expedition — and an unsuccessful one at that.  A majority of Houston ISD board members did not meet to discuss the potential removal of the current interim superintendent and the installation of a new interim superintendent prior to a regularly scheduled board meeting.[36]

Pursuant to the First Amended SAI Notice, TEA conducted an onsite investigation, reviewed documents, and conducted interviews with Board Members and the District's administration.  On February 8, 2019, the District received notice that the documents requested in the First Amended SAI Notice should be provided by February 22, 2019.  The District provided all requested documents in a timely manner.

During the course of its investigation, TEA obtained no evidence that five or more Houston ISD board members deliberated regarding the potential removal of the current interim superintendent at a meeting with a quorum of board members outside of a regularly scheduled board meeting.

TEA Staff appears to allege that the Board improperly held these private meetings in numbers less than a quorum in order to circumvent the formal requirements of the TOMA, in violation of the criminal conspiracy provision, Section 551.143.  That provision is inapplicable for two reasons.  First, enforcement is limited to local prosecutors because it is a criminal statute.  *See Hispanic Educ. Comm. v. Houston Indep. Sch. Dist.*, No. 95-20029, 1995 U.S. App. LEXIS 42227, *4 (5th Cir. 1995) (emphasis added).  Second, approximately one month after the First Amended SAI Notice was issued, the Texas Court of Criminal Appeals declared Section 551.143 to be unconstitutionally vague and invalidated it.  *State v. Doyal*, No. PD-0254-18, 2019 Tex. Crim. App. LEXIS 161, at *2 (Tex. Crim. App. Feb. 27, 2019).

---

[36]   *See* **Exhibits 3–5.**

On April 24, 2019, in the wake of the *Doyal* decision, the Commissioner requested an advisory opinion from the Texas Attorney General addressing whether "walking quorums" were prohibited by the remaining civil provisions of TOMA.  On May 24, 2019, the Texas Attorney General issued an advisory opinion (KP-0254) erroneously concluding that "walking quorums" were prohibited by the civil provisions of TOMA.[37]  The Texas Attorney General's advisory opinion conflicts with the holdings in *Hispanic Education Committee v. Houston Independent School District*, No. 95-20029, 1995 U.S. App. LEXIS 42227 (5th Cir. 1995) and *Hispanic Education Committee v. Houston Independent School District*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227.  Inexplicably, the Texas Attorney General failed to cite or discuss either of these cases.[38]  Therefore, at best the Texas Attorney General's office is unaware of these cases — at worst, the Texas Attorney General's office chose to ignore relevant caselaw.[39]  Either way, this failure renders the attorney general's opinion untrustworthy.

---

[37]   **Exhibit 1**, Preliminary SAI Report, Exh. 1.3.

[38]   *Id.*

[39]   *See id.*  Instead of discussing these highly relevant cases, the Texas Attorney General relies almost solely on *Esperanza Peace & Justice Center v. City of San Antonio*, a case in which a federal court held that city council members violated TOMA by meeting in groups of less than a quorum in order to prepare a final draft of a budget, which all council members signed before the public meeting. 316 F. Supp. 2d 433, 471–78 (W.D. Tex. 2001). But there are at least three, significant problems with attempting to apply *Esperanza* to this case.

First, *Esperanza* cannot be applied to the facts of this case because there is no allegation of any written joint statement by Houston ISD's board members.  In *Esperanza*, the court's holding hinged on the fact that at the public meeting the "council merely confirmed the deal already memorialized in the consensus memorandum" signed by all council members before the meeting.  316 F. Supp. 2d at 478.  Here, it is undisputed that there was no written agreement before the public meeting.

Second, *Esperanza* cannot be applied to the facts of this case because what happened in this case is no different than what happened in *Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227 (5th Cir. 1995).  The district court in *Hispanic Education Committee* explained that the successive meetings of board members did not violate TOMA because there was no attempt to appoint a superintendent "without properly obtaining approval by the entire board in public."  *Hispanic Educ. Comm. v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994) ("Regardless of earlier discussions, Paige was elected in an open meeting that fully satisfied the requirements of Texas law.").  Here, it is undisputed that regardless of TEA's mischaracterizations of the board members' discussions with Dr. Saavedra, the motion to offer him an interim superintendent contract was made in an open meeting that fully satisfied the requirements of Texas law.  This case is indistinguishable from *Hispanic Education Committee v. Houston ISD*.

Third, *Esperanza* cannot be applied to the facts of this case because the reasoning in *Esperanza* was based, at least in part, on the "walking quorum" provision in TOMA, i.e., Section 551.143.  *See Esperanza*, 316 F. Supp. 2d at 473.  But Section 551.143 is void because was determined to be unconstitutional.  Without this section, it is

On the same day the Texas Attorney General issued this advisory opinion, TEA prepared a second amended Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("Second Amended SAI Notice").  The Second Amended SAI Notice contained no notice of any alleged violation of TOMA.  Although TEA's Second Amended SAI Notice removed any allegations regarding an alleged TOMA violation, TEA's Report finds a TOMA violation where none exists based on several, clear errors.

> ### *(1) TEA's Report falsely claims that the motion to hire a new superintendent was made with no prior notice and no public deliberation.*

Although they fail to assert any alleged violation regarding the board members' actions at the October 11, 2018 meeting, TEA's investigators assert that their investigation was prompted by a motion made at the October 11, 2018 meeting "to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was under consideration."[40]  This finding is patently absurd and indisputably false.

The posted agenda for the October 11, 2018 meeting, attached as **Exhibit 2**, specifically lists two publicly posted items relevant to the motion:

> C-1 Personnel
>
> a) **Deliberate the duties of the interim superintendent of schools**, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members (including board committees); **evaluations of the interim superintendent** and chief audit executive, **consideration of compensation, and contractual provisions.**
>
> d) **Consider employment of interim superintendent and employment contract through September 30, 2019**.

(emphasis added)

Additionally, the Report's statement that there was no public deliberation is also patently false.  At the public meeting board members publicly deliberated regarding this motion.

---

unlikely that *Esperanza*'s holding would be the same.

[40]   **Exhibit 1**, Preliminary SAI Report, p. 7.

### (2) TEA's Report misquotes the definition of a walking quorum from the Texas Open Meetings 2018 Handbook

TEA's Report also errs when it claims that the Texas Open Meetings 2018 Handbook states that "a walking quorum occurs when a governmental body deliberates about district business without a quorum being physically present in one place at one time."[41]  TEA is simply wrong about TOMA and about what the Handbook says.  The Handbook does not say that mere deliberations by less than a quorum would violate TOMA.  The Handbook does say that a governmental body could violate TOMA if a quorum *takes an action* outside of a public meeting and then merely ratifies that action later, at a public meeting.[42]

Here, there is simply no evidence that any action was taken outside of a properly noticed, public meeting.  A quorum of board members did not execute an interim superintendent contract with Dr. Saavedra and attempt to ratify it at the board meeting.  Rather, board members merely met with Dr. Saavedra.  During those meetings with Dr. Saavedra, there was no discussion of the interim superintendent position. However, regardless of what was discussed, there cannot be a violation of TOMA because no action was taken outside of a public meeting.

### (3) TEA falsely contends that board members violated TOMA by meeting in groups of less than a quorum.

TEA's Report falsely states that "holding two successive meetings attended by a quorum of the HISD Board of Education [sic]" violated TOMA.[43]  As discussed above, the civil provisions of TOMA do not apply unless a quorum is present for a meeting.[44]  *Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227 at *4; *Hispanic Education Committee*, 886 F. Supp. at 610.

TEA's Report is also wrong when it states that it violates TOMA for board members to "deliberate public business outside of a properly posted public meeting through multiple

---

[41]   **Exhibit 1**, Preliminary SAI Report, p. 12.

[42]   *See* Texas Open Meetings 2018 Handbook, p. 20 (explaining that it would violate TOMA if board members reached a consensus, memorialized the consensus in a memorandum containing the signatures of at least a quorum, and then ratified this memorialized consensus at a later meeting).  This statement is based on the fact pattern in the *Esperanza* case, which (for the reasons discussed above) is inapplicable to the facts in this case.

[43]   **Exhibit 1**, Preliminary SAI Report, p. 12.

[44]   As discussed in *Esparza*, the criminal provision could prevent certain actions (e.g., the signing of a joint statement prior to a meeting) from occurring based on successive meetings of less than a quorum.  But the criminal provision of TOMA is inapplicable in this case because it had been declared unconstitutionally vague and was, therefore, void *ab initio*.

communications each involving fewer than a quorum."[45]  As a matter of law, board members do not violate TOMA by meeting privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action.  *Hispanic Educ. Comm.*, 886 F. Supp. at 610, *aff'd by* 1995 U.S. App. LEXIS 42227.

### *(4) TEA willfully misconstrues a statement by Trustee Santos.*

TEA's report claims that Trustee Santos publicly admitted that she violated the Texas Open Meetings Act based on Finding 14.[46]  This willfully misconstrues Trustee Santos' statement.  Trustee Santos was making the point that the same conduct that is being investigated by TEA and criticized by some board members is substantially similar to conduct in which that other board members have engaged.

In the heat of the moment, Trustee Santos did not make this point as articulately as she could have, but it is clear from the context what she meant.  Trustee Santos did not intend to claim that any board members had violated TOMA.[47]

### *(5) TEA unfairly criticizes board members for not having detailed memories of a meeting that had occurred months before they were interviewed.*

TEA's report unfairly criticizes board members for having "little memory of this highly important meeting" and unfairly accuses board members of making "deceptive statements."

First, it is worth noting that TEA's investigators interviewed board members without legal counsel present and engaged in questioning that was combative, argumentative, and coercive.[48]  In that type of situation, anyone would be nervous and would find it difficult to recall details about a meeting that had occurred months earlier.

Second, although TEA's investigators attempt to characterize meeting Dr. Saavedra as a "highly important meeting," this ignores the evidence in this case.  The board members who met with Dr. Saavedra did not consider the meeting to be "highly important" because at the time they were not considering Dr. Saavedra for interim superintendent and did not discuss the interim superintendent position with him.

---

[45]  **Exhibit 1**, Preliminary SAI Report, p. 13.

[46]  **Exhibit 1**, Preliminary SAI Report, p. 13.  The Report says the conclusion is based on Finding 13, but this is clearly a mistake.

[47]  **Exhibit 5**, Santos Declaration, ¶ 19.

[48]  **Exhibits 3–5**.

Third, although TEA's investigators accuse Trustee Davila of not cooperating with the investigation, their accusations say more about the investigators' own biases than Trustee Davila's conduct.  Trustee Davila retained no text messages regarding this meeting because the meeting was not "highly important" — it was a 10–15-minute meeting with Dr. Saavedra.  Additionally, Trustee Davila did not "falsely claim[] that there were no other trustees present when she met with Dr. Saavedra."[49]  There were no other trustees present when she met with Dr. Saavedra.[50]  When she first arrived, Trustee Vilaseca was present, but Trustee Vilaseca left shortly after Trustee Davila arrived.[51]  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

Fourth, TEA's investigators unfairly criticize Dr. Lira for telling the investigators that his best recollection was that he met with Dr. Saavedra when no other trustees were present.  When Dr. Lira spoke with the investigators, he attempted to answer their questions about a meeting that had occurred months ago.  His best recollection is that he spoke with Dr. Saavedra when no other board members were present, and when other board members arrived, he left shortly after they had all exchanged greetings.

The attached declarations from individual board members regarding the October 8, 2018 visit they had with Dr. Saavedra at a public restaurant demonstrate that the board members did their best to cooperate in good faith with TEA's investigators by answering questions about a meeting that had occurred approximately six months before investigators interviewed them.  It is insincere for TEA to conclude that board members were untruthful during the course of its investigation when the alleged "inconsistencies," TEA's investigators' criticisms, are easily explained by a fuller understanding of what occurred.  Additionally, the board members told TEA's investigators that their answers were given to the best of their recollection because it would be unreasonable to expect the board members to remember every detail about an encounter that happened months prior to be asked about it.  For TEA's investigators to (1) take advantage of the fact that board members provided answers to the best of their ability instead of simply answering "I do not recall" and then (2) describe instances of forgetfulness as moments of deceit is disingenuous and goes to show that the investigation had a predetermined conclusion before it began.

Houston ISD's board members cooperated with this investigation to the best of their ability and responded to combative and argumentative questioning from TEA investigators, by answering to the best of their recollections.  Nevertheless, despite the evidence, which clearly and

---

[49]   **Exhibit 1**, Preliminary SAI Report, p. 14.

[50]   **Exhibit 3**, Davila Declaration, ¶ 8.

[51]   **Exhibit 3**, Davila Declaration, ¶ 8.

unambiguously demonstrates no violation of TOMA's civil provisions, TEA's investigators have arbitrarily and capriciously concluded that by simply meeting with Dr. Saavedra in groups of less than a quorum, board members violated TOMA.  Moreover, nothing in the Board's policy requires individual board members to obtain "prior authorization of the board" before meeting with an individual.[52]

---

[52]  **Exhibit 1**, Preliminary SAI Report, pp. 24–25.  TEA mischaracterizes the meetings with Dr. Saavedra as "interviews" despite sworn statements from all board members who met with Dr. Saavedra that they did not discuss the interim superintendent position with him.  Regardless of how these meetings are described by TEA's investigators, the individual board member are not required to obtain board approval before meeting with someone, whatever each board member's reason for meeting with the individual may be.

## Houston ISD's Response to Allegation Two

Allegation Two of the Preliminary report posed the following question:

> Did the members of the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code § 11.051 Governance of Independent School District?

What follows in the Report is a mishmash of unrelated events ostensibly designed to demonstrate an overall pattern of board members acting individually on behalf of the Board of Trustees. However, many of the events are inaccurately described in the Report — largely because TEA's investigators failed to follow best practices, including speaking to relevant witnesses to corroborate the accusations leveled against board members.

Putting aside the fact that the factual statements in the Report are rife with inaccuracies, the events described in the Report do not violate existing Texas laws.

### A. Individual board members have the inherent right to access information, documents, and records maintained by the District.

Section 11.051(a-1) of the Texas Education Code states that a board member "may not, individually, act on behalf of the board" unless authorized to do so by the Board of Trustees. TEX. EDUC. CODE § 11.051(a-1). This means that "[b]oard action only occurs when at a meeting where there is a quorum [and] more members vote for a motion than vote against a motion, with abstentions not being counted." *Conner v. Houston ISD*, TEA Docket No. No. 088-R2-0612, 2012 TX Educ. Agency LEXIS 87, at *7 (Tex. Comm'r Educ. 2012) (citing *Webster v. Tex. & Pac. Motor Transp.*, 166 S.W.2d 75, 77 (Tex. 1942). Section 11.051(a-1) does not prevent board members from making requests or gathering information — it merely prevents them from acting, individually, on behalf of the Board of Trustees without authorization. *See* TEX. EDUC. CODE § 11.051(a-1).

In fact, individual board members have the "inherent right to access information, documents, and records maintained by the district." TEX. EDUC. CODE § 11.1512 (c). This inherent right is reflected in the District's local policy, which states that each board member "has an inherent right of access to information, documents, and records maintained by the district."[53]

---

[53]  **Exhibit 10**, HISD Policy BBE(Legal).

In order to facilitate efficient internal operations, Houston ISD has adopted various local procedures.  The first of these local procedures cited by TEA's investigators is BBE(Local).  TEA's investigators cite the policy stating: "Board members as individuals shall not exercise authority over the District, its property, or its employees . . .."  HISD Policy BBE(Local).  TEA's investigators quote this excerpt from the policy in the Report.  But they fail to disclose that they are misquoting the language of the policy by omitting the second half of the sentence.  Why do TEA's investigators misquote this sentence?  Probably because when read in context, the full sentence clearly gives board members the right to request information from District employees:

> Board members as individuals shall not exercise authority over the District, its property, or its employees; ***however, individual Board members shall have the right to seek information from District records and employees in accordance with this policy***.

**Exhibit 9**, HISD Policy BBE(Local) (emphasis added to highlight the language omitted by TEA's investigators).  Houston ISD's internal procedures further state that individual board members may submit written requests to the superintendent for preparation of reports derived from an analysis of information."[54]

In its Report, TEA's investigators repeatedly state that board members violated HISD Policy BBE(Local) by taking various actions without "obtaining approval of the entire board."[55]  But this local policy does not supersede board members' inherent authority to request information, and it does not prevent board members from expressing opinions or communicating information to administration.  It simply prevents them from exercising authority on behalf of the Board without Board approval.  None of the incidents described in TEA's Report — whether accurately or falsely described — constitutes an exercise of authority on behalf of the Board.

TEA's investigators also contend that board members have violated Policy BBE2(Regulation).[56]  The investigators should know better.  Regulations such as BBE2 do not bind Trustees — they are adopted to govern District employees.  HISD Policy BBE2(Regulation) says as much at its outset:

---

[54]    **Exhibit 9**, HISD Policy BBE(Local).

[55]    **Exhibit 1**, Preliminary SAI Report, pp. 24–26.

[56]    **Exhibit 11**, HISD Policy BBE2(Regulation).

The objective of these procedures is to *assist employees* as they address requests received from Trustees and the Superintendent.

**Exhibit 11**, HISD Policy BBE2(Regulation) (emphasis added).  Moreover, if any Houston ISD employee legitimately believed that a board member was acting inappropriately, the employee could file a complaint pursuant to HISD Policy BBE1(Regulation).  TEA's investigators have attached no such complaints to its Report from any of the unnamed administrators who have now provided unreliable and false statements to TEA's investigators.

    **B.  TEA's investigators have made numerous findings which, even if they were true, amount to nothing more than requests for information or communications of information.**

TEA's investigators recite findings of fact based on statements they gathered from unnamed administrators.  Many of these statements are misleading; others are pure fabrications.  But TEA's investigators failed to discover the errors in these statements because they failed to corroborate these statements by interviewing board members or other witnesses.  If they had, they would have discovered that the unnamed administrators they rely on are not reliable witnesses.

        *(1) Findings 1–4 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion.*

On pages 15–16 and 25 of the Report, TEA's investigators assert that Trustee Davila exceeded the scope of her authority during a campus visit based on interviews with a high school principal and an unnamed administrator.   But Findings 1–4 contain numerous factual misstatements and reach a legally untenable conclusion.

    <u>**Factual Error #1.**</u>  According to TEA's investigators, the campus principal was not aware that Trustee Davila and others were on a campus for a tour until the principal saw pictures of the tour on Twitter.  But that is simply not true.  But the campus principal was the individual who gave Trustee Davila and others the campus tour.[57]   Contrary to the statement in TEA's Report, the campus principal did not learn about the tour on Twitter — she knew about the campus tour because she was there.[58]

---

[57]  **Exhibit 3**, Davila Declaration, ¶ 22.

[58]  **Exhibit 3**, Davila Declaration, ¶¶ 22–24.

Moreover, putting aside this factual error, nothing prohibits board members from visiting campuses or requires approval from the principal.  As indicated by her statement, Trustee Davila had expressly been given permission to visit this campus by the area superintendent.

**Factual Error #2.**  TEA's report states that a campus principal told them that the project manager told the principal that "Trustee Davila told the construction people to take a wall down."  TEA's investigators further claim that Trustee Davila "instructed the construction team to make material modifications to an area that was already built."  Both statements are false.  If TEA's investigators had taken the time to speak with Davila, they would have learned that the request to take down the wall was not even made by her.  Second, based on the documents attached to TEA's report, regardless of what Trustee did or did not say, the modifications were not made based on any request from Trustee Davila.  Rather, the changes were made based upon a perfectly legal and routine Construction Change Directive that was generated by the Project Architect as an integral part of the project management process[59] properly submitted by the project manager and approved by Houston ISD administrators.

Instead of corroborating this hearsay-within-hearsay statement by speaking with Trustee Davila or any of the other witnesses who were in the campus courtroom, TEA simply accepts this statement as true without interviewing either Trustee Davila or the project manager.  If TEA's investigators had spoken with Trustee Davila, they would have discovered that she did not tell "the construction people to take a wall down."  When an individual working on the courtroom told her, they could take down a wall to make the courtroom bigger, Trustee Davila said she did not think they should do that.[60]

Additionally, even the error-riddled description of events in TEA's report does not constitute any legal violation.  A board member is perfectly within her rights to conduct a campus visit and express opinions about building projects.  Why else would Trustees be invited to tour the facilities.  Here, TEA's own account demonstrates that Trustee Davila did nothing more than, at most, express an opinion.  Trustee Davila did not approve the change to the campus courtroom.  Rather, the project manager submitted a change order that was properly approved and documented by Houston ISD's administration.

---

[59]    *See* Project General Conditions, AIA Document A201.

[60]    **Exhibit 3**, Davila Declaration, ¶¶ 23–24.

The TEA analysis completely failed to review and access the project construction file, which shows that the change order was approved through the appropriate processes and procedures without any involvement by Trustee Davila.[61]  As indicated in Exhibit 2.1, a construction change directive was initiated by Roy Gilbert on February 23, 2018.  (Mr. Gilbert was the Project Architect with the firm of Page Sutherland Page, Inc.)  According to a contemporaneous document, the Construction Change Directive was initiated by Jorge Huerta, a Senior Project Manager with Houston ISD.   The submission to Houston ISD contained a drawing executed by the Architect.  The drawing was dated February 20, 2018.  The Construction Change Directive was signed on behalf of Houston ISD by Meredith Smith on February 28, 2018.  (Meredith Smith is a Senior Manager for Construction for Houston ISD.)   The documents selected by TEA's investigators do not include an express approval by the Contractor, B3Ci, but the Contractor was clearly consulted because there was an adjustment to the Project's Guaranteed Maximum Price approved by Meredith Smith.  Nowhere on any of the Project paperwork and required approvals is there any mention of Trustee Davila, or for that matter any other Trustee.  This Project was a Construction Manager at Risk project, which was constructed and managed in accordance with the practices and procedures identified by the American Institute of Architects.  It was fully administered and constructed in accordance with the project documents and Houston ISD project administration protocols for such projects.  TEA's investigators include much of the relevant paperwork showing that this is so, but TEA's Report includes no critical analysis of these documents.

Instead of reviewing the project paperwork, which is extensive, to determine the procedural and paperwork underpinnings the Construction Change Directive presented, TEA's investigators chose instead to assert, without any corroborated evidence, that Trustee Davila exceeded her authority by visiting a campus.  The assertion was made based upon anecdotal statements made by unidentified individuals.  We have not been provided with the statements of the unidentified individuals and are, therefore, unable to test their veracity.  Nor are we able to test the credibility, knowledge, or bias of the alleged witnesses.

> **(2)  *Finding 5 in TEA's Report regarding Allegation Two is factually inaccurate and amounts to nothing more to an appropriate request to reschedule an agenda item by a mere two months.***

TEA's investigators next criticize Trustee Davila for asking that an item be removed from the agenda.  But there is nothing untoward about board members requesting that items be removed from the board's agenda.  And the item referenced in the report was ultimately placed on an agenda

---

[61]    *See* **Exhibit 1**, Preliminary SAI Report.  Portions of the construction file are attached to the Preliminary SAI Report as Exhibit 2.1

for a meeting that took place just two months later, in February 2017 (not in 2018, as TEA's Report asserts).  When the item was discussed at the February 2017 meeting, Trustee Davila thanked Houston ISD administration for attending a 4-hour meeting with the community to answer questions regarding the item.  And when the Board of Trustees voted on the item, Trustee Davila voted in favor of it.

  **Factual Error #3.**  TEA's investigators further claim that an unnamed administrator has accused Trustee Davila of threatening his job if he did not make sure that a contract for construction of Austin High School was awarded to a "firm out of Dallas."  This unsubstantiated claim by an anonymous witness is as bizarre as it is false.  Neither Trustee Davila nor Abel Davila threatened an administrator's job regarding this contract.[62]  Neither wanted the contract awarded to an unnamed "firm out of Dallas."

  **Factual Error #4.**  It is disappointing that TEA's investigators would think it is appropriate to include such bizarre and unsubstantiated allegations in TEA's Report.  But it is, perhaps, more disappointing that TEA's investigators would falsely claim that the agenda item was allegedly removed from the December 2016 meeting and postponed for over a year, until the February 2018 meeting.  In reality, the agenda item was considered just two months after the December 2016 meeting, at the February 2017 meeting.

  Moreover, as a matter of law, a board member's request that an item be postponed to be considered at a later meeting does not violate Section 11.051(a-1) or any of the cited local policies.  Ultimately, this item was ultimately removed from the agenda at the request of the board president, not Trustee Davila.  Moreover, TEA's investigators fail to disclose that when the item was voted on two months later, at the February 2017 meeting, Trustee Davila seconded the motion and voted in favor of approving the agenda item.[63]

  The evidence clearly establishes that Trustee Davila was not opposed to the agenda item awarding the contract for construction of Austin High School and voted in favor of the agenda item when it was considered at the February 2017 meeting.

---

[62] **Exhibit 3**, Davila Declaration, ¶¶ 25–27.

[63] **Exhibit 8**, Board Minutes from the February 9, 2017 meeting, p. 8

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date: August 26, 2019

> **(3) Finding 6 in TEA's Report regarding Allegation Two is factually inaccurate and describes no exercise of board authority by an individual board member.**

TEA's investigators next claim Trustee Santos hosted a campaign event called "Field Good Day" on Houston ISD property without paying for the event. The allegation is based upon the uncorroborated statement of an unidentified witness. Basing such a finding on uncorroborated, secret, and false testimony is the worst form of demagoguery.

**Factual Error #5.** As is readily discernable from publicly available information "Field Good Day" was not a campaign event — it was a community event that was first organized in 2016 (before Trustee Santos was elected to serve on the Board) in order to bring the community together after a Houston ISD student was murdered.[64]



When members of the community were organizing this event again in 2018, they reached out to Trustee Santos to help coordinate with Houston ISD administration regarding the event. And she helped. She did so in an effort to serve her constituents, not as part of any campaign. (Indeed, the event occurred almost a year after Trustee Santos was elected.)

Finally, it should have been obvious to TEA's investigator's that whatever unnamed administrators said about "Field Good Day" 2018, the flyer for the event, which TEA's investigators attach to their Report,

---

[64]    **Exhibit 5**, Santos Declaration, ¶¶ 14–16, **Exhibit 6**, Rodriguez Declaration ¶¶ 3–4.

does not describe a campaign event — the flyer contains no mention whatsoever of Trustee Santos or her campaign.[65]  The flyer clearly describes a community event.

**Misleading Factual Statement.**  The Report states that Trustee Santos indicated she would cover the cost of the event and failed to submit payment and indicates that an unnamed administration official confirmed that Trustee Santos did not pay for the event.  This is an extremely misleading statement.  The cost of the event was minimal because Trustee Santos was able to have security at the event provided at no charge by local police officers who work for a county constable, the cost to Houston ISD was *de minimis*.  Nevertheless, Trustee Santos did offer to pay for any costs Houston ISD incurred, however, no one ever sent her an invoice reflecting that Houston ISD incurred any costs from this event.

Trustee Santos did nothing wrong by helping sponsor a community event.  TEA's own Report does not support the later assertion that Trustee Santos "requir[ed] the district to allow her to host" this event.  She merely assisted community members with the event and offered to pay for any *de minimis* costs incurred by the District as a result of the event.  At the current time, because of the volunteers obtained from the community, we are unaware that Houston ISD has incurred any costs associated with the event.

> *(4) Finding 7 in TEA's Report regarding Allegation Two is factually inaccurate and does not describe any exercise of board authority by an individual board member.*

In Finding 7, TEA's investigators merely repeat a statement from an unnamed administrator who purportedly said "[Trustee] Santos was getting all this food and not paying for it.  She tells people, 'I am a trustee and board services covers that.'"  This generic, uncorroborated statement is impossible to respond to because it does not identify any improper act.  At virtually every meeting of the Board of Trustees food is provided for board members and administrators and they are not required to pay for it.  If an administrator truly told TEA's investigators that board members are expected to pay for the meals provided at board meetings, that administrator was not being truthful.

The statement by TEA's investigators that Trustee Santos "require[ed] the district to allow her to eat for free when visiting the Hattie Mae White Education Support Center" is unsupported by any finding in the Report and is not substantiated by any evidence, nor does it describe a violation of law or policy.

---

[65]   **Exhibit 1**, Preliminary SAI Report, Exh. 2.3.

### (5) Finding 8 in TEA's Report regarding Allegation Two amounts to nothing more than a board member's expression of opinion.

TEA's Report next recounts a workshop during which board members, Deputy Commissioner AJ Crabill, and Houston ISD administration interacted with principals from Improvement Required campuses. At that workshop, Trustee Davila exhorted the principals to "explain what they needed so trustees could provide resources to prevent another failing year." Her exhortations were entirely appropriate. It is unclear why TEA investigators have included this event in the Report because there was nothing improper in Trustee Davila's statement.

Later in the Report, TEA's investigators assert that Trustee Davila's comments "require[ed] district employees to answer her questions under the threat of an adverse personnel action."[66] But the language TEA's investigator's quote in their Report did not threaten action by the Board, the language Trustee Davila used indicated that the principals of struggling campuses would lose her single vote if they could not articulate what they needed to improve the campuses. That is not a threat of action by the Board; it is an indication of how she will vote if the matter comes to the Board. Trustee Davila is absolutely within her rights to vote as she sees fit.

### (6) Findings 9–12 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion.

In a series of findings, TEA's investigators recount that TEA's conservator has reported that board members have, in some instances, sent requests directly to administration offices instead of sending it to administration officials via board services. Houston ISD is entirely within its rights to institute internal procedures describing how best to facilitate communications between board members and administration officials, but these internal procedures cannot supersede board members inherent right to access information, documents, and records maintained by the District. TEX. EDUC. CODE § 11.1512(c).

A review of the communications reviewed demonstrates that none of these communications show that any current member of Houston ISD's Board of Trustees violated Section 11.051 of the Texas Education Code by individually acting on behalf of the Board. Rather, these communications show board members attempting to gather information — as is there inherent right — to perform their duties and to disseminate information to allow Houston ISD's administration to do its job.

---

[66]    **Exhibit 1**, Preliminary SAI Report, p. 25.

### a. Electronic Communications from 2016

The majority of the communications described by TEA's investigators do not involve current board members — they are related to unnamed former trustees.[67]  Presumably TEA's investigators have complied with TEA's Investigation Procedures and sent a copy of this preliminary report to these former trustees to provide them with "an opportunity to request an informal review of the findings."[68]  However, the former trustees do not appear to have been copied on the Preliminary SAI Report, so TEA's investigators may have ignored the requirement in TEA's Investigation Procedures.  In any case, these findings regarding former trustees are outside the scope of the Second SAI Notice and are irrelevant to the proposed punitive actions against Houston ISD and its current Board of Trustees.

The remaining two communications from 2016 merely describe a board member's communications providing information to an administration official and that same board member's request for information.[69]  Both of these communications are further addressed in more detail with supporting evidence in the **TH Supplemental Response** for the appropriate board member or board members.

In paragraphs (a)-(j) on pages 17 and 18 of the report, TEA's investigators cite communications from former and current trustees to the District's Administration.  None of the provided emails in this section show any kind of overreach by current and former trustees.  Curiously, TEA in its report did not cite Texas Education Code 11.1512 (c)-(f) which grants Trustees access to information.  Specifically, it states that "when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district.  "Official capacity" means all duties of office and includes administrative decisions or actions.  The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.  The district may withhold or redact information, a document, or a record requested by a board member to the extent that the item is excepted from disclosure or is confidential under the Public Information Act or other law.  A district shall provide a board

---

[67]    **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2016, ¶¶ (a)–(c), (e)–(g), (i), and (j); Finding 12, Electronic Communication[s] from 2017, ¶¶ (d), (g), (h).

[68]    **Exhibit 11**, TEA's Investigation Procedures.

[69]    **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2016, ¶¶ (d), (h).

member with information, documents, and records requested not later than the 20th business day after the date the district receives the request. The district may take a reasonable additional period of time, not to exceed the 30th business day after the date the district receives the request, to respond to a request if compliance by the 20th business day would be unduly burdensome given the amount, age, or location of the requested information. The district shall inform the board member of the reason for the delay and the date by which the information will be provided. If a district does not provide requested information to a board member in the time required, the member may bring suit against the district for appropriate injunctive relief. A member who prevails in a suit is entitled to recover court costs and reasonable attorney's fees. The district shall pay the costs and fees from the budget of the superintendent's office.

Additionally, it is important to note that during this time period, Richard Carranza was the Superintendent of Schools. His communication protocol allowed Board Members to ask for information and to direct concerns to his cabinet members. All emails cited by TEA as examples of overreach by the Board of Trustees evidence Trustee requests for information, which they are entitled to by state law, being sent to District staff as requested by the Superintendent at the time.

In paragraph (a) TEA alleges that an email from a former trustee (which has since passed away) asking if a position had been filled and stating that an internal applicant had applied but had not been contacted is an overreach by a trustee. In the exhibit email provided by TEA, there is no directive from the former trustee directing the administration to hire the individual referenced in the email. He only posed a question and made a statement that an internal applicant had not been contacted. This former trustee not only did nothing wrong; he even forwarded the internal applicant's email that he received to the administration. In accordance with Houston ISD Board Policy DGBA (LOCAL) an employee shall not be prohibited from communicating with a member of the Board regarding District operations. There is nothing improper about a board member gathering information or posing questions to the District's administration officials when this type of communication is sanctioned by the Superintendent. Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely gathering information which he was entitled to.

In paragraph (b) the email correspondence referenced was from a former trustee to the Interim Superintendent regarding upcoming board agenda items that had been changed by the administration after the information had been sent to the Board. On one of the upcoming items, the former trustee requested information regarding the administration's recommendation. He did not direct the administration to make a certain recommendation, he posed a question as to what the recommendation was going to be. According to TEA's investigators, this question is evidence

of trustee overreach. This assertion is not only absurd, its false. Texas Education Code and Houston ISD Board Policy state when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district... The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.  TEX. EDUC. CODE § 11.1512(c)–(f).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (c), the email referenced by TEA's investigators was from a former trustee to the Chief of Human Resources regarding a pay dispute with an employee who had resigned and was claiming to be owed a 3-month severance payment. In the email sent by the former trustee (the same trustee who has passed away) he forwarded an email from the former employee stating he had not been paid compensation he was owed by the District. The Trustee sent the information over and requested for the administration to address the matter. He did not direct them to address it a certain way, or to pay the individual, but requested for the administration to address it. Additionally, he requested to be cc'd on the response. Again, the evidence provided by TEA's investigators show no directive or overreach by a Trustee. What the evidence shows is a trustee forwarding information to the District's administration.

In paragraph (d), TEA references an email from Trustee Skillern-Jones to former Chief Communications Officer while Richard Carranza was superintendent of schools. It is important to repeat the Mr. Carranza requested for board members to communicate with members of his cabinet when they had questions or issues. In this email Trustee Skillern-Jones was expressing her opinion on an individual performance regarding the preparation of a board member led community event. Trustee Skillern-Jones requested that a more experienced staff member take the lead on the event and to ensure the facility at which the event was going to take place at was prepped. Again, this type of communication was sanctioned by the previous superintendent at the time as a result this communication is not inappropriate.

In paragraph (e), TEA's investigators provide an email from a former trustee to the former superintendent of school choice requesting a racial breakdown of each magnet school's magnet students. This is another example of TEA misinterpreting the law and claiming when a board member asks for information, he or she is overstepping their authority. Texas Education Code and

Houston ISD Board Policy state when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district… The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting. Tex. Educ. Code § 11.1512(c)–(f).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (f), TEA alleges that a former board member directed the former media relations manager to respond to an email from a law firm who was questioning a decision by the District. The email was merely a request that the former employee have someone respond to the email and explain the basis of the decision. There is no evidence of a directive or overreach by the former trustee in the email provided by TEA.

In paragraph (g), TEA alleges that an email from a former board member to the former Chief Superintendent of Choice asking how the application process is handled for students applying to in district magnet schools is an overreach by the former trustee. Board members are entitled to information pursuant to state law and local polices. All this allegation shows is an overreach by TEA attempting to take over a locally elected board because current and former trustees ask for information they are entitled to. Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (h), TEA alleges an email from Trustee Skillern-Jones to two District employees requesting facts for a trustee led community meeting about the state of District buildings and other matters in her community is an overreach. In this circumstance trustee was acting as an ambassador for HISD and needed information to provide to community members who showed up. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything; she was merely requesting information which she was entitled to.

In paragraph (i), TEA alleges that a former trustee emailed an HISD senior administrator regarding a principal's complaint and directed them to fix it. What TEA failed to mention was that the email was a forward of the complaint from the principal that was sent to the former trustee and

that the complaint from the former principal was a serious one. The former trustee does request for the matter to be addressed by the administration. She did not direct the administration on how to address it, but only that they address it. Nothing in state law or local policy states a board member cannot give his or her individual opinion on a matter. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. She was forwarding a concern and requesting for the administration to review.

In paragraph (j), TEA alleges that a former trustee emailed a staff member asking if she could pick up her child's old test scores and documents because she lost them. What TEA failed to mention was that the staff member was her child's principal and this request could have been made by any parent. The former board member was acting in her capacity of a mother of a student, not a board member. She was not directing the staff member to do anything; she was asking for a courtesy. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.

### b.  Electronic Communications from 2017

In paragraphs (a)–(k) on pages 18-19 of the report, TEA's investigators cite communications from former and current trustees to the District's administration. None of the provided emails in this section show any kind of overreach by current or former trustees.  Rather, like the communications from 2016, these communications simply show board members exercising that statutory right to access information.  TEX. EDUC. CODE § 11.1512 (c).  TEA's Report fails to cite Texas Education Code 11.1512 (which grants Trustees the inherent right to access information, documents, and records) either because TEA's investigators are unaware of this statutory provision or willfully ignored it.

Additionally, it is important to note that during this time period, Richard Carranza was the Superintendent of Schools. Superintendent Carranza's communication protocols allowed board members to ask for information from (and to direct concerns to) his cabinet members. All emails cited by TEA as examples of overreach by the Board of Trustees evidence Trustee requests for information — which they are entitled to receive by state law — being sent to District staff as requested by the Superintendent at the time.

In paragraph (a), TEA alleges that Trustee Adams forwarded an email to the former Superintendent of Schools, former Deputy Superintendent, and former Chief of Human Resources the resume of a friend of a coworker at her job. The allegation states that Trustee Adams instructed the recipients of the email to the view the resume and to consider for a possible telephone

conversation. The contents of the email do not have instructions or directives from Trustee Adams to the District's administration. The email from Trustee Adams is simply notification of a possibly good candidate for a job within HISD. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.

In paragraph (b), TEA alleges that an email forwarded from Trustee Skillern-Jones to the District's former Chief of Human Resources regarding a former employee's issue an overreach. TEA alleges that Trustee Skillern-Jones directed the administrator to investigate. The email TEA provides as evidence of overreach contains two words from Trustee Skillern-Jones, "Please Investigate." The rest of the message was a forward of the email from the former employee. Skillern-Jones did not overreach or direct any employee to do anything. She forwarded a concern from a former employee in accordance with the protocols established by the Superintendent at the time and requested that the matter be looked into. TEA's interpretation that two words (please investigate) can be considered a directive is absurd. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. The Trustee shared information with the administration that was sent to her.

In paragraph (c), TEA alleges that a statement made by Trustee Adams to document violations of local policy by the former Superintendent, former Chief of Human Resources, and former Office of Human Talent is an overreach. Firstly in allegation 3 of TEA's preliminary report, investigators allege that the HISD board of trustees failed to ensure that staff followed contract procurement rules and procedures, but here in this section, when Trustee Adams is requesting that the three employees found to have violated such procedures go to training, the email from the District's internal auditor (who is the board's employee) be placed in all three employee personnel files, and to make sure the violations is reported so that there is transparency, she is overreaching. TEA is holding the HISD Board to a double-edged standard. On one hand, the Board didn't do enough to make sure administrators followed all laws and procedures regarding procurement rules, but on the other hand, when a Trustee requests that employees who were found to have violated board policies regarding procurement be trained, she is overstepping. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. She is asking for steps to be taken to ensure a violation of the policy at the subject of the email not be violated again, which is within her rights and duties as a board member.

In paragraph (d), TEA alleges that a former Trustee overstepped because he sent a forward of an email from the aunt of a student who was being bullied at a middle school. Some of the comments sent to this student suggested she should kill herself, and that she was going to be

"jumped" after a school day. In his message to the District administrator, the former trustee requested that the administrator "please look into this." Again, TEA is interpreting requests by trustees from administration to look into serious issues as directives. Nowhere in this communication does the Former Trustee act individually on behalf of the Board or direct the administration to do anything.  He was simply passing along information that had been relayed to him and requested that the administration look into the matter before a student could get hurt or hurt herself.

In paragraph (e), TEA alleges that an email from Trustee Adams requesting that "staff" meet with a principal who sent her a concern is an overstep is another example if TEA misinterpreting a directive from a request. Trustee Adams specifically requests for staff to meet with the principal who emailed her with his concerns. She doesn't state I direct you to meet with this principal, she requested that they meet with the principal. Nothing in statute prohibits Trustees from requesting District administration to look into District matters that are sent to them. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.  She was simply passing along information that had been relayed to her and requested that the administration look into the matter.

In paragraph (f), TEA alleges that an email from Trustee Adams to the Chief Financial Officer requesting the cost to the District, if the Board were to adopt a pay increase to $12.50 an hour for District employees is an overreach and improper. Texas Education Code 11.1511(b) explicitly states a school boards mandatory power and duties. One of those duties out of many is to adopt an annual budget for the district as required by Texas Education Code 44.004. Tex. Educ. Code 11.1511 (b)(9). As stated above individual trustees are allowed to request information from the District administration regarding the district's administration. Additionally, Superintendent Carranza's communication protocols allowed for board members to request information from cabinet level staff. The email provided by TEA as evidence that Trustee Adams overreached her role is actually evidence of her requesting information, as allowed by state law, from a cabinet level administrator, as requested by the then superintendent, so she could have information related to the district's budget, which is required to be adopted by the Board. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The email correspondence is evidence of a board member requesting for information needed before a vote on a decision that is explicitly the responsibility of the Board pursuant to state law.

In paragraph (g), TEA alleges a Former Trustee overreached by requesting information from cabinet level administrators regarding an email sent to the Board from a teacher within the

District. The former trustee posed the question if she could please get data on the positions mentioned in the email. Nowhere in the email did she demand the information or direct district administration to create any reports or to give her any information. TEA is misinterpreting a request as a directive. Nowhere in this communication does the Former Trustee act individually on behalf of the Board or direct the administration to do anything.

In paragraph (h), TEA alleges a Former Trustee overreached by requesting how many new principals were starting at campuses for the 2017-2018 school year as compared to the previous school year. This is a simple request for information to which trustees are entitled to. Nothing in this request is improper or outside of what is allowed by law or the communication protocols established by the superintendent at the time. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The Former Trustee was merely gathering information.

In paragraph (i), TEA's investigators cite a communication in which Trustee Flynn Vilaseca attempted to gather information by sending the former Chief of Human Resources a list of seven questions.  Finding 12, Electronic Communication[s] from 2017, ¶ (i).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does Trustee Flynn Vilaseca act individually on behalf of the Board; she was merely gathering information.  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (j), TEA's investigators cite a communication in which Trustee Flynn Vilaseca notified a Houston ISD administrator an email notifying him about a plumbing issue and stating "it would be great if we could get this checked out and fixed soon."  It is unclear why TEA's investigators appear to be critical of Trustee Flynn Vilaseca's attempt to notify administration about a plumbing issue that needs to be fixed.  Finding 12, Electronic Communication[s] from 2017, ¶ (j).  Nowhere in this communication does Trustee Flynn Vilaseca act individually on behalf of the Board; she was merely providing time-sensitive information to administration officials.  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (k), TEA alleges Trustee Skillern-Jones overreached her role as a trustee by requesting information on all vacant properties owned by the District. Again, TEA is characterizing the request for information that board members are entitled to as improper with no basis in law to substantiate such a claim. This statement goes for every email cited and provided by TEA as evidence of overreach by current and former trustees in the year 2017 as improper.

Additionally, pursuant to state law, the Board is the only entity in the District that can authorize the sale of land. What the email submitted by TEA evidences is a trustee asking for information related to one of the actions under the jurisdiction of the board she sits on. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The Trustee was merely gathering information.

These communications discussed above are further addressed in more detail with supporting evidence in the **TH Supplemental Response** for the appropriate board member or board members.

### c.  Electronic Communications from 2018

The communications from 2018 are much of the same: board members exercising their inherent right to request information and attempting to assist Houston ISD administration by providing information to administration officials.[70]  These communications involve communications that (1) provide information about safety concerns at school campuses,[71] (2) request information,[72] express opinions in response to requests from administration for input,[73] and requests to administration.[74]  None of these communications provide examples of Trustees acting individually on behalf of the Board or direct administration to do anything improper.

These communications are further addressed in more detail in the **TH Supplemental Response** for the appropriate board member or board members.

### d.  Electronic Communications from 2019

The communications from 2019 are not substantially different that the other appropriate communications TEA's investigators attempt to criticize.

Paragraph (a) is addressed in the **TH Supplemental Response** for the appropriate board member or board members.

---

[70]  **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2018, ¶¶ (a)–(h).

[71]  *Id.* at ¶¶ (b), (e).

[72]  *Id.* at ¶¶ (a), (d), (g), (h).

[73]  *Id.* at ¶ (c).

[74]  *Id.* at ¶¶ (f)

In paragraph (b), TEA's investigators cite a communication in which Trustee Santos forwarded an email to the interim superintendent along with additional information she thought the interim superintendent should know.  Nowhere in this communication does Trustee Santos act individually on behalf of the Board; she was merely providing important information to the interim superintendent.

In paragraph (c), TEA's investigators cite communications from a parent thanking Trustee Sung for her assistance in resolving an issue.  It is difficult to understand how Trustee attempts to resolve constituent issues violate any legal mandate.  None are cited by TEA.  Trustee Sung's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (d), TEA's investigators cite a communication in which Trustee Davila asked the interim superintendent for information regarding the "process of hiring a principal for an elementary and middle school"  and forwarded an email to the interim superintendent along with additional information she thought the interim superintendent should know.  Nowhere in this communication does Trustee Davila act individually on behalf of the Board. She was merely providing important information to the interim superintendent.  There is no governance standard implicated in this transaction.

Similarly, in paragraph (e), TEA's investigators cite a communication in which Trustee Davila asked about the principal search and noted her support for an "inclusive and transparent" selection process.  It is not clear what criticism TEA's investigators have of this email.  Nowhere in this communication does Trustee Davila act individually on behalf of the Board; she was merely providing important information to the interim superintendent and supporting an inclusive and transparent process.

## Houston ISD's Response to Allegation Three

Allegation Three of the Preliminary report posed the following question:

> Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code § 44.031?

TEA's investigators conducted a one-sided investigation by failing to speak with the relevant witnesses regarding their findings and by criticizing transactions that do not violate state procurement laws.

The legal and factual inaccuracies regarding Findings 1 of TEA's Allegation Three is addressed in the **TH Supplemental Response** for the appropriate board member or board members.

A. **Findings 2 and 3 in TEA's Report under Allegation 3 are pure fiction and fail to describe any unlawful act by a board member .**

Although Findings 2 and 3 involve alleged events that would have been observed by at least five individuals regarding Finding 2 and three individuals regarding Finding 3, TEA's investigators simply took a statement from an unnamed administrator and an individual named Jose Perez at face value without attempting to corroborate their stories.  These findings are emblematic of TEA's one-side investigation.

*(1) The meeting described in Finding 2 in TEA's Report Regarding TEA Allegation Three did not happen.*

The Report alleges that Trustee Davila met with an unnamed administrator at Pappadeaux Seafood Kitchen along with Abel Davila, Art Lopez, and Leticia Ablaza.  TEA's investigators have not identified the unnamed administrator, have provided no sworn or written statement in support of his story, and do not appear to have attempted to contact any of the other four people who allegedly attended this meeting.  If TEA's investigators had done so, they would have discovered that this meeting never occurred.[75]

Other than the uncorroborated and unsubstantiated statement of an anonymous witness, TEA's investigators have produced no information or evidence indicating that this meeting ever occurred.

Furthermore, even if (1) this meeting took place and (2) the conversation involved ways to get bond contracts canceled or focused on a custodial contract with MetroClean, TEA's investigators fail to show how these actions violate Section 44.031(a)(1) of the Texas Education Code.  TEA's investigators attempt to portray these actions as "circumvent[ing] the competitive bidding process," but they offer no legal reasoning to show how they reached this conclusion.  There was no bidding process at the time these alleged statements were made because MetroClean was already a vendor.  And MetroClean remains a vendor to this day. There is no law that prevents a school board member from expressing her opinions about service vendors in a school district.

---

[75]    **Exhibit 3**, Davila Declaration, ¶¶ 28–29**.**

TEA's investigators have apparently taken the position that board members can never discuss their opinions about vendors outside formal board meetings.  But this would set a dangerous precedent and create a standard that TEA is certainly not applying to other school districts' board members.  Elected board members are frequently approached by school district employees and members of the community about the happenings inside the school district.  It is not uncommon, nor is it illegal, for board members to share these experiences with school administrators.  A finding to the contrary would create unprecedented—and unlawful—roadblocks to board members' ability to engage with administration and community members.

> ### *(2) No Houston ISD board member has knowledge of the incident between two private individuals described in Finding 3 of TEA's Report Regarding TEA Allegation Three.*

Next, TEA's investigators attempt to punish a Trustee and conduct a school district takeover as a result of an alleged conversation between two individuals — Jose Perez (owner of MetroClean) and Ricardo Aguirre (owner of ABM Inc.).  According to TEA's report, Aguirre approached Perez with a consulting agreement that was never executed.  Although TEA's investigators apparently spoke with Perez, it appears they have reached this finding based solely on his one-sided account without conducting an interview with Aguirre to confirm what happened.  If they had spoken to Aguirre, they would have discovered that he disputes TEA's version of events.[76]

Moreover, TEA's investigators seem to speculate that Trustee Davila was somehow aware of this meeting because of Perez's statement that Aguirre told him that Trustee Davila's husband sent him to have him sign this agreement.  Putting aside the lack of reliability inherent in such a statement, which is hearsay within hearsay within hearsay based on speculation, these far-fetched allegations do not support any finding of wrongdoing by Trustee Davila.

Finally, even if one assumes the alleged encounter between Jose Perez and Ricardo Aguirre occurred as described in the Report, SAI investigators presented no evidence or legal justification to support their contention that these alleged actions of two private citizens can somehow amount to a Trustee's violation of Texas Education Code § 44.031 (a)(1), and ultimately merit takeover of a school district. TEA's investigators have failed to cite any legal authority that the isolated private actions of Aguirre could properly result in a finding that Trustee Davila violated Texas Education Code § 44.031 (a)(1).

---

[76]  **Exhibit 7**, Aguirre Declaration.

The crux of SAI's governance claim against Trustee Davila rests entirely on the following assumptions: (1) that Perez is accurately recounting Aguirre's statement; (2) that Aguirre's statement is truthful; and (3) that Trustee Davila was aware of Aguirre's actions.  And we all know what happens when you make assumptions.

TEA's investigators allege that Trustee Davila violated this statute because she tried to circumvent the competitive bidding process. However, it is well settled law that:

> "Competitive bidding" requires due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications. Its purpose is to stimulate competition, prevent favoritism, and secure the best work and materials at the lowest practicable price, for the best interests and benefit of the taxpayers and property owners. There can be no competitive bidding in a legal sense where the terms of the letting of the contract prevent or restrict competition, favor a contractor or materialman, or increase the cost of the work or of the materials or other items going into the protect.

*Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.*, 372 S.W.2d 525, 527 (Tex. 1963)

Therefore, even if all the alleged facts in this finding are taken as true, investigators have presented no evidence that Trustee Davila interfered with advertisement of District bids, nor that she prevented a company from submitting a bid. There has been no evidence presented that bidders were on different planes of equality before the committees that review the district bids, nor that Trustee Davila interfered with the process of these submissions. SAI investigators have also presented no evidence that any bidders for the District bid on different terms, nor that there were substantially different specifications for the same bid. Finally, SAI investigators have submitted no evidence that there were any formal complaints or allegations about the awarding of any bids, including MetroClean's bid.

At best, SAI investigators have, if proven to be true, shown Trustee Davila expressed dissatisfaction with a current District vendor and requested an administrator to consider alternatives for better service—these actions hardly amount to circumventing the elaborate competitive bidding process and all the mechanisms created around it to protect the integrity of the competitive bidding process.

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

### B. TEA's Conclusions regarding "so-called" Findings 4–12 in TEA's Report Regarding Allegation Three are based on an incorrect analysis of applicable state law.

In "Findings of Fact for Allegation Three," Findings No. 4-12 relate to issues over the District's use of job order contracts in 2013 and 2014.  These so-called "Findings of Fact" were not properly investigated, they are not based on correct analysis of applicable law, and they do not reflect standards that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas.  Findings No. 4–11 are based on an internal auditors' report (JOC Report) dated September 8, 2015.  Finding No. 12 is based on an internal auditors' report dated March 10, 2015.

First, these job order contract (JOC) issues are years old and do not in any way reflect the current governance, administration, operation or purchasing processes in the District.  These issues involve a prior Administration and a prior Board of Education.  Only two members of the current Board were even on the Board in 2013 and 2014, and neither of them were officers.  The Agency's Preliminary Report does not make any effort to establish a relationship between these issues from 2013 and 2014, and the District's current Administration and Board.  It appears that the Agency's investigators stumbled upon these JOC issues from 2013 and 2014 after beginning the current investigation, and the inclusion of these "Findings of Fact" appears to be an effort by the Agency's investigators to bolster a predetermined conclusion with "guilt by association" incidents that do not relate to the current Board or current Administration, and that do not reflect the current governance, administration, operation or purchasing processes in the District.

Second, the Agency has not established that these "Findings of Fact" reflect a correct and clearly established analysis of applicable law, and the conclusions based on these Findings therefore are improper.  The JOC Report dated September 8, 2015, prepared by the District's internal auditors, was written without any legal analysis or review.  To the best of our knowledge, the internal auditors simply made their own interpretations of statutes and never sought advice either from the District's internal attorneys or external attorneys.  The District's Administration at the time strongly disagreed with the internal auditors' JOC Report and particularly the auditors' interpretation of applicable statutes.  The District's Administration sought and received a legal analysis from the law firm of Olson & Olson LLP that concluded that the JOC Report dated September 8, 2015, incorrectly interpreted and applied statutes governing job order contracts.  The Olsen & Olsen LLP opinion is dated June 14, 2016.  The District's Administration also sought and received a legal analysis from the law firm of Rogers, Morris & Grover more generally analyzing

**Appx.068**

both job order contracts and the District's purchasing processes, and responding to the auditor's report dated March 10, 2015.  The Rogers, Morris & Grover opinion is dated May 18, 2015.  Neither of these legal reviews secured by the District's Administration agreed with the internal auditors' JOC Report dated September 8, 2015, or the internal auditors' report dated March 10, 2015.  A complete review of this issue supports a conclusion that the District handled it correctly.  When the District's Administration and internal auditors had a disagreement over an auditors' report that was not legally reviewed, the District sought and received independent legal advice and acted in accordance with the advice received.

It does not appear that the Agency's investigators reviewed the legal analyses obtained by the District, nor interviewed either the District's internal attorneys or external attorneys about these job order contract issues.  Rather, the Agency's investigators appear to have simply taken selected portions from the internal auditors' reports at face value and made "Findings of Fact" based on the reports that have nothing to do with the District's current Board or Administration, or current governance, administrative, or purchasing practices.  This issue of the correct interpretation of the statutes applicable to job order contracts and purchasing practices in general is important, because the Agency is not authorized to adopt informal "rules" or interpretations of generally applicable statutes.

Third, the Preliminary Report's effort to bolster its predetermined conclusion to recommend appointment of a board of managers, by taking selected issues from past years that do not relate to the District's current Board and Administration, is not a standard that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas.  Is the Agency truly prepared to make board of managers decisions for all school districts in Texas based on years-old disagreements between districts' administration and auditors, where the auditors' position is not supported by any legal advice a district received?  The Agency clearly is not authorized to hold the Houston Independent School District and its Board of Education and Administration to a different standard of conduct than is applied to all Texas public school districts.

In the "Analysis of Allegation Three" the Agency's Preliminary Report relies on the improper "Findings of Fact" No. 4-12 for the conclusion that the District failed to follow proper purchasing processes with regard to job order contracts.  As described above, since the "Findings of Fact" were not properly investigated, are not based on a correct analysis of applicable statutes, and do not reflect a standard that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas, the conclusions based on those Findings must fail.  Further, as discussed above, the Preliminary Report does not make any effort to relate these issues from 2013 and 2014 to the current Board or Administration, or to the District's current governance,

administrative, or purchasing processes.  These "Findings of Fact" are a weak attempt to bolster a predetermined conclusion and recommendation, and these "Findings of Fact" would not be admissible in any proceeding to demonstrate any misconduct by the District's current Board and Administration.  At most, these "Findings of Fact" only show that years ago the District's Administration and internal auditors had a disagreement, and the Administration sought and acted in accordance with legal advice.

For all of these reasons, "Findings of Fact" No. 4-12 should be deleted, and the "Analysis of Allegation Three" should be revised to remove any reference to or reliance on these Findings.

### Legal Analysis of the Fundamental Flaws in the Processes and Procedures Utilized by TEA in this Investigation

As detailed below, the Preliminary SAI Report's proposed corrective measures and sanctions, including a proposal to lower the District's accreditation rating, are unwarranted, unlawful and unnecessary.  At the current time (the 2018–19 school year), relevant TEA standards show Houston ISD has a 2018 FIRST Rating of "A-Superior".  In 2018 Houston ISD did not receive an Accountability Rating because of Hurricane Harvey, However, if the District would have been rated, it would have received a "B" based on the state's current accountability system.  The District also and a 2018-19 accreditation status of "Accredited".[77]  Moreover, a decision after an informal review to uphold the Preliminary SAI Report would be in violation of statutory law governing the preparation and adoption of such SAI reports, and would exceed the TEA's statutory authority.  Furthermore, an adoption of the Preliminary SAI Report as a Final Report would be arbitrary and capricious, and illegally affect and abridge the substantial rights of the District, its voters, and its Trustees for the reasons discussed below in the balance of this Response.

**A. There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.**

There are distinct legal and procedural errors committed by TEA Staff regarding the Preliminary SAI Report which preclude TEA from forming the basis of lawful action by the Commissioner under TEX. EDUC. CODE § 39.102(a)(9).  Special accreditation investigations must be authorized by the Commissioner or his designee.  TEX. EDUC. CODE §§ 7.055(b)(5), 39.057(a).  Both the original and amended notice letters were issued by and under the authority of Director Jason Hewitt, a person who has not been delegated the authority to initiate SAI investigations.

---

[77]    *See* http://tea4avcastro.tea.state.tx.us/accountability/accreditation/2018_2019_accreditation_statuses.html (TEA website for 2018–19 Accreditation Statuses).

Although the notices contain boilerplate language that the investigations were authorized by the Commissioner, the mere recital of commissioner authority, without any evidence that the special accreditation investigation was properly authorized, is legally insufficient.

On January 22, 2019, TEA issued a Notice of Special Accreditation Investigation and a First Amended Notice of Special Accreditation Investigation.  The notices were issued by Jason Hewitt, Director Special Investigations Unit.  A copy of the letter was sent, inter alia, to Deputy Commissioner Crabill and others.  The notices indicated that they were authorized by the Commissioner.  However, the letter did not explain how such authorization was obtained nor did it provide any evidence of actual Commissioner pre-approval.  There is no indication that either Commissioner Morath or Deputy Crabill authorized the investigation.  The mere recital of such authority, without the proffer of any evidence to support the assertion is legally insufficient.

On March 24, 2019, TEA issued a Second Amended Notice of Special Accreditation Investigation.  Again, the notice was issued by Jason Hewitt, Director Special Investigations Unit. A copy of the letter was sent to Deputy Commissioner Crabill but not to Commissioner Morath. The Amended Notice of Special Accreditation Investigation again indicated on its face, that it was authorized by the Commissioner.  However, TEA has not provided any evidence of actual Commissioner pre-approval.  There is no indication that either Commissioner Morath or Deputy Crabill authorized the investigation.  There is no evidence in the record that the Commissioner delegated his personal responsibilities under by TEX. EDUC. CODE § 39.057(a).  The mere recital of such authority, without the proffer of any evidence to support same, is legally insufficient.

The August 5, 2019 Preliminary SAI Report failed to provide evidence that the SAI was lawfully pre-authorized by the Commissioner, as required by TEX. EDUC. CODE § 39.057(a). Although the notices recite boilerplate language that the investigations were authorized by the Commissioner of Education, neither the notice letters nor the Preliminary SAI Report provide any information as to how such an authorization happened, if at all.

The Preliminary SAI Report also fails to provide evidence that the SAI was conducted within any parameters and constraints authorized by law to the Commissioner, if such investigation was lawfully authorized at all.  The Report contains allegations relating to matters which were not specifically authorized in the original investigation nor even remotely related thereto. Furthermore, any findings and general allegations on investigative issues must be the kind of issues authorized by law to initiate an SAI investigation. Therefore, if the nature of an allegation is not specifically authorized by TEX. EDUC. CODE § 37.057(a), the allegation or finding must be dismissed as a matter of law.

### B. There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.

As discussed at the beginning of this Response, TEA's own investigation procedures require that any evidence substantiating TEA's allegations be gathered and reported in the preliminary report. However, much of the evidence that should be attached to the Preliminary SAI Report is inexplicably absent. Houston ISD objects to the attempt by TEA's investigators to withhold material evidence regarding the allegations they have leveled against Houston ISD and demands that TEA's investigators comply with TEA's Investigation Procedures and provide all evidence they claim supports allegation of wrongdoing including, but not limited to:

- Any and all "documents and tangible things" reflecting or relating to the factual statements from identified and unnamed administrators;[78]
- Any and all audio and/or video recordings of interviews regarding this investigation (including TEA's recording of the interviews with Houston ISD's board members);
- Any other evidence that TEA's investigators believe supports their allegations of wrongdoing.

Houston ISD is committed to transparency. If TEA shares this commitment, its investigators should not be withholding material evidence regarding this investigation.

### C. Houston ISD demands that TEA comply with the Texas Education Codes and submit this response to the Commissioner or a designated hearing examiner for an informal review of this investigation.

Houston ISD respectfully requests that TEA provide an informal review at a hearing conducted by the Commissioner or a hearing examiner in compliance with Chapter 39's statutory requirements. TEX. EDUC. CODE § 39.058(b) ("Before issuing a report with its final findings, the agency must provide a person or entity the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.").

Houston ISD submits this Response along with the attached exhibits and supplemental responses to be reviewed and considered by the Commissioner or hearing examiner at the informal review hearing required by Chapter 39.

---

[78] "Documents and tangible things" as used here is defined by Texas Rule of Civil Procedure 192.3(b) and includes all electronic or magnetic data, as defined by Rule 196.4.

## <u>Conclusion</u>

Based on the above and foregoing, the District opposes TEA's findings and recommended corrective actions and sanctions.  As demonstrated above, there is no evidence the undertaking of this Special Accreditation Investigation was properly authorized by the Commissioner of Education.  Moreover, the Preliminary Report improperly varies from the limited scope of issues addressed in the notices of Special Accreditation Investigation.

The investigation in this case was not conducted in good faith: it was conducted with a predetermined result.  And in order to reach that result TEA's investigators conducted a one-sided investigation that includes numerous factual errors.  The failure of TEA's investigators to engage in a good faith attempt to reach unbiased factual findings results in findings, conclusions, and recommendations that are arbitrary and capricious.

Moreover, even if the findings reached by TEA's one-sided investigation could be given any credence, TEA's investigators failed to properly apply the relevant legal standards to these findings and has applied irrelevant legal standards when conducting its investigation and issuing its Preliminary Report.  TEA improperly relied on irrelevant legal standards to assess draconian corrective actions and sanction against the District and its Board.  These actions and sanctions are not supported by statute or other law and offend the legally protected interests of District Trustees to hold elected office.  TEA's failure to follow the law in reaching its conclusions and recommendations in this case was arbitrary and capricious.

The District reserves the right to supplement this Response and hereby requests an Informal Review of the Preliminary Report, the appointment of an unbiased hearing officer, and all other relief to which it is entitled to.

Respectfully Submitted,

_____

Kevin O'Hanlon
Benjamin Castillo
David Campbell
**O'HANLON, DEMERATH & CASTILLO**
808 West Avenue | Austin, Texas 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919

*Special Counsel to Houston ISD*

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 1



**Texas Education Agency**

**Commissioner Mike Morath**

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

August 5, 2019

Diana Davila, Board President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

<table>
<tr><td>**Preliminary Report**</td></tr>
<tr><td>**Informal Review Request Due:**</td></tr>
<tr><td>**August 15, 2019**</td></tr>
</table>

Holly Maria Flynn Vilaseca, 1st Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Elizabeth Santos, 2nd Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sergio Lira, Board Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sue Deigaard, Assistant Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Jolanda Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Rhonda Skillern-Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Wanda Adams, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Anne Sung, Board Member   .
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

**Dear President Davila and Interim Superintendent Lathan**:

The enclosed report presents the findings resulting from a Special Accreditation Investigation (SAI) conducted by the Texas Education Agency's (TEA) Special Investigations Unit (SIU). This investigation relates to allegations of a systemic breakdown of the Houston Independent School District (HISD) Board of Education's (Board of Trustees) ability to govern, operate within the scope of their authority, and ensure adherence to contracting laws and district policies.

**Executive Summary**

Trustee Diana Davila made a motion during the October 11, 2018 board meeting to replace the current interim superintendent without any prior notice or public deliberation. This action set in

**Appx.076**

motion a chain of events resulting in complaints being filed with the TEA alleging dysfunction within the HISD Board of Trustees.

On October 15, 2018, the TEA received multiple complaints alleging that the HISD is not in compliance with the laws relating to governance of an Independent School District, Tex. Educ. Code §§11.051, and 44.031; and Tex. Gov't Code Chapter 551 Open Meetings. On January 22, 2019, TEA issued a notice of Special Accreditation Investigation (SAI) to HISD and conducted an on-site investigation at the Hattie Mae White Education Support Center, Houston Independent School District, 4400 West 18th Street, Houston, Texas 77092. Due to the concerns reported by HISD staff, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. §44.031. On March 24, 2019, SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092.

TEA finds that HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of the board of trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act.

TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous other times, exceeding the scope of their authority in violation of Texas Education Code §11.051. SIU discovered numerous instances via email correspondence where the HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

Lastly, TEA finds HISD Board of Trustees violated contract procurement rules while the district was selecting a vendor/contractor as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §§44.031 and 44.031 (a)(1). HISD failed to monitor contractual obligations, resulting in the manipulation and abuse Job Order Contracts. The HISD Board of Trustees attempted to award contracts indirectly by contacting vendors during the Request For Proposal (RFP) process, advocating for specific contractors and HISD Board of Trustees manipulated contracts to circumvent contract procurement rules.

Based on the findings, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing Board of Trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the  scope of their authority, circumventing the authority of the Superintendent, and inability to ensure proper contract procurement laws are followed.

**Conclusion**

This preliminary report addresses only those allegations described herein and investigated by the SIU to date. These findings do not address all the allegations raised before or after the investigation. Additional investigative work may be conducted in the future to address any remaining allegations. Furthermore, additional TEA divisions may be in the process of investigating HISD or issuing other investigative reports regarding the district.

The preliminary report is for your review and response related to the findings identified in the report. The attachments to the preliminary report contain FERPA-protected information. FERPA-protected information may not be released to anyone unless they are authorized to receive that information pursuant to FERPA. The school district or any person identified in this report as having violated a law, rule, or policy may request, in writing an informal review of the preliminary report, as authorized by the Tex. Educ. Code §39.058 and 19 Tex. Admin. Code §157.1123. A request for an informal review must be received, along with any information or documentation the requestor would like the agency to consider during the informal review, on or before August 15, 2019, and addressed to the following postal mail or email address:

<u>Mailing address:</u>    Jason Hewitt
Special Investigations Unit
Texas Education Agency
1701 North Congress Avenue
Austin, Texas 78701

<u>Email address:</u>    Jason.hewitt@tea.texas.gov

If no informal review is requested by the deadline, this report will become final, in accordance with 19 Tex. Admin. Code §157.1123.

Please contact me at (512) 936-5962, should you have any questions.

Sincerely,

Jason Hewitt
Special Investigations Unit, TEA

TEA Special Accreditation Investigation
Preliminary Investigative Report
Houston Independent School District

## Introduction

On October 15, 2018, the Texas Education Agency, hereinafter referred to as "TEA" received multiple complaints alleging that the Houston Independent School District, hereinafter referred to as "HISD" or "district", is not in compliance with the laws relating to Governance of Independent School District, Tex. Educ. Code §§11.051, and 44.031; and Tex. Gov't Code Chapter 551, Open Meetings. On January 22, 2019, TEA issued a notice of Special Accreditation Investigation, hereinafter referred to as "SAI" to HISD.

In January of 2019, TEA's Special Investigations Unit, hereinafter referred to as "SIU" met with HISD's Interim Superintendent, Dr. Grenita Lathan, to discuss the nature of the complaint and the purpose of the investigation. Dr. Lathan was also provided a copy of the SAI procedures. HISD provided TEA with documents pertaining to board services, electronic communication records, conservator reports, and employment contracts. SIU conducted this on-site investigation at the Hattie Mae White Educational Support Center-HISD, Houston Independent School District 4400 West 18th Street, Houston, Texas 77092, to interview board members and district staff. Additionally, SIU obtained information from Dr. Abelardo Saavedra, current and former Central Office leadership staff, and former HISD Superintendents.

Moreover, information provided during on-site interviews identified additional areas of concern regarding contract procurement. On March 24, 2019, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. Code §44.031. SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092. The SIU findings described in this report are the result of the investigation extensive document analysis, interviews of HISD Board of Trustees, as well as current and former HISD employees.

## Background Information

The resignation of HISD Superintendent Terry Grier changed the organizational structure of the HISD, requiring the Board of Trustees to name a new superintendent to oversee the leadership, management, and daily operations of the district. Dr. Grier's departure prompted HISD to engage in a superintendent search. After a lengthy superintendent search, Dr. Richard Carranza was named Superintendent of HISD by unanimous vote in August of 2016. Not long after, the leadership of HISD changed yet again when Dr. Carranza abruptly ended his contract in March of 2018.

On March 22, 2018 the HISD Board of Trustees convened in a 7-hour special emergency meeting to deliberate the successor to Dr. Richard Carranza, and appointed Dr. Grenita Lathan as Interim

Superintendent by unanimous vote. Moving forward, Dr. Lathan assumed the role and duties as Interim Superintendent while the board conducted its search for a permanent superintendent.

Filling the position of a permanent superintendent was not the only pressing issue HISD Board of Trustees faced. HISD's long struggle with "Improvement Required" schools is an issue that the Board of Trustees has failed to successfully address, requiring the Commissioner of Education to appoint a conservator to ensure district-level support for Kashmere High School.  Additionally, tension on the board created discord within the community leading to scrutiny from legislators, constituents, and stakeholders at the local and state level. Community members such as Zeph Capo, President of the Houston Federation of Teachers, was quoted in the Houston Public Media saying, "The conduct of the HISD's board was nothing short of embarrassing and harmful. It demonstrated a dysfunction that does not serve our community, our school district and our students well." Trustees have also been criticized by Houston Mayor Sylvester Turner, calling the HISD board, "destabilizing and unacceptable."

Board attempts to address low performing campuses have resulted in disorderly and disorganized board meetings. During the April 24, 2018, board workshop, interactions amongst the Board of Trustees, and the public, escalated to unmanageable outbursts, constant disruptions, and disrespectful comments. Upon going over the allotted time, former President Rhonda Skillern-Jones asked law enforcement to remove the last public speaker from the podium sparking further outbursts from the audience. Former President Skillern-Jones then requested law enforcement assistance in clearing the boardroom. The audience reacted in outrage shouting expletives while Trustee Wanda Adams can be heard saying, "I'm sick of this shit, clear the room." Law enforcement had to remove audience members out of the board room and arrested two community members.

Additionally, HISD Board of Trustees have demonstrated unprofessional behaviors by means of inappropriate verbal arguments during multiple meetings. Trustees have historically interrupted each other during their allotted speaking time, complained about speaking time, and regularly failed adhering to Robert's Rules of Order. Board meetings lack control and order, as evident in the May 10, 2018 meeting when Trustee Jolanda Jones interrupted President Skillern-Jones and stated, "It's frustrating that they [administration] send us [trustees] stuff, and then we come to this table and ask questions we've already gotten the answers to… This is already a long meeting and there are people sitting here that still haven't gotten to speak yet, so I'm tired of meeting to death."

During a board meeting held on June 14, 2018 Trustee Jones stated, "…In reference to the Legislative Budget Board Audit… I think that's a crackhead move, that's my opinion." At the end of that meeting, Trustee Sue Deigaard said, "I think that tonight revealed for me, and the week that proceeded it, was some significant struggles that our board has and I'm really hoping our board can learn from this week, and learn from tonight and pull it together for kids and focus on student outcomes."

Moreover, TEA Conservator Dolores Delaney reported conflicts between trustees have created an environment that impedes the board from focusing on student outcomes. During the September 20, 2018, special board meeting trustees engaged in explosive disagreements when considering the approval to exercise warranty under February 2016, Hazard Young, Attea and Associates "HYA" services for a superintendent search.

Further on, events that occurred during the October 11, 2018 meeting revealed the chaotic dynamics of the HISD Board of Trustees. As Trustee Anne Sung calls a motion to execute the agreement with HYA, arguments erupted between trustees. Trustee Adams commented on the specifics of the contract. Legal counsel interjected during Trustee Adams' commentary to keep her from disclosing closed session discussions, such as; specifics of the contract, and the lack of community engagement. Tension on the board intensified when Trustee Davila expressed that there had been an intentional delay to begin the superintendent search by other trustees.

Trustee Davila's rhetoric prompted Trustee Adams to express her frustrations about a factional divide on the Board of Trustees and within the district's administration. Trustee Adams stated, "Read the conservator's reports, it is about racial lines, and we need to stop it as a board… when you say our community, Santos, that means Black, Brown, Hispanic, Asian, it means everybody. Not just one side, so you need to collaborate with all the principals that don't look like you. We need to come together as one team and make sure we are all on one accord, because we are sending a message that should not be… We have to put what's best for kids, and we are not… we are worried about if someone is Black, White, Hispanic, Asian, it shouldn't be that way… it should be about one color and that's our kids."

Conflicts between trustees not only highlight a difference of opinion, they expose a factional divide that prevents the HISD governing body from moving forward as a district. As Trustee Jones pointed out, "We have people that are working here because Latinos on the board have threatened the superintendent that she better not fire them… there is a race war on this board. I know from both Sergio and Sue that they are concerned, and I do not believe my colleagues always vote for what's best for student achievement but to not appear to side with one race over another." The comments from board members clearly illustrate the dysfunction of the board.

During the October 8, 2018 meeting with Dr. Saavedra, the trustees present in that meeting stated their complaints about the interim superintendent and other trustees.  Dr. Saavedra summarized the complaints of Trustees Lira, Sung, Santos, and Vilaseca as follows:

> They shared with me how disenfranchised they felt on the board.  They discussed at length how the interim superintendent ignored them and did not respect them.  They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees.  One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused.

The inner turmoil of the divided HISD Board of Trustees reached a tipping point during the October 11, 2018 regular board meeting, when Trustee Davila motioned to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was under consideration. This motion and subsequent vote caused a chain of events that prompted TEA intervention.

HISD has also experienced historical problems with contract awarding and contract procurement. The events leading to the arrest of a former Trustee for violating federal racketeering laws highlighted the corruption of the business affairs within the district. HISD internal auditors investigated and confirmed the abuse of Job Order Contracts in which contracts were split in order to avoid the $500,000 threshold as required by state law. In conjunction to these findings, the district's former Chief Auditor, Richard Patton, filed a whistleblower lawsuit against HISD for terminating his contract after reporting unallowable contracting practices within the district.

In addition to egregious board dysfunction and contract procurement issues, the board members frequently overstep their authority. Examples of overreach and overstep of authority by the HISD Board of Trustees can be found dating back to 2009. During the investigation, SIU found that in August of 2009 the HISD board voted 8-1 to allocate $121.5 million for additional facilities projects in each of the nine trustee's districts. The board members who participated in this vote were former 2009 Board of Trustees, and current Board President Diana Davila. This was called the Trustee Allocation Fund (TAF). ( See Exhibit A )

On April 29, 2019, an HISD senior administrator was interviewed by SIU investigators. The administrator reported that the TAF was funded with residual bond money from the 2007 bonds. The amount of money in the fund totaling $121.5 million, was to be split (nine) ways. At this time, the funds have been depleted. The HISD senior administrator explained, "The trustee identified how they wanted the funds spent, and a board item was drafted to allocate the fund request from un-allocated to allocated per the Board vote and approval."(See Exhibit B) The administrator stated that trustees managed TAF money. Trustees used the money for various projects of their choice for schools in their own district. For example, Trustee Skillern-Jones used some of the bond money allocated in her fund to purchase books for Burrus Elementary and "furniture for school reception area" for High School Ahead Academy Middle School. (See Exhibit C) The amount in the fund rolled over to whichever trustee was elected to that seat, until the money was exhausted. This further exemplifies the overreach of the HISD Board of Trustees. The action to approve trustee spending is not only an overreach of the board,but is in direct conflict with the superintendent's contract that states, "the management of the district falls under their (superintendent's) purview." Again, HISD Board of Trustees exceeded their authority by passing this measure and directing HISD employees.

The three specific allegations, SIU's findings of fact, and analysis have resulted in TEA's final decision as stated below:

**Allegation One**

Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?

### Applicable Statute

Texas Governmental Code §551.002. states every regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter.

**Allegation Two**

Did the members of the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

### Applicable Statutes

Texas Education Code §11.051 states:

(a)  An independent school district is governed by a board of trustees who, as a body corporate, shall:
      (1)  oversee the management of the district; and
      (2)  ensure that the superintendent implements and monitors plans, procedures, programs, and systems to achieve appropriate, clearly defined, and desired results in the major areas of district operations.
(a-1) Unless authorized by the board, a member of the board may not, individually, act on behalf of the board.  The board of trustees may act only by majority vote of the members present at a meeting held in compliance with Chapter 551, Government Code, at which a quorum of the board is present and voting.  The board shall provide the superintendent an opportunity to present at a meeting an oral or written recommendation to the board on any item that is voted on by the board at the meeting.

(b)  The board consists of the number of members that the district had on September 1, 1995.
(c)  A board of trustees that has three or five members may by resolution increase the membership to seven.  A board of trustees that votes to increase its membership must consider whether the district would benefit from also adopting a single-member election system under Section 11.052.  A resolution increasing the number of trustees takes effect with the second regular election of trustees that occurs after the adoption of the resolution.  The resolution must provide for a transition in the number of trustees so that when the transition is complete, trustees are elected as provided by Section 11.059.

**Allegation Three**

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

### Applicable Statutes

Texas Education Code, § 44.031 states:

(a)  Except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district:

(1)  competitive bidding for services other than construction services;
(2)  competitive sealed proposals for services other than construction services;
(3)  a request for proposals, for services other than construction services;
(4)  an interlocal contract;
(5)  a method provided by Chapter 2269, Government Code, for construction services;
(6)  the reverse auction procedure as defined by Section 2155.062(d), Government Code; or
(7)  the formation of a political subdivision corporation under Section 304.001, Local Government Code.

**Findings of Fact for Allegation One**

Did a quorum of the HISD Board of Trustees consider or discuss public business over which the trustees have supervision or control outside of a public meeting posted in compliance with Tex. Gov't Code Chapter 551 "Open Meetings"?

The following findings of fact are a result of interviews conducted and an examination of HISD internal documents.

**Open Meetings**

1. On March 5, 2018 at 11:17 PM, Trustee Holly Maria Flynn Vilaseca sent an email to Dr. Saavedra stating, "Holly here (HISD Trustee) As you may have heard, many changes are taking place here. Would love to hop on a call to check-in." ( See Exhibit 1.1 ).
2. Trustee Davila told SIU, "I communicated with Dr. Saavedra when Richard Carranza announced that he was going to be leaving… we talked about a possible interim superintendent interest."
3. Text messages submitted by Trustee Vilaseca confirm that on October 5, 2018, Trustee Vilaseca asked Dr. Saavedra if they could meet on October 8, 2018 from 3PM -6PM. ( See Exhibit 1.2 )

4. During her interview with SIU, Trustee Flynn Vilaseca stated that on October 8, 2018, she met with Dr. Saavedra at a local restaurant along with Trustees: Santos, Lira, Sung and Davila.

5. Dr. Saavedra stated that he met with Trustees Lira, Sung, Santos, and Flynn Vilaseca on October 8, 2018. After Trustees Lira, Santos and Sung left, Dr. Saavedra met with Trustees Vilaseca and Davila.

6. In their interviews with SIU, Trustees Santos and Sung acknowledge they were in a meeting with Dr. Saavedra, Trustee Lira, and Trustee Flynn Vilaseca

7. Dr. Saavedra told the SIU that Trustee Vilaseca told him that some of the HISD Board of Trustees did not know him and wanted to meet him.

8. According to Dr. Saavedra, the board members wanted to talk to him that day because they wanted to consider him as a replacement for Dr. Lathan.

9. Trustee Flynn Vilaseca told SIU investigators that during the meeting with Dr. Saavedra, Trustee Flynn Vilaseca provided Dr. Saavedra with a copy of former Superintendent Carranza's contract.

10. On October 11, 2018, three days after the meeting between trustees and Dr. Saavedra, Trustee Davila called a motion to replace Dr. Lathan as Superintendent with Dr. Saavedra. The motion passed on a 5-to-4 vote. The five trustees (Lira, Davila, Sung, Santos and Vilaseca) who secretly met with Dr. Saavedra all voted for the motion three days after meeting with Dr. Saavedra.

11. In the motion to hire Dr. Saavedra, the board offered the same salary and benefits as were present in Dr. Caranza's contract that was provided to Dr. Saavedra by Trustee Holly Vilaseca in the secret meeting three days prior.

12. During the deliberations regarding Trustee Davila's motion to replace Dr. Lathan with Dr. Saavedra, Trustee Davila explained that she had recently been at a conference where she was told that it was hard to get qualified candidates to apply for a superintendent job when the current interim superintendent is pursuing that position. Trustee Davila then stated that she had "spoken to Dr. Saavedra and he has no interest of staying or applying for the position."

13. SIU conducted separate interviews with Trustee Adams, Trustee Jones, Trustee Skillern-Jones and Trustee Deigaard. When asked if they knew about the meeting at a local restaurant, they all denied knowing about the meeting and stated that no one told them about it. Their statements are corroborated by Dr. Saavedra and the five board members who knew about the meeting.

14. Most recently at the August 1, 2019 Agenda review meeting, Trustee Santos stated,"I just find it quite funny that people keep throwing stones at certain trustees but were not the only ones in violation the Texas open meeting act, so I'm gonna go ahead and remind this board that last year when we voted for um [sic] the September vote when certain elected officials showed up here there were five other trustees that knew about a September 1st contract for the interim superintendent that somebody was going to make the motion on. There were five trustees that knew about it, we were not-didn't in any clue about it [sic], so the investigation, I welcomed the TEA to continue investigating not just the five educators that you keep pointing fingers at, Trustee Deigaard, because if I recall, you were the one that

was going to make that motion. Anyway I'm gonna go ahead and back up Trustee Sung, because I didn't get on this board to be elected, I didn't come up on here for talking points, I didn't come up here to hault-to stop [sic] the democratically elected process that you know what when we got up here 18 months ago, but five years ago, five years ago there were nine trustees up here that were not doing the work for children; now you have a board that is willing to do the work and you want to sit here and hide behind talking points? It's not just these five educators that need to be under investigation Trustee Deigaard." Trustee Skillern Jones admitted that there have consistently been problems with the HISD board for five years, describing the board as "contentious and conservative". Trustee Skillern-Jones also accused some of her fellow board members of receiving their talking points from community members who attend the board meetings through their phone.

## Cooperation with TEA investigation

15. When SIU investigators asked Trustee Vilaseca why she provided Dr. Saavedra with a copy of former Superintendent Richard Carranza's contract, Trustee Vilaseca stated she did not recall.

16. When asked about her relationship with Dr. Saavedra, Trustee Davila stated, "I was on the board with him for five years and he was superintendent for five years. We have a professional relationship…Dr. Saavedra and I, every now and then will send texts like: Happy New year, Happy Birthday, Happy Father's Day… when I was still on the board even after I hired Dr. Grier it would be like, Do you remember what the budget looked like when you were here? or, do you remember the process we used when you were here?, things like that."

17. During her interview with SIU, Trustee Davila further stated that in 2018, she had communicated with Dr. Saavedra "five or six times."

18. Dr. Saavedra told the SIU that he had exchanged text messages with Trustee Davila on or about October 4, 2018 about whether he had heard from Trustee Vilaseca. When he responded that he had not, Trustee Davila told him that he would hear from her soon.

19. SIU submitted requests to HISD for text messages from HISD Board of Trustees (including Trustee Davila) to Dr. Saavedra. Trustee Davila failed to respond to the request and failed to produce any records. Board members are subject to the Public Information Act and the Local Records Retention Schedule. Text messages regarding the arrangement of a meeting with a person being considered for the interim superintendent position should have been retained and turned over to the SIU upon request.

20. In her interview with SIU, Trustee Davila stated that when she met with Dr. Saavedra there were no other trustees present; however, Trustee Vilaseca and Dr. Saavedra confirm that Trustee Vilaseca was present when Trustee Davila met with Dr. Saavedra.

21. In his interview with SIU, Trustee Lira admitted that he met with Dr. Saavedra before the October 11, 2018 regular board meeting. However, Trustee Lira told to the SIU investigators that he was alone when he met with Dr. Saavedra and no other trustees were present for the meeting. This declaration is contradicted by Dr. Saavedra's statement that he met with Trustees Lira, Santos, Vilaseca and Sung and later by Trustee Davila. Additionally, Trustees

Sung, Santos, and Vilaseca confirmed that Trustee Lira was present during the meeting with Dr. Saavedra.

**Analysis of Allegation 1**

**OPEN MEETING VIOLATION**

TEA finds that HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of the board of trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act.

According to the Texas Open Meetings 2018 Handbook, as provided by the Office of Attorney General, a walking quorum occurs when a governmental body attempts to avoid compliance with the Act by deliberating about district business without a quorum being physically present in one place at one time. Additionally, per Government Code §551.001(4), "meeting" means: a deliberation between a quorum of governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has a supervision or control is discussed or considered or during which the governmental body takes formal action.

On May 24, 2019, Attorney General, Ken Paxton provided an opinion on the Texas Open Meetings Act quorum rules and stated the following, "If a quorum of a governmental body deliberates about public business within the jurisdiction of the body outside of a meeting authorized by the Texas Open Meetings Act, through multiple communications each involving fewer than a quorum, the governmental body violates the Act. If the Texas Education Agency conducts an investigation as authorized by section 39.057 of the Education Code and concludes that members of a school district board of trustees violated their duty to comply with the Act, it could take appropriate civil action authorized by subsection 39.057(d) of the Education Code." ( See Exhibit 1.3 )

Based on Findings of Fact 1-13, five individual members of the HISD Board of Trustees violated the Open Meetings Act by holding two successive meetings attended by a quorum of the HISD Board of Education. At this meeting the quorum of the board discussed and considered public business over which the board has supervision or control by engaging in conversation and dialogue for the purpose of replacing Dr. Lathan with Dr. Saavedra. The hiring of a superintendent for the district is public business over which the HISD Board of Education has supervision or control. See Tex. Educ. Code §11.201(b) ("The board of trustees for an independent school district may employ by contract a superintendent for a term not to exceed five years.")

Based on Findings of Fact 1-6, Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila all secretly met with Dr. Saavedra on October 8, 2018, in a meeting that was not posted in accordance with the Open Meetings Act. Trustees Vilaseca and Davila had been talking with Dr. Saavedra about

the position of interim superintendent since Dr. Carranza's resignation. It is irreverent that there is no evidence that all five trustees were in the meeting with Dr. Saavedra at the same time, as the trustees violate the open meetings act when they deliberate public business outside of a properly posted public meeting through multiple communications each involving fewer than a quorum.

Based on Findings of Fact 7-12, the purpose of the meetings with Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila with Dr. Saavedra was to consider Dr. Saavedra for the position of interim superintendent. Dr. Saavedra was told by Trustee Vilaseca that some of the Board members did not know him and wanted to meet him. See Finding of Fact 7. It is reasonable to conclude that the board members would want to meet Dr. Saavedra before voting to name him as the new interim superintendent. Further, Dr. Saavedra himself concluded that the board members were interested in hiring him to be the new interim superintendent. See Finding of Fact 8.

In addition, Trustee Vilaseca admitted that she provided Dr. Saavedra a copy of former superintendent Dr. Caranza's contract. See Finding of Fact 9. There would be no reason to present a copy of the former superintendent's contract if the board members were not considering him for the position of the interim superintendent. The fact that three days later the five board members who secretly met with Dr. Saavedra then voted to name him as the new interim superintendent under the same terms as the contract they presented to him at the October 8, 2018 meeting corroborate the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent. See Findings of Fact 10-11.

Finally, after Trustee Davila made the motion to name Dr. Saavedra as the new interim superintendent, Trustee Davila acknowledged that she had spoken to Dr. Saavedra about the position of interim superintendent and that he had told Trustee Davila that he would not be interested in taking the permanent position. See Finding of Fact 12. This corroborates other evidence that the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent.

Based on Finding of Fact 13 Trustee Santos publicly admitted that she violated the Texas Open Meetings Act and then accused her fellow board members of the same.

As a tenured trustee, Diana Davila understood the concept of a walking quorum. During her interview with SIU, she defined a walking quorum as, "five trustees engaged in conversation with district business to discover if you have a consensus, additionally, a walking quorum does not have to be all at once. As in, we all don't have to be sitting together all at one time."

### Cooperation with TEA Investigation

At the time of October 8, 2018 meeting with Dr. Saavedra, the position of interim superintendent was a highly contentious issue. Dr. Saavedra described the complaints of Trustees Lira, Sung, Santos, and Vilaseca. Dr. Saavedra summarized the issues as follows:

> They shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in

one of the board committees. One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused.

However, when SIU interviewed the board members, there were many instances where the board members had little memory of this highly important meeting. Further, some of the board members made deceptive statements to the SIU, either by making inconsistent statements and through omission.

As detailed in Finding of Fact 9, Trustee Vilaseca acknowledged providing Dr. Saavedra with a copy of former superintendent Richard Carranza's contract. However, Trustee Vilaseca could not or would not explain why she presented Dr. Saavedra with a copy of that contract. See Finding of Fact 14. However, when the motion was made to make Dr. Saavedra the interim superintendent, the motion specifically identified the compensation and benefits in the contract to be given to Dr. Saavedra to be equal to the rate paid to Dr. Carranza. Trustee Vilaseca failed to cooperate with the investigation by failing to explain why she had a copy of Dr. Carranza's contract and why she presented it to Dr. Saavedra.

As detailed in Findings of Fact 15-18, Trustee Davila regularly communicated with Dr. Saavedra about HISD business, including an exchange of text messages arranging the secret meeting held in violation of the Open Meetings Act. These communications are public records and are required to be retained pursuant to the Texas Public Information Act and the Local Records Retention Schedule. Trustee Davila failed to cooperate with the investigation by failing to turn over text messages that were requested pursuant to this investigation.

As detailed in Finding of Fact 19, Trustee Davila failed to cooperate with the Agency's investigation by falsely claiming that there were no other trustees present when she met with Dr. Saavedra. Trustee Vilaseca and Dr. Saavedra confirm that Trustee Vilaseca was present when Trustee Davila met with Dr. Saavedra.

As detailed in Finding of Fact 20, Trustee Lira failed to cooperate with the Agency's investigation by falsely claiming that there were no other trustees present when he met with Dr. Saavedra. Trustees Santos, Sung, and Vilaseca and Dr. Saavedra all confirm that Trustee Lira was present at the meeting attended by Trustees Santos, Sung, and Vilaseca and Dr. Saavedra.

**Overall Conclusion**

Therefore, allegation one "Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?" has been substantiated. Five out of the nine board members met in a walking quorum on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held

in compliance with the Open Meetings Act.. The nature of these actions do not reflect HISD Policy BBE (LOCAL) which states, Official Board actions shall be taken only in meetings that comply with the Open Meetings Act, thus, the HISD Board of Trustees explicitly violated the Texas Open Meetings Act. ( See Exhibit 1.4 )

## Findings of Fact for Allegation Two

Did the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

The following findings of fact are a result of interviews and an examination of HISD internal documents.

1. On January 29, 2019, SIU investigators interviewed the Principal for the High School of Law and Justice. The Principal recalled an incident in 2018 with Trustee Davila during a site visit of the High School for Law and Justice campus. "I am in a brand-new campus. As it was being built, Diana Davila had a tour of the campus without my knowledge… I found out about it on Twitter when I saw her pictures with my construction manager, and them taking pictures of the new building. Then I got a phone call from my project manager, as Trustee Davila told the construction people to take a wall down out of my new campus out of the courtroom. I became a little upset. They took that wall down. I went to the HISD Senior Administrator and I told him, 'she can't do that', and he says that, 'I'm very aware that she cannot do that. If you want the wall back, we will put the wall back up.'"

2. On April 16, 2019, SIU investigators interviewed a HISD Administrator. This administrator corroborated the Principal's account that Trustee Davila gave a directive to modify construction of a classroom while on a site tour. The administrator stated, "One project we just finished was High School for Law… it was pretty much done with the construction or the particular areas was done and it was one of the feature areas which was the courtroom set up like a full courtroom, a mock courtroom because it was actually a classroom… So that was all done and at a board member's request all of that had to be changed just off a site tour." During a site visit, Trustee Davila directed that a completed mock courtroom be changed. Initially, the room was a mock courtroom, within a classroom. During her site visit, Trustee Davila complained that the courtroom was too small and directed the construction services administration, including the administrator to change it. The administrator provided the construction change order documents. ( See Exhibit 2.1 )

3. The change order states that the total cost of changes to the mock classroom amounted to $20,000. When asked who ultimately approves a change like this, the administrator responded, "it was a trustee said it and it was done. I know what you're looking for, yes, it's out of protocol, that's the simple answer." When asked if this was overreach by a trustee, the administrator responded, "yeah, cause I mean, I have to manage that budget and you just made a request, that you don't care about... but I have to figure out how that money works, I have to call in that favor with that contractor."

Appx.090

4. According to the Principal, and the administrator's testimony, Trustee Davila conducted a campus visit without letting the campus principal know and instructed the construction team to make material modifications to an area that was already built.

5. An HISD senior administrator was directed to remove a contract for the construction of Austin High School in December 2016. The HISD senior administrator stated Trustee Davila asked him to remove the Pepper Lawson contract from the January board agenda after the procurement process had occurred. Moreover, Trustee Davila and her husband told the administrator that they wanted a firm out of Dallas, wanted him to make it happen, and threatened him with his job if he did not do it. Although the administrator refused to remove the contract from the agenda, a former board president took the liberty to remove the agenda item. Subsequently, the agenda item was placed on the February 2018 regular board meeting. ( See Exhibit 2.2 and Exhibit 2.2.1)

6. On October 3, 2018, Trustee Elizabeth Santos hosted a campaign event on HISD property paid for by the district. The event, "Field Good Day", was not sponsored by HISD ( See Exhibit 2.3 ). Although Trustee Santos indicated she would cover the cost of the event, she failed to submit payment. A HISD senior administrator confirmed Trustee Santos did not pay for the event.

7. Trustee Santos misused her role as a trustee when visiting the Hattie Mae White Educational Support Center. The administrator told SIU, "Santos was getting all this food and not paying for it. She tells people, 'I am a trustee and board services covers that.'" The administrator stated board services did not cover the cost of those meals because it was not in policy to do so.

8. During a workshop with Deputy Commissioner AJ Crabill and HISD administration regarding Improvement Required campuses, Trustee Davila expected principals to explain what they needed so trustees could provide resources to prevent another failing year. Principals refused to speak over the superintendent, prompting Trustee Davila to say, "Let me be clear, I won't hesitate to vote you out when your contract comes up if you don't tell me what you want right now, because your four schools are in the playoffs."

9. A Senior HISD administrator told SIU that Dr. Lathan set protocols in place to prevent trustees from interacting with staff and enforced the use of the board service referral system. Additionally, Dr. Lathan had to address the issue with the board several times in writing as well as during closed session during their retreat.

10. Dr. Doris Delaney has served as a conservator for Houston ISD from September 2016 to present. Dr. Delaney is responsible for attending Houston ISD school board meetings on a regular basis and noting important board decisions, board interactions, and areas of concern within her monthly conservator reports. During this time, Dr. Delaney attended roughly 104 board meetings and spent substantial time observing board interactions, some of which are depicted in the following exerts from her monthly conservator reports to TEA:

    a. In the March 2018 conservator report, TEA Conservator Doris Delaney reported, "Board members continue to make requests of staff that take away from the staff being able to spend time performing their assigned duties." In March 2018, the board members requested the following:

     i.   How much money do we currently spend per student at each campus and what has the historical trend been for the past 10 years? Please disaggregate state/local funding from federal funding.

     ii.   For each campus (248), what is current funding under the PUA and what is the funding under an FTE? For each campus, I'm looking for the following data points (included 27 individual questions) ( See Exhibit 2.4 )

11. Dr. Delaney reported on the status of board member requests that were being handled by board services. ( See Exhibit 2.5 ) Dr. Delaney reported numerous instances where individual board members contacted members of the administration directly.  The members of the administration then sent the request to board services.

12. The SIU reviewed electronic communications from Trustees dating back to the beginning of 2016.  During this period of time, the individual board members frequently contacted members of the HISD administration providing individual input and directing activity in the areas of personnel, operations, contracting, and campaign events.

**Electronic Communications from 2016**

    a.   On January 27, 2016, a former trustee forwarded an email to the former Chief of Human Resources, in regard to an HISD employee applicant and the positions she applied for. The trustee stated, "Could I please ask you to check if these positions have been filled? Ms. Lorenzo has applied and has not received any reply." ( See Exhibit 2.6 )

    b.   On April 12, 2016, a former trustee emailed the Interim Superintendent questions regarding the upcoming board agenda items. The interim superintendent directed the former Chief of Student Support Officer to answer the trustee's questions. The officer complied and answered all the former trustee's questions. The trustee then replied and asked about which vendor the administration was recommending for a project. The officer sent him the HISD policy on the Code of Silence with potential vendors. The former trustee replied, "I know the law." (See Exhibit 2.7 )

    c.   On August 1, 2016, a former trustee forwarded an email to former Chief of Human Resources, regarding a pay dispute with an employee who had resigned and was claiming to be owed a 3-month severance payment. The former trustee directed her to reply to the forwarded email. The former trustee stated, "Please see below and reply, thank you. Cc me on the response."
( See Exhibit 2.8 )

    d.   On September 19, 2016, Trustee Skillern-Jones sent an email to the former Chief Communications Officer regarding a meeting being planned. Trustee Skillern-Jones directed the officer as to whom she wanted to plan her meeting, even though someone else was already assigned. In the email, Trustee Skillern-Jones also laid out numerous demands. Trustee Skillern-Jones stated, "I want [employee A] working this meeting and the decorations done appropriately… Please ensure landscaping is done, please ensure refreshments are provided, please ensure décor

is acceptable, please ensure agendas are done, and please ensure sufficient staff is in place." ( See Exhibit 2.9 )

e.  On January 26, 2016, a former trustee emailed the former Superintendent of School Choice and requested that she send him a spreadsheet of the racial breakdown of each magnet's school "magnet students." ( See Exhibit 2.10 )

f.  On March 1, 2016, a former trustee directed the former Media Relations Manager to respond to a letter from a law firm. The former trustee stated, "Manager, I would like your lead to respond to this letter with back up from [employee B] as to why HISD is moving away from UIL at Carnaige."
( See Exhibit 2.11 )

g.  On March 28, 2016, a former trustee emailed the former Chief Superintendent of School Choice and requested information regarding student applications for a particular school. ( See Exhibit 2.12 )

h.  On May 16, 2016, Trustee Skillern-Jones emailed [employee C] and [employee D] requesting information for her to share at her community meeting hours before it was to commence. ( See Exhibit 2.13 )

i.  On May 24, 2016, a former trustee emailed a HISD senior administrator  and other HSID staff members regarding a principal's complaint of the lack of maintenance staff at her school. The former trustee stated, "Please fix this…It's not acceptable for a principal working a turn-around campus to have to do this work herself."
( See Exhibit 2.14 )

j.  On June 26, 2016, a former trustee emailed a staff member to see if she could pick up her student's old test grades and documents because she lost them and needs to turn them in so her child can go to school. (See Exhibit 2.15)

## Electronic Communication from 2017

a.  On May 3, 2017, Trustee Adams forwarded an email she received from a friend of a coworker at her job to the former Superintendent, former Deputy Superintendent, and former Chief of Human Resources. The forwarded email contained a list of positions the friend applied for within HISD. Along with the forwarded email, Trustee Adams instructed the recipients of the email to view the resume and "consider for possible telephone conversation." Trustee Adams also stated that she will forward the resume once received from the friend.
( See Exhibit 2.16 )

b.  On May 24, 2017 Trustee Skillern-Jones forwarded an email to the former Chief of Human Resources regarding a former employee's issue. The former employee was requesting to be eligible for rehire, despite being told that she was not eligible for rehire due to performance issues. Trustee Skillern-Jones directed the former chief to "please investigate." ( See Exhibit 2.17 )

c.  On December 5, 2017, Trustee Adams and a former trustee were forwarded three reports of Code of Silence violations by a former Superintendent, former Chief of Human Resources, and former Officer of Human Talent. The email was sent by the former HISD Ethics and Compliance Officer. Trustee Adams responded to the

email giving the directive that all cabinet members be trained annually on ethics policies and further stated she wanted the email to be placed in the personnel file of all listed in the email.

( See Exhibit 2.18 )

d.  On March 31, 2017, a former trustee forwarded an email to an Area Superintendent regarding a parent complaint at one of the schools. The former trustee directed the area superintendent to look into the situation. ( See Exhibit 2.19 )

e.  On May 1, 2017, Trustee Adams sent an email directly to an HISD senior administrator, former Chief of Staff, board services, HISD Senior Administrator, and former high school Principal. Trustee Adams requested all staff meet with [employee E] to address the needs of that high school, which is in her district. ( See Exhibit 2.20 )

f.  On June 1, 2017, Trustee Adams emailed an HISD Senior Administrator and requested he send her the budget cost "if we were to increase pay to 12.50 per hour." ( See Exhibit 2.21 )

g.  On June 7, 2017, a former trustee emailed HISD administration and staff members and requested information. The trustee stated, "Could we please get the data on the positions mentioned? Including a comparison of central office positions over the last five years with budget increases." ( See Exhibit 2.22 )

h.  On August 3, 2017, a former trustee emailed the Chief of Human Resources, and requested information regarding new principal positions. ( See Exhibit 2.23 )

i.  On October 22, 2017, Trustee Flynn Vilaseca sent the former Chief of Human Resources a list of seven (7) questions. (See Exhibit 2.24)

j.  On November 10, 2017, Trustee Flynn Vilaseca emailed an HISD Senior Administrator and directed him to resolve an issue. Trustee Flynn Vilaseca stated, "Looks like there are plumbing issues at Askew. I have sent [employee F] a referral but wanted to send directly to you as it would be great if we could get this checked out and fixed soon."  ( See Exhibit 2.25 )

k.  On December 6, 2017, Trustee Skillern-Jones directly emailed an HISD Senior Administrator and requested information. Trustee Skillern-Jones stated, "Please have real estate send me a list of all vacant properties." ( See Exhibit 2.26 )

## Electronic Communications from 2018

a.  On January 10, 2018, Trustee Adams directly emailed an HISD Senior Administrator and asked for an update on the construction of two schools.        ( See Exhibit 2.27 )

b.  On February 22, 2018, the former Chief of Staff alerted Trustee Deigaard to an incident that occurred at a middle school. Trustee Deigaard then emailed that she wanted the doors at a different school locked, stating that, "the doors are only locked from the front and not from the back."  ( See Exhibit 2.28 )

c.  On February 22, 2018, a former Area Superintendent emailed Trustee Adams and attached the interview and staffing timeline for the hiring of a principal at a particular school. Also, in the email the area superintendent informed Trustee

Adams about how many internal and external applicants there were. Trustee Adams expressed her desire for three specific members to participate in the hiring committee. Trustee Adams had already communicated to one of these members that he would be part of the hiring committee before she informed HISD staff. ( See Exhibit 2.29 )

d. On February 27, 2018, Trustee Deigaard asked the former Chief of Student Support Officer for information regarding, "How many current students are from each trustee district?" She also wanted to know, "How many students come from each middle school?" ( See Exhibit 2.30 )

e. On April 18, 2018, Trustee Deigaard sent an HISD Senior Administrator a lengthy email in discussing how she witnessed a bus make an unsafe turn as she was driving her daughter to school. ( See Exhibit 2.31 )

f. On August 24, 2018, Trustee Skillern Jones emailed an HISD Senior Administrator and asked for a closed HISD parking lot to be open for her event. ( See Exhibit 2.32 )

g. On October 3, 2018, Trustee Deigaard forwarded an email to an HISD Senior Administrator regarding a parent who has bus transportation concerns. Trustee Deigaard stated, "I didn't include the new head of transportation on this because I couldn't remember their name…please let me know their name and address for future correspondence, I would appreciate it." ( See Exhibit 2.33 )

h. On October 23, 2018, Trustee Deigaard emailed an HISD Senior Administrator and asked him, "Where might I find the quarterly investments reports online? I've looked several places but haven't found it yet." ( See Exhibit 2.34 )

**Electronic Communications from 2019**

a. On March 18, 2019, an HISD Senior Administrator forwarded an email from the General Manager of the Benefits Department regarding a phone call between Trustee Skillern-Jones, a contractor, and a MWBE subcontractor. Allegedly, the phone call discussed HISD's medical plan and medical RFP. It was stated that Trustee Skillern-Jones wanted to set up a meeting with the benefits department. When Dr. Lathan emailed Trustee Skillern-Jones and asked her why she wanted a meeting, Trustee Skillern Jones replied, "I got a call from Nick because he heard I had concerns, the same concerns I voiced in the budget workshop. I did not ask Nick to speak for me or to set up a meeting for me….(AT NO TIME DID I DISCUSS AN RFP PERIOD. HE STATED HE THOUGHT MAYBE SOMEONE ELSE COULD SAVE US MONEY.)" Regardless of whether the contractor was the one to initiate the phone call, Trustee Skillern-Jones should have referred the call to the interim superintendent as it is not part of her statutory duties. ( See Exhibit 2.35 )

b. On April 16, 2019, Trustee Santos forwarded a public information request (PIR) from a community member to Dr. Lathan. The PIR related to an evaluation. In the initial PIR email, the community member sent the request to HISD staff and carbon copied Dr. Lathan and Trustee Santos. In her email to Dr. Lathan, Trustee Santos

stated, "I know you've received this, and I believe the community has a requested a meeting with the Area Supe. I hope we can clear this up soon." ( See Exhibit 2.36 )

c.  In April of 2019, an email was sent to Trustee Sung from a parent discussing a grievance and thanking Trustee Sung for all her close help in trying to solve the matter. The parent emailed Trustee Sung, "[t]hank you for working so closely with our family to resolve the issues … pertaining discriminatory and retaliatory practices…Hopefully the assistance and consistent communication that you have provided in support of our family will not jeopardize your voting power to negate any action pertaining to the future of [name of program redacted pursuant to FERPA]…" The parent also requested an update on Trustee Sung's "assistance in resolving the matter." In April of 2019, the parent emailed Trustee Sung again and stated, "[t]hank you for assisting in the effort to resolve the ongoing issues at [name of program redacted pursuant to FERPA], I read your attached email. The forms of resolution you brought up in your discussion with [name of administrator redacted pursuant to FERPA] were not implemented…" In the same email the parent asked Trustee Sung to ask certain questions to the parties involved in the grievance. The parent emailed Trustee Sung in April of 2019, and stated, "[y]ou have been the responsive and hands on board member and at times you made many of us feel as if you were our area superintendent because of your active participation." ( See Exhibit 2.37 )

d.  On April 26, 2019, Board President Davila emailed Interim Superintendent Dr. Lathan requesting to be updated on the process of hiring a principal for an elementary and middle school. Board President Davila requested to know timelines, people serving on the committees, and their roles in the school community. ( See Exhibit 2.38 )

e.  On May 1, 2019, Trustee Davila, emailed Interim Superintendent Dr. Lathan and copied Trustee Anne Sung, asking her about the principal search at a school. Trustee Davila stated, "[w]hat is happening with this process? Making sure the district is inclusive and transparent in the selection of a campus leader is policy. We don't need legislators making a new law because of this one HISD campus." ( See Exhibit 2.39 )

13. From 2016 to 2018, there were numerous direct and indirect communications by a board member to HISD staff.  Direct communications are communications where a board member directly communicates to a staff member via email without copying the superintendent or interim superintendent. Indirect communications are communications where a board member directly communicates to a staff member and copies the superintendent or interim superintendent. ( See Exhibit 2.40 and Exhibit 2.40.1).

### Analysis of Allegation Two

TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous times, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051. While investigating allegations that trustees acted without authority given in an open meeting, SIU discovered other

instances of other trustees acting without authority. SIU discovered numerous instances via email correspondence where the HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the HISD Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

Tex. Educ. Code §11.051(a-1) clarifies that a member of the board may not individually act on behalf of the board and that the board of trustees may only act by a majority vote of the members present at a meeting held in compliance with the Open Meetings Act.

Tex. Educ. Code §11.1511(b) and (c) enumerate the powers of the Board of Trustees of an independent school district in relation to the superintendent.

(b)  The board shall:

(1)  seek to establish working relationships with other public entities to make effective use of community resources and to serve the needs of public school students in the community;

(2)  adopt a vision statement and comprehensive goals for the district and the superintendent and monitor progress toward those goals;

(3)  establish performance goals for the district concerning:

(A)  the academic and fiscal performance indicators under Subchapters C, D, and J, Chapter 39; and

(B)  any performance indicators adopted by the district;

(4)  ensure that the superintendent:

(A)  is accountable for achieving performance results;

(B)  recognizes performance accomplishments; and

(C)  takes action as necessary to meet performance goals;

(5)  adopt a policy to establish a district- and campus-level planning and decision-making process as required under Section 11.251;

(6)  publish an annual educational performance report as required under Section 39.306;

(7)  adopt an annual budget for the district as required under Section 44.004;

(8)  adopt a tax rate each fiscal year as required under Section 26.05, Tax Code;

(9)  monitor district finances to ensure that the superintendent is properly maintaining the district's financial procedures and records;

(10)  ensure that district fiscal accounts are audited annually as required under Section 44.008;

(11)  publish an end-of-year financial report for distribution to the community;

(12)  conduct elections as required by law;

(13)  by rule, adopt a process through which district personnel, students or the parents or guardians of students, and members of the public may obtain a hearing from the district administrators and the board regarding a complaint;

(14)  make decisions relating to terminating the employment of district employees employed under a contract to which Chapter 21 applies, including terminating or not renewing an employment contract to which that chapter applies; and

(15)  carry out other powers and duties as provided by this code or other law.

(c)  The board may:

(1)  issue bonds and levy, pledge, assess, and collect an annual ad valorem tax to pay the principal and interest on the bonds as authorized under Sections 45.001 and 45.003;

(2)  levy, assess, and collect an annual ad valorem tax for maintenance and operation of the district as authorized under Sections 45.002 and 45.003;

(3)  employ a person to assess or collect the district's taxes as authorized under Section 45.231; and

(4)  enter into contracts as authorized under this code or other law and delegate contractual authority to the superintendent as appropriate.

Tex. Educ. Code §11.1512(a) defines the relationship between the board and the superintendent. It states that, "In relation to the superintendent of the school district, the board of trustees has the powers and duties specified by Sections 11.1511(b) and (c).  The superintendent shall, on a day-to-day basis, ensure the implementation of the policies created by the board."

The superintendent is responsible for enforcing policy and procedures to operate district business effectively and efficiently acting as the chief executive officer. Section 11.201(d) of the Texas Education Code, (d) identifies the duties of the superintendent, which include:

1.  Assuming administrative responsibility and leadership for the planning, organization, operation, supervision, and evaluation of the education programs, services, and facilities of the district and for the annual performance appraisal of the district's staff;

2.  Except as provided by section 11.202. assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district other than the superintendent;

3.  Overseeing compliance with the standards for school facilities established by the commissioner under section 46.008;

4.  Initiating the termination or suspension of an employee or the nonrenewal of an employee's term contract;

5.  Managing the day-to-day operations of the district as its administrative manager, including implementing and monitoring plans, procedures, programs, and systems to achieve clearly defined and desired results in major areas of district operations,

6.  Preparing and submitting to the board of trustees a proposed budget as provided by section 44.002 and rules adopted under that section, and administering the budget;

7.  Preparing recommendations for policies to be adopted by the board of trustees and overseeing the implantation of adopted policies;

8.  Developing or causing to be developed appropriate administrative regulations to implement policies established by the board of trustees,

9. Providing leadership for the attainment, and, if necessary, improvement of student performance in the district based on the indicators adopted under sections 39.053 and 39.301 and other indicators adopted by the commissioner or the district's board of trustees.

10. Organizing the district's central administration;

11. Consulting with the district-level committee as required under section 11.252;

12. Ensuring:
   A.   Adoption of a student code of conduct as required under section 37.001; and
   B.   Enforcement of that code of conduct; and adoption and enforcement of other student disciplinary rules and procedures as necessary;

13. Submitting reports as required by state or federal law, rule or regulation, and ensuring that a copy of any report required by law, rule, or regulation is also delivered to the agency;

14. Providing joint leadership with the board of trustees to ensure that the responsibilities of the board and superintendent team are carried out; and

15. Performing any other duties assigned by action of the board of trustees.

Houston ISD has adopted policies governing board member interactions with staff. Policy BBE(LOCAL) has been in effect since 2001 and states that, "Board members as individuals shall not exercise authority over the district, its property, or its employees." ( See Exhibit 1.4 ). This policy also states, "An individual member may act on behalf of the board only with the official express authorization of the board. Without such authorization, no individual member may commit the board on any issue."

This policy also prohibits board members from directing or requiring district employees to "prepare reports derived from an analysis of information in existing district records or to create a new record compiled from information in existing district records. Directives to the superintendent regarding the preparation of reports shall be by (1) Board action; (2) Request of an individual board member made in a board meeting after discussion by the board as a whole; or (3) Written request of an individual board member. ( See Exhibit 1.4 )

This policy also requires individual board members to refer citizen concerns or complaints to the Superintendent who is then required to proceed per the appropriate complaint policy. The board retains authority to address concerns or complaints by considering placement on the board agenda in limited circumstances. The concern or complaint must directly pertain to the board's own actions or policy for which there is no administrative remedy. ( See Exhibit 1.4 )

Houston ISD adopted Policy BBE2 (REGULATION) on April 15, 2013. This policy establishes a procedure governing all referrals from trustees or the superintendent. The policy defines a referral as "any verbal or written communication received from a trustee … that requires action, such as requesting information or resolution of an issue." The policy does not allow board members to make referrals to staff including the superintendent or interim superintendent without complying with this policy. Rather, the policy requires trustees to submit all requests to the board services team lead or designee. ( See Exhibit 2.41 )

As described in Allegation 1, all five members of the HISD Board of Trustees that met with Dr. Saavedra on October 8, 2018 violated Tex. Educ. Code §11.051(a-1) and Board Policy BBE

(LOCAL) by interviewing Dr. Saavedra for the position of interim superintendent without prior authorization of the board.

As described in Findings of Fact 1-4, Trustee Davila conducted a campus visit without notifying the campus principal and instructed the construction team to make material modifications to an area that was already built. This conduct violates Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) because it was an action taken by an individual board member without consideration by the board, and Policy BBE2 (REGULATION) because it was a board member referral to staff that did not go through the board referral system.

As detailed in Finding of Fact 5, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by directing the HISD Administration to remove a vendor for the board's agenda after the procurement process has ended without the approval of the entire board.  Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 6, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to host a campaign event on HISD property without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 7, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to eat for free when visiting the Hattie Mae White Education Support Center without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 8, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring district employees to answer her questions under the threat of an adverse personnel action without first receiving approval from the entire board. Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 9, the board overreach is a continuing problem that the interim superintendent has had to address with the board multiple times in writing, or as well during closed session and during board retreats.

As detailed in Finding of Fact 10, the district's conservator has documented in her reports that trustees continue to make requests of staff that take away from their duties, interfere in personnel issues, and direct staff to attend events (sometimes without notifying the interim superintendent).

As detailed in Findings of Fact 11, Trustees Jones, Adams, Lira, Davila, and Santos violated Policy BBE2 (REGULATION) by requesting information but failing to make this referral through board services.

As detailed in Finding of Fact 12, individual trustee overreach is common, and individual trustees have a long-standing practice of monitoring, directing, influencing or interfering with

administrative actions in the areas of operations (including campaign events), contracting, grievances, and personnel in violation of Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL). Specifically, Trustees; Skillern-Jones, Adams, Flynn Vilaseca, Deigaard, Santos, Sung, and Davila engaged in this practice.

As detailed in Finding of Fact 13, SIU discovered numerous direct or indirect communications to staff at HISD, that violate Tex. Educ. Code §11.051(a-1), Policy BBE (LOCAL), and Policy BBE2 (REGULATION). Direct communications are when a trustee directly communicates to a staff member without copying the superintendent or interim superintendent. Indirect communications are when a trustee directly communicates to a staff member and copies the superintendent or interim superintendent. In each instance, the trustee made a referral to staff without going through the Board Referral System as required by Policy BBE2 (REGULATION).

Therefore, Allegation Two, "Did the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?" is substantiated because HISD Board of Trustees have acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the board of trustees present at a meeting held in compliance with the open meetings act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

The amount of board overreach has impacted the operations of the district. Former superintendents indicated that the HISD Board of Trustees made it impossible for them to do their job as CEO of the district due to constant trustee involvement causing them to leave the district. Moreover, the former superintendent stated, "It seems like Trustee Davila wanted to be the superintendent of the district."

## Findings of Fact for Allegation Three

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

The following findings of fact are a result of interviews conducted via audio recordings and video recordings. In addition, SIU investigators examined HISD internal documents.

1. On October 12, 2015, the HISD Ethics and Compliance Officer, issued a compliance review of procurement RFP #15-07-05 ( See Exhibit 3.1 ). On September 3, 2015, Trustee Adams provided non-public information to a vendor regarding the award for RFP #15-07-05 Two-Way Radio System for Transportation with Infrastructure Upgrade. The awardee, Vendor #1, had been made known to the Board of Trustees on September 2, 2015 and the public was notified on September 7, 2015. Records indicate that on September 4, 2015, Trustee Adams violated District Policy CAA Local Financial Management Goals and Objectives, Financial Ethics, regarding the Code of Silence ( See Exhibit 3.2 ). Recommendations of this investigation included that the HISD Board of Trustees receive additional training from the Office of Ethics and Compliance regarding the Code of Silence. TEA requested trustee training transcripts; however, the district was only able to

provide TASB training. TEA could not verify if trustees received training from the Office of Ethics and Compliance. ( See Exhibit 3.3 )

2. In August of 2016, Trustee Davila met with a HISD senior administrator at Pappadeaux Seafood Kitchen along with her husband, Abel Davila, Art Lopez, and Leticia Ablaza. The administrator stated that the nature of the meeting was to strategize a way to get bond contracts cancelled and re-bid. Moreover, the administrator told SIU investigators Trustee Davila and her husband, along with Mr. Lopez and Ms. Ablaza, focused on the custodial contract with MetroClean. Trustee Davila, Art Lopez, and Leticia Ablaza demanded that HISD cancel its contract with MetroClean, and award it to Accel Building Maintenance (ABM Inc.). The administrator responded, "ABM Inc. did not have a good reputation with the district and therefore would not be considered as a vendor." To which Trustee Davila replied, "It will happen if we want it to happen."

3. After the administrator refused to cancel the MetroClean Contract, the owner of MetroClean told the administrator that ABM Inc. had approached MetroClean to give them a consultant agreement. On March 19, 2019, SIU contacted Jose Perez, owner of MetroClean Commercial Building Services, and discussed his interaction with Ricardo Aguirre, owner of ABM Inc. ( See Exhibit 3.4 ). On March 19, 2019, during an interview with SIU, Mr. Perez confirmed that Ricardo Aguirre approached him and attempted to force him to sign a consulting agreement stating that "MetroClean" would pay "Accel" a monthly salary of 2% of gross revenue received. In addition, "MetroClean" would increase the monthly payment to 3% if more contracts were secured. Mr. Perez provided the administrator a photographic document of what Mr. Aguirre wanted him to sign. ( See Exhibit 3.5 ). Mr. Perez stated that he was in the Request for Proposal process with HISD for custodial services when he was approached by Mr. Aguirre to circumvent the procurement process. Moreover, Mr. Perez mentioned that Mr. Aguirre attempted to pressure him into signing the agreement stating, "Diana Davila's husband sent me here to have you sign this agreement." Additionally, Mr. Perez stated that Aguirre threatened him saying, "If you don't sign the agreement, HISD will not approve your contract."

4. Problems with contracting procedures are not a recent development within HISD. Historical evidence of unlawful contract awarding can be traced to 2013 through the internal documentation of Job Order Contract misuse. SIU received documents from an HISD internal audit demonstrating the district split Job Order Contracts to avoid the state law limit. ( See Exhibit 3.6 ) The investigation, conducted by the former Internal Auditor, revealed that the HISD violated Tex. Educ. Code § 44.031(a)(5) a method provided by Chapter 2269, Government Code, for construction services; and Tex. Gov't. Code §2269.403 (c) the governing body of a governmental entity shall approve each, job, task, or job purchase order that exceeds $500,000. The audit determined that 14 Job Order Contracts were split to avoid the $500,000 limit, with one contract going over $1 million in funds. The following table illustrates a sample of Job Order Contracts that were audited and found to be non-compliant.

**Job Order Contracts**

| Job Order Number | Contractor Num. | Contractor | Campus | Split Amounts | Actual Contract Value |
|---|---|---|---|---|---|
| **KBR 20104** | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | |
| **KBR 20105** | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | **$960,000.00** |
| **KBR 30006** | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $324,600 | |
| **KBR 30007** | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $408,300 | **$732,900.00** |
| **KBR 30008** | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $174,923 | |
| **KBR 30009** | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $330,116 | **$505,039.00** |
| **KBR 30063** | 84879 | Kellogg Brown & Root | Cage Elementary School | $491,376 | |
| **KBR 30064** | 84879 | Kellogg Brown & Root | Cage Elementary School | $359,922 | **$851,298.00** |
| **JLS 30079** | 64938 | Jamail & Smith Construction | Sanchez ES | $499,150 | |
| **JLS 30148** | 64938 | Jamail & Smith Construction | Sanchez ES | $33,720.89 | **$532,870.89** |
| **P2M 30044** | 93555 | P2MG | Jones High School | $381,758.96 | |
| **P2M 30045** | 93555 | P2MG | Jones High School | $481,060.71 | |
| **P2M 30047** | 93555 | P2MG | Jones High School | $484,475.00 | **$1,487,254.25** |
| **P2M 30048** | 93555 | P2MG | Jones High School | $139,959.58 | |
| **P2M 30054** | 93555 | P2MG | Jones High School | $288,909.81 | |
| | | | | $498,341.11 | **$1,170,675.47** |
| | | | | $383,424.55 | |

5. As stated in the Job Order Contracting Report (JOC Report) issued September 8, 2015, HISD internal auditors found that Job Orders (KBR 20104 and KBR 20105, issue date June 11, 2013) had been awarded to Kellogg Brown & Root (KBR) independently however should have been awarded as a single contract with a "not to exceed" value of $960,000. Instead, HISD awarded two $480,000 contracts to KBR for the "Demolition" and "Asbestos Abatement" for the NFISD Career and Technology Center.  Auditors reported that the HISD Board of Trustees approved funding for these job orders on July 18, 2013, a month after the funding had been awarded to KBR. Furthermore, the report goes on to say that KBR did not provide HISD with any final accounting and mentioned that HISD failed to request an audit of the records to determine the final cost of the project.

6. The JOC Report finds that on August 6, 2013, HISD awarded two (2) "not to exceed" job order contracts to KBR for demolition and abatement of buildings at Kirby Middle School. Contract KBR 30006 was valued at $324,600 and KBR 30007 was valued at $408,300. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $732,900 should have been approved by the Board of Trustees.

7. As per the JOC Report, job orders KBR 30008 and KBR 30009 were awarded to KBR on August 6 and 7, 2013 for work at Lakewood Elementary School. As per HISD auditors, KBR 30008 was awarded for the "Abatement of Existing Structures" for a total value of $174,923. KBR 30009 was awarded to KBR for "Demolition of Buildings" for a total value of $330,116. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $505,039 should have been approved by the Board of Trustees.

8. Job orders KBR 30063 and KBR 30064 as referenced in the JOC Report were awarded to KBR on May 8, 2014 for work at Cage Elementary School. KBR 30063 cited "Architectural and Site Work for the Principals Restroom, and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $491,376.  KBR 30064 cited "Electrical, Plumbing and Mechanical for the Principal's Restroom and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $359,922. Because of the value of the contracts were less than the $500,000 threshold, there was no board item approving these contracts. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $851,298 should have been approved by the Board of Trustees.

9. The JOC Report identified Jamail & Smith Construction (JLS) as another entity that conducted business with HISD. As per the report, JLS was awarded job order contract JLS 30079 for "Sanchez Elementary Bathroom TDLR Renovations" on April 4, 2014, at a value of $499,150. The project included "Site work for concrete and paving details for bathrooms X60B, 45B, 43B, 41B, Boys and Girls Restrooms 31 and 31A, Specialty Rooms 26A and 26, State Area Room X63, and Classroom 32 and 33. Moreover, JLS 30148 was awarded on September 15, 2014, at a value of $33,720.89. The purpose of JLS 30148 was for "Sanchez Elementary Bathroom TDLR Renovations Additional Works". HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $532,870.89 should have been approved by the Board of Trustees.

10. The JOC Report also reviewed contract work performed by P2MG for projects at Jones High School. The following job orders were approved:

a. P2M 30044, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Culinary Arts Area, 2. New Administration Area, 3. New Wall between the classrooms," for a value of $381,758.96.

b. P2M 30045, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Welding, 2. HVACR, 3. Cosmetology," for a value of $481,060.71.

c. P2M 30047, awarded on June 5, 2014, for "Jones High School, 1. Canopy Painting, 2. Upgrade Lights," for a value of $484,475.

d. P2M 30048, awarded June 5, 2014, for "Jones High School, 1. Resurface Tennis Courts, 2. Restroom Renovations, 3. Bus Lane," for a value of $139,959.58.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after the work was paid and completed. HISD internal auditors concluded that since the four projects were performed simultaneously, a single contract valued at $1,487,254.25 should have been approved by the HISD Board of Trustees.

11. The JOC Report pointed out an additional job order awarded to P2MG for work at Jones High School. Order P2M 30054 was awarded as three separate requisitions on July 23, 2014, for "Jones High School (Design and Grading) Parking Lot Addition -Phase I", at a value of $288,909.81, "Jones High School Parking Lot Addition (Paving Parking Area) - Phase II" at a value of $498,341.11, and "Jones High School Parking Lot Addition (Paving Parking Area) - Phase III" at a value of $383,424.55.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after work was paid and completed. HISD internal auditors concluded that since the three projects were performed simultaneously, a single contract valued at $1,170,675.47 should have been approved by the HISD Board of Trustees.

12. A closer look the audit report "Internal Audit of the Design and Selection Process for Job Order Contracts, General Construction – Major & Minor Projects" Issued March 10, 2015 provided additional insight as to the contract awarding process at HISD ( See Exhibit 3.7 ). Not only did the report highlight a lack of transparency, non-compliance with state laws, non-compliance with HISD policy and procedures and a lack of timely and cost effective/best value services, it also cited an alarming concern, "Historical instances existed where contractors actually received an award even though they were not recommended for an award."

## Analysis of Allegation Three

TEA finds that the HISD Board of Trustees violated contract procurement rules and failed to ensure staff followed these rules and procedures while the district was selecting a vendor/contractor, as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §44.031. Section 44.031 (a)(1) specifies that "except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district: (1) competitive bidding for services other than construction services." HISD failed to monitor contractual obligations allowing the district to manipulate and abuse Job Order Contracts.

Tex. Educ. Code §44.031 (d) allows the district to adopt rules and procedures for the acquisition of goods and services. HISD adopted policy CAA (LOCAL), which details the district's code of silence. CAA (LOCAL) states "Code of Silence" shall mean a prohibition on any communication regarding any RFP, bid, or other competitive solicitation (as defined in the procurement methods above) between:

1.   Any person who seeks an award from the district or its affiliated entities (including, but not limited to, the HISD Foundation and the HISD Public Facility Corporation), including a potential vendor or vendor's representative; and

2.   A Board member, the Superintendent, senior staff member, principal, department head, director, manager, or other District representative who has influence in the evaluation or selection process.

The investigation revealed numerous instances of trustees violating the District's rules and procedures with regard to the process of purchasing contracts.

Interference in the contract procurement process has been an ongoing problem at HISD. Garland Blackwell, the current Chief Audit Executive for the district, told SIU that HISD Board of Trustees have been investigated internally by the Ethics and Compliance Office and Internal Audit Office on more than one occasion.

As detailed in Findings of Fact 1, Trustee Adams' intervention in the RFP process posed a great risk to the procurement process and defeats the controls set in place to prevent fraudulent contract awarding. As mentioned in the memo drafted by former Compliance Officer Debi Fincher, Trustee Adams provided non-public information to a sub-contractor affiliated with the vendor in an ongoing RFP. Unbeknownst to the district, that sub-contractor was a colleague of Trustee Adams which could lead to the conclusion that Trustee Adams was pushing for the contract to go in favor of that vendor. This conduct violates Tex. Educ. Code§44.031(a)(1) because this was a board member who interfered with the competitive bidding process. This conduct also violates CAA (LOCAL) because the board member shared confidential information to a vendor, during the RFP process, breaking the Code of Silence.

As detailed in Findings of Fact 2 and 3 Trustee Davila violated Tex. Educ. Code §44.031 (a)(1) when she met with an HISD senior administrator to influence the administrator to choose a certain vendor for a custodial contract. Trustee Davila violated this statute because she tried to circumvent the competitive bidding process. Furthermore, a colleague of Trustee Davila visited with a vendor who was in the RFP process and tried to coerce the vendor into a consulting contract.

As detailed in Finding of Fact 4, HISD violated Tex. Educ. Code § 44.031 (a)(5) and Tex. Gov't. Code §2269.403 (c) when the district split job order contracts to avoid the $500,000 limit, which should have been approved by the HISD Board of Trustees.

As detailed in Finding of Fact 5, HISD split a contract that should have otherwise been awarded as a single contract. This was determined by the date issued and the sequence number of the job order contracts for KBR. HISD approved funding for these contracts prior to approval from the HISD Board of Trustees. Moreover, the board item that was later approved did not specify the use

of Job Order Contracting or a waiver of the statutory pricing limits. There was no justification as to why HISD awarded two contracts to the same contractor on the same day.

As detailed in Finding of Fact 6, the job order contracts with KBR regarding Kirby Middle School demonstrates that HISD split a contract and therefore evaded board approval once more. This conclusion was reached based on the fact that KBR was awarded two contracts that had the same objective and therefore should have been awarded as a single contract that required board approval. Again, HISD could not justify awarding two contracts to one contractor on the same day for doing simultaneous work on Kirby Middle School.

As detailed in Findings of Fact 7, there was no reasonable explanation as to why two work orders were issued to complete the work at Lakewood Elementary School. KBR's objective was to demolish the school, so the scope of work order KBR 30008 and KBR 30009 were the same. In addition to the same scope of work, the total value to this project totaled $505,039, which exceeds the amount required for board approval.

As detailed in Findings of Fact 8, KBR was awarded two contracts that reflected work to be completed concurrently at identical locations. Because KBR was awarded both contracts on the same day and the job orders are numerically sequential, this contract should have been awarded as a single item valued at $851,638. These actions demonstrate how HISD continued to award contracts under the $500,000 threshold to circumvent the required board approval.

Although not approved on the same day and not in sequential order, the contracts (JLS 30079 and JLS 30148) should have been approved by the board as the cost of the project totaled $532,870.89. The nature of the second contract is considered to be a change order to JLS 30079 and should not have been assigned a separate job order number. Evidently, HISD did not receive approval from the board for awarding these contracts.

As detailed in Findings of Fact 10, P2MG was awarded four job order contracts which remained under the $500,000 threshold. However, P2M 30044 and P2M 30045 were requested in sequential order and were identical in nature. Those two job orders should not have been requested separately and should have been combined which would be valued at $862,819.67. Nonetheless, these four job orders total $1,487,254.25, which exceeds the annual limit of $1 million per campus per year (see Exhibit 3.6 p.4). Moreover, the work was completed and billed by September 3, 2014, of which, $767,957.99 was paid before the HISD Board of Trustees approved Board Item (H-2) in September 11, 2014. Therefore, HISD did not seek approval of the board prior to awarding contracts or prior to completion of the work.

As detailed in Finding of Fact 11, P2MG was awarded three job orders that, when combined, were valued at $1,170,675.47. These contracts should not have been issued as individual orders and should have been procured properly. The contracts should have been initially valued at $1,170,675.47 as the nature of the work completely focused on the parking lot addition of Jones High School. Moreover, when HISD presented the contract as part of Board Item (H-2), the HISD Board of Trustees approved the requisitions almost two months after P2M 30054 was awarded.

Government contracts are easily susceptible to fraud and therefore contract procurement rules should be followed accordingly. However, HISD manipulated contract procurement rules through the abuse of Job Order Contracts and multiple change orders. The district not only intentionally split Job Order Contracts to avoid the $500,000 limit, they approved multiple change orders to projects subsequently increasing the cost of projects, thus, proving fraudulent behaviors that contribute to a lack of transparency.

Therefore, allegation four, "Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?" is substantiated because on multiple occasions the HISD Board of Trustees violated the law by interfering with the contract procurement process. The HISD Board of Trustees intentionally tried to award contracts indirectly by contacting vendors during the RFP process, advocating for contractors, and HISD was found to be manipulating contracts to circumvent contract procurement rules.

## Summary

The HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by setting up a secret and unposted meeting of a quorum of the board of trustees to conduct important district business in secret.  The findings establish a systemic breakdown of the HISD Board of Trustees' ability to govern and oversee the management of HISD. This behavior is demonstrated by taking actions outside the scope of their authority, in directing district employees to perform tasks that exhibit overreach, intimidating and questioning employees about their responsibilities, and directing hiring decisions. Further, the HISD Board of Trustees interfered with contract procurement laws by contacting vendors during the RFP process and allowing Job Order Contracts to be awarded with lowered amounts to circumvent the threshold as required by law.

The findings establish that there is a failure of the HISD Board of Trustees to collaborate with the district superintendent within the limits of the board's statutorily specified duties. Also, there is an demonstrate and inability to provide leadership for the district. The dissention between board members, the superintendent, and other district leadership is detrimental to the students of Houston Independent School District, thus affecting student outcomes.

## Recommendation for Sanctions

Based on the findings, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing board of trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the  scope of their authority, circumventing the authority of the superintendent, and inability to ensure adherence to contract procurement policies and laws are followed.

The above recommendation will enable HISD to function in the best interest of students, while policies and procedures can be implemented to address the issues raised in this investigation. TEA reserves the right to implement all available interventions and sanctions under Tex. Educ. Code,

Chapter 39, and 19 Tex. Admin Code Chapter 97, to address the current, or any future deficiencies identified for HISD.

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 2



**THE HOUSTON INDEPENDENT SCHOOL DISTRICT
BOARD OF EDUCATION
OFFICIAL AGENDA AND MEETING NOTICE**

<u>OCTOBER 11, 2018</u>          **SCHOOL BOARD MEETING**                    **2:00 P.M.**
                          **CLOSED SESSION**                            **2:00 P.M.**
                          **REGULAR BOARD MEETING**                 **5:00 P.M.**
**BOARD SERVICES CONFERENCE ROOM AND BOARD AUDITORIUM
4400 WEST 18TH STREET
HOUSTON, TEXAS 77092**

<span style="color:red">**At the October 11, 2018, Board of Education meeting, all agenda items were approved as presented, except B-1, D-2, and K-1, which were postponed until November 8, 2018.**</span>

<span style="color:red">**Additional information may be obtained from the Board Services Office, 713-556-6121.**</span>

A CITIZEN WISHING TO SPEAK TO A REGULAR BOARD MEETING AGENDA ITEM OR ANY OTHER DISTRICT-RELATED MATTER MAY DO SO BY REGISTERING TO SPEAK WITH THE BOARD SERVICES OFFICE BY 9:30 A.M. THE DAY OF THE REGULAR BOARD MEETING. A CITIZEN DESIRING TO APPEAR BEFORE THE BOARD OF EDUCATION AT ITS PUBLIC HEARING TO ADDRESS AN ISSUE NOT INCLUDED IN THE REGULAR BOARD MEETING AGENDA SHALL FILE ANY SUPPORT INFORMATION (E.G., HANDOUTS) REGARDING THE CITIZEN'S CONCERN WITH THE BOARD SERVICES OFFICE.

**ANY ITEM THAT ESTABLISHES, MODIFIES, OR DELETES BOARD POLICY MAY, AT THE BOARD'S DISCRETION, BE PASSED AND BECOME EFFECTIVE IMMEDIATELY FOLLOWING FIRST READING.**

**THE ITEMS ON THIS AGENDA MAY BE TAKEN IN ANY ORDER.**

**NO AGENDA OR DISTRICT BUSINESS WILL BE DISCUSSED EXCEPT AS NOTICED BELOW AND ANY ACTION WILL OCCUR IN THE ROOM OPEN TO THE PUBLIC. IT IS THE INTENT OF THE DISTRICT TO HAVE, AND THE MEETING WILL HAVE, A QUORUM AND PRESIDING OFFICER PHYSICALLY PRESENT AT THIS LOCATION. THE ABOVE LOCATION WILL BE EQUIPPED WITH VIDEO CONFERENCE EQUIPMENT.**

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

**2:00 P.M. – BOARD SERVICES CONFERENCE ROOM**

- **CALL TO ORDER**
- **ADJOURN TO CLOSED OR EXECUTIVE SESSION UNDER SECTIONS 551.004, 551.071, 551.072, 551.073, 551.074, 551.076, 551.082, 551.0821, 551.083, AND 551.084 OF THE TEXAS GOVERNMENT CODE FOR THE PURPOSES LISTED UNDER SECTION C**
- **RECESS**

**5:00 P.M. – BOARD AUDITORIUM**

- **REGULAR BOARD MEETING RECONVENES FOR OPEN SESSION**
- **MEDITATION AND PLEDGE OF ALLEGIANCE**
- **RECOGNITIONS**
- **SPEAKERS TO AGENDA ITEMS**

**BUSINESS AGENDA**

- **CONSIDERATION AND POSSIBLE ACTION ON MATTERS DISCUSSED IN CLOSED OR EXECUTIVE SESSION**
- **CONSIDERATION AND APPROVAL OF MINUTES FROM PREVIOUS MEETINGS**

**A.    SUPERINTENDENT'S PRIORITY ITEMS**

A-1    Approval Of Personal Services Performed By The Superintendent, Including Speaking Engagements, Panel Discussions, Workshops, Etc., In Accordance With Texas Education Code Section 11.201(E)

A-2    Board Monitoring Update: Presentation Of Goal 1 Progress Measures 1.1 and 1.2 And Goal 3 Progress Measure 3.1

**B.    TRUSTEE ITEMS**

B-1    Appointment Of Houston Independent School District Representatives To The Houston Land Bank Board Of Directors **[POSTPONED]**

B-2    Approval Of The Board's Quarterly Self-Evaluations, Staff Use Tracker, Time Use Tracker, And Quarterly Progress Tracker In Accordance With The Texas Education Agency Implementation Integrity Instrument

B-3    Announcement Of Required Board Member Continuing Education

B-4    Appointment Of Houston Independent School District Representative To Tax Increment Reinvestment Zone 18 Board Of Directors

Appx.112

**C.    CLOSED SESSION (CLOSED TO PUBLIC) – BOARD SERVICES CONFERENCE ROOM**

C-1    Personnel
a) Deliberate the duties of the interim superintendent of schools, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members (including board committees); evaluations of the interim superintendent and chief audit executive, consideration of compensation, and contractual provisions.
b) Consider and approve proposed appointments, reassignments, proposed terminations, terminations/suspensions, contract lengths, proposed nonrenewals, renewals, and resignations/retirements of personnel including teachers, assistant principals, principals, chief officers, assistant superintendents, and other administrators, and, if necessary, approve waiver and release and compromise agreements.
c) Hear complaints against and deliberate the appointment, evaluation, and duties of public officers or employees and resolution of same.
d) Consider employment of interim superintendent and employment contract through September 30, 2019.

C-2    Legal
a) Matters on which the district's attorney's duty to the district under the Code of Professional Responsibility clearly conflicts with the Texas Open Meetings Law
b) Pending or contemplated litigation matters and status report
c) Legal discussion and advice concerning House Bill 1842 (84th Leg., 2015), Senate Bill 1882 (85th Leg., 2017), and the district's options
d) Receive legal advice concerning the process for selecting an interim/permanent superintendent.
e) Consideration and approval of mediated settlement agreement in the matter of _Roy Fuller v. Houston Independent School District_; in the 133rd Judicial District Court of Harris County, Texas; Cause No. 2017-47104
f) Consideration and authority to settle in the matter of _Houston Independent School District v. Goldshire Developers, LLC, and Developers Surety & Indemnity, Company_; in the 152nd Judicial District Court of Harris County, Texas; Cause No. 2017-54931
g) Consideration and approval of settlement agreement related to termination of Liberty High School lease agreement
h) Consideration and authority to settle the subrogation lien of Tarnisha Hartsfield against Juan Jesus Arredondo and Allstate Insurance for workers' compensation benefits; Allstate Insurance Claim No. 0495545733
i) Consideration and authority to file suit and settle the subrogation lien of Carolyn Mackey against Mariela Garcia Aguilera for workers' compensation benefits
j) Consideration and approval of confidential settlement agreement and release of all claims in the Section 504 matter regarding John S. b/n/f Shannon Young
k) Discuss with legal counsel and consider the proposed HYA Superintendent Search Contract

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

C-3   Real Estate
    a)  Sale
    b)  Purchase
    c)  Exchange
    d)  Other

**CLOSED SESSION AUTHORIZATION DURING MEETING**

**If during the course of the meeting covered by this notice the board should determine that a closed or executive meeting or session of the board should be held or is required, then such closed or executive meeting or session as authorized by Chapter 551 of the Texas Government Code (the Open Meetings Act) will be held by the board at the date, hour, and place given in this notice or as soon after the commencement of the meeting covered by this notice as the board may conveniently meet in such closed or executive session concerning any and all subjects and for any and all purposes permitted by Section 551.071 through Section 551.084 inclusive of said Open Meetings Act including, but not limited to:**

| | |
|---|---|
| **Section 551.071** | **For the purpose of a private consultation with the board's attorney on any or all subjects or matters authorized;** |
| **Section 551.072** | **For the purpose of discussing the purchase, exchange, lease, or value of real property;** |
| **Section 551.073** | **For the purpose of discussing negotiated contracts for prospective gifts or donations to the District;** |
| **Section 551.074** | **For the purpose of considering the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public officer or employee or to hear complaints or charges against a public officer or employee;** |
| **Section 551.076** | **To consider the deployment, or specific occasions for implementation, of security personnel or devices;** |
| **Section 551.082** | **For the purpose of considering discipline of a public school child or children, or to hear a complaint or charge brought against a school district employee by another school district employee;** |
| **Section 551.0821** | **For the purpose of deliberating a matter regarding a public school student if personally identifiable information about the student will necessarily be revealed by the deliberation;** |
| **Section 551.083** | **For the purpose of considering the standards, guidelines, terms, or conditions the board will follow, or instruct its representatives to follow, in consultation with representatives of employee groups in connection with consultation agreements provided for by Section 13.901 and/or Section 11.151(b) of the Texas Education Code; and** |
| **Section 551.084** | **For the purpose of excluding any witness or witnesses from a hearing during the examination of another witness.** |

Appx.114

**OFFICIAL AGENDA AND MEETING NOTICE**                      **OCTOBER 11, 2018**

**Should any final action, final decision, or final vote be required in the opinion of the board with regard to any matter considered in such closed or executive session, then such final action, final decision, or final vote shall be at either:**

a) **the open meeting covered by this notice upon the reconvening of this public meeting, or**

b) **a subsequent public meeting of the board upon notice thereof, as the board shall determine.**

**MATTERS TO BE CONSIDERED IN OPEN SESSION**

**D.     ACADEMIC SERVICES**

D-1     Authority To Ratify Renewal Agreements With Community Agencies And/Or Educational Service Providers For Appraisal And Related Instructional And/Or Consultant Services For Students With Disabilities For School Year 2018–2019

D-2     District Improvement Plan For 2018–2019 **[POSTPONED]**

D-3     Approval Of The Executive Summaries Of School Improvement Plans For The 2018–2019 School Year

D-4     Approval Of Certified Appraisers For The Teacher Appraisal And Development System For School Year 2018–2019

**E.     SCHOOL OFFICES**

E-1     Approval Of Targeted Improvement Plan For Year 1 Improvement Required Campuses

E-2     Approval Of Targeted Improvement Plans For Campuses Identified As Comprehensive Support By The Texas Education Agency

**F.     STRATEGY AND INNOVATION**

**G.     HUMAN RESOURCES**

**H.     BUSINESS OPERATIONS**

**I.     FINANCE**

I-1     Approval Of Vendor Awards For Purchases Over $100,000 And Ratification Of Vendor Awards For Purchases Under $100,000

I-2     Approval Of Current And Anticipated Donations For Districtwide And School-Specific Programs And Authorization To Negotiate, Execute, And Amend Necessary Contracts Associated With These Donations

Appx.115

<u>**OFFICIAL AGENDA AND MEETING NOTICE**</u>                    <u>**OCTOBER 11, 2018**</u>

I-3     Acceptance Of Grant Funds In Support Of Districtwide And School-Specific Programs And Authorization To Negotiate And Execute Contracts Required Under The Grants

I-4     Approval Of Resolution Adopting Tax Rate And Levying Ad Valorem Taxes For Tax Year 2018

**J.**     **OTHER**

**K.**     **POLICY**

K-1     Proposed Revisions To Board Policy BBE(LOCAL), *Board Members: Authority*—Second Reading **[POSTPONED]**

K-2     Proposed Revisions To Board Policy BBB(LEGAL), *Board Members: Elections*—Second Reading

K-3     Proposed Revisions To Board Policy BBB(LOCAL), *Board Members: Elections*—Second Reading

K-4     Proposed Deletion Of Board Policy BBBA(LOCAL), *Campaign Funds*, And Establishment Of Board Policy BBBC(LOCAL), *Campaign Finance*—Second Reading

K-5     Proposed Revisions To Board Policies FFAA(LOCAL), *Wellness And Health Services: Physical Examinations* And FFAD(LOCAL), *Wellness And Health Services: Communicable Diseases*—Second Reading

K-6     Proposed Revisions To Board Policy FFH(LOCAL), *Student Welfare: Freedom From Discrimination, Harassment, And Retaliation*—First Reading

K-7     Proposed Revisions To Board Policy FB(LOCAL), *Equal Educational Opportunity*—First Reading

**L.**     **SUPERINTENDENT'S INFORMATION ITEMS**

<u>**HEARING OF CITIZENS**</u>

<u>**TRUSTEE REPORTS AND COMMENTS**</u>
Reports and comments from the board president and board members regarding meetings and conferences attended, including board committee meetings; schools visited; community and district activities; new initiatives; education programs; and continuing education. There will be no action concerning these items.

<u>**REPORTS FROM THE SUPERINTENDENT**</u>
Reports and comments by the superintendent of schools regarding meetings and conferences attended, schools visited, community and district activities, new initiatives,

Appx.116

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

and education programs, on which there will be no action. The items may be discussed, but no final action will be taken on these items at this meeting.

**ADJOURN**

**CERTIFICATE AS TO POSTING OR GIVING OF NOTICE**

**On this 8th day of October 2018 at 2:00 p.m., this notice was posted on a bulletin board located at a place convenient to the public in the Hattie Mae White Educational Support Center of the Houston Independent School District, the address of which is 4400 West 18th Street, Houston, Texas, as well as on the district's public web portal.**

_____
Office of Board Services
Houston Independent School District

Appx.117

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 3

## DECLARATION OF DIANA DAVILA

1. My name is Diana Davila. I am over 18 years of age, of sound mind, and capable of making this declaration. Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2. I am currently a member of the Board of Trustees of Houston Independent School District.

3. In early 2019, I was interviewed by several TEA investigators. They recorded the interview. During the interview, TEA's investigators were extremely combative and argumentative.

4. Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra during at a public restaurant on or about October 8, 2018.

5. Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

6. I respect Dr. Saavedra and consider him to be a mentor and a friend.

7. I am offended that TEA's Preliminary Report accuses me of not cooperating with the Agency's investigation. I did not falsely claim that there were no other trustees present when I met with Dr. Saavedra. I voluntarily agreed to speak with TEA's investigators and answered their questions to the best of my ability to recall what had happened.

8. My best recollection is that when I arrived, Trustee Vilaseca was speaking with Dr. Saavedra. After spending a few minutes engaging in a social conversation among us, Trustee Vilaseca left, and I spoke with Dr. Saavedra for another 10–15 minutes. During that time, I did not discuss the interim superintendent position with Dr. Saavedra. I am not aware of any discussions between Dr. Saavedra and any board members regarding the interim superintendent position.

9. I have exchanged text messages with Dr. Saavedra in the past, but none of these text messages related to the interim superintendent position at Houston ISD. I have not regularly communicated with Dr. Saavedra about District business by text messages. My text messages to Dr. Saavedra have generally been social in nature.

10. When I was interviewed by investigators from the Texas Education Agency, approximately six months had passed since the meeting.

11. In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent. I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

12. After I spoke with Dr. Saavedra, we both left the restaurant.

13. Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

14. Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

15. It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business. Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

16. On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant. The meeting with Dr. Saavedra was not secret, and it was not an interview. It was an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

17. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present — at times I was alone with Dr. Saavedra and at other time other board members were present. During that meeting, there were never more than four board members (including myself) present. At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

18. Between October 8, 2018 and October 11, 2018, when the HISD Board met at a duly posted meeting to discuss the employment of interim superintendent, Dr. Lathan, I did not have any discussion with any other board member regarding Dr. Saavedra's possible employment as interim superintendent.

19. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members. With fewer than a quorum present, nothing can be formally decided. Without a formal decision, no act can be taken on behalf of Houston ISD.

20. I have reviewed Findings 1–4 on pages 15–16 of TEA's Preliminary SAI Report regarding a campus visit to the High School of Law and Justice. These Findings contain numerous factual inaccuracies and untrue statements. TEA's investigators never contacted me about the events described in Findings 1–4. If they had contacted me, I could have told

them what actually happened.

21. When I visited the High School of Law and Justice, the superintendent at the time had asked that we obtain permission for campus visits through the regional superintendent. I followed this procedure by contacting the regional superintendent, who approved the campus visit.

22. When I arrived at the High School of Law and Justice with Trustee Deigaard, Conservator Delaney, and other individuals, the principal for the campus met us and gave us the tour. I do not know why TEA's investigators state that the principal was not aware of the tour until she saw pictures on Twitter. This seems difficult to believe because the campus principal is the person who gave us the tour.

23. When the campus principal showed us a courtroom during the tour, I commented that the courtroom in the High School of Law and Justice seemed small. One of the individuals who was apparently working on the construction project told me they could knock down a wall to make the courtroom larger. I told him I didn't think they should do that because I did not think we needed to add to the cost of the project. The campus principal (who was giving us the tour), Trustee Deigaard, the Conservator, and others were in the courtroom when this exchange occurred. I do not know whether any of them heard this exchange.

24. I do not know whether the project manager actually told the campus principal that I had "told the construction people to take a wall down out of [the] new campus out of the courtroom." But if he did, that statement would have been inaccurate. I said the opposite to the individual I spoke with. I never spoke with any Houston ISD administrator about taking a wall down in the courtroom.

25. I have reviewed Finding 5 on page 16 of TEA's Preliminary SAI Report. This Finding contains one sentence that is completely untrue, one misstated fact, and one misleading statement. TEA's investigators never contacted me about the events described in Finding 5. If they had contacted me, I could have told them what actually happened.

26. The third sentence in Finding 5 on page 16 of TEA's Report is completely untrue. Neither I nor Abel Davila told any Houston ISD administrator that we wanted a "firm out of Dallas" to be awarded a contract for Austin High School. Neither I nor Abel Davila threatened an administrator's job regarding a contract for the construction of Austin High School.

27. The statement that the contract was placed on the agenda for the "February 2018 regular board meeting" is also false. It was placed on the agenda for the February 2017 meeting. At that meeting I voted in favor of the motion made regarding this agenda item.

28. I understand that investigators with the Texas Education Agency ("TEA") have included the following paragraph on page 27 of the Preliminary SAI Report issued on August 5, 2019 as Finding 2:

2. In August of 2016, Trustee Davila met with a HISD senior administrator at Pappadeaux Seafood Kitchen along with her husband, Abel Davila, Art Lopez, and Leticia Ablaza. The administrator stated that the nature of the meeting was to strategize a way to get bond contracts cancelled and re-bid. Moreover, the administrator told SIU investigators Trustee Davila and her husband, along with Mr. Lopez and Ms. Ablaza, focused on the custodial contract with MetroClean. Trustee Davila, Art Lopez, and Leticia Ablaza demanded that HISD cancel its contract with MetroClean, and award it to Accel Building Maintenance (ABM Inc.) The administrator responded, "ABM Inc. did not have a good reputation with the district and therefore would not be considered as a vendor." To which Trustee Davila replied, "It will happen if we want it to happen."

29. Everything described in the above paragraph, identified as Finding 2, is untrue. The meeting described above did not occur. No investigators from TEA contacted me regarding Finding 2. If they had, I would have told them this meeting did not occur.

30. I have reviewed Finding 3 on page 27 of TEA's Preliminary SAI Report. TEA's investigators never contacted me about the events described in Finding 5. If they had contacted me, I could have told them I have no knowledge of any proposed contract between ABM Inc. and MetroClean.

31. My date of birth is December 26, 1972 and my mailing address is 221 St Charles, Houston, TX 77003. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Harris County, State of Texas on the 24th day of August, 2019.

**Diana Davila**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 4

## DECLARATION OF DR. SERGIO LIRA

1.   My name is Dr. Sergio Lira.  I am over 18 years of age, of sound mind, and capable of making this declaration.  Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2.   I am currently a member of the Board of Trustees of Houston Independent School District.

3.   In early 2019, I was interviewed by several TEA investigators.  They recorded the interview. During the interview, TEA's investigators were extremely combative and argumentative.

4.   Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra at a public restaurant on or about October 8, 2018.

5.   Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

6.   I am offended that TEA's Preliminary Report accuses me of not cooperating with the Agency's investigation.  I did not falsely claim that there were no other trustees present when I met with Dr. Saavedra.  I voluntarily agreed to speak with TEA's investigators and answered their questions to the best of my ability to recall what had happened.

7.   When I was interviewed by investigators from the Texas Education Agency, I told them I did not recall exactly who had attended the meeting with Dr. Saavedra.  At that point, approximately six months had passed since the meeting.  To the best of my recollection I

**Appx.122**

spoke with Dr. Saavedra alone and at the end of that conversation, other board members joined us.

8.  My best recollection is that I spoke with Dr. Saavedra when no other board members were present.  When other board members arrived, I left shortly after we had all exchanged greetings.  During my discussions with Dr. Saavedra, we did not discuss the interim superintendent position.

9.  In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent.  I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

10.  Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

11.  Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

12.  It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business.  Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

13.  On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant.  The meeting with Dr. Saavedra was not secret, and it was not an interview.  It was an

**Appx.123**

opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

14. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present — at times I was alone with Dr. Saavedra and at other time other board members were present. During that meeting, there were never more than four board members (including myself) present. At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

15. Between October 8, 2018 and October 11, 2018, when the HISD Board met at a duly posted meeting to discuss the employment of interim superintendent, Dr. Lathan, I did not have any discussion with any other board member regarding Dr. Saavedra's possible employment as interim superintendent.

16. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members. With fewer than a quorum present, nothing can be formally decided. Without a formal decision, no act can be taken on behalf of Houston ISD.

17. My date of birth is _11/25/1961_, and my mailing address is 4400 West 18th Street, Houston, Texas 77092. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct. Executed in Harris County, State of Texas on the 23rd day of August, 2019.


**Dr. Sergio Lira**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 5

## DECLARATION OF ELIZABETH SANTOS

1.  My name is Elizabeth Santos.  I am over 18 years of age, of sound mind, and capable of making this declaration.  Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2.  In early 2019, I was interviewed by several TEA investigators for over an hour.  They recorded the interview, and I also recorded the interview so that I could have a copy.

3.  During the interview, the investigators were extremely combative, argumentative, and attempted to coerce me into violating Texas law by disclosing discussions that occurred in closed session.  I refused to violate Texas law by disclosing those closed-session discussions.

4.  Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra at a public restaurant on or about October 8, 2018.

5.  Prior to that meeting, I knew Dr. Saavedra only by reputation.  Prior to joining the board, I was involved in education as a teacher in Houston ISD for 9 years and 5 months.  During that time, one of the superintendents of Houston ISD was Dr. Saavedra.

6.  Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

7.  In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent.  I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

8.  Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

**Appx.126**

9.   Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

10. It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business.  Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

11. On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant.  The meeting with Dr. Saavedra was not secret, and it was not an interview.   It was an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

12. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present.  During that meeting, there were never more than four board members (including myself) present.  At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

13. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members.  With fewer than a quorum present, nothing can be formally decided.  Without a formal decision, no act can be taken on behalf of Houston ISD.

14. I have reviewed Finding 6 on page 16 of TEA's Preliminary SAI Report.  This Finding contains several, material misstatements of fact.  No investigators from TEA contacted me regarding Finding 6.  If they had, I would could have corrected their misstatements.

15.  The event described in Finding 6 was not a campaign event — no campaign materials were distributed; I was unable to attend because I was on a board retreat; no one attended the event on my

behalf; and I was not actively campaigning at the time. "Field Good Day" is a community event that was first organized in 2016 to bring the community together after a Houston ISD student was murdered. At that time, I had not yet been elected to the Board of Trustees and did not attend the event.

16. In 2018, members of the community decided to revive this community event. I was honored to help community members organize the "Field Good Day" event in 2018.

17. Individuals in Houston ISD's administration brought it to my attention that holding the event on Houston ISD property would incur costs because security officers would need to be hired. I offered to pay for any costs incurred by Houston ISD, but I thought that was no longer necessary when Harris County Constable Precinct 6 agreed to provide law enforcement officers to volunteer their time for the event. I have never received either an invoice from Houston ISD for this event or any request that I reimburse Houston ISD for any expense incurred by this event. If I receive such a request, I will honor my prior commitment.

18. I have reviewed Finding 7 regarding Allegation 2 in TEA's Preliminary Report. I have no idea what the anonymous administrator is referring to. The administration typically provides food for board members at our meetings and other events and board members are not asked to pay for the food that is provided. I have never demanded that anyone allow me to eat for free when visiting the Hattie Mae White Education Support Center.

19. At the August 1, 2019 meeting, I did not intend to indicate that I or any other board members have violated the Texas Open Meetings Act. My intent was to express that the same conduct that is being investigated by TEA and criticized by some board members is substantially similar to conduct in which other board members have engaged.

20. My date of birth is March 22, 1982, and my mailing address is 4400 West 18th St., Houston, TX 77092.  I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Travis County, State of Texas on the 23rd day of August, 2019.

**Elizabeth Santos**

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 6

## DECLARATION OF VENUS RODRIGUEZ

1. My name is Venus Rodriguez. I am over 18 years of age, of sound mind, and capable of making this declaration. Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal .

2. I helped organize "Field Good Day" in 2016. "Field Good Day" is a community event that I, and others in the community, organized to bring the community together after a Houston ISD student was murdered. I helped organize this event because students were feeling anxiety and members of the community were feeling unsafe. I and others wanted to create an event that let members of the community know that the community could come together and feel safe and know that we were attempting to make sure that justice would be done and something like this would not happen again.

3. In 2018, I, and other community leaders, helped organize "Field Good Day" again to bring the community together and let everyone know that we were continuing to work for community safety.

4. "Field Good Day" was not intended to be, and was not in fact, a campaign event for Trustee Santos or any other individual.

5. My date of birth is January 19, 1976, and my mailing address is 1507 Amundsen Street, Houston, Texas 77009. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Harris County, State of Texas on the 26th day of August, 2019.

*Venus Rodriguez*
**Venus Rodriguez**

**Appx.131**

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 7

## DECLARATION OF RICARDO AGUIRRE

1. My name is Ricardo Aguirre. I am over 18 years of age, of sound mind, and capable of making this declaration. Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2. I understand that investigators with the Texas Education Agency ("TEA") have included the following paragraph on page 27 of the Preliminary SAI Report issued on August 5, 2019 as Finding 3:

> 3 After the administrator refused to cancel the MetroClean Contract, the owner of MetroClean told the administrator that ABM Inc. had approached MetroClean to give them a consultant agreement. On March 19, 2019, SIU contacted Jose Perez, owner of MetroClean Commercial Building Services, and discussed his interaction with Ricardo Aguirre, owner of ABM Inc. ( See Exhibit 3 4 ) On March 19, 2019, during an interview with SIU, Mr. Perez confirmed that Ricardo Aguirre approached him and attempted to force him to sign a consulting agreement stating that "MetroClean" would pay "Accel" a monthly salary of 2% of gross revenue received. In addition, "MetroClean" would increase the monthly payment to 3% if more contracts were secured. Mr. Perez provided the administrator a photographic document of what Mr. Aguirre wanted him to sign ( See Exhibit 3 5 ) Mr. Perez stated that he was in the Request for Proposal process with HISD for custodial services when he was approached by Mr. Aguirre to circumvent the procurement process. Moreover, Mr. Perez mentioned that Mr. Aguirre attempted to pressure him into signing the agreement stating, "Diana Davila's husband sent me here to have you sign this agreement." Additionally, Mr. Perez stated that Aguirre threatened him saying, "If you don't sign the agreement, HISD will not approve your contract."

3. No investigators from TEA contacted me regarding Finding 3. If they had, I would have told them that neither Trustee Davila nor Abel Davila asked me to reach out to MetroClean regarding any agreement.

4. I saw Trustee Davila and Abel Davila at an event in 2014, but I have neither seen nor spoken to Trustee Davila since that event. I had not seen Trustee Davila for at least 10 years before attending that event.

5. My date of birth is _Jan 6, 1949_____, and my mailing address is

_4306 Ruth Dr. Missouri City_ I declare under penalty of perjury
_Texas 77459_
under the laws of the United States of America and of the State of Texas that the foregoing is

true and correct.

Executed in _Fort Bend_ County, State of Texas on the 25th day of August, 2019.

_____
Ricardo Aguirre

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 8

**MINUTES OF THE REGULAR MEETING**
**BOARD OF EDUCATION**
**HOUSTON INDEPENDENT SCHOOL DISTRICT**

**February 09, 2017**

## MEETING HELD - MEMBERS PRESENT

The Board of Trustees of the Houston Independent School District (HISD) held a Regular Meeting on February 9, 2017, beginning at 2:09 PM in the Board Services Conference Room of the Hattie Mae White Educational Support Center, 4400 West 18th St., Houston, TX 77092.

| Attendee Name | Title | Status | Arrived | Departed |
|---|---|---|---|---|
| Michael L Lunceford | District V Trustee | Present | | |
| Rhonda Skillern-Jones | District II Trustee | Present | 5:28 PM | 8:43 p.m. |
| Wanda Adams | President and District IX Trustee | Present | | |
| Anna Eastman | District I Trustee | Present | | |
| Manuel Rodriguez | District III Trustee | Present | | |
| Jolanda Jones | District IV Trustee | Present | | |
| Diana Davila | District VIII Trustee | Present | | |
| Holly Maria Flynn Vilaseca | District VI Trustee | Present | | |
| Anne Sung | District VII Trustee | Present | | |

## ADJOURNMENT TO EXECUTIVE SESSION 2:09 PM

The Board adjourned at 2:09 p.m. to closed or executive session under Section D of Chapter 551 of Texas Government Code, Open Meetings Act, Subsections 551.071, 551.072, 551.073, 551.074, 551.076, 551.082, 551.083, and 551.084 for the purposes stated in the notice of this meeting.  If any final action, vote or decision on any matter considered in the closed session shall be required, such final action, vote or decision shall be taken at the open meeting covered by this notice upon the reconvening of this public meeting or at a subsequent meeting of the Board upon notice thereof.

## RECONVENED IN OPEN SESSION IN THE BOARD AUDITORIUM 3:31 PM

## PUBLIC HEARING ON TEXAS ACADEMIC PERFORMANCE REPORT FOR 2015-2016

Ms. Carla Stevens, Assistant Superintendent of Research and Accountability provided a presentation of the Texas Academic Performance Report for 2015-2016.

#### Speaker
Roberto Centeno

## RECONVENED IN OPEN SESSION IN THE BOARD AUDITORIUM: 5:00 P.M.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

## MEETING CALLED TO ORDER - PURPOSE

President Adams called to order the Regular Meeting of the Board of Education of the Houston Independent School District and declared the Board convened to consider matters pertaining to the Houston Independent School District as listed on the duly posted meeting notice.

## MEDITATION AND PLEDGE OF ALLEGIANCE TO THE FLAG

President Adams invited the audience to stand and join in a moment of silent meditation and to remain standing for the pledge of allegiance.

Trustee Holly Maria Flynn Vilaseca introduced the pledge leader, Cadet Lieutenant Colonel Bavani Kathir, the Battalion Commander for the JROTC Battalion at Westside High School.

## SPECIAL RECOGNITIONS

Chief Robert Mock introduced the Employees of the Month for March: Officers Victor Rojas and Eddie Trevino

Trustee Jolanda Jones recognized the librarians who helped reorganize the library collections and resources at Cullen and Attucks Middle Schools.

Black History Month Proclamation was read by Trustee Jones.

Last year's MLK Oratory winner, Richard Espinosa-Garza introduced the current winner, Nhedrick Jabier from Crespo Elementary School.

## SUPERINTENDENT'S PRESENTATION ON STUDENT DATA:

State Accountability A–F Ratings System

## HEARING OF CITIZENS

David (Pete) Medford
Ebru Erdini
Barbara Carroll
Susan Nerlove
Georgina Lavallee
Art Smith
Kenneth Davis
Dr. Robert Muhammad
Karen Yvette Hurdle
Larry McKinzie

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

Mindy Wilson
Deyadira Arellano
Dr. Pamela Boveland
Roberto Centeno
Sam Smith
Ben Becker
Sarah Becker
Gerry Monroe

**A.**   **SUPERINTENDENT'S PRIORITY ITEMS**

A-1.   Approval Of Personal Services Performed By The Superintendent, Including Speaking Engagements, Panel Discussions, Workshops, Etc., In Accordance With Texas Education Code Section 11.201(E)

**B.**   **TRUSTEE ITEMS**

B-1.   Board Resolution In Support Of the Houston Independent School District Immigrant Community

**Speakers**
Anabella Fernandez
Zeph Capo (registered to items B-1, B-2, J-1 and J-2)
Deborah Chen
Deyadira Arellano (registered to items B-1 and H-3)
Carlos Duarte

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Skillern-Jones, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |

B-2.   Approval Of Resolution Ordering An Election On May 6, 2017, For The Houston Independent School District Concerning Texas Education Code Chapter 41 Status (Also Known As "Recapture"); Authorization To Submit A Signed Chapter 41 Contract To The TEA; And Authorization To Negotiate, Execute, And Amend Agreements With Harris County To Provide Election Services  *- Revised*

**Speakers**
Gerry Monroe (registered to agenda items B-2, G-1, and G-2)
Gayle Fallon
Sam Smith
Dr. Pamela Boveland
Larry McKinzie
Sean Cheben (registered to agenda items B-2 and G-2)

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [5 TO 3] |
|---|---|
| MOVER: | Manuel Rodriguez, District III Trustee |
| SECONDER: | Anna Eastman, District I Trustee |
| AYES: | Lunceford, Skillern-Jones, Adams, Eastman, Flynn Vilaseca |
| NAYS: | Rodriguez, Jones, Davila |
| ABSTAIN: | Sung |

C.     **CLOSED SESSION**

C-1.    Personnel

a. Deliberate the duties of the superintendent of schools, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members; evaluations of the superintendent and chief audit executive, consideration of compensation, and contractual provisions.

b. Consider and approve proposed appointments, reassignments, proposed terminations, terminations/suspensions, contract lengths, proposed nonrenewals, renewals, and resignations/retirements of personnel including teachers, assistant principals, principals, chief officers, assistant superintendents, chief audit executive, and other administrators, and, if necessary, approve waiver and release and compromise agreements.

On motion by Trustee Eastman, and seconded by Trustee Rodriguez, the Board approved the proposed nonrenewal of a term contract and separation and release agreements, as discussed in closed session, effective February 9, 2017.

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

On motion by Trustee Eastman, and seconded by Trustee Rodriguez, the Board approved a finding of no good cause for resignation or abandonment of contracts under Texas Education Code, Sections 21.105 (c), 21.160 (c), or 21.210 (c) and Texas Administrative Code, Section 249.14 (g) as discussed in closed session, effective February 9, 2017.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.139**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

   c. Hear complaints against and deliberate the duties of public officers or employees and resolution of same.

C-2.   Legal Matters

   a. Matters on which the district's attorney's duty to the district under the Code of Professional Responsibility clearly conflicts with the Texas Open Meetings Law

   b. Pending or contemplated litigation matters and status report

   c. Consideration and authority to settle the subrogation lien of Mary Overhouse against A&F Elevator Company and York Risk Services Group for workers' compensation benefits; York Risk Services Group Claim No. HECP-13771A1

On motion by Trustee Eastman and seconded by Trustee Davila, the Board approved the authority to settle the subrogation lien of Mary Overhouse against A&F Elevator Company and York Risk Services Group for workers comp benefits, York Claim No. HECP-13771A1 as discussed in closed session with legal counsel, effective February 9, 2017.

| RESULT: | APPROVED [8 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| AWAY: | Skillern-Jones |

   d. Consideration and authority to settle the subrogation lien of Maria Gomez against Corina Maria Carvajal and Progressive Insurance for workers' compensation benefits; Progressive Insurance Claim Number 155647700

On motion by Trustee Eastman and seconded by Trustee Davila, the Board approved authority to settle the subrogation lien of Maria Gomez against Corina Maria Carvajal and Progressive Insurance for workers comp benefits, Progressive Claim #15564770 as discussed with legal counsel in closed session, effective February 9, 2017.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

5

**Appx.140**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| | |
|---|---|
| **RESULT:** | **APPROVED [7 TO 0]** |
| **MOVER:** | Anna Eastman, District I Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSTAIN:** | Adams |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

e.  Consideration and authority to settle the subrogation lien of Danyle Dixon against Luis A. Tellez, Patricia Reyes, and ACCC Insurance Company for workers' compensation benefits; ACCC Insurance Company Claim No. U0746104-9

On motion by Trustee Eastman and seconded by Trustee Rodriguez, the Board approved the authority to settle the subrogation lien of Danyle Dixon against Luis Tellez and Patricia Reyes and ACCC Insurance Company for workers comp benefits, ACCC Claim U0746104-9 as discussed in closed session with legal counsel, effective February 9, 2017.

| | |
|---|---|
| **RESULT:** | **APPROVED [7 TO 0]** |
| **MOVER:** | Anna Eastman, District I Trustee |
| **SECONDER:** | Manuel Rodriguez, District III Trustee |
| **AYES:** | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSTAIN:** | Adams |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

C-3.  Real Estate

**D.**   **ACADEMIC SERVICES**

D-1.  Approval of Current and Anticipated Donations for Districtwide and School-Specific Programs and Authorization to Negotiate, Execute, and Amend Necessary Contracts Associated With These Donations

- Attachment For Approval Of Donations

*Approved by Consensus*

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| | |
|---|---|
| **RESULT:** | **APPROVED [UNANIMOUS]** |
| **MOVER:** | Michael L Lunceford, District V Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

D-2.     Acceptance of Grant Funds In Support Of Districtwide and School-Specific Programs and Authorization to Negotiate and Execute Contracts Required Under the Grants

- Attachment For Acceptance Of Grants
- Detailed Budget: University Of North Texas Grant For HIPPY Program

*Approved by Consensus*

| | |
|---|---|
| **RESULT:** | **APPROVED [UNANIMOUS]** |
| **MOVER:** | Michael L Lunceford, District V Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

D-3.     Allocation of Flow-Through Funds for the Region 4 Regional Day School Program for the Deaf

*Approved by Consensus*

| | |
|---|---|
| **RESULT:** | **APPROVED [UNANIMOUS]** |
| **MOVER:** | Michael L Lunceford, District V Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**E.     SCHOOL OFFICES**

**F.     STUDENT SUPPORT**

**G.     HUMAN RESOURCES**

G-1.     Approval of Waiver of Student Performance from the Teacher Appraisal and Development System for the 2016–2017 School Year

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.142**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

<u>Speakers</u>
Mindy Wilson
Andrew Dewey (registered to agenda items G-1, J-1, and J-2)

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Holly Maria Flynn Vilaseca, District VI Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

G-2.    Consideration and Approval Of Teach For America Contract for the 2017–2018 School Year

<u>Speakers</u>
Aisha Crumbine
Kara Devoto
Roberto Centeno
Ben Becker

| RESULT: | APPROVED [6 TO 1] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca |
| NAYS: | Jones |
| ABSTAIN: | Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

## H.    BUSINESS OPERATIONS

H-1.    Authority to Negotiate, Execute, and Amend a Construction Manager-At-Risk Contract Related To Stephen F. Austin High School

<u>Speaker</u>
Mark Kerrisey

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

H-2.     Approval to Amend and Increase the Design Contract for Evan Worthing High School

*Approved by Consensus*

| RESULT: | **APPROVED [UNANIMOUS]** |
|---|---|
| **MOVER:** | Michael L Lunceford, District V Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

H-3.     Approval to Establish a Budget for Lead Testing

**Speakers**
Orell Fitzsimmons
Yvette Arellano
Ben Tecumseh DeSoto

| RESULT: | **APPROVED [UNANIMOUS]** |
|---|---|
| **MOVER:** | Anna Eastman, District I Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I.     **FINANCE**

I-1.     Approval of Vendor Awards For Purchases over $100,000 and Ratification of Vendor Awards for Purchases Under $100,000

- Purchasing Requests

*Approved by Consensus*

**Speaker**
Mark Kerrisey

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.144**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-2.     Approval to Contract with Linebarger, Goggan, Blair & Sampson, L.L.P., For Delinquent Tax Collection Services

<u>Speaker</u>
Sarah Becker

| RESULT: | APPROVED [5 TO 1] |
|---|---|
| MOVER: | Manuel Rodriguez, District III Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Flynn Vilaseca, Sung |
| NAYS: | Rodriguez |
| ABSTAIN: | Jones, Davila |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-3.     Approval of the 2016–2017 Midyear Budgetary Update

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-4.     Authority to Contract with First Southwest, a Division of Hilltop Securities Inc. For The Purpose Of Providing Financial Advisory Services

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.145**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**J.**     **OTHER**

J-1.     Consideration and Approval of Term Contract Employment Areas for Reduction in Force

- 2016–2017 School List

| RESULT: | APPROVED [7 TO 1] |
|---|---|
| MOVER: | Diana Davila, District VIII Trustee |
| SECONDER: | Anne Sung, District VII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca, Sung |
| NAYS: | Jones |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

J-2.     Consideration and Approval of Continuing Contract Teaching Fields for Reduction in Force

- 2016–2017 School List

| RESULT: | APPROVED [7 TO 1] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Holly Maria Flynn Vilaseca, District VI Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca, Sung |
| NAYS: | Jones |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**K.**     **POLICY**

**L.**     **SUPERINTENDENT'S INFORMATION ITEMS**

**ADJOURNMENT**

There being no further business to come before the Board at this Regular Meeting, the President declared the meeting adjourned at 10:35 p.m.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

11

**Appx.146**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

**MINUTES APPROVED**

The foregoing minutes of the Regular Meeting of the Board of Education of the Houston Independent School District held on February 9, 2017 in the Board Auditorium of the Hattie Mae White Educational Support Center of the Houston Independent School District, 4400 West 18th Street, Houston, Texas, were duly approved at a Regular meeting held on March 9, 2017.

**ATTEST**


_____          _____
Wanda Adams                              Rhonda Skillern-Jones
Board of Education, President            Board of Education, Secretary
Houston Independent School District      Houston Independent School District

Any supplemental information to Agenda Items may be found in the Meeting Folder of
this date located in the Office of Board Services, Houston Independent School District.

12

Appx.147

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 9

Houston ISD
101912

BOARD MEMBERS                                                    BBE
AUTHORITY                                                    (LOCAL)

BOARD AUTHORITY    The Board has final authority to determine and interpret the poli-
                   cies that govern the schools and, subject to the mandates and lim-
                   its imposed by state and federal authorities, has complete and full
                   control of the District.  Official Board action shall be taken only in
                   meetings that comply with the Open Meetings Act.  [See BE (LE-
                   GAL)]

TRANSACTING        When a proposal is presented to the Board, a discussion shall be
BUSINESS           held and a decision reached.  Although there may be dissenting
                   votes, which are made a matter of public record, each Board deci-
                   sion shall be an action by the whole Board binding upon each
                   member.

INDIVIDUAL         Board members as individuals shall not exercise authority over the
AUTHORITY          District, its property, or its employees; however, individual Board
                   members shall have the right to seek information from District re-
                   cords and employees in accordance with this policy.

COMMITTING THE     An individual member may act on behalf of the Board only with the
BOARD              official express authorization of the Board.  Without such authoriza-
                   tion, no individual member may commit the Board on any issue.

ACCESS TO          Individual Board members, acting in their official capacity, have ac-
RECORDS            cess to any records pertaining to District fiscal affairs, business
                   transactions, governance, and personnel, including existing reports
                   and internal correspondence that properly may be withheld from
                   members of the general public in accordance with the Public In-
                   formation Chapter of the Government Code.  [See GBA]

                   Individual members have access to personally identifiable student
                   records that properly may be withheld from members of the gen-
                   eral public only on a need-to-know basis and in accordance with
                   policies FL(LEGAL) and (LOCAL).

CONFIDENTIALITY    At the time Board members are provided access to confidential re-
                   cords, the Superintendent or other District employee shall advise
                   them of their responsibility to maintain the confidentiality require-
                   ments.

REQUESTS FOR       Individual members shall not direct or require District employees to
RECORDS            prepare reports derived from an analysis of information in existing
                   District records or to create a new record compiled from informa-
                   tion in existing District records.  [See also BE(LOCAL)]

                   Directives to the Superintendent regarding the preparation of re-
                   ports shall be by:

                   1.    Board action;

Houston ISD
101912

BOARD MEMBERS                                                                    BBE
AUTHORITY                                                                      (LOCAL)

2.   Request of an individual Board member made in a Board meeting after discussion by the Board as a whole; or

3.   Written request of an individual Board member.

**REFERRING COMPLAINTS**

If citizens bring concerns or complaints to an individual Board member, he or she shall refer them to the Superintendent, who shall proceed according to the appropriate complaint policy.  [See BED and GF]  Where the concern or complaint directly pertains to the Board's own actions or policy, for which there is no administrative remedy, it may also be appropriately considered for placement on the agenda.

**COMPLAINT AGAINST A BOARD MEMBER**

A person affected by any activity of a Board member may register a complaint with the President of the Board, or in the case of a complaint involving the President, with the First Vice-President of the Board.

The President or Vice-President shall act to resolve the complaint and may utilize the services of an experienced, trained mediator.

The person who initiated the complaint shall be advised of the resolution of his or her complaint.

DATE ISSUED: 1/8/2001                    ADOPTED:                              2 of 2
LDU-02-01
BBE(LOCAL)-X

**Appx.150**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 10

Houston ISD
101912

BOARD MEMBERS                                                          BBE
AUTHORITY                                                          (LEGAL)

**Board Authority**

The board members as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. *Education Code 11.151(b)*

A board may act only by majority vote of the members present at a meeting held in compliance with Government Code Chapter 551, at which a quorum of the board is present and voting. Unless authorized by the board, a member of the board may not, individually, act on behalf of the board. *Education Code 11.051(a-1)*

**Access to District Facility**

A district shall create a policy on visits to a district campus or facility by a member of the board.

**Access to Information**

When acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district.

"Official capacity" means all duties of office and includes administrative decisions or actions.

The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.

The district may withhold or redact information, a document, or a record requested by a board member to the extent that the item is excepted from disclosure or is confidential under the Public Information Act or other law [see GBA].

A district shall provide a board member with information, documents, and records requested not later than the 20th business day after the date the district receives the request. The district may take a reasonable additional period of time, not to exceed the 30th business day after the date the district receives the request, to respond to a request if compliance by the 20th business day would be unduly burdensome given the amount, age, or location of the requested information. The district shall inform the board member of the reason for the delay and the date by which the information will be provided.

If a district does not provide requested information to a board member in the time required, the member may bring suit against the district for appropriate injunctive relief. A member who prevails in a suit is entitled to recover court costs and reasonable attorney's fees. The district shall pay the costs and fees from the budget of the superintendent's office.

DATE ISSUED: 11/14/2017                                              1 of 3
UPDATE 109
BBE(LEGAL)-P

Houston ISD
101912

BOARD MEMBERS                                                    BBE
AUTHORITY                                                    (LEGAL)

A board member shall maintain the confidentiality of information, documents, and records received from the district as required by the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. 1232g) and any other applicable privacy laws. [See FL].

A district shall post, in a place convenient to the public, the cost of responding to one or more requests submitted by a board member under Education Code 11.1512(c) if the requests are for 200 or more pages of material in a 90-day period.

A district shall report annually to TEA not later than September 1 of each year:

1.  The number of requests submitted by a board member under Education Code 11.1512(c) during the preceding school year; and

2.  The total cost to the district for that school year of responding to the requests.

*Education Code 11.1512(c)–(f)*

**Access to Student Records**

Personally identifiable information in education records may be released, without the written consent of the student's parents, only to a school official who has a legitimate educational interest in the education records. *34 C.F.R. 99.31* [See FL]

**Responsibility for Records**

A person, including a board member, commits a criminal offense if the person:

1.  Knowingly or intentionally destroys, conceals, removes, or otherwise impairs the verity, legibility, or availability of a district record in contravention of Local Government Code Chapter 202. *Local Gov't Code 202.008; Penal Code 37.10*

2.  Willfully destroys, mutilates, alters, or removes public information without permission as provided by Government Code Chapter 552. *Gov't Code 552.351*

3.  Distributes information considered confidential under the Public Information Act. *Gov't Code 552.352*

**Protections for Acting on a Legislative Measure**

A board member may not be subject to disciplinary action or a sanction, penalty, disability, or liability for:

1.  An action permitted by law that the officer takes in the officer's official capacity regarding a legislative measure;

2.  Proposing, endorsing, or expressing support for or opposition to a legislative measure or taking any action permitted by law to support or oppose a legislative measure;

DATE ISSUED: 11/14/2017                                        2 of 3
UPDATE 109
BBE(LEGAL)-P

Houston ISD
101912

BOARD MEMBERS                                                         BBE
AUTHORITY                                                           (LEGAL)

|  |  |
|---|---|
|  | 3. The effect of a legislative measure or of a change in law proposed by a legislative measure on any person; or |
|  | 4. A breach of duty, in connection with the board member's practice of or employment in a licensed or regulated profession or occupation, to disclose to any person information, or to obtain a waiver or consent from any person, regarding the officer's actions relating to a legislative measure; or the substance, effects, or potential effects of a legislative measure. |
|  | *Gov't Code 572.059* |
| **Board Member Immunities** | The statutory immunity detailed below is in addition to and does not preempt the common law doctrine of official and governmental immunity. *Education Code 22.051(b)* |
| State Law Immunities | A board member is not personally liable for any act that is incident to or within the scope of the duties of the board member's position and that involves the exercise of judgment or discretion. *Education Code 22.0511(a)* |
| Federal Law Immunities | Except as provided in 20 U.S.C. Section 7946(b), no board member shall be liable for harm caused by an act or omission of the board member on behalf of a district if the conditions of the Paul D. Coverdell Teacher Protection Act of 2001 are met. *20 U.S.C. 7943, 7946(a)* [See also DGC] |

DATE ISSUED: 11/14/2017                                              3 of 3
UPDATE 109
BBE(LEGAL)-P

**Appx.154**

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 11

# Texas Education Agency
# Special Investigations Unit

# Investigation Procedures

### Purpose

This document contains the procedures for investigations of school districts and charter schools conducted by the Special Investigations Unit (SIU) of the Texas Education Agency (TEA) pursuant to Texas Education Code (TEC) §§ 39.057 and 39.058.  These procedures supersede any former procedures issued by or covering the SIU and pertain to all current or future investigations as of the effective date of these procedures. These procedures do not apply to an on-site investigation conducted under TEC § 39.056.

### Mission

The mission of the SIU is to use a variety of investigative approaches to gather evidence related to alleged wrongdoing including but not limited to potential violations of state or federal law, rules and regulations, policies and procedures, and other abuses that may negatively impact a school district or charter school.

Investigations will focus on obtaining sufficient factual evidence to determine whether certain enforcement actions should be taken against the district or charter school.

### Authority

The authority to investigate school districts and charter schools is specified under Chapter 39 of the TEC. The Commissioner of Education or the Commissioner's designee authorizes the SIU to conduct special accreditation investigations (SAI) pursuant to TEC §§ 39.057 and 39.058.

### Procedures

Part I.  Initial Review

SIU investigates complaints referred by TEA's Complaints Management Division. SIU also accepts referrals from TEA program areas or executive management based on concerns identified through program area compliance monitoring functions or external referrals. Upon referral, SIU conducts a preliminary inquiry and review of the referral, which may include obtaining or requesting additional documents or information from complainants, witnesses, other agencies, and/or the school district or charter school.

After reviewing the referral, if the SIU determines an SAI is warranted, SIU makes a recommendation to the Commissioner of Education or the Commissioner's designee through the Director of Governance & Investigations for final approval of the SAI.

Part II.  Initial Notification

If an SAI is authorized by the Commissioner or the Commissioner's designee, a written notice of investigation is sent by SIU to the superintendent and board president of the school district or charter school.  This written notification will include:

- The statement of purpose, mission, and authority of the SIU;
- The allegation(s) or matter(s) under investigation;
- A copy of these procedures;
- Requests for information; and
- Contact information for the investigator(s) assigned to the investigation.


Part III.  Conduct of Investigation

Investigation Plan:

Upon opening an SAI, the SIU will develop an investigative plan.  The investigative plan may be revised at any time, as new information is received.  The investigative plan may include: a request for and review of records and data from the school district or charter school; interviews; the scheduling of an on-site investigation; and/or communication with other agencies outside of the TEA.

On-Site Investigation:

The SIU may determine an on-site investigation is required in order to conduct a thorough investigation of the allegations. Notice of an on-site will be made either in the original notice of investigation or at a later date. If SIU conducts an on-site investigation, the investigator(s) will conduct an entry meeting with the superintendent (or a designee) upon arriving at the district.  An overview of the investigative process will be discussed with the superintendent or a designee at that time.

While on-site, or before or after an on-site, interviews may be conducted with school district or charter school staff, parents, students, and other persons with direct and/or relevant knowledge related to a SAI. If SIU determines the need to interview a student, SIU will contact the parent or guardian of that student. Student interviews of a minor child require the written consent and presence of the parent or guardian. If the parent or guardian is unable to attend but gives written consent, the parent or guardian may designate a representative to be present during the interview.

Additional individuals may be identified during an on-site or throughout the course of an investigation. Interviews may be recorded electronically, with the consent of the interviewee. Any person being recorded may request a copy of the recording.  If consent is not given, the interview will be conducted without an electronic recording device.

Documents, records, and other relevant information may be identified during the course of the on-site SAI.  These items will be reviewed for investigative information which may be pertinent to determining the facts relative to a potential violation.  Information and data collected will be documented, organized, and maintained throughout the course of the investigation.

The SIU investigator(s) may meet with the superintendent (or a designee) before exiting the district. During the exit conference SIU staff will remind the superintendent the investigation is ongoing and will give the superintendent contact information for the SIU investigator(s).


Evidence:

Evidence substantiating allegations of non-compliance or a violation of state or federal law, rule, or regulation will be gathered and reported in a preliminary investigative report.  If the evidence confirms an allegation of wrongdoing, the evidence will be included as a part of the preliminary and final report submitted to the Commissioner of Education and may be referred to external entities.


Part IV.  Investigative Reports

Preliminary Report:

Upon completion of the SAI, the SIU will issue a preliminary report in accordance with Section 39.058 of the TEC and Chapter 157 of the TAC.  The preliminary report is a draft and audit working papers of the investigation.

The preliminary report will state the findings of fact and explain why the allegation is or is not substantiated.   The preliminary report will also include recommendations to the Commissioner of Education or the Commissioner's designee for any corrective or disciplinary action or interventions for the district.  The preliminary report will be provided to the district and to any person the TEA finds has violated a law, rule, or policy, and will include information for requesting an informal review of the report.

If the preliminary report finds no violation of law or rules, the TEA may issue this report as its final report. In addition, if the SIU finds no violations of law, rule, or policy, the SIU may administratively close the investigation without issuing a preliminary or final report. The district will receive notice if the SIU administratively closes the investigation. An administrative closure without preliminary report may be reopened by the SIU at any time, if it is determined to be necessary based on new or additional evidence, a new complaint, or review of data from another program area within TEA.

Informal Review:

The preliminary report will provide an opportunity to request an informal review of the findings to the school district, charter school, or person found to have violated a law, rule, or policy. The preliminary report will include a deadline by which the written request for an informal review must be received by the TEA. The request for an informal review must be in writing and include all information or documentation the school district, charter school, or individual would like the TEA to consider in the review. Following the informal review, a final report will be issued. If a request for informal review is not received by the TEA on or before the deadline, the report and the findings are final.

Final Report:

The TEA will issue a final report in accordance with Section 39.058 of the TEC and Chapter 157 of the TAC. The final report is a public document.  The final report will be issued to the district and to any person the TEA finds has violated a law, rule, or policy.  The final report will also be issued to the Governor's Office and any substantive Legislative committee, and TEA will provide any additional information to these entities as requested.  Any recommendations for sanctions or enforcement will be referred to the Division

of Enforcement Coordination. The Commissioner of Education or the Commissioner's designee will make the final determination regarding any sanctions.  Once the final report is issued, the findings in the report are final and no further appeals are available.

Part V.  Release of Information, Referrals, Procedural Matters

SIU may refer allegations, evidence, or investigative findings to other areas of the agency, to other state or federal agencies, or to appropriate law enforcement at any time during an investigation, including referring the final report at the conclusion of an investigation. If the report includes suspected criminal violations, the report and the underlying evidence may be submitted to the appropriate law enforcement authority, including the county district attorney.  Evidence that one or more educators violated a state or federal law may be referred to the Educator Investigations Division or to the Student Assessment Division for further review and determinations.

TEA complies with the Texas Public Information Act (TPIA) regarding the release of information in response to a request for public information. Information can only be kept confidential to the extent allowed by law. If audit working papers and drafts relating to the investigation are requested by the public, TEA will seek to withhold them from release through the Office of the Attorney General.

Inquiries received from the media will be directed to the TEA Office of Communications. Until a final report is issued, an investigation is ongoing and the SIU will not release any information regarding the investigation until it is final.

A copy of these procedures will be made available to the complainant, if possible, the school district or charter school, and the public.

SIU staff will be trained in the above-listed procedures and will follow these procedures in conducting SAI investigations.  These procedures align with the Offices of Inspector General Principles and Standards green book.

Any modifications to these procedures or the complaint resolution procedures may be ratified by the Commissioner or the Commissioner's designee at any time.

Effective date: September 2016

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 12



**ROGERS MORRIS & GROVER**

5718 WESTHEIMER ROAD, SUITE 1200
HOUSTON, TEXAS 77057
PHONE: (713) 960-6000  •  FAX: (713) 960-6025
**www.rmgllp.com**

MICHELLE R. MORRIS
Direct Dial:  (713) 960-6009
mmorris@rmgllp.com

May 18, 2015

### *PRIVILEGED & CONFIDENTIAL*
### *ATTORNEY-CLIENT COMMUNICATION*

### *Via E-mail*
Ms. Monika Harris
Chief Procurement Officer, Interim
Houston Independent School District
4400 West 19th Street
Houston, Texas 77092-8501

   Re: Comments to Internal Audit of the Design and Selection Process for Job
     Order Contacts

Dear Ms. Harris

  Per your request, this letter offers comments and recommendations in connection
with the District's plan to reissue a solicitation for job order contracting services.  I have
had an opportunity to review the 2015 report issued by Internal Audit, the management
responses to the audit, and relevant procurement documents related to the Job Order
Contract solicitation issued on October 31, 2014.  My comments to the auditor's findings
are set forth below, in the order presented by in the audit.

### Finding #1

  *Internal Audit found that all twenty-one (21) proposals were submitted on
or before the submittal deadline of 10:00 a.m. on November 25, 2014;
however, one (1) of the proposals was incomplete.  One firm did not submit
its M/WBE package until November 25, 2014 at 3:32 p.m., which was after
the deadline.   The package was accepted at the discretion of the
Procurement Sourcing Specialist.  In addition, the two (2) proposals which*

Ms. Monika Harris
May 18, 2015
Page 2

*were submitted on November 19, 2014, did not include copies of all of the signed addendums.*

*The CSP contains conflicting language.   Paragraph 1.11.6 "Late Proposals" states: "Responses submitted after the due date and time noted in this CSP shall not be considered and shall be returned to the Proposer(s), unopened, by United States Mail." ...   "There shall be no exceptions to these requirements."   Paragraph 3.4 states: "... Each proposal received will be analyzed to determine overall responsiveness and completeness as defined in the scope section and in the instructions on submitting a proposal.  Failure to comply with the instructions or to submit a complete proposal may deem a proposal non-responsive and may at the discretion of the Evaluation Committee be eliminated from further evaluation.*

*According to paragraph 3.4 of the CSP, the Procurement Sourcing Specialist was allowed to accept the late M/WBE package.  It is known that the failure to submit an M/WBE package timely is grounds for eliminating a proposal in the District's Construction Manager at Risk (CMAR) CSP selection processes.   The CMAR CSP selection process is not consistent with the process followed for the JOC CSP selection process, which allowed a late submission.  Although a case can be made for both positions, inconsistent treatment of issues like the late acceptance or waiver of missing supporting documentation between similar procurement processes can cause questions to be raised about the integrity of those processes and impact public confidence.*

**<u>RMG Comments and Recommendations:</u>**

The CSP language dictates that proposals submitted late will be returned to the proposer unopened, without exception.  This language clearly refers to the initial sealed packet submission, in its unopened state.  The completeness of a proposal cannot be determined until it is opened and evaluated for completeness.  Once opened, the District should, and based on the CSP language does, retain discretion to determine whether the proposal is sufficiently complete.  The CSP language states that lack of completeness *"may deem a proposal non-responsive and may at the discretion of the Evaluation Committee be eliminated from further evaluation."*  This is a post-opening issue, distinct from submission of a late sealed proposal package prior to opening.  The language does not therefore appear to conflict.  As for the auditor's claim that failure to timely submit



Ms. Monika Harris
May 18, 2015
Page 3

an M/WBE package is "grounds" for elimination in a CMR process, the CSP language has the same effect. "Grounds" for elimination is not automatic – it sill leaves discretion. The JOC CSP, by using the word "may," creates the same discretion to make incompleteness grounds for elimination. Again, I fail to se the conflict.

I do not recommend implementing an inflexible hard line rule that incomplete or late forms, no matter how immaterial to "best value," will lead to disqualification. Such a blanket practice could subject the District to exposure. Discretion should be exercised to determine the materiality of the omission, and whether late acceptance of missing proposal elements would cause competitive injury to other proposers. The District also could, as part of the scoring process, penalize a proposer for submitting an incomplete proposer, rather than eliminating a potentially "best value" proposer from the process.

### Finding #2

> The CSP was issued on Friday, October 31, 2014. On Tuesday November 4, 2014, HISD employees were notified by email that in accordance with the Code of Silence Policy, Board Policy CAA (Local), that a CSP that fell within their span of control had been issued.

> The evaluation committee was formed on October 31, 2014. The Procurement Sourcing Specialist had each committee member outside of the Procurement Department sign a Confidentiality Agreement for "JOC General Construction – Major & Minor Projects" on December 2, 2014, the day the committee met to evaluate the proposals.

> In accordance with District Policy, the notification about the Code of Silence should have been issued no later than the date of the issuance of the RFQ. The Confidentiality Agreements should have been signed at the time the committee was formed, or on the date the RFQ was issued, whichever occurred first. In this case both occurred on October 31, 2014.

### RMG Comments and Recommendations:

I agree that the Code of Silence directives should be issued the same day as the procurement release date, and evaluators should execute Confidentiality Agreements as soon as the committee is formed.



Ms. Monika Harris
May 18, 2015
Page 4

## Finding #3

*After reviewing the pre-determined criteria and weights in CSP #14-11-05 and reviewing the evaluation form used by the evaluation committee, Internal Audit determined that the Board approved criteria and weights for a CSP as listed in Board Item G-20 were not included in CSP #14-11-05, nor used in the evaluation process. The criteria used in the process differed significantly from that approved by the Board. The most significant difference was the reduction of the Quantitative Criteria (pricing) from 45% to 30%, which runs contrary to a recommendation made in the Audit Report issued by the Council of Great City Schools. That recommendation was to "Provide a substantially higher value to* **"price"** *as a weighted factor."*

*It should be noted that the weight for the "Price (Coefficient)" in the 2008 RFP for the Supplemental Job Order Contract was 55%. In the 2010 the weight for the "Pricing/Cost Coefficient" in the RFP for Job Order Contract Program for Repair, Rehabilitation, Minor Construction and Alteration of Facilities was 50%.*

*Minimizing the weighted value of the Quantitative Criteria (pricing) to 30% and increasing the weight of the Qualitative Criteria to 70% increased the amount of subjectivity in the process, and resulted in firms being recommended with pricing adjustment factors which were significantly higher than other firms which were not recommended. It was noted that although the evaluation committee submitted a final Qualitative Criteria score sheet, they did not document the rationale for the scoring. Because the qualitative evaluation was not documented, the only way to validate the qualitative scores would be to re-perform the evaluations.*

## RMG Comments and Recommendations:

Regardless of which version of Board-approved selection criteria is the correct applicable version, none of the selection criteria appear to be specifically applicable to a JOC CSP. Rather, the CSP criteria referenced in the report seem to be intended for a traditional "CSP," where there is a defined project scope. Certain factors relevant to "best value" on a defined project CSP, such as "proposed duration" and "subcontractor qualifications," are unknown, and unable to be determined at the time job order contractors are selected. It would therefore be meaningless to include, and impossible to



**Appx.164**

Ms. Monika Harris
May 18, 2015
Page 5

score these criteria in a JOC CSP solicitation.  While the HSD Board may have approved selection criteria for certain delivery methods, the law does not require Board approval of selection criteria.    If there is a standing Board policy or prior action requiring Board approval of selection criteria (or revisions to selection criteria), then Board approval of selection criteria specific applicable to a JOC CSP should be sought.  If there is no such local mandate, than this legal authority rests with the Superintendent.

There is likewise no legal basis for the conclusion, as suggested by the auditor, that price must be weighted as a majority factor in order to pass legal scrutiny.  While price is a certainly a significant factor in the determination of best value, it need not be the majority factor.  A school district can realize significant financial loss by selecting a lowest price proposer who lacks sufficient qualifications and experience.  The evaluation of qualitative factors, which are also relevant to "best value," is unavoidably subjective to a certain extent.  This subjectivity is expressly permitted by law, as evidenced by the list of various permissible subjective evaluation criteria set forth in Texas Government Code Section 2269.055.

## Finding #4

*Quantitative Evaluation - Internal Audit reviewed the adjustment factor worksheet and noted that one (1) of the twenty-one (21) firms' adjustment factors were not carried over to the scoring sheet correctly . . .*

*In addition, six (6) of the twenty-one (21) firms had included Non Pre-priced adjustment factors which were not within the range specified in the CSP . . .*

*Qualitative Evaluation – Total weight given to all of the Qualitative Criteria was 70% of the total score.  The Qualitative Criteria excluding the M/WBE portion was weighted at 60% and the M/WBE criteria was weighted at 10%.   The evaluation committee was given the proposals (averaging over 1,800 pages of documents), and scored the Qualitative Criteria with the exception of the M/WBE portion for all twenty-one (21) firms in a single day.  According to members of the committee, they met, discussed each firm in relation to each criteria, verbally agreed on a score for each, and completed the single evaluation form, which they all then signed.  Although the sheet was populated and signed by each member of the committee, none of the members kept notes regarding each firm and*



Ms. Monika Harris
May 18, 2015
Page 6

> *why each score was assigned. The only way one can validate each score is*
> *to perform the entire evaluation again, but that process cannot guarantee*
> *the same results. Internal Audit has no reason to believe that the committee*
> *acted in any manner other than in the best interests of the District;*
> *however, the lack of documentation by the committee to support the*
> *reasoning behind the qualitative scoring can cause one to doubt the*
> *integrity of the process and impact public confidence . . .*

**RMG Comments and Recommendations:**

As it relates to Non Pre-priced adjustment factors (which only come into play for extraordinary items that cannot be found in the unit price book), I do not recommend dictating upfront an acceptable range of competitive pricing. Such a practice eliminates the opportunity for proposers to compete openly and offer additional discounts. If the District wishes to dictate the maximum markup it is willing to pay for certain items, I recommend handling this in one of two ways: (1) dictate the maximum allowable markup in negotiations, rather than inserting curbs to open competition at the outset; or (2) dictate in the CSP the exact markup the district is willing to pay for Non Pre-priced items, rather than a range.

With respect to the collective evaluation system employed by the committee, and its use of a single scoring sheet for the group, the law does not dictate whether evaluators must score proposals individually or collectively. Nor does the law require a minimum level of documentation, beyond the scores and rankings, to evidence evaluators' rationales for scores given in subjective scoring categories. Scoring procedures within a committee are within the discretion of the entity. While reasonable minds can differ on the best approach, use of a collective scoring sheet does not, in and of itself, render the procurement results unreliable or defective. That said, use of individual score sheets is typically employed a best practice to (1) prevent committee members from being influenced by other committee members, and (2) corroborate and validate the final results by showing the independent conclusions of each evaluator. I am not suggesting that evaluators should score proposers individually and in a vacuum, but at the end of the day, even after group discussion, each member should be entitled to submit his/her own perspective and conclusions towards the final result.

At HISD, the Board has expressly delegated the evaluation, scoring and ranking of proposers to the administration. So while it is left to the administration to determine which approach best serves the District's objectives and interests, the administration's approach should be aligned with the wishes of the Board, so that the Board is comfortable



Ms. Monika Harris
May 18, 2015
Page 7

relying on the administration's recommendations. I therefore recommend seeking direction from the Board on this issue, as the management response indicates in its Action Plan.

## Finding #5

> The language in the CSP does not require that each respondent submit financial statements. Accordingly, of the twenty – one (21) proposals only two (2) contained financial statements. In addition, Internal Audit has found no evidence of a request for financial statements by Procurement, so a review of each firm's financial position was never part of the process. Although one (1) of the criteria is Bonding and Stability, that evaluation focused primarily on bonding capacity. It has been noted in other construction or construction related procurement processes that the submission of financial statements is a requirement in order for the respondent to demonstrate the "… Respondent's financial stability and ability to fulfill the obligations of the contract(s) that may be awarded with their submittal." The requirement for submission and evaluation of a proposing firm's financial records is an internal control to ensure that the District's interests are protected. The omission of a financial evaluation is a deficiency in the thoroughness of an evaluation process. Internal Audit believes that not requiring and evaluating financial statements of proposing firms puts the District at risk of contracting with a firm which is financially incapable of performing the contract requirements.

## RMG Comments and Recommendations:

I agree with Management's response. Financial statements, while important when determining to whom to award a major construction project with a substantial duration, are not as critical in the selection of job order contractors. JOC projects, by nature, are minor in scope and value, and the HISD Board caps the maximum dollar value of each job order. As such, small businesses that compete in JOC solicitations may not be able to offer audited financial statements. By law, individual job orders exceeding certain dollar amounts require payment and performance bonds, and surety companies thoroughly evaluate the financial strength of companies and their principals when issuing bonds and setting a firm's bonding capacity. As the auditor points out, HISD evaluates each proposer's bonding capacity, which is in and of itself indicative of a company's financial strength. This practice, along with insurance verification, is sufficient to protect HISD



Ms. Monika Harris
May 18, 2015
Page 8

from the minimal financial risk associated with minor projects to be performed under HISD's JOC program.

### Finding #6

> *Although Risk Management provided the required types of insurance coverage and minimum limits, Internal Audit has found no evidence that the insurance requirements in the CSP were a factor in the evaluation process. A review of the responses to the CSP found that out of the twenty-one (21) responses, twelve (12) included insurance certificates. Of those twelve certificates three (3) did not contain the required coverage. Nine (9) firms submitted responses with no insurance certificates at all. Of the thirteen (13) firms which were recommended for an award, only six (6) provided certificates in their responses, all of which contained adequate coverage.*

> *Whether each firm's evidence of insurability was considered by the evaluation committee cannot be determined because the committee failed to keep notes on the evaluation process. Verification of insurability requires an independent confirmation of each contractor with their insurance carrier.*

> *In order to determine if the insurance coverage was reviewed for each firm during the evaluation process, Internal Audit contacted Risk Management for documentation of their review of the insurance coverage. Risk Management could not find any evidence that Procurement had requested a review of insurability for the firms which responded to CSP 14-11-05 during the evaluation period. Although it is known that Risk Management reviews actual insurance coverage when contracts are executed, this evaluation process was not in compliance with Article 2.12.2 of the CSP requiring that each supplier submit evidence of insurability with the proposal. In addition, the acceptance of proposals without the required insurance certificates speaks to the issue of completeness of a proposal, as noted in the finding on timely submission above.*

### RMG Comments and Recommendations:

I recommend requiring the submission of insurance certificates as part of any construction solicitation, to evidence a firm's insurability in general. An owner may



Ms. Monika Harris
May 18, 2015
Page 9

assign scoring points for acceptable insurance certificates, but I do not recommend the practice. As for the auditor's conclusions, I do not agree that it is improper to make compliance with specific insurance limits a condition to contract award (as suggested by Management), rather than a condition for competing in the process (as recommended by the auditor). It would be unfair to require companies to incur the expense of purchasing insurance limits dictated by HISD prior to knowing if they will be awarded a contract. Either way, the CSP should be clear whether proof of acceptable insurance a contracting prerequisite, rather than a requirement for proposal consideration (or a scoring factor).

**Finding #7**

> *Each firm submitted statements of bonding capacity as part of the CSP response package, which was provided to the committee and was more than likely considered in the evaluation process. The evaluation of each firm's bonding capacity by the committee cannot be confirmed; however, because the committee failed to keep notes on the evaluation process. Verification of bonding capacity requires an independent confirmation of each contractor's capacity with the respective sureties. Currently, there is no evidence that the respective sureties were contacted. The committee members stated that they only considered what was in each package and Risk Management has stated that they were never requested to evaluate the sureties and review total and available bonding capacity limits for this CSP.*

**RMG Comments and Recommendations:**

Management's response was appropriate, and I would not recommend changes to the current practice. Statements contained in the audit recommending that bonds be provided and verified "at the time the contract is signed" and "immediately before each renewal" reveal the auditor's lack of understanding as to how bonding works in job order contracting. Job order contracts are not bonded upfront; rather, Texas Government Code Section 2269.411 requires job order contractors to provide bonds only as necessary for a particular job order, based on the amount or estimated amount of any job order. While bonding capacity should be evaluated upfront to ensure that, if and when needed, a vendor would be able to obtain bonds for the maximum potential amount of any single job order, formally issued bonds should not be requested at the time of contract award or renewal.

Ms. Monika Harris
May 18, 2015
Page 10

## Finding #8

> The CSP did not require the proposing firms to submit reference information, so no formal reference contact process was performed. The lack of a formal reference verification process is a deficiency in the CSP process. The contacting of references is typically a part of a solicitation process for construction or construction related services intended as an internal control measure to protect the District's interests. It was included in the recent solicitations and evaluations of Architects, Project Managers, and Construction Managers-at-Risk by CFS. In soliciting construction services, the District has an obligation to make reasonable efforts to obtain an adequate level of information on each prospective vendor in order to make an informed evaluation. The potential benefits obtained from requesting of reference information and contacting the references outweighs the amount of effort it takes to do so.

> It should be noted that some firms provided letters of recommendation from past clients in their responses to support the "Qualifications" and "Relevant Experience" evaluation criteria. In discussing the evaluation process the committee members stated that they considered the letters as references "if they were provided", and also considered if a committee member had a prior experience with a proposing firm. The fact that not all responding firms included letters of recommendation with their submittals put those firms which did not at a disadvantage. The lack of a specific request for references in the CSP and a uniform reference verification process is a deficiency in the evaluation process.

## RMG Comments and Recommendations:

I do not agree that HISD's failure to conduct a formal reference checking process was "a deficiency in the CSP process," as suggested by the audit, especially given that there was not a separate designated scoring criteria for "references." When owners create a distinct scoring criterion for references, one would expect to see a survey questionnaire distributed to references in order to evaluate responses and score the proposers accordingly. Here, HISD evaluated "qualifications," in general. It appears that the CSP specifically requested that vendors submit client references, not necessarily for the purpose of providing contacts for a formal reference check, but to permit proposers to demonstrate past experience. If HISD were to decide to assign specific weight to a

Ms. Monika Harris
May 18, 2015
Page 11

proposer's "references," (which is not mandatory), then I would recommend that HISD conduct and documented external reference checks for each proposer.

### Finding #9

> *In selecting the use of Gordian, HISD did not perform a cost benefit analysis of Gordian vs. R.S. Means or other available pricing methods.  The fact that the estimated Gordian fees on the estimated annual value of JOC work range between $582,000 and $970,000, warranted such an exercise to protect the District's interests and demonstrate fiscal responsibility.  A competitive procurement RFP process should have been issued for alternative pricing methods to ensure the District received best value and made the most informed decision.*

> *According to Procurement, Gordian was selected over R.S. Means because Gordian acquired R.S. Means and R.S. Means stated that they were not issuing additional licenses to accommodate HISD requirements going forward.  It is known that entities still use R.S. Means for their Job Order Contracting.  The fact that R.S. Means has stopped issuing licenses has not been verified, but even if it is the case, a public procurement of JOC pricing options would have brought transparency to the process of selecting Gordian.*

### RMG Comments and Recommendations:

Section 2269.404 of the Texas Government Code provides two, and only two, allowable methods for obtaining competitive unit prices for job order contracts:  First, the governmental entity may "specify one or more published construction unit price books and the applicable divisions or line items."  Proposers compete by offering coefficients (discounts) or multipliers (markups) to the published unit prices for each material or labor item.   The law does not require any formal process to be conducted prior to the specification of the unit price book, nor does it require a determination that the selected price book represents a "best value."  The price book designation merely sets a uniform baseline of data points against which proposers submit competitive coefficients or multipliers.  There are several price book options from which owners may choose.  RS Means unit price books are national estimate price books; however, the estimates are adjusted for local market conditions with the application of a "City Cost Index."  The City Cost Index is automatically applied to unit prices prior to the application of the job order contractor's coefficient/multiplier.  By contrast, the Gordian Group (which now owns the RS Means publications) offers its own customized unit price book product,



Ms. Monika Harris
May 18, 2015
Page 12

utilizing localized and specific data to create line item categories tailored to an owner's specific needs. Use of a customized Gordian price book results in an additional cost to the owner -- a percentage fee – charged by Gordian on each job order issued by the owner. Other unit price books exist throughout the United States, but for job order contracting purposes, RS Means and Gordian are the two prevailing price books, with RS Means being the designated price book for the majority of job order contracts in the United States. Other published unit price books or estimating tools are utilized for insurance claims adjustment, rather than job order contracting.

The second manner in which owners may establish job order contract unit prices, under Texas Government Code Section 2269.404, is by providing "a list of work items and requiring the offerors to propose one or more coefficients or multipliers to be applied to the price book or pre-priced work items as the price proposal." In other words, the governmental entity can create its own unit price book or price list, or hire a company such as Gordian, to create one. Given the amount of effort involved in creating a comprehensive unit price book/list, it may not be feasible for owners to create a book/list for anything other than limited scope job order contract solicitations (i.e., painting, roofing, etc.), without use of an outside consultant such as Gordian.

With respect to the findings of the auditor, I disagree that a competitive RFP process should be conducted to determine which unit price book offers the best value to an owner. Such a determination can be lawfully and practically made by internal due diligence. There is no competitive incentive to be offered by publishers, and the publishers cannot adjust the data for competitive purposes. The data is what it is, and the published unit price books can be obtained and compared without requiring a competitive submission by the publishers. The publishers' licensing or book purchase fees alone will not exceed $50,000 in a 12-month period, such that procurement would be required before selection of a unit price book. The auditor appears to question the Gordian option, due to the fees charged by Gordian for its customized unit price book service. Presently, Gordian is the only company that offers the service of creating customized unit price book for owners, and offers sole source documentation to this effect to governmental entities. Gordian's fees may be subject to negotiation, but a competitive process is not required to engage in such negotiations where the company providing the service is a sole source provider.

As correctly pointed out in the legal opinion provided by Sandy Hellums-Gomez of Thompson and Horton dated September 14, 2014, job order contracting is the only delivery method available to school districts wishing to select one or more vendors to call upon to perform future construction services of an indefinite scope or quantity. The two



**Appx.172**

Ms. Monika Harris
May 18, 2015
Page 13

options described above for setting job order contract prices are the only options currently permitted by the legislature.  Statutory revisions adopted in 2011 clarify that school districts may no longer list cost categories (without baseline unit prices) and allow proposers to submit their own "time and materials" pricing schedule/rates for future work.

**Finding #10**

"Article 16 Compensation" of the Sample Contract provided as Exhibit C with the CSP states that *"Payment for Work performed during (non) standard Working hours shall be based on the (Non) Standard Coefficient multiplied factor of X.XXXX multiplied times the sum of unit prices specified in R. S. Means, Facilities Construction Cost Data, multiplied by the City Cost Index (Houston)."*   The intent to use Gordian in the instructions for the CSP, while the Sample Contract (Exhibit C) attached references compensation will be based on the R. S. Means Facilities Construction Cost Data, is indicative of a process that was rushed with poor quality.

**RMG Comments and Recommendations:**

This appears to have been a clerical error, which will be corrected.

**Finding #11**

*The primary emphasis of this finding is not failure to comply with state law, but the amount and timing of the efforts the District expended to prepare for compliance with state law.  The District had from the end of the legislative session in 2011 to prepare for the state law change in contracting methodology.  Although existing contracts were grandfathered, research into the state law requirements and determining the pricing structure, the number of contractors required, and contractual terms which offered best value to the District should have been an ongoing process by Procurement since 2011.  By utilizing Contractors from state cooperatives, and the existing annual vendors and contract extensions, Procurement effectively avoided addressing the state law change until 2014.  While doing so, the Gordian vs. R.S. Means issue came to light and caused a*



Ms. Monika Harris
May 18, 2015
Page 14

*disruption in the process, resulting in the JOC CSP process which was rushed and contained shortcuts. The CSP was issued on October 31, 2014 and the recommendations had to be approved by the board on December 11, 2014.  Even though Procurement did not start addressing this JOC Contract until 2014, once they ran into the Gordian issue the process should have been put on hold until the issue was properly researched and the method providing best value was determined.  The District still had the option of using the co-operatives and it would have been the safer course to spend a few more months using the co-operatives than rushing the process and winding up with long term contracts which do not represent best value to HISD.*

**RMG Comments and Recommendations:**

I disagree with the auditor's claim.  In my experience representing the District, I have reviewed documents clearly demonstrating that HISD began the process of transitioning from "time and materials" contracts to job order contracts in 2012, not 2014.

I hope these general comments are helpful to you as you finalize the 2015 JOC CSP solicitation.  Please do not hesitate to contact me if you would like more elaboration or additional guidance on a particular subject, or if I can be of further assistance.

Very truly yours,

ROGERS, MORRIS & GROVER, LLP

Michelle R. Morris



**Appx.174**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 13



June 14, 2016

Elneita Hutchins-Taylor
General Counsel
Houston Independent School District
Hattie Mae White Building
4400 West 18th Street
Houston, Texas 77092-8501

Re: Review of legal issues raised in HISD internal audit of Job Order Contracting

Dear Elneita Hutchins-Taylor:

### Introduction and Summary

On November 2, 2015, you engaged us to review the Internal Audit Report dated 9/4/2015, regarding "Job Order Contracting-Implementation and Execution" (the "Report") and to advise you, as the District's General Counsel, as to whether, in our opinion, the facts and other information recited in the Report demonstrate that violations of state procurement laws have or may have occurred. We have reviewed the Report and other related documents provided by you to us at our request or obtained by us from the District's website. Based upon our review of the facts and other information recited in the Report, we conclude that the Report misinterprets state law and erroneously concludes that violations of law occurred.

### Report Overview

The Report states that its purpose is, in part, to "determine that each job order was written in compliance with the contractual requirements, State Law and District Policy." Report at 4. The focus of the Report is "to review and test a sample selection of job orders for compliance with State law and District policy." Report at 4. The Report concludes that the "review found job orders which did not comply with State law." Report at 4. The Report further asserts that "single projects were broken up into multiple job orders to keep the value of each job order

**Appx.176**

below the $500,000 statutory value limitation."[1]

In the Report Detail ("Detail") that accompanies the Report, the auditors stated: "Currently, per State law ..., job orders can be issued for up to $500,000 per project, without Board approval. ...Job orders exceeding those limits can be issued; however, according to Section 2269.403 of the Texas Government Code, they must be individually approved by ... (the Board)." Detail, p. 7 [also referencing Texas Education Code § 44.032 pertaining to enforcement of purchase procedures]. Subsequently in the Detail, the Audit Team makes the following "recommendation(s)":

(1) "CFS should not divide the work to fit statutory limits, as component, separate or sequential purchases are a violation of the Texas Education Code." Detail, e.g., pp. 9, 14, 19; see also p. 18 ("job orders represent component, separate, or sequential purchases ... not permitted under the Texas Education Code").

(2) Further, CFS should perform work "under a single job order with special approval by the Board for exceeding the $500,000 contract limit." Detail, e.g., p. 9 (emphasis added).

In our opinion, the Report misinterprets state law by mistakenly applying the Education Code's restrictions on "component, separate or sequential purchases" to job order contracts made under the Government Code. Additionally, the Report appears to impose unnecessary Board approval requirements on job order contracts exceeding $500,000.

### Overview of Applicable Law

### Legislative History of Competitive Procurement of Public Works Contracts by School Districts

Prior to 1995, public school districts, like other local governments, were required to utilize competitive bidding for the award of construction contracts. Tex. Loc. Gov't Code § 271.021 et seq. (competitive bidding on certain public works

---

[1] As noted in the Report Detail, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in the memorandum dated April 2, 2014. Detail at p. 9. The Procurement Department guidance is attached as Exhibit B.

2

contracts). State law required that local governments award construction contracts to the responsible bidder offering the lowest price based upon plans and specifications prepared by an architect or engineer for a public work requiring an expenditure of more than $10,000[2]. For projects over the expenditure limit, local governments were required to 1) give public notice of the project and 2) award the contract for the project to the lowest bidder.

Under the laws applicable to cities, counties and other local governments, including school districts, the Texas Legislature passed various statutes prohibiting governmental officers or employees from intentionally making separate, sequential and/or component purchases in order to avoid the competitive bidding statutes' monetary limitation. Tex. Rev. Civ. Stat. Art. 2368a.3 and 2368a.5 (now Tex. Loc. Gov't Code §§ 262.023(c) and 271.029(a); 252.001(2), (6) and (7) and 252.062(a) (separate, sequential or component purchases); see also Tex. Atty. Gen. Op. JM-725 (1987) (prohibits intentional circumvention of $5,000 limitation by separate, sequential, and/or component purchases by the same county officers, departments or institutions); Tex. Atty. Gen. Op. JM-783 (1987); Tex. Atty. Gen. Op. JM-1254 (1990) (county not precluded from making isolated spot purchases to meet county's requirements); Tex. Educ. Code § 44.032 (1995) (separate, sequential or component purchases limitation adopted for school districts). These statutes were adopted for the purpose of ensuring that the local governments gave the required public notice and awarded the contract to the lowest bidder.

Recently, however, "... statutes have evolved from fairly simple 'lowest bidder' requirements to laws that allow a local governing body to consider a number of factors." *GADV, Inc. v. Beaumont Indep. Sch. Dist.*, No. 1:11-CV-187 at 1 (E.D. Tex. Jun. 7, 2011)(mem. order). In 1995, the Texas Legislature rewrote the procurement requirements in Chapter 44 of the Texas Education Code with the enactment of Senate Bill 1. Act of May 30, 1995, 74th Leg. R.S., Ch. 260, § 1, 1995 Tex. Gen. Laws 2207. After Senate Bill 1, school districts were authorized to choose from the laundry list of permitted methods of procurement set out in Section 44.031 of the Texas Education Code. School districts were required to select the procurement method that provides the "best value for the district". The local government is no longer required to award the contract for a public works

---

[2] The dollar limitation requiring bidding increased from $2,000.00 in 1931 to $50,000 today. *Compare* Vernon's Ann. Civ. Stat. Art. 2368a (1934) *with* Tex. Educ. Code § 44.031. *See generally* D. Brooks, 36 Texas Practice, County and Special District Law § 13.03 Statutory Requirements for Competitive Bidding (2015).

3

project to the lowest bidder.

Similarly, the state laws now provide for broader participation in the procurement process by permitting interlocal agreements such as TCPN / National IPA. Cf. Texas Government Code Ch. 791; Texas. Local Government Code Ch. 271. Under these interlocal agreements, potential vendors may qualify to participate in public works opportunities for multiple governments or multiple projects. The public notice requirement may, accordingly, be accomplished by public bidding, by a competitive sealed proposal method, or through an interlocal agreement. *Id*; see also Tex. Gov't Code §§ 2269.405-.407.

Consistent with this evolution of the procurement law, the Legislature added former Texas Education Code Section 44.035 regarding competitive sealed proposals for construction services, and it provided in part:

> Except as otherwise provided by this subchapter, *a school district using competitive sealed proposals to select a contractor for construction services, to select a construction manager, or to award a job order contract for construction services shall base its selection or award on a combination of price and other factors that the district determines provides the best value to the district.* Act of May 27, 1997, 75th Leg., R.S, Ch. 1179, § 2, 1997 Tex. Gen. Laws 4533, 4534 (emphasis added).

The Legislature also added Section 44.041, Job Order Contracts for Facilities Repair, which provided for job order contracts. *Id.* at pp. 4538-4539.

In summary, from 1995 until 2011, most school district procurement laws for goods and services, including construction services, were set out in Chapter 44 of the Texas Education Code.

**Chapter 2269, Contracting and Delivery Procedures for Construction Projects**

In 2011, the enactment of House Bill 628 moved school district construction procurement requirements (except interlocal contracts and energy saving performance contracts) to Chapter 2267 of the Texas Government Code. Construction procurement provisions formerly codified in Chapter 44 of the Education Code were repealed, including Sections 44.035 and 44.041 discussed

4

above. Act of May 28, 2011, 82nd Leg., R.S., § 2.02, 2.08 and 5.01, 2011 Tex. Gen. Laws 2900. One major purpose of House Bill 628 was to consolidate contracting and delivery procedures for construction projects for most local governmental entities into a single chapter of the Government Code. House Research Organization, Bill Analysis, Tex. H.B. 628, 82nd Leg., R.S. (1995).

In 2013, Texas Government Code Chapter 2267 was renumbered to Chapter 2269 with no substantive revisions. Act of May 2, 2013, 83rd Leg., R.S., § 22.001(23), 2013 Tex. Gen. Laws 622, 702. Consequently, while job order contracts have been permitted since 1997, the construction procurement law for school districts as currently codified in Chapter 2269 has only been in effect since 2011. The rules governing school district procurement of contracts for goods and services, other than public works contracts, are found in Education Code Chapter 44 while the rules related to school district procurement of contracts for public works are found in Government Code Chapter 2269.

In November 2013, HISD's legal counsel advised the Board of the changes in state procurement law effectuated by the Legislature's enactment of Chapter 2269. See Resolution Authorizing Determination of Construction Methods; April 8, 2013; CVF (LEGAL) issued 11/22/2013.

### The School District Authorized to Use Job Order Contracting for Public Works Contracts

As indicated above, the Texas Legislature authorized school districts to use job order contracts in 1997. Act of May 27, 1997, 75th Leg., R.S, Ch. 1179. Since at least 2000, the District has used job order contracts as permitted by the Texas Education Code. See, e.g., Board Minutes July 19, 2012, p. F-5 (approving job order contract).

Texas Education Code Section 44.031(a)(5) now provides that a school district may use a procurement method provided by Chapter 2269, Government Code, for construction services[3]. The District uses the "job order contracting" method in Subchapter I of Chapter 2269 of the Texas Government Code. Tex. Gov't Code §§ 2269.401-2269.411. Chapter 2269 provides that "(t)he governing

---

[3] Chapter 2269 provides that public works contracts may be procured by competitive bidding, competitive sealed proposals, the construction-manager-agent method, the construction manager at risk method, design build, or job order contracting. Tex. Gov't Code Ch. 2269.

body of a governmental entity that considers a construction contract using a method authorized by this chapter other than competitive bidding must, before advertising, determine which method provides the best value for the governmental entity." Tex. Gov't Code § 2269.056(a).[5]

As set forth in Chapter 2269, "job order contracting" is a procurement method used for maintenance, repair, alteration, renovation, remediation, or minor construction of a facility when the work is of a recurring nature but the delivery times, type, and quantities of work required are indefinite. This method only applies to a facility that is a building, the design and construction of which is governed by accepted building codes. Tex. Gov't Code § 2269.402. Job order contracts may be awarded for indefinite quantities and the tasks or purchase orders within the contract are awarded substantially on the basis of pre-described and pre-priced tasks. *Id.*, § 2269.403(a)(2).

Job order contracts must be publicly advertised or competitively bid. *Id.*, §§ 2269.405(a) and (b). The solicitation for proposed vendors should establish the maximum aggregate contract price when advertised. *Id.*, § 2269.403. The Board must approve "each job, task or purchase order" that exceeds $500,000. *Id.*, § 2269.403(c).

The base term for a job order contract may not exceed two years. *Id.*, § 2269.409. The District may renew the contract annually for not more than three additional years. *Id.* The District may award job order contracts to one or more job contractors in connection with each solicitation of proposals. *Id.*, § 2269.406.

### Summary of Job Order Contracts in Report

The Audit Team reviewed a sampling of job order contracts to prepare its Report. The Report describes 27 job orders issued under four job order contracts, or public notices (JOC10-01-05, JOC 5086, TCPN 5087, TCPN 5092). See Exhibit A. The subject job order contracts encompassed work at twelve different campuses. *Id.* The Report suggests that the job order contracts at eight of the District's campuses constituted "component" or "sequential" purchases made in violation of the Texas Education Code.

6

### Audit Team Misstates Applicability of Texas Education Code § 44.032 to Job Order Contracts

As indicated above, the Texas Education Code provides that a district shall, for contracts for the purchase of goods and services valued at $50,000 or more, use the method that provides the best value for the district, which includes any method provided by Chapter 2269. Tex. Educ. Code § 44.031(a)(5). Section 2269.003 of the Texas Government Code expressly provides that Chapter 2269 prevails over any other law relating to a public works contract. Tex. Gov't Code § 2269.003. Although Chapter 2269 requires that a district "advertise or [provide] public notice of requests for bids, proposals or qualifications in a manner prescribed by law", there is no prohibition in Chapter 2269 of component, separate, or sequential purchasing. *Id.*, §§ 2269.052(a) and (b).[4]

The Board may delegate its authority regarding any action required by Chapter 2269 to a designated representative, committee or other person. *Id.*, Tex. Gov't Code § 2269.053. The Board may include the notice of delegation in either: 1) a rule adopted under Section 2269.051; or 2) in the request for bids, proposals or qualification or an addendum to them. Tex. Gov't Code §§ 2269.051, 2269.053(b).[5]

Job order contracting inherently involves bundling various tasks into one project or purchase order. For example, a restroom renovation may likely include demolition, framing, electrical wiring, plumbing, sheetrocking, tiling and other tasks that, because of complexity, size, specialization, or sequencing of the work, may properly be bundled together or separated. The very purpose of job order contracting is to permit a district to maintain, repair, alter, renovate, remediate or do minor construction on a facility where the work is recurring but delivery times and quantities are indefinite. Tex. Gov't Code § 2269.403. The statute permits an entity to piecemeal work at a facility to one or more contractors provided that the entity pre-qualifies such work through the job order contracting process. As noted

---

[4] An officer, employee, or agent of a school district who, with criminal negligence, makes or authorizes separate, sequential, or component purchases to avoid the requirements of Texas Education Code 44.031(a) or (b) commits a Class B misdemeanor offense. Tex. Educ. Code § 44.032(b). By contrast, a violation of Chapter 2269 may be corrected by declaratory or injunctive relief, including voiding the contract. Tex. Gov't Code §§ 2269.451-.452.

[5] See Resolution dated 04/08/13 providing for delegation of authority.

**Appx.182**

in the Report, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in (a) memorandum dated April 2, 2014." Detail at p. 9. The guidance recommended that the "overall work scope be assigned [to job order contracts] sequentially or by trades, rather than by division of similar work." Exhibit B.

The principal purpose of Texas Education Code Sections 44.031(purchasing contracts) and 44.032 (enforcement of purchase procedures/prohibition of separate, sequential or component purchases) is to ensure that contracts over $50,000 be let through a competitive (publicly advertised) bidding or proposal process. It is undisputed that the District gave notice and pre-qualified offerors for the job orders described in the Report.

In our opinion, Texas Education Code Section 44.032 only prohibits the use of component, sequential or separate purchases intentionally made to circumvent the $50,000 competitive bid requirement contained in Section 44.031. The Report improperly concludes that the employees or officers of the District violated Section 44.032 when bundling work for job contract orders under Chapter 2269 of the Government Code.

**Audit Team Misstates the Minor Construction Limitation**

Similarly, the Audit Team misstates the scope of job orders permitted under Chapter 2269. The Audit Team asserts that "Job Order Contracts should only be used for minor construction, repairs and rehabilitation projects where the quantities and deliveries are indefinite." Report at p. 4. In doing so, the Audit Team uses the statutory language found in Texas Education Code Section 51.784, related to institutions of higher education (not school districts)[6]. Section 51.784 does not apply to the District.

It is possible that in writing Section 51.784 that the Texas Legislature borrowed language from the federal government's job order contracting regulations. Under federal procurement practice, "minor construction" means a project with a cost between $750,000 and $1,500,000. Cf. 10 U.S.C. § 2805

---

[6] Former Section 44.041 of the Texas Education Code authorized job order contracts for "minor repair, rehabilitation, or alteration of a facility. Tex. Educ. Code § 44.041 (1997) (repealed); compare Tex. Gov't Code 51.784 (related to higher education, "minor construction, repair, rehabilitation or alteration of a facility").

(authority to carry out unspecified minor construction projects).

Regardless, Chapter 2269 of the Texas Government Code, which is applicable to the job order contracts under review, provides that the contracts may be used for "maintenance, repair, alteration, renovation, remediation, or minor construction of a facility". Tex. Gov't Code § 2269.403(a). The statute permitting job order contracts is broader in two contexts than stated by the Audit Team: 1) the work is not restricted to "minor" work, and 2) the work is not restricted to a "project".

Chapter 2269 sets no monetary limitation on the scope of work permitted under a job order contract. Indeed, the statute contemplates that the maintenance, repair, alteration, renovation or remediation may be substantial in scale and may exceed $500,000 (since Board approval is necessary for jobs over $500,000). Cf. Tex. Gov't Code § 2269.403(c).

The only limitation imposed on job order contracts is that, with regard to new construction, the contracts should be used for "minor construction of a facility". Tex. Gov't Code § 2269.403(a). The construction of new facilities necessarily requires certain design considerations that may only be met by preparation of construction documents for the project. Cf. Tex. Gov't Code §§ 2269.152, 2269.205 and 2269.252 (use of architect or engineer); Tex. Occ. Code § 1051.606 (substantial alteration of public buildings requires architect). Accordingly the "minor" limitation on construction appears to be imposed by Chapter 2269 in the context of the "structural" changes to the building resulting from the work, not the monetary value of the work. There is no evidence cited in the Report, nor does it appear from the Report, that the job order contracts process was used to construct new public buildings or make substantial structural additions or changes to existing buildings that would have required the preparation of architectural or engineering plans.

The Audit Team misstates the law defining the scope of work permitted under job order contracts covered by Chapter 2269, and accordingly, misleadingly implies that the District permitted work not appropriate under that Chapter.

9

### The Audit Team Mistakenly Concludes that the District Executed
### Job Order Contracts without Board Approval

Texas Government Code Section 2269.403 provides that the Board is required to approve "each job, task, or purchase order" that exceeds $500,000. Tex. Gov't Code § 2269.403(c). The Audit Team alleges in its Report that "single projects were broken up into multiple job orders to keep the value of each job order below the $500,000 statutory value limitation." Report p. 5. In particular, the Audit Team focused on "job orders ... sequentially numbered for work at the same location". Audit Report p. 4; p. 8 (Job Orders KBR 20104 and 20105-North Forest HS); p. 9 (Job Orders KBR 20110, 20111, and 20112-Energy Institute HS); p. 10 (Job Orders KBR 30006 and KBR 30007-Kirby MS); p. 12 (Job Orders KBR 30008 and KBR 30009-Lakewood ES) and p. 13 (Job Orders KBR 30063 and KBR 300064). As noted above, the Audit Team appears to assume "sequential" purchases are presumptively prohibited by state law or that the Board was required to give some "individual" or "special" approval to any cumulative job order contracts at a particular site that totaled more than $500,000. Based upon our review of the Report, it appears that the Audit Team failed to understand the statutory requirement for Board approval.

Although Chapter 2269 generally references projects, with regard to job order contracts, the chapter requires that the Board approve "each job, task, or purchase order" over $500.000. As noted in the Report, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in [a] memorandum dated April 2, 2014". Detail at p. 9; Exhibit B, attached. The guidance recognized that the terms job, task, purchase order and project are not defined by Chapter 2269. Although project and job are used repeatedly in the statute, the terms "task" and "purchase order" appear only in Section 2269.403. In the absence of a statutory definition, it is appropriate to use the terms' common meanings. Generally "project" would encompass several jobs or tasks. Cf. Tex. Loc. Gov't Code § 245.001(1) (project means endeavor for which one or more permits required). "Job" or "task" generally indicates a part of a project: "job-a task or piece of work". See Google Dictionary.

Unfortunately, the State law does not provide a bright line for what a "job" or "task" is. The "guidance" addressed the "work scope" permitted under a "job order contract" as a project, job or task, and recommended that work scope "be assigned sequentially or by trades, rather than by division of similar work." Exhibit B- Memorandum dated April 2, 2015. The Audit Team rejects that approach

without discussion, and adopts a conservative approach that the District not enter into any contract or contracts with a contractor for more than $500,000 without prior Board approval.

In our opinion, a court would review the award of a contract under Chapter 2269 under a rational basis test, i.e., did the District have a reasonable, articulable basis to bundle or unbundle various job(s), task(s) or purchase order(s) and, as properly bundled, did the board approve the bundles over $500,000? Similar to the federal acquisition regulations, factors that may affect the determination whether one or more "job(s), task(s) or purchase order(s)" are properly bundled together for purposes of applying the $500,000 limitation may include "the diversity, size and specialized nature of the elements of performance specified," "the aggregate dollar value of the award", and "the geographical dispersion of the contract". Cf. Federal Acquisition Regulation 2.101. Although the Audit Team appeared to consider some factors that might relate to proper bundling of jobs or tasks[7], the Audit Team failed to articulate a guideline and its objectivity in determining a rational basis for bundling tasks appears tainted by its mistaken conclusion that such bundling inherently constitutes "component, sequential or separate purchases" prohibited by Chapter 44 of the Texas Education Code.

It also appears from the Report that the Board did, in fact, approve job order contracts in excess of $500,000 for the various campuses as required by Texas Government Code Section 2269.403(c). See Exhibit A. Moreover, as noted in the Audit Report, the Board had approved an annual limit of $1,000,000 on job order contracts per campus. Audit Report 4. As promulgated, the Board's rules provide that the District may "aggregate contracts for an offeror" ... "not to exceed $1,000,000 per annum per campus." Resolution Authorizing Determination of Construction Methods, April 8, 2013.

---

[7] See, e.g., Detail at p. 20- Fonwood ES-"Case can be made to justify them (chalkboard replacement, door replacement, and restroom renovation) as separate orders."

11

**Summary / Recommendations**

In our opinion the Audit Team misinterpreted the state law applicable to job order contracting, which resulted in a flawed Audit Report. The Audit Team mistakenly assumed that "component, sequential or separate" purchases violate the job order contracting provisions of Chapter 2269 and that job order contracts are for "minor" projects only. The Audit Team's efforts were further hindered by the inherent ambiguity, and newness, of Chapter 2269. Admittedly, as a relatively new procurement method, the parameters of job order contracting are not well defined.

Given the ambiguity of the statute and the confusion that it has caused, we recommend that the Board consider amending its rules for the use of job order contracting under Chapter 2269 to establish guidelines for the bundling of jobs or tasks for purposes of determining when Board approval of purchase or requisition orders for job order contracts is required. The federal guidelines regarding the bundling of smaller contract into a single contract might serve as a basis for such rules.

If we can be of further assistance in this matter, please advise.

Olson & Olson, LLP

Scott Bounds

Exhibit A, attached (Summary of 27 JOC in Report)
Exhibit B, attached (Procurement Department Guidance, April 2, 2014)

12

**Exhibit A**

| | Campus | Job Order | Description | Amount | Issue Date | Notice | Bid Approval | CSS |
|---|---|---|---|---|---|---|---|---|
| 1 | North Forest HS | KBR 20104 | asbestos abatement | $480,000.00 | 6/11/2013 | 10-01-05 | 7/18/2013 | Component P. 9 |
| 2 | North Forest HS | KBR 20005 | demolition | $480,000.00 | 6/11/2013 | 10-01-05 | 7/18/2013 | Component P. 9 |
| 3 | Energy HS | KBR 20110 | canopy and concrete | $176,444.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 4 | Energy HS | KBR 20111 | classroom reno/gen plumbing | $362,156.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 5 | Energy HS | KBR 20112 | classroom reno/flooring, elec, doors | $271,416.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 6 | Kirby MS | KBR 30006 | demo | $324,600.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 10 |
| 7 | Kirby MS | KBR 30007 | abatement | $408,300.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 10 |
| 8 | Lakewood ES | KBR 30008 | abatement | $174,923.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 12 |
| 9 | Lakewood ES | KBR 30009 | demo | $330,116.00 | 8/7/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 12 |
| 10 | Cage ES | KBR 30063 | architectural for principal's restrooms | $491,716.00 | 5/8/2014 | TCPN 5087 | <500K | Component Sequential P. 14 |
| 11 | Cage ES | KBR 30064 | electrical, plumbing, mechanical for p | $359,922.00 | 5/8/2014 | TCPN 5087 | <500K | Component Sequential P. 14 |
| 12 | Sutton ES | JLN 20124 | HVAC | $1,285,586.03 | 5/17/2013 | 10-01-05 | 3/7/2014 | no issue w/CSS P. 15 |
| 13 | Holland MS | JLN 20125 | HVAC line replacement | $472,680.38 | 5/21/2013 | 10-01-05 | 4/11/2014 | no issue w/CSS P. 15 |
| 14 | Burnet ES | JLS 30003 | roof repairs | $669,893.62 | 6/27/2013 | TCPN 5086 | 5/9/2013 | no issue w/CSS P. 15 |
| 15 | Sanchez ES | JLS 30079 | bathroom renos | $499,150.00 | 4/4/2014 | TCPN 5086 | <500K | Project continuation P. 18 |
| 16 | Sanchez ES | JLS 30148 | additional pipe and tile installation | $33,720.89 | 9/15/2014 | TCPN 5086 | <500K | Project continuation P. 18 |
| 17 | Fonwood ES | P2M 30000 | chalkboard replacement | $54,333.59 | 7/19/2013 | TCPN 5092 | 7/18/2013 | Seq., but no issue w/CSS P. 20 |
| 18 | Fonwood ES | P2M 30001 | replace doors and glass front | $282,827.14 | 7/19/2013 | TCPN 5092 | <500K | Seq., but no issue w/CSS P. 20 |
| 19 | Fonwood ES | P2M 30002 | restroom renovations | $428,256.33 | 7/19/2013 | TCPN 5092 | 7/18/2013 | Seq., but no issue w/CSS P. 20 |
| 20 | Jones HS | P2M 30044 | reno of culinary arts, new admin area, | $381,758.96 | 6/10/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 21 | Jones HS | P2M 30045 | reno of welding, HVACR, cosmetology | $481,060.71 | 6/10/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 22 | Jones HS | P2M 30047 | canopy painting, upgrade lights | $484,475.00 | 6/5/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 23 | Jones HS | P2M 30048 | tennis courts, restroom reno, bus lane | $139,959.58 | 6/5/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 24 | Jones HS | P2M 30054 | parking lot addition | $1,170,675.47 | 7/23/2014 | TCPN 5092 | 9/11/2014 | Single project P. 27 |
| 25 | Attucks MS | P2M 30046 | painting and chalkboard | $255,287.45 | 6/10/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 27 |
| 26 | Attucks MS | P2M 30051 | gym floor upgrade | $104,711.75 | 7/21/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 27 |
| 27 | Attucks MS | P2M 30052 | upgrade library bookshelves | $42,819.90 | 7/21/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 30 |

13

**Appx.188**

**Exhibit B**



5444 Westheimer Rd, Suite 200,,
Houston, TX 77056
T 713.780.4100  F 713.780.0838
www.aecom.com

## Memorandum

Date:      **April 2, 2014**

To:        Meredith Smith, Senior Project Manager, CFS,

Houston ISD From:    Kenneth L English, Program Director

Subject:   HISD Job Order Contractor Contracts

The following is a summary of our meeting last week with Elvis Eaglin and Earl Finley regarding the limitations on JOC contracts set by state law.  Present in this meeting were:

- Dillon Brady, General Manager of Construction HISD CFS
- Elvis Eaglin, Procurement Manager, HISD,
- Earl Finley, Sr. Source Specialist, Procurement, HISD
- Meredith Smith, Senior Project Manager, HISD, CFS
- Bruce Green, Senior Project Manager, HISD, CFS
- Kenneth English, Program Director, AECOM

1. The direction received from procurement team members at this meeting regarding the use job order contracts is that we may proceed with multiple, concurrent job orders contracts, with one or more vendors, as long as the job order contracts do not exceed the limits established by the HISD Board. That is, no single job order contract may exceed $500,000 and the total aggregate of job order contracts per campus, per fiscal year, may not exceed $1,000,000.

2. To confirm this direction, we reviewed the HISD Board Resolution approved on April 11, 2013 regarding JOC contract limits and discussed the applicable state laws regarding the use of job order contractors by school districts.

3. While the statutes do not address how work scope may be assigned to job order contracts and do not define terms such as "projects", "jobs", or "tasks", the CFS team prefers that overall work scope be assigned sequentially or by trades, rather than by division of similar work.

14

**Appx.189**



**Texas Education Agency**

Commissioner Mike Morath

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

October 30, 2019

> **FINAL REPORT**
>
> **NO RESPONSE REQUIRED**

Diana Davila, Board President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Holly Maria Flynn Vilaseca, 1st Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Elizabeth Santos, 2nd Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sergio Lira, Board Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sue Deigaard, Assistant Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Jolanda Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Rhonda Skillern-Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Wanda Adams, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Anne Sung, Board Member   .
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

**Dear President Davila and Interim Superintendent Lathan**:

The enclosed final report presents the findings resulting from a Special Accreditation Investigation (SAI) conducted by the Texas Education Agency's (TEA) Special Investigations Unit (SIU). This investigation relates to allegations of a systemic breakdown of the Houston Independent School District (HISD) Board of Education's (Board of Trustees) ability to govern, operate within the scope of their authority, and ensure

**Appx.190**

adherence to contracting laws and district policies. An informal review was conducted on October 30, 2019 by Deputy Commissioner, Jeff Cottrill.  The results of the informal review are listed below.

## Executive Summary

Trustee Diana Davila made a motion during the October 11, 2018 board meeting to replace the current interim superintendent without any prior notice or public deliberation. This action set in motion a chain of events resulting in complaints being filed with the TEA alleging dysfunction within the HISD Board of Trustees.

On October 15, 2018, the TEA received multiple complaints alleging that HISD is not in compliance with the laws relating to governance of an Independent School District, Tex. Educ. Code §§11.051, and 44.031; and Tex. Gov't Code Chapter 551 Open Meetings. On January 22, 2019, TEA issued a notice of SAI to HISD and conducted an on-site investigation at the Hattie Mae White Education Support Center, Houston Independent School District, 4400 West 18th Street, Houston, Texas 77092. Due to the concerns reported by HISD staff, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. Code §44.031. On March 24, 2019, SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092. Subsequently, following the investigations, TEA issued a preliminary report on August 5, 2019 with findings of fact and analysis of three allegations. This final report sustains most allegations from the preliminary report. When a finding is withdrawn, the withdrawal is noted in the analysis section of each allegation.

## Allegation One

Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?

In the final report, TEA found HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of HISD Board of Trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018, at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code §11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the board of trustees present at a meeting held in compliance with the Texas Open Meetings Act. TEA analyzed written responses from HISD and individual trustees regarding Allegation One during the informal review of the preliminary report. Please see pages 16-32 for TEA's detailed responses to HISD's arguments. Upon analysis of the HISD responses, TEA is not compelled to change its original position and substantiates the findings of Allegation One listed in the final report.

**Allegation Two**

Did the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

In the final report, TEA found HISD Board of Trustees acted individually on behalf of the board numerous other times, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051. SIU discovered many instances via email correspondence where HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the HISD Board of Trustees present at a meeting held in compliance with the Texas Open Meetings Act. HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.  TEA analyzed written responses from HISD and individual trustees regarding Allegation Two during the informal review of the preliminary report. Please see pages 42-53 for TEA's detailed responses to HISD's arguments. Upon analysis of the HISD responses, TEA is not compelled to change its original position and substantiates a majority of the findings of Allegation Two listed in the final report.

**Allegation Three**

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

In the final report, TEA found HISD Board of Trustees violated contract procurement rules while the district was selecting a vendor/contract as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §§44.031 and 44.031(a)(1). HISD failed to monitor contractual obligations, resulting in the manipulation and abuse of Job Order Contracts. HISD Board of Trustees attempted to award contracts indirectly by contacting vendors during the Request for Proposal (RFP) process, advocating for specific contractors, and manipulating contracts to circumvent contract procurement rules. TEA analyzed written responses from HISD and individual trustees regarding Allegation Three during the informal review of the preliminary report. Please see pages 60-65 of TEA's detailed responses to HISD's arguments. Upon analysis of the HISD responses, TEA is not compelled to change its original position and substantiates a majority of the findings of Allegation Three listed in the final report.

**Conclusion**

Based on the findings and substantiation of Allegation One, Allegation Two, and Allegation Three, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing board of trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the scope of their authority by circumventing the authority of the superintendent, and inability to ensure proper contract procurement laws are followed.

This final report addresses only those allegations described herein and investigated by the SIU to date. These findings do not address all the allegations raised before or after the investigation. Additional investigative work may be conducted in the future to address any remaining allegations. Furthermore, additional TEA divisions may be in the process of investigating HISD or issuing other investigative reports regarding the district.

The final report is for your review and a response is not required. The final report may contain Family Educational Rights Privacy Act (FERPA)-protected information. FERPA-protected information may not be released to anyone unless they are authorized to receive that information pursuant to FERPA. Exhibits noted in the Final Report have already been delivered to HISD via file transfer during the release of the Preliminary Report. Pursuant to a delegation from the Commissioner of Education, Dr. Jeff Cottrill, Deputy Commissioner of Governance and Accountability completed the informal review and approved this final report on October 30, 2019.

Sincerely,

Jason Hewitt
Special Investigations Unit, TEA

**<u>Table of Contents</u>**

Introduction _____ *6*

Background Information_____ *6*

Findings of Fact for Allegation One_____ *11*

Analysis of Allegation One_____ *13*

Analysis of HISD Response to Allegation One_____ *16*

Findings of Fact for Allegation Two _____ *32*

Analysis of Allegation Two _____ *37*

Analysis of HISD Response to Allegation Two _____ *42*

Findings of Fact for Allegation Three_____ *53*

Analysis of Allegation Three_____ *57*

Analysis of HISD Response to Allegation Three _____ *60*

Summary _____ *65*

Recommendation for Sanctions _____ *66*

**Appx.194**

Texas Education Agency
Special Accreditation Investigation
Final Investigative Report
Houston Independent School District

## Introduction

On October 15, 2018, the Texas Education Agency, hereinafter referred to as "TEA," or the "Agency," received multiple complaints alleging that the Houston Independent School District, hereinafter referred to as "HISD" or "district", is not in compliance with the laws relating to Governance of Independent School District, Tex. Educ. Code §§ 11.051, and 44.031; and Tex. Gov't Code Chapter 551, Open Meetings. On January 22, 2019, TEA issued a notice of Special Accreditation Investigation, hereinafter referred to as "SAI," to HISD.

In January of 2019, TEA's Special Investigations Unit, hereinafter referred to as "SIU," met with HISD's Interim Superintendent, Dr. Grenita Lathan, to discuss the nature of the complaint and the purpose of the investigation. Dr. Lathan was also provided a copy of the SAI procedures. HISD provided TEA with documents pertaining to board services, electronic communication records, conservator reports, and employment contracts. SIU conducted this on-site investigation at the Hattie Mae White Educational Support Center-HISD, Houston Independent School District 4400 West 18th Street, Houston, Texas 77092, to interview board members and district staff. Additionally, SIU obtained information from Dr. Abelardo Saavedra, current and former Central Office leadership staff, and former HISD Superintendents.

Moreover, information provided during on-site interviews identified additional areas of concern regarding contract procurement. On March 24, 2019, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. Code §44.031. SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092. The SIU findings described in this report are the result of the investigation, extensive document analysis, interviews of HISD Board of Trustees, as well as current and former HISD employees.

## Background Information

The resignation of HISD Superintendent Terry Grier changed the organizational structure of the HISD, requiring the Board of Trustees to name a new superintendent to oversee the leadership, management, and daily operations of the district. Dr. Grier's departure prompted HISD to engage in a superintendent search. After a lengthy superintendent search, Dr. Richard Carranza was named Superintendent of HISD by unanimous vote in August of 2016. Not long after, the leadership of HISD changed yet again when Dr. Carranza abruptly ended his contract in March of 2018.

On March 22, 2018, the HISD Board of Trustees convened in a 7-hour special emergency meeting to deliberate the successor to Dr. Richard Carranza, and appointed Dr. Grenita Lathan as interim

superintendent by unanimous vote. Moving forward, Dr. Lathan assumed the role and duties as interim superintendent while the board conducted its search for a permanent superintendent.

Filling the position of a permanent superintendent was not the only pressing issue HISD Board of Trustees faced. HISD's long struggle with "Improvement Required" schools are an issue that the Board of Trustees has failed to successfully address, requiring the Commissioner of Education to appoint a conservator to ensure district-level support for Kashmere High School. Additionally, tension on the board created discord within the community leading to scrutiny from legislators, constituents, and stakeholders at the local and state level. Community members such as Zeph Capo, President of the Houston Federation of Teachers, was quoted in the Houston Public Media saying, "The conduct of the HISD's board was nothing short of embarrassing and harmful. It demonstrated a dysfunction that does not serve our community, our school district and our students well." Trustees have also been criticized by Houston Mayor Sylvester Turner, calling the HISD board, "destabilizing and unacceptable."

Board attempts to address low performing campuses have resulted in disorderly and disorganized board meetings. During the April 24, 2018 board workshop, interactions amongst the Board of Trustees, and the public escalated to unmanageable outbursts, constant disruptions, and disrespectful comments. Upon going over the allotted time, former President Rhonda Skillern-Jones asked law enforcement to remove the last public speaker from the podium sparking further outbursts from the audience. Former President Skillern-Jones then requested law enforcement assistance in clearing the boardroom. The audience reacted in outrage shouting expletives while Trustee Wanda Adams could be heard saying, "I'm sick of this shit, clear the room." Law enforcement had to remove audience members out of the board room and arrested two community members.

Additionally, the HISD Board of Trustees have demonstrated unprofessional behaviors by means of inappropriate verbal arguments during multiple meetings. Trustees have historically interrupted each other during their allotted speaking time, complained about speaking time, and regularly failed adhering to Robert's Rules of Order. Board meetings lack control and order, as evident in the May 10, 2018 meeting when Trustee Jolanda Jones interrupted President Skillern-Jones and stated, "It's frustrating that they [administration] send us [trustees] stuff, and then we come to this table and ask questions we've already gotten the answers to… This is already a long meeting and there are people sitting here that still haven't gotten to speak yet, so I'm tired of meeting to death."

During a board meeting held on June 14, 2018, Trustee Jones stated, "…In reference to the Legislative Budget Board Audit… I think that's a crackhead move, that's my opinion." At the end of that meeting, Trustee Sue Deigaard said, "I think that tonight revealed for me, and the week that proceeded it, was some significant struggles that our board has and I'm really hoping our board can learn from this week, and learn from tonight and pull it together for kids and focus on student outcomes."

Moreover, TEA Conservator, Dr. Dolores Delaney, reported conflicts between trustees have created an environment that impedes the board from focusing on student outcomes. During the September 20, 2018, special board meeting trustees engaged in explosive disagreements when considering the approval to

exercise warranty under February 2016, Hazard Young, Attea and Associates (HYA) services for a superintendent search.

Further on, events that occurred during the October 11, 2018 meeting revealed the chaotic dynamics of the HISD Board of Trustees. As Trustee Anne Sung calls a motion to execute the agreement with HYA, arguments erupted between trustees. Trustee Adams commented on the specifics of the contract. Legal counsel interjected during Trustee Adams' commentary to keep her from disclosing closed session discussions, such as specifics of the contract, and the lack of community engagement. Tension on the board intensified when Trustee Davila expressed that there had been an intentional delay to begin the superintendent search by other trustees.

Trustee Davila's rhetoric prompted Trustee Adams to express her frustrations about a factional divide on the HISD Board of Trustees and within the district's administration. Trustee Adams stated, "Read the conservator's reports, it is about racial lines, and we need to stop it as a board… when you say our community, Santos, that means Black, Brown, Hispanic, Asian, it means everybody. Not just one side, so you need to collaborate with all the principals that don't look like you. We need to come together as one team and make sure we are all on one accord, because we are sending a message that should not be… We have to put what's best for kids, and we are not… we are worried about if someone is Black, White, Hispanic, Asian, it shouldn't be that way… it should be about one color and that's our kids."

Conflicts between trustees not only highlight a difference of opinion, they expose a factional divide that prevents the HISD governing body from moving forward as a district. As Trustee Jones pointed out, "We have people that are working here because Latinos on the board have threatened the superintendent that she better not fire them… there is a race war on this board. I know from both Sergio and Sue that they are concerned, and I do not believe my colleagues always vote for what's best for student achievement but to not appear to side with one race over another." The comments from board members clearly illustrate the dysfunction of the board.

During the October 8, 2018 meeting with Dr. Saavedra, the trustees present in that meeting stated their complaints about the interim superintendent and other trustees. Dr. Saavedra summarized the complaints of Trustees Lira, Sung, Santos, and Flynn Vilaseca as follows:

> "They shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees. One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused."

The inner turmoil of the divided HISD Board of Trustees reached a tipping point during the October 11, 2018 regular board meeting when Trustee Davila motioned to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was

under consideration. This motion and subsequent vote caused a chain of events that prompted TEA intervention.

HISD has also experienced historical problems with contract awarding and contract procurement. The events leading to the arrest of a former trustee for violating federal racketeering laws highlighted the corruption of the district's business affairs. HISD internal auditors investigated and confirmed the abuse of Job Order Contracts in which contracts were split in order to avoid the $500,000 threshold as established under state law. In conjunction to these findings, the district's former Chief Auditor, Richard Patton, filed a whistleblower lawsuit against HISD for terminating his contract after he reported unallowable contracting practices within the district.

In addition to egregious board dysfunction and contract procurement issues, the board members frequently overstep their authority. Examples of overreach and overstep of authority by the HISD Board of Trustees can be found dating back to 2009. During the investigation, SIU found that in August of 2009 the HISD board voted 8-1 to allocate $121.5 million for additional facilities projects in each of the nine trustee's districts. The board members who participated in this vote were former 2009 Board of Trustees, and current Board President Diana Davila. This was called the Trustee Allocation Fund (TAF). (See Exhibit A)

On April 29, 2019, an HISD senior administrator was interviewed by SIU investigators. The administrator reported that the TAF was funded with residual bond money from the 2007 bonds. The amount of money in the fund totaling $121.5 million, was to be split (nine) ways. At this time, the funds have been depleted. The HISD senior administrator explained, "The trustee identified how they wanted the funds spent, and a board item was drafted to allocate the fund request from un-allocated to allocated per the Board vote and approval"(See Exhibit B). The administrator stated that trustees managed TAF money. Trustees used the money for various projects of their choice for schools in their own district. For example, Trustee Skillern-Jones used some of the bond money allocated in her fund to purchase books for Burrus Elementary and "furniture for a school reception area" for High School Ahead Academy Middle School. (See Exhibit C) The amount in the fund rolled over to whichever trustee was elected to that seat, until the money was exhausted. This further exemplifies the overreach of the HISD Board of Trustees. The action to approve trustee spending is not only an overreach of the board but is in direct conflict with the superintendent's contract that states, "the management of the district falls under their [superintendent's] purview." Again, the HISD Board of Trustees exceeded their authority by passing this measure and directing HISD employees.

The three specific allegations, SIU's findings of fact, and analysis have resulted in TEA's final decision as stated below:

## **Allegation One**

Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?

**Applicable Statute**

Texas Governmental Code §551.002 states:

Every regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter.

## Allegation Two

Did the members of the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

**Applicable Statutes**

Texas Education Code §11.051 states:

(a) An independent school district is governed by a board of trustees who, as a body corporate, shall:

(1) oversee the management of the district; and

(2) ensure that the superintendent implements and monitors plans, procedures, programs, and systems to achieve appropriate, clearly defined, and desired results in the major areas of district operations.

(a-1) Unless authorized by the board, a member of the board may not, individually, act on behalf of the board. The board of trustees may act only by majority vote of the members present at a meeting held in compliance with Chapter 551, Government Code, at which a quorum of the board is present and voting. The board shall provide the superintendent an opportunity to present at a meeting an oral or written recommendation to the board on any item that is voted on by the board at the meeting.

(b) The board consists of the number of members that the district had on September 1, 1995.

(c) A board of trustees that has three or five members may by resolution increase the membership to seven. A board of trustees that votes to increase its membership must consider whether the district would benefit from also adopting a single-member election system under Section 11.052. A resolution increasing the number of trustees takes effect with the second regular election of trustees that occurs after the adoption of the resolution. The resolution must provide for a transition in the number of trustees so that when the transition is complete, trustees are elected as provided by Section 11.059.

## Allegation Three

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

**Applicable Statutes**

Texas Education Code, § 44.031 states:

(a) Except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district:

    (1) competitive bidding for services other than construction services;
    (2) competitive sealed proposals for services other than construction services;
    (3) a request for proposals, for services other than construction services;
    (4) an interlocal contract;
    (5) a method provided by Chapter 2269, Government Code, for construction services;
    (6) the reverse auction procedure as defined by Section 2155.062(d), Government Code; or
    (7) the formation of a political subdivision corporation under Section 304.001, Local Government Code.

**Findings of Fact for Allegation One**

Did a quorum of the HISD Board of Trustees consider or discuss public business over which the trustees have supervision or control outside of a public meeting posted in compliance with Tex. Gov't Code Chapter 551 "Open Meetings"?

The following findings of fact are a result of interviews conducted and an examination of HISD internal documents.

**Open Meetings**

1. On March 5, 2018 at 11:17 PM, Trustee Holly Maria Flynn Vilaseca sent an email to Dr. Saavedra stating, "Holly here (HISD Trustee) As you may have heard, many changes are taking place here. Would love to hop on a call to check-in." ( See Exhibit 1.1 )
2. Trustee Davila told SIU, "I communicated with Dr. Saavedra when Richard Carranza announced that he was going to be leaving… we talked about a possible interim superintendent interest."
3. Text messages submitted by Trustee Flynn Vilaseca confirm that on October 5, 2018, Trustee Flynn Vilaseca asked Dr. Saavedra if they could meet on October 8, 2018 from 3PM -6PM. ( See Exhibit 1.2 )
4. During her interview with SIU, Trustee Flynn Vilaseca stated that on October 8, 2018, she met with Dr. Saavedra at a local restaurant along with Trustees Santos, Lira, Sung and Davila.
5. Dr. Saavedra stated that he met with Trustees Lira, Sung, Santos, and Flynn Vilaseca on October 8, 2018. After Trustees Lira, Santos, and Sung left, Dr. Saavedra met with Trustees Flynn Vilaseca and Davila.
6. In their interviews with SIU, Trustees Santos and Sung acknowledged they were in a meeting with Dr. Saavedra, Trustee Lira and Trustee Flynn Vilaseca.
7. Dr. Saavedra told the SIU that Trustee Flynn Vilaseca told him that some of the HISD Board of Trustees did not know him and wanted to meet him.
8. According to Dr. Saavedra, the board members wanted to talk to him that day because they wanted to consider him as a replacement for Dr. Lathan.

9. Trustee Flynn Vilaseca told SIU investigators that during the meeting with Dr. Saavedra, Trustee Flynn Vilaseca provided Dr. Saavedra with a copy of former Superintendent Carranza's contract.

10. On October 11, 2018, three days after the meeting between trustees and Dr. Saavedra, Trustee Davila called a motion to replace Dr. Lathan as Superintendent with Dr. Saavedra. The motion passed on a 5-to-4 vote. The five trustees (Lira, Davila, Sung, Santos, and Flynn Vilaseca) who secretly met with Dr. Saavedra all voted for the motion three days after meeting with Dr. Saavedra.

11. In the motion to hire Dr. Saavedra, the board offered the same salary and benefits as were present in Dr. Carranza's contract that was provided to Dr. Saavedra by Trustee Flynn Vilaseca in the secret meeting three days prior.

12. During the deliberations regarding Trustee Davila's motion to replace Dr. Lathan with Dr. Saavedra, Trustee Davila explained that she had recently been at a conference where she was told that it was hard to get qualified candidates to apply for a superintendent job when the current interim superintendent is pursuing that position. Trustee Davila then stated that she had "spoken to Dr. Saavedra and he has no interest of staying or applying for the position."

13. SIU conducted separate interviews with Trustee Adams, Trustee Jones, Trustee Skillern-Jones and Trustee Deigaard. When asked if they knew about the meeting at a local restaurant, they all denied knowing about the meeting and stated that no one told them about it. Their statements are corroborated by Dr. Saavedra and the five board members who knew about the meeting.

14. Most recently at the August 1, 2019 Agenda review meeting, Trustee Santos stated, "I just find it quite funny that people keep throwing stones at certain trustees but we're not the only ones in violation of the Open Meeting Act, so I'm gonna go ahead and remind this board that last year when we voted for um [sic] the September vote when certain elected officials showed up here there were five other trustees that knew about a September 1st contract for the interim superintendent that somebody was going to make the motion on. There were five trustees that knew about it, we were not-didn't have any clue about it [sic], so the investigation, I welcomed the TEA to continue investigating not just the five educators that you keep pointing fingers at, Trustee Deigaard, because if I recall, you were the one that was going to make that motion. Anyway I'm gonna go ahead and back up Trustee Sung, because I didn't get on this board to be elected, I didn't come up on here for talking points, I didn't come up here to haul-to stop [sic] the democratically elected process that you know what when we got up here 18 months ago, but five years ago, five years ago there were nine trustees up here that were not doing the work for children; now you have a board that is willing to do the work and you want to sit here and hide behind talking points? It's not just these five educators that need to be under investigation Trustee Deigaard." Trustee Skillern-Jones admitted that there have consistently been problems with the HISD Board for five years, describing the board as "contentious and conservative". Trustee Skillern-Jones also accused some of her fellow board members of receiving their talking points from community members who attend the board meetings through their phone.


**Cooperation with TEA Investigation**

15. When SIU investigators asked Trustee Flynn Vilaseca why she provided Dr. Saavedra with a copy of former Superintendent Richard Carranza's contract, Trustee Flynn Vilaseca stated she did not recall.

16. When asked about her relationship with Dr. Saavedra, Trustee Davila stated, "I was on the board with him for five years and he was superintendent for five years. We have a professional relationship… Dr. Saavedra and I, every now and then will send texts like: Happy New Year,

Happy Birthday, Happy Father's Day… when I was still on the board even after I hired Dr. Grier it would be like, do you remember what the budget looked like when you were here? or, do you remember the process we used when you were here?, things like that."

17. During her interview with SIU, Trustee Davila further stated that in 2018, she had communicated with Dr. Saavedra "five or six times."

18. Dr. Saavedra told the SIU that he had exchanged text messages with Trustee Davila on or about October 4, 2018 about whether he had heard from Trustee Flynn Vilaseca. When he responded that he had not, Trustee Davila told him that he would hear from her soon.

19. SIU submitted requests to HISD for text messages from HISD Board of Trustees (including Trustee Davila) to Dr. Saavedra. Trustee Davila failed to respond to the request and failed to produce any records. Board members are subject to the Public Information Act and the Local Records Retention Schedule. Text messages regarding the arrangement of a meeting with a person being considered for the interim superintendent position should have been retained and turned over to SIU upon request.

20. In her interview with SIU, Trustee Davila stated that when she met with Dr. Saavedra there were no other trustees present; however, Trustee Flynn Vilaseca and Dr. Saavedra confirmed that Trustee Flynn Vilaseca was present when Trustee Davila met with Dr. Saavedra.

21. In his interview with SIU, Trustee Lira admitted that he met with Dr. Saavedra before the October 11, 2018 regular board meeting. However, Trustee Lira told the SIU investigators that he was alone when he met with Dr. Saavedra and no other trustees were present for the meeting. This declaration is contradicted by Dr. Saavedra's statement that he met with Trustees Lira, Santos, Flynn Vilaseca and Sung and later with Trustee Davila. Additionally, Trustees Sung, Santos, and Flynn Vilaseca confirmed that Trustee Lira was present during the meeting with Dr. Saavedra.

## Analysis of Allegation One

## OPEN MEETING VIOLATION

TEA finds that HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of the board of trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code §11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Texas Open Meetings Act.

According to the Texas Open Meetings 2018 Handbook, as provided by the Office of Attorney General, a walking quorum occurs when a governmental body attempts to avoid compliance with the Act by deliberating about district business without a quorum being physically present in one place at one time. Additionally, per Government Code §551.001(4), "meeting" means: a deliberation between a quorum of governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has a supervision or control is discussed or considered or during which the governmental body takes formal action.

**Appx.202**

On May 24, 2019, Attorney General Ken Paxton provided an opinion on the Texas Open Meetings Act quorum rules and stated the following, "If a quorum of a governmental body deliberates about public business within the jurisdiction of the body outside of a meeting authorized by the Texas Open Meetings Act, through multiple communications each involving fewer than a quorum, the governmental body violates the Act. If the Texas Education Agency conducts an investigation as authorized by section 39.057 of the Education Code and concludes that members of a school district board of trustees violated their duty to comply with the Act, it could take appropriate civil action authorized by subsection 39.057(d) of the Education Code." ( See Exhibit 1.3 )

As detailed in Finding of Facts 1-13, five individual members of the HISD Board of Trustees violated the Texas Open Meetings Act by holding two successive meetings attended by a quorum of the HISD Board of Education. At this meeting the quorum of the board discussed and considered public business over which the board has supervision or control by engaging in conversation and dialogue for the purpose of replacing Dr. Lathan with Dr. Saavedra. The hiring of a superintendent for the district is public business over which the HISD Board of Education has supervision or control. See Tex. Educ. Code §11.201(b) ("The board of trustees for an independent school district may employ by contract a superintendent for a term not to exceed five years.")

As detailed in Finding of Facts 1-6, Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila all secretly met with Dr. Saavedra on October 8, 2018, in a meeting that was not posted in accordance with the Texas Open Meetings Act. Trustees Flynn Vilaseca and Davila had been talking with Dr. Saavedra about the position of interim superintendent since Dr. Carranza's resignation. It is irrelevant that there is no evidence that all five trustees were in the meeting with Dr. Saavedra at the same time, as the trustees violate the Texas Open Meetings Act when they deliberate public business outside of a properly posted public meeting through multiple communications each involving fewer than a quorum.

As detailed in Finding of Facts 7-12, the purpose of the meetings with Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila with Dr. Saavedra was to consider Dr. Saavedra for the position of interim superintendent. Dr. Saavedra was told by Trustee Flynn Vilaseca that some of the board members did not know him and wanted to meet him. See Finding of Fact 7. It is reasonable to conclude that the board members would want to meet Dr. Saavedra before voting to name him as the new interim superintendent. Further, Dr. Saavedra himself concluded that the board members were interested in hiring him to be the new interim superintendent. See Finding of Fact 8.

In addition, Trustee Flynn Vilaseca admitted that she provided Dr. Saavedra a copy of former superintendent Dr. Carranza's contract. See Finding of Fact 9. There would be no reason to present a copy of the former superintendent's contract if the board members were not considering him for the position of the interim superintendent. The fact that three days later the five board members who secretly met with Dr. Saavedra then voted to name him as the new interim superintendent under the same terms as the contract they presented to him at the October 8, 2018 meeting corroborate the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent. See Findings of Fact 10-11.

Finally, after Trustee Davila made the motion to name Dr. Saavedra as the new interim superintendent, Trustee Davila acknowledged that she had spoken to Dr. Saavedra about the position of interim superintendent and that he had told Trustee Davila that he would not be interested in taking the permanent

position. See Finding of Fact 12. This corroborates other evidence that the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent.

As detailed in Finding of Fact 13, Trustee Santos publicly admitted that she violated the Texas Open Meetings Act and then accused her fellow board members of the same.

As a tenured trustee, Diana Davila understood the concept of a walking quorum. During her interview with SIU, she defined a walking quorum as, "five trustees engaged in conversation with district business to discover if you have a consensus, additionally, a walking quorum does not have to be all at once. As in, we all don't have to be sitting together all at one time."

## Cooperation with TEA Investigation

At the time of October 8, 2018 meeting with Dr. Saavedra, the position of interim superintendent was a highly contentious issue. Dr. Saavedra described the complaints of Trustees Lira, Sung, Santos, and FlynnVilaseca. Dr. Saavedra summarized the issues as follows:

> "They shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees. One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused."

However, when SIU interviewed the board members, there were many instances where the board members had little memory of this highly important meeting. Further, some of the board members made deceptive statements to the SIU, either by making inconsistent statements and through omission.

As detailed in Finding of Fact 9, Trustee Flynn Vilaseca acknowledged providing Dr. Saavedra with a copy of former Superintendent Richard Carranza's contract. However, Trustee Flynn Vilaseca could not or would not explain why she presented Dr. Saavedra with a copy of that contract. See Finding of Fact 14. However, when the motion was made to make Dr. Saavedra the interim superintendent, the motion specifically identified the compensation and benefits in the contract to be given to Dr. Saavedra to be equal to the rate paid to Dr. Carranza. Trustee Flynn Vilaseca failed to cooperate with the investigation by failing to explain why she had a copy of Dr. Carranza's contract and why she presented it to Dr. Saavedra.

As detailed in Findings of Fact 15-18, Trustee Davila regularly communicated with Dr. Saavedra about HISD business, including an exchange of text messages arranging the secret meeting held in violation of the Open Meetings Act. These communications are public records and are required to be retained pursuant to the Texas Public Information Act and the Local Records Retention Schedule. Trustee Davila failed to cooperate with the investigation by failing to turn over text messages that were requested pursuant to this investigation.

As detailed in Finding of Fact 19, Trustee Davila failed to cooperate with TEA's investigation by falsely claiming that there were no other trustees present when she met with Dr. Saavedra. Trustee Flynn Vilaseca and Dr. Saavedra confirmed that Trustee Flynn Vilaseca was present when Trustee Davila met with Dr. Saavedra.

As detailed in Finding of Fact 20, Trustee Lira failed to cooperate with the Agency's investigation by falsely claiming that there were no other trustees present when he met with Dr. Saavedra. Trustees Santos, Sung, Flynn Vilaseca and Dr. Saavedra all confirm that Trustee Lira was present at the meeting attended by Trustees Santos, Sung, Flynn Vilaseca and Dr. Saavedra.

## Overall Conclusion

Therefore, Allegation One, "Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?" has been substantiated. Five out of the nine board members met in a walking quorum on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The nature of these actions does not reflect HISD Policy BBE (LOCAL) which states, "Official Board actions shall be taken only in meetings that comply with the Open Meetings Act, thus, the HISD Board of Trustees explicitly violated the Texas Open Meetings Act." ( See Exhibit 1.4 )

## HISD Response to Allegation One

HISD and the five individual members of the Board of Trustees dispute TEA's conclusion that the board members violated the Texas Open Meetings Act by holding a series of meetings with Dr. Saavedra prior to voting to hire him as the interim superintendent.  Trustee Davila, Lira and Santos' responses are included in the HISD response, attached as Appendix 1. Trustee Flynn Vilaseca and Trustee Sung filed separate responses, attached as Appendices 2 and 3, respectively.  Trustee Sung adopts the legal position of HISD with respect to Finding 1.[1]  Trustee Flynn Vilaseca adopts legal positions consistent with the HISD response.  The following analysis will address the arguments in Appendices 1  through 3 and will collectively refer to these responses as responses from HISD.

1.    **HISD argues that then-Trustee Davila[2] did not discuss the potential removal of the current interim superintendent and the installation of a new interim superintendent with Dr. Saavedra.**

---

[1] See Appendix 3, p. 2.

[2] Diana Davila became Board President on January 17, 2019.  This report will refer to her as Board President Davila, but will refer to her as then-Trustee Davila when context requires.  Former Board President Skillern-Jones and Adams will be referred to as Trustee Skillern-Jones, but will refer to her as then-Board President Skillern Jones or then-Board President Adams when context requires.

In Board President Davila's declaration, she swears that, "during that time [referring to her meeting with Dr. Saavedra at a public restaurant on October 8, 2018], I did not discuss the interim superintendent position with Dr. Saavedra.  I am not aware of any discussions between Dr. Saavedra and any board members regarding the interim superintendent position."[3]  She further swears while she had exchanged text messages with Dr. Saavedra, "…none of these related to the interim superintendent position at Houston ISD."[4] Board President Davila further swears that. "[i]n my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new superintendent."[5]

### Analysis of HISD Response:

These sworn statements are directly contradicted by then-Trustee Davila's public statements where she acknowledged having discussions with Dr. Saavedra about the interim superintendent position.  After then-Trustee Davila made her motion to relieve the current interim superintendent of her duties and to appoint Dr. Saavedra as the new interim superintendent, she took the position that because the current interim superintendent also wanted the permanent position, this would discourage other qualified people from applying for the position.  Then she told the board that she had spoken to Dr. Saavedra and that he had told her that if he was appointed as the interim superintendent that he would not seek the permanent position.  Davila argues that this would make the search for the permanent superintendent "more fair."[6]

After then-Trustee Davila made this motion, then-Board President Skillern-Jones called for a recess.  After the recess, the following exchange between Trustee Sung and then-Trustee Davila occurred.

> **Trustee Sung:** "…if this motion moves forward, is Dr. Saavedra to be considered for permanent superintendent or for interim only?"

> **Trustee Davila:** "My motion is only for interim. **I have spoken with Dr. Saavedra and Dr. Saavedra has no interest of staying here or applying for the position**."  (emphasis added).

> Trustee Sung then asked a further clarifying question that makes it clear that Dr. Saavedra had agreed that if he was made the interim superintendent that he would not apply for the permanent position, indicating that then-Trustee Davila had substantive discussions with Dr. Saavedra regarding the terms of his employment as interim superintendent and that Trustee Sung was aware of this agreement.

> **Trustee Sung:** "So that would allow us to have a search where the interim would not consider applying."

> **Trustee Davila:** "Correct, so he would not consider applying and the only reason I make this motion is because I just went to TASB two weekends ago and at the event I talked to

---

[3] See Appendix 1, Exhibit 3, p.1," ¶ 8.
[4] Id. ¶ 9.
[5] Id. ¶ 11.
[6] See October 11, 2018 Board Meeting Video, https://houstonisdtx.swagit.com/play/10112018-1133.

several different board members and sitting superintendents and they said when you have a sitting interim superintendent that also wants to apply it will discourage some people from applying. And as someone that also experienced, this will be my fourth superintendent search and when we had a sitting superintendent the same thing happened.  Some people that we asked to apply said "no" because they did not want to risk their job when they had an interim superintendent that was holding the spot that was also going to apply. So, this makes it a more fair process so that people have the opportunity to apply."[7]

Thus, despite her claims to the contrary, it is clear that Board President Davila did have substantive discussions with Dr. Saavedra about the interim superintendent position and that Dr. Saavedra had assured her that if he was made the interim superintendent he would not consider applying for the permanent position.

**2.     HISD argues that the five board members who met with Dr. Saavedra did not exercise decision making powers at the meeting.**

HISD argues that the five members of the Board of Trustees who met with Dr. Saavedra on October 8, 2018, did not exercise their decision-making powers outside of a publicly posted meeting, and that when the five members met with Dr. Saavedra three days before voting to hire him as the new superintendent, this meeting was only for advice and counsel.[8] HISD further argues that the prospect of hiring Dr. Saavedra as an interim superintendent was not discussed.[9] HISD claims that TEA misquotes the Texas Open Meetings 2018 Handbook, and that it takes more than mere deliberations to violate the Texas Open Meetings Act, and that the quorum of the board only violates the Act when it exercises decision-making authority.[10]

**Analysis of HISD Response:**

There is ample evidence that the five members of the board of trustees that met with Dr. Saavedra had decided to replace the current interim superintendent with Dr. Saavedra, and that the subsequent public meeting that occurred on October 11, 2018 merely ratified the decision that had already been made.

Then-Trustee Davila's motion did not ask Dr. Saavedra to consider the position of interim superintendent. The motion did not ask for the board to interview Dr. Saavedra. Rather, the motion was to "name Dr. Abelardo Saavedra as interim superintendent of the Houston Independent School District." Additionally, Board President Davila's motion did not ask for a contract to be negotiated with Dr. Saavedra or to offer him a contract. Rather, her motion was to "issue him an interim superintendent contract…."[11] The substance of this motion demonstrates that a decision had already been made by quorum of the board outside of a meeting held in compliance with the Texas Open Meetings Act.

There were a series of communications between five members of the HISD Board of Trustees and Dr. Saavedra prior to the vote to name him as the new interim superintendent on October 11, 2018.  Trustee

---

[7] See October 11, 2018 Board Meeting Video, https://houstonisdtx.swagit.com/play/10112018-1133.
[8] Appendix 1, p. 28, Appendix 2, p. 2.
[9] Id. pp. 29-30, Appendix 2, p. 2.
[10] See Appendix 1, pp. 34-35, Appendix 2, p. 2.
[11] See October 11, 2018 Board Meeting Video, https://houstonisdtx.swagit.com/play/10112018-1133.

Flynn Vilaseca acknowledges that she had individual discussions with Dr. Saavedra about whether he would be interested in serving as the interim superintendent, and in connection with that conversation Dr. Saavedra asked Trustee Flynn Vilaseca for a copy of Dr. Carranza's contract.[12] She coordinated a meeting with four other trustees to meet with Dr. Saavedra.[13]   An agreement was reached with Dr. Saavedra regarding the terms of his employment as interim superintendent when he was both provided a copy of former Superintendent Richard Carranza's contract and then hired with a salary and benefit package based on that same contract.[14]   These facts also demonstrate a coordinated effort on behalf of Board President Davila and Trustee Flynn Vilaseca with respect to the agreement regarding the salary and benefits that Dr. Saavedra would receive, because Trustee Flynn Vilaseca provided the contract to Dr. Saavedra and then-Trustee Davila made the motion to issue him an interim superintendent contract based on the contract that Trustee Flynn Vilaseca had provided.

In addition to reaching an understanding about compensation and benefits, Board President Davila had negotiated another condition of his employment prior to the October 11, 2018 board meeting, when she obtained Dr. Saavedra's agreement that if he was named the interim superintendent, he would not seek the permanent position.[15]   This was an important condition of his employment, because Board President Davila's sole stated reason for replacing the current interim superintendent was her interest in the permanent position and the sole reason for naming Dr. Saavedra as the new interim superintendent was his assurance to then-Trustee Davila that he would not apply for the permanent position.[16]

It is also apparent that board members who attended the secret meeting on October 8, 2018 were frustrated with current interim superintendent. Dr. Saavedra stated:

> "They shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees. One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused. [17]"

However, during the public deliberation regarding the replacement of the current interim superintendent with Dr. Saavedra, the sole stated reason for removing the interim superintendent was the issue about whether this would discourage other applicants for the permanent superintendent position.  But this was merely a pretext for her replacement, and the real reason was the board member's frustrations that were communicated to Dr. Saavedra. The fact that none of the board members publicly stated their frustrations with the current interim superintendent in an effort to persuade other board members to vote to remove the current interim superintendent is consistent with the conclusion that a decision had already been reached.

---

[12] See Appendix 2, p. 5, ¶5.
[13] Id. pp. 5-6, ¶6.
[14] See Preliminary Report dated August 5, 2019, Allegation One, Finding of Facts 9, 11, p. 10.
[15] See Preliminary Report dated August 5, 2019, Allegation One, Finding of Facts 9, 12, p. 10.
[16] See October 11, 2018, Board Meeting Video, https://houstonisdtx.swagit.com/play/10112018-1133.
[17] See Preliminary Report, pp. 13-14.

Collectively, these facts indicate that an agreement had been reached to replace the current interim superintendent with Dr. Saavedra with an agreed-upon compensation and benefits package. Part of this agreement included representations that Dr. Saavedra would not pursue the interim superintendent position and that this would be the publicly stated reason for taking personnel actions at the October 11, 2018 meeting. Thus, the action at the public board meeting on October 11, 2018, to relieve the current superintendent of her associated duties, to name Dr. Saavedra as the new interim superintendent, and to issue him an interim superintendent contract with a stated compensation and benefit package was a mere ratification of a decision that had already been made.

**3.       HISD argues that the October 8, 2018 meeting at the local restaurant was not an interview.**

HISD contends that the five members of the HISD Board of Trustees that met with Dr. Saavedra on October met with him for "advice and counsel."[18]

Board President Davila describes the meeting as "an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including HISD." She claims that she did not discuss the interim superintendent position with Dr. Saavedra at that meeting.[19]

Trustee Lira describes the meeting as "an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including HISD."[20]

Trustee Santos describes the meeting as "an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including HISD."[21]

Trustee Flynn Vilaseca stated that "[t]he meeting with Dr. Saavedra was not secret, and it was not an interview.  It was an opportunity to communicate concerns and questions I had and gain the benefits of his experience as superintendent in many school districts, including HISD."[22]

Trustee Sung stated that she was "…interested in meeting Dr. Saavedra because I knew he had been the superintendent at South San Antonio ISD during the time when they had a conservator in their district and they had been successful in convincing the TEA to remove the conservator. The October 8, 2018 gathering was not an interview of Dr. Saavedra, but rather a chance to sound out my ideas and concerns as a trustee and hopefully gain from his experience in various school districts."[23]

### Analysis of HISD Response:

Whether the meeting was a de facto interview depends on the facts and circumstances, not the label that the board members attach to the meeting. The facts and circumstances surrounding the meeting indicate

---

[18] See Appendix 1, p. 28, Appendix 2, p. 2.
[19] See Appendix 1, Exhibit 3, p. 1.
[20] See Appendix 1, Exhibit 4, p. 1.
[21] See Appendix 1, Exhibit 5, p. 1.
[22] See Appendix 2, pp. 5-6.
[23] See Appendix 3, p. 5.

that it was a de facto interview. The five members constituted a quorum, and that quorum had the actual and apparent authority to hire an interim superintendent.[24] All members of this quorum met with Dr. Saavedra in a nested series of meetings immediately prior to their actions to name him the new interim superintendent and to issue him an interim superintendent contract. These meetings were orchestrated to create the appearance that they were not subject to the Texas Open Meetings Act, by never having the entire quorum present at the same time.  In addition, there were other conversations between certain board members and Dr. Saavedra, including Trustee Flynn Vilaseca's conversations with Dr. Saavedra about his interest in the interim superintendent position and then-Trustee Davila's conversations about if he was named interim superintendent whether he would pursue the permanent position.

In this series of meetings, Dr. Saavedra was told that he was a possible candidate for the position of interim superintendent and a meeting was arranged that allowed Dr. Saavedra an opportunity to talk to the trustees who could, and three days later would, hire him for the position of interim superintendent.[25] Prior to the meeting, Dr. Saavedra inquired about the terms of the employment by asking for a copy of a contract containing the salary and benefit information for the position. He was provided this information.[26] At the meeting, he had an opportunity to discuss the operation of the district.[27] At some point, he agreed that if he was made the interim superintendent, he would not seek the permanent position.[28]

Dr. Saavedra believed that he was being considered for the position of interim superintendent.[29]  Given the nature of the contacts and the fact that three days later the Board did in fact vote to name him the interim superintendent and issue him an interim superintendent contract with the terms based on the contract that was provided to him, his belief was both reasonable and accurate.

Dr. Saavedra was not the only one who believed that the board was considering him for interim superintendent when they met with him.  After then-Trustee Davila had disclosed that she had met with Dr. Saavedra and obtained assurances that if he was named the interim superintendent that he would not seek the permanent position, then-Board President Rhonda Skillern-Jones characterized this as an interview. She stated: "I'm disturbed that one trustee can interview the interim and we come here and … I haven't talked to Abe Saavedra … has anyone else here been talking to Abe Saavedra?"[30]

Based on the facts and circumstances, it is readily apparent that a quorum of the HISD Board of Trustees conducted a de facto interview of Dr. Saavedra for the purposes of deciding whether to hire him to be the new interim superintendent.

### 4.    HISD argues that board members cooperated with the investigation and that TEA investigators were combative and argumentative.

---

[24] See Tex. Educ. Code §11.1513(a) "The board of trustees for each independent school district shall adopt a policy providing for the employment and duties of district personnel.  The employment policy must provide that: (1) the board employs and evaluates the superintendent."
[25] See Appendix 2 p. 5, ¶5.
[26] See Appendix 2, pp. 5-6, ¶6.
[27] See Preliminary Report, pp. 13-14.
[28] See Preliminary Report, p. 10, Finding of Fact 12.
[29] See Preliminary Report, p. 10, Finding of Fact  8.
[30] See October 11, 2018 Board Meeting Video, https://houstonisdtx.swagit.com/play/10112018-1133.

HISD argues that TEA investigators were combative and that made the board members nervous and made it difficult for board members to recall details of the meeting with Dr. Saavedra.[31] HISD also complains that the board members were not represented by counsel.[32]

### Analysis of HISD Response:

TEA investigators were given the task of determining the facts surrounding the actions taken at the October 11, 2018 HISD Board Meeting to determine if a violation of the Texas Open Meetings Act had occurred. TEA investigators interviewed HISD board members with the reasonable expectation of receiving complete and honest answers to their questions. Instead, the investigators were provided false or evasive answers from three board members.[33] Each of these false or evasive statements minimized that board member's individual culpability for the violation that the investigators were investigating, and each false or evasive statement was relevant to a material issue of fact. When the investigators were presented with false and evasive answers, it was appropriate for the investigators to challenge these statements.

Board members were not prohibited from having counsel present. Trustee Lira was the only Trustee that requested legal counsel be present. At his interview, counsel for the district was present.

## 5. HISD argues that Board President Davila cooperated with the TEA investigation.

HISD argues that the TEA findings that Board President Davila failed to cooperate with the investigation was a result of bias against Trustee Davila, and that Trustee Davila did not retain text messages regarding this meeting because it was not a highly important meeting. HISD also argues that when Board President Davila told TEA investigators that she had met alone with Dr. Saavedra it was because she only shared a social moment with Dr. Saavedra and Trustee Flynn Vilaseca. Board President Davila claims that she did not meet with Dr. Saavedra until after Trustee Flynn Vilaseca left.[34]

Board President Davila's declaration states:

> 3. …During the interview, TEA's investigators were extremely combative and argumentative…
> 7. I am offended that TEA's preliminary report accuses me of not cooperating with the Agency's investigation. I did not falsely claim that there were no other trustees present when I met with Dr. Saavedra. I voluntarily agreed to speak to TEA's investigators and answered their questions to the best of my ability to recall what had happened.
> 8. My best recollection is that when I arrived, Trustee Flynn Vilaseca was speaking with Dr. Saavedra. After spending a few minutes engaging in social conversation among us, Trustee Flynn Vilaseca left, and I spoke with Dr. Saavedra for another 10-15 minutes…
> 9. I have exchanged text messages with Dr. Saavedra in the past, but none of these text messages related to the interim superintendent position at HISD…[35]

---

[31] See Appendix 1, p. 35.
[32] See Appendix 1, p. 35.
[33] See Preliminary Report, Findings of Fact 15-21, and analysis pp. 13-15.
[34] See Appendix 1, p. 36.
[35] See Appendix 1, Exhibit 3, p. 1, ¶3, 7-9.

**Analysis of HISD Response**:

Board President Davila's claim that she had not remembered who was present at that meeting is not credible for several reasons. Both Trustee Flynn Vilaseca and Dr. Saavedra remembered that the three of them met together.[36] Board President Davila is the only one present at that time who claimed that this did not occur. Further, the meeting was orchestrated so that the quorum of board members that met that day were never all together at the same time. Given that then-Trustee Davila made the motion to replace Dr. Grenita Lathan with Dr. Saavedra and given that she negotiated key aspect of the agreement reached with Dr. Saavedra relating to his promise that he would only serve as interim superintendent and that he would not apply for the permanent position, it is readily apparent that Board President Davila had more than a peripheral role in the meeting with Dr. Saavedra. Given her central role in this transaction, her claim that her prior false statements were a result of failure to remember, rather than failure to cooperate with the investigation is not credible.

Further, Board President Davila's failure to remember key facts is selective.  In her statement supporting HISD's response to the preliminary report, Board President Davila is able to remember the identity of people present at a campus tour for the High School of Law and Justice that occurred in 2018.  In her statement, she states, "When I arrived at the High School of Law and Justice with Trustee Deigaard, Conservator Delaney, and other individuals, the principal for the campus met us and gave us a tour.[37]

HISD's claim that Board President Davila did not remember details of the meeting because it was not an important meeting at the time is not credible for similar reasons. Replacing the interim superintendent with Dr. Saavedra was an extremely important and controversial event. A meeting between every board member who voted for that action and Dr. Saavedra that occurred three days before the action is an undeniably important event.

Board President Davila's original statement was self-serving because it minimized her and the board's misconduct.  Board President Davila only acknowledges her original statement was not true after learning that Trustee Flynn Vilaseca and Dr. Saavedra had acknowledged that all three had met together on October 8, 2018. Given her involvement in the meeting and given the high level of importance of the action, the evidence indicates that Board President Davila falsely told investigators that she met with Dr. Saavedra alone.

6.    **HISD argues that Board President Davila did not keep records of her text message to Dr. Saavedra because she did not consider the meeting to be important.**

HISD disputes the finding that Board President Davila failed to produce text messages regarding her contacts with Dr. Saavedra.  Board President Davila claims that she "…exchanged text messages with Dr. Saavedra in the past, but none of these text messages related to the interim superintendent position at Houston ISD.  I have not regularly communicated with Dr. Saavedra about district business via text

---

[36] See Preliminary Report, Allegation One, Finding of Fact 20.
[37] See Appendix 1, Exhibit 3, p. 2, ¶22.

message.  My text messages to Dr. Saavedra have generally been social in nature." HISD states that these messages were not retained because she did not consider the meeting to be important.[38]

**Analysis of HISD Response:**

Board President Davila produced no text messages between her and Dr. Saavedra.  However, Dr. Saavedra told SIU investigators that he did exchange text messages with then-Trustee Davila, and she inquired about whether Trustee Flynn Vilaseca had contacted him on or about October 4, 2018.  When he responded that he had not heard from Trustee Flynn Vilaseca, Board President Davila told him that he would soon hear from Trustee Flynn Vilaseca.

On or about October 5, 2018, Trustee Flynn Vilaseca did contact Dr. Saavedra. Trustee Flynn Vilaseca admits that she arranged the October 8, 2018, meeting with Dr. Saavedra.[39] It is clear that Board President Davila and Trustee Flynn Vilaseca played key roles in the recruitment of Dr. Saavedra to be named the interim superintendent and that they were coordinating their efforts.[40] Trustee Flynn Vilaseca admits that she had individual discussions with Dr. Saavedra about his interest in becoming the interim superintendent.  According to Trustee Flynn Vilaseca, Dr. Saavedra requested and was provided a copy of  former superintendent Carranza's contract.[41] Board President Davila has publicly admitted that she had explicit discussions with Dr. Saavedra about the interim superintendent position before she made her motion on October 11, 2018, to name Dr. Saavedra as the new interim superintendent, and that he had told her that if he was made the new interim superintendent that he would not apply for the permanent position.

The incriminating text messages between Board President Davila and Dr. Saavedra coordinating the meeting that ultimately occurred on October 8, 2018 should have been turned over to SIU investigators. Board President Davila failed to cooperate with the TEA investigation by withholding these text messages.

## 7. HISD argues that Trustee Lira did not make false statements to TEA investigators.

HISD argues that TEA unfairly criticizes Trustee Lira for telling investigators that to the best of his recollection that he met with Dr. Saavedra when no other trustees were present. HISD argues that this was his best recollection at the time, and that his best recollection now is that he spoke to Dr. Saavedra when no other board members were present, and when other board members arrived, he left shortly after they had all exchanged greetings.[42]

**Analysis of HISD Response:**

Trustee Lira's original statement to TEA was that he met with Dr. Saavedra when no other board members were present was not true. The false statement minimized his personal culpability in the investigation about whether a quorum of the board met with Dr. Saavedra. It is hard to imagine how Trustee Lira forgot Trustees Santos, Sung, and Flynn Vilaseca were also present when he met with Dr. Saavedra.

---

[38] See Appendix 1, pp. 35-36.
[39] See Appendix 2, pp. 5-6, ¶6.
[40] See Preliminary Report, Allegation One, Finding of Fact 18.
[41] See Appendix 2, p. 5, ¶ 5, 9.
[42] See Appendix 1, p. 36.

His current statement is inconsistent with Dr. Saavedra's description of the meeting. Dr. Saavedra described a meeting with Trustees Lira, Sung, Santos and Flynn Vilaseca where "[t]hey shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees. One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be, and she refused."

Given the facts and circumstances, the evidence does not support Trustee Lira's contention that his original statement was not false because he had forgotten that Trustees Santos, Sung and Flynn Vilaseca were all present with him when he met with Dr. Saavedra on October 8, 2018.

**8.      Trustee Flynn Vilaseca argues that she cooperated with investigation**.

Trustee Flynn Vilaseca argues that her inability to recall specifically why she handed Dr. Saavedra a copy of former superintendent Carranza's contract at the gathering that occurred approximately six months prior to her interview was not a failure to cooperate with the investigation. Trustee Flynn Vilaseca now clarifies that she handed Dr. Saavedra a copy of the contract because he had previously asked for it. In Trustee Flynn Vilaseca's declaration she states:

> 5. I have discussed my frustrations and concerns related to my position of the HISD Board with Dr. Saavedra on several occasions since being appointed as a trustee in 2017. At one point in time, I – individually – discussed with Dr. Saavedra whether he would have any interest in serving as the interim superintendent of HISD, if the situation was such that another interim superintendent was needed. In connection with that discussion, Dr. Saavedra asked to see a copy of Dr. Richard Carranza's superintendent contract.

> 9. While being interviewed by the TEA in connection with its Special Accreditation Investigation, I could not recall why I gave Dr. Saavedra a copy of Dr. Carranza's contract at that time. I am certain now that I did so because Dr. Saavedra had previously asked for a copy of the contract. I handed a covered copy of the contract to him and no discussions, whatsoever, regarding the contract occurred at the October 8, 2018 meeting with Dr. Saavedra.[43]

---

[43] See Appendix 2, pp. 2, 5-6, ¶ 5, 9.

**Analysis of Trustee Flynn Vilaseca's Response**:

The provision of this contract is a key piece of evidence establishing that Dr. Saavedra was being considered for the position of interim superintendent. As Trustee Flynn Vilaseca now admits, she had previously discussed whether Dr. Saavedra had any interest in becoming interim superintendent if another interim superintendent was needed. She then arranged for Dr. Saavedra to meet with her and four other board members where the several board members discussed their frustrations with the current interim superintendent.

As Trustee Flynn Vilaseca now admits, Dr. Saavedra asked for a copy of the contract in response to her discussions about his interest in serving as interim superintendent if another one was needed. She provided him a copy of that contract at that meeting. Three days later, the five members of the board that met with Dr. Saavedra on October 8, 2018 voted to name Dr. Saavedra as the new interim superintendent with a compensation package based on the contract that was provided to him by Trustee Flynn Vilaseca. There is no reasonable explanation for why Trustee Flynn Vilaseca was so confused during her interview about why she provided the contract to Dr. Saavedra, as it is clear from the facts and circumstances that the contract contained the compensation package that the board was willing to give Dr. Saavedra.

## 9.     HISD argues that TEA willfully misconstrues a statement of Trustee Santos.

HISD argues TEA's report misconstrues Trustee Santos' statement when it concluded that she publicly admitted that the board had violated the Texas Open Meetings Act. HISD argues that she was making the point that the same conduct that is being investigated and criticized by some board members is substantially similar to conduct in which other board members engaged. HISD argues that the statement was made in the heat of the moment, and she did not make the point as articulately as she could have, but it is clear from the context what she meant.[44]

Trustee Deigaard disputes accusations made by Trustee Santos that Trustee Deigaard also violated the Texas Open Meetings Act.[45]

**Analysis of HISD Response:**

The important part of the admission is that the trustees engaged in the conduct that forms the basis of the findings in TEA's report. When Trustee Santos accused other members of engaging in substantially similar behavior, she complained that earlier "…when certain elected officials showed up here there were five other trustees that knew about a September 1st contract for the interim superintendent that somebody was going to make the motion on. There were five trustees that knew about it, we were not – didn't have any clue about it."[46]

From this context, it is clear Trustee Santos is admitting that the five members of the HISD school board that met knew there would be a motion at the October 11, 2018 board meeting to replace the current interim superintendent with Dr. Saavedra and there were four trustees who did not know.  She is accusing board members of engaging in substantially similar behavior when she accuses five members of the board

---

[44] See Appendix 1, p. 35.
[45] See Appendix 6, p. 2.
[46] See Preliminary Report, Allegation One, Finding of Fact 14.

about knowing that there would be a motion for a new contract for the current interim superintendent. This set forth her argument that five board members had secretly met and reached an agreement on a new contract for the current interim superintendent and were merely ratifying the agreement that had been reached outside of a meeting held in compliance with the Texas Open Meetings Act.

**Analysis of Trustee Deigaard's Response:**

The Agency clarifies that it did not investigate or make fact findings that Trustee Deigaard violated the Texas Open Meetings Act.  While Trustee Santos did accuse Trustee Deigaard of violating the Act, her statement was included to demonstrate that Trustee Santos has admitted the five members of the board that met with Dr. Saavedra on October 8, 2018 violated the Texas Open Meetings Act.

**10.     HISD argues that it had properly posted a notice of the action taken at the October 11, 2018 board meeting.**

The HISD describes the following statement in the background section of the preliminary report as "patently false and indisputably false."[47]:

> The inner turmoil of the divided HISD Board of Trustees reached a tipping point during the October 11, 2018 regular board meeting, when Trustee Davila motioned to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was under consideration. This motion and subsequent vote caused a chain of events that prompted TEA intervention.

HISD points to an agenda item for the October 11, 2018 meeting that calls for consideration of the "duties of the interim superintendent … evaluations of the interim superintendent and … consideration of compensation, and contractual provisions."  A separate agenda item was to "[c]onsider employment of interim superintendent and employment contract through September 30, 2019."

**Analysis of HISD Response:**

The preliminary report does not make a finding with respect to the meeting agenda that was posted, and no findings are made in the background section of the report. This statement; however, is a true and accurate description of the chaotic October 11, 2018 board meeting. The public and four members of the HISD governing board were clearly surprised by the motion and had no idea that the board was seeking out a new interim superintendent. Nothing in this posting suggests that the board was going to take action to name Dr. Abelardo Saavedra as the new interim superintendent and issue him an interim superintendent contract.

The fact that the board proposed and then took final action to name a new leader of the district and issue him a contract in such a manner did cause the chain of events that led to the TEA investigation. This investigation revealed a quorum of the board had secretly met with Dr. Saavedra prior to this action and had reached an agreement with Dr. Saavedra regarding terms of his employment as the new interim

---

[47] See Appendix 1, p. 33.

superintendent. These facts were unknown to the public prior to the TEA investigation and would never have been known if there had not been an investigation.

**11.      Some board members present claim that they did not see Trustee Flynn Vilaseca give Dr. Saavedra a copy of the contract containing the salary and benefit information.**

Trustees Davila, Lira, and Santos claim that they did not see Trustee Flynn Vilaseca hand a copy of former Superintendent Richard Carranza's contract to Dr. Saavedra.[48]

<u>Analysis of HISD Response:</u>

Trustee Flynn Vilaseca has admitted that she presented a copy of former superintendent Dr. Richard Carranza's contract to Dr. Saavedra at the October 8, 2018 meeting. Board President Davila, and Trustees Lira and Santos each deny seeing this happen. Trustee Sung does not address the issue in her response. Even if these statements are true, it does not matter whether some aspects of the interactions with Dr. Saavedra were made by specific individuals or groups of individuals, rather than the quorum of the board. The violation of the Texas Open Meetings Act occurred through a nested series of meetings and conversations, whereby a quorum of the members of a quorum of the governing board for Houston ISD deliberated about replacing the current interim superintendent with Dr. Saavedra. At a minimum, these meetings included a face-to-face meeting between Dr. Saavedra and each member of the quorum that voted to name him the interim superintendent three days later, conversations between Board President Davila and Dr. Saavedra regarding whether Dr. Saavedra would seek the permanent superintendent position if he was named the interim superintendent, and communications between Trustee Flynn Vilaseca and Dr. Saavedra regarding the compensation packet that the Board voted to give Dr. Saavedra when they named him the new interim superintendent.

**12.      HISD argues that there can be no violation of the Texas Open Meetings Act unless a quorum of the board is physically present at the same time.**

HISD argues that no violation of the Texas Open Meetings Act can occur unless the entire quorum of the Board is physically present at the same time and at the same place. HISD also argues that only the district attorney can enforce the prohibition on walking quorums.[49]

<u>Analysis of HISD Response:</u>

The Texas Attorney General has concluded that the Texas Open Meetings Act can be violated even if a quorum of the board is not physically present at the same time. The attorney general has stated that the Texas Open Meetings Act requires "[e]very regular, special, or called meeting of a governmental body shall be open to the public, except as provided by [the act]" and that "[n]othing in the statutory definitions of the terms or general rule itself requires that the deliberation occur simultaneously or in the same location." The Act defines "meeting" to include "a deliberation between a quorum of a governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the body has supervision or control is discussed or considered." *Id.* § 551.001(4)(A). It further defines "deliberation" as "a verbal exchange during a meeting between a quorum of a governmental body, or between a quorum of a governmental body and another person, concerning an issue within the jurisdiction of the governmental body or any public business." *Id.* §

---

[48] See Appendix 1, Exhibit 3, ¶11, Exhibit 4, ¶9, and Exhibit 5, ¶7.
[49] See Appendix 1, pp. 28-30, Appendix 2, p. 2.

551.001(2). Reading these definitions together, a meeting occurs when a quorum of a governmental body has a verbal exchange about public business or public policy within the jurisdiction of the governmental body.

The attorney general further noted that "[n]othing in the statutory definitions of these terms or the general rule itself require that the deliberation occur simultaneously or in the same location to constitute a meeting.

The attorney general addressed the impact of a recent court ruling on Section 551.143(a) of the Texas Open Meetings Act and determined that the ruling only affected that section and that "all other provisions of the Act remain valid and binding."[50]

### 13.    HISD argues that the prohibition against a walking quorum has been overruled.

HISD argues that a ruling from the court of criminal appeals relating to criminal provisions in the Texas Open Meetings Act mean that there is no prohibition against a walking quorum.[51] HISD claims that TEA misquotes the Texas Open Meetings 2018 Handbook, and that it takes more than mere deliberations to violate the Texas Open Meetings Act, and that a quorum of the board only violates the Act when it exercises decision-making authority.[52]

#### Analysis of HISD Response:

As explained in Texas Attorney General Opinion KP-0254, the ruling from the court of criminal appeals does not overrule the civil remedies associated with a walking quorum, and deliberations by a quorum of a governing body outside of a meeting posted in compliance with the Texas Open Meetings Act still violates the Texas Open Meetings Act.[53]

The Texas Open Meetings 2018 Handbook is cited in the Preliminary Report. The cited portion of the handbook does cite to a case where a decision had been reached as a result of the deliberations. However, the Texas Open Meetings Act does not require that the deliberations result in a decision being made. Texas Attorney General Opinion KP-0254 states "When a majority of a public decision-making body is considering a pending issue, there can be no 'informal discussion.' There is either formal consideration of a matter in compliance with the Texas Open Meetings Act or an illegal meeting."[54] Under the plain language of the statute and the definitions provided by the Legislature, if a quorum of a governing body deliberates about public business within the jurisdiction of the body outside a meeting authorized by the Act, the governmental body violates the Act.[55]

### 14.    HISD argues that informal discussions between board members and other people does not violate the Texas Open Meetings Act.

---

[50] See KP-0254, p. 1.
[51] See Appendix 1, pp 28-33, Appendix 2, p. 2.
[52] See Appendix 1, pp. 34-35, Appendix 2, p. 2.
[53] See KP-0254, pp. 2-3.
[54] See Texas Attorney General Opinion KP-0254, p. 2, quoting from *Acker v. Texas Water Commission*, 790 S.W.2d 299, 300 (Tex. 1990).
[55] See Texas Attorney General Opinion KP-0254, p. 2.

HISD argues that board members may have informal discussions amongst themselves about business for which they have jurisdiction,[56] citing to the case of *Hispanic Education Committee v. Houston Independent School District*.[57]

**Analysis of HISD Response:**

While the *Hispanic Education Committee* case does allow for board members to meet privately among themselves in overlapping clusters where a quorum is not present, this only refers to meetings board when no attempt is made to take action.[58] The court notes that the real question is whether informal discussions become a substitute for a formal deliberative session of the governing body.[59] In the *Hispanic Education Committee* case, the court found that the informal discussions revealed no systemic attempt to circumvent the public interest in voicing opinions about a new superintendent nor do they reveal a conspiracy to appoint a superintendent without properly obtaining approval by the entire board in public.

The facts presented in *Hispanic Education Committee* case are markedly different from the facts presented in this report. In the *Hispanic Education Committee* case, the entire board of trustees for the Houston Independent School District first met in closed session, and voted to ask one of its members, Rod Paige, to "consider" being a candidate for appointment as general superintendent. The court held that the Texas Open Meetings Act allows this type of discussion to occur in a closed session of the board. Two weeks later, the entire board met in open session and resolved to "select and offer to employ Paige as the next General Superintendent."  Four days later the board met for a third time on this issue and the second time in open session and approved the contract that had been negotiated.

In the matters investigated in this report, there was no discussion in closed session with the entire board present.  Rather, five individual board members secretly engaged in conversations with each other and Dr. Saavedra about the interim superintendent position, including conversations about the board members' dissatisfaction with the current interim superintendent[60] and conversations about Dr. Saavedra's interest in the position[61] and the terms under which he would be employed in that capacity.[62]  The meeting with Dr. Saavedra was held away from the school district premises and excluded Trustees Adams, Deigaard, Jones and Skillern-Jones, as well as the public.

Further, in the *Hispanic Education Committee* case, in the second meeting held in compliance with the Texas Open Meetings Act, the board voted to "select and offer" employment to Dr. Paige, indicating that Dr. Paige had not yet accepted employment.  In this case, the board voted to "name Dr. Saavedra as interim superintendent," indicating that an agreement had already been reached.  Finally, in the *Hispanic Education Committee* case, after the Board voted to "select and offer" employment to Dr. Paige, a contract was then negotiated and approved in a subsequent open meeting.  In this case, the first and only vote was to issue a contract with an already agreed-upon term and compensation package. Additionally, Dr.

---

[56] See Appendix 1, pp 28-33, Appendix 2, p. 2.
[57] *Hispanic Educ. Comm. v. Houston Indep. Sch. Dist.*,  886 F. Supp. 606 (1994), affirmed by 5th Circuit, U.S. Dist. LEXIS 203101995 U.S. App. LEXIS 42227 (1995).
[58] *Hispanic Education Committee*, id at 610.
[59] Id.
[60] See Preliminary Report, pp. 13-14.
[61] See Appendix 2, p. 5, ¶ 5.
[62] See Preliminary Report, Allegation One, Findings of Fact 11-12.

Saavedra had agreed that if he was named the interim superintendent that he would not seek the permanent position.

Overall, the process described in *Hispanic Education Committee* spanned 17 days (from January 20 to February 7), included three meetings of the entire board held in compliance with the Act, one in closed session and two in open session before a contract was approved.  In this case, the public process was concluded in one board meeting.  The process included one motion, a short amount of deliberation, and a vote to issue a contract to Dr. Saavedra. This process deprived the board members who were excluded from the discussion with Dr. Saavedra and the public from having any meaningful participation in the discussions.

The facts presented in this case are more analogous to *Esperanza Peace and Justice Center v. City of San Antonio*.[63]  In this case, a quorum of the city council for the city of San Antonio met in small groups at the city manager's office with the mayor of San Antonio and discussed the city budget, prior to the adoption of the budget.  The council members made efforts to avoid a physical quorum from existing by having council members leave the office area so that a physical quorum would not be present. The court wrote that "[t]he transparent subterfuge of separating members physically by an office wall or a telephone line cannot avoid the strictures of the Act." Similarly, HISD conducted a meeting where an entire quorum of the board met with Dr. Saavedra, but not at the same time. Each board member deliberated with Dr. Saavedra about the interim superintendent position. The transparent subterfuge of arranging this as a series of meetings where trustees would leave to avoid a physical quorum being present does not avoid the requirements of the act.

While the agreement in *Esperanza* was reduced down to a written signed agreement, this does not mean that every such violation have a similar written statement, as HISD argues.  In fact, the court notes that "[t]he council members understood that the memorandum was not binding and that any of them could have moved to change the proposed budget or the items contained in the memorandum during the council meetings."[64] The facts and circumstances in this case demonstrate that the five board members had already decided to replace the current interim superintendent with Dr. Saavedra, and the actions taken at the October 11, 2018 meeting was a mere ratification of that decision.[65]

Further, in Esperanza "[m]ost of the changes deliberated in those meetings were never publicly deliberated."[66] In this case, the secret meetings with Dr. Saavedra were focused on the trustees' feelings of disenfranchisement, about how they felt ignored and disrespected by the current interim superintendent, and other specific grievances with the current interim superintendent.  None of this was deliberated publicly.  Instead, the sole stated reason for taking the action was to get a better applicant pool by having a sitting interim superintendent who is not seeking the permanent position. Thus, the entire reasoning behind the decision in this case was never publicly deliberated.

Finally, In *Esperanza* the court found that the intent of the meetings was clearly to build a consensus on the budget prior to the public meeting.  Here, the intent of the Board is clear. They met with Dr. Saavedra,

---

[63] *Esperanza Peace and Justice Center v. City of San Antonio*, 316 F.Supp.2d 433.
[64] See *Esperanza* at 472.
[65] See Section Two of this analysis, pp. 18-20.
[66] *Esperanza* at 472.

a person who has held prior superintendent positions including for HISD. At the meeting, Board members expressed their dissatisfaction with the current interim superintendent. He was presented a contract. Then-Trustee Davila obtained an assurance that if he was named interim superintendent, he would not seek the permanent position. The intent of the board to replace the current interim superintendent with Dr. Saavedra is clear based on these facts alone. The actions taken in the October 11, 2018 meeting confirm that the five board members that met with Dr. Saavedra had already decided to replace the current interim superintendent with Dr. Saavedra. The action of the same five members to name Dr. Saavedra as interim superintendent three days later was a mere ratification of this decision.

**Findings of Fact for Allegation Two**

Did the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

The following findings of fact are a result of interviews and an examination of HISD internal documents.

1. On January 29, 2019, SIU investigators interviewed the Principal for the High School of Law and Justice. The Principal recalled an incident in 2018 with Trustee Davila during a site visit of the High School for Law and Justice campus. "I am in a brand-new campus. As it was being built, Diana Davila had a tour of the campus without my knowledge… I found out about it on Twitter when I saw her pictures with my construction manager, and them taking pictures of the new building. Then I got a phone call from my project manager, as Trustee Davila told the construction people to take a wall down out of my new campus out of the courtroom. I became a little upset. They took that wall down. I went to the HISD Senior Administrator and I told him, 'she can't do that', and he says that, 'I'm very aware that she cannot do that. If you want the wall back, we will put the wall back up.'"

2. On April 16, 2019, SIU investigators interviewed an HISD Administrator. This administrator corroborated the principal's account that Trustee Davila gave a directive to modify construction of a classroom while on a site tour. The administrator stated, "One project we just finished was High School for Law… it was pretty much done with the construction or the particular areas was done and it was one of the feature areas which was the courtroom set up like a full courtroom, a mock courtroom because it was actually a classroom… So that was all done and at a board member's request all of that had to be changed just off a site tour." During a site visit, Trustee Davila directed that a completed mock courtroom be changed. Initially, the room was a mock courtroom, within a classroom. During her site visit, Trustee Davila complained that the courtroom was too small and directed the construction services administration, including the administrator to change it. The administrator provided the construction change order documents. (See Exhibit 2.1)

3. The change order states that the total cost of changes to the mock classroom amounted to $20,000. When asked who ultimately approves a change like this, the administrator responded, "it was a trustee said it and it was done. I know what you're looking for, yes, it's out of protocol, that's the simple answer." When asked if this was overreach by a trustee, the administrator responded, "yeah, cause I mean, I have to manage that budget and you just made a request, that you don't care about... but I have to figure out how that money works, I have to call in that favor with that contractor."

4. According to the principal, and the administrator's testimony, Trustee Davila conducted a campus visit without letting the campus principal know and instructed the construction team to make material modifications to an area that was already built.

5. An HISD senior administrator was directed to remove a contract for the construction of Austin High School in December 2016. The HISD senior administrator stated Trustee Davila asked him to remove the Pepper Lawson contract from the January board agenda after the procurement process had occurred. Moreover, Trustee Davila and her husband told the administrator that they wanted a firm out of Dallas, wanted him to make it happen, and threatened him with his job if he did not do it. Although the administrator refused to remove the contract from the agenda, a former board president took the liberty to remove the agenda item. Subsequently, the agenda item was placed on the February 2017 regular board meeting. (See Exhibit 2.2 and Exhibit 2.2.1)

6. On October 3, 2018, Trustee Santos hosted a campaign event on HISD property paid for by the district. The event, "Field Good Day", was not sponsored by HISD (See Exhibit 2.3). Although Trustee Santos indicated she would cover the cost of the event, she failed to submit payment. A HISD senior administrator confirmed Trustee Santos did not pay for the event.

7. Trustee Santos misused her role as a trustee when visiting the Hattie Mae White Educational Support Center. The administrator told SIU, "Santos was getting all this food and not paying for it. She tells people, 'I am a trustee and board services covers that.'" The administrator stated board services did not cover the cost of those meals because it was not in policy to do so.

8. During a workshop with Deputy Commissioner AJ Crabill and HISD administration regarding Improvement Required campuses, Trustee Davila expected principals to explain what they needed so trustees could provide resources to prevent another failing year. Principals refused to speak over the superintendent, prompting Trustee Davila to say, "Let me be clear, I won't hesitate to vote you out when your contract comes up if you don't tell me what you want right now, because your four schools are in the playoffs."

9. A Senior HISD administrator told SIU that Dr. Lathan set protocols in place to prevent trustees from interacting with staff and enforced the use of the board service referral system. Additionally, Dr. Lathan had to address the issue with the board several times in writing as well as during closed session at their retreat.

10. Dr. Doris Delaney has served as a conservator for Houston ISD from September 2016 to present. Dr. Delaney is responsible for attending Houston ISD school board meetings on a regular basis and noting important board decisions, board interactions, and areas of concern within her monthly conservator reports. During this time, Dr. Delaney attended roughly 104 board meetings and spent substantial time observing board interactions, some of which are depicted in the following exerts from her monthly conservator reports to TEA:

    a. In the March 2018 conservator report, TEA Conservator Doris Delaney reported, "Board members continue to make requests of staff that take away from the staff being able to spend time performing their assigned duties." In March 2018, the board members requested the following:

        i. How much money do we currently spend per student at each campus and what has the historical trend been for the past 10 years? Please disaggregate state/local funding from federal funding.

        ii. For each campus (248), what is current funding under the PUA and what is the funding under an FTE? For each campus, I'm looking for the following data points (included 27 individual questions) (See Exhibit 2.4)

11. Dr. Delaney reported on the status of board member requests that were being handled by Board Services. ( See Exhibit 2.5 ) Dr. Delaney reported numerous instances where individual board members contacted members of the administration directly. The members of the administration then sent the request to Board Services.

12. The SIU reviewed electronic communications from trustees dating back to the beginning of 2016. During this period of time, the individual board members frequently contacted members of the HISD administration providing individual input and directing activity in the areas of personnel, operations, contracting, and campaign events.

**Electronic Communications from 2016**

    a. On January 27, 2016, a former trustee forwarded an email to the former Chief of Human Resources, in regard to an HISD employee applicant and the positions she applied for. The trustee stated, "Could I please ask you to check if these positions have been filled? Ms. Lorenzo has applied and has not received any reply." ( See Exhibit 2.6 )

    b. On April 12, 2016, a former trustee emailed the interim superintendent questions regarding the upcoming board agenda items. The interim superintendent directed the former Chief of Student Support Officer to answer the trustee's questions. The officer complied and answered all the former trustee's questions. The trustee then replied and asked about which vendor the administration was recommending for a project. The officer sent him the HISD policy on the Code of Silence with potential vendors. The former trustee replied, "I know the law." (See Exhibit 2.7)

    c. On August 1, 2016, a former trustee forwarded an email to former Chief of Human Resources regarding a pay dispute with an employee who had resigned and was claiming to be owed a 3-month severance payment. The former trustee directed her to reply to the forwarded email. The former trustee stated, "Please see below and reply, thank you. Cc me on the response." (See Exhibit 2.8)

    d. On September 19, 2016, Trustee Skillern-Jones sent an email to the former Chief Communications Officer regarding a meeting being planned. Trustee Skillern-Jones directed the officer as to whom she wanted to plan her meeting, even though someone else was already assigned. In the email, Trustee Skillern-Jones also laid out numerous demands. Trustee Skillern-Jones stated, "I want [employee A] working this meeting and the decorations done appropriately… Please ensure landscaping is done, please ensure refreshments are provided, please ensure décor is acceptable, please ensure agendas are done, and please ensure sufficient staff is in place." (See Exhibit 2.9)

    e. On January 26, 2016, a former trustee emailed the former Superintendent of School Choice and requested that she send him a spreadsheet of the racial breakdown of each magnet school's "magnet students." (See Exhibit 2.10)

    f. On March 1, 2016, a former trustee directed the former Media Relations Manager to respond to a letter from a law firm. The former trustee stated, "Manager, I would like your lead to respond to this letter with back up from [employee B] as to why HISD is moving away from UIL at Carnaige." (See Exhibit 2.11)

    g. On March 28, 2016, a former trustee emailed the former Chief Superintendent of School Choice and requested information regarding student applications for a particular school. (See Exhibit 2.12)

    h. On May 16, 2016, Trustee Skillern-Jones emailed [employee C] and [employee D] requesting information for her to share at her community meeting hours before it was to commence. (See Exhibit 2.13)

    i. On May 24, 2016, a former trustee emailed an HISD senior administrator and other HSID staff members regarding a principal's complaint of the lack of maintenance staff at her

school. The former trustee stated, "Please fix this…It's not acceptable for a principal working a turn-around campus to have to do this work herself." (See Exhibit 2.14)

j. On June 26, 2016, a former trustee emailed a staff member to see if she could pick up her student's old test grades and documents because she lost them and needs to turn them in so her child can go to school. (See Exhibit 2.15)

**Electronic Communication from 2017**

a. On May 3, 2017, Trustee Adams forwarded an email she received from a friend of a coworker at her job to the former Superintendent, former Deputy Superintendent, and former Chief of Human Resources. The forwarded email contained a list of positions the friend applied for within HISD. Along with the forwarded email, Trustee Adams instructed the recipients of the email to view the resume and "consider for possible telephone conversation." Trustee Adams also stated that she will forward the resume once received from the friend. (See Exhibit 2.16)

b. On May 24, 2017 Trustee Skillern-Jones forwarded an email to the former Chief of Human Resources regarding a former employee's issue. The former employee was requesting to be eligible for rehire, despite being told that she was not eligible for rehire due to performance issues. Trustee Skillern-Jones directed the former chief to "please investigate." (See Exhibit 2.17)

c. On December 5, 2017, Trustee Adams and a former trustee were forwarded three reports of Code of Silence violations by a former Superintendent, former Chief of Human Resources, and former Officer of Human Talent. The email was sent by the former HISD Ethics and Compliance Officer. Trustee Adams responded to the email giving the directive that all cabinet members be trained annually on ethics policies and further stated she wanted the email to be placed in the personnel file of all listed in the email.  (See Exhibit 2.1)

d. On March 31, 2017, a former trustee forwarded an email to an Area Superintendent regarding a parent complaint at one of the schools. The former trustee directed the area superintendent to look into the situation. (See Exhibit 2.19)

e. On May 1, 2017, Trustee Adams sent an email directly to an HISD senior administrator, former Chief of Staff, board services, HISD Senior Administrator, and former high school Principal. Trustee Adams requested all staff meet with [employee E] to address the needs of that high school, which is in her district. (See Exhibit 2.20)

f. On June 1, 2017, Trustee Adams emailed an HISD Senior Administrator and requested he send her the budget cost "if we were to increase pay to 12.50 per hour." (See Exhibit 2.21)

g. On June 7, 2017, a former trustee emailed HISD administration and staff members and requested information. The trustee stated, "Could we please get the data on the positions mentioned? Including a comparison of central office positions over the last five years with budget increases." (See Exhibit 2.22)

h. On August 3, 2017, a former trustee emailed the Chief of Human Resources, and requested information regarding new principal positions. (See Exhibit 2.23)

i. On October 22, 2017, Trustee Flynn Vilaseca sent the former Chief of Human Resources a list of seven (7) questions. (See Exhibit 2.24)

j. On November 10, 2017, Trustee Flynn Vilaseca emailed an HISD Senior Administrator and directed him to resolve an issue. Trustee Flynn Vilaseca stated, "Looks like there are plumbing issues at Askew. I have sent [employee F] a referral but wanted to send directly to you as it would be great if we could get this checked out and fixed soon." ( See Exhibit 2.25 )

k. On December 6, 2017, Trustee Skillern-Jones directly emailed an HISD Senior Administrator and requested information. Trustee Skillern-Jones stated, "Please have real estate send me a list of all vacant properties." (See Exhibit 2.26)

## Electronic Communication from 2018

a. On January 10, 2018, Trustee Adams directly emailed an HISD Senior Administrator and asked for an update on the construction of two schools. (See Exhibit 2.27)

b. On February 22, 2018, the former chief of staff alerted Trustee Deigaard to an incident that occurred at a middle school. Trustee Deigaard then emailed that she wanted the doors at a different school locked, stating that, "the doors are only locked from the front and not from the back." (See Exhibit 2.28)

c. On February 22, 2018, a former area superintendent emailed Trustee Adams and attached the interview and staffing timeline for the hiring of a principal at a particular school. Also, in the email the area superintendent informed Trustee Adams about how many internal and external applicants there were. Trustee Adams expressed her desire for three specific members to participate in the hiring committee. Trustee Adams had already communicated to one of these members that he would be part of the hiring committee before she informed HISD staff. (See Exhibit 2.29)

d. On February 27, 2018, Trustee Deigaard asked the former chief of student support officer for information regarding, "How many current students are from each trustee district?" She also wanted to know, "How many students come from each middle school?" (See Exhibit 2.30)

e. On April 18, 2018, Trustee Deigaard sent an HISD Senior Administrator a lengthy email in discussing how she witnessed a bus make an unsafe turn as she was driving her daughter to school. (See Exhibit 2.31)

f. On August 24, 2018, Trustee Skillern Jones emailed an HISD Senior Administrator and asked for a closed HISD parking lot to be open for her event. (See Exhibit 2.32)

g. On October 3, 2018, Trustee Deigaard forwarded an email to an HISD Senior Administrator regarding a parent who has bus transportation concerns. Trustee Deigaard stated, "I didn't include the new head of transportation on this because I couldn't remember their name…please let me know their name and address for future correspondence, I would appreciate it." (See Exhibit 2.33)

h. On October 23, 2018, Trustee Deigaard emailed an HISD Senior Administrator and asked him, "Where might I find the quarterly investments reports online? I've looked several places but haven't found it yet." (See Exhibit 2.34)

## Electronic Communications from 2019

a. On March 18, 2019, an HISD Senior Administrator forwarded an email from the General Manager of the Benefits Department regarding a phone call between Trustee Skillern-Jones, a contractor, and a MWBE subcontractor. Allegedly, the phone call discussed HISD's medical plan and medical RFP. It was stated that Trustee Skillern-Jones wanted to set up a meeting with the benefits department. When Dr. Lathan emailed Trustee Skillern-Jones and asked her why she wanted a meeting, Trustee Skillern Jones replied, "I got a call from Nick because he heard I had concerns, the same concerns I voiced in the budget workshop. I did not ask Nick to speak for me or to set up a meeting for me….(AT NO TIME DID I DISCUSS AN RFP PERIOD. HE STATED HE

THOUGHT MAYBE SOMEONE ELSE COULD SAVE US MONEY.)" Regardless of whether the contractor was the one to initiate the phone call, Trustee Skillern-Jones should have referred the call to the interim superintendent as it is not part of her statutory duties.  See Exhibit 2.35)

b. On April 16, 2019, Trustee Santos forwarded a public information request (PIR) from a community member to Dr. Lathan. The PIR related to an evaluation. In the initial PIR email, the community member sent the request to HISD staff and carbon copied Dr. Lathan and Trustee Santos. In her email to Dr. Lathan, Trustee Santos stated, "I know you've received this, and I believe the community has requested a meeting with the Area Supe. I hope we can clear this up soon." (See Exhibit 2.36)

c. In April of 2019, an email was sent to Trustee Sung from a parent discussing a grievance and thanking Trustee Sung for all her close help in trying to solve the matter. The parent emailed Trustee Sung, "[t]hank you for working so closely with our family to resolve the issues … pertaining discriminatory and retaliatory practices…Hopefully the assistance and consistent communication that you have provided in support of our family will not jeopardize your voting power to negate any action pertaining to the future of [name of program redacted pursuant to FERPA]…" The parent also requested an update on Trustee Sung's "assistance in resolving the matter." In April of 2019, the parent emailed Trustee Sung again and stated, "[t]hank you for assisting in the effort to resolve the ongoing issues at [name of program redacted pursuant to FERPA], I read your attached email. The forms of resolution you brought up in your discussion with [name of administrator redacted pursuant to FERPA] were not implemented…" In the same email the parent asked Trustee Sung to ask certain questions to the parties involved in the grievance. The parent emailed Trustee Sung in April of 2019, and stated, "[y]ou have been the responsive and hands on board member and at times you made many of us feel as if you were our area superintendent because of your active participation." (See Exhibit 2.37)

d. On April 26, 2019, Board President Davila emailed Interim Superintendent Dr. Lathan requesting to be updated on the process of hiring a principal for an elementary and middle school. Board President Davila requested to know timelines, people serving on the committees, and their roles in the school community. (See Exhibit 2.38)

e. On May 1, 2019, Trustee Davila, emailed Interim Superintendent Dr. Lathan and copied Trustee Anne Sung, asking her about the principal search at a school. Trustee Davila stated, "[w]hat is happening with this process? Making sure the district is inclusive and transparent in the selection of a campus leader is policy. We don't need legislators making a new law because of this one HISD campus." (See Exhibit 2.39)

f. From 2016 to 2018, there were numerous direct and indirect communications by a board member to HISD staff. Direct communications are communications where a board member directly communicates to a staff member via email without copying the superintendent or interim superintendent. Indirect communications are communications where a board member directly communicates to a staff member and copies the superintendent or interim superintendent. (See Exhibit 2.40 and Exhibit 2.40.1)

## Analysis of Allegation Two

TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous times, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051. While investigating allegations that trustees acted without authority given in an open meeting, SIU discovered other instances of other trustees acting without authority. SIU discovered numerous instances via email correspondence

where the HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the HISD Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

Tex. Educ. Code §11.051(a-1) clarifies that a member of the board may not individually act on behalf of the board and that the board of trustees may only act by a majority vote of the members present at a meeting held in compliance with the Texas Open Meetings Act.

Tex. Educ. Code §11.1511(b) and (c) enumerate the powers of the board of trustees of an independent school district in relation to the superintendent.

    (b)  The board shall:

        (1)  seek to establish working relationships with other public entities to make effective use of community resources and to serve the needs of public school students in the community;

        (2)  adopt a vision statement and comprehensive goals for the district and the superintendent and monitor progress toward those goals;

        (3)  establish performance goals for the district concerning:

            (A)  the academic and fiscal performance indicators under Subchapters C, D, and J, Chapter 39; and

            (B)  any performance indicators adopted by the district;

        (4)  ensure that the superintendent:

            (A)  is accountable for achieving performance results;

            (B)  recognizes performance accomplishments; and

            (C)  takes action as necessary to meet performance goals;

        (5)  adopt a policy to establish a district- and campus-level planning and decision-making process as required under Section 11.251;

        (6)  publish an annual educational performance report as required under Section 39.306;

        (7)  adopt an annual budget for the district as required under Section 44.004;

        (8)  adopt a tax rate each fiscal year as required under Section 26.05, Tax Code;

        (9)  monitor district finances to ensure that the superintendent is properly maintaining the district's financial procedures and records;

        (10)  ensure that district fiscal accounts are audited annually as required under Section 44.008;

        (11)  publish an end-of-year financial report for distribution to the community;

        (12)  conduct elections as required by law;

        (13)  by rule, adopt a process through which district personnel, students or the parents or guardians of students, and members of the public may obtain a hearing from the district administrators and the board regarding a complaint;

        (14)  make decisions relating to terminating the employment of district employees employed under a contract to which Chapter 21 applies, including terminating or not renewing an employment contract to which that chapter applies; and

        (15)  carry out other powers and duties as provided by this code or other law.

    (c)  The board may:

(1)  issue bonds and levy, pledge, assess, and collect an annual ad valorem tax to pay the principal and interest on the bonds as authorized under Sections 45.001 and 45.003;

(2)  levy, assess, and collect an annual ad valorem tax for maintenance and operation of the district as authorized under Sections 45.002 and 45.003;

(3)  employ a person to assess or collect the district's taxes as authorized under Section 45.231; and

(4)  enter into contracts as authorized under this code or other law and delegate contractual authority to the superintendent as appropriate.

Tex. Educ. Code §11.1512(a) defines the relationship between the board and the superintendent.  It states that "In relation to the superintendent of the school district, the board of trustees has the powers and duties specified by Sections 11.1511(b) and (c).   The superintendent shall, on a day-to-day basis, ensure the implementation of the policies created by the board."

The superintendent is responsible for enforcing policy and procedures to operate district business effectively and efficiently acting as the chief executive officer. Section 11.201(d) of the Tex. Educ. Code, (d) identifies the duties of the superintendent, which include:

1. Assuming administrative responsibility and leadership for the planning, organization, operation, supervision, and evaluation of the education programs, services, and facilities of the district and for the annual performance appraisal of the district's staff;
2. Except as provided by section 11.202. assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district other than the superintendent;
3. Overseeing compliance with the standards for school facilities established by the commissioner under section 46.008;
4. Initiating the termination or suspension of an employee or the nonrenewal of an employee's term contract;
5. Managing the day-to-day operations of the district as its administrative manager, including implementing and monitoring plans, procedures, programs, and systems to achieve clearly defined and desired results in major areas of district operations;
6. Preparing and submitting to the board of trustees a proposed budget as provided by section 44.002 and rules adopted under that section, and administering the budget;
7. Preparing recommendations for policies to be adopted by the board of trustees and overseeing the implantation of adopted policies;
8. Developing or causing to be developed appropriate administrative regulations to implement policies established by the board of trustees,
9. Providing leadership for the attainment, and, if necessary, improvement of student performance in the district based on the indicators adopted under sections 39.053 and 39.301 and other indicators adopted by the commissioner or the district's board of trustees.
10. Organizing the district's central administration;
11. Consulting with the district-level committee as required under section 11.252;
12. Ensuring:
    A.    Adoption of a student code of conduct as required under section 37.001; and

    B.    Enforcement of that code of conduct; and adoption and enforcement of other student disciplinary rules and procedures as necessary;

13. Submitting reports as required by state or federal law, rule or regulation, and ensuring that a copy of any report required by law, rule, or regulation is also delivered to the agency;

14. Providing joint leadership with the board of trustees to ensure that the responsibilities of the board and superintendent team are carried out; and

15. Performing any other duties assigned by action of the board of trustees.

Houston ISD has adopted policies governing board member interactions with staff. Policy BBE(LOCAL) has been in effect since 2001 and states that, "Board members as individuals shall not exercise authority over the district, its property, or its employees." ( See Exhibit 1.4 ). This policy also states, "An individual member may act on behalf of the board only with the official express authorization of the board. Without such authorization, no individual member may commit the board on any issue."

This policy also prohibits board members from directing or requiring district employees to "prepare reports derived from an analysis of information in existing district records or to create a new record compiled from information in existing district records. Directives to the superintendent regarding the preparation of reports shall be by (1) Board action; (2) Request of an individual board member made in a board meeting after discussion by the board as a whole; or (3) Written request of an individual board member. ( See Exhibit 1.4 )

This policy also requires individual board members to refer citizen concerns or complaints to the Superintendent who is then required to proceed per the appropriate complaint policy. The board retains authority to address concerns or complaints by considering placement on the board agenda in limited circumstances. The concern or complaint must directly pertain to the board's own actions or policy for which there is no administrative remedy. ( See Exhibit 1.4 )

Houston ISD adopted Policy BBE2(REGULATION) on April 15, 2013. This policy establishes a procedure governing all referrals from trustees or the superintendent. The policy defines a referral as "any verbal or written communication received from a trustee … that requires action, such as requesting information or resolution of an issue." The policy does not allow board members to make referrals to staff including the superintendent or interim superintendent without complying with this policy. Rather, the policy requires trustees to submit all requests to the board services team lead or designee. (See Exhibit 2.41)

As described in Allegation One, all five members of the HISD Board of Trustees that met with Dr. Saavedra on October 8, 2018 violated Tex. Educ. Code §11.051(a-1) and Board Policy BBE(LOCAL) by interviewing Dr. Saavedra for the position of interim superintendent without prior authorization of the board.

As described in Findings of Fact 1-4, Trustee Davila conducted a campus visit without notifying the campus principal and instructed the construction team to make material modifications to an area that was already built. This conduct violates Tex. Educ. Code §11.051(a-1) and Policy BBE(LOCAL) because it was an action taken by an individual board member without consideration by the board, and Policy BBE2 (REGULATION) because it was a board member referral to staff that did not go through the board referral system.

As detailed in Finding of Fact 5, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by directing the HISD Administration to remove a vendor for the board's agenda after the procurement process has ended without the approval of the entire board. Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 6, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to host a campaign event on HISD property without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2(REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 7, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to eat for free when visiting the Hattie Mae White Education Support Center without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2(REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 8, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring district employees to answer her questions under the threat of an adverse personnel action without first receiving approval from the entire board. Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 9, the board overreach is a continuing problem that the interim superintendent has had to address with the board multiple times in writing, or as well during closed session and during board retreats.

As detailed in Finding of Fact 10, the district's conservator has documented in her reports that trustees continue to make requests of staff that take away from their duties, interfere in personnel issues, and direct staff to attend events (sometimes without notifying the interim superintendent).

As detailed in Findings of Fact 11, Trustees Jones, Adams, Lira, Davila, and Santos violated Policy BBE2 (REGULATION) by requesting information but failing to make this referral through board services.

As detailed in Finding of Fact 12, individual trustee overreach is common, and individual trustees have a long-standing practice of monitoring, directing, influencing or interfering with administrative actions in the areas of operations (including campaign events), contracting, grievances, and personnel in violation of Tex. Educ. Code §11.051(a-1) and Policy BBE(LOCAL). Specifically, Trustees; Skillern-Jones, Adams, Flynn Vilaseca, Deigaard, Santos, Sung, and Davila engaged in this practice.

As detailed in Finding of Fact 13, SIU discovered numerous direct or indirect communications to staff at HISD, that violate Tex. Educ. Code §11.051(a-1), Policy BBE(LOCAL), and Policy BBE2 (REGULATION). Direct communications are when a trustee directly communicates to a staff member without copying the superintendent or interim superintendent. Indirect communications are when a trustee directly communicates to a staff member and copies the superintendent or interim superintendent. In each instance, the trustee made a referral to staff without going through the Board Referral System as required by Policy BBE2(REGULATION).

Therefore, Allegation Two, "Did the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?" is substantiated because HISD Board of Trustees have acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the board of trustees present at a meeting held in compliance with the Texas Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

The amount of board overreach has impacted the operations of the district. Former superintendents indicated that the HISD Board of Trustees made it impossible for them to do their job as CEO of the district due to constant trustee involvement causing them to leave the district. Moreover, the former superintendent stated, "It seems like Trustee Davila wanted to be the superintendent of the district."

**HISD Response to Allegation Two**

1. **HISD and individual trustees dispute TEA findings related to individual board members' requests for information.**

HISD and individual trustees argue that individual board members have an inherent right to access information, and that these questioned requests for information are proper.[67] They also argue that the board is not bound by a policy adopted by the administration and that they can interpret this policy.[68]

**Analysis of HISD Response:**

HISD has adopted policies and procedures that govern how board members would access information from the school district.[69] While Tex. Educ. Code §11.1512(c) does give board members an inherent right to access information from the district, Tex. Educ. Code §11.1512(e) requires the district to annually report to the Agency the number of requests submitted by the board of trustees of the district pursuant to Tex. Educ. Code §11.1512(c) and the total cost to the district of responding to these requests.

Tex. Educ. Code §11.151(d) gives the board the authority to adopt rules and bylaws necessary to carry out its powers and duties. The HISD Board Policy Manual includes Policy BBE(LOCAL) and BBE2(REGULATION). Policy BBE(LOCAL) is a board policy that addresses the manner in which the district complies with TEC §11.1511(c)-(e) and BBE2(REGULATION) is the administrative regulation that implements board policy. These policies do not restrict any board member's inherent right to access information. Rather, it provides a mechanism for the district to track and report the number of requests and cost associated with these requests.[70] This administrative policy has been in place since April 15, 2013, and the HISD board has taken no action to modify this policy or require that the administration

---

[67] See Appendix 1, pp. 38-40, Appendix 4, pp. 2-4, Appendix 5, pp. 2-4, Appendix 6, pp 6-8, Appendix 7, pp. 2-5.
[68] See Appendix 1 pp. 39-40, Appendix 4, p. 4, Appendix 5, pp. 2-4, Appendix 6, pp 6-8, Appendix 7, pp. 2-5.
[69] See Board Policy BBE(LOCAL).
[70] See Policy BBE(LOCAL) requiring the district to publicly report the number of requests from the previous year and the cost of filling this requests and Policy BBE2(REGULATION) which identifies Board Services as the coordinator for Board Requests for Information from the school district.

adopt a different regulation.[71] If this policy had been followed, HISD board members would have been able to document the interactions between individual board members and members of the HISD administration.

Policy BBE2(REGULATION) governs the way individual board members interact with the administrative staff.  If the board did not want to comply with the policy or wanted the administration to adopt a different policy, the board should have met in a meeting held in compliance with the Texas Open Meetings Act and taken action to direct the modification or rescission of the policy, instead of just ignoring the policy. By doing so, they acted in their individual capacities to take action on behalf of the board without acting in a meeting held in compliance with the Texas Open Meetings Act.

TEA does have jurisdiction to make findings that an individual school board member violated Tex. Educ. Code §11.051(a-1).  The Agency also has authority to find that an individual or entity violated a policy.[72]

While the board has the authority to interpret its policies, there is no evidence that the board did so in a meeting held in compliance with the Texas Open Meetings Act.  To the extent that individual board members interpreted district policy without first obtaining the approval of the board in a meeting held in compliance with the Texas Open Meetings Act, they did so in violation of Tex. Educ. Code §11.051(a-1).

## 2.  HISD disputes findings relating to individual board member actions directing staff.

HISD challenges certain agency findings that individual board members directed HISD administrative staff without board authorization and without sending the communication through Board Services.  HISD argues that these communications were merely the board members expressing their opinion.

Board policy prohibits individual board members from exercising authority over administrators.[73] There is major power imbalance between individual board members and HISD administrators.  An administrator who crosses a board member faces the increased likelihood of an adverse personnel action. For example, Board President Davila has publicly threatened to take adverse personnel actions against administrators who did not comply with her requests: "I won't hesitate to vote you out when your contract comes up if you don't tell me what you need right now…".[74] Any employee of an organization has good reason to fear an adverse employment action, as this could cause significant financial hardships through loss of pay, loss of health insurance, and long-term damage to the administrator's career, as they would have to acknowledge the previous adverse employment action when applying for future jobs. Further, the board has authority over the budget and could retaliate against any employee by cutting funds in that employee's area of responsibility.

---

[71] The Board as a whole, acting in a meeting held in compliance with the Texas Open Meetings Act, has the authority to oversee the management of the public schools of the district.  It also has the authority to adopt its own policies.  Tex. Educ. Code §11.151(b), (d).

[72] Tex. Educ. Code §39.058(b) "After completing a special accreditation investigation … the agency must provide a person or entity the agency finds has violated a law, rule, or policy, an opportunity for an informal review by the commissioner or a designated hearing examiner."

[73] HISD Policy BBE "Board members as individuals shall not exercise authority over the district, its property, or its employees." HISD Policy BBE2(REGULATION) establishes a procedure governing all referrals from trustees or the superintendent. The policy defines a referral as "any verbal or written communication received from a trustee … that requires action, such as requesting information or resolution of an issue."

[74] See Allegation Two, Finding of Fact 8.

Thus, the characterization of these communications as merely being expressions of opinions is unpersuasive, given the inherent power imbalance between the district employees and individual board members.  Moreover, the individual board member's disregard of district policy when they would routinely bypass Board Services, further isolates the individual employee and enhances the pre-existing power imbalance. Furthermore, in many cases the disregard of district policy served to prevent the full documentation of the interactions between the individual board members and the district administrators.

This policy does not restrict the board member's ability to alert the administration of important issues to be addressed.  For instance, when a parent makes a complaint to a board member, it is appropriate for the board member to make a referral through Board Services or instruct the parent of their ability to file a grievance.  But when an individual board member starts contacting the administrator on behalf of one parent, that complaint may get better treatment than a similar complaint made by a less well-connected parent.

3. **HISD disputes findings because former Superintendent Richard Carranza allowed this violation to continue.**

HISD and board members argue that former Superintendent Richard Carranza allowed individual board members to directly request information from administrators and to otherwise contact them regarding the operation of the district without first going through Board Services.[75]

**Analysis of HISD Response:**

Houston ISD adopted Policy BBE2(REGULATION) on April 15, 2013. This policy establishes a procedure governing all referrals from trustees or the superintendent. The policy defines a referral as "any verbal or written communication received from a trustee … that requires action, such as requesting information or resolution of an issue."  This policy was in effect during the time period covered by these findings and was not modified or rescinded.  The failure of the administration to enforce its policies is not an excuse for its violation.

Even if former Superintendent Richard Carranza allowed this activity, the superintendent took no action to the amend, waive, revise or rescind this regulation. Any failure of the administration to enforce this policy and any failure of individual administrators to complain about violations does not excuse an individual board member's failure to comply with the policy.

Moreover, the Agency's findings do not solely rely on Policy BBE2 to establish the violations. These actions also violate Board Policy BBE, which prohibits trustees from exercising authority over district employees. Former Superintendent Carranza had no authority to rescind the board policy.

---

[75] See Appendix 1, p. 48.

**4. Trustees argue that some allegations were not properly investigated.**

HISD Trustees argued that they were not interviewed about the communications referenced in the preliminary report.[76]

**Analysis of HISD Response:**

The Agency collected documentary evidence and conducted interviews. The preliminary report contained preliminary findings based on the documentary evidence, the interviews, or both. The people who the Agency found were in violation of a law, rule or policy have been provided an opportunity to respond to the allegations prior to the finalization of these findings. There is nothing improper about the investigation.

**5. Trustees argue that their actions were proper because they were acting as board president and had enhanced responsibilities.**

HISD Trustees Skillern-Jones and Adams both served as board president in the past and argue that Board Policy BDAA(LOCAL) and BE(LOCAL) outlines enhanced duties with respect to board meetings, agendas, complaints about board members, and the superintendent's compliance with a monitoring system for a district of innovation plan, and that because of these responsibilities, the board member's contact with HISD administrators that did not comply with HISD policy was proper.[77]

**Analysis of HISD Response:**

Acknowledging that the board president does have enhanced duties with respect to board meetings, complaints about board members, and the superintendent's compliance with a monitoring system for a district of innovation plan, nothing in these duties give the board president an enhanced right to act in violation of the district's policies.

**6. HISD disputes content related to Allegation Two, Findings of Fact 1-4.**

HISD disputes content related to Findings of Fact 1-4 regarding allegations that then-Trustee Davila directed a construction change at a high school during its construction, arguing that the findings are factually inaccurate and amount to nothing more than an expression of opinion and that she did not exceed the scope of her authority during a campus visit. HISD argues that the statements supporting this finding are hearsay. HISD argues that then-Trustee Davila had permission to visit the campus from the area superintendent. HISD argues that the change order was processed by district administrators, not then-Trustee Davila herself.[78]

---

[76] See Appendix 4, pp. 5-10, Appendix 5, 5-10, Appendix 6.
[77] See Appendix 4, 5-6, Appendix 5, pp. 5-6.
[78] See Appendix 1, pp. 40-42.

**Analysis of HISD Response:**

Board President Davila acknowledges that she visited the campus in question and that she did state that she thought the courtroom looked small, but takes the position that the idea of knocking down a wall and making the courtroom bigger was raised by someone else and that she told them not to do it because it would increase the cost of the project.[79]

Board President Davila's claim is not supported by the facts and circumstances related to this incident. The fact remains that she identified a perceived problem with the project and that the construction project was modified mid-course to accommodate this concern. It is unlikely that she would have specifically told the construction personnel not to make the change, but that they would still go out of their way to accommodate her request over her specific objections. As discussed elsewhere in this report, Board President Davila has not fully cooperated in other aspects of this investigation.[80]

TEA interviewed two witnesses who confirmed that then-Trustee Davila directed HISD administrators to change the construction plans. One of the witnesses directly witnessed the exchange and this information is not hearsay.[81] The other witness was told about this exchange.[82] While the second witness' information is hearsay, it does corroborate the finding that Trustee Davila directed the construction change.

Board President Davila's claim that the campus visit was approved by the area superintendent does not negate the finding because the finding relates to the directive to change the construction, not whether the visit was authorized. Further, Tex. Educ. Code §11.1512 requires the district to create a policy on visits to a district campus or other facility by a member of the board of trustees of a district. The HISD has adopted Board Policy GKC(REGULATION) that requires "All visitors are required to report to the principal's office or other designated area for authorization in order to be in the school's premises."

It does not matter whether district officials approved the change order. The finding does not allege that the administration falsified the construction change order, the finding alleges that then-Trustee Davila directed the change in the construction as an individual board member and that she failed to obtain the approval of the board in a meeting held in compliance with the Texas Open Meetings Act. As set forth in Section Two of this analysis, there is a power imbalance between individual board members and the employees of the district. The Agency is not persuaded to change the finding related to then-Trustee Davila's direction to the district officials to make a change to the construction of the facility as an individual trustee, without obtaining the approval of the board.

7. **HISD disputes content related to Allegation Two, Finding of Fact 5.**

HISD argues that Finding of Fact 5 regarding then-Trustee Davila's actions to remove an agenda item relating to a contract were proper. HISD argues that she just rescheduled that vote and ultimately seconded the motion and voted to approve the item. Board President Davila denies that she made any statement expressing favoritism for another contractor and denied that she threated the HISD administrator's job. She also points out that there is a typographical error in the date of the meeting.

---

[79] See Appendix 1, Exhibit 3, ¶ 20-24.
[80] See Allegation One, Finding of Fact 16-20, Final Report pp. 24-25, 52-53, and 68-69.
[81] See Allegation Two, Finding of Fact 2.
[82] See Allegation Two, Finding of Fact 1.

**Analysis of HISD Response:**

The finding relates to allegations that then-Trustee Davila directed staff to remove an agenda item as part of an effort to influence the contracting process in favor of another vendor. HISD does not contest the finding that then-Trustee Davila asked the administrator to remove the agenda item, or the fact that the agenda item was ultimately removed at her request. If then-Trustee Davila had complied with Tex. Educ. Code §11.051(a-1) by asking the board to direct the administrator to remove the agenda item in an open meeting, or had complied with Board Policy BBE2(REGULATION) by issuing the directive through Board Services, then the exact nature of the communication would have been documented and available to the public.

While the findings related to favoring a specific vendor and allegations of threatening the administrator's job are disputed, Board President Davila fails to provide an explanation for why she wanted the agenda item removed. While the subsequent action to remove the agenda item and a community meeting held related to the item are not themselves improper, the actions corroborate the administrator's claim that then-Trustee Davila was using her position as a board member to influence the contracting decision. While then-Trustee Davila ultimately voted to approve the action, this is the result of the HISD contracting process not being influenced by the actions of an individual board member.

Further, the allegation that she threatened the administrator's job is consistent with the allegation that then-Trustee Davila threatened the jobs of other HISD administrators if they did not comply with her request.[83] This allegation is also consistent with other allegations that Board President Davila has used her position as a trustee to influence the District's contracting practices to favor certain vendors.

The typographical error identifying the date of the board action as occurring at the February 2018 board meeting has been corrected. The action occurred at the February 2017 Board meeting.

8. **HISD disputes content related to Allegation Two, Finding of Fact 6.**

HISD argues the Trustee Santos' actions relating to an event called Field Good Day were not a result of the event being connected to her campaign. HISD also claims that any costs would have been minimal after voluntary security was obtained, and that HISD had not presented her with an invoice.

**Analysis of HISD Response:**

Based on the additional information provided, the Agency withdraws this Finding of Fact 6 related to Allegation Two.

9. **HISD disputes content related to Allegation Two, Finding of Fact 7.**

HISD argues that this allegation lacks specificity and does not identify when Trustee Santos received food without paying for it. HISD notes that many board functions are catered.

**Analysis of HISD Response:**

---

[83] See Allegation Two, Finding of Fact 8.

Based on the additional information provided, the Agency withdraws this Finding of Fact 7 related to Allegation Two.

**10. HISD disputes content related to Allegation Two, Finding of Fact 8.**

HISD disputes finding 8, which relates to actions taken by then-Trustee Davila at a workshop where she stated to HISD employees, "I won't hesitate to vote you out when your contract comes up if you don't tell me what you need right now…".  HISD argues that she had only one vote in employee contract actions and that her statements were appropriate expression of her opinion.[84]

**Analysis of HISD Response:**

Then-Trustee Davila used her individual position on the board and her authority with respect to employee contract actions to require employees to answer her questions.  HISD policy does not allow an individual trustee to require an action of district staff, including the request for information, without making a referral through Board Services.  HISD board policy prohibits trustees from exercising authority over district personnel.  The fact that the threatened personnel action would have required other board members to also vote to take adverse employment action does not mean that then-Trustee Davila did not require the staff to provide information.  The fact that she possessed the authority to participate in the employee contract process meant that her threat was credible and that the threatened employees would reasonably fear losing their job if they did not comply with the request.  See section two of this analysis relating to the power imbalance between individual trustees and district employees.

**11. HISD and individual trustee disputes content related to Allegation Two, Findings of Fact 9-12.**

HISD disputes content related to Finding of Facts 9-12 in Allegation Two arguing that it has a right to implement internal procedures describing how to best facilitate communication between board members and administration, but the internal procedure cannot supersede board members inherent right to access information. HISD further argues that the communications were not directives and just an expression of opinion, and that former Superintendent Richard Carranza allowed board members to violate Policy BBE2(REGULATION).[85]

Trustee Jones disputes Allegation Two, Finding 11, where the district's conservator reported on the amount of board member requests for information.  Trustee Jones was included in the report but argues that her inherent right to access information cannot be superseded by district policy.[86]

**Analysis of HISD Response:**

 HISD and board member disputes arguing the communications were proper requests for information, were just expressions of opinion and not directives, and were allowed by former Superintendent Richard Carranza are answered in sections one through three of this analysis.

**Analysis of Trustee Jones' Response:**

---

[84] See Appendix 1, p. 46.
[85] See Appendix 1, p. 46.
[86] See Appendix 7, pp. 2-5.

Analysis related to Trustees' right to access information is addressed in Section One of this analysis.

### Electronic communications from 2016

HISD claims that emails identified in Findings of Fact b, d, e, g, and h, were merely requests for information, pursuant to the board members inherent right of access to information, documents and records.[87] HISD and a trustee claim that the communications identified in Finding of Fact a, d, and h were proper and appropriate because former Superintendent Carranza did not enforce the district's policy.[88] HISD claims that emails a, c, f, i and j, indicate no evidence of directive or overreach by current or former board members. HISD claims these communications were merely requests and not directives.[89]

HISD argues that communications referenced in Findings of Fact a-c, e-g, i, and j, are related to unnamed former trustees.[90] HISD claims that these findings are irrelevant and that the former trustees are outside the scope of the SAI investigation.[91]

### Analysis of HISD Response:

HISD and board member arguments that the communications were proper requests for information were allowed by former Superintendent Richard Carranza or were just expressions of opinion and not directives are answered in Sections One through Three of this analysis.

Findings related to former board members that are included in this preliminary report are included for background information only. These findings are made against HISD as an entity and demonstrate that the current problems with board overreach are long-running and systemic. When the Agency makes a finding that a specific person or entity violated a law, rule, or policy, it provides that person or entity with an opportunity to respond. When the Agency makes a finding that does not name a specific individual or entity, the Agency does not provide that unnamed person or entity with an informal review.

HISD appears to argue that the second amended SAI notice that added alleged contractual violations identified in Finding of Fact 3 removed the allegations of board overreach. The second amended SAI notice added allegations but did not purport to remove the allegations that were already under investigation.

TEA is not persuaded to change the substance of its finding based on the response provided by HISD.

### Electronic communications from 2017

HISD claims that communications related to Findings of Fact f, g, h, i, and k were merely requests for information, pursuant to the board members inherent right of access to information, documents and

---

[87] See Appendix 1, pp. 48-51, Appendix 5, pp. 7-10.
[88] See Appendix 1, pp. 48-49, Appendix 5, pp. 7-10.
[89] See Appendix 1, pp. 48-51, Appendix 5, pp. 7-10.
[90] See Appendix 1, p. 47.
[91] See Appendix 1, p. 47.

records. HISD claims the board member's requests were not improper.[92] HISD and a trustee claim that all the communications identified in this set of findings of fact were proper and appropriate because former Superintendent Carranza's did not enforce the district's policy.[93] HISD and two trustees claim that emails a, b, c, d, e, f, g, h, i and j  indicate no evidence of directive or overreach by current or former board members. HISD claims these communications were merely requests and not directives.[94]

Trustee Adams argued that the communication referenced in Finding of Fact a was proper because  she forwarded the email to HISD staff at the direction of former Superintendent Richard Carranza.[95]

HISD argued that the communication referenced in Finding of Fact b was not a directive and that the words "please investigate" does not direct the administration to do anything.[96]

Trustee Adams argued that the communication referenced in Finding of Fact c was in response to a communication she received in her role as board president and that she had to do something with it.[97]

Trustee Flynn Vilaseca argued the communication referenced in Findings of Fact j was proper, and states that she emailed a senior administrator directly because when she tried to email the board services contact for a referral, that person was out of office. Trustee Flynn Vilaseca claims that she didn't direct the senior administrator in any manner.[98]

### Analysis of HISD Response:

HISD and Board member arguments that the communications were proper requests for information, were allowed by former Superintendent Richard Carranza, or were just expressions of opinion and not directives are answered in Sections One through Three of this analysis.

With regards to Trustee Adams dispute regarding the email referenced in Finding of Fact a, former Superintendent Carranza did not have the authority to allow Trustee Adams to contact staff in Human Resources to ask them to consider a resume of a friend of Trustee Adams' colleague. Board Policy BBE does not allow Trustees to exercise authority over district staff.  This includes directions to the Human Resources staff to consider a resume. No evidence was provided to establish that the former superintendent requested the information to be sent to the Human Resources Officer.

With regards to HISD's argument related to the communication referenced in Finding of Fact b, the words "please investigate" is a directive to the HISD staff to investigate an issue.

With regards to Trustee Adams' argument related to the communication referenced in Finding of Fact c, she should have asked the entire board to take the actions she took in her individual capacity.  In this case, she acted in her individual capacity to direct staff to undergo additional training and to direct human resources staff to document the incidents in specific individual's personnel files.

---

[92] See Appendix 1, pp. 51-55, Appendix 2, p. 3, Appendix 4, pp. 7-8, Appendix 5, pp. 7-10.
[93] See Appendix 1, pp. 51-55, Appendix 4, p. 8. Appendix 5, pp. 7-10.
[94] See Appendix 1, pp. 51-55, Appendix 2, p. 3, Appendix 4, p. 6-8, Appendix 5, pp. 7-10.
[95] See Appendix 4, p. 6.
[96] See Appendix 1, p. 52.
[97] See Appendix 4, p. 7.
[98] See Appendix 2, p. 3.

With regards to Trustee Flynn Vilaseca's dispute regarding the email referenced in Finding of Fact j, the lack of an immediate response from Board Services is not an exception to the HISD administrative policy requiring that communications from board members to staff at HISD asking for the resolution of an issue be handled through Board Services.

### Electronic Communications from 2018

HISD claims that emails related to Findings of Fact a, d, g and h were merely requests for information, pursuant to the board members inherent right of access to information, documents and records. HISD claims the board member's requests were not improper.[99] HISD claims that email refenced in Finding of Fact b, e, and f indicates no evidence of directive or overreach by current or former board members. HISD claims these communications were merely requests and not directives.[100]

In the 2018 email communication Findings of Fact b, Trustee Deigaard alleged that the former chief of staff initiated the email correspondence. Trustee Deigaard claims that the former chief of staff asked her what she can do and Trustee Deigaard claims that she asked for the high school doors where her other daughter attends to be locked. Trustee Deigaard claims that she responded as a parent and that her response was appropriate and reasonable.[101]

In the 2018 email communication Findings of Fact c, Trustee Adams alleged that she was appropriate in her response to the senior administrator with the names of the three individuals due to HISD DP2 (REGULATION).  Trustee Adams alleges HISD DP2(REGULATION) allows for the chief school officer to notify the board member, in whose geographic district a principal vacancy is, of the vacancy as well as the selection process and the timeline for the vacancy. It is further stated that the selection process includes the formation of an interview committee. Trustee Adams claims that the HISD administrator asked her to provide the names for the interview committee.[102]

In the 2018 email communication Findings of Fact g, Trustee Deigaard claims that she only emailed the senior administrator for clarification of the administrator's preference in handling large number of transportation complaints from parents. Trustee Deigaard claims that her original email was to Board Services and they told her to email the senior administrator and enter a referral if the complaint was worth tracking.

### Analysis of HISD Response:

HISD and Board member arguments that the communications were proper requests for information or were just expressions of opinion and not directives are answered in Sections One and Two of this analysis.

With regards to Trustee Deigaard's response to the Finding of Fact b, the fact that a board member is also a parent does not expand the board member's authority.  Other parents do not have the same ability to direct or influence the actions of HISD administrators.

---

[99] See Appendix 1, p. 55, Appendix 6, pp. 3-5.
[100] See Appendix 1, p. 55, Appendix 5, p. 9, Appendix 6, pp. 3-4.
[101] See Appendix 6, pp. 2-3.
[102] See Appendix 4, pp. 8-9.

With regards to Trustee Adams' response to the Finding of Fact c, Policy DP2(REGULATION) allows board member notification when a vacancy occurs: "[t]he [Chief School Officer] will notify the Superintendent and the appropriate Board member of the principal vacancy as it occurs. The CSO will inform the Superintendent and Board member of the selection process and timeline." This policy makes it clear that the hiring process is the responsibility of the administration: "In the District, the hiring of principals is a responsibility of the School Improvement Officer (SIO) with concurrence of the Chief School Officer (CSO) and the superintendent."  Notably, the policy does not allow the board member to direct the process in any way or recommend or select members of the interview committee.  In fact, after receiving information about the vacancy and the hiring process, the board is not involved in any way until after the selection is made. At the point "[t]he CSO informs the appropriate board member of the selection … the Superintendent notifies the Board of Education of the new principal hire …". Further, the Agency was provided no documentation that Trustee Adams was requested to provide input on the composition of the hiring committee.  The documentary evidence relating to this allegation indicates that Trustee Adams' request relating to the composition of the interview panel was not prompted by any request.

With regards to Trustee Deigaard's dispute regarding Finding of Fact g that she only contacted the administrator regarding that administrator's preference for handling a large number of transportation complaints, HISD board policy defined the process for board members to handle referrals that require the resolution of an issue, such as a parent complaint.  HISD policy required this to be sent through Board Services.  The violation of this policy creates two types of parent complaints. When complaints are handled in compliance with the HISD policy, those complaints are assigned and tracked by Board Services.  When complaints are not handled in compliance with board policy, the complaints are assigned by individual board members who are in a power position with respect to the administrators. Further, there is no documentary evidence to support Trustee Deigaard's claim that her original email was sent to  Board Services. Her original email was sent to the administrator.

### Electronic Communications from 2019

HISD and a trustee claim that communications related to Findings of Fact a and d were merely requests for information, pursuant to the board members inherent right of access to information, documents and records. HISD and the board member claim the board member's requests were not improper.[103] HISD and trustee claim that emails a, b, d and e indicate no evidence of directive or overreach by current or former board members. HISD claim these communications were merely requests and not directives.[104]

In the 2019 email communication referenced in Finding of Fact a, Trustee Skillern-Jones claims that she never told the vendor that she would set up any meeting and that she did not discuss the RFP with the vendor. Trustee Skillern-Jones alleges that she demonstrated appropriate board behavior, by consulting the board attorney whether her requests to the administration were "within the proper governance lane."[105]

In the 2019 email communication Findings of Fact c, Trustee Sung claims that a parent had contacted her about issues at Mandarin Immersion Magnet School. Trustee Sung claims she spoke to the parent and then

---

[103] See Appendix 1, pp. 55-56, Appendix 5, p. 9.
[104] See Appendix 1, pp. 55-56, Appendix 3, p. 2, Appendix 5, p. 9.
[105] See Appendix 5, p. 9.

afterwards, entered a board referral. Trustee Sung claims that she told the parent that a referral was entered and closed and asked her if she needed another one. Trustee Sung claims that once she learned that the parent filed a grievance with the district, Trustee Sung explained to the parent that she should follow the grievance process and that she would no longer be responding to her emails outside of that process.[106]

### Analysis of HISD Response:

HISD and board member disputes arguing the communications were proper requests for information were just expressions of opinion and not directives are answered in Sections One through Two of this analysis.

HISD argues that the interim superintendent was copied on these emails does not change the finding. HISD policy requiring a referral when a request is made for information or for the resolution of an issue also applies to the interim superintendent.

With regard to Trustee Skillern-Jones' dispute relating to Finding of Fact a, Trustee Skillern-Jones contacted staff directly, without going through the Board Services referral process. Further, Trustee Skillern-Jones tried to set up a meeting with the benefits department to resolve her issues regarding the HISD medical plan. She only contacted counsel for the district after attempting to setup the meeting.

With regard to Trustee Sung's dispute relating to Finding of Fact c, Trustee Sung provided documentary evidence indicating that she complied with the Board Referral process and once the parent filed a grievance, Trustee Sung advised the parent that she would not be able to discuss the pending grievance. For these reasons, the Agency withdraws this Finding of Fact c related to Allegation Two.

### Findings of Fact for Allegation Three

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

The following findings of fact are a result of interviews conducted via audio recordings and video recordings. In addition, SIU investigators examined HISD internal documents.

1. On October 12, 2015, the HISD Ethics and Compliance Officer, issued a compliance review of procurement RFP #15-07-05 ( See Exhibit 3.1 ). On September 3, 2015, Trustee Adams provided non-public information to a vendor regarding the award for RFP #15-07-05 Two-Way Radio System for Transportation with Infrastructure Upgrade. The awardee, Vendor #1, had been made known to the Board of Trustees on September 2, 2015 and the public was notified on September 7, 2015. Records indicate that on September 4, 2015, Trustee Adams violated District Policy CAA Local Financial Management Goals and Objectives, Financial Ethics, regarding the Code of Silence ( See Exhibit 3.2 ). Recommendations of this investigation included that the HISD Board of Trustees receive additional training from the Office of Ethics and Compliance regarding the Code of Silence. TEA requested trustee training transcripts; however, the district was only able to provide TASB training. TEA could not verify if trustees received training from the Office of Ethics and Compliance. ( See Exhibit 3.3 )

---

[106] See Appendix 3, pp. 2-3.

2. In August of 2016, Trustee Davila met with an HISD senior administrator at Pappadeaux Seafood Kitchen along with her husband, Abel Davila, Art Lopez, and Leticia Ablaza. The administrator stated that the nature of the meeting was to strategize a way to get bond contracts cancelled and re-bid. Moreover, the administrator told SIU investigators Trustee Davila and her husband, along with Mr. Lopez and Ms. Ablaza, focused on the custodial contract with MetroClean. Trustee Davila, Art Lopez, and Leticia Ablaza demanded that HISD cancel its contract with MetroClean, and award it to Accel Building Maintenance (ABM Inc.). The administrator responded, "ABM Inc. did not have a good reputation with the district and therefore would not be considered as a vendor." To which Trustee Davila replied, "It will happen if we want it to happen."

3. After the administrator refused to cancel the MetroClean Contract, the owner of MetroClean told the administrator that ABM Inc. had approached MetroClean to give them a consultant agreement. On March 19, 2019, SIU contacted Jose Perez, owner of MetroClean Commercial Building Services, and discussed his interaction with Ricardo Aguirre, owner of ABM Inc. ( See Exhibit 3.4 ). On March 19, 2019, during an interview with SIU, Mr. Perez confirmed that Ricardo Aguirre approached him and attempted to force him to sign a consulting agreement stating that "MetroClean" would pay "Accel" a monthly salary of 2% of gross revenue received. In addition, "MetroClean" would increase the monthly payment to 3% if more contracts were secured. Mr. Perez provided the administrator a photographic document of what Mr. Aguirre wanted him to sign. ( See Exhibit 3.5 ). Mr. Perez stated that he was in the Request for Proposal process with HISD for custodial services when he was approached by Mr. Aguirre to circumvent the procurement process. Moreover, Mr. Perez mentioned that Mr. Aguirre attempted to pressure him into signing the agreement stating, "Diana Davila's husband sent me here to have you sign this agreement." Additionally, Mr. Perez stated that Aguirre threatened him saying, "If you don't sign the agreement, HISD will not approve your contract."

4. Problems with contracting procedures are not a recent development within HISD. Historical evidence of unlawful contract awarding can be traced to 2013 through the internal documentation of Job Order Contract misuse. SIU received documents from an HISD internal audit demonstrating the district split Job Order Contracts to avoid the state law limit. ( See Exhibit 3.6 ) The investigation, conducted by the former Internal Auditor, revealed that the HISD violated Tex. Educ. Code §44.031(a)(5) a method provided by Chapter 2269, Government Code, for construction services; and Tex. Gov't. Code §2269.403 (c) the governing body of a governmental entity shall approve each, job, task, or job purchase order that exceeds $500,000. The audit determined that 14 Job Order Contracts were split to avoid the $500,000 limit, with one contract going over $1 million in funds. The following table illustrates a sample of Job Order Contracts that were audited and found to be non-compliant.

## Job Order Contracts

| Job Order Number | Contractor Num. | Contractor | Campus | Split Amounts | Actual Contract Value |
|---|---|---|---|---|---|
| **KBR 20104** | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | |
| **KBR 20105** | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | $960,000.00 |
| **KBR 30006** | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $324,600 | |
| **KBR 30007** | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $408,300 | $732,900.00 |
| **KBR 30008** | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $174,923 | |
| **KBR 30009** | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $330,116 | $505,039.00 |
| **KBR 30063** | 84879 | Kellogg Brown & Root | Cage Elementary School | $491,376 | |
| **KBR 30064** | 84879 | Kellogg Brown & Root | Cage Elementary School | $359,922 | $851,298.00 |
| **JLS 30079** | 64938 | Jamail & Smith Construction | Sanchez ES | $499,150 | |
| **JLS 30148** | 64938 | Jamail & Smith Construction | Sanchez ES | $33,720.89 | $532,870.89 |
| **P2M 30044** | 93555 | P2MG | Jones High School | $381,758.96 | |
| **P2M 30045** | 93555 | P2MG | Jones High School | $481,060.71 | |
| **P2M 30047** | 93555 | P2MG | Jones High School | $484,475.00 | $1,487,254.25 |
| **P2M 30048** | 93555 | P2MG | Jones High School | $139,959.58 | |
| **P2M 30054** | 93555 | P2MG | Jones High School | $288,909.81 | |
| | | | | $498,341.11 | $1,170,675.47 |
| | | | | $383,424.55 | |

5. As stated in the Job Order Contracting Report (JOC Report) issued September 8, 2015, HISD internal auditors found that Job Orders (KBR 20104 and KBR 20105, issue date June 11, 2013) had been awarded to Kellogg Brown & Root (KBR) independently, however; should have been awarded as a single contract with a "not to exceed" value of $960,000. Instead, HISD awarded two $480,000

contracts to KBR for the "Demolition" and "Asbestos Abatement" for the NFISD Career and Technology Center. Auditors reported that the HISD Board of Trustees approved funding for these job orders on July 18, 2013, a month after the funding had been awarded to KBR. Furthermore, the report goes on to say that KBR did not provide HISD with any final accounting and mentioned that HISD failed to request an audit of the records to determine the final cost of the project.

6.  The JOC Report finds that on August 6, 2013, HISD awarded two (2) "not to exceed" job order contracts to KBR for demolition and abatement of buildings at Kirby Middle School. Contract KBR 30006 was valued at $324,600 and KBR 30007 was valued at $408,300. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $732,900 should have been approved by the HISD Board of Trustees.

7.  As per the JOC Report, job orders KBR 30008 and KBR 30009 were awarded to KBR on August 6 and August 7, 2013 for work at Lakewood Elementary School. As per HISD auditors, KBR 30008 was awarded for the "Abatement of Existing Structures" for a total value of $174,923. KBR 30009 was awarded to KBR for "Demolition of Buildings" for a total value of $330,116. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $505,039 should have been approved by the HISD Board of Trustees.

8.  Job orders KBR 30063 and KBR 30064 as referenced in the JOC Report were awarded to KBR on May 8, 2014 for work at Cage Elementary School. KBR 30063 cited "Architectural and Site Work for the Principals Restroom, and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $491,376. KBR 30064 cited "Electrical, Plumbing and Mechanical for the Principal's Restroom and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $359,922. Because of the value of the contracts were less than the $500,000 threshold, there was no board item approving these contracts. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $851,298 should have been approved by the HISD  Board of Trustees.

9.  The JOC Report identified Jamail & Smith Construction (JLS) as another entity that conducted business with HISD. As per the report, JLS was awarded job order contract JLS 30079 for "Sanchez Elementary Bathroom TDLR Renovations" on April 4, 2014, at a value of $499,150. The project included "Site work for concrete and paving details for bathrooms X60B, 45B, 43B, 41B, Boys and Girls Restrooms 31 and 31A, Specialty Rooms 26A and 26, State Area Room X63, and Classroom 32 and 33. Moreover, JLS 30148 was awarded on September 15, 2014, at a value of $33,720.89. The purpose of JLS 30148 was for "Sanchez Elementary Bathroom TDLR Renovations Additional Works". HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $532,870.89 should have been approved by the HISD Board of Trustees.

10. The JOC Report also reviewed contract work performed by P2MG for projects at Jones High School. The following job orders were approved:

    a.  P2M 30044, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Culinary Arts Area, 2. New Administration Area, 3. New Wall between the classrooms," for a value of $381,758.96.

    b.  P2M 30045, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Welding, 2. HVACR, 3. Cosmetology," for a value of $481,060.71.

    c.  P2M 30047, awarded on June 5, 2014, for "Jones High School, 1. Canopy Painting, 2. Upgrade Lights," for a value of $484,475.

    d.  P2M 30048, awarded June 5, 2014, for "Jones High School, 1. Resurface Tennis Courts, 2. Restroom Renovations, 3. Bus Lane," for a value of $139,959.58.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after the work was paid and completed. HISD internal auditors concluded that since the four projects were performed simultaneously, a single contract valued at $1,487,254.25 should have been approved by the HISD Board of Trustees.

11. The JOC Report pointed out an additional job order awarded to P2MG for work at Jones High School. Order P2M 30054 was awarded as three separate requisitions on July 23, 2014, for "Jones High School (Design and Grading) Parking Lot Addition -Phase I", at a value of $288,909.81, "Jones High School Parking Lot Addition (Paving Parking Area) - Phase II" at a value of $498,341.11, and "Jones High School Parking Lot Addition (Paving Parking Area) -Phase III" at a value of $383,424.55.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after work was paid and completed. HISD internal auditors concluded that since the three projects were performed simultaneously, a single contract valued at $1,170,675.47 should have been approved by the HISD Board of Trustees.

12. A closer look at the audit report "Internal Audit of the Design and Selection Process for Job Order Contracts, General Construction – Major & Minor Projects" Issued March 10, 2015 provided additional insight as to the contract awarding process at HISD ( See Exhibit 3.7 ). Not only did the report highlight a lack of transparency, non-compliance with state laws, non-compliance with HISD policy and procedures, and a lack of timely and cost effective/best value services, it also cited an alarming concern, "Historical instances existed where contractors actually received an award even though they were not recommended for an award."

### Analysis of Allegation Three

TEA finds that the HISD Board of Trustees violated contract procurement rules and failed to ensure staff followed these rules and procedures while the district was selecting a vendor/contractor, as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §44.031. Section 44.031 (a)(1) specifies that "except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district: (1) competitive bidding for services other than construction services." HISD failed to monitor contractual obligations allowing the district to manipulate and abuse Job Order Contracts.

Tex. Educ. Code §44.031 (d) allows the district to adopt rules and procedures for the acquisition of goods and services. HISD adopted policy CAA (LOCAL), which details the district's code of silence. CAA (LOCAL) states "Code of Silence" shall mean a prohibition on any communication regarding any RFP, bid, or other competitive solicitation (as defined in the procurement methods above) between:

    1) Any person who seeks an award from the district or its affiliated entities (including, but not limited to, the HISD Foundation and the HISD Public Facility Corporation), including a potential vendor or vendor's representative; and

2) A Board member, the Superintendent, senior staff member, principal, department head, director, manager, or other District representative who has influence in the evaluation or selection process.

The investigation revealed numerous instances of trustees violating the District's rules and procedures with regard to the process of purchasing contracts.

Interference in the contract procurement process has been an ongoing problem at HISD. Garland Blackwell, the current Chief Audit Executive for the district, told SIU that HISD Board of Trustees have been investigated internally by the Ethics and Compliance Office and Internal Audit Office on more than one occasion.

As detailed in Findings of Fact 1, Trustee Adams' intervention in the RFP process posed a great risk to the procurement process and defeats the controls set in place to prevent fraudulent contract awarding. As mentioned in the memo drafted by former Compliance Officer Debi Fincher, Trustee Adams provided non-public information to a sub-contractor affiliated with the vendor in an ongoing RFP. Unbeknownst to the district, that sub-contractor was a colleague of Trustee Adams which could lead to the conclusion that Trustee Adams was pushing for the contract to go in favor of that vendor. This conduct violates Tex. Educ. Code§44.031(a)(1) because this was a board member who interfered with the competitive bidding process. This conduct also violates CAA(LOCAL) because the board member shared confidential information to a vendor, during the RFP process, breaking the Code of Silence.

As detailed in Findings of Fact 2 and 3, Trustee Davila violated Tex. Educ. Code §44.031 (a)(1) when she met with an HISD senior administrator to influence the administrator to choose a certain vendor for a custodial contract. Trustee Davila violated this statute because she tried to circumvent the competitive bidding process.  Furthermore, a colleague of Trustee Davila visited with a vendor who was in the RFP process and tried to coerce the vendor into a consulting contract.

As detailed in Finding of Fact 4, HISD violated Tex. Educ. Code §44.031 (a)(5) and Tex. Gov't. Code §2269.403 (c) when the district split job order contracts to avoid the $500,000 limit, which should have been approved by the HISD Board of Trustees.

As detailed in Finding of Fact 5, HISD split a contract that should have otherwise been awarded as a single contract. This was determined by the date issued and the sequence number of the job order contracts for KBR. HISD approved funding for these contracts prior to approval from the HISD Board of Trustees. Moreover, the board item that was later approved did not specify the use of Job Order Contracting or a waiver of the statutory pricing limits. There was no justification as to why HISD awarded two contracts to the same contractor on the same day.

As detailed in Finding of Fact 6, the job order contracts with KBR regarding Kirby Middle School demonstrates that HISD split a contract and therefore evaded board approval once more. This conclusion was reached based on the fact that KBR was awarded two contracts that had the same objective and therefore should have been awarded as a single contract that required board approval. Again, HISD could not justify awarding two contracts to one contractor on the same day for doing simultaneous work on Kirby Middle School.

As detailed in Finding of Fact 7, there was no reasonable explanation as to why two work orders were issued to complete the work at Lakewood Elementary School. KBR's objective was to demolish the

school, so the scope of work order KBR 30008 and KBR 30009 were the same. In addition to the same scope of work, the total value to this project totaled $505,039, which exceeds the amount required for board approval.

As detailed in Finding of Fact 8, KBR was awarded two contracts that reflected work to be completed concurrently at identical locations. Because KBR was awarded both contracts on the same day and the job orders are numerically sequential, this contract should have been awarded as a single item valued at $851,638. These actions demonstrate how HISD continued to award contracts under the $500,000 threshold to circumvent the required board approval.

Although not approved on the same day and not in sequential order, the contracts (JLS 30079 and JLS 30148) should have been approved by the board as the cost of the project totaled $532,870.89. The nature of the second contract is considered to be a change order to JLS 30079 and should not have been assigned a separate job order number. Evidently, HISD did not receive approval from the board for awarding these contracts.

As detailed in Finding of Fact 10, P2MG was awarded four job order contracts which remained under the $500,000 threshold. However, P2M 30044 and P2M 30045 were requested in sequential order and were identical in nature. Those two job orders should not have been requested separately and should have been combined, which would be valued at $862,819.67. Nonetheless, these four job orders total $1,487,254.25, which exceeds the annual limit of $1 million per campus per year (see Exhibit 3.6 p. 4). Moreover, the work was completed and billed by September 3, 2014, of which, $767,957.99 was paid before the HISD Board of Trustees approved Board Item (H-2) in September 11, 2014. Therefore, HISD did not seek approval of the board prior to awarding contracts or prior to completion of the work.

As detailed in Finding of Fact 11, P2MG was awarded three job orders that, when combined, were valued at $1,170,675.47. These contracts should not have been issued as individual orders and should have been procured properly. The contracts should have been initially valued at $1,170,675.47 as the nature of the work completely focused on the parking lot addition of Jones High School. Moreover, when HISD presented the contract as part of Board Item (H-2), the HISD Board of Trustees approved the requisitions almost two months after P2M 30054 was awarded.

Government contracts are easily susceptible to fraud and therefore contract procurement rules should be followed accordingly. However, HISD manipulated contract procurement rules through the abuse of Job Order Contracts and multiple change orders. The district not only intentionally split Job Order Contracts to avoid the $500,000 limit, they approved multiple change orders to projects subsequently increasing the cost of projects, thus, proving fraudulent behaviors that contribute to a lack of transparency.

Therefore, Allegation Three, "Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?" is substantiated because on multiple occasions the HISD Board of Trustees violated the law by interfering with the contract procurement process. The HISD Board of Trustees intentionally tried to award contracts indirectly by contacting vendors during the RFP process, advocating for contractors, and HISD was found to be manipulating contracts to circumvent contract procurement rules.

**HISD Response to Allegation Three**

### 1.   Trustee Adams Response to Allegation Three, Finding of Fact 1

Trustee Adams claims that TEA has no statutory authority to enforce HISD's code of silence because it is a local requirement, and not a TEA statute.  Trustee Adams also claims that she merely forwarded a complaint by a subcontractor to HISD administration and requested additional clarification. She claims that she did not direct any action by the administration.  Trustee Adams claims that the document she provided to the subcontractor was the final agenda for the HISD board meeting. Trustee Adams claims there is no law that bars her from sharing the final agenda to the public.

#### Analysis of Trustee Response:

TEA has the authority to ensure that school districts comply with the Texas Education Code. The HISD code of silence policy are part of the competitive bidding rules and procedures which school districts adopt to have in order to comply with Tex. Educ. Code §44.031 (a) (1), and are specifically authorized by Tex. Educ. Code  §44.031(d).[107]   Moreover, Tex. Educ. Code §39.058(b) specifically contemplates that the Agency would make findings in a special accreditation investigation that a person or entity has violated "a law, rule or policy."

As stated in the preliminary report, Trustee Adams violated the HISD policy establishing the "code of silence" when she provided non-public information to a sub-contractor affiliated with the vendor in an ongoing RFP. The vendor was also a colleague of Trustee Adams. While Trustee Adams disputes that she released non-public information, she agreed that she would "not share the final board meeting agenda with members of the public until it is posted online."[108]

TEA is not persuaded to change the substance of its finding based on the response provided by HISD.

### 2.   HISD Response to Allegation Three, Finding of Fact 2

HISD and Trustee Davila claim that the meeting described in Finding of Fact 2 of Allegation Three, did not happen and Trustee Davila, Abel Davila, Art Lopez, and Leticia Ablaza never met with the unnamed administrator.[109]

HISD further claims that even if the meeting did take place, and a conversation did happen about the custodial contract with MetroClean, or to get bond contracts cancelled, it would not be a violation of section 44.031(a) (1) of the Texas Education Code. HISD claims that no bidding process occurred at the time the meeting took place because MetroClean was already a vendor.[110]

---

[107] See Board Policy CAA(LOCAL), "The District shall implement a Code of Silence to enforce its commitment to ethical contracting standards and improve accountability and public confidence."
[108] See Appendix 4, pp. 9-10.
[109] See Appendix 1, pp. 57-58.
[110] See Appendix 1, pp. 57-58.

**Analysis of HISD Response:**

TEA received information from an HISD administrator describing the meeting referenced in Finding of Fact 5. The HISD administrator who told the investigators about the meeting asked not to be named in the report.   Board President Davila claims the meeting never occurred.

Clearly, the statement of the HISD administrator and Board President Davila cannot both be true, and the credibility of the people making the statements must be examined. Throughout  this investigation, Board President Davila has provided TEA investigators with false statements regarding material facts. These false statements have tended to minimize her responsibility for the allegations being investigated. She has falsely told investigators that she met with Dr. Saavedra alone on October 8, 2018, when Trustee Flynn Vilaseca was present for that meeting.  She has falsely told the Agency that she did not exchange text messages with Dr. Saavedra, when Dr. Saavedra has acknowledged that they exchanged text messages regarding Trustee Flynn Vilaseca's arrangements for the October 8, 2018 meeting.   Further, Board President Davila has failed to cooperate with this investigation by failing to turn over the relevant text messages.

Board President Davila has made other statements that are contradicted by other evidence in addition to this claim. Two HISD officials told investigators that then-Trustee Davila asked them to move a wall during construction and that the wall was moved at the expense of the district.  Board President Davila acknowledges that she commented about the wall, but that she specifically told the contractors not to move the wall because it would incur an additional expense. This is a material fact regarding an allegation in the preliminary report that then-Trustee Davila acted individually on behalf of the board by directing the construction change. Based on the evidence, this claim by Board President Davila has been rejected by the Agency.

In this instance, an HISD official has told TEA that then-Trustee Davila pressured him to change contractors and that she threatened his job.  Board President Davila has a history of threatening employment actions against HISD administrators who do not do what she tells them.[111] Further, this allegation is corroborated by statements from Jose Perez stating that the vendor contacted him with threats that Board President Davila would not approve the contract unless he was given a consulting fee. Similar to the example cited above, Board President Davila accuses this administrator of fabricating the entire incident. HISD attaches an affidavit from Ricardo Aguirre denying that either Board President Davila or her husband asked him to reach out to MetroClean regarding any agreement.[112]

Given that Board President Davila has provided demonstrably false and dubious statements in this investigation, her denial of this accusation lacks credibility.  Even though the HISD administrator is not identified, the presence of evidence corroborating this allegation, and the evidence that Board President Davila has failed to cooperate with this investigation requires the Agency to sustain this allegation.

---

[111] See Preliminary Report Allegation Two, Finding of Fact 8.
[112] See Appendix 1, Exhibit 7.

### 3. HISD Response to Finding of Fact 3

HISD claims that no HISD Board Member has knowledge of a meeting that occurred between Ricardo Aguirre and Jose Perez. HISD claims that even if such meeting occurred, it would be the actions of two private citizens and not an HISD Trustee's violation of Tex. Educ. Code §44.031 (a) (1). HISD provided a declaration from Ricardo Aguirre stating that Trustee Davila and her husband Abel Davila, never contacted him regarding MetroClean. In fact, in Mr. Aguirre's declaration, he claims that the last time he saw and spoke to Trustee Davila and her husband was in 2014.

Trustee Davila claims that she has no knowledge of a proposed contract between ABM Inc and MetroClean. [113]

#### Analysis of HISD Response:

TEA has statements from Jose Perez detailing the conversation as well as a statement from Ricardo Aguirre denying the allegation. Both statements cannot be true. However, the statement from Jose Perez is corroborated by the statements from an HISD administrator that then-Trustee Davila and her husband pressured him to select Ricardo Aguirre's company for the contract, when the award of that contract must go through the district's competitive bidding process.

Further, the statements from Jose Perez and the documentary evidence establish that Mr. Aguirre did in fact ask Jose Perez to sign a consulting agreement. No explanation was provided by either HISD, Trustee Davila or Mr. Aguirre that would establish a reason for this agreement.

Taken together, the facts and circumstances established in this report corroborate the allegations made.

### 4. Houston ISD's Response to Finding of Fact 4-11

HISD argues that TEA's conclusions regarding these findings are incorrect because they are based on HISD's own internal audit report, which the district now argues is flawed and based on an incorrect analysis of applicable state law. HISD provides an opinion from the firm Olson & Olson LLP that criticizes the internal audit report for misstating the applicability of TEC §44.032 to job order contracts and for failing to articulate a guideline for determining whether one or more jobs, tasks or purchase orders are properly bundled. [114]

HISD indicates that issues with the Job Order Contracts did not reflect the current governance, administration, operation or purchasing processes in the district because they occurred during 2013 and 2014. Trustee Davila was elected to the board in 2003 and went on to serve on the board until 2010 when she prematurely resigned as trustee before her term was over. Additionally, Trustee Skillern-Jones and Trustee Adams were elected on the board in 2011 and 2013. The most tenured and influential Trustees are still on the board and were around when activities such as the Job Contract Order issue occurred.

---

[113] See Appendix 1, pp. 58-59.
[114] The report also criticizes conclusions regarding the Minor Construction Limitation. See Appendix 1, Exhibit 13, pp. 8-9.

**Analysis of HISD Response**:

The internal audit report concludes that numerous Job Order Contracts were split into smaller contracts in order to avoid the necessity of board approval. Board approval is required for Job Order Contracts that exceed $500,000. The report from Olsen and Olsen does not directly dispute the internal auditor's finding that the job order contracts were split, but rather criticizes the report for failing "to articulate a guideline" for when it is appropriate to bundle tasks. It contends the internal auditor's "objectivity in determining a rational basis for bundling tasks appear tainted by its conclusion that such bundling constitutes 'component, sequential or separate purchases' prohibited by Chapter 44 of the Education Code."[115]

Chapter 44 of the Education Code contains statutory language that prohibits the use of component purchases to avoid the bidding requirements for contracts over $50,000. Tex. Educ. Code §44.032 contains specific prohibitions against evading this contracting threshold by splitting the contract into smaller component purchases. While the Agency agrees that this provision does not apply to Job Order Contracts, it does not follow that the $500,000 threshold for seeking board approval may be evaded by splitting the contract into smaller component purchases. As the Olsen and Olsen opinion acknowledges, "… a court would review the award of a contract under Chapter 2269 under a rational basis test, i.e., did the District have a reasonable articulable basis to bundle or unbundle various job(s), tasks(s) or purchase order(s) and, as properly bundled, did the board approve the bundles over $500,000?"[116] This is just a restatement of the test in Tex. Educ. Code §44.032, which prohibits splitting contracts that "in normal purchasing practices would be purchased in one purchase."[117]

The Olsen and Olsen opinion even acknowledges that the internal audit report did consider some of the factors that might relate to proper bundling of jobs or tasks, citing the internal auditors analysis of Fonwood ES, where the internal auditor noted that a "[c]ase can be made to justify them (chalkboard replacement, door replacement, and restroom renovation) as separate orders."[118] This demonstrates that the internal auditor did not automatically determine that all contracts issued to the same contractor were improperly split, but rather that the internal auditor conducted further analysis regarding whether there was a business reason for splitting the purchase. The Olsen and Olsen opinion bases its conclusions on the contention that the internal auditor did not articulate a "guideline" for making this determination and that the objectivity of the internal auditor was tainted by the internal auditors mistaken conclusion that such bundling inherently constitutes a component, sequential or separate purchase.

While the internal audit report may not have articulated a standard for determining when a job order would normally be split and when a job order was split just to avoid the application of the $500,000 board approval threshold, there is no requirement that the internal auditor design such a test. As the Olsen and Olsen opinion acknowledges, this was a new statutory scheme and the design of a test that would address all circumstances under which the statute might be violated may have exceeded the scope of the report. Instead, the internal auditor appears to have examined the business reason for splitting the contract. Where no business reason justified splitting the contract, the internal auditor found that the contract had been

---

[115] See Appendix 1, Exhibit 13, p. 11.
[116] See Appendix 1, Exhibit 13, p. 11.
[117] See Tex. Educ. Code §44.032(a)(1-3). The test appears in all three sections defining "component purchases," "separate purchases," and "sequential purchases."
[118] See Appendix 1, Exhibit 13, p. 11.

inappropriately split to avoid the application of the $500,000 threshold for board approval. The internal auditor considered factors such as whether the contract was given to the same contractor, whether the contract was awarded on the same day, whether the work was at the same facility, whether the work was related, and whether the work was provided simultaneously.

Given that internal auditor made determinations that the Job Order Contracts that were split should have been procured as a single contract and because the inappropriate splitting of the contracts resulted in an evasion of the $500,000 threshold for board approval, the Agency will not change this finding.  While the Agency acknowledges that the findings in this report do not relate to any specific current trustee, the findings document the type of systemic failings that have plagued HISD in recent times.

### 5.   Houston ISD's Response to Finding of Fact 12

HISD disputes Finding of Fact 12, arguing that its internal audit report was flawed.  HISD provided a legal opinion from the law firm of Rogers, Morris and Grover, LLP.  This opinion criticizes the report.

#### Analysis of HISD Response:

The finding is based on HISD's own internal audit report.  The finding is included for background purposes to show the continuing nature of HISD's contracting problems.  The fact that it relates back to reports from 2011 and 2012 is not disputed.

#### Other Issues Raised by HISD

### 1.   HISD makes several arguments claiming  that TEA's processes and procedures are in error.

HISD claims that there is no evidence that the SAI against HISD was authorized by the Commissioner. HISD acknowledges that the initial SAI notice, the amended SAI notice, and the Preliminary Report indicated that the HISD SAI investigation was authorized by the Commissioner, however TEA provided no evidence that it did.[119]

#### Analysis of HISD Response:

TEA is not obligated to present *how* the Commissioner authorizes Special Accreditation Investigations. Tex. Educ. Code §39.057(a) states " the commissioner may authorize special accreditation investigations to be conducted…"  The statute is clear that on the instances in which the Commissioner may authorize special accreditation investigations and it is silent as to how the Commissioner may grant his authority. Therefore, TEA has no obligation to present evidence on how the Commissioner delegated his authority.

### 2.   HISD claims that TEA withheld evidence that should have been attached to the report.

HISD argues that TEA's procedures require it to attach all documentary evidence substantiating the violations found be attached to the preliminary report.[120]

---

[119] See Appendix 1, pp. 62-64.
[120] See Appendix 1, pp. 2-3, and 64.

<u>**Analysis of HISD Response:**</u>

TEA has provided sufficient documentation to support its findings during its investigation and to allow HISD and individual administrators an opportunity to respond to the allegations. TEA procedures do not require the Agency attach all the documentary evidence, but rather that TEA gather and report evidence. The evidence substantiating the violations found in the preliminary report is also reported in the preliminary report.

3. **HISD requests an informal review at a hearing conducted by the Commissioner or a hearing examiner pursuant to Chapter 39.** [121]

<u>**Analysis of HISD Response**</u>:

Pursuant to its rules, the informal review is conducted by the person designated in notice.[122] The Commissioner has the authority to delegate his executive and ministerial duties and has done so here by rule.[123] This rule allows the examination of the issues raised in the informal review by the most appropriate Agency subject matter expert. Subsequent to the issuance of this letter, the Commissioner specifically delegated the responsibility to conduct the informal review to Deputy Commissioner, Dr. Jeff Cottrill.

<u>**Summary**</u>

The HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by setting up a secret and unposted meeting of a quorum of the board of trustees to conduct important district business in secret. The findings establish a systemic breakdown of the HISD Board of Trustees' ability to govern and oversee the management of HISD. This behavior is demonstrated by taking actions outside the scope of their authority, in directing district employees to perform tasks that exhibit overreach, intimidating and questioning employees about their responsibilities, and directing hiring decisions. Further, the HISD Board of Trustees interfered with contract procurement laws by contacting vendors during the RFP process and allowing Job Order Contracts to be awarded with lowered amounts to circumvent the threshold as required by law.

The findings establish that there is a failure of the HISD Board of Trustees to collaborate with the district superintendent within the limits of the board's statutorily specified duties. Also, there is a demonstrated inability to provide leadership for the district. The dissention between board members, the superintendent, and other district leadership is detrimental to the students of Houston Independent School District, thus affecting student outcomes.

---

[121] See Appendix 1, pp. 2 and 64.
[122] See 19 Tex. Admin. Code §157.1123(b) (" A written request for informal review must be addressed to the designated Texas Education Agency (TEA) representative. The written request must be received by the TEA representative on or before the deadline identified in the notice issued under §157.1122 of this title (relating to Notice).") See also 19 Tex. Admin. Code §157.1123(f)(" Following the informal review by the TEA representative, a final report, assignment, determination, or decision will be issued.").
[123] Tex. Educ. Code §7.055(b)(5)(" The commissioner may delegate ministerial and executive functions to agency staff ...").

### **Recommendation for Sanctions**

Based on the findings, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing board of trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the scope of their authority, circumventing the authority of the superintendent, and inability to ensure adherence to contract procurement policies and laws are followed.

The above recommendations will enable HISD to function in the best interest of students, while policies and procedures can be implemented to address the issues raised in this investigation. TEA reserves the right to implement all available interventions and sanctions under Tex. Educ. Code, Chapter 39, and 19 Tex. Admin Code Chapter 97, to address the current, or any future deficiencies identified for HISD.

- T E X A S   E D U C A T I O N   A G E N C Y -

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



APPENDIX 1

1 7 0 1   N O R T H   C O N G R E S S   A V E
A U S T I N ,   T X   7 8 7 0 1

# O'HANLON, DEMERATH & CASTILLO
## ATTORNEYS & COUNSELORS AT LAW
808 WEST AVE
AUSTIN, TEXAS 78701

TELEPHONE: (512) 494-9949
FACSIMILE: (512) 494-9919

August 26, 2019

Jason Hewitt, Director
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment
&Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

---

### HOUSTON ISD's RESPONSE TO TEA's PRELIMINARY REPORT
### AND REQUEST FOR INFORMAL REVIEW

---

Dear Director Hewitt, Deputy Cottrill, and Texas Education Agency Legal Staff:

This letter is submitted in response to the Preliminary Special Accreditation Investigation Report (hereinafter "Preliminary SAI Report" or "Report") issued by the Texas Education Agency's Division of Governance on August 5, 2019 against the Houston Independent School District ("Houston ISD" or "District").[1]

Although the investigation culminating in TEA's Report lasted more than 6 months, the Report initially required a response from the District by August 15, 2019, a mere 10 days after TEA issued the Report. Attempting to review and respond to the multifarious allegations, findings, and analysis in the Report (along with the voluminous exhibits attached to the Report) would have

---

[1]   The Preliminary SAI Report is attached as **Exhibit 1**.

been completely unrealistic on that timeframe.  Since TEA spent more than six months assembling the Preliminary SAI Report, Houston ISD requested a reasonable 30-day extension.  TEA agreed to extend the deadline by 11 days.

In order to meet this deadline, the undersigned has collaborated with additional counsel who have prepared supplemental reports in response to TEA's Report along with this response to TEA's Preliminary SAI Report ("Response").[2]

### *Hearing Demand*

Houston ISD respectfully requests that TEA provide an informal review at a hearing conducted by the Commissioner or a hearing examiner in compliance with Chapter 39's statutory requirements.  TEX. EDUC. CODE § 39.058(b) ("Before issuing a report with its final findings, the agency must provide a person or entity the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.").  Houston ISD submits this Response along with the attached exhibits and supplemental responses to be reviewed and considered by the Commissioner or hearing examiner at the informal review hearing.

### *Objections to the Evidence Missing from TEA's Report*

TEA's own investigation procedures require that any evidence substantiating TEA's allegations be gathered and reported in the preliminary report.  TEA's own investigation procedures require that any evidence that confirms allegations of wrongdoing be included as a part of the preliminary report.[3]  However, much of the evidence that should be attached to the Preliminary SAI Report is inexplicably absent.

---

[2]   These supplemental responses were prepared by Thompson & Horton LLP and Feldman & Feldman PC and are referred to as "**TH Supplemental Response**" and "**FF Supplemental Response**".  These supplemental responses are being submitted to TEA along with this Response.  Both the supplemental responses and evidence attached to these responses are incorporated by reference into this Response.

[3]   Specifically, TEA's Special Investigations Unit Investigation Procedures state the following:

> Evidence substantiating allegations of non-compliance or a violation of state or federal law, rule, or regulation will be gathered and reported in the preliminary investigative report.  If the evidence confirms an allegation of wrongdoing, the evidence will be included as a part of the preliminary and final report submitted to the Commissioner of Education and may be referred to external entities.

The Report contains numerous "statements" that unnamed administrators allegedly provided to TEA's investigators in support of TEA's allegations.  Where is the evidence that these statements actually occurred?  TEA's investigators have included a couple of these statements.[4] Where then is the evidence of the various other statements described by TEA's investigators? TEA's investigators have not identified many of the unnamed individuals who allegedly provided these statements or attached any recordings from interviews, declarations or affidavits, signed written statements, or interview notes regarding these alleged statements.  And TEA has not identified the majority of these unnamed administrators so that Houston ISD can evaluate whether they are credible witnesses.  If the statements referred to in TEA's Report truly confirm TEA's allegations, TEA's own rules require that they be attached.  Moreover, basic due process requires that the unnamed accusers must be identified so that Houston ISD can adequately respond to their accusations.

Houston ISD objects to the attempt by TEA's investigators to withhold material evidence regarding the allegations they have leveled against Houston ISD.  Houston ISD hereby requests that the Commissioner or hearing examiner order TEA's investigators to supplement their preliminary report with all evidence (whether written, electronic, or in audio format) regarding these "statements" from unnamed administrators.

Houston ISD is committed to transparency.   If TEA shares this commitment, its investigators should not be withholding material evidence regarding their investigation.

---

[4]    *See, e.g.*, **Exhibit 1**, Preliminary SAI Report, Exh. B (written statement regarding the Trustee Allocation Fund). The exhibits attached to TEA's Preliminary SAI Report are voluminous and are obviously already in TEA's possession.  Accordingly, instead of attaching those exhibits to Exhibit 1, Houston ISD incorporates by reference all exhibits attached to TEA's Preliminary SAI Report.

## Table of Contents

**Table of Contents** ...................................................................................................4

**Executive Summary** ...............................................................................................7

**Introduction** .........................................................................................................12

**Background Information** .....................................................................................13

   A.  Current conditions within Houston ISD ..................................................... 13

      (1)  Curriculum and Instruction ................................................................. 13

      (2)  Finance ................................................................................................ 17

      (3)  Governance/Training ........................................................................... 18

   B.  TEA's "Background Information" demonstrates apparent animus toward board members' constitutional rights ........................................................ 23

**Houston ISD's Response to Allegation One** ......................................................28

   A.  TEA's conclusion that Houston ISD's board members violated TOMA based on informal meetings in less than quorum is wrong as a matter of law. ......................................... 28

   B.  TEA's own fact findings demonstrate that there was no violation of the Texas Open Meetings Act. ............................................................................. 30

      (1)  TEA's Report falsely claims that the motion to hire a new superintendent was made with no prior notice and no public deliberation. ....................................................... 33

      (2)  TEA's Report misquotes the definition of a walking quorum from the Texas Open Meetings 2018 Handbook ............................................. 34

      (3)  TEA falsely contends that board members violated TOMA by meeting in groups of less than a quorum. ........................................................ 34

      (4)  TEA willfully misconstrues a statement by Trustee Santos. ................ 35

      (5)  TEA unfairly criticizes board members for not having detailed memories of a meeting that had occurred months before they were interviewed. ......................................... 35

**Houston ISD's Response to Allegation Two** .....................................................38

   A.  Individual board members have the inherent right to access information, documents, and records maintained by the District. ....................................... 38

B.   TEA's investigators have made numerous findings which, even if they were true, amount to nothing more than requests for information or communications of information..........................................................................................................40

(1)   Findings 1–4 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion....................................40

(2)   Finding 5 in TEA's Report regarding Allegation Two is factually inaccurate and amounts to nothing more to an appropriate request to reschedule an agenda item by a mere two months. ..........................................................................................42

(3)   Finding 6 in TEA's Report regarding Allegation Two is factually inaccurate and describes no exercise of board authority by an individual board member. ...........44

(4)   Finding 7 in TEA's Report regarding Allegation Two is factually inaccurate and does not describe any exercise of board authority by an individual board member..............45

(5)   Finding 8 in TEA's Report regarding Allegation Two amounts to nothing more than a board member's expression of opinion..................................................46

(6)   Findings 9–12 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion................................46

   a.   Electronic Communications from 2016 ......................................................47

   b.   Electronic Communications from 2017 ......................................................51

   c.   Electronic Communications from 2018 ......................................................55

   d.   Electronic Communications from 2019 ......................................................55

Houston ISD's Response to Allegation Three...............................................................56

A.   Findings 2 and 3 in TEA's Report under Allegation 3 are pure fiction and fail to describe any unlawful act by a board member . ..................................................57

(1)   The meeting described in Finding 2 in TEA's Report Regarding TEA Allegation Three did not happen. ..........................................................................................57

(2)   No Houston ISD board member has knowledge of the incident between two private individuals described in Finding 3 of TEA's Report Regarding TEA Allegation Three..........................................................................................................58

B.   TEA's Conclusions regarding "so-called" Findings 4–12 in TEA's Report Regarding Allegation Three are based on an incorrect analysis of applicable state law. ............................60

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

**Legal Analysis of the Fundamental Flaws in the Processes and Procedures Utilized by TEA in this Investigation**................................................................................................62

   A.   There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.........................................................................62

   B.   There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.........................................................................64

   C.   Houston ISD demands that TEA comply with the Texas Education Codes and submit this response to the Commissioner or a designated hearing examiner for an informal review of this investigation. ..................................................................................64

**Conclusion** ................................................................................................................65

## Executive Summary

The findings presented in TEA's Report are fundamentally flawed because they resulted from an investigation that began with a predetermined result.  This meant that instead of conducting a fair and unbiased investigation, TEA's investigators searched for a problem to use as a pretext for replacing Houston ISD's elected Board of Trustees with an unelected board of managers.  Like many school boards in Texas, Houston ISD's Board of Trustees faces many challenging issues, and its board members often disagree about how the District should move forward.  But TEA should not have engaged in this pretextual investigation to punish Houston ISD's board members for their public disagreements and political debate.  Disagreement is not dysfunction — it is democracy.  Despite disagreements, Houston ISD's Board of Trustees has been diligently working to improve the school district and has seen excellent results in recent years.[5]  However, this effort has been hampered by an investigation by TEA that appears to be more interested in finding flaws than in finding the truth.

According to the Preliminary SAI Report, TEA initiated this investigation because of a motion made by Trustee Davila at an October 11, 2018 meeting to consider employment of Dr. Abelardo Saavedra as interim superintendent.[6]  The Report states this motion was made "without any prior notice or public deliberation".[7]  This statement is demonstrably false on both accounts:

- There was prior notice.  Pursuant to Texas law, the Board's agenda was posted more than 72 hours before the meeting and stated that the Board would "[c]onsider employment of interim superintendent and employment contract through September 30, 2019."[8]

- There was public deliberation.  Houston ISD's board members publicly deliberated on the motion in open session.

The fact that this motion — made *with* proper notice and *with* public deliberation — purportedly prompted TEA's investigation is extremely troubling and indicates that TEA's investigations are

---

[5]   *See infra*, Background Information, Section A, pp. 12–21.

[6]   **Exhibit 1**, Preliminary SAI Report, pp. 1–2.

[7]   **Exhibit 1**, Preliminary SAI Report, p. 2.

[8]   **Exhibit 2**, Board Agenda for the October 11, 2018 Meeting (publicly posted more than 72 hours before the meeting at which the motion was made).

being used to assault basic democratic principles and undermine board members' constitutional rights.[9]

**Allegation One.**  The Report asserts TEA received complaints about an alleged violation of the Texas Open Meetings Act without disclosing who made these complaints.  TEA has produced no evidence of these complaints, so it is unclear whether any complaints were actually made and, if so, by whom.  Nevertheless, to their credit, TEA's investigators did not simply accept these alleged complaints as true and instead interviewed Houston ISD's board members to get a full picture of what happened.  (Unfortunately, the same cannot be said about how TEA's investigators treated other purported complaints from unnamed sources.)  These interviews of board members and of Dr. Saavedra demonstrated that there was no "secret" meeting that occurred with a quorum of board members.[10]  And although the Report repeatedly *asserts* that the board members who met with Dr. Saavedra "acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees,"[11] the Report *fails to identify* a single action that was actually taken outside of a publicly-called meeting.[12]

Simply put, the facts described in the Report establish that Houston ISD's board members did not violate the Texas Open Meetings Act by informally meeting with Dr. Saavedra in groups of less than a quorum.  As one federal court has explained, the Texas Open Meetings Act does not prevent school board members from discussing district issues outside of formal meetings so long as a quorum is not present for such discussions.[13]  Indeed, the federal court noted that limiting informal discussions outside of formal meetings "would seriously impede the board's ability to

---

[9]    *See infra*, Background Information, Section B, pp. 22–25.

[10]   The Report repeated refers to an October 8, 2019 meeting at a public restaurant at which various board members met with Dr. Saavedra, an experienced and well-respected prior superintendent of Houston ISD, as a "secret" meeting.  But this mischaracterization of this meeting is completely unsupported by any evidence.  There was nothing "secret" about this meeting at a public restaurant.  And contrary to the assertions in the Report, the evidence clearly establishes that no District business was conducted at this meeting.  The Report's findings indicate that the board members who met with Dr. Saavedra discussed various issues they were experiencing, but they conducted no District business.  *See* **Exhibit 1**, Preliminary SAI Report, pp. 9–11.

[11]   **Exhibit 1**, Preliminary SAI Report, pp. 2, 12, 14.

[12]   *See* **Exhibit 1**, Preliminary SAI Report, pp. 8–14.

[13]   *Hispanic Education Committee v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227 ("Assuming that trustees met privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action, these conferences are not meetings of the board.").

function."[14]   In the words of that federal judge: "It is for exactly this reason that notice requirements apply only to meetings involving at least a quorum of members."[15]

**Allegation Two.**[16]   TEA's Report also asserts that Houston ISD board members acted individually on behalf of the board "numerous other times, exceeding the scope of their authority in violation of Texas Education Code § 11.051."  But many of the alleged facts in the Report are either unequivocally false or they significantly mischaracterize actual events.  These errors can be readily explained by the lack of a rigorous investigation by TEA's investigators.   TEA's investigators appear to have simply accepted statements by unnamed administrators as true, who are either mistaken about the events they related or intentionally misled investigators.  TEA's investigators failed to give Houston ISD's board members an opportunity to respond to the allegations made by TEA's unnamed sources. TEA's investigators also failed to corroborate these allegations with other witnesses who could have told TEA's investigators that their unnamed sources are unreliable.[17]

TEA's findings regarding its second allegation are plagued by inaccurate and/or fabricated accounts of events.  But the conclusions TEA reaches based on these findings are also infected with a foundational misunderstanding of the law.  A board member cannot exceed his or her authority under Section 11.051 by merely communicating information, expressing opinions, or requesting information.  In this case, all of the emails or accounts of situations presented by TEA as a board "overreach" were merely board members expressing an opinion, communicating information, or requesting information. No board members exceeded their authority by simply communicating information, expressing opinions, and requesting information.

---

[14]   *Id.*

[15]   *Id.*

[16]   This Response generally responds to TEA's contentions regarding Allegation Two and contains specific responses to the factual misstatements and legal misstatements regarding several specific findings in TEA's Report.  The **TH Supplemental Response** contains specific responses to the remainder of these factual misstatements and legal missteps for the appropriate board member or board members..

[17]   For example, TEA's Report recounts a meeting involving an unnamed administrator and four individuals.  This meeting is pure fiction.  TEA's investigators could have easily discovered that this unnamed administrator was providing false information if they had contacted any of these four individuals.  However, TEA's investigators failed to speak with any of these individuals to corroborate the story told by the unnamed administrator.  If they had, they could have easily discovered that this meeting never occurred.  **Exhibit 3**, Davila Declaration, ¶¶ 28–29.

**Allegation Three.**[18]  Lastly, TEA's investigators allege that Houston ISD has violated contract procurement rules while selecting vendors and contractors by adopting the conclusions reached in an "Internal Audit."  It is unclear from TEA asked any licensed attorney to review the Internal Audit.  However, the District asked for two separate and independent legal opinions regarding the Internal Audit — one in May 2015 and the other in June 2016.[19]  Both legal opinions independently concluded that the Internal Audit misinterpreted state law.[20]

None of the findings under Allegation Three demonstrate any violation of state procurement law.  Moreover, many of the factual allegations are simply untrue — likely because TEA's investigators failed to corroborate the one-sided account of events they received.

Based on TEA's factual findings and legal analysis, TEA's investigators arbitrarily and capriciously recommend that the Commissioner of Education lower the District's accreditation status, appoint a conservator, and replace the elected Board of Trustees with an unelected board of managers pursuant to Section 39.057(d) of the Texas Education Code.  Although the first two of these actions would be completely unwarranted based on *this* investigation, the Commissioner has the legal authority to lower the District's accreditation status or appoint a conservator based on a special accreditation investigation if such action is warranted by a proper special accreditation investigation.  However, the Commissioner has no legal authority to replace the Board of Trustees in this case.  The Report's recommendation that the Commissioner appoint a board of managers invites the Commissioner to commit an unlawful act in violation of Section 39A.004 of the Texas Education Code.[21]  The Commissioner has no legal authority to appoint a board of managers in Houston ISD.

The Texas Legislature has recognized that preliminary findings from special accreditation investigations are just that — preliminary.  Accordingly, the Legislature has provided that a school

---

[18]   This Response generally responds to TEA's contentions regarding Allegation Three and contains specific responses to two of the findings under Allegation Three.  The remainder of the factual misstatements and legal errors under Allegation Three are discussed in the TH Supplemental Response.

[19]   These legal opinions are attached as **Exhibit 11** and **Exhibit 12**.

[20]   *See* **Exhibit 11**, **Exhibit 12**.

[21]   Section 39A.004 prohibits the Commissioner from appointing a board of managers unless one of the following is true: (1) the District has a current accreditation status of accredited-warned or accredited-probation (2) the District fails to satisfy any standard under section 39.054(e); or (3) the District fails to satisfy financial accountability standards.  TEX. EDUC. CODE § 39A.004.  None of these is true of Houston ISD.  Houston ISD's current accreditation status is "accredited."  Houston ISD has not failed to satisfy any standard under section 39.054(e).  And Houston ISD has not failed to satisfy any financial accountability standards.

district has the right to have preliminary findings reviewed in good faith by the Commissioner or a designated hearing examiner.[22]

Houston ISD objects to the Report's findings, legal analysis, discussion, conclusions, and proposed corrective measures and sanctions.  Houston ISD expressly requests the appointment of an unbiased hearing examiner to (1) review the Report's findings, legal conclusions, and proposed corrective measures and sanctions and (2) compel TEA's investigators to comply with TEA's investigation procedures by disclosing all of the evidence that allegedly supports their allegations.

In order to address the legal errors and factual misstatements undergirding the faulty findings, analysis, and recommendations in the Report, Houston ISD submits this Response with the attached exhibits in the sincere hope that consistent with the Commissioner's statutory obligation, either the Commissioner or a designated hearing examiner will conduct a good faith review of this investigation to ensure that TEA's investigations are conducted in good faith with transparency.

---

[22]    TEX. EDUC. CODE § 39.058(b).

## <u>Introduction</u>

TEA has asserted three allegations against Houston ISD after allegedly receiving an unidentified number of complaints from individuals hiding behind the cloak of anonymity.  But TEA's investigation into these allegations was skewed by fundamental misunderstandings of Texas law and by a failure to fairly investigate by engaging in a balanced investigation.

TEA's first allegation relates to the Texas Open Meetings Act (or "TOMA").  TEA's investigators interviewed board members and requested documents regarding this allegation.  But the evidence from these interviews revealed that a quorum did not meet or attempt to take action outside of a formally called meeting.  Thus, as a matter of law, there is no TOMA violation because it is not a violation of TOMA for board members to engage in multiple, successive meetings.[23] Despite this, the investigators refused to acknowledge that this first allegation lacks merit and instead attempted to pad the investigation with new allegations.

TEA's investigators added two new allegations that involved criticisms of board members and conducted a one-sided investigation of these allegations.  Notably, the investigators did not interview board members or provide the District with notice of a document request.  If TEA's investigators were interested in finding the truth, why didn't they corroborate the statements they claim to have received from unnamed witnesses?  Why didn't they give Houston ISD time to provide them with the context necessary to place the documents fed to investigators?  By failing to get both sides of the story, TEA's investigators ended up recommending findings that either mischaracterize the truth or, in some cases, are pure fiction. Compounding this error, TEA's investigators reach conclusions that are legally wrong, finding violations of law where none exist.

---

[23]   *Hispanic Education Committee*, 886 F. Supp. at 610 ("Assuming that trustees met privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action, these conferences are not meetings of the board.").

## **Background Information**

### A.  Current Conditions Within Houston ISD

TEA's investigators spent a significant amount of time and space including criticisms of former trustees and of conduct that has nothing to do with the current Houston ISD Board of Trustees.   Instead of spending so much time focused on the distant past, TEA's investigators should have spent more time focused on the District's current condition, which shows that Houston ISD is an academically and financially healthy school district with an upward trajectory.

The Commissioner should take the District's current condition into consideration because although the Commissioner could adjust the District's accreditation status "if the commissioner determines that the action is necessary to improve any areas of the district's performance. . . including the district's financial accounting practices."[24]  The Commissioner should not adjust Houston ISD's accreditation status because there are great things happening in the Houston Independent School District.  The following provides a brief list of some of Houston ISD's major recent achievements.

### *(1) Curriculum and Instruction*

Houston ISD is currently an academically healthy school district that has seen excellent improvement in campus performance and student outcomes. The Board of Education's mission is to equitably educate the whole child so that every student graduate with the tools to reach their full potential. Houston ISD's vision is that every child shall have equitable opportunities and equal access to an effective and personalized education in a nurturing and safe environment. Houston ISD is a global district in a global city. The District places an emphasis on ensuring its students graduate ready for the world — possessing the characteristics they need to be successful in college and to compete in today's global workforce.

With an enrollment of over 214,000 students, Houston ISD is the seventh-largest public-school system in the nation and the largest in Texas. The District encompasses 332 square miles within Harris County, Texas including 51% of the current geographic area of the City of Houston and all or part of four other cities and villages. Houston ISD is one of the most ethnically diverse school districts in Texas: 61.2 percent of students are Hispanic, 24 percent are African American,

---

[24]   TEX. EDUC. CODE § 39.057(e).

8.7 percent are White, 4.1 percent are Asian, and 2 percent are of other ethnicities. About 100 different languages are spoken by students throughout the District.

Houston ISD provides services through 280 schools, of which 8 are early childhood centers (pre-kindergarten for four-year-old students), 160 elementary schools (grades K–5), 38 middle schools (grades 6–8), 37 high schools (grades 9–12) and 37 combination/alternative sites. The average age of the District's school buildings is 46 years. The District offers many education programs in addition to general education including special education services, gifted and talented programs, career and technical education, dual language programs, and various magnet programs.

Houston ISD has continued to have academic growth across all content areas as measured by the State's academic accountability system.  This past year academic gains were made at the elementary level improving from 61% to 67% at the "approaches" standard; from 29% to 34% at the "meets" standard; from 12% to 13% at the "masters" standard.  At the middle school level there was consistency with a 64% rating at the "approaches" standard; an increase from 30% to 33% at the "meets" standard; and an increase from 35% to 37% at the "masters standard.  High school students achieved an increase from 69% to 72% at the "approaches" standard; from 41% to 46% at the "meets" standard; and from 9% to 13% at the "masters" standard.  In comparison to the six neighboring school districts which surround Houston ISD's boundaries and have similar demographics, Houston ISD outscores them in overall district index score, in student achievement, and in school progress.

Houston ISD's graduation rates have progressively increased over the last 3 years.  Rates for the relevant years are as follows: Class of 2015 at 89.1%, Class of 2016 at 92.3% and Class of 2017 at 94.3%.[25]

In 2018, 92% of HISD's campuses — 252 out of 275 rated campuses — were rated "Met Standard."

The District showed more growth than the state average in grades 3 through 8 in both reading and math.  The District also illustrated more growth than the state average in Algebra and English I.

For grade levels 3 through 8, Houston ISD showed increases in the percentage of students at or above the "Approaches Grade Level Standard" in reading, math, science, and social students

---

[25] Preliminary data reported by Houston ISD on TEASE system.

(in English and Spanish combined), with the District's reading and math increases exceeding those of the state.

For grade levels 3 through 8, the 2018 District STAAR first administration reading results increased by three percentage points compared to 2017. Changes ranged from no change in seventh grade to a six percentage-point increase in fifth grade. The 2018 district STAAR first administration mathematics results increased by three percentage points compared to 2017. Changes ranged from no change in grade seven to a five percentage-point increase in grades four and eight.

For grade levels 3 through 8 performance at the Meets and Masters Grade Level standards remained the same or increased for all content areas.

The 2018 STAAR End of Course ("EOC") Exam results for all students tested showed improvement in Algebra I, English I, English II, and U.S. History when compared to the Spring 2017 results at the Approaches Grade Level standard. The District's increases in Algebra I and English I exceeded those of the state.

Between 2015 and 2018, the proportion of all students tested performing at or above the Meets Grade Level standard increased for every racial/ethnic group in every subject. These increases included 13 percentage points for African American students on Algebra I EOC exams and 14 percentage points for Hispanic students on U.S. History EOC exams.

Gains made by the "Superintendent's Schools" and "Achieve 180" schools from 2017 to 2018 on the STAAR EOC exams exceeded District and state increases for Algebra I (ranging from six to 14 percentage points) and English II (ranging from six to seven percentage points).

In 2018, although the District did not officially receive an accountability rating as result of Hurricane Harvey, if it had received an accountability rating, the District would have received a "B" rating with 84 out of 100 possible points.

For 2019, the District's overall academic rating increased by 4 points from an 84 to an 88, continuing to excel by maintaining its "B" rating.

A majority of Houston ISD's campuses — 142 campuses overall — received at least one distinction designation from TEA.  And 24 Houston ISD schools earned ALL distinctions.

In 2019, Houston ISD exited nine campuses from the state's "Improvement Required" list.

In 2019, according to the ratings released by TEA, 92 percent of Houston ISD schools (250 out of 271 rated campuses) earned a passing grade. For the first time, all Houston ISD schools received a letter grade under the state's new A–F rating system, which was implemented in 2018. Houston ISD campuses performed extremely well in the state's rating system: 57 Houston ISD campuses earned A's, 78 earned B's, 86 earned C's and 29 earned D's. A minimum grade of "D" is required for a school to receive a passing rating.

Under the A–F system, campuses must receive a grade of "D" or better in order to meet state accountability standards. Based on TEA's accountability system, only 21 HISD schools received an "F" rating for the 2018-2019 school year, including: Ashford, Isaacs, C. Martinez, Northline, Osborne, Robinson, Rucker, Seguin, Smith, Whidby, and Young Elementary Schools; Deady, Edison, E-STEM Central, Fleming, High School Ahead Academy, Key, Sugar Grove, Thomas, and Williams Middle Schools; and Wheatley High School.

If not for the provision introduced into TEA's 2018 Accountability Manual, Houston ISD would have 6 fewer "F" campuses. The provision states that "if a campus receives an 'F' in three of the four domain calculations (Student Achievement, Academic Growth, Relative Performance, Closing the Gaps), the highest scaled score a campus can receive for the overall rating is a 59."

This indicates that the highest score that Osborne and Ashford Elementary Schools; Deady, E-STEM Central, and Edison Middle Schools; and Wheatley High School could earn is a 59, an "F" rating, which puts them in IR status.

Wheatley High School demonstrated tremendous academic progress and earned a passing grade of "D" this year, with a calculated score of 63. But based on the provision, the school could only obtain a maximum score allowed of 59. The district is implementing strategies to ensure Wheatley exits IR in the 2019–2020 school year with a minimum grade of "C".

Additionally, the District has adopted several programs to target high need areas in the District such as ACHIEVE 180. ACHIEVE 180 is a research-based action plan to support, strengthen, and empower underserved and underperforming HISD feeder pattern communities to increase student achievement. These are ten schools that have remained on the state's "Improvement Required" list for five or more years. Thirty school support officers report to the area superintendents. They provide leadership to principals, align resources and support for teachers, and ensure that the district is providing equitable and quality educational opportunities to students. HISD's organization is designed to emphasize teaching and learning, align school goals and programs for sustained improvement, eliminate duplication of services, and maintain compliance with both federal and state requirements.

### *(2) Finance*

Houston ISD is currently a financially healthy school district.  The District believes that there is no responsibility as great as that of educating its youth, and all of its efforts lead back to the classroom. Given that the District's academic advancements are dependent upon its fiscal successes, it is imperative that HISD continue to improve upon its reporting proficiencies. The following text cites awards received by the District for financial reporting excellence and the related acknowledgments.

**GFOA Certificate of Achievement:** The Government Finance Officers Association of the United States and Canada ("GFOA") awarded a Certificate of Achievement for Excellence in Financial Reporting to the District for its Comprehensive Annual Financial Report for the fiscal year ended June 30, 2017. This was the 45th consecutive year that the District has achieved this prestigious award. In order to be awarded a Certificate of Achievement, a District must publish an easily readable and efficiently organized comprehensive annual financial report. This report must satisfy both generally accepted accounting principles and applicable legal requirements.

A Certificate of Achievement is valid for a period of one year only. We believe that our current comprehensive annual financial report continues to meet the Certificate of Achievement Program's requirements and we are submitting it to the GFOA to determine its eligibility for another certificate.

**ASBO Certificate of Excellence:** The District received the Association of School Business Officials' ("ASBO") Certificate of Excellence in Financial Reporting for the fiscal year ended June 30, 2017. The District has received this award for 39 consecutive years. This award certifies that the Comprehensive Annual Financial Report substantially conforms to the principles and standards of financial reporting as recommended and adopted by the ASBO.

The District has been able to maintain a healthy financial system even though in August 2017 a major hurricane swept through the District and caused billions of dollars of damage to the City. Hurricane Harvey caused damage to various facilities of the District, ranging from minor damage to complete destruction of certain buildings. The District spent approximately $76 million from the General Fund on repairs. To date, the District has received approximately $40 million in insurance proceeds and has submitted requests for FEMA reimbursement. Additionally, Harvey related flood damage required the closure of four elementary schools. These four schools are being rebuilt at an estimated cost of $126 million using General Fund reserves and Capital Renovation funds derived from tax increment reinvestment zones.

The District has maintained an "A" rating in the TEA's FIRST rating for the last four years. Before that, the District earned all possible points for the 2014-2015 FIRST Report. Prior to 2014-

2015 report, HISD has earned a rating of "Superior Achievement" all but one time  since the creation of the FIRST rating in 2002.  The School Financial Integrity Rating System of Texas ("FIRST"), ensures that Texas public schools are held accountable for the quality of their financial management practices and that they improve those practices. The system is designed to encourage Texas public schools to better manage their financial resources to provide the maximum allocation possible for direct instructional purposes.

### (3) Governance/Training

Houston ISD's Board of Trustees have adopted procedures and governance models to help them implement strategies to improve governance and focus on student outcomes.

In 2019, the Board of Trustees adopted the Lone Star Governance Framework. The intention of Lone Star Governance is to provide a continuous improvement model for governing teams (board members in collaboration with their Superintendents) that choose to intensively focus on one primary objective: improving student outcomes. Lone Star Governance accomplishes this intense focus through tailored execution of the five points of the Texas Framework for School Board Development: Vision, Accountability, Structure, Unity, and Advocacy.

Additionally, the Houston ISD Board of Trustees has hired a coach to guide them through this framework.  The Board has also adopted policies regarding time limits on discussion and monitors its progress towards achieving the tenets of the Lonestar Governance framework.  As part of this process the Board has committed to allotting a majority of its time in board meetings to focus on student outcomes amongst other things. Below are the mission, vison, beliefs, constraints, and goals adopted by the Board.

**Mission.**  The Board of Education's mission is to equitably educate the whole child so that every student graduate with the tools to reach their full potential.

**Vision.**  Every child shall have equitable opportunities and equal access to an effective and personalized education in a nurturing and safe environment. Our students will graduate as critical thinkers and problem solvers; they will know and understand how to be successful in a global society.

**Beliefs.**  Houston ISD has adopted the following beliefs that reflect its mission and vision:

- We believe that equity is a/the lens through which all policy decisions are made.

- We believe that there should be no achievement gap among socio-economic groups or children of ethnic diversity.

- We believe that the district must meet the needs of the whole child, providing wraparound services and social and emotional supports.

- We believe our classrooms/schools should be safe, vibrant, joyful spaces where students are guaranteed access to a challenging and deep educational experience.

- We believe that instruction should be customized/personalized to meet the learning needs for each individual child, including students with disabilities, gifted and talented students, and English Language Learners, so they have the support and opportunity they need to flourish.

- We believe that recruitment and retention of qualified and effective personnel are the keys to enhancing the quality of education and increasing student achievement.

- We believe that the community has a right to transparent operations across the district in all schools, departments, and divisions.

- We believe that meaningful engagement with the community is important in all major decision-making.

Houston ISD has adopted the following goals that reflect its mission, vision, and beliefs:

**Goal 1.**  The percentage of students reading and writing at or above grade level as measured by the percent of students at the Meets Grade Level standard on STAAR for grade 3 through English II shall increase by three percentage points annually from 37% to 46% between spring 2017 and spring 2020.

- **Goal Progress Measure 1.1:** End of year reading data collected on the District-wide screener shall annually show a three-percentage point improvement in the percentage of students reading on grade level from 38% to 44% between spring 2018 and spring 2020. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 1.2:** Grades 4 and 7 students shall be assessed in writing in the Fall and Spring; percent of students meeting the grade level standard shall increase at least three percentage points annually from 22% in spring 2018 to 28% in spring 2020. Results will be presented to the board after the fall and spring testing windows.

**Goal 2.**  The percentage of graduates meeting the Global Graduate standards as measured by the College, and Career, Readiness component of the Texas accountability system shall increase

three percentage points annually per year from the 2017 graduates baseline of 52 percent up to 67 percent by 2022.

- **Goal Progress Measure 2.1:** The percentage of students completing (earning a 70 or better) a career and technical education (CTE) course shall be reported for each semester and shall show improvement of 2 percentage points annually from 63.0 percent in Spring 2017 to 69.0 percent in Spring 2020.

- **Goal Progress Measure 2.2:** The percentage of students completing (earning a 70 or better) an Advanced Placement (AP) or International Baccalaureate (IB) course shall be reported for each semester and shall show improvement of 1 percentage point annually from 39.1 percent in Spring 2017 to 42.1 percent in Spring 2020.

- **Goal Progress Measure 2.3:** The percentage of students completing (earning a 70 or better) a dual credit or dual enrollment course shall be reported for each semester and shall show improvement of 1 percentage point annually from 10 percent in spring 2017 to 13 percent in spring 2020.

**Goal 3.**  Among students who exhibit below satisfactory performance on state assessments, the percentage who demonstrate at least one year of academic growth, as measured by the STAAR Progress Measure, shall increase three percentage points annually in reading and in math from 57 percent in spring 2017 to 66 percent in spring 2020.

- **Goal Progress Measure 3.1:** The percentage of students identified as needing intervention in reading on the district's screener who demonstrate growth from the beginning to end of year benchmarks shall increase three percentage points annually from 48% in spring 2018 to 57% in spring 2021. Results will be reported after each testing window.

- **Goal Progress Measure 3.2:** The percentage of students identified as needing intervention in math on the district's screener who demonstrate growth from the beginning to end of year benchmarks shall increase three percentage points annually from 58% in spring 2018 to 67% in spring 2021. Results will be reported after each testing window.

**Goal 4.**  The reading and math performance gap between historically underserved and non-historically underserved student groups, as measured by the average of the percentage-point gaps between economically and non-economically disadvantaged student groups at the Meets Grade Level Standard on STAAR between 1) economically and non-economically disadvantaged student groups, 2) African-American and White student groups, 3) Hispanic and White student groups, 4) English Learners (ELs) and non-English Learners (non-Els), and 5) students receiving special education services and students not receiving special education services, shall annually show a

one-percentage point decrease from an average of 30.3 percentage points in spring 2018 to an average of 27.3 percentage points in spring 2021. Monitoring of student performance for all groups listed above along with the specified gaps will be provided to the board. All student groups should make progress; therefore, if this average gap decreases but the percentage of students at the Meets Grade Level Standard on STAAR for any of the student groups listed in this goal declines, then this goal shall be considered not met.

- **Goal Progress Measure 4.1:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between economically and non-economically disadvantaged students performing at or above benchmark (40th percentile) from 24% to 21% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 4.2:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between English Learners (ELs) and Non-English Learners (Non-ELs) performing at or above benchmark (40th percentile) from 11% to 8% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

- **Goal Progress Measure 4.3:** End of year data collected on the District-wide screener shall annually show a one-percentage point decrease in the gap between students receiving special education services and students not receiving special education services performing at or above benchmark (40th percentile) from 37% to 34% between spring 2018 and spring 2021. Results on the District-wide screener will be presented to the board after the beginning of the year, middle of the year, and end of the year testing windows.

Houston ISD has also adopted the following constraints:

**Constraint 1.**  The Superintendent shall not permit the District to operate without a community school and feeder pattern framework, including a definition, processes, and goals.

- **Constraint Progress Measure 1.1:** The District shall launch cohort one of Every Community, Every School with a minimum of 15 schools (5 percent) by the end of the 2017–18 school year and shall increase annually until all schools (100 percent) are served in 2022.

- **Constraint Progress Measure 1.2:** The District shall develop tools for campuses to conduct a needs assessment, to access to a provider database, a data tracker, and

professional development in 2017–18 and shall increase usage annually from 0 percent in Fall 2017 to 100 percent of campuses access the tools and training by 2022.

**Constraint 2.**  The Superintendent shall not require teachers to administer more than two District-created assessments per semester.

- **Constraint Progress Measure 2.1:** The number of District-required, District-created assessments shall not increase from one per semester in fall 2017 to more than two per semester in spring 2020.

**Constraint 3.**  The Superintendent shall not allow struggling schools to operate without highly qualified leaders and teachers in core subjects.[26]

- **Constraint Progress Measure 3.1:** The percentage of campus administrators at struggling schools rated as effective or above shall increase by two percentage points annually from 65 percent in 2017 to 73 percent by 2020.

- **Constraint Progress Measure 3.2:** The percentage of first-year teachers at struggling schools shall decrease by two percentage points annually from 10 percent in 2017 to four percent by 2020.

- **Constraint Progress Measure 3.3:** The percentage of teaching positions at struggling schools held by teachers certified in their assigned subject areas and grade levels shall increase each semester from 99 percent in 2017 until 100 percent is reached and maintained through 2020.

Based on the information presented above, Houston ISD is doing well academically, financially, and the Board of Trustees have been in the process of focusing its attention to student outcomes as can be evidenced by its commitment to the Lone Star Governance Framework and its adoption of goals, goal progress measures, constraints, and constraint progress measures. All of the above information is evidence of a healthy organization that is in no need of state intervention.

---

[26] Struggling schools include Improvement Required (IR) schools, formerly IR schools, and schools receiving an overall accountability scale score of 65 or less. Teacher qualification should consider certification and experience.

### B.  TEA's "Background Information" demonstrates apparent animus toward board members' constitutional rights

The Authors of the Preliminary SAI Report fail to either understand the democratic process or appreciate the parameters of the "Speech and Debate" clauses of both the United States and Texas Constitutions.

In the section of the August 5, 2019 Preliminary SAI Report entitled "Background Information",[27] TEA's staff launches into what can only be described as an *ad hominem* attack upon the decorum with which meetings of Houston ISD Board of Trustees were conducted.  As proof for their allegations, TEA staff use unsubstantiated newspaper comments of outside observers such as a union representative and the Mayor of Houston, Texas relating to the manner in which Houston ISD Board meetings were being conducted.  Additionally, TEA staff cited multiple instances regarding the comments made by board members at public meetings.

In responding to these allegations, Houston ISD will not attempt to deal with each specific allegation set forth in this section of the TEA Report.  No response to the specific allegations is necessary because none of the allegations contained in the "Background Information" portion of the TEA Report appear to be integral to the ultimate conclusions drawn by TEA's,[28] each of which will be discussed below.

At page 7 of the Preliminary SAI Report, TEA Staff complains of the Trustee allocation Fund.  The Report seems to indicate that individual Trustees had full and independent control of equally allocated Bond proceeds in order to address items of need on campuses within their individual Trustee single-member districts.  The TEA finding was that "in August of 2009 the HISD board voted 8-1 to allocate $121.5 million for additional facilities projects in each of the nine trustee's districts. The board members who participated in this vote were former 2009 Board of Trustees, and current Board President Diana Davila. This was called the Trustee Allocation

---

[27]  **Exhibit 1**, Preliminary SAI Report, pp. 4–7

[28]  TEA also includes almost a page in the "Background Information" section regarding information from an unnamed senior administrator regarding the Trustee Allocation Fund.  **Exhibit 1**, Preliminary SAI Report, p. 7. Why TEA's investigators included this is anyone's guess — the creation of the Fund is clearly outside the scope of their investigation and was entirely proper.  The Fund was created more than a decade ago and has been used to pay for various projects throughout the District.  Without citing any legal authority, TEA's investigators claim that by approving of the creation of the Fund over a decade ago exceeded their authority.  They are wrong.  Section 11.051 of the Texas Government Code gives the Board of Trustees authority to govern the District.  TEX. EDUC. CODE § 11.051.  And no matter what language was included in the superintendent's contract regarding management of the District, the Texas Legislature has given the Board of Trustees "the exclusive power and duty to govern and oversee the management of the public schools of the" District.  TEX. EDUC. CODE § 11.151.

Fund (TAF)."    As found by TEA "the TAF was funded with residual bond money from the 2007 bonds. The amount of money in the fund totaling $121.5 million was to be split (nine) ways." "The trustees identified how they wanted the funds spent, and a board item was drafted to allocate the fund request from un-allocated to allocated (sic) per the Board vote and approval."  The TEA findings make it clear that in all instances, there was HISD <u>full Board approval</u> for each item of expenditure from the TAF.  Seen in this light, Trustees made individual recommendations for capital projects.  These recommendations were approved in each case by the Board.  By requiring full Board action prior to the approval of individual expenditures, Houston ISD ensured that Board control of the HISD Budget, adopted under Tex. Educ. Code § 44.04 and/or any adopted budget amendments adopted under Tex. Educ. Code § 44.06 were maintained at all times.

Tex. Educ. Code § 11.151(b) provides: The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district.  All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.

The Houston ISD Board of Trustees has the full authority under the aforesaid provision to make whatever allocation of the distribution it saw fit.  In a district as large as Houston ISD with the many capital requirements which are attendant to that size and scale, some methodology to ensure an equitable distribution of capital resources across the entire district would seem to be appropriate.  There was certainly nothing unlawful about the allocation strategy employed by the Houston ISD Board of Trustees in creating the TAF in full cooperation with the District's administration.  It is telling that the TEA report cites no provision of law which would preclude the Board strategy.  That is because there is no such prohibition.  In such instances Tex. Educ. Code § 11.151(b) requires that "the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.   The Preliminary SAI Report ignores the express statutory limitation upon its prerogative.  Finally, it must be noted that the allegations at issue with respect to the TAF are a decade old.  The fact that TEA staff feels compelled to dredge up such old allegations, in an effort to sanction and remove a Board of Trustees which is now composed almost entirely of different individuals would seem to be an act of desperation to reach a pre-ordained result.  Such actions should not be countenanced.

Nevertheless, the self-appointed role which TEA Staff appear to have created for themselves as the arbiter of proper decorum of a publicly elected governmental body is a troubling overreach of regulatory authority.  TEA investigators have not and cannot cite any legal authority granting the Agency any authority to regulate the nature of local debate on matters which come

before the Houston ISD Board of Trustees for discussion and disposition.  To the contrary, interference with local deliberative processes are prohibited by the Constitutions of the United States and the State of Texas.

The Speech or Debate Clause in the United States Constitution states that members of both Houses of Congress

> . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their Respective Houses, and in going to and from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S Const. art. I, § 6, cl. 1.  The intended purpose of this provision is to prevent the President or other officials of the executive branch from having members arrested on a pretext to prevent them from voting a certain way or otherwise taking actions with which the President might disagree.  *See, e.g.*, *Tenney v. Brandhove*, 341 U.S. 367, 377 (1972).

The United States Supreme Court has explained that the speech or debate clause represents the culmination of a long struggle for parliamentary supremacy:

> Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature.

*United States v. Johnson*, 383 U.S. 169, 178 (1966); *see Powell v. McCormack*, 395 U.S. 486, 502 (1969).  The "immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."  *United States v. Brewster,* 408 U.S. 501, 507 (1972);  *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1881); *see also Coffin v. Coffin*, 4 Mass. 1, 28 (1808).

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

The protection of this clause is not limited to words spoken in debate. "Committee reports, resolutions, and the act of voting are equally covered, as are 'things generally done in a session of the House by one of its members in relation to the business before it.'" *Powell v. McCormack,* 395 U.S. 486, 502 (1969) (quoting *Kilbourn v. Thompson,* 103 U.S. 168, 204 (1881)).  So long as legislators or their local equivalents are "acting in the sphere of legitimate legislative activity," they are "protected not only from the consequence of litigation's results but also from the burden of defending themselves." *Tenney*, 341 U.S. at 376–77; *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967);  *Powell v. McCormack*, 395 U.S. 486, 505 (1969).

Similar clauses in many state constitutions protect members of state legislatures in the United States. *See, e.g.*, TEX. CONST. art. III, § 21.  State courts have routinely extended the rights conferred by the state versions of the speech or debate clause to members of the governing bodies of local governments and political subdivisions of the various states.  *See, e.g.*, *Davenport v. Garcia*, 832 S.W.2d 4, 12–13 n.23 (Tex. 1992) (citing *State v. Beno*, 341 N.W.2d 668 (Wis. 1984)).

In Texas, the equivalent of the Speech and Debate Clause is set forth in the Texas Constitution, which provides:

> WORDS SPOKEN IN DEBATE.  No member shall be questioned in any other place for words spoken in debate in either House.  The standard for application of this and similar provisions in the Constitutions appeared to be whether the comments were within the sphere of legitimate legislative activity." *United States v. Brewster,* 408 U.S. 501 (1972).

TEX. CONST. art. III, § 21.  The Speech and Debate Clause in the Texas Constitution is similar to the clause in the United States Constitution.  *Bowles v. Clipp*, 920 S.W.2d 752, 758 (Tex. App.— Dallas 1996, writ denied) (comparing TEX. CONST. art. III, § 21 with U.S. CONST. art. I, § 6).

It is clear the Trustees have general oversight responsibilities towards the management of the District:

> The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the

agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.

TEX. EDUC. CODE § 11.151(b).

The comments which TEA Staff find to be objectionable were made during the course of public debate concerning legitimate and specific functions of the Houston Independent School District.   The fact that these comments might make members of the public or other Trustees feel uncomfortable does not remove the constitutional protections of these comments.  The remarks made by Houston ISD Trustees were privileged remarks made in the course of the performance of their duties.  At public meetings, Trustees are given a forum to make remarks concerning items on the Agenda.

Any content-based objections to board members' speech, amount to nothing less than blatant censorship of the Trustees' free speech rights protected by the First Amendment of the Unites States Constitution and Article I, § 8 of the Texas Constitution.   TEA's criticisms of Trustees for making these comments, or the Board President for not *sua sponte* silencing the Trustees, is another example of TEA's attempt to censor free speech. Each of the Trustee comments cited in the Report was made in the exercise of the Trustees constitutionally protected rights, TEA's after-the-fact criticism of these comments is problematical at best.

## Houston ISD's Response to Allegation One

At Allegation One of its Preliminary SAI Report[29] TEA Staff poses the investigative question as follows:

> Did the Houston ISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't. Code Chapter 551 Open Meetings?

For both the factual and legal reasons discussed below, the answer to TEA's question is a resounding "no."  TEA's investigators cannot, in good faith, shoehorn the facts of this case into a TOMA violation unless they choose to willfully mischaracterize the evidence, turn a blind eye to their own findings, and ignore the law.

TEA's own findings demonstrate that a quorum of board members did not exercise decision making powers outside of a publicly posted meeting.  TEA's findings show that various board members informally met with a former superintendent of Houston ISD for advice and counsel.  At no time was a quorum present.  No board member exercised decision-making powers.  And no board member attempted to exercise decision-making powers.  There is simply no cognizable violation of the Texas Open Meetings Act in this case.

### A. TEA's conclusion that Houston ISD's board members violated TOMA based on informal meetings in less than quorum is wrong as a matter of law.

The Preliminary SAI Report is founded on the faulty legal premise that TOMA's civil provisions can be violated by successive meetings of less than a quorum of board members.  As a matter of law, TOMA's civil provisions cannot be violated by successive meetings of less than a quorum.[30]  The United States Court of Appeals for the Fifth Circuit has held that TOMA's civil

---

[29]  **Exhibit 1**, Preliminary SAI Report, p. 8

[30]  *Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227, at *4 (5th Cir. 1995) (affirming the district court's opinion and holding that TOMA's civil provisions cannot apply unless a quorum of board members is present); *Hispanic Educ. Comm. v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994) (holding that it did not violate TOMA for Houston ISD board members to meet in several "overlapping clusters" of board members in groups of less than a quorum to discuss a potential superintendent candidate).

provisions cannot be violated by Houston ISD unless at least five board members are present at a meeting:

> The Board consists of nine members.  Therefore, to have a quorum and thereby a meeting to which the TOMA would be applicable, at least five members must be present.

*Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227, at *4 (5th Cir. 1995).

In the lower court's decision, which was affirmed by the Fifth Circuit, a federal judge had concluded that Houston ISD board members did not violate TOMA by meeting privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action.  *Hispanic Education Committee v. Houston Independent School District*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227.  The federal judge explained that informal meetings with less than a quorum of board members allow board members "to have the best information from all sources."  *See id.*  "Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the board's ability to function."  *See id.*  "Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business."  *See id.*  Notice requirements under TOMA "apply only to meetings involving at least a quorum of members."  *See id.*  "With fewer than a quorum present, nothing can be formally decided; without a formal decision, no act is taken."  *See id.*  And "[w]ithout action, there is no illegality."  *See id.*

In its Preliminary SAI Report, TEA erroneously concludes that Houston ISD's board members violated TOMA by meeting in groups of less than a quorum to engage "in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement" in "two successive meetings."[31]  TEA's own fact findings prove that there was no meeting with Dr. Saavedra that was attended by a quorum of board members, so there was no "meeting to which the TOMA would be applicable."[32]  Additionally, the prospect of hiring Dr. Saavedra as an interim was not discussed.[33]  In the report, TEA states that it "is irreverent [sic]

---

[31]   **Exhibit 1**, Preliminary SAI Report, p. 12.

[32]   *See Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227 at *4.

[33]   *See* **Exhibits 3–5**.  TEA asserts that Dr. Saavedra believed that board members wanted to talk to him that day because they wanted to consider him as a replacement for Dr. Lathan.  TEA does not indicate how Dr. Saavedra

that there is no evidence that all five trustees were in the meeting with Dr. Saavedra at the same time, as the trustees violate the open meetings act when they deliberate public business outside of a properly posted public meeting through multiple communications each involving fewer than a quorum."[34]   The United States Court of Appeals for the Fifth Circuit disagrees.  That federal appellate court has held that *it is quite relevant* whether or not a quorum attends a meeting because TOMA's civil provisions cannot be violated unless a quorum is present in a meeting.  *Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227, at *4.  TEA's staff concedes, as it must, that is has found no evidence to show that a quorum attended any meeting with Dr. Saavedra.[35]

The Fifth Circuit has also held that enforcement of the criminal conspiracy provision of TOMA in Section 551.143 (which has since been declared unconstitutional and replaced by the Texas Legislature) "is limited to the local prosecutor."  *Id.*  Limiting board members' ability to discuss school district issues with one another in informal meetings of less than a quorum and outside of formal meetings would seriously impede the District's ability to function.  Requiring board members to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.  Restricting the board members' opportunities to inform themselves, to negotiate, to build coalitions, and to propose tentative ideas would be a disservice to the voters and students of Houston ISD.

### B. TEA's own fact findings demonstrate that there was no violation of the Texas Open Meetings Act.

Based on TEA's own findings, there was no violation of the civil provision of the Texas Open Meetings Act in this case because TEA's own findings demonstrate that a quorum of board members did not meet to discuss the potential replacement of the current interim superintendent.  Additionally, TEA's own findings demonstrate that there was no attempt to exercise decision making powers without deliberating in a properly noticed, public meeting.

---

came to this belief.  However, it is clear from TEA's Report that it is not based on anything that was told to Dr. Saavedra.  *See* **Exhibit 1**, Preliminary SAI Report, p. 13 (noting that Dr. Saavedra "concluded that the board members were interested in hiring him to be the new interim superintendent").  Whatever Dr. Saavedra may have assumed, it is undisputed that there was no discussion of hiring him as interim superintendent.  When Dr. Saavedra summarized the issues he discussed with various board members, his summary did not include any discussion of considering him as interim superintendent.  *See* **Exhibit 1**, Preliminary SAI Report, pp. 13–14.

[34]   **Exhibit 1**, Preliminary SAI Report, p. 13.  (Presumably TEA's investigators meant it is "irrelevant", not "irreverent".  Either way, they are mistaken.)

[35]   **Exhibit 1**, Preliminary SAI Report, pp. 12–13.

TEA instigated a Special Accreditation Investigation and sent the District a Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("SAI Notice") dated January 22, 2019.  Apparently, on the same date, TEA issued an amended Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("First Amended SAI Notice") that was substantially similar to the original notice.  Like the original SAI Notice, the First Amended SAI Notice was issued by Jason Hewitt, Director Special Investigations Unit and contained the same described complaint: "Houston ISD Board of Trustees may have violated The Open Meetings Act by deliberating district business prior to a regularly scheduled board meeting regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent."

The complaint described in the SAI Notice and First Amended SAI Notice is not sourced; it is not true; and it is not supported by any evidence.  It's a fishing expedition — and an unsuccessful one at that.  A majority of Houston ISD board members did not meet to discuss the potential removal of the current interim superintendent and the installation of a new interim superintendent prior to a regularly scheduled board meeting.[36]

Pursuant to the First Amended SAI Notice, TEA conducted an onsite investigation, reviewed documents, and conducted interviews with Board Members and the District's administration.  On February 8, 2019, the District received notice that the documents requested in the First Amended SAI Notice should be provided by February 22, 2019.  The District provided all requested documents in a timely manner.

During the course of its investigation, TEA obtained no evidence that five or more Houston ISD board members deliberated regarding the potential removal of the current interim superintendent at a meeting with a quorum of board members outside of a regularly scheduled board meeting.

TEA Staff appears to allege that the Board improperly held these private meetings in numbers less than a quorum in order to circumvent the formal requirements of the TOMA, in violation of the criminal conspiracy provision, Section 551.143.  That provision is inapplicable for two reasons.  First, enforcement is limited to local prosecutors because it is a criminal statute.  *See Hispanic Educ. Comm. v. Houston Indep. Sch. Dist.*, No. 95-20029, 1995 U.S. App. LEXIS 42227, *4 (5th Cir. 1995) (emphasis added).  Second, approximately one month after the First Amended SAI Notice was issued, the Texas Court of Criminal Appeals declared Section 551.143 to be unconstitutionally vague and invalidated it.  *State v. Doyal*, No. PD-0254-18, 2019 Tex. Crim. App. LEXIS 161, at *2 (Tex. Crim. App. Feb. 27, 2019).

---

[36]   *See* **Exhibits 3–5.**

On April 24, 2019, in the wake of the *Doyal* decision, the Commissioner requested an advisory opinion from the Texas Attorney General addressing whether "walking quorums" were prohibited by the remaining civil provisions of TOMA.  On May 24, 2019, the Texas Attorney General issued an advisory opinion (KP-0254) erroneously concluding that "walking quorums" were prohibited by the civil provisions of TOMA.[37]  The Texas Attorney General's advisory opinion conflicts with the holdings in *Hispanic Education Committee v. Houston Independent School District*, No. 95-20029, 1995 U.S. App. LEXIS 42227 (5th Cir. 1995) and *Hispanic Education Committee v. Houston Independent School District*, 886 F. Supp. 606, 610 (S.D. Tex. 1994), *aff'd by* 1995 U.S. App. LEXIS 42227.  Inexplicably, the Texas Attorney General failed to cite or discuss either of these cases.[38]  Therefore, at best the Texas Attorney General's office is unaware of these cases — at worst, the Texas Attorney General's office chose to ignore relevant caselaw.[39]  Either way, this failure renders the attorney general's opinion untrustworthy.

---

[37]   **Exhibit 1**, Preliminary SAI Report, Exh. 1.3.

[38]   *Id.*

[39]   *See id.*  Instead of discussing these highly relevant cases, the Texas Attorney General relies almost solely on *Esperanza Peace & Justice Center v. City of San Antonio*, a case in which a federal court held that city council members violated TOMA by meeting in groups of less than a quorum in order to prepare a final draft of a budget, which all council members signed before the public meeting. 316 F. Supp. 2d 433, 471–78 (W.D. Tex. 2001). But there are at least three, significant problems with attempting to apply *Esperanza* to this case.

First, *Esperanza* cannot be applied to the facts of this case because there is no allegation of any written joint statement by Houston ISD's board members.  In *Esperanza*, the court's holding hinged on the fact that at the public meeting the "council merely confirmed the deal already memorialized in the consensus memorandum" signed by all council members before the meeting.  316 F. Supp. 2d at 478.  Here, it is undisputed that there was no written agreement before the public meeting.

Second, *Esperanza* cannot be applied to the facts of this case because what happened in this case is no different than what happened in *Hispanic Educ. Comm. v. Houston ISD*, No. 95-20029, 1995 U.S. App. LEXIS 42227 (5th Cir. 1995).  The district court in *Hispanic Education Committee* explained that the successive meetings of board members did not violate TOMA because there was no attempt to appoint a superintendent "without properly obtaining approval by the entire board in public."  *Hispanic Educ. Comm. v. Houston ISD*, 886 F. Supp. 606, 610 (S.D. Tex. 1994) ("Regardless of earlier discussions, Paige was elected in an open meeting that fully satisfied the requirements of Texas law.").  Here, it is undisputed that regardless of TEA's mischaracterizations of the board members' discussions with Dr. Saavedra, the motion to offer him an interim superintendent contract was made in an open meeting that fully satisfied the requirements of Texas law.  This case is indistinguishable from *Hispanic Education Committee v. Houston ISD*.

Third, *Esperanza* cannot be applied to the facts of this case because the reasoning in *Esperanza* was based, at least in part, on the "walking quorum" provision in TOMA, i.e., Section 551.143.  *See Esperanza*, 316 F. Supp. 2d at 473.  But Section 551.143 is void because was determined to be unconstitutional.  Without this section, it is

On the same day the Texas Attorney General issued this advisory opinion, TEA prepared a second amended Notice of Special Accreditation Investigation (SAI # INV2019-10-034) ("Second Amended SAI Notice").  The Second Amended SAI Notice contained no notice of any alleged violation of TOMA.  Although TEA's Second Amended SAI Notice removed any allegations regarding an alleged TOMA violation, TEA's Report finds a TOMA violation where none exists based on several, clear errors.

> ### *(1) TEA's Report falsely claims that the motion to hire a new superintendent was made with no prior notice and no public deliberation.*

Although they fail to assert any alleged violation regarding the board members' actions at the October 11, 2018 meeting, TEA's investigators assert that their investigation was prompted by a motion made at the October 11, 2018 meeting "to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was under consideration."[40]  This finding is patently absurd and indisputably false.

The posted agenda for the October 11, 2018 meeting, attached as **Exhibit 2**, specifically lists two publicly posted items relevant to the motion:

> C-1 Personnel
>
> a) **Deliberate the duties of the interim superintendent of schools**, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members (including board committees); **evaluations of the interim superintendent** and chief audit executive, **consideration of compensation, and contractual provisions.**
>
> d) **Consider employment of interim superintendent and employment contract through September 30, 2019**.

(emphasis added)

Additionally, the Report's statement that there was no public deliberation is also patently false.  At the public meeting board members publicly deliberated regarding this motion.

---

unlikely that *Esperanza*'s holding would be the same.

[40]   **Exhibit 1**, Preliminary SAI Report, p. 7.

### (2) TEA's Report misquotes the definition of a walking quorum from the Texas Open Meetings 2018 Handbook

TEA's Report also errs when it claims that the Texas Open Meetings 2018 Handbook states that "a walking quorum occurs when a governmental body deliberates about district business without a quorum being physically present in one place at one time."[41]  TEA is simply wrong about TOMA and about what the Handbook says.  The Handbook does not say that mere deliberations by less than a quorum would violate TOMA.  The Handbook does say that a governmental body could violate TOMA if a quorum *takes an action* outside of a public meeting and then merely ratifies that action later, at a public meeting.[42]

Here, there is simply no evidence that any action was taken outside of a properly noticed, public meeting.  A quorum of board members did not execute an interim superintendent contract with Dr. Saavedra and attempt to ratify it at the board meeting.  Rather, board members merely met with Dr. Saavedra.  During those meetings with Dr. Saavedra, there was no discussion of the interim superintendent position. However, regardless of what was discussed, there cannot be a violation of TOMA because no action was taken outside of a public meeting.

### (3) TEA falsely contends that board members violated TOMA by meeting in groups of less than a quorum.

TEA's Report falsely states that "holding two successive meetings attended by a quorum of the HISD Board of Education [sic]" violated TOMA.[43]  As discussed above, the civil provisions of TOMA do not apply unless a quorum is present for a meeting.[44]  *Hispanic Educ. Comm.*, 1995 U.S. App. LEXIS 42227 at *4; *Hispanic Education Committee*, 886 F. Supp. at 610.

TEA's Report is also wrong when it states that it violates TOMA for board members to "deliberate public business outside of a properly posted public meeting through multiple

---

[41]   **Exhibit 1**, Preliminary SAI Report, p. 12.

[42]   *See* Texas Open Meetings 2018 Handbook, p. 20 (explaining that it would violate TOMA if board members reached a consensus, memorialized the consensus in a memorandum containing the signatures of at least a quorum, and then ratified this memorialized consensus at a later meeting).  This statement is based on the fact pattern in the *Esperanza* case, which (for the reasons discussed above) is inapplicable to the facts in this case.

[43]   **Exhibit 1**, Preliminary SAI Report, p. 12.

[44]   As discussed in *Esparza*, the criminal provision could prevent certain actions (e.g., the signing of a joint statement prior to a meeting) from occurring based on successive meetings of less than a quorum.  But the criminal provision of TOMA is inapplicable in this case because it had been declared unconstitutionally vague and was, therefore, void *ab initio*.

communications each involving fewer than a quorum."[45]  As a matter of law, board members do not violate TOMA by meeting privately among themselves in several overlapping clusters, as long as a quorum was not present and as long as no attempt was made to take action.  *Hispanic Educ. Comm.*, 886 F. Supp. at 610, *aff'd by* 1995 U.S. App. LEXIS 42227.

### *(4) TEA willfully misconstrues a statement by Trustee Santos.*

TEA's report claims that Trustee Santos publicly admitted that she violated the Texas Open Meetings Act based on Finding 14.[46]  This willfully misconstrues Trustee Santos' statement. Trustee Santos was making the point that the same conduct that is being investigated by TEA and criticized by some board members is substantially similar to conduct in which that other board members have engaged.

In the heat of the moment, Trustee Santos did not make this point as articulately as she could have, but it is clear from the context what she meant.  Trustee Santos did not intend to claim that any board members had violated TOMA.[47]

### *(5) TEA unfairly criticizes board members for not having detailed memories of a meeting that had occurred months before they were interviewed.*

TEA's report unfairly criticizes board members for having "little memory of this highly important meeting" and unfairly accuses board members of making "deceptive statements."

First, it is worth noting that TEA's investigators interviewed board members without legal counsel present and engaged in questioning that was combative, argumentative, and coercive.[48]  In that type of situation, anyone would be nervous and would find it difficult to recall details about a meeting that had occurred months earlier.

Second, although TEA's investigators attempt to characterize meeting Dr. Saavedra as a "highly important meeting," this ignores the evidence in this case.  The board members who met with Dr. Saavedra did not consider the meeting to be "highly important" because at the time they were not considering Dr. Saavedra for interim superintendent and did not discuss the interim superintendent position with him.

---

[45]   **Exhibit 1**, Preliminary SAI Report, p. 13.

[46]   **Exhibit 1**, Preliminary SAI Report, p. 13.  The Report says the conclusion is based on Finding 13, but this is clearly a mistake.

[47]   **Exhibit 5**, Santos Declaration, ¶ 19.

[48]   **Exhibits 3–5**.

Third, although TEA's investigators accuse Trustee Davila of not cooperating with the investigation, their accusations say more about the investigators' own biases than Trustee Davila's conduct.  Trustee Davila retained no text messages regarding this meeting because the meeting was not "highly important" — it was a 10–15-minute meeting with Dr. Saavedra.  Additionally, Trustee Davila did not "falsely claim[] that there were no other trustees present when she met with Dr. Saavedra."[49]  There were no other trustees present when she met with Dr. Saavedra.[50]  When she first arrived, Trustee Vilaseca was present, but Trustee Vilaseca left shortly after Trustee Davila arrived.[51]  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

Fourth, TEA's investigators unfairly criticize Dr. Lira for telling the investigators that his best recollection was that he met with Dr. Saavedra when no other trustees were present.  When Dr. Lira spoke with the investigators, he attempted to answer their questions about a meeting that had occurred months ago.  His best recollection is that he spoke with Dr. Saavedra when no other board members were present, and when other board members arrived, he left shortly after they had all exchanged greetings.

The attached declarations from individual board members regarding the October 8, 2018 visit they had with Dr. Saavedra at a public restaurant demonstrate that the board members did their best to cooperate in good faith with TEA's investigators by answering questions about a meeting that had occurred approximately six months before investigators interviewed them.  It is insincere for TEA to conclude that board members were untruthful during the course of its investigation when the alleged "inconsistencies," TEA's investigators' criticisms, are easily explained by a fuller understanding of what occurred.  Additionally, the board members told TEA's investigators that their answers were given to the best of their recollection because it would be unreasonable to expect the board members to remember every detail about an encounter that happened months prior to be asked about it.  For TEA's investigators to (1) take advantage of the fact that board members provided answers to the best of their ability instead of simply answering "I do not recall" and then (2) describe instances of forgetfulness as moments of deceit is disingenuous and goes to show that the investigation had a predetermined conclusion before it began.

Houston ISD's board members cooperated with this investigation to the best of their ability and responded to combative and argumentative questioning from TEA investigators, by answering to the best of their recollections.  Nevertheless, despite the evidence, which clearly and

---

[49]   **Exhibit 1**, Preliminary SAI Report, p. 14.

[50]   **Exhibit 3**, Davila Declaration, ¶ 8.

[51]   **Exhibit 3**, Davila Declaration, ¶ 8.

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

unambiguously demonstrates no violation of TOMA's civil provisions, TEA's investigators have arbitrarily and capriciously concluded that by simply meeting with Dr. Saavedra in groups of less than a quorum, board members violated TOMA.  Moreover, nothing in the Board's policy requires individual board members to obtain "prior authorization of the board" before meeting with an individual.[52]

---

[52]   **Exhibit 1**, Preliminary SAI Report, pp. 24–25.   TEA mischaracterizes the meetings with Dr. Saavedra as "interviews" despite sworn statements from all board members who met with Dr. Saavedra that they did not discuss the interim superintendent position with him.   Regardless of how these meetings are described by TEA's investigators, the individual board member are not required to obtain board approval before meeting with someone, whatever each board member's reason for meeting with the individual may be.

<u>**Houston ISD's Response to Allegation Two**</u>

Allegation Two of the Preliminary report posed the following question:

> Did the members of the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code § 11.051 Governance of Independent School District?

What follows in the Report is a mishmash of unrelated events ostensibly designed to demonstrate an overall pattern of board members acting individually on behalf of the Board of Trustees. However, many of the events are inaccurately described in the Report — largely because TEA's investigators failed to follow best practices, including speaking to relevant witnesses to corroborate the accusations leveled against board members.

Putting aside the fact that the factual statements in the Report are rife with inaccuracies, the events described in the Report do not violate existing Texas laws.

**A.  Individual board members have the inherent right to access information, documents, and records maintained by the District.**

Section 11.051(a-1) of the Texas Education Code states that a board member "may not, individually, act on behalf of the board" unless authorized to do so by the Board of Trustees.  TEX. EDUC. CODE § 11.051(a-1).  This means that "[b]oard action only occurs when at a meeting where there is a quorum [and] more members vote for a motion than vote against a motion, with abstentions not being counted."  *Conner v. Houston ISD*, TEA Docket No. No. 088-R2-0612, 2012 TX Educ. Agency LEXIS 87, at *7 (Tex. Comm'r Educ. 2012) (citing *Webster v. Tex. & Pac. Motor Transp.*, 166 S.W.2d 75, 77 (Tex. 1942).  Section 11.051(a-1) does not prevent board members from making requests or gathering information — it merely prevents them from acting, individually, on behalf of the Board of Trustees without authorization.  *See* TEX. EDUC. CODE § 11.051(a-1).

In fact, individual board members have the "inherent right to access information, documents, and records maintained by the district."  TEX. EDUC. CODE § 11.1512 (c). This inherent right is reflected in the District's local policy, which states that each board member "has an inherent right of access to information, documents, and records maintained by the district."[53]

---

[53]   **Exhibit 10**, HISD Policy BBE(Legal).

In order to facilitate efficient internal operations, Houston ISD has adopted various local procedures.  The first of these local procedures cited by TEA's investigators is BBE(Local).  TEA's investigators cite the policy stating: "Board members as individuals shall not exercise authority over the District, its property, or its employees . . . ."   HISD Policy BBE(Local).  TEA's investigators quote this excerpt from the policy in the Report.  But they fail to disclose that they are misquoting the language of the policy by omitting the second half of the sentence.  Why do TEA's investigators misquote this sentence?  Probably because when read in context, the full sentence clearly gives board members the right to request information from District employees:

> Board members as individuals shall not exercise authority over the District, its property, or its employees; ***however, individual Board members shall have the right to seek information from District records and employees in accordance with this policy***.

**Exhibit 9**, HISD Policy BBE(Local) (emphasis added to highlight the language omitted by TEA's investigators).  Houston ISD's internal procedures further state that individual board members may submit written requests to the superintendent for preparation of reports derived from an analysis of information."[54]

In its Report, TEA's investigators repeatedly state that board members violated HISD Policy BBE(Local) by taking various actions without "obtaining approval of the entire board."[55]  But this local policy does not supersede board members' inherent authority to request information, and it does not prevent board members from expressing opinions or communicating information to administration.  It simply prevents them from exercising authority on behalf of the Board without Board approval.  None of the incidents described in TEA's Report — whether accurately or falsely described — constitutes an exercise of authority on behalf of the Board.

TEA's investigators also contend that board members have violated Policy BBE2(Regulation).[56]  The investigators should know better.  Regulations such as BBE2 do not bind Trustees — they are adopted to govern District employees.  HISD Policy BBE2(Regulation) says as much at its outset:

---

[54]   **Exhibit 9**, HISD Policy BBE(Local).

[55]   **Exhibit 1**, Preliminary SAI Report, pp. 24–26.

[56]   **Exhibit 11**, HISD Policy BBE2(Regulation).

**HOUSTON ISD** - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

The objective of these procedures is to *assist employees* as they address requests received from Trustees and the Superintendent.

**Exhibit 11**, HISD Policy BBE2(Regulation) (emphasis added).  Moreover, if any Houston ISD employee legitimately believed that a board member was acting inappropriately, the employee could file a complaint pursuant to HISD Policy BBE1(Regulation).  TEA's investigators have attached no such complaints to its Report from any of the unnamed administrators who have now provided unreliable and false statements to TEA's investigators.

B. **TEA's investigators have made numerous findings which, even if they were true, amount to nothing more than requests for information or communications of information.**

TEA's investigators recite findings of fact based on statements they gathered from unnamed administrators.  Many of these statements are misleading; others are pure fabrications.  But TEA's investigators failed to discover the errors in these statements because they failed to corroborate these statements by interviewing board members or other witnesses.  If they had, they would have discovered that the unnamed administrators they rely on are not reliable witnesses.

*(1) Findings 1–4 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion.*

On pages 15–16 and 25 of the Report, TEA's investigators assert that Trustee Davila exceeded the scope of her authority during a campus visit based on interviews with a high school principal and an unnamed administrator.   But Findings 1–4 contain numerous factual misstatements and reach a legally untenable conclusion.

**Factual Error #1.**  According to TEA's investigators, the campus principal was not aware that Trustee Davila and others were on a campus for a tour until the principal saw pictures of the tour on Twitter.  But that is simply not true.  But the campus principal was the individual who gave Trustee Davila and others the campus tour.[57]  Contrary to the statement in TEA's Report, the campus principal did not learn about the tour on Twitter — she knew about the campus tour because she was there.[58]

---

[57]   **Exhibit 3**, Davila Declaration, ¶ 22.

[58]   **Exhibit 3**, Davila Declaration, ¶¶ 22–24.

Moreover, putting aside this factual error, nothing prohibits board members from visiting campuses or requires approval from the principal.  As indicated by her statement, Trustee Davila had expressly been given permission to visit this campus by the area superintendent.

**Factual Error #2.**  TEA's report states that a campus principal told them that the project manager told the principal that "Trustee Davila told the construction people to take a wall down." TEA's investigators further claim that Trustee Davila "instructed the construction team to make material modifications to an area that was already built."  Both statements are false.  If TEA's investigators had taken the time to speak with Davila, they would have learned that the request to take down the wall was not even made by her.  Second, based on the documents attached to TEA's report, regardless of what Trustee did or did not say, the modifications were not made based on any request from Trustee Davila.  Rather, the changes were made based upon a perfectly legal and routine Construction Change Directive that was generated by the Project Architect as an integral part of the project management process[59] properly submitted by the project manager and approved by Houston ISD administrators.

Instead of corroborating this hearsay-within-hearsay statement by speaking with Trustee Davila or any of the other witnesses who were in the campus courtroom, TEA simply accepts this statement as true without interviewing either Trustee Davila or the project manager.  If TEA's investigators had spoken with Trustee Davila, they would have discovered that she did not tell "the construction people to take a wall down."  When an individual working on the courtroom told her, they could take down a wall to make the courtroom bigger, Trustee Davila said she did not think they should do that.[60]

Additionally, even the error-riddled description of events in TEA's report does not constitute any legal violation.  A board member is perfectly within her rights to conduct a campus visit and express opinions about building projects.  Why else would Trustees be invited to tour the facilities.  Here, TEA's own account demonstrates that Trustee Davila did nothing more than, at most, express an opinion.  Trustee Davila did not approve the change to the campus courtroom. Rather, the project manager submitted a change order that was properly approved and documented by Houston ISD's administration.

---

[59]   *See* Project General Conditions, AIA Document A201.

[60]   **Exhibit 3**, Davila Declaration, ¶¶ 23–24.

The TEA analysis completely failed to review and access the project construction file, which shows that the change order was approved through the appropriate processes and procedures without any involvement by Trustee Davila.[61]  As indicated in Exhibit 2.1, a construction change directive was initiated by Roy Gilbert on February 23, 2018.  (Mr. Gilbert was the Project Architect with the firm of Page Sutherland Page, Inc.)  According to a contemporaneous document, the Construction Change Directive was initiated by Jorge Huerta, a Senior Project Manager with Houston ISD.   The submission to Houston ISD contained a drawing executed by the Architect. The drawing was dated February 20, 2018.  The Construction Change Directive was signed on behalf of Houston ISD by Meredith Smith on February 28, 2018.  (Meredith Smith is a Senior Manager for Construction for Houston ISD.)   The documents selected by TEA's investigators do not include an express approval by the Contractor, B3Ci, but the Contractor was clearly consulted because there was an adjustment to the Project's Guaranteed Maximum Price approved by Meredith Smith.  Nowhere on any of the Project paperwork and required approvals is there any mention of Trustee Davila, or for that matter any other Trustee.  This Project was a Construction Manager at Risk project, which was constructed and managed in accordance with the practices and procedures identified by the American Institute of Architects.  It was fully administered and constructed in accordance with the project documents and Houston ISD project administration protocols for such projects.  TEA's investigators include much of the relevant paperwork showing that this is so, but TEA's Report includes no critical analysis of these documents.

Instead of reviewing the project paperwork, which is extensive, to determine the procedural and paperwork underpinnings the Construction Change Directive presented, TEA's investigators chose instead to assert, without any corroborated evidence, that Trustee Davila exceeded her authority by visiting a campus.  The assertion was made based upon anecdotal statements made by unidentified individuals.  We have not been provided with the statements of the unidentified individuals and are, therefore, unable to test their veracity.  Nor are we able to test the credibility, knowledge, or bias of the alleged witnesses.

### (2) Finding 5 in TEA's Report regarding Allegation Two is factually inaccurate and amounts to nothing more to an appropriate request to reschedule an agenda item by a mere two months.

TEA's investigators next criticize Trustee Davila for asking that an item be removed from the agenda.  But there is nothing untoward about board members requesting that items be removed from the board's agenda.  And the item referenced in the report was ultimately placed on an agenda

---

[61]   *See* **Exhibit 1**, Preliminary SAI Report.  Portions of the construction file are attached to the Preliminary SAI Report as Exhibit 2.1

for a meeting that took place just two months later, in February 2017 (not in 2018, as TEA's Report asserts).  When the item was discussed at the February 2017 meeting, Trustee Davila thanked Houston ISD administration for attending a 4-hour meeting with the community to answer questions regarding the item.  And when the Board of Trustees voted on the item, Trustee Davila voted in favor of it.

**Factual Error #3.**  TEA's investigators further claim that an unnamed administrator has accused Trustee Davila of threatening his job if he did not make sure that a contract for construction of Austin High School was awarded to a "firm out of Dallas."  This unsubstantiated claim by an anonymous witness is as bizarre as it is false.  Neither Trustee Davila nor Abel Davila threatened an administrator's job regarding this contract.[62]  Neither wanted the contract awarded to an unnamed "firm out of Dallas."

**Factual Error #4.**  It is disappointing that TEA's investigators would think it is appropriate to include such bizarre and unsubstantiated allegations in TEA's Report.  But it is, perhaps, more disappointing that TEA's investigators would falsely claim that the agenda item was allegedly removed from the December 2016 meeting and postponed for over a year, until the February 2018 meeting.  In reality, the agenda item was considered just two months after the December 2016 meeting, at the February 2017 meeting.

Moreover, as a matter of law, a board member's request that an item be postponed to be considered at a later meeting does not violate Section 11.051(a-1) or any of the cited local policies.  Ultimately, this item was ultimately removed from the agenda at the request of the board president, not Trustee Davila.  Moreover, TEA's investigators fail to disclose that when the item was voted on two months later, at the February 2017 meeting, Trustee Davila seconded the motion and voted in favor of approving the agenda item.[63]

The evidence clearly establishes that Trustee Davila was not opposed to the agenda item awarding the contract for construction of Austin High School and voted in favor of the agenda item when it was considered at the February 2017 meeting.

---

[62]   **Exhibit 3**, Davila Declaration, ¶¶ 25–27.

[63]   **Exhibit 8**, Board Minutes from the February 9, 2017 meeting, p. 8

HOUSTON ISD - Request for Informal Review
Preliminary SAI Report dated August 5, 2019
Response Due Date:  August 26, 2019

> ### (3) Finding 6 in TEA's Report regarding Allegation Two is factually inaccurate and describes no exercise of board authority by an individual board member.

TEA's investigators next claim Trustee Santos hosted a campaign event called "Field Good Day" on Houston ISD property without paying for the event.  The allegation is based upon the uncorroborated statement of an unidentified witness.  Basing such a finding on uncorroborated, secret, and false testimony is the worst form of demagoguery.

<u>**Factual Error #5.**</u>  As is readily discernable from publicly available information "Field Good Day" was not a campaign event — it was a community event that was first organized in 2016 (before Trustee Santos was elected to serve on the Board) in order to bring the community together after a Houston ISD student was murdered.[64]



When members of the community were organizing this event again in 2018, they reached out to Trustee Santos to help coordinate with Houston ISD administration regarding the event.  And she helped.  She did so in an effort to serve her constituents, not as part of any campaign.  (Indeed, the event occurred almost a year after Trustee Santos was elected.)

Finally, it should have been obvious to TEA's investigator's that whatever unnamed administrators said about "Field Good Day" 2018, the flyer for the event, which TEA's investigators attach to their Report,

---

[64]   **Exhibit 5**, Santos Declaration, ¶¶ 14–16, **Exhibit 6**, Rodriguez Declaration ¶¶ 3–4.

does not describe a campaign event — the flyer contains no mention whatsoever of Trustee Santos or her campaign.[65]  The flyer clearly describes a community event.

**Misleading Factual Statement.**  The Report states that Trustee Santos indicated she would cover the cost of the event and failed to submit payment and indicates that an unnamed administration official confirmed that Trustee Santos did not pay for the event.  This is an extremely misleading statement.  The cost of the event was minimal because Trustee Santos was able to have security at the event provided at no charge by local police officers who work for a county constable, the cost to Houston ISD was *de minimis*.  Nevertheless, Trustee Santos did offer to pay for any costs Houston ISD incurred, however, no one ever sent her an invoice reflecting that Houston ISD incurred any costs from this event.

Trustee Santos did nothing wrong by helping sponsor a community event.  TEA's own Report does not support the later assertion that Trustee Santos "requir[ed] the district to allow her to host" this event.  She merely assisted community members with the event and offered to pay for any *de minimis* costs incurred by the District as a result of the event.  At the current time, because of the volunteers obtained from the community, we are unaware that Houston ISD has incurred any costs associated with the event.

> **(4) Finding 7 in TEA's Report regarding Allegation Two is factually inaccurate and does not describe any exercise of board authority by an individual board member.**

In Finding 7, TEA's investigators merely repeat a statement from an unnamed administrator who purportedly said "[Trustee] Santos was getting all this food and not paying for it.  She tells people, 'I am a trustee and board services covers that.'"  This generic, uncorroborated statement is impossible to respond to because it does not identify any improper act.  At virtually every meeting of the Board of Trustees food is provided for board members and administrators and they are not required to pay for it.  If an administrator truly told TEA's investigators that board members are expected to pay for the meals provided at board meetings, that administrator was not being truthful.

The statement by TEA's investigators that Trustee Santos "require[ed] the district to allow her to eat for free when visiting the Hattie Mae White Education Support Center" is unsupported by any finding in the Report and is not substantiated by any evidence, nor does it describe a violation of law or policy.

---

[65]   **Exhibit 1**, Preliminary SAI Report, Exh. 2.3.

### (5) Finding 8 in TEA's Report regarding Allegation Two amounts to nothing more than a board member's expression of opinion.

TEA's Report next recounts a workshop during which board members, Deputy Commissioner AJ Crabill, and Houston ISD administration interacted with principals from Improvement Required campuses.  At that workshop, Trustee Davila exhorted the principals to "explain what they needed so trustees could provide resources to prevent another failing year." Her exhortations were entirely appropriate.  It is unclear why TEA investigators have included this event in the Report because there was nothing improper in Trustee Davila's statement.

Later in the Report, TEA's investigators assert that Trustee Davila's comments "require[ed] district employees to answer her questions under the threat of an adverse personnel action."[66]  But the language TEA's investigator's quote in their Report did not threaten action by the Board, the language Trustee Davila used indicated that the principals of struggling campuses would lose her single vote if they could not articulate what they needed to improve the campuses. That is not a threat of action by the Board; it is an indication of how she will vote if the matter comes to the Board.  Trustee Davila is absolutely within her rights to vote as she sees fit.

### (6) Findings 9–12 in TEA's Report regarding Allegation Two are factually inaccurate and amount to nothing more than an expression of opinion.

In a series of findings, TEA's investigators recount that TEA's conservator has reported that board members have, in some instances, sent requests directly to administration offices instead of sending it to administration officials via board services.  Houston ISD is entirely within its rights to institute internal procedures describing how best to facilitate communications between board members and administration officials, but these internal procedures cannot supersede board members inherent right to access information, documents, and records maintained by the District. TEX. EDUC. CODE § 11.1512(c).

A review of the communications reviewed demonstrates that none of these communications show that any current member of Houston ISD's Board of Trustees violated Section 11.051 of the Texas Education Code by individually acting on behalf of the Board.  Rather, these communications show board members attempting to gather information — as is there inherent right — to perform their duties and to disseminate information to allow Houston ISD's administration to do its job.

---

[66]   **Exhibit 1**, Preliminary SAI Report, p. 25.

### a. Electronic Communications from 2016

The majority of the communications described by TEA's investigators do not involve current board members — they are related to unnamed former trustees.[67] Presumably TEA's investigators have complied with TEA's Investigation Procedures and sent a copy of this preliminary report to these former trustees to provide them with "an opportunity to request an informal review of the findings."[68] However, the former trustees do not appear to have been copied on the Preliminary SAI Report, so TEA's investigators may have ignored the requirement in TEA's Investigation Procedures. In any case, these findings regarding former trustees are outside the scope of the Second SAI Notice and are irrelevant to the proposed punitive actions against Houston ISD and its current Board of Trustees.

The remaining two communications from 2016 merely describe a board member's communications providing information to an administration official and that same board member's request for information.[69] Both of these communications are further addressed in more detail with supporting evidence in the **TH Supplemental Response** for the appropriate board member or board members.

In paragraphs (a)-(j) on pages 17 and 18 of the report, TEA's investigators cite communications from former and current trustees to the District's Administration. None of the provided emails in this section show any kind of overreach by current and former trustees. Curiously, TEA in its report did not cite Texas Education Code 11.1512 (c)-(f) which grants Trustees access to information. Specifically, it states that "when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district. "Official capacity" means all duties of office and includes administrative decisions or actions. The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting. The district may withhold or redact information, a document, or a record requested by a board member to the extent that the item is excepted from disclosure or is confidential under the Public Information Act or other law. A district shall provide a board

---

[67] **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2016, ¶¶ (a)–(c), (e)–(g), (i), and (j); Finding 12, Electronic Communication[s] from 2017, ¶¶ (d), (g), (h).

[68] **Exhibit 11**, TEA's Investigation Procedures.

[69] **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2016, ¶¶ (d), (h).

member with information, documents, and records requested not later than the 20th business day after the date the district receives the request.  The district may take a reasonable additional period of time, not to exceed the 30th business day after the date the district receives the request, to respond to a request if compliance by the 20th business day would be unduly burdensome given the amount, age, or location of the requested information.  The district shall inform the board member of the reason for the delay and the date by which the information will be provided.  If a district does not provide requested information to a board member in the time required, the member may bring suit against the district for appropriate injunctive relief.  A member who prevails in a suit is entitled to recover court costs and reasonable attorney's fees.  The district shall pay the costs and fees from the budget of the superintendent's office.

Additionally, it is important to note that during this time period, Richard Carranza was the Superintendent of Schools. His communication protocol allowed Board Members to ask for information and to direct concerns to his cabinet members. All emails cited by TEA as examples of overreach by the Board of Trustees evidence Trustee requests for information, which they are entitled to by state law, being sent to District staff as requested by the Superintendent at the time.

In paragraph (a) TEA alleges that an email from a former trustee (which has since passed away) asking if a position had been filled and stating that an internal applicant had applied but had not been contacted is an overreach by a trustee.  In the exhibit email provided by TEA, there is no directive from the former trustee directing the administration to hire the individual referenced in the email. He only posed a question and made a statement that an internal applicant had not been contacted. This former trustee not only did nothing wrong; he even forwarded the internal applicant's email that he received to the administration. In accordance with Houston ISD Board Policy DGBA (LOCAL) an employee shall not be prohibited from communicating with a member of the Board regarding District operations. There is nothing improper about a board member gathering information or posing questions to the District's administration officials when this type of communication is sanctioned by the Superintendent.  Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely gathering information which he was entitled to.

In paragraph (b) the email correspondence referenced was from a former trustee to the Interim Superintendent regarding upcoming board agenda items that had been changed by the administration after the information had been sent to the Board. On one of the upcoming items, the former trustee requested information regarding the administration's recommendation. He did not direct the administration to make a certain recommendation, he posed a question as to what the recommendation was going to be. According to TEA's investigators, this question is evidence

of trustee overreach. This assertion is not only absurd, its false. Texas Education Code and Houston ISD Board Policy state when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district… The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.  TEX. EDUC. CODE § 11.1512(c)–(f).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (c), the email referenced by TEA's investigators was from a former trustee to the Chief of Human Resources regarding a pay dispute with an employee who had resigned and was claiming to be owed a 3-month severance payment. In the email sent by the former trustee (the same trustee who has passed away) he forwarded an email from the former employee stating he had not been paid compensation he was owed by the District. The Trustee sent the information over and requested for the administration to address the matter. He did not direct them to address it a certain way, or to pay the individual, but requested for the administration to address it. Additionally, he requested to be cc'd on the response. Again, the evidence provided by TEA's investigators show no directive or overreach by a Trustee. What the evidence shows is a trustee forwarding information to the District's administration.

In paragraph (d), TEA references an email from Trustee Skillern-Jones to former Chief Communications Officer while Richard Carranza was superintendent of schools. It is important to repeat the Mr. Carranza requested for board members to communicate with members of his cabinet when they had questions or issues. In this email Trustee Skillern-Jones was expressing her opinion on an individual performance regarding the preparation of a board member led community event. Trustee Skillern-Jones requested that a more experienced staff member take the lead on the event and to ensure the facility at which the event was going to take place at was prepped. Again, this type of communication was sanctioned by the previous superintendent at the time as a result this communication is not inappropriate.

In paragraph (e), TEA's investigators provide an email from a former trustee to the former superintendent of school choice requesting a racial breakdown of each magnet school's magnet students. This is another example of TEA misinterpreting the law and claiming when a board member asks for information, he or she is overstepping their authority. Texas Education Code and

Houston ISD Board Policy state when acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district… The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting. TEX. EDUC. CODE § 11.1512(c)–(f).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (f), TEA alleges that a former board member directed the former media relations manager to respond to an email from a law firm who was questioning a decision by the District. The email was merely a request that the former employee have someone respond to the email and explain the basis of the decision. There is no evidence of a directive or overreach by the former trustee in the email provided by TEA.

In paragraph (g), TEA alleges that an email from a former board member to the former Chief Superintendent of Choice asking how the application process is handled for students applying to in district magnet schools is an overreach by the former trustee. Board members are entitled to information pursuant to state law and local polices. All this allegation shows is an overreach by TEA attempting to take over a locally elected board because current and former trustees ask for information they are entitled to. Nowhere in this communication does the former Trustee act individually on behalf of the Board or direct the administration to do anything; he was merely requesting information which he was entitled to.

In paragraph (h), TEA alleges an email from Trustee Skillern-Jones to two District employees requesting facts for a trustee led community meeting about the state of District buildings and other matters in her community is an overreach. In this circumstance trustee was acting as an ambassador for HISD and needed information to provide to community members who showed up. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything; she was merely requesting information which she was entitled to.

In paragraph (i), TEA alleges that a former trustee emailed an HISD senior administrator regarding a principal's complaint and directed them to fix it. What TEA failed to mention was that the email was a forward of the complaint from the principal that was sent to the former trustee and

that the complaint from the former principal was a serious one. The former trustee does request for the matter to be addressed by the administration. She did not direct the administration on how to address it, but only that they address it. Nothing in state law or local policy states a board member cannot give his or her individual opinion on a matter. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. She was forwarding a concern and requesting for the administration to review.

In paragraph (j), TEA alleges that a former trustee emailed a staff member asking if she could pick up her child's old test scores and documents because she lost them. What TEA failed to mention was that the staff member was her child's principal and this request could have been made by any parent. The former board member was acting in her capacity of a mother of a student, not a board member. She was not directing the staff member to do anything; she was asking for a courtesy. This was a request, not a directive. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.

### b.  Electronic Communications from 2017

In paragraphs (a)–(k) on pages 18-19 of the report, TEA's investigators cite communications from former and current trustees to the District's administration. None of the provided emails in this section show any kind of overreach by current or former trustees.  Rather, like the communications from 2016, these communications simply show board members exercising that statutory right to access information.  TEX. EDUC. CODE § 11.1512 (c).  TEA's Report fails to cite Texas Education Code 11.1512 (which grants Trustees the inherent right to access information, documents, and records) either because TEA's investigators are unaware of this statutory provision or willfully ignored it.

Additionally, it is important to note that during this time period, Richard Carranza was the Superintendent of Schools. Superintendent Carranza's communication protocols allowed board members to ask for information from (and to direct concerns to) his cabinet members. All emails cited by TEA as examples of overreach by the Board of Trustees evidence Trustee requests for information — which they are entitled to receive by state law — being sent to District staff as requested by the Superintendent at the time.

In paragraph (a), TEA alleges that Trustee Adams forwarded an email to the former Superintendent of Schools, former Deputy Superintendent, and former Chief of Human Resources the resume of a friend of a coworker at her job. The allegation states that Trustee Adams instructed the recipients of the email to the view the resume and to consider for a possible telephone

conversation. The contents of the email do not have instructions or directives from Trustee Adams to the District's administration. The email from Trustee Adams is simply notification of a possibly good candidate for a job within HISD. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.

In paragraph (b), TEA alleges that an email forwarded from Trustee Skillern-Jones to the District's former Chief of Human Resources regarding a former employee's issue an overreach. TEA alleges that Trustee Skillern-Jones directed the administrator to investigate. The email TEA provides as evidence of overreach contains two words from Trustee Skillern-Jones, "Please Investigate." The rest of the message was a forward of the email from the former employee. Skillern-Jones did not overreach or direct any employee to do anything. She forwarded a concern from a former employee in accordance with the protocols established by the Superintendent at the time and requested that the matter be looked into. TEA's interpretation that two words (please investigate) can be considered a directive is absurd. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. The Trustee shared information with the administration that was sent to her.

In paragraph (c), TEA alleges that a statement made by Trustee Adams to document violations of local policy by the former Superintendent, former Chief of Human Resources, and former Office of Human Talent is an overreach. Firstly in allegation 3 of TEA's preliminary report, investigators allege that the HISD board of trustees failed to ensure that staff followed contract procurement rules and procedures, but here in this section, when Trustee Adams is requesting that the three employees found to have violated such procedures go to training, the email from the District's internal auditor (who is the board's employee) be placed in all three employee personnel files, and to make sure the violations is reported so that there is transparency, she is overreaching. TEA is holding the HISD Board to a double-edged standard. On one hand, the Board didn't do enough to make sure administrators followed all laws and procedures regarding procurement rules, but on the other hand, when a Trustee requests that employees who were found to have violated board policies regarding procurement be trained, she is overstepping. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything. She is asking for steps to be taken to ensure a violation of the policy at the subject of the email not be violated again, which is within her rights and duties as a board member.

In paragraph (d), TEA alleges that a former Trustee overstepped because he sent a forward of an email from the aunt of a student who was being bullied at a middle school. Some of the comments sent to this student suggested she should kill herself, and that she was going to be

"jumped" after a school day. In his message to the District administrator, the former trustee requested that the administrator "please look into this." Again, TEA is interpreting requests by trustees from administration to look into serious issues as directives. Nowhere in this communication does the Former Trustee act individually on behalf of the Board or direct the administration to do anything.  He was simply passing along information that had been relayed to him and requested that the administration look into the matter before a student could get hurt or hurt herself.

In paragraph (e), TEA alleges that an email from Trustee Adams requesting that "staff" meet with a principal who sent her a concern is an overstep is another example if TEA misinterpreting a directive from a request. Trustee Adams specifically requests for staff to meet with the principal who emailed her with his concerns. She doesn't state I direct you to meet with this principal, she requested that they meet with the principal. Nothing in statute prohibits Trustees from requesting District administration to look into District matters that are sent to them. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything.  She was simply passing along information that had been relayed to her and requested that the administration look into the matter.

In paragraph (f), TEA alleges that an email from Trustee Adams to the Chief Financial Officer requesting the cost to the District, if the Board were to adopt a pay increase to $12.50 an hour for District employees is an overreach and improper. Texas Education Code 11.1511(b) explicitly states a school boards mandatory power and duties. One of those duties out of many is to adopt an annual budget for the district as required by Texas Education Code 44.004. Tex. Educ. Code 11.1511 (b)(9). As stated above individual trustees are allowed to request information from the District administration regarding the district's administration. Additionally, Superintendent Carranza's communication protocols allowed for board members to request information from cabinet level staff. The email provided by TEA as evidence that Trustee Adams overreached her role is actually evidence of her requesting information, as allowed by state law, from a cabinet level administrator, as requested by the then superintendent, so she could have information related to the district's budget, which is required to be adopted by the Board. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The email correspondence is evidence of a board member requesting for information needed before a vote on a decision that is explicitly the responsibility of the Board pursuant to state law.

In paragraph (g), TEA alleges a Former Trustee overreached by requesting information from cabinet level administrators regarding an email sent to the Board from a teacher within the

District. The former trustee posed the question if she could please get data on the positions mentioned in the email. Nowhere in the email did she demand the information or direct district administration to create any reports or to give her any information. TEA is misinterpreting a request as a directive. Nowhere in this communication does the Former Trustee act individually on behalf of the Board or direct the administration to do anything.

In paragraph (h), TEA alleges a Former Trustee overreached by requesting how many new principals were starting at campuses for the 2017-2018 school year as compared to the previous school year. This is a simple request for information to which trustees are entitled to. Nothing in this request is improper or outside of what is allowed by law or the communication protocols established by the superintendent at the time. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The Former Trustee was merely gathering information.

In paragraph (i), TEA's investigators cite a communication in which Trustee Flynn Vilaseca attempted to gather information by sending the former Chief of Human Resources a list of seven questions.  Finding 12, Electronic Communication[s] from 2017, ¶ (i).  There is nothing improper about a board member gathering information from administration officials.  Nowhere in this communication does Trustee Flynn Vilaseca act individually on behalf of the Board; she was merely gathering information.  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (j), TEA's investigators cite a communication in which Trustee Flynn Vilaseca notified a Houston ISD administrator an email notifying him about a plumbing issue and stating "it would be great if we could get this checked out and fixed soon."  It is unclear why TEA's investigators appear to be critical of Trustee Flynn Vilaseca's attempt to notify administration about a plumbing issue that needs to be fixed.  Finding 12, Electronic Communication[s] from 2017, ¶ (j).  Nowhere in this communication does Trustee Flynn Vilaseca act individually on behalf of the Board; she was merely providing time-sensitive information to administration officials.  Trustee Vilaseca's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (k), TEA alleges Trustee Skillern-Jones overreached her role as a trustee by requesting information on all vacant properties owned by the District. Again, TEA is characterizing the request for information that board members are entitled to as improper with no basis in law to substantiate such a claim. This statement goes for every email cited and provided by TEA as evidence of overreach by current and former trustees in the year 2017 as improper.

Additionally, pursuant to state law, the Board is the only entity in the District that can authorize the sale of land. What the email submitted by TEA evidences is a trustee asking for information related to one of the actions under the jurisdiction of the board she sits on. Nowhere in this communication does the Trustee act individually on behalf of the Board or direct the administration to do anything improper. The Trustee was merely gathering information.

These communications discussed above are further addressed in more detail with supporting evidence in the **TH Supplemental Response** for the appropriate board member or board members.

### c.  Electronic Communications from 2018

The communications from 2018 are much of the same: board members exercising their inherent right to request information and attempting to assist Houston ISD administration by providing information to administration officials.[70]  These communications involve communications that (1) provide information about safety concerns at school campuses,[71] (2) request information,[72] express opinions in response to requests from administration for input,[73] and requests to administration.[74]  None of these communications provide examples of Trustees acting individually on behalf of the Board or direct administration to do anything improper.

These communications are further addressed in more detail in the **TH Supplemental Response** for the appropriate board member or board members.

### d.  Electronic Communications from 2019

The communications from 2019 are not substantially different that the other appropriate communications TEA's investigators attempt to criticize.

Paragraph (a) is addressed in the **TH Supplemental Response** for the appropriate board member or board members.

---

[70]  **Exhibit 1**, Preliminary SAI Report, Finding 12, Electronic Communications from 2018, ¶¶ (a)–(h).

[71]  *Id.* at ¶¶ (b), (e).

[72]  *Id.* at ¶¶ (a), (d), (g), (h).

[73]  *Id.* at ¶ (c).

[74]  *Id.* at ¶¶ (f)

In paragraph (b), TEA's investigators cite a communication in which Trustee Santos forwarded an email to the interim superintendent along with additional information she thought the interim superintendent should know.  Nowhere in this communication does Trustee Santos act individually on behalf of the Board; she was merely providing important information to the interim superintendent.

In paragraph (c), TEA's investigators cite communications from a parent thanking Trustee Sung for her assistance in resolving an issue.  It is difficult to understand how Trustee attempts to resolve constituent issues violate any legal mandate.  None are cited by TEA.  Trustee Sung's response to these accusations are addressed in more detail in the **FF Supplemental Response** with appropriate evidence.

In paragraph (d), TEA's investigators cite a communication in which Trustee Davila asked the interim superintendent for information regarding the "process of hiring a principal for an elementary and middle school"  and forwarded an email to the interim superintendent along with additional information she thought the interim superintendent should know.  Nowhere in this communication does Trustee Davila act individually on behalf of the Board. She was merely providing important information to the interim superintendent.  There is no governance standard implicated in this transaction.

Similarly, in paragraph (e), TEA's investigators cite a communication in which Trustee Davila asked about the principal search and noted her support for an "inclusive and transparent" selection process.  It is not clear what criticism TEA's investigators have of this email.  Nowhere in this communication does Trustee Davila act individually on behalf of the Board; she was merely providing important information to the interim superintendent and supporting an inclusive and transparent process.

### <u>Houston ISD's Response to Allegation Three</u>

Allegation Three of the Preliminary report posed the following question:

> Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code § 44.031?

TEA's investigators conducted a one-sided investigation by failing to speak with the relevant witnesses regarding their findings and by criticizing transactions that do not violate state procurement laws.

The legal and factual inaccuracies regarding Findings 1 of TEA's Allegation Three is addressed in the **TH Supplemental Response** for the appropriate board member or board members.

### A. Findings 2 and 3 in TEA's Report under Allegation 3 are pure fiction and fail to describe any unlawful act by a board member .

Although Findings 2 and 3 involve alleged events that would have been observed by at least five individuals regarding Finding 2 and three individuals regarding Finding 3, TEA's investigators simply took a statement from an unnamed administrator and an individual named Jose Perez at face value without attempting to corroborate their stories.  These findings are emblematic of TEA's one-side investigation.

#### (1) The meeting described in Finding 2 in TEA's Report Regarding TEA Allegation Three did not happen.

The Report alleges that Trustee Davila met with an unnamed administrator at Pappadeaux Seafood Kitchen along with Abel Davila, Art Lopez, and Leticia Ablaza.  TEA's investigators have not identified the unnamed administrator, have provided no sworn or written statement in support of his story, and do not appear to have attempted to contact any of the other four people who allegedly attended this meeting.  If TEA's investigators had done so, they would have discovered that this meeting never occurred.[75]

Other than the uncorroborated and unsubstantiated statement of an anonymous witness, TEA's investigators have produced no information or evidence indicating that this meeting ever occurred.

Furthermore, even if (1) this meeting took place and (2) the conversation involved ways to get bond contracts canceled or focused on a custodial contract with MetroClean, TEA's investigators fail to show how these actions violate Section 44.031(a)(1) of the Texas Education Code.  TEA's investigators attempt to portray these actions as "circumvent[ing] the competitive bidding process," but they offer no legal reasoning to show how they reached this conclusion.  There was no bidding process at the time these alleged statements were made because MetroClean was already a vendor.  And MetroClean remains a vendor to this day. There is no law that prevents a school board member from expressing her opinions about service vendors in a school district.

---

[75]   **Exhibit 3**, Davila Declaration, ¶¶ 28–29**.**

TEA's investigators have apparently taken the position that board members can never discuss their opinions about vendors outside formal board meetings.  But this would set a dangerous precedent and create a standard that TEA is certainly not applying to other school districts' board members.  Elected board members are frequently approached by school district employees and members of the community about the happenings inside the school district.  It is not uncommon, nor is it illegal, for board members to share these experiences with school administrators.  A finding to the contrary would create unprecedented—and unlawful—roadblocks to board members' ability to engage with administration and community members.

> **(2) No Houston ISD board member has knowledge of the incident between two private individuals described in Finding 3 of TEA's Report Regarding TEA Allegation Three.**

Next, TEA's investigators attempt to punish a Trustee and conduct a school district takeover as a result of an alleged conversation between two individuals — Jose Perez (owner of MetroClean) and Ricardo Aguirre (owner of ABM Inc.).  According to TEA's report, Aguirre approached Perez with a consulting agreement that was never executed.  Although TEA's investigators apparently spoke with Perez, it appears they have reached this finding based solely on his one-sided account without conducting an interview with Aguirre to confirm what happened. If they had spoken to Aguirre, they would have discovered that he disputes TEA's version of events.[76]

Moreover, TEA's investigators seem to speculate that Trustee Davila was somehow aware of this meeting because of Perez's statement that Aguirre told him that Trustee Davila's husband sent him to have him sign this agreement.  Putting aside the lack of reliability inherent in such a statement, which is hearsay within hearsay within hearsay based on speculation, these far-fetched allegations do not support any finding of wrongdoing by Trustee Davila.

Finally, even if one assumes the alleged encounter between Jose Perez and Ricardo Aguirre occurred as described in the Report, SAI investigators presented no evidence or legal justification to support their contention that these alleged actions of two private citizens can somehow amount to a Trustee's violation of Texas Education Code § 44.031 (a)(1), and ultimately merit takeover of a school district. TEA's investigators have failed to cite any legal authority that the isolated private actions of Aguirre could properly result in a finding that Trustee Davila violated Texas Education Code § 44.031 (a)(1).

---

[76]   **Exhibit 7**, Aguirre Declaration.

The crux of SAI's governance claim against Trustee Davila rests entirely on the following assumptions: (1) that Perez is accurately recounting Aguirre's statement; (2) that Aguirre's statement is truthful; and (3) that Trustee Davila was aware of Aguirre's actions.  And we all know what happens when you make assumptions.

TEA's investigators allege that Trustee Davila violated this statute because she tried to circumvent the competitive bidding process. However, it is well settled law that:

> "Competitive bidding" requires due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications. Its purpose is to stimulate competition, prevent favoritism, and secure the best work and materials at the lowest practicable price, for the best interests and benefit of the taxpayers and property owners. There can be no competitive bidding in a legal sense where the terms of the letting of the contract prevent or restrict competition, favor a contractor or materialman, or increase the cost of the work or of the materials or other items going into the protect.

*Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc.*, 372 S.W.2d 525, 527 (Tex. 1963)

Therefore, even if all the alleged facts in this finding are taken as true, investigators have presented no evidence that Trustee Davila interfered with advertisement of District bids, nor that she prevented a company from submitting a bid. There has been no evidence presented that bidders were on different planes of equality before the committees that review the district bids, nor that Trustee Davila interfered with the process of these submissions. SAI investigators have also presented no evidence that any bidders for the District bid on different terms, nor that there were substantially different specifications for the same bid. Finally, SAI investigators have submitted no evidence that there were any formal complaints or allegations about the awarding of any bids, including MetroClean's bid.

At best, SAI investigators have, if proven to be true, shown Trustee Davila expressed dissatisfaction with a current District vendor and requested an administrator to consider alternatives for better service—these actions hardly amount to circumventing the elaborate competitive bidding process and all the mechanisms created around it to protect the integrity of the competitive bidding process.

### B. TEA's Conclusions regarding "so-called" Findings 4–12 in TEA's Report Regarding Allegation Three are based on an incorrect analysis of applicable state law.

In "Findings of Fact for Allegation Three," Findings No. 4-12 relate to issues over the District's use of job order contracts in 2013 and 2014.  These so-called "Findings of Fact" were not properly investigated, they are not based on correct analysis of applicable law, and they do not reflect standards that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas.  Findings No. 4–11 are based on an internal auditors' report (JOC Report) dated September 8, 2015.  Finding No. 12 is based on an internal auditors' report dated March 10, 2015.

First, these job order contract (JOC) issues are years old and do not in any way reflect the current governance, administration, operation or purchasing processes in the District.  These issues involve a prior Administration and a prior Board of Education.  Only two members of the current Board were even on the Board in 2013 and 2014, and neither of them were officers.  The Agency's Preliminary Report does not make any effort to establish a relationship between these issues from 2013 and 2014, and the District's current Administration and Board.  It appears that the Agency's investigators stumbled upon these JOC issues from 2013 and 2014 after beginning the current investigation, and the inclusion of these "Findings of Fact" appears to be an effort by the Agency's investigators to bolster a predetermined conclusion with "guilt by association" incidents that do not relate to the current Board or current Administration, and that do not reflect the current governance, administration, operation or purchasing processes in the District.

Second, the Agency has not established that these "Findings of Fact" reflect a correct and clearly established analysis of applicable law, and the conclusions based on these Findings therefore are improper.  The JOC Report dated September 8, 2015, prepared by the District's internal auditors, was written without any legal analysis or review.  To the best of our knowledge, the internal auditors simply made their own interpretations of statutes and never sought advice either from the District's internal attorneys or external attorneys.  The District's Administration at the time strongly disagreed with the internal auditors' JOC Report and particularly the auditors' interpretation of applicable statutes.  The District's Administration sought and received a legal analysis from the law firm of Olson & Olson LLP that concluded that the JOC Report dated September 8, 2015, incorrectly interpreted and applied statutes governing job order contracts.  The Olsen & Olsen LLP opinion is dated June 14, 2016.  The District's Administration also sought and received a legal analysis from the law firm of Rogers, Morris & Grover more generally analyzing

both job order contracts and the District's purchasing processes, and responding to the auditor's report dated March 10, 2015.  The Rogers, Morris & Grover opinion is dated May 18, 2015.  Neither of these legal reviews secured by the District's Administration agreed with the internal auditors' JOC Report dated September 8, 2015, or the internal auditors' report dated March 10, 2015.  A complete review of this issue supports a conclusion that the District handled it correctly.  When the District's Administration and internal auditors had a disagreement over an auditors' report that was not legally reviewed, the District sought and received independent legal advice and acted in accordance with the advice received.

It does not appear that the Agency's investigators reviewed the legal analyses obtained by the District, nor interviewed either the District's internal attorneys or external attorneys about these job order contract issues.  Rather, the Agency's investigators appear to have simply taken selected portions from the internal auditors' reports at face value and made "Findings of Fact" based on the reports that have nothing to do with the District's current Board or Administration, or current governance, administrative, or purchasing practices.  This issue of the correct interpretation of the statutes applicable to job order contracts and purchasing practices in general is important, because the Agency is not authorized to adopt informal "rules" or interpretations of generally applicable statutes.

Third, the Preliminary Report's effort to bolster its predetermined conclusion to recommend appointment of a board of managers, by taking selected issues from past years that do not relate to the District's current Board and Administration, is not a standard that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas.  Is the Agency truly prepared to make board of managers decisions for all school districts in Texas based on years-old disagreements between districts' administration and auditors, where the auditors' position is not supported by any legal advice a district received?  The Agency clearly is not authorized to hold the Houston Independent School District and its Board of Education and Administration to a different standard of conduct than is applied to all Texas public school districts.

In the "Analysis of Allegation Three" the Agency's Preliminary Report relies on the improper "Findings of Fact" No. 4-12 for the conclusion that the District failed to follow proper purchasing processes with regard to job order contracts.  As described above, since the "Findings of Fact" were not properly investigated, are not based on a correct analysis of applicable statutes, and do not reflect a standard that the Agency is capable of nor should attempt to apply uniformly to all public school districts in Texas, the conclusions based on those Findings must fail.  Further, as discussed above, the Preliminary Report does not make any effort to relate these issues from 2013 and 2014 to the current Board or Administration, or to the District's current governance,

administrative, or purchasing processes.  These "Findings of Fact" are a weak attempt to bolster a predetermined conclusion and recommendation, and these "Findings of Fact" would not be admissible in any proceeding to demonstrate any misconduct by the District's current Board and Administration.  At most, these "Findings of Fact" only show that years ago the District's Administration and internal auditors had a disagreement, and the Administration sought and acted in accordance with legal advice.

For all of these reasons, "Findings of Fact" No. 4-12 should be deleted, and the "Analysis of Allegation Three" should be revised to remove any reference to or reliance on these Findings.

<u>**Legal Analysis of the Fundamental Flaws in the Processes and Procedures
Utilized by TEA in this Investigation**</u>

As detailed below, the Preliminary SAI Report's proposed corrective measures and sanctions, including a proposal to lower the District's accreditation rating, are unwarranted, unlawful and unnecessary.  At the current time (the 2018–19 school year), relevant TEA standards show Houston ISD has a 2018 FIRST Rating of "A-Superior".  In 2018 Houston ISD did not receive an Accountability Rating because of Hurricane Harvey, However, if the District would have been rated, it would have received a "B" based on the state's current accountability system.  The District also and a 2018-19 accreditation status of "Accredited".[77]  Moreover, a decision after an informal review to uphold the Preliminary SAI Report would be in violation of statutory law governing the preparation and adoption of such SAI reports, and would exceed the TEA's statutory authority.  Furthermore, an adoption of the Preliminary SAI Report as a Final Report would be arbitrary and capricious, and illegally affect and abridge the substantial rights of the District, its voters, and its Trustees for the reasons discussed below in the balance of this Response.

A. **There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.**

There are distinct legal and procedural errors committed by TEA Staff regarding the Preliminary SAI Report which preclude TEA from forming the basis of lawful action by the Commissioner under TEX. EDUC. CODE § 39.102(a)(9).  Special accreditation investigations must be authorized by the Commissioner or his designee.  TEX. EDUC. CODE §§ 7.055(b)(5), 39.057(a).  Both the original and amended notice letters were issued by and under the authority of Director Jason Hewitt, a person who has not been delegated the authority to initiate SAI investigations.

---

[77]  *See* http://tea4avcastro.tea.state.tx.us/accountability/accreditation/2018_2019_accreditation_statuses.html (TEA website for 2018–19 Accreditation Statuses).

Although the notices contain boilerplate language that the investigations were authorized by the Commissioner, the mere recital of commissioner authority, without any evidence that the special accreditation investigation was properly authorized, is legally insufficient.

On January 22, 2019, TEA issued a Notice of Special Accreditation Investigation and a First Amended Notice of Special Accreditation Investigation.  The notices were issued by Jason Hewitt, Director Special Investigations Unit.  A copy of the letter was sent, inter alia, to Deputy Commissioner Crabill and others.  The notices indicated that they were authorized by the Commissioner.  However, the letter did not explain how such authorization was obtained nor did it provide any evidence of actual Commissioner pre-approval.  There is no indication that either Commissioner Morath or Deputy Crabill authorized the investigation.  The mere recital of such authority, without the proffer of any evidence to support the assertion is legally insufficient.

On March 24, 2019, TEA issued a Second Amended Notice of Special Accreditation Investigation.  Again, the notice was issued by Jason Hewitt, Director Special Investigations Unit. A copy of the letter was sent to Deputy Commissioner Crabill but not to Commissioner Morath. The Amended Notice of Special Accreditation Investigation again indicated on its face, that it was authorized by the Commissioner.  However, TEA has not provided any evidence of actual Commissioner pre-approval.  There is no indication that either Commissioner Morath or Deputy Crabill authorized the investigation.  There is no evidence in the record that the Commissioner delegated his personal responsibilities under by TEX. EDUC. CODE § 39.057(a).  The mere recital of such authority, without the proffer of any evidence to support same, is legally insufficient.

The August 5, 2019 Preliminary SAI Report failed to provide evidence that the SAI was lawfully pre-authorized by the Commissioner, as required by TEX. EDUC. CODE § 39.057(a). Although the notices recite boilerplate language that the investigations were authorized by the Commissioner of Education, neither the notice letters nor the Preliminary SAI Report provide any information as to how such an authorization happened, if at all.

The Preliminary SAI Report also fails to provide evidence that the SAI was conducted within any parameters and constraints authorized by law to the Commissioner, if such investigation was lawfully authorized at all.  The Report contains allegations relating to matters which were not specifically authorized in the original investigation nor even remotely related thereto. Furthermore, any findings and general allegations on investigative issues must be the kind of issues authorized by law to initiate an SAI investigation. Therefore, if the nature of an allegation is not specifically authorized by TEX. EDUC. CODE § 37.057(a), the allegation or finding must be dismissed as a matter of law.

**B. There is no evidence that the Special Accreditation Investigation against Houston ISD was authorized by the Commissioner.**

As discussed at the beginning of this Response, TEA's own investigation procedures require that any evidence substantiating TEA's allegations be gathered and reported in the preliminary report. However, much of the evidence that should be attached to the Preliminary SAI Report is inexplicably absent. Houston ISD objects to the attempt by TEA's investigators to withhold material evidence regarding the allegations they have leveled against Houston ISD and demands that TEA's investigators comply with TEA's Investigation Procedures and provide all evidence they claim supports allegation of wrongdoing including, but not limited to:

- Any and all "documents and tangible things" reflecting or relating to the factual statements from identified and unnamed administrators;[78]
- Any and all audio and/or video recordings of interviews regarding this investigation (including TEA's recording of the interviews with Houston ISD's board members);
- Any other evidence that TEA's investigators believe supports their allegations of wrongdoing.

Houston ISD is committed to transparency. If TEA shares this commitment, its investigators should not be withholding material evidence regarding this investigation.

**C. Houston ISD demands that TEA comply with the Texas Education Codes and submit this response to the Commissioner or a designated hearing examiner for an informal review of this investigation.**

Houston ISD respectfully requests that TEA provide an informal review at a hearing conducted by the Commissioner or a hearing examiner in compliance with Chapter 39's statutory requirements. TEX. EDUC. CODE § 39.058(b) ("Before issuing a report with its final findings, the agency must provide a person or entity the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.").

Houston ISD submits this Response along with the attached exhibits and supplemental responses to be reviewed and considered by the Commissioner or hearing examiner at the informal review hearing required by Chapter 39.

---

[78] "Documents and tangible things" as used here is defined by Texas Rule of Civil Procedure 192.3(b) and includes all electronic or magnetic data, as defined by Rule 196.4.

## **Conclusion**

Based on the above and foregoing, the District opposes TEA's findings and recommended corrective actions and sanctions.  As demonstrated above, there is no evidence the undertaking of this Special Accreditation Investigation was properly authorized by the Commissioner of Education.  Moreover, the Preliminary Report improperly varies from the limited scope of issues addressed in the notices of Special Accreditation Investigation.

The investigation in this case was not conducted in good faith: it was conducted with a predetermined result.  And in order to reach that result TEA's investigators conducted a one-sided investigation that includes numerous factual errors.  The failure of TEA's investigators to engage in a good faith attempt to reach unbiased factual findings results in findings, conclusions, and recommendations that are arbitrary and capricious.

Moreover, even if the findings reached by TEA's one-sided investigation could be given any credence, TEA's investigators failed to properly apply the relevant legal standards to these findings and has applied irrelevant legal standards when conducting its investigation and issuing its Preliminary Report.  TEA improperly relied on irrelevant legal standards to assess draconian corrective actions and sanction against the District and its Board.  These actions and sanctions are not supported by statute or other law and offend the legally protected interests of District Trustees to hold elected office.  TEA's failure to follow the law in reaching its conclusions and recommendations in this case was arbitrary and capricious.

The District reserves the right to supplement this Response and hereby requests an Informal Review of the Preliminary Report, the appointment of an unbiased hearing officer, and all other relief to which it is entitled to.

Respectfully Submitted,

_____

Kevin O'Hanlon
Benjamin Castillo
David Campbell
**O'HANLON, DEMERATH & CASTILLO**
808 West Avenue | Austin, Texas 78701
Tel: (512) 494-9949 | Fax: (512) 494-9919

*Special Counsel to Houston ISD*

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 1



**Texas Education Agency**

**Commissioner Mike Morath**

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

August 5, 2019

Diana Davila, Board President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

> **Preliminary Report**
>
> **Informal Review Request Due:**
>
> **August 15, 2019**

Holly Maria Flynn Vilaseca, 1st Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Elizabeth Santos, 2nd Vice President
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sergio Lira, Board Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Sue Deigaard, Assistant Secretary
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Jolanda Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Rhonda Skillern-Jones, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Wanda Adams, Board Member
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Anne Sung, Board Member   .
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 West 18th Street
Houston, Texas 77092-8501

**Dear President Davila and Interim Superintendent Lathan**:

The enclosed report presents the findings resulting from a Special Accreditation Investigation (SAI) conducted by the Texas Education Agency's (TEA) Special Investigations Unit (SIU). This investigation relates to allegations of a systemic breakdown of the Houston Independent School District (HISD) Board of Education's (Board of Trustees) ability to govern, operate within the scope of their authority, and ensure adherence to contracting laws and district policies.

**Executive Summary**

Trustee Diana Davila made a motion during the October 11, 2018 board meeting to replace the current interim superintendent without any prior notice or public deliberation. This action set in

**Appx.324**

motion a chain of events resulting in complaints being filed with the TEA alleging dysfunction within the HISD Board of Trustees.

On October 15, 2018, the TEA received multiple complaints alleging that the HISD is not in compliance with the laws relating to governance of an Independent School District, Tex. Educ. Code §§11.051, and 44.031; and Tex. Gov't Code Chapter 551 Open Meetings. On January 22, 2019, TEA issued a notice of Special Accreditation Investigation (SAI) to HISD and conducted an on-site investigation at the Hattie Mae White Education Support Center, Houston Independent School District, 4400 West 18th Street, Houston, Texas 77092. Due to the concerns reported by HISD staff, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. §44.031. On March 24, 2019, SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092.

TEA finds that HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of the board of trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act.

TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous other times, exceeding the scope of their authority in violation of Texas Education Code §11.051. SIU discovered numerous instances via email correspondence where the HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

Lastly, TEA finds HISD Board of Trustees violated contract procurement rules while the district was selecting a vendor/contractor as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §§44.031 and 44.031 (a)(1). HISD failed to monitor contractual obligations, resulting in the manipulation and abuse Job Order Contracts. The HISD Board of Trustees attempted to award contracts indirectly by contacting vendors during the Request For Proposal (RFP) process, advocating for specific contractors and HISD Board of Trustees manipulated contracts to circumvent contract procurement rules.

Based on the findings, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing Board of Trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the  scope of their authority, circumventing the authority of the Superintendent, and inability to ensure proper contract procurement laws are followed.

**Conclusion**

This preliminary report addresses only those allegations described herein and investigated by the SIU to date. These findings do not address all the allegations raised before or after the investigation. Additional investigative work may be conducted in the future to address any remaining allegations. Furthermore, additional TEA divisions may be in the process of investigating HISD or issuing other investigative reports regarding the district.

The preliminary report is for your review and response related to the findings identified in the report. The attachments to the preliminary report contain FERPA-protected information. FERPA-protected information may not be released to anyone unless they are authorized to receive that information pursuant to FERPA. The school district or any person identified in this report as having violated a law, rule, or policy may request, in writing an informal review of the preliminary report, as authorized by the Tex. Educ. Code §39.058 and 19 Tex. Admin. Code §157.1123. A request for an informal review must be received, along with any information or documentation the requestor would like the agency to consider during the informal review, on or before August 15, 2019, and addressed to the following postal mail or email address:

Mailing address:    Jason Hewitt
                    Special Investigations Unit
                    Texas Education Agency
                    1701 North Congress Avenue
                    Austin, Texas 78701
Email address:      Jason.hewitt@tea.texas.gov

If no informal review is requested by the deadline, this report will become final, in accordance with 19 Tex. Admin. Code §157.1123.

Please contact me at (512) 936-5962, should you have any questions.

Sincerely,

Jason Hewitt
Special Investigations Unit, TEA

TEA Special Accreditation Investigation
Preliminary Investigative Report
Houston Independent School District

**Introduction**

On October 15, 2018, the Texas Education Agency, hereinafter referred to as "TEA" received multiple complaints alleging that the Houston Independent School District, hereinafter referred to as "HISD" or "district", is not in compliance with the laws relating to Governance of Independent School District, Tex. Educ. Code §§11.051, and 44.031; and Tex. Gov't Code Chapter 551, Open Meetings. On January 22, 2019, TEA issued a notice of Special Accreditation Investigation, hereinafter referred to as "SAI" to HISD.

In January of 2019, TEA's Special Investigations Unit, hereinafter referred to as "SIU" met with HISD's Interim Superintendent, Dr. Grenita Lathan, to discuss the nature of the complaint and the purpose of the investigation. Dr. Lathan was also provided a copy of the SAI procedures. HISD provided TEA with documents pertaining to board services, electronic communication records, conservator reports, and employment contracts. SIU conducted this on-site investigation at the Hattie Mae White Educational Support Center-HISD, Houston Independent School District 4400 West 18th Street, Houston, Texas 77092, to interview board members and district staff. Additionally, SIU obtained information from Dr. Abelardo Saavedra, current and former Central Office leadership staff, and former HISD Superintendents.

Moreover, information provided during on-site interviews identified additional areas of concern regarding contract procurement. On March 24, 2019, TEA issued an amended notice of SAI to HISD to include the alleged violations of contract procurement, Tex. Educ. Code §44.031. SIU conducted a second investigation at the Educational Service Center IV, 7200 Northwest Drive, Houston, Texas 77092. The SIU findings described in this report are the result of the investigation extensive document analysis, interviews of HISD Board of Trustees, as well as current and former HISD employees.

**Background Information**

The resignation of HISD Superintendent Terry Grier changed the organizational structure of the HISD, requiring the Board of Trustees to name a new superintendent to oversee the leadership, management, and daily operations of the district. Dr. Grier's departure prompted HISD to engage in a superintendent search. After a lengthy superintendent search, Dr. Richard Carranza was named Superintendent of HISD by unanimous vote in August of 2016. Not long after, the leadership of HISD changed yet again when Dr. Carranza abruptly ended his contract in March of 2018.

On March 22, 2018 the HISD Board of Trustees convened in a 7-hour special emergency meeting to deliberate the successor to Dr. Richard Carranza, and appointed Dr. Grenita Lathan as Interim

Superintendent by unanimous vote. Moving forward, Dr. Lathan assumed the role and duties as Interim Superintendent while the board conducted its search for a permanent superintendent.

Filling the position of a permanent superintendent was not the only pressing issue HISD Board of Trustees faced. HISD's long struggle with "Improvement Required" schools is an issue that the Board of Trustees has failed to successfully address, requiring the Commissioner of Education to appoint a conservator to ensure district-level support for Kashmere High School.  Additionally, tension on the board created discord within the community leading to scrutiny from legislators, constituents, and stakeholders at the local and state level. Community members such as Zeph Capo, President of the Houston Federation of Teachers, was quoted in the Houston Public Media saying, "The conduct of the HISD's board was nothing short of embarrassing and harmful. It demonstrated a dysfunction that does not serve our community, our school district and our students well." Trustees have also been criticized by Houston Mayor Sylvester Turner, calling the HISD board, "destabilizing and unacceptable."

Board attempts to address low performing campuses have resulted in disorderly and disorganized board meetings. During the April 24, 2018, board workshop, interactions amongst the Board of Trustees, and the public, escalated to unmanageable outbursts, constant disruptions, and disrespectful comments. Upon going over the allotted time, former President Rhonda Skillern-Jones asked law enforcement to remove the last public speaker from the podium sparking further outbursts from the audience. Former President Skillern-Jones then requested law enforcement assistance in clearing the boardroom. The audience reacted in outrage shouting expletives while Trustee Wanda Adams can be heard saying, "I'm sick of this shit, clear the room." Law enforcement had to remove audience members out of the board room and arrested two community members.

Additionally, HISD Board of Trustees have demonstrated unprofessional behaviors by means of inappropriate verbal arguments during multiple meetings. Trustees have historically interrupted each other during their allotted speaking time, complained about speaking time, and regularly failed adhering to Robert's Rules of Order. Board meetings lack control and order, as evident in the May 10, 2018 meeting when Trustee Jolanda Jones interrupted President Skillern-Jones and stated, "It's frustrating that they [administration] send us [trustees] stuff, and then we come to this table and ask questions we've already gotten the answers to… This is already a long meeting and there are people sitting here that still haven't gotten to speak yet, so I'm tired of meeting to death."

During a board meeting held on June 14, 2018 Trustee Jones stated, "…In reference to the Legislative Budget Board Audit… I think that's a crackhead move, that's my opinion." At the end of that meeting, Trustee Sue Deigaard said, "I think that tonight revealed for me, and the week that proceeded it, was some significant struggles that our board has and I'm really hoping our board can learn from this week, and learn from tonight and pull it together for kids and focus on student outcomes."

Moreover, TEA Conservator Dolores Delaney reported conflicts between trustees have created an environment that impedes the board from focusing on student outcomes. During the September 20, 2018, special board meeting trustees engaged in explosive disagreements when considering the approval to exercise warranty under February 2016, Hazard Young, Attea and Associates "HYA" services for a superintendent search.

Further on, events that occurred during the October 11, 2018 meeting revealed the chaotic dynamics of the HISD Board of Trustees. As Trustee Anne Sung calls a motion to execute the agreement with HYA, arguments erupted between trustees. Trustee Adams commented on the specifics of the contract. Legal counsel interjected during Trustee Adams' commentary to keep her from disclosing closed session discussions, such as; specifics of the contract, and the lack of community engagement. Tension on the board intensified when Trustee Davila expressed that there had been an intentional delay to begin the superintendent search by other trustees.

Trustee Davila's rhetoric prompted Trustee Adams to express her frustrations about a factional divide on the Board of Trustees and within the district's administration. Trustee Adams stated, "Read the conservator's reports, it is about racial lines, and we need to stop it as a board… when you say our community, Santos, that means Black, Brown, Hispanic, Asian, it means everybody. Not just one side, so you need to collaborate with all the principals that don't look like you. We need to come together as one team and make sure we are all on one accord, because we are sending a message that should not be… We have to put what's best for kids, and we are not… we are worried about if someone is Black, White, Hispanic, Asian, it shouldn't be that way… it should be about one color and that's our kids."

Conflicts between trustees not only highlight a difference of opinion, they expose a factional divide that prevents the HISD governing body from moving forward as a district. As Trustee Jones pointed out, "We have people that are working here because Latinos on the board have threatened the superintendent that she better not fire them… there is a race war on this board. I know from both Sergio and Sue that they are concerned, and I do not believe my colleagues always vote for what's best for student achievement but to not appear to side with one race over another." The comments from board members clearly illustrate the dysfunction of the board.

During the October 8, 2018 meeting with Dr. Saavedra, the trustees present in that meeting stated their complaints about the interim superintendent and other trustees.  Dr. Saavedra summarized the complaints of Trustees Lira, Sung, Santos, and Vilaseca as follows:

> They shared with me how disenfranchised they felt on the board.  They discussed at length how the interim superintendent ignored them and did not respect them.  They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in one of the board committees.  One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused.

The inner turmoil of the divided HISD Board of Trustees reached a tipping point during the October 11, 2018 regular board meeting, when Trustee Davila motioned to terminate the current interim superintendent and hire a new interim superintendent with no prior notice that the position of interim superintendent was under consideration. This motion and subsequent vote caused a chain of events that prompted TEA intervention.

HISD has also experienced historical problems with contract awarding and contract procurement. The events leading to the arrest of a former Trustee for violating federal racketeering laws highlighted the corruption of the business affairs within the district. HISD internal auditors investigated and confirmed the abuse of Job Order Contracts in which contracts were split in order to avoid the $500,000 threshold as required by state law. In conjunction to these findings, the district's former Chief Auditor, Richard Patton, filed a whistleblower lawsuit against HISD for terminating his contract after reporting unallowable contracting practices within the district.

In addition to egregious board dysfunction and contract procurement issues, the board members frequently overstep their authority. Examples of overreach and overstep of authority by the HISD Board of Trustees can be found dating back to 2009. During the investigation, SIU found that in August of 2009 the HISD board voted 8-1 to allocate $121.5 million for additional facilities projects in each of the nine trustee's districts. The board members who participated in this vote were former 2009 Board of Trustees, and current Board President Diana Davila. This was called the Trustee Allocation Fund (TAF). ( See Exhibit A )

On April 29, 2019, an HISD senior administrator was interviewed by SIU investigators. The administrator reported that the TAF was funded with residual bond money from the 2007 bonds. The amount of money in the fund totaling $121.5 million, was to be split (nine) ways. At this time, the funds have been depleted. The HISD senior administrator explained, "The trustee identified how they wanted the funds spent, and a board item was drafted to allocate the fund request from un-allocated to allocated per the Board vote and approval."(See Exhibit B) The administrator stated that trustees managed TAF money. Trustees used the money for various projects of their choice for schools in their own district. For example, Trustee Skillern-Jones used some of the bond money allocated in her fund to purchase books for Burrus Elementary and "furniture for school reception area" for High School Ahead Academy Middle School. (See Exhibit C) The amount in the fund rolled over to whichever trustee was elected to that seat, until the money was exhausted. This further exemplifies the overreach of the HISD Board of Trustees. The action to approve trustee spending is not only an overreach of the board,but is in direct conflict with the superintendent's contract that states, "the management of the district falls under their (superintendent's) purview." Again, HISD Board of Trustees exceeded their authority by passing this measure and directing HISD employees.

The three specific allegations, SIU's findings of fact, and analysis have resulted in TEA's final decision as stated below:

**Allegation One**

Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?

**Applicable Statute**

Texas Governmental Code §551.002. states every regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter.

**Allegation Two**

Did the members of the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

**Applicable Statutes**

Texas Education Code §11.051 states:

(a) An independent school district is governed by a board of trustees who, as a body corporate, shall:
> (1) oversee the management of the district; and
> (2) ensure that the superintendent implements and monitors plans, procedures, programs, and systems to achieve appropriate, clearly defined, and desired results in the major areas of district operations.

(a-1) Unless authorized by the board, a member of the board may not, individually, act on behalf of the board. The board of trustees may act only by majority vote of the members present at a meeting held in compliance with Chapter 551, Government Code, at which a quorum of the board is present and voting. The board shall provide the superintendent an opportunity to present at a meeting an oral or written recommendation to the board on any item that is voted on by the board at the meeting.

(b) The board consists of the number of members that the district had on September 1, 1995.

(c) A board of trustees that has three or five members may by resolution increase the membership to seven. A board of trustees that votes to increase its membership must consider whether the district would benefit from also adopting a single-member election system under Section 11.052. A resolution increasing the number of trustees takes effect with the second regular election of trustees that occurs after the adoption of the resolution. The resolution must provide for a transition in the number of trustees so that when the transition is complete, trustees are elected as provided by Section 11.059.

**Allegation Three**

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

**Applicable Statutes**

Texas Education Code, § 44.031 states:

(a)  Except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district:

(1)  competitive bidding for services other than construction services;
(2)  competitive sealed proposals for services other than construction services;
(3)  a request for proposals, for services other than construction services;
(4)  an interlocal contract;
(5)  a method provided by Chapter 2269, Government Code, for construction services;
(6)  the reverse auction procedure as defined by Section 2155.062(d), Government Code; or
(7)  the formation of a political subdivision corporation under Section 304.001, Local Government Code.

**Findings of Fact for Allegation One**

Did a quorum of the HISD Board of Trustees consider or discuss public business over which the trustees have supervision or control outside of a public meeting posted in compliance with Tex. Gov't Code Chapter 551 "Open Meetings"?

The following findings of fact are a result of interviews conducted and an examination of HISD internal documents.

**Open Meetings**

1.  On March 5, 2018 at 11:17 PM, Trustee Holly Maria Flynn Vilaseca sent an email to Dr. Saavedra stating, "Holly here (HISD Trustee) As you may have heard, many changes are taking place here. Would love to hop on a call to check-in." ( See Exhibit 1.1 ).
2.  Trustee Davila told SIU, "I communicated with Dr. Saavedra when Richard Carranza announced that he was going to be leaving… we talked about a possible interim superintendent interest."
3.  Text messages submitted by Trustee Vilaseca confirm that on October 5, 2018, Trustee Vilaseca asked Dr. Saavedra if they could meet on October 8, 2018 from 3PM -6PM. ( See Exhibit 1.2 )

4. During her interview with SIU, Trustee Flynn Vilaseca stated that on October 8, 2018, she met with Dr. Saavedra at a local restaurant along with Trustees: Santos, Lira, Sung and Davila.

5. Dr. Saavedra stated that he met with Trustees Lira, Sung, Santos, and Flynn Vilaseca on October 8, 2018. After Trustees Lira, Santos and Sung left, Dr. Saavedra met with Trustees Vilaseca and Davila.

6. In their interviews with SIU, Trustees Santos and Sung acknowledge they were in a meeting with Dr. Saavedra, Trustee Lira, and Trustee Flynn Vilaseca

7. Dr. Saavedra told the SIU that Trustee Vilaseca told him that some of the HISD Board of Trustees did not know him and wanted to meet him.

8. According to Dr. Saavedra, the board members wanted to talk to him that day because they wanted to consider him as a replacement for Dr. Lathan.

9. Trustee Flynn Vilaseca told SIU investigators that during the meeting with Dr. Saavedra, Trustee Flynn Vilaseca provided Dr. Saavedra with a copy of former Superintendent Carranza's contract.

10. On October 11, 2018, three days after the meeting between trustees and Dr. Saavedra, Trustee Davila called a motion to replace Dr. Lathan as Superintendent with Dr. Saavedra. The motion passed on a 5-to-4 vote. The five trustees (Lira, Davila, Sung, Santos and Vilaseca) who secretly met with Dr. Saavedra all voted for the motion three days after meeting with Dr. Saavedra.

11. In the motion to hire Dr. Saavedra, the board offered the same salary and benefits as were present in Dr. Caranza's contract that was provided to Dr. Saavedra by Trustee Holly Vilaseca in the secret meeting three days prior.

12. During the deliberations regarding Trustee Davila's motion to replace Dr. Lathan with Dr. Saavedra, Trustee Davila explained that she had recently been at a conference where she was told that it was hard to get qualified candidates to apply for a superintendent job when the current interim superintendent is pursuing that position. Trustee Davila then stated that she had "spoken to Dr. Saavedra and he has no interest of staying or applying for the position."

13. SIU conducted separate interviews with Trustee Adams, Trustee Jones, Trustee Skillern-Jones and Trustee Deigaard. When asked if they knew about the meeting at a local restaurant, they all denied knowing about the meeting and stated that no one told them about it. Their statements are corroborated by Dr. Saavedra and the five board members who knew about the meeting.

14. Most recently at the August 1, 2019 Agenda review meeting, Trustee Santos stated, "I just find it quite funny that people keep throwing stones at certain trustees but were not the only ones in violation the Texas open meeting act, so I'm gonna go ahead and remind this board that last year when we voted for um [sic] the September vote when certain elected officials showed up here there were five other trustees that knew about a September 1st contract for the interim superintendent that somebody was going to make the motion on. There were five trustees that knew about it, we were not-didn't in any clue about it [sic], so the investigation, I welcomed the TEA to continue investigating not just the five educators that you keep pointing fingers at, Trustee Deigaard, because if I recall, you were the one that

was going to make that motion. Anyway I'm gonna go ahead and back up Trustee Sung, because I didn't get on this board to be elected, I didn't come up on here for talking points, I didn't come up here to hault-to stop [sic] the democratically elected process that you know what when we got up here 18 months ago, but five years ago, five years ago there were nine trustees up here that were not doing the work for children; now you have a board that is willing to do the work and you want to sit here and hide behind talking points? It's not just these five educators that need to be under investigation Trustee Deigaard." Trustee Skillern Jones admitted that there have consistently been problems with the HISD board for five years, describing the board as "contentious and conservative". Trustee Skillern-Jones also accused some of her fellow board members of receiving their talking points from community members who attend the board meetings through their phone.

## Cooperation with TEA investigation

15. When SIU investigators asked Trustee Vilaseca why she provided Dr. Saavedra with a copy of former Superintendent Richard Carranza's contract, Trustee Vilaseca stated she did not recall.

16. When asked about her relationship with Dr. Saavedra, Trustee Davila stated, "I was on the board with him for five years and he was superintendent for five years. We have a professional relationship…Dr. Saavedra and I, every now and then will send texts like: Happy New year, Happy Birthday, Happy Father's Day… when I was still on the board even after I hired Dr. Grier it would be like, Do you remember what the budget looked like when you were here? or, do you remember the process we used when you were here?, things like that."

17. During her interview with SIU, Trustee Davila further stated that in 2018, she had communicated with Dr. Saavedra "five or six times."

18. Dr. Saavedra told the SIU that he had exchanged text messages with Trustee Davila on or about October 4, 2018 about whether he had heard from Trustee Vilaseca. When he responded that he had not, Trustee Davila told him that he would hear from her soon.

19. SIU submitted requests to HISD for text messages from HISD Board of Trustees (including Trustee Davila) to Dr. Saavedra. Trustee Davila failed to respond to the request and failed to produce any records. Board members are subject to the Public Information Act and the Local Records Retention Schedule. Text messages regarding the arrangement of a meeting with a person being considered for the interim superintendent position should have been retained and turned over to the SIU upon request.

20. In her interview with SIU, Trustee Davila stated that when she met with Dr. Saavedra there were no other trustees present; however, Trustee Vilaseca and Dr. Saavedra confirm that Trustee Vilaseca was present when Trustee Davila met with Dr. Saavedra.

21. In his interview with SIU, Trustee Lira admitted that he met with Dr. Saavedra before the October 11, 2018 regular board meeting. However, Trustee Lira told to the SIU investigators that he was alone when he met with Dr. Saavedra and no other trustees were present for the meeting. This declaration is contradicted by Dr. Saavedra's statement that he met with Trustees Lira, Santos, Vilaseca and Sung and later by Trustee Davila. Additionally, Trustees

Sung, Santos, and Vilaseca confirmed that Trustee Lira was present during the meeting with Dr. Saavedra.

**Analysis of Allegation 1**

**OPEN MEETING VIOLATION**

TEA finds that HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by coordinating an unposted meeting of a quorum of the board of trustees to conduct important district business in secret. Five out of the nine board members met in a "walking quorum" on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo (Abe) Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held in compliance with the Open Meetings Act.

According to the Texas Open Meetings 2018 Handbook, as provided by the Office of Attorney General, a walking quorum occurs when a governmental body attempts to avoid compliance with the Act by deliberating about district business without a quorum being physically present in one place at one time. Additionally, per Government Code §551.001(4), "meeting" means: a deliberation between a quorum of governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has a supervision or control is discussed or considered or during which the governmental body takes formal action.

On May 24, 2019, Attorney General, Ken Paxton provided an opinion on the Texas Open Meetings Act quorum rules and stated the following, "If a quorum of a governmental body deliberates about public business within the jurisdiction of the body outside of a meeting authorized by the Texas Open Meetings Act, through multiple communications each involving fewer than a quorum, the governmental body violates the Act. If the Texas Education Agency conducts an investigation as authorized by section 39.057 of the Education Code and concludes that members of a school district board of trustees violated their duty to comply with the Act, it could take appropriate civil action authorized by subsection 39.057(d) of the Education Code." ( See Exhibit 1.3 )

Based on Findings of Fact 1-13, five individual members of the HISD Board of Trustees violated the Open Meetings Act by holding two successive meetings attended by a quorum of the HISD Board of Education.  At this meeting the quorum of the board discussed and considered public business over which the board has supervision or control by engaging in conversation and dialogue for the purpose of replacing Dr. Lathan with Dr. Saavedra.  The hiring of a superintendent for the district is public business over which the HISD Board of Education has supervision or control. See Tex. Educ. Code §11.201(b) ("The board of trustees for an independent school district may employ by contract a superintendent for a term not to exceed five years.")

Based on Findings of Fact 1-6, Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila all secretly met with Dr. Saavedra on October 8, 2018, in a meeting that was not posted in accordance with the Open Meetings Act. Trustees Vilaseca and Davila had been talking with Dr. Saavedra about

the position of interim superintendent since Dr. Carranza's resignation. It is irreverent that there is no evidence that all five trustees were in the meeting with Dr. Saavedra at the same time, as the trustees violate the open meetings act when they deliberate public business outside of a properly posted public meeting through multiple communications each involving fewer than a quorum.

Based on Findings of Fact 7-12, the purpose of the meetings with Trustees Lira, Sung, Santos, Flynn Vilaseca, and Davila with Dr. Saavedra was to consider Dr. Saavedra for the position of interim superintendent. Dr. Saavedra was told by Trustee Vilaseca that some of the Board members did not know him and wanted to meet him. See Finding of Fact 7. It is reasonable to conclude that the board members would want to meet Dr. Saavedra before voting to name him as the new interim superintendent. Further, Dr. Saavedra himself concluded that the board members were interested in hiring him to be the new interim superintendent. See Finding of Fact 8.

In addition, Trustee Vilaseca admitted that she provided Dr. Saavedra a copy of former superintendent Dr. Caranza's contract. See Finding of Fact 9. There would be no reason to present a copy of the former superintendent's contract if the board members were not considering him for the position of the interim superintendent. The fact that three days later the five board members who secretly met with Dr. Saavedra then voted to name him as the new interim superintendent under the same terms as the contract they presented to him at the October 8, 2018 meeting corroborate the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent. See Findings of Fact 10-11.

Finally, after Trustee Davila made the motion to name Dr. Saavedra as the new interim superintendent, Trustee Davila acknowledged that she had spoken to Dr. Saavedra about the position of interim superintendent and that he had told Trustee Davila that he would not be interested in taking the permanent position. See Finding of Fact 12. This corroborates other evidence that the purpose of the meeting was to discuss making Dr. Saavedra the new interim superintendent.

Based on Finding of Fact 13 Trustee Santos publicly admitted that she violated the Texas Open Meetings Act and then accused her fellow board members of the same.

As a tenured trustee, Diana Davila understood the concept of a walking quorum. During her interview with SIU, she defined a walking quorum as, "five trustees engaged in conversation with district business to discover if you have a consensus, additionally, a walking quorum does not have to be all at once. As in, we all don't have to be sitting together all at one time."

## Cooperation with TEA Investigation

At the time of October 8, 2018 meeting with Dr. Saavedra, the position of interim superintendent was a highly contentious issue. Dr. Saavedra described the complaints of Trustees Lira, Sung, Santos, and Vilaseca. Dr. Saavedra summarized the issues as follows:

> They shared with me how disenfranchised they felt on the board. They discussed at length how the interim superintendent ignored them and did not respect them. They described how a community member had been disrespectful and threatening toward one or more of them and another trustee turns around and places that threatening community member in

one of the board committees.  One or more of the trustees that was meeting with me said that they had asked Dr. Lathan for a district police officer to attend the meetings where the threatening community member would be at and she refused.

However, when SIU interviewed the board members, there were many instances where the board members had little memory of this highly important meeting. Further, some of the board members made deceptive statements to the SIU, either by making inconsistent statements and through omission.

As detailed in Finding of Fact 9, Trustee Vilaseca acknowledged providing Dr. Saavedra with a copy of former superintendent Richard Carranza's contract. However, Trustee Vilaseca could not or would not explain why she presented Dr. Saavedra with a copy of that contract.  See Finding of Fact 14.  However, when the motion was made to make Dr. Saavedra the interim superintendent, the motion specifically identified the compensation and benefits in the contract to be given to Dr. Saavedra to be equal to the rate paid to Dr. Carranza. Trustee Vilaseca failed to cooperate with the investigation by failing to explain why she had a copy of Dr. Carranza's contract and why she presented it to Dr. Saavedra.

As detailed in Findings of Fact 15-18, Trustee Davila regularly communicated with Dr. Saavedra about HISD business, including an exchange of text messages arranging the secret meeting held in violation of the Open Meetings Act.   These communications are public records and are required to be retained pursuant to the Texas Public Information Act and the Local Records Retention Schedule.  Trustee Davila failed to cooperate with the investigation by failing to turn over text messages that were requested pursuant to this investigation.

As detailed in Finding of Fact 19, Trustee Davila failed to cooperate with the Agency's investigation by falsely claiming that there were no other trustees present when she met with Dr. Saavedra.  Trustee Vilaseca and Dr. Saavedra confirm that Trustee Vilaseca was present when Trustee Davila met with Dr. Saavedra.

As detailed in Finding of Fact 20, Trustee Lira failed to cooperate with the Agency's investigation by falsely claiming that there were no other trustees present when he met with Dr. Saavedra. Trustees Santos, Sung, and Vilaseca and Dr. Saavedra all confirm that Trustee Lira was present at the meeting attended by Trustees Santos, Sung, and Vilaseca and Dr. Saavedra.

## Overall Conclusion

Therefore, allegation one "Did the HISD Board of Trustees exercise decision making powers without deliberating in a public quorum of trustees or posting a public meeting notice as required by Tex. Gov't Code Chapter 551 Open Meetings?" has been substantiated. Five out of the nine board members met in a walking quorum on October 8, 2018 at a local restaurant in Houston, Texas. SIU determined that members of the HISD Board of Trustees engaged in conversation and dialogue to relieve Dr. Grenita Lathan as Interim Superintendent and hire Dr. Abelardo Saavedra as her replacement. This conduct not only violated the Texas Open Meetings Act, but also violated Tex. Educ. Code § 11.051 because the trustees acted on behalf of the board without the authorization by a majority vote of the members of the Board of Trustees present at a meeting held

in compliance with the Open Meetings Act.. The nature of these actions do not reflect HISD Policy BBE (LOCAL) which states, Official Board actions shall be taken only in meetings that comply with the Open Meetings Act, thus, the HISD Board of Trustees explicitly violated the Texas Open Meetings Act. ( See Exhibit 1.4 )

## Findings of Fact for Allegation Two

Did the HISD Board of Trustees act individually on behalf of the Board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?

The following findings of fact are a result of interviews and an examination of HISD internal documents.

1. On January 29, 2019, SIU investigators interviewed the Principal for the High School of Law and Justice. The Principal recalled an incident in 2018 with Trustee Davila during a site visit of the High School for Law and Justice campus. "I am in a brand-new campus. As it was being built, Diana Davila had a tour of the campus without my knowledge… I found out about it on Twitter when I saw her pictures with my construction manager, and them taking pictures of the new building. Then I got a phone call from my project manager, as Trustee Davila told the construction people to take a wall down out of my new campus out of the courtroom. I became a little upset. They took that wall down. I went to the HISD Senior Administrator and I told him, 'she can't do that', and he says that, 'I'm very aware that she cannot do that. If you want the wall back, we will put the wall back up.'"

2. On April 16, 2019, SIU investigators interviewed a HISD Administrator. This administrator corroborated the Principal's account that Trustee Davila gave a directive to modify construction of a classroom while on a site tour. The administrator stated, "One project we just finished was High School for Law… it was pretty much done with the construction or the particular areas was done and it was one of the feature areas which was the courtroom set up like a full courtroom, a mock courtroom because it was actually a classroom… So that was all done and at a board member's request all of that had to be changed just off a site tour." During a site visit, Trustee Davila directed that a completed mock courtroom be changed. Initially, the room was a mock courtroom, within a classroom. During her site visit, Trustee Davila complained that the courtroom was too small and directed the construction services administration, including the administrator to change it. The administrator provided the construction change order documents. ( See Exhibit 2.1 )

3. The change order states that the total cost of changes to the mock classroom amounted to $20,000. When asked who ultimately approves a change like this, the administrator responded, "it was a trustee said it and it was done. I know what you're looking for, yes, it's out of protocol, that's the simple answer." When asked if this was overreach by a trustee, the administrator responded, "yeah, cause I mean, I have to manage that budget and you just made a request, that you don't care about... but I have to figure out how that money works, I have to call in that favor with that contractor."

4. According to the Principal, and the administrator's testimony, Trustee Davila conducted a campus visit without letting the campus principal know and instructed the construction team to make material modifications to an area that was already built.

5. An HISD senior administrator was directed to remove a contract for the construction of Austin High School in December 2016. The HISD senior administrator stated Trustee Davila asked him to remove the Pepper Lawson contract from the January board agenda after the procurement process had occurred. Moreover, Trustee Davila and her husband told the administrator that they wanted a firm out of Dallas, wanted him to make it happen, and threatened him with his job if he did not do it. Although the administrator refused to remove the contract from the agenda, a former board president took the liberty to remove the agenda item. Subsequently, the agenda item was placed on the February 2018 regular board meeting. ( See Exhibit 2.2 and Exhibit 2.2.1)

6. On October 3, 2018, Trustee Elizabeth Santos hosted a campaign event on HISD property paid for by the district. The event, "Field Good Day", was not sponsored by HISD ( See Exhibit 2.3 ). Although Trustee Santos indicated she would cover the cost of the event, she failed to submit payment. A HISD senior administrator confirmed Trustee Santos did not pay for the event.

7. Trustee Santos misused her role as a trustee when visiting the Hattie Mae White Educational Support Center. The administrator told SIU, "Santos was getting all this food and not paying for it. She tells people, 'I am a trustee and board services covers that.'" The administrator stated board services did not cover the cost of those meals because it was not in policy to do so.

8. During a workshop with Deputy Commissioner AJ Crabill and HISD administration regarding Improvement Required campuses, Trustee Davila expected principals to explain what they needed so trustees could provide resources to prevent another failing year. Principals refused to speak over the superintendent, prompting Trustee Davila to say, "Let me be clear, I won't hesitate to vote you out when your contract comes up if you don't tell me what you want right now, because your four schools are in the playoffs."

9. A Senior HISD administrator told SIU that Dr. Lathan set protocols in place to prevent trustees from interacting with staff and enforced the use of the board service referral system. Additionally, Dr. Lathan had to address the issue with the board several times in writing as well as during closed session during their retreat.

10. Dr. Doris Delaney has served as a conservator for Houston ISD from September 2016 to present. Dr. Delaney is responsible for attending Houston ISD school board meetings on a regular basis and noting important board decisions, board interactions, and areas of concern within her monthly conservator reports. During this time, Dr. Delaney attended roughly 104 board meetings and spent substantial time observing board interactions, some of which are depicted in the following exerts from her monthly conservator reports to TEA:

   a. In the March 2018 conservator report, TEA Conservator Doris Delaney reported, "Board members continue to make requests of staff that take away from the staff being able to spend time performing their assigned duties." In March 2018, the board members requested the following:

  i. How much money do we currently spend per student at each campus and what has the historical trend been for the past 10 years? Please disaggregate state/local funding from federal funding.

  ii. For each campus (248), what is current funding under the PUA and what is the funding under an FTE? For each campus, I'm looking for the following data points (included 27 individual questions) ( See Exhibit 2.4 )

11. Dr. Delaney reported on the status of board member requests that were being handled by board services. ( See Exhibit 2.5 ) Dr. Delaney reported numerous instances where individual board members contacted members of the administration directly. The members of the administration then sent the request to board services.

12. The SIU reviewed electronic communications from Trustees dating back to the beginning of 2016. During this period of time, the individual board members frequently contacted members of the HISD administration providing individual input and directing activity in the areas of personnel, operations, contracting, and campaign events.

### Electronic Communications from 2016

 a. On January 27, 2016, a former trustee forwarded an email to the former Chief of Human Resources, in regard to an HISD employee applicant and the positions she applied for. The trustee stated, "Could I please ask you to check if these positions have been filled? Ms. Lorenzo has applied and has not received any reply." ( See Exhibit 2.6 )

 b. On April 12, 2016, a former trustee emailed the Interim Superintendent questions regarding the upcoming board agenda items. The interim superintendent directed the former Chief of Student Support Officer to answer the trustee's questions. The officer complied and answered all the former trustee's questions. The trustee then replied and asked about which vendor the administration was recommending for a project. The officer sent him the HISD policy on the Code of Silence with potential vendors. The former trustee replied, "I know the law." (See Exhibit 2.7 )

 c. On August 1, 2016, a former trustee forwarded an email to former Chief of Human Resources, regarding a pay dispute with an employee who had resigned and was claiming to be owed a 3-month severance payment. The former trustee directed her to reply to the forwarded email. The former trustee stated, "Please see below and reply, thank you. Cc me on the response." ( See Exhibit 2.8 )

 d. On September 19, 2016, Trustee Skillern-Jones sent an email to the former Chief Communications Officer regarding a meeting being planned. Trustee Skillern-Jones directed the officer as to whom she wanted to plan her meeting, even though someone else was already assigned. In the email, Trustee Skillern-Jones also laid out numerous demands. Trustee Skillern-Jones stated, "I want [employee A] working this meeting and the decorations done appropriately… Please ensure landscaping is done, please ensure refreshments are provided, please ensure décor

is acceptable, please ensure agendas are done, and please ensure sufficient staff is in place." ( See Exhibit 2.9 )

e.  On January 26, 2016, a former trustee emailed the former Superintendent of School Choice and requested that she send him a spreadsheet of the racial breakdown of each magnet's school "magnet students." ( See Exhibit 2.10 )

f.  On March 1, 2016, a former trustee directed the former Media Relations Manager to respond to a letter from a law firm. The former trustee stated, "Manager, I would like your lead to respond to this letter with back up from [employee B] as to why HISD is moving away from UIL at Carnaige."
( See Exhibit 2.11 )

g.  On March 28, 2016, a former trustee emailed the former Chief Superintendent of School Choice and requested information regarding student applications for a particular school. ( See Exhibit 2.12 )

h.  On May 16, 2016, Trustee Skillern-Jones emailed [employee C] and [employee D] requesting information for her to share at her community meeting hours before it was to commence. ( See Exhibit 2.13 )

i.  On May 24, 2016, a former trustee emailed a HISD senior administrator  and other HSID staff members regarding a principal's complaint of the lack of maintenance staff at her school. The former trustee stated, "Please fix this…It's not acceptable for a principal working a turn-around campus to have to do this work herself."
( See Exhibit 2.14 )

j.  On June 26, 2016, a former trustee emailed a staff member to see if she could pick up her student's old test grades and documents because she lost them and needs to turn them in so her child can go to school. (See Exhibit 2.15)

**Electronic Communication from 2017**

a.  On May 3, 2017, Trustee Adams forwarded an email she received from a friend of a coworker at her job to the former Superintendent, former Deputy Superintendent, and former Chief of Human Resources. The forwarded email contained a list of positions the friend applied for within HISD. Along with the forwarded email, Trustee Adams instructed the recipients of the email to view the resume and "consider for possible telephone conversation." Trustee Adams also stated that she will forward the resume once received from the friend.
( See Exhibit 2.16 )

b.  On May 24, 2017 Trustee Skillern-Jones forwarded an email to the former Chief of Human Resources regarding a former employee's issue. The former employee was requesting to be eligible for rehire, despite being told that she was not eligible for rehire due to performance issues. Trustee Skillern-Jones directed the former chief to "please investigate." ( See Exhibit 2.17 )

c.  On December 5, 2017, Trustee Adams and a former trustee were forwarded three reports of Code of Silence violations by a former Superintendent, former Chief of Human Resources, and former Officer of Human Talent. The email was sent by the former HISD Ethics and Compliance Officer. Trustee Adams responded to the

email giving the directive that all cabinet members be trained annually on ethics policies and further stated she wanted the email to be placed in the personnel file of all listed in the email.
( See Exhibit 2.18 )

d. On March 31, 2017, a former trustee forwarded an email to an Area Superintendent regarding a parent complaint at one of the schools. The former trustee directed the area superintendent to look into the situation. ( See Exhibit 2.19 )

e. On May 1, 2017, Trustee Adams sent an email directly to an HISD senior administrator, former Chief of Staff, board services, HISD Senior Administrator, and former high school Principal. Trustee Adams requested all staff meet with [employee E] to address the needs of that high school, which is in her district. ( See Exhibit 2.20 )

f. On June 1, 2017, Trustee Adams emailed an HISD Senior Administrator and requested he send her the budget cost "if we were to increase pay to 12.50 per hour." ( See Exhibit 2.21 )

g. On June 7, 2017, a former trustee emailed HISD administration and staff members and requested information. The trustee stated, "Could we please get the data on the positions mentioned? Including a comparison of central office positions over the last five years with budget increases." ( See Exhibit 2.22 )

h. On August 3, 2017, a former trustee emailed the Chief of Human Resources, and requested information regarding new principal positions. ( See Exhibit 2.23 )

i. On October 22, 2017, Trustee Flynn Vilaseca sent the former Chief of Human Resources a list of seven (7) questions. (See Exhibit 2.24)

j. On November 10, 2017, Trustee Flynn Vilaseca emailed an HISD Senior Administrator and directed him to resolve an issue. Trustee Flynn Vilaseca stated, "Looks like there are plumbing issues at Askew. I have sent [employee F] a referral but wanted to send directly to you as it would be great if we could get this checked out and fixed soon." ( See Exhibit 2.25 )

k. On December 6, 2017, Trustee Skillern-Jones directly emailed an HISD Senior Administrator and requested information. Trustee Skillern-Jones stated, "Please have real estate send me a list of all vacant properties." ( See Exhibit 2.26 )

## Electronic Communications from 2018

a. On January 10, 2018, Trustee Adams directly emailed an HISD Senior Administrator and asked for an update on the construction of two schools.      ( See Exhibit 2.27 )

b. On February 22, 2018, the former Chief of Staff alerted Trustee Deigaard to an incident that occurred at a middle school. Trustee Deigaard then emailed that she wanted the doors at a different school locked, stating that, "the doors are only locked from the front and not from the back." ( See Exhibit 2.28 )

c. On February 22, 2018, a former Area Superintendent emailed Trustee Adams and attached the interview and staffing timeline for the hiring of a principal at a particular school. Also, in the email the area superintendent informed Trustee

Adams about how many internal and external applicants there were.   Trustee Adams expressed her desire for three specific members to participate in the hiring committee. Trustee Adams had already communicated to one of these members that he would be part of the hiring committee before she informed HISD staff. ( See Exhibit 2.29 )

d.   On February 27, 2018, Trustee Deigaard asked the former Chief of Student Support Officer for information regarding, "How many current students are from each trustee district?" She also wanted to know, "How many students come from each middle school?" ( See Exhibit 2.30 )

e.   On April 18, 2018, Trustee Deigaard sent an HISD Senior Administrator a lengthy email in discussing how she witnessed a bus make an unsafe turn as she was driving her daughter to school. ( See Exhibit 2.31 )

f.   On August 24, 2018, Trustee Skillern Jones emailed an HISD Senior Administrator and asked for a closed HISD parking lot to be open for her event. ( See Exhibit 2.32 )

g.   On October 3, 2018, Trustee Deigaard forwarded an email to an HISD Senior Administrator regarding a parent who has bus transportation concerns. Trustee Deigaard stated, "I didn't include the new head of transportation on this because I couldn't remember their name…please let me know their name and address for future correspondence, I would appreciate it." ( See Exhibit 2.33 )

h.   On October 23, 2018, Trustee Deigaard emailed an HISD Senior Administrator and asked him, "Where might I find the quarterly investments reports online? I've looked several places but haven't found it yet." ( See Exhibit 2.34 )

**Electronic Communications from 2019**

a.   On March 18, 2019, an HISD Senior Administrator forwarded an email from the General Manager of the Benefits Department regarding a phone call between Trustee Skillern-Jones, a contractor, and a MWBE subcontractor. Allegedly, the phone call discussed HISD's medical plan and medical RFP. It was stated that Trustee Skillern-Jones wanted to set up a meeting with the benefits department. When Dr. Lathan emailed Trustee Skillern-Jones and asked her why she wanted a meeting, Trustee Skillern Jones replied, "I got a call from Nick because he heard I had concerns, the same concerns I voiced in the budget workshop. I did not ask Nick to speak for me or to set up a meeting for me….(AT NO TIME DID I DISCUSS AN RFP PERIOD. HE STATED HE THOUGHT MAYBE SOMEONE ELSE COULD SAVE US MONEY.)"  Regardless of whether the contractor was the one to initiate the phone call, Trustee Skillern-Jones should have referred the call to the interim superintendent as it is not part of her statutory duties. ( See Exhibit 2.35 )

b.   On April 16, 2019, Trustee Santos forwarded a public information request (PIR) from a community member to Dr. Lathan. The PIR related to an evaluation. In the initial PIR email, the community member sent the request to HISD staff and carbon copied Dr. Lathan and Trustee Santos. In her email to Dr. Lathan, Trustee Santos

stated, "I know you've received this, and I believe the community has a requested a meeting with the Area Supe. I hope we can clear this up soon." ( See Exhibit 2.36 )

   c.   In April of 2019, an email was sent to Trustee Sung from a parent discussing a grievance and thanking Trustee Sung for all her close help in trying to solve the matter. The parent emailed  Trustee Sung, "[t]hank you for working so closely with our family to resolve the issues … pertaining discriminatory and retaliatory practices…Hopefully the assistance and consistent communication that you have provided in support of our family will not jeopardize your voting power to negate any action pertaining to the future of [name of program redacted pursuant to FERPA]…" The parent also requested an update on Trustee Sung's "assistance in resolving the matter." In April of 2019, the parent emailed Trustee Sung again and stated, "[t]hank you for assisting in the effort to resolve the ongoing issues at [name of program redacted pursuant to FERPA], I read your attached email. The forms of resolution you brought up in your discussion with [name of administrator redacted pursuant to FERPA] were not implemented…" In the same email the parent asked Trustee Sung to ask certain questions to the parties involved in the grievance. The parent emailed Trustee Sung in April of 2019, and stated, "[y]ou have been the responsive and hands on board member and at times you made many of us feel as if you were our area superintendent because of your active participation." ( See Exhibit 2.37 )

   d.   On April 26, 2019, Board President Davila emailed Interim Superintendent Dr. Lathan requesting to be updated on the process of hiring a principal for an elementary and middle school. Board President Davila requested to know timelines, people serving on the committees, and their roles in the school community. ( See Exhibit 2.38 )

   e.   On May 1, 2019, Trustee Davila, emailed Interim Superintendent Dr. Lathan and copied Trustee Anne Sung, asking her about the principal search at a school. Trustee Davila stated, "[w]hat is happening with this process? Making sure the district is inclusive and transparent in the selection of a campus leader is policy. We don't need legislators making a new law because of this one HISD campus." ( See Exhibit 2.39 )

13. From 2016 to 2018, there were numerous direct and indirect communications by a board member to HISD staff.  Direct communications are communications where a board member directly communicates to a staff member via email without copying the superintendent or interim superintendent. Indirect communications are communications where a board member directly communicates to a staff member and copies the superintendent or interim superintendent. ( See Exhibit 2.40 and Exhibit 2.40.1).

### Analysis of Allegation Two

TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous times, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051. While investigating allegations that trustees acted without authority given in an open meeting, SIU discovered other

instances of other trustees acting without authority. SIU discovered numerous instances via email correspondence where the HISD Board of Trustees acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the HISD Board of Trustees present at a meeting held in compliance with the Open Meetings Act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

Tex. Educ. Code §11.051(a-1) clarifies that a member of the board may not individually act on behalf of the board and that the board of trustees may only act by a majority vote of the members present at a meeting held in compliance with the Open Meetings Act.

Tex. Educ. Code §11.1511(b) and (c) enumerate the powers of the Board of Trustees of an independent school district in relation to the superintendent.

(b)  The board shall:

(1)  seek to establish working relationships with other public entities to make effective use of community resources and to serve the needs of public school students in the community;

(2)  adopt a vision statement and comprehensive goals for the district and the superintendent and monitor progress toward those goals;

(3)  establish performance goals for the district concerning:

(A)  the academic and fiscal performance indicators under Subchapters C, D, and J, Chapter 39; and

(B)  any performance indicators adopted by the district;

(4)  ensure that the superintendent:

(A)  is accountable for achieving performance results;

(B)  recognizes performance accomplishments; and

(C)  takes action as necessary to meet performance goals;

(5)  adopt a policy to establish a district- and campus-level planning and decision-making process as required under Section 11.251;

(6)  publish an annual educational performance report as required under Section 39.306;

(7)  adopt an annual budget for the district as required under Section 44.004;

(8)  adopt a tax rate each fiscal year as required under Section 26.05, Tax Code;

(9)  monitor district finances to ensure that the superintendent is properly maintaining the district's financial procedures and records;

(10)  ensure that district fiscal accounts are audited annually as required under Section 44.008;

(11)  publish an end-of-year financial report for distribution to the community;

(12)  conduct elections as required by law;

(13)  by rule, adopt a process through which district personnel, students or the parents or guardians of students, and members of the public may obtain a hearing from the district administrators and the board regarding a complaint;

(14) make decisions relating to terminating the employment of district employees employed under a contract to which Chapter 21 applies, including terminating or not renewing an employment contract to which that chapter applies; and

(15) carry out other powers and duties as provided by this code or other law.

(c) The board may:

(1) issue bonds and levy, pledge, assess, and collect an annual ad valorem tax to pay the principal and interest on the bonds as authorized under Sections 45.001 and 45.003;

(2) levy, assess, and collect an annual ad valorem tax for maintenance and operation of the district as authorized under Sections 45.002 and 45.003;

(3) employ a person to assess or collect the district's taxes as authorized under Section 45.231; and

(4) enter into contracts as authorized under this code or other law and delegate contractual authority to the superintendent as appropriate.

Tex. Educ. Code §11.1512(a) defines the relationship between the board and the superintendent. It states that, "In relation to the superintendent of the school district, the board of trustees has the powers and duties specified by Sections 11.1511(b) and (c). The superintendent shall, on a day-to-day basis, ensure the implementation of the policies created by the board."

The superintendent is responsible for enforcing policy and procedures to operate district business effectively and efficiently acting as the chief executive officer. Section 11.201(d) of the Texas Education Code, (d) identifies the duties of the superintendent, which include:

1. Assuming administrative responsibility and leadership for the planning, organization, operation, supervision, and evaluation of the education programs, services, and facilities of the district and for the annual performance appraisal of the district's staff;

2. Except as provided by section 11.202. assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district other than the superintendent;

3. Overseeing compliance with the standards for school facilities established by the commissioner under section 46.008;

4. Initiating the termination or suspension of an employee or the nonrenewal of an employee's term contract;

5. Managing the day-to-day operations of the district as its administrative manager, including implementing and monitoring plans, procedures, programs, and systems to achieve clearly defined and desired results in major areas of district operations,

6. Preparing and submitting to the board of trustees a proposed budget as provided by section 44.002 and rules adopted under that section, and administering the budget;

7. Preparing recommendations for policies to be adopted by the board of trustees and overseeing the implantation of adopted policies;

8. Developing or causing to be developed appropriate administrative regulations to implement policies established by the board of trustees,

9. Providing leadership for the attainment, and, if necessary, improvement of student performance in the district based on the indicators adopted under sections 39.053 and 39.301 and other indicators adopted by the commissioner or the district's board of trustees.

10. Organizing the district's central administration;

11. Consulting with the district-level committee as required under section 11.252;

12. Ensuring:

    A. Adoption of a student code of conduct as required under section 37.001; and

    B. Enforcement of that code of conduct; and adoption and enforcement of other student disciplinary rules and procedures as necessary;

13. Submitting reports as required by state or federal law, rule or regulation, and ensuring that a copy of any report required by law, rule, or regulation is also delivered to the agency;

14. Providing joint leadership with the board of trustees to ensure that the responsibilities of the board and superintendent team are carried out; and

15. Performing any other duties assigned by action of the board of trustees.

Houston ISD has adopted policies governing board member interactions with staff. Policy BBE(LOCAL) has been in effect since 2001 and states that, "Board members as individuals shall not exercise authority over the district, its property, or its employees." ( See Exhibit 1.4 ). This policy also states, "An individual member may act on behalf of the board only with the official express authorization of the board. Without such authorization, no individual member may commit the board on any issue."

This policy also prohibits board members from directing or requiring district employees to "prepare reports derived from an analysis of information in existing district records or to create a new record compiled from information in existing district records. Directives to the superintendent regarding the preparation of reports shall be by (1) Board action; (2) Request of an individual board member made in a board meeting after discussion by the board as a whole; or (3) Written request of an individual board member. ( See Exhibit 1.4 )

This policy also requires individual board members to refer citizen concerns or complaints to the Superintendent who is then required to proceed per the appropriate complaint policy. The board retains authority to address concerns or complaints by considering placement on the board agenda in limited circumstances. The concern or complaint must directly pertain to the board's own actions or policy for which there is no administrative remedy. ( See Exhibit 1.4 )

Houston ISD adopted Policy BBE2 (REGULATION) on April 15, 2013. This policy establishes a procedure governing all referrals from trustees or the superintendent. The policy defines a referral as "any verbal or written communication received from a trustee … that requires action, such as requesting information or resolution of an issue." The policy does not allow board members to make referrals to staff including the superintendent or interim superintendent without complying with this policy. Rather, the policy requires trustees to submit all requests to the board services team lead or designee. ( See Exhibit 2.41 )

As described in Allegation 1, all five members of the HISD Board of Trustees that met with Dr. Saavedra on October 8, 2018 violated Tex. Educ. Code §11.051(a-1) and Board Policy BBE

(LOCAL) by interviewing Dr. Saavedra for the position of interim superintendent without prior authorization of the board.

As described in Findings of Fact 1-4, Trustee Davila conducted a campus visit without notifying the campus principal and instructed the construction team to make material modifications to an area that was already built. This conduct violates Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) because it was an action taken by an individual board member without consideration by the board, and Policy BBE2 (REGULATION) because it was a board member referral to staff that did not go through the board referral system.

As detailed in Finding of Fact 5, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by directing the HISD Administration to remove a vendor for the board's agenda after the procurement process has ended without the approval of the entire board.  Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 6, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to host a campaign event on HISD property without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 7, Trustee Santos violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring the district to allow her to eat for free when visiting the Hattie Mae White Education Support Center without first obtaining approval of the entire board. Trustee Santos further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 8, Trustee Davila violated Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL) by requiring district employees to answer her questions under the threat of an adverse personnel action without first receiving approval from the entire board. Trustee Davila further violated Policy BBE2 (REGULATION) by failing to make this referral through board services.

As detailed in Finding of Fact 9, the board overreach is a continuing problem that the interim superintendent has had to address with the board multiple times in writing, or as well during closed session and during board retreats.

As detailed in Finding of Fact 10, the district's conservator has documented in her reports that trustees continue to make requests of staff that take away from their duties, interfere in personnel issues, and direct staff to attend events (sometimes without notifying the interim superintendent).

As detailed in Findings of Fact 11, Trustees Jones, Adams, Lira, Davila, and Santos violated Policy BBE2 (REGULATION) by requesting information but failing to make this referral through board services.

As detailed in Finding of Fact 12, individual trustee overreach is common, and individual trustees have a long-standing practice of monitoring, directing, influencing or interfering with

administrative actions in the areas of operations (including campaign events), contracting, grievances, and personnel in violation of Tex. Educ. Code §11.051(a-1) and Policy BBE (LOCAL). Specifically, Trustees; Skillern-Jones, Adams, Flynn Vilaseca, Deigaard, Santos, Sung, and Davila engaged in this practice.

As detailed in Finding of Fact 13, SIU discovered numerous direct or indirect communications to staff at HISD, that violate Tex. Educ. Code §11.051(a-1), Policy BBE (LOCAL), and Policy BBE2 (REGULATION). Direct communications are when a trustee directly communicates to a staff member without copying the superintendent or interim superintendent. Indirect communications are when a trustee directly communicates to a staff member and copies the superintendent or interim superintendent. In each instance, the trustee made a referral to staff without going through the Board Referral System as required by Policy BBE2 (REGULATION).

Therefore, Allegation Two, "Did the HISD Board of Trustees act individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051 Governance of Independent School District?" is substantiated because HISD Board of Trustees have acted individually, on behalf of the board, without the prior authorization by a majority vote of the members of the board of trustees present at a meeting held in compliance with the open meetings act. The HISD Board of Trustees also violated the board policies adopted to govern the interactions between the board members and the district's administration.

The amount of board overreach has impacted the operations of the district. Former superintendents indicated that the HISD Board of Trustees made it impossible for them to do their job as CEO of the district due to constant trustee involvement causing them to leave the district. Moreover, the former superintendent stated, "It seems like Trustee Davila wanted to be the superintendent of the district."

## Findings of Fact for Allegation Three

Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?

The following findings of fact are a result of interviews conducted via audio recordings and video recordings. In addition, SIU investigators examined HISD internal documents.

1. On October 12, 2015, the HISD Ethics and Compliance Officer, issued a compliance review of procurement RFP #15-07-05 ( See Exhibit 3.1 ). On September 3, 2015, Trustee Adams provided non-public information to a vendor regarding the award for RFP #15-07-05 Two-Way Radio System for Transportation with Infrastructure Upgrade. The awardee, Vendor #1, had been made known to the Board of Trustees on September 2, 2015 and the public was notified on September 7, 2015. Records indicate that on September 4, 2015, Trustee Adams violated District Policy CAA Local Financial Management Goals and Objectives, Financial Ethics, regarding the Code of Silence ( See Exhibit 3.2 ). Recommendations of this investigation included that the HISD Board of Trustees receive additional training from the Office of Ethics and Compliance regarding the Code of Silence. TEA requested trustee training transcripts; however, the district was only able to

provide TASB training. TEA could not verify if trustees received training from the Office of Ethics and Compliance. ( See Exhibit 3.3 )

2. In August of 2016, Trustee Davila met with a HISD senior administrator at Pappadeaux Seafood Kitchen along with her husband, Abel Davila, Art Lopez, and Leticia Ablaza. The administrator stated that the nature of the meeting was to strategize a way to get bond contracts cancelled and re-bid. Moreover, the administrator told SIU investigators Trustee Davila and her husband, along with Mr. Lopez and Ms. Ablaza, focused on the custodial contract with MetroClean. Trustee Davila, Art Lopez, and Leticia Ablaza demanded that HISD cancel its contract with MetroClean, and award it to Accel Building Maintenance (ABM Inc.). The administrator responded, "ABM Inc. did not have a good reputation with the district and therefore would not be considered as a vendor." To which Trustee Davila replied, "It will happen if we want it to happen."

3. After the administrator refused to cancel the MetroClean Contract, the owner of MetroClean told the administrator that ABM Inc. had approached MetroClean to give them a consultant agreement. On March 19, 2019, SIU contacted Jose Perez, owner of MetroClean Commercial Building Services, and discussed his interaction with Ricardo Aguirre, owner of ABM Inc. ( See Exhibit 3.4 ). On March 19, 2019, during an interview with SIU, Mr. Perez confirmed that Ricardo Aguirre approached him and attempted to force him to sign a consulting agreement stating that "MetroClean" would pay "Accel" a monthly salary of 2% of gross revenue received. In addition, "MetroClean" would increase the monthly payment to 3% if more contracts were secured. Mr. Perez provided the administrator a photographic document of what Mr. Aguirre wanted him to sign. ( See Exhibit 3.5 ). Mr. Perez stated that he was in the Request for Proposal process with HISD for custodial services when he was approached by Mr. Aguirre to circumvent the procurement process. Moreover, Mr. Perez mentioned that Mr. Aguirre attempted to pressure him into signing the agreement stating, "Diana Davila's husband sent me here to have you sign this agreement." Additionally, Mr. Perez stated that Aguirre threatened him saying, "If you don't sign the agreement, HISD will not approve your contract."

4. Problems with contracting procedures are not a recent development within HISD. Historical evidence of unlawful contract awarding can be traced to 2013 through the internal documentation of Job Order Contract misuse. SIU received documents from an HISD internal audit demonstrating the district split Job Order Contracts to avoid the state law limit. ( See Exhibit 3.6 ) The investigation, conducted by the former Internal Auditor, revealed that the HISD violated Tex. Educ. Code § 44.031(a)(5) a method provided by Chapter 2269, Government Code, for construction services; and Tex. Gov't. Code §2269.403 (c) the governing body of a governmental entity shall approve each, job, task, or job purchase order that exceeds $500,000. The audit determined that 14 Job Order Contracts were split to avoid the $500,000 limit, with one contract going over $1 million in funds. The following table illustrates a sample of Job Order Contracts that were audited and found to be non-compliant.

## Job Order Contracts

| Job Order Number | Contractor Num. | Contractor | Campus | Split Amounts | Actual Contract Value |
|---|---|---|---|---|---|
| KBR 20104 | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | |
| KBR 20105 | 84879 | Kellogg Brown & Root | NFISD Career and Tech. Center | $480,000 | **$960,000.00** |
| KBR 30006 | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $324,600 | |
| KBR 30007 | 84879 | Kellogg Brown & Root | NFISD Kirby MS | $408,300 | **$732,900.00** |
| KBR 30008 | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $174,923 | |
| KBR 30009 | 84879 | Kellogg Brown & Root | NFISD Lakewood Elem. School | $330,116 | **$505,039.00** |
| KBR 30063 | 84879 | Kellogg Brown & Root | Cage Elementary School | $491,376 | |
| KBR 30064 | 84879 | Kellogg Brown & Root | Cage Elementary School | $359,922 | **$851,298.00** |
| JLS 30079 | 64938 | Jamail & Smith Construction | Sanchez ES | $499,150 | |
| JLS 30148 | 64938 | Jamail & Smith Construction | Sanchez ES | $33,720.89 | **$532,870.89** |
| P2M 30044 | 93555 | P2MG | Jones High School | $381,758.96 | |
| P2M 30045 | 93555 | P2MG | Jones High School | $481,060.71 | |
| P2M 30047 | 93555 | P2MG | Jones High School | $484,475.00 | **$1,487,254.25** |
| P2M 30048 | 93555 | P2MG | Jones High School | $139,959.58 | |
| P2M 30054 | 93555 | P2MG | Jones High School | $288,909.81 | |
| | | | | $498,341.11 | **$1,170,675.47** |
| | | | | $383,424.55 | |

5.  As stated in the Job Order Contracting Report (JOC Report) issued September 8, 2015, HISD internal auditors found that Job Orders (KBR 20104 and KBR 20105, issue date June 11, 2013) had been awarded to Kellogg Brown & Root (KBR) independently however should have been awarded as a single contract with a "not to exceed" value of $960,000. Instead, HISD awarded two $480,000 contracts to KBR for the "Demolition" and "Asbestos Abatement" for the NFISD Career and Technology Center.  Auditors reported that the HISD Board of Trustees approved funding for these job orders on July 18, 2013, a month after the funding had been awarded to KBR. Furthermore, the report goes on to say that KBR did not provide HISD with any final accounting and mentioned that HISD failed to request an audit of the records to determine the final cost of the project.

6.  The JOC Report finds that on August 6, 2013, HISD awarded two (2) "not to exceed" job order contracts to KBR for demolition and abatement of buildings at Kirby Middle School. Contract KBR 30006 was valued at $324,600 and KBR 30007 was valued at $408,300. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $732,900 should have been approved by the Board of Trustees.

7.  As per the JOC Report, job orders KBR 30008 and KBR 30009 were awarded to KBR on August 6 and 7, 2013 for work at Lakewood Elementary School. As per HISD auditors, KBR 30008 was awarded for the "Abatement of Existing Structures" for a total value of $174,923. KBR 30009 was awarded to KBR for "Demolition of Buildings" for a total value of $330,116. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $505,039 should have been approved by the Board of Trustees.

8.  Job orders KBR 30063 and KBR 30064 as referenced in the JOC Report were awarded to KBR on May 8, 2014 for work at Cage Elementary School. KBR 30063 cited "Architectural and Site Work for the Principals Restroom, and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $491,376.  KBR 30064 cited "Electrical, Plumbing and Mechanical for the Principal's Restroom and Restroom Nos. 110A, 111A, 114A, 123A, 123B, 164 and 165" at a final value of $359,922. Because of the value of the contracts were less than the $500,000 threshold, there was no board item approving these contracts. HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $851,298 should have been approved by the Board of Trustees.

9.  The JOC Report identified Jamail & Smith Construction (JLS) as another entity that conducted business with HISD. As per the report, JLS was awarded job order contract JLS 30079 for "Sanchez Elementary Bathroom TDLR Renovations" on April 4, 2014, at a value of $499,150. The project included "Site work for concrete and paving details for bathrooms X60B, 45B, 43B, 41B, Boys and Girls Restrooms 31 and 31A, Specialty Rooms 26A and 26, State Area Room X63, and Classroom 32 and 33. Moreover, JLS 30148 was awarded on September 15, 2014, at a value of $33,720.89. The purpose of JLS 30148 was for "Sanchez Elementary Bathroom TDLR Renovations Additional Works". HISD internal auditors concluded that since the two projects were performed simultaneously, a single contract valued at $532,870.89 should have been approved by the Board of Trustees.

10. The JOC Report also reviewed contract work performed by P2MG for projects at Jones High School. The following job orders were approved:

    a. P2M 30044, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Culinary Arts Area, 2. New Administration Area, 3. New Wall between the classrooms," for a value of $381,758.96.

    b. P2M 30045, awarded on June 10, 2014, for "Renovation of the Specialty Areas at Jones High School, 1. Welding, 2. HVACR, 3. Cosmetology," for a value of $481,060.71.

    c. P2M 30047, awarded on June 5, 2014, for "Jones High School, 1. Canopy Painting, 2. Upgrade Lights," for a value of $484,475.

    d. P2M 30048, awarded June 5, 2014, for "Jones High School, 1. Resurface Tennis Courts, 2. Restroom Renovations, 3. Bus Lane," for a value of $139,959.58.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after the work was paid and completed. HISD internal auditors concluded that since the four projects were performed simultaneously, a single contract valued at $1,487,254.25 should have been approved by the HISD Board of Trustees.

11. The JOC Report pointed out an additional job order awarded to P2MG for work at Jones High School. Order P2M 30054 was awarded as three separate requisitions on July 23, 2014, for "Jones High School (Design and Grading) Parking Lot Addition -Phase I", at a value of $288,909.81, "Jones High School Parking Lot Addition (Paving Parking Area) - Phase II" at a value of $498,341.11, and "Jones High School Parking Lot Addition (Paving Parking Area) - Phase III" at a value of $383,424.55.

On September 11, 2014, the HISD Board of Trustees approved this Board Item (H-2) after work was paid and completed. HISD internal auditors concluded that since the three projects were performed simultaneously, a single contract valued at $1,170,675.47 should have been approved by the HISD Board of Trustees.

12. A closer look the audit report "Internal Audit of the Design and Selection Process for Job Order Contracts, General Construction – Major & Minor Projects" Issued March 10, 2015 provided additional insight as to the contract awarding process at HISD ( See Exhibit 3.7 ). Not only did the report highlight a lack of transparency, non-compliance with state laws, non-compliance with HISD policy and procedures and a lack of timely and cost effective/best value services, it also cited an alarming concern, "Historical instances existed where contractors actually received an award even though they were not recommended for an award."

<u>**Analysis of Allegation Three**</u>

TEA finds that the HISD Board of Trustees violated contract procurement rules and failed to ensure staff followed these rules and procedures while the district was selecting a vendor/contractor, as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §44.031. Section 44.031 (a)(1) specifies that "except as provided by this subchapter, all school district contracts for the purchase of goods and services, except contracts for the purchase of produce or vehicle fuel, valued at $50,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district: (1) competitive bidding for services other than construction services." HISD failed to monitor contractual obligations allowing the district to manipulate and abuse Job Order Contracts.

Tex. Educ. Code §44.031 (d) allows the district to adopt rules and procedures for the acquisition of goods and services. HISD adopted policy CAA (LOCAL), which details the district's code of silence. CAA (LOCAL) states "Code of Silence" shall mean a prohibition on any communication regarding any RFP, bid, or other competitive solicitation (as defined in the procurement methods above) between:

1.   Any person who seeks an award from the district or its affiliated entities (including, but not limited to, the HISD Foundation and the HISD Public Facility Corporation), including a potential vendor or vendor's representative; and

2.   A Board member, the Superintendent, senior staff member, principal, department head, director, manager, or other District representative who has influence in the evaluation or selection process.

The investigation revealed numerous instances of trustees violating the District's rules and procedures with regard to the process of purchasing contracts.

Interference in the contract procurement process has been an ongoing problem at HISD. Garland Blackwell, the current Chief Audit Executive for the district, told SIU that HISD Board of Trustees have been investigated internally by the Ethics and Compliance Office and Internal Audit Office on more than one occasion.

As detailed in Findings of Fact 1, Trustee Adams' intervention in the RFP process posed a great risk to the procurement process and defeats the controls set in place to prevent fraudulent contract awarding. As mentioned in the memo drafted by former Compliance Officer Debi Fincher, Trustee Adams provided non-public information to a sub-contractor affiliated with the vendor in an ongoing RFP. Unbeknownst to the district, that sub-contractor was a colleague of Trustee Adams which could lead to the conclusion that Trustee Adams was pushing for the contract to go in favor of that vendor. This conduct violates Tex. Educ. Code§44.031(a)(1) because this was a board member who interfered with the competitive bidding process. This conduct also violates CAA (LOCAL) because the board member shared confidential information to a vendor, during the RFP process, breaking the Code of Silence.

As detailed in Findings of Fact 2 and 3 Trustee Davila violated Tex. Educ. Code §44.031 (a)(1) when she met with an HISD senior administrator to influence the administrator to choose a certain vendor for a custodial contract. Trustee Davila violated this statute because she tried to circumvent the competitive bidding process. Furthermore, a colleague of Trustee Davila visited with a vendor who was in the RFP process and tried to coerce the vendor into a consulting contract.

As detailed in Finding of Fact 4, HISD violated Tex. Educ. Code § 44.031 (a)(5) and Tex. Gov't. Code §2269.403 (c) when the district split job order contracts to avoid the $500,000 limit, which should have been approved by the HISD Board of Trustees.

As detailed in Finding of Fact 5, HISD split a contract that should have otherwise been awarded as a single contract. This was determined by the date issued and the sequence number of the job order contracts for KBR. HISD approved funding for these contracts prior to approval from the HISD Board of Trustees. Moreover, the board item that was later approved did not specify the use

of Job Order Contracting or a waiver of the statutory pricing limits. There was no justification as to why HISD awarded two contracts to the same contractor on the same day.

As detailed in Finding of Fact 6, the job order contracts with KBR regarding Kirby Middle School demonstrates that HISD split a contract and therefore evaded board approval once more. This conclusion was reached based on the fact that KBR was awarded two contracts that had the same objective and therefore should have been awarded as a single contract that required board approval. Again, HISD could not justify awarding two contracts to one contractor on the same day for doing simultaneous work on Kirby Middle School.

As detailed in Findings of Fact 7, there was no reasonable explanation as to why two work orders were issued to complete the work at Lakewood Elementary School. KBR's objective was to demolish the school, so the scope of work order KBR 30008 and KBR 30009 were the same. In addition to the same scope of work, the total value to this project totaled $505,039, which exceeds the amount required for board approval.

As detailed in Findings of Fact 8, KBR was awarded two contracts that reflected work to be completed concurrently at identical locations. Because KBR was awarded both contracts on the same day and the job orders are numerically sequential, this contract should have been awarded as a single item valued at $851,638. These actions demonstrate how HISD continued to award contracts under the $500,000 threshold to circumvent the required board approval.

Although not approved on the same day and not in sequential order, the contracts (JLS 30079 and JLS 30148) should have been approved by the board as the cost of the project totaled $532,870.89. The nature of the second contract is considered to be a change order to JLS 30079 and should not have been assigned a separate job order number. Evidently, HISD did not receive approval from the board for awarding these contracts.

As detailed in Findings of Fact 10, P2MG was awarded four job order contracts which remained under the $500,000 threshold. However, P2M 30044 and P2M 30045 were requested in sequential order and were identical in nature. Those two job orders should not have been requested separately and should have been combined which would be valued at $862,819.67. Nonetheless, these four job orders total $1,487,254.25, which exceeds the annual limit of $1 million per campus per year (see Exhibit 3.6 p.4). Moreover, the work was completed and billed by September 3, 2014, of which, $767,957.99 was paid before the HISD Board of Trustees approved Board Item (H-2) in September 11, 2014. Therefore, HISD did not seek approval of the board prior to awarding contracts or prior to completion of the work.

As detailed in Finding of Fact 11, P2MG was awarded three job orders that, when combined, were valued at $1,170,675.47. These contracts should not have been issued as individual orders and should have been procured properly. The contracts should have been initially valued at $1,170,675.47 as the nature of the work completely focused on the parking lot addition of Jones High School. Moreover, when HISD presented the contract as part of Board Item (H-2), the HISD Board of Trustees approved the requisitions almost two months after P2M 30054 was awarded.

Government contracts are easily susceptible to fraud and therefore contract procurement rules should be followed accordingly. However, HISD manipulated contract procurement rules through the abuse of Job Order Contracts and multiple change orders. The district not only intentionally split Job Order Contracts to avoid the $500,000 limit, they approved multiple change orders to projects subsequently increasing the cost of projects, thus, proving fraudulent behaviors that contribute to a lack of transparency.

Therefore, allegation four, "Did the HISD Board of Trustees fail to follow contract procurement rules and procedures, and fail to ensure staff followed these rules and procedures when awarding contracts for goods and services in violation of Tex. Educ. Code §44.031?" is substantiated because on multiple occasions the HISD Board of Trustees violated the law by interfering with the contract procurement process. The HISD Board of Trustees intentionally tried to award contracts indirectly by contacting vendors during the RFP process, advocating for contractors, and HISD was found to be manipulating contracts to circumvent contract procurement rules.

## Summary

The HISD Board of Trustees violated the requirements of the Texas Open Meetings Act by setting up a secret and unposted meeting of a quorum of the board of trustees to conduct important district business in secret.  The findings establish a systemic breakdown of the HISD Board of Trustees' ability to govern and oversee the management of HISD. This behavior is demonstrated by taking actions outside the scope of their authority, in directing district employees to perform tasks that exhibit overreach, intimidating and questioning employees about their responsibilities, and directing hiring decisions. Further, the HISD Board of Trustees interfered with contract procurement laws by contacting vendors during the RFP process and allowing Job Order Contracts to be awarded with lowered amounts to circumvent the threshold as required by law.

The findings establish that there is a failure of the HISD Board of Trustees to collaborate with the district superintendent within the limits of the board's statutorily specified duties. Also, there is an demonstrate and inability to provide leadership for the district. The dissention between board members, the superintendent, and other district leadership is detrimental to the students of Houston Independent School District, thus affecting student outcomes.

## Recommendation for Sanctions

Based on the findings, the SIU will recommend to the Commissioner of Education that the accreditation status of the district be lowered, a conservator be appointed, and a Board of Managers be installed in accordance with Tex. Educ. Code §39.057(d) to replace the existing board of trustees due to the HISD Board of Trustees' demonstrated inability to appropriately govern, inability to operate within the  scope of their authority, circumventing the authority of the superintendent, and inability to ensure adherence to contract procurement policies and laws are followed.

The above recommendation will enable HISD to function in the best interest of students, while policies and procedures can be implemented to address the issues raised in this investigation. TEA reserves the right to implement all available interventions and sanctions under Tex. Educ. Code,

Chapter 39, and 19 Tex. Admin Code Chapter 97, to address the current, or any future deficiencies identified for HISD.

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 2



**THE HOUSTON INDEPENDENT SCHOOL DISTRICT
BOARD OF EDUCATION
OFFICIAL AGENDA AND MEETING NOTICE**

| | | |
|---|---|---|
| **OCTOBER 11, 2018** | **SCHOOL BOARD MEETING** | **2:00 P.M.** |
| | **CLOSED SESSION** | **2:00 P.M.** |
| | **REGULAR BOARD MEETING** | **5:00 P.M.** |

**BOARD SERVICES CONFERENCE ROOM AND BOARD AUDITORIUM
4400 WEST 18TH STREET
HOUSTON, TEXAS 77092**

<span style="color:red">**At the October 11, 2018, Board of Education meeting, all agenda items were approved as presented, except B-1, D-2, and K-1, which were postponed until November 8, 2018.**</span>

<span style="color:red">**Additional information may be obtained from the Board Services Office, 713-556-6121.**</span>

A CITIZEN WISHING TO SPEAK TO A REGULAR BOARD MEETING AGENDA ITEM OR ANY OTHER DISTRICT-RELATED MATTER MAY DO SO BY REGISTERING TO SPEAK WITH THE BOARD SERVICES OFFICE BY 9:30 A.M. THE DAY OF THE REGULAR BOARD MEETING. A CITIZEN DESIRING TO APPEAR BEFORE THE BOARD OF EDUCATION AT ITS PUBLIC HEARING TO ADDRESS AN ISSUE NOT INCLUDED IN THE REGULAR BOARD MEETING AGENDA SHALL FILE ANY SUPPORT INFORMATION (E.G., HANDOUTS) REGARDING THE CITIZEN'S CONCERN WITH THE BOARD SERVICES OFFICE.

**ANY ITEM THAT ESTABLISHES, MODIFIES, OR DELETES BOARD POLICY MAY, AT THE BOARD'S DISCRETION, BE PASSED AND BECOME EFFECTIVE IMMEDIATELY FOLLOWING FIRST READING.**

**THE ITEMS ON THIS AGENDA MAY BE TAKEN IN ANY ORDER.**

**NO AGENDA OR DISTRICT BUSINESS WILL BE DISCUSSED EXCEPT AS NOTICED BELOW AND ANY ACTION WILL OCCUR IN THE ROOM OPEN TO THE PUBLIC. IT IS THE INTENT OF THE DISTRICT TO HAVE, AND THE MEETING WILL HAVE, A QUORUM AND PRESIDING OFFICER PHYSICALLY PRESENT AT THIS LOCATION. THE ABOVE LOCATION WILL BE EQUIPPED WITH VIDEO CONFERENCE EQUIPMENT.**

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

**2:00 P.M. – BOARD SERVICES CONFERENCE ROOM**

- **CALL TO ORDER**
- **ADJOURN TO CLOSED OR EXECUTIVE SESSION UNDER SECTIONS 551.004, 551.071, 551.072, 551.073, 551.074, 551.076, 551.082, 551.0821, 551.083, AND 551.084 OF THE TEXAS GOVERNMENT CODE FOR THE PURPOSES LISTED UNDER SECTION C**
- **RECESS**

**5:00 P.M. – BOARD AUDITORIUM**

- **REGULAR BOARD MEETING RECONVENES FOR OPEN SESSION**
- **MEDITATION AND PLEDGE OF ALLEGIANCE**
- **RECOGNITIONS**
- **SPEAKERS TO AGENDA ITEMS**

**BUSINESS AGENDA**

- **CONSIDERATION AND POSSIBLE ACTION ON MATTERS DISCUSSED IN CLOSED OR EXECUTIVE SESSION**
- **CONSIDERATION AND APPROVAL OF MINUTES FROM PREVIOUS MEETINGS**

**A.     SUPERINTENDENT'S PRIORITY ITEMS**

A-1     Approval Of Personal Services Performed By The Superintendent, Including Speaking Engagements, Panel Discussions, Workshops, Etc., In Accordance With Texas Education Code Section 11.201(E)

A-2     Board Monitoring Update: Presentation Of Goal 1 Progress Measures 1.1 and 1.2 And Goal 3 Progress Measure 3.1

**B.     TRUSTEE ITEMS**

B-1     Appointment Of Houston Independent School District Representatives To The Houston Land Bank Board Of Directors **[POSTPONED]**

B-2     Approval Of The Board's Quarterly Self-Evaluations, Staff Use Tracker, Time Use Tracker, And Quarterly Progress Tracker In Accordance With The Texas Education Agency Implementation Integrity Instrument

B-3     Announcement Of Required Board Member Continuing Education

B-4     Appointment Of Houston Independent School District Representative To Tax Increment Reinvestment Zone 18 Board Of Directors

Appx.360

C.   **CLOSED SESSION (CLOSED TO PUBLIC) – BOARD SERVICES CONFERENCE ROOM**

C-1   Personnel
a) Deliberate the duties of the interim superintendent of schools, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members (including board committees); evaluations of the interim superintendent and chief audit executive, consideration of compensation, and contractual provisions.
b) Consider and approve proposed appointments, reassignments, proposed terminations, terminations/suspensions, contract lengths, proposed nonrenewals, renewals, and resignations/retirements of personnel including teachers, assistant principals, principals, chief officers, assistant superintendents, and other administrators, and, if necessary, approve waiver and release and compromise agreements.
c) Hear complaints against and deliberate the appointment, evaluation, and duties of public officers or employees and resolution of same.
d) Consider employment of interim superintendent and employment contract through September 30, 2019.

C-2   Legal
a) Matters on which the district's attorney's duty to the district under the Code of Professional Responsibility clearly conflicts with the Texas Open Meetings Law
b) Pending or contemplated litigation matters and status report
c) Legal discussion and advice concerning House Bill 1842 (84th Leg., 2015), Senate Bill 1882 (85th Leg., 2017), and the district's options
d) Receive legal advice concerning the process for selecting an interim/permanent superintendent.
e) Consideration and approval of mediated settlement agreement in the matter of *Roy Fuller v. Houston Independent School District*; in the 133rd Judicial District Court of Harris County, Texas; Cause No. 2017-47104
f) Consideration and authority to settle in the matter of *Houston Independent School District v. Goldshire Developers, LLC, and Developers Surety & Indemnity, Company*; in the 152nd Judicial District Court of Harris County, Texas; Cause No. 2017-54931
g) Consideration and approval of settlement agreement related to termination of Liberty High School lease agreement
h) Consideration and authority to settle the subrogation lien of Tarnisha Hartsfield against Juan Jesus Arredondo and Allstate Insurance for workers' compensation benefits; Allstate Insurance Claim No. 0495545733
i) Consideration and authority to file suit and settle the subrogation lien of Carolyn Mackey against Mariela Garcia Aguilera for workers' compensation benefits
j) Consideration and approval of confidential settlement agreement and release of all claims in the Section 504 matter regarding John S. b/n/f Shannon Young
k) Discuss with legal counsel and consider the proposed HYA Superintendent Search Contract

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

C-3   Real Estate
    a)  Sale
    b)  Purchase
    c)  Exchange
    d)  Other

## CLOSED SESSION AUTHORIZATION DURING MEETING

**If during the course of the meeting covered by this notice the board should determine that a closed or executive meeting or session of the board should be held or is required, then such closed or executive meeting or session as authorized by Chapter 551 of the Texas Government Code (the Open Meetings Act) will be held by the board at the date, hour, and place given in this notice or as soon after the commencement of the meeting covered by this notice as the board may conveniently meet in such closed or executive session concerning any and all subjects and for any and all purposes permitted by Section 551.071 through Section 551.084 inclusive of said Open Meetings Act including, but not limited to:**

| | |
|---|---|
| **Section 551.071** | **For the purpose of a private consultation with the board's attorney on any or all subjects or matters authorized;** |
| **Section 551.072** | **For the purpose of discussing the purchase, exchange, lease, or value of real property;** |
| **Section 551.073** | **For the purpose of discussing negotiated contracts for prospective gifts or donations to the District;** |
| **Section 551.074** | **For the purpose of considering the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of a public officer or employee or to hear complaints or charges against a public officer or employee;** |
| **Section 551.076** | **To consider the deployment, or specific occasions for implementation, of security personnel or devices;** |
| **Section 551.082** | **For the purpose of considering discipline of a public school child or children, or to hear a complaint or charge brought against a school district employee by another school district employee;** |
| **Section 551.0821** | **For the purpose of deliberating a matter regarding a public school student if personally identifiable information about the student will necessarily be revealed by the deliberation;** |
| **Section 551.083** | **For the purpose of considering the standards, guidelines, terms, or conditions the board will follow, or instruct its representatives to follow, in consultation with representatives of employee groups in connection with consultation agreements provided for by Section 13.901 and/or Section 11.151(b) of the Texas Education Code; and** |
| **Section 551.084** | **For the purpose of excluding any witness or witnesses from a hearing during the examination of another witness.** |

Appx.362

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

**Should any final action, final decision, or final vote be required in the opinion of the board with regard to any matter considered in such closed or executive session, then such final action, final decision, or final vote shall be at either:**

a) **the open meeting covered by this notice upon the reconvening of this public meeting, or**

b) **a subsequent public meeting of the board upon notice thereof, as the board shall determine.**

**MATTERS TO BE CONSIDERED IN OPEN SESSION**

**D.     ACADEMIC SERVICES**

D-1    Authority To Ratify Renewal Agreements With Community Agencies And/Or Educational Service Providers For Appraisal And Related Instructional And/Or Consultant Services For Students With Disabilities For School Year 2018–2019

D-2    District Improvement Plan For 2018–2019 **[POSTPONED]**

D-3    Approval Of The Executive Summaries Of School Improvement Plans For The 2018–2019 School Year

D-4    Approval Of Certified Appraisers For The Teacher Appraisal And Development System For School Year 2018–2019

**E.     SCHOOL OFFICES**

E-1    Approval Of Targeted Improvement Plan For Year 1 Improvement Required Campuses

E-2    Approval Of Targeted Improvement Plans For Campuses Identified As Comprehensive Support By The Texas Education Agency

**F.     STRATEGY AND INNOVATION**

**G.     HUMAN RESOURCES**

**H.     BUSINESS OPERATIONS**

**I.     FINANCE**

I-1    Approval Of Vendor Awards For Purchases Over $100,000 And Ratification Of Vendor Awards For Purchases Under $100,000

I-2    Approval Of Current And Anticipated Donations For Districtwide And School-Specific Programs And Authorization To Negotiate, Execute, And Amend Necessary Contracts Associated With These Donations

I-3   Acceptance Of Grant Funds In Support Of Districtwide And School-Specific Programs And Authorization To Negotiate And Execute Contracts Required Under The Grants

I-4   Approval Of Resolution Adopting Tax Rate And Levying Ad Valorem Taxes For Tax Year 2018

**J.     OTHER**

**K.     POLICY**

K-1   Proposed Revisions To Board Policy BBE(LOCAL), *Board Members: Authority*— Second Reading **[POSTPONED]**

K-2   Proposed Revisions To Board Policy BBB(LEGAL), *Board Members: Elections*— Second Reading

K-3   Proposed Revisions To Board Policy BBB(LOCAL), *Board Members: Elections*— Second Reading

K-4   Proposed Deletion Of Board Policy BBBA(LOCAL), *Campaign Funds*, And Establishment Of Board Policy BBBC(LOCAL), *Campaign Finance*—Second Reading

K-5   Proposed Revisions To Board Policies FFAA(LOCAL), *Wellness And Health Services: Physical Examinations* And FFAD(LOCAL), *Wellness And Health Services: Communicable Diseases*—Second Reading

K-6   Proposed Revisions To Board Policy FFH(LOCAL), *Student Welfare: Freedom From Discrimination, Harassment, And Retaliation*—First Reading

K-7   Proposed Revisions To Board Policy FB(LOCAL), *Equal Educational Opportunity*—First Reading

**L.     SUPERINTENDENT'S INFORMATION ITEMS**


**HEARING OF CITIZENS**

**TRUSTEE REPORTS AND COMMENTS**
Reports and comments from the board president and board members regarding meetings and conferences attended, including board committee meetings; schools visited; community and district activities; new initiatives; education programs; and continuing education. There will be no action concerning these items.

**REPORTS FROM THE SUPERINTENDENT**
Reports and comments by the superintendent of schools regarding meetings and conferences attended, schools visited, community and district activities, new initiatives,

**OFFICIAL AGENDA AND MEETING NOTICE**                    **OCTOBER 11, 2018**

and education programs, on which there will be no action. The items may be discussed, but no final action will be taken on these items at this meeting.

**ADJOURN**

**CERTIFICATE AS TO POSTING OR GIVING OF NOTICE**

**On this 8th day of October 2018 at 2:00 p.m., this notice was posted on a bulletin board located at a place convenient to the public in the Hattie Mae White Educational Support Center of the Houston Independent School District, the address of which is 4400 West 18th Street, Houston, Texas, as well as on the district's public web portal.**

_____

Office of Board Services
Houston Independent School District

Appx.365

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 3

## DECLARATION OF DIANA DAVILA

1. My name is Diana Davila. I am over 18 years of age, of sound mind, and capable of making this declaration. Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2. I am currently a member of the Board of Trustees of Houston Independent School District.

3. In early 2019, I was interviewed by several TEA investigators. They recorded the interview. During the interview, TEA's investigators were extremely combative and argumentative.

4. Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra during at a public restaurant on or about October 8, 2018.

5. Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

6. I respect Dr. Saavedra and consider him to be a mentor and a friend.

7. I am offended that TEA's Preliminary Report accuses me of not cooperating with the Agency's investigation. I did not falsely claim that there were no other trustees present when I met with Dr. Saavedra. I voluntarily agreed to speak with TEA's investigators and answered their questions to the best of my ability to recall what had happened.

8. My best recollection is that when I arrived, Trustee Vilaseca was speaking with Dr. Saavedra. After spending a few minutes engaging in a social conversation among us, Trustee Vilaseca left, and I spoke with Dr. Saavedra for another 10–15 minutes. During that time, I did not discuss the interim superintendent position with Dr. Saavedra. I am not aware of any discussions between Dr. Saavedra and any board members regarding the interim superintendent position.

9. I have exchanged text messages with Dr. Saavedra in the past, but none of these text messages related to the interim superintendent position at Houston ISD. I have not regularly communicated with Dr. Saavedra about District business by text messages. My text messages to Dr. Saavedra have generally been social in nature.

10. When I was interviewed by investigators from the Texas Education Agency, approximately six months had passed since the meeting.

11. In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent. I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

12. After I spoke with Dr. Saavedra, we both left the restaurant.

13. Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

14. Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

15. It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business. Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

16. On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant. The meeting with Dr. Saavedra was not secret, and it was not an interview. It was an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

17. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present — at times I was alone with Dr. Saavedra and at other time other board members were present. During that meeting, there were never more than four board members (including myself) present. At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

18. Between October 8, 2018 and October 11, 2018, when the HISD Board met at a duly posted meeting to discuss the employment of interim superintendent, Dr. Lathan, I did not have any discussion with any other board member regarding Dr. Saavedra's possible employment as interim superintendent.

19. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members. With fewer than a quorum present, nothing can be formally decided. Without a formal decision, no act can be taken on behalf of Houston ISD.

20. I have reviewed Findings 1–4 on pages 15–16 of TEA's Preliminary SAI Report regarding a campus visit to the High School of Law and Justice. These Findings contain numerous factual inaccuracies and untrue statements. TEA's investigators never contacted me about the events described in Findings 1–4. If they had contacted me, I could have told

them what actually happened.

21. When I visited the High School of Law and Justice, the superintendent at the time had asked that we obtain permission for campus visits through the regional superintendent. I followed this procedure by contacting the regional superintendent, who approved the campus visit.

22. When I arrived at the High School of Law and Justice with Trustee Deigaard, Conservator Delaney, and other individuals, the principal for the campus met us and gave us the tour. I do not know why TEA's investigators state that the principal was not aware of the tour until she saw pictures on Twitter. This seems difficult to believe because the campus principal is the person who gave us the tour.

23. When the campus principal showed us a courtroom during the tour, I commented that the courtroom in the High School of Law and Justice seemed small. One of the individuals who was apparently working on the construction project told me they could knock down a wall to make the courtroom larger. I told him I didn't think they should do that because I did not think we needed to add to the cost of the project. The campus principal (who was giving us the tour), Trustee Deigaard, the Conservator, and others were in the courtroom when this exchange occurred. I do not know whether any of them heard this exchange.

24. I do not know whether the project manager actually told the campus principal that I had "told the construction people to take a wall down out of [the] new campus out of the courtroom." But if he did, that statement would have been inaccurate. I said the opposite to the individual I spoke with. I never spoke with any Houston ISD administrator about taking a wall down in the courtroom.

25. I have reviewed Finding 5 on page 16 of TEA's Preliminary SAI Report. This Finding contains one sentence that is completely untrue, one misstated fact, and one misleading statement. TEA's investigators never contacted me about the events described in Finding 5. If they had contacted me, I could have told them what actually happened.

26. The third sentence in Finding 5 on page 16 of TEA's Report is completely untrue. Neither I nor Abel Davila told any Houston ISD administrator that we wanted a "firm out of Dallas" to be awarded a contract for Austin High School. Neither I nor Abel Davila threatened an administrator's job regarding a contract for the construction of Austin High School.

27. The statement that the contract was placed on the agenda for the "February 2018 regular board meeting" is also false. It was placed on the agenda for the February 2017 meeting. At that meeting I voted in favor of the motion made regarding this agenda item.

28. I understand that investigators with the Texas Education Agency ("TEA") have included the following paragraph on page 27 of the Preliminary SAI Report issued on August 5, 2019 as Finding 2:

2. In August of 2016, Trustee Davila met with a HISD senior administrator at Pappadeaux Seafood Kitchen along with her husband, Abel Davila, Art Lopez, and Leticia Ablaza. The administrator stated that the nature of the meeting was to strategize a way to get bond contracts cancelled and re-bid. Moreover, the administrator told SIU investigators Trustee Davila and her husband, along with Mr. Lopez and Ms. Ablaza, focused on the custodial contract with MetroClean. Trustee Davila, Art Lopez, and Leticia Ablaza demanded that HISD cancel its contract with MetroClean and award it to Accel Building Maintenance (ABM Inc.). The administrator responded, "ABM Inc. did not have a good reputation with the district and therefore would not be considered as a vendor." To which Trustee Davila replied, "It will happen if we want it to happen."

29. Everything described in the above paragraph, identified as Finding 2, is untrue. The meeting described above did not occur. No investigators from TEA contacted me regarding Finding 2. If they had, I would have told them this meeting did not occur.

30. I have reviewed Finding 3 on page 27 of TEA's Preliminary SAI Report. TEA's investigators never contacted me about the events described in Finding 5. If they had contacted me, I could have told them I have no knowledge of any proposed contract between ABM Inc. and MetroClean.

31. My date of birth is December 26, 1972 and my mailing address is 221 St Charles, Houston, TX 77003. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Harris County, State of Texas on the 24th day of August, 2019.

**Diana Davila**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 4

## DECLARATION OF DR. SERGIO LIRA

1. My name is Dr. Sergio Lira.  I am over 18 years of age, of sound mind, and capable of making this declaration.  Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2. I am currently a member of the Board of Trustees of Houston Independent School District.

3. In early 2019, I was interviewed by several TEA investigators.  They recorded the interview.  During the interview, TEA's investigators were extremely combative and argumentative.

4. Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra at a public restaurant on or about October 8, 2018.

5. Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

6. I am offended that TEA's Preliminary Report accuses me of not cooperating with the Agency's investigation.  I did not falsely claim that there were no other trustees present when I met with Dr. Saavedra.  I voluntarily agreed to speak with TEA's investigators and answered their questions to the best of my ability to recall what had happened.

7. When I was interviewed by investigators from the Texas Education Agency, I told them I did not recall exactly who had attended the meeting with Dr. Saavedra.  At that point, approximately six months had passed since the meeting.  To the best of my recollection I

**Appx.370**

spoke with Dr. Saavedra alone and at the end of that conversation, other board members joined us.

8. My best recollection is that I spoke with Dr. Saavedra when no other board members were present.  When other board members arrived, I left shortly after we had all exchanged greetings.  During my discussions with Dr. Saavedra, we did not discuss the interim superintendent position.

9. In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent.  I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

10. Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

11. Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

12. It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business.  Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

13. On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant.  The meeting with Dr. Saavedra was not secret, and it was not an interview.  It was an

**Appx.371**

opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

14. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present — at times I was alone with Dr. Saavedra and at other time other board members were present. During that meeting, there were never more than four board members (including myself) present. At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

15. Between October 8, 2018 and October 11, 2018, when the HISD Board met at a duly posted meeting to discuss the employment of interim superintendent, Dr. Lathan, I did not have any discussion with any other board member regarding Dr. Saavedra's possible employment as interim superintendent.

16. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members. With fewer than a quorum present, nothing can be formally decided. Without a formal decision, no act can be taken on behalf of Houston ISD.

17. My date of birth is _11/25/1961_, and my mailing address is 4400 West 18th Street, Houston, Texas 77092. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct. Executed in Harris County, State of Texas on the 23rd day of August, 2019.


Dr. Sergio Lira

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 5

## DECLARATION OF ELIZABETH SANTOS

1.  My name is Elizabeth Santos.  I am over 18 years of age, of sound mind, and capable of making this declaration.  Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2.  In early 2019, I was interviewed by several TEA investigators for over an hour.  They recorded the interview, and I also recorded the interview so that I could have a copy.

3.  During the interview, the investigators were extremely combative, argumentative, and attempted to coerce me into violating Texas law by disclosing discussions that occurred in closed session.  I refused to violate Texas law by disclosing those closed-session discussions.

4.  Many of the questions during this interview focused on discussions I had with Dr. Abelardo Saavedra at a public restaurant on or about October 8, 2018.

5.  Prior to that meeting, I knew Dr. Saavedra only by reputation.  Prior to joining the board, I was involved in education as a teacher in Houston ISD for 9 years and 5 months.  During that time, one of the superintendents of Houston ISD was Dr. Saavedra.

6.  Prior to October 8, 2018, I was told that Dr. Saavedra was going to be in Houston and would be available to meet at a public restaurant if I had time to come by and see him.

7.  In my discussions with Dr. Saavedra, there was no discussion regarding the potential removal of the current interim superintendent and the installation of a new interim superintendent.  I did not observe anyone give Dr. Saavedra a copy of Dr. Carranza's contract.

8.  Informal discussions with board members and others, in meetings with less than a quorum of board members, allow board members "to have the best information from all sources."

**Appx.374**

9.  Limiting board members' ability to discuss school district issues with one another outside of formal meetings would seriously impede the Board's ability to function.

10. It is important for board members to be able to discuss issues regarding Houston ISD with each other, members of the community, or other individuals in order to allow the Houston ISD Board of Trustees to conduct business.  Requiring members of the board to consider only information obtained through public comment and staff recommendations presented in formal sessions would cripple the board's ability to conduct business.

11. On October 8, 2018, I met with Dr. Abelardo Saavedra at a public restaurant.  The meeting with Dr. Saavedra was not secret, and it was not an interview.  It was an opportunity to communicate concerns and questions I had and gain the benefit of his experience as superintendent in many school districts, including Houston ISD.

12. At all times during my meeting with Dr. Saavedra, there were fewer than a quorum of board members present.  During that meeting, there were never more than four board members (including myself) present.  At that meeting with Dr. Saavedra, I observed no board member attempted to take action on behalf of Houston ISD.

13. It is my understanding that the Texas Open Meetings Act applies to meetings involving a quorum of board members.  With fewer than a quorum present, nothing can be formally decided. Without a formal decision, no act can be taken on behalf of Houston ISD.

14. I have reviewed Finding 6 on page 16 of TEA's Preliminary SAI Report.  This Finding contains several, material misstatements of fact.  No investigators from TEA contacted me regarding Finding 6.  If they had, I would could have corrected their misstatements.

15.  The event described in Finding 6 was not a campaign event — no campaign materials were distributed; I was unable to attend because I was on a board retreat; no one attended the event on my

behalf; and I was not actively campaigning at the time.  "Field Good Day" is a community event that was first organized in 2016 to bring the community together after a Houston ISD student was murdered.  At that time, I had not yet been elected to the Board of Trustees and did not attend the event.

16. In 2018, members of the community decided to revive this community event.  I was honored to help community members organize the "Field Good Day" event in 2018.

17. Individuals in Houston ISD's administration brought it to my attention that holding the event on Houston ISD property would incur costs because security officers would need to be hired. I offered to pay for any costs incurred by Houston ISD, but I thought that was no longer necessary when Harris County Constable Precinct 6 agreed to provide law enforcement officers to volunteer their time for the event.  I have never received either an invoice from Houston ISD for this event or any request that I reimburse Houston ISD for any expense incurred by this event.  If I receive such a request, I will honor my prior commitment.

18. I have reviewed Finding 7 regarding Allegation 2 in TEA's Preliminary Report.  I have no idea what the anonymous administrator is referring to.  The administration typically provides food for board members at our meetings and other events and board members are not asked to pay for the food that is provided.  I have never demanded that anyone allow me to eat for free when visiting the Hattie Mae White Education Support Center.

19. At the August 1, 2019 meeting, I did not intend to indicate that I or any other board members have violated the Texas Open Meetings Act.  My intent was to express that the same conduct that is being investigated by TEA and criticized by some board members is substantially similar to conduct in which other board members have engaged.

20. My date of birth is March 22, 1982, and my mailing address is 4400 West 18th St., Houston, TX 77092. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Travis County, State of Texas on the 23rd day of August, 2019.

**Elizabeth Santos**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 6

## DECLARATION OF VENUS RODRIGUEZ

1. My name is Venus Rodriguez. I am over 18 years of age, of sound mind, and capable of making this declaration. Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal .

2. I helped organize "Field Good Day" in 2016. "Field Good Day" is a community event that I, and others in the community, organized to bring the community together after a Houston ISD student was murdered. I helped organize this event because students were feeling anxiety and members of the community were feeling unsafe. I and others wanted to create an event that let members of the community know that the community could come together and feel safe and know that we were attempting to make sure that justice would be done and something like this would not happen again.

3. In 2018, I, and other community leaders, helped organize "Field Good Day" again to bring the community together and let everyone know that we were continuing to work for community safety.

4. "Field Good Day" was not intended to be, and was not in fact, a campaign event for Trustee Santos or any other individual.

5. My date of birth is January 19, 1976, and my mailing address is 1507 Amundsen Street, Houston, Texas 77009. I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in Harris County, State of Texas on the 26th day of August, 2019.

*Venus Rodriguez*
**Venus Rodriguez**

**Appx.379**

HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW

# Exhibit 7

## DECLARATION OF RICARDO AGUIRRE

1.  My name is Ricardo Aguirre.  I am over 18 years of age, of sound mind, and capable of making this declaration.  Pursuant to 28 U.S.C. § 1746 and Texas Civil Practice & Remedies Code § 132.001, the facts stated in this declaration are true and correct based on my personal knowledge.

2.  I understand that investigators with the Texas Education Agency ("TEA") have included the following paragraph on page 27 of the Preliminary SAI Report issued on August 5, 2019 as Finding 3:

> 3  After the administrator refused to cancel the MetroClean Contract, the owner of MetroClean told the administrator that ABM Inc. had approached MetroClean to give them a consultant agreement  On March 19, 2019, SIU contacted Jose Perez, owner of MetroClean Commercial Building Services, and discussed his interaction with Ricardo Aguirre, owner of ABM Inc ( See Exhibit 3 4 )  On March 19, 2019, during an interview with SIU, Mr Perez confirmed that Ricardo Aguirre approached him and attempted to force him to sign a consulting agreement stating that "MetroClean" would pay "Accel" a monthly salary of 2% of gross revenue received. In addition, "MetroClean" would increase the monthly payment to 3% if more contracts were secured  Mr Perez provided the administrator a photographic document of what Mr Aguirre wanted him to sign ( See Exhibit 3 5 )  Mr Perez stated that he was in the Request for Proposal process with HISD for custodial services when he was approached by Mr Aguirre to circumvent the procurement process  Moreover, Mr Perez mentioned that Mr Aguirre attempted to pressure him into signing the agreement stating, "Diana Davila's husband sent me here to have you sign this agreement"  Additionally, Mr Perez stated that Aguirre threatened him saying, "If you don't sign the agreement, HISD will not approve your contract."

3.  No investigators from TEA contacted me regarding Finding 3.  If they had, I would have told them that neither Trustee Davila nor Abel Davila asked me to reach out to MetroClean regarding any agreement.

4.  I saw Trustee Davila and Abel Davila at an event in 2014, but I have neither seen nor spoken to Trustee Davila since that event.  I had not seen Trustee Davila for at least 10 years before attending that event.

5. My date of birth is _Jan 6, 1949_____, and my mailing address is _4306 Ruth Dr. Missouri City Texas 77459_ I declare under penalty of perjury under the laws of the United States of America and of the State of Texas that the foregoing is true and correct.

Executed in _Fort Bend_ County, State of Texas on the 25th day of August, 2019.

_____
Ricardo Aguirre

**Appx.382**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 8

**MINUTES OF THE REGULAR MEETING**
**BOARD OF EDUCATION**
**HOUSTON INDEPENDENT SCHOOL DISTRICT**

**February 09, 2017**

## MEETING HELD - MEMBERS PRESENT

The Board of Trustees of the Houston Independent School District (HISD) held a Regular Meeting on February 9, 2017, beginning at 2:09 PM in the Board Services Conference Room of the Hattie Mae White Educational Support Center, 4400 West 18th St., Houston, TX 77092.

| Attendee Name | Title | Status | Arrived | Departed |
|---|---|---|---|---|
| Michael L Lunceford | District V Trustee | Present | | |
| Rhonda Skillern-Jones | District II Trustee | Present | 5:28 PM | 8:43 p.m. |
| Wanda Adams | President and District IX Trustee | Present | | |
| Anna Eastman | District I Trustee | Present | | |
| Manuel Rodriguez | District III Trustee | Present | | |
| Jolanda Jones | District IV Trustee | Present | | |
| Diana Davila | District VIII Trustee | Present | | |
| Holly Maria Flynn Vilaseca | District VI Trustee | Present | | |
| Anne Sung | District VII Trustee | Present | | |

## ADJOURNMENT TO EXECUTIVE SESSION 2:09 PM

The Board adjourned at 2:09 p.m. to closed or executive session under Section D of Chapter 551 of Texas Government Code, Open Meetings Act, Subsections 551.071, 551.072, 551.073, 551.074, 551.076, 551.082, 551.083, and 551.084 for the purposes stated in the notice of this meeting.  If any final action, vote or decision on any matter considered in the closed session shall be required, such final action, vote or decision shall be taken at the open meeting covered by this notice upon the reconvening of this public meeting or at a subsequent meeting of the Board upon notice thereof.

## RECONVENED IN OPEN SESSION IN THE BOARD AUDITORIUM 3:31 PM

## PUBLIC HEARING ON TEXAS ACADEMIC PERFORMANCE REPORT FOR 2015-2016

Ms. Carla Stevens, Assistant Superintendent of Research and Accountability provided a presentation of the Texas Academic Performance Report for 2015-2016.

### Speaker
Roberto Centeno

## RECONVENED IN OPEN SESSION IN THE BOARD AUDITORIUM: 5:00 P.M.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

## MEETING CALLED TO ORDER - PURPOSE

President Adams called to order the Regular Meeting of the Board of Education of the Houston Independent School District and declared the Board convened to consider matters pertaining to the Houston Independent School District as listed on the duly posted meeting notice.

## MEDITATION AND PLEDGE OF ALLEGIANCE TO THE FLAG

President Adams invited the audience to stand and join in a moment of silent meditation and to remain standing for the pledge of allegiance.

Trustee Holly Maria Flynn Vilaseca introduced the pledge leader, Cadet Lieutenant Colonel Bavani Kathir, the Battalion Commander for the JROTC Battalion at Westside High School.

## SPECIAL RECOGNITIONS

Chief Robert Mock introduced the Employees of the Month for March: Officers Victor Rojas and Eddie Trevino

Trustee Jolanda Jones recognized the librarians who helped reorganize the library collections and resources at Cullen and Attucks Middle Schools.

Black History Month Proclamation was read by Trustee Jones.

Last year's MLK Oratory winner, Richard Espinosa-Garza introduced the current winner, Nhedrick Jabier from Crespo Elementary School.

## SUPERINTENDENT'S PRESENTATION ON STUDENT DATA:

State Accountability A–F Ratings System

## HEARING OF CITIZENS

David (Pete) Medford
Ebru Erdini
Barbara Carroll
Susan Nerlove
Georgina Lavallee
Art Smith
Kenneth Davis
Dr. Robert Muhammad
Karen Yvette Hurdle
Larry McKinzie

Any supplemental information to Agenda Items may be found in the Meeting Folder of
this date located in the Office of Board Services, Houston Independent School District.

2

**Appx.385**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

Mindy Wilson
Deyadira Arellano
Dr. Pamela Boveland
Roberto Centeno
Sam Smith
Ben Becker
Sarah Becker
Gerry Monroe

## A.    SUPERINTENDENT'S PRIORITY ITEMS

A-1.    Approval Of Personal Services Performed By The Superintendent, Including Speaking Engagements, Panel Discussions, Workshops, Etc., In Accordance With Texas Education Code Section 11.201(E)

## B.    TRUSTEE ITEMS

B-1.    Board Resolution In Support Of the Houston Independent School District Immigrant Community

**Speakers**
Anabella Fernandez
Zeph Capo (registered to items B-1, B-2, J-1 and J-2)
Deborah Chen
Deyadira Arellano (registered to items B-1 and H-3)
Carlos Duarte

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Skillern-Jones, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |

B-2.    Approval Of Resolution Ordering An Election On May 6, 2017, For The Houston Independent School District Concerning Texas Education Code Chapter 41 Status (Also Known As "Recapture"); Authorization To Submit A Signed Chapter 41 Contract To The TEA; And Authorization To Negotiate, Execute, And Amend Agreements With Harris County To Provide Election Services  *- Revised*

**Speakers**
Gerry Monroe (registered to agenda items B-2, G-1, and G-2)
Gayle Fallon
Sam Smith
Dr. Pamela Boveland
Larry McKinzie
Sean Cheben (registered to agenda items B-2 and G-2)

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.386**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [5 TO 3] |
|---|---|
| MOVER: | Manuel Rodriguez, District III Trustee |
| SECONDER: | Anna Eastman, District I Trustee |
| AYES: | Lunceford, Skillern-Jones, Adams, Eastman, Flynn Vilaseca |
| NAYS: | Rodriguez, Jones, Davila |
| ABSTAIN: | Sung |

## C.    CLOSED SESSION

C-1.    Personnel

    a. Deliberate the duties of the superintendent of schools, chief officers, assistant superintendents, principals, employees, chief audit executive, and board members; evaluations of the superintendent and chief audit executive, consideration of compensation, and contractual provisions.

    b. Consider and approve proposed appointments, reassignments, proposed terminations, terminations/suspensions, contract lengths, proposed nonrenewals, renewals, and resignations/retirements of personnel including teachers, assistant principals, principals, chief officers, assistant superintendents, chief audit executive, and other administrators, and, if necessary, approve waiver and release and compromise agreements.

On motion by Trustee Eastman, and seconded by Trustee Rodriguez, the Board approved the proposed nonrenewal of a term contract and separation and release agreements, as discussed in closed session, effective February 9, 2017.

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

On motion by Trustee Eastman, and seconded by Trustee Rodriguez, the Board approved a finding of no good cause for resignation or abandonment of contracts under Texas Education Code, Sections 21.105 (c), 21.160 (c), or 21.210 (c) and Texas Administrative Code, Section 249.14 (g) as discussed in closed session, effective February 9, 2017.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.387**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

   c. Hear complaints against and deliberate the duties of public officers or employees and resolution of same.

C-2.   Legal Matters

   a. Matters on which the district's attorney's duty to the district under the Code of Professional Responsibility clearly conflicts with the Texas Open Meetings Law

   b. Pending or contemplated litigation matters and status report

   c. Consideration and authority to settle the subrogation lien of Mary Overhouse against A&F Elevator Company and York Risk Services Group for workers' compensation benefits; York Risk Services Group Claim No. HECP-13771A1

On motion by Trustee Eastman and seconded by Trustee Davila, the Board approved the authority to settle the subrogation lien of Mary Overhouse against A&F Elevator Company and York Risk Services Group for workers comp benefits, York Claim No. HECP-13771A1 as discussed in closed session with legal counsel, effective February 9, 2017.

| RESULT: | APPROVED [8 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| AWAY: | Skillern-Jones |

   d. Consideration and authority to settle the subrogation lien of Maria Gomez against Corina Maria Carvajal and Progressive Insurance for workers' compensation benefits; Progressive Insurance Claim Number 155647700

On motion by Trustee Eastman and seconded by Trustee Davila, the Board approved authority to settle the subrogation lien of Maria Gomez against Corina Maria Carvajal and Progressive Insurance for workers comp benefits, Progressive Claim #15564770 as discussed with legal counsel in closed session, effective February 9, 2017.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

5

**Appx.388**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

e.  Consideration and authority to settle the subrogation lien of Danyle Dixon against Luis A. Tellez, Patricia Reyes, and ACCC Insurance Company for workers' compensation benefits; ACCC Insurance Company Claim No. U0746104-9

On motion by Trustee Eastman and seconded by Trustee Rodriguez, the Board approved the authority to settle the subrogation lien of Danyle Dixon against Luis Tellez and Patricia Reyes and ACCC Insurance Company for workers comp benefits, ACCC Claim U0746104-9 as discussed in closed session with legal counsel, effective February 9, 2017.

| RESULT: | APPROVED [7 TO 0] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Manuel Rodriguez, District III Trustee |
| AYES: | Lunceford, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSTAIN: | Adams |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

C-3.    Real Estate

**D.    ACADEMIC SERVICES**

D-1.    Approval of Current and Anticipated Donations for Districtwide and School-Specific Programs and Authorization to Negotiate, Execute, and Amend Necessary Contracts Associated With These Donations

- Attachment For Approval Of Donations

*Approved by Consensus*

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.389**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

D-2.    Acceptance of Grant Funds In Support Of Districtwide and School-Specific Programs and Authorization to Negotiate and Execute Contracts Required Under the Grants

- Attachment For Acceptance Of Grants
- Detailed Budget: University Of North Texas Grant For HIPPY Program

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

D-3.    Allocation of Flow-Through Funds for the Region 4 Regional Day School Program for the Deaf

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**E.    SCHOOL OFFICES**

**F.    STUDENT SUPPORT**

**G.    HUMAN RESOURCES**

G-1.    Approval of Waiver of Student Performance from the Teacher Appraisal and Development System for the 2016–2017 School Year

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.390**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

<u>Speakers</u>
Mindy Wilson
Andrew Dewey (registered to agenda items G-1, J-1, and J-2)

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Holly Maria Flynn Vilaseca, District VI Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

G-2. Consideration and Approval Of Teach For America Contract for the 2017–2018 School Year

<u>Speakers</u>
Aisha Crumbine
Kara Devoto
Roberto Centeno
Ben Becker

| RESULT: | APPROVED [6 TO 1] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca |
| NAYS: | Jones |
| ABSTAIN: | Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

## H.      BUSINESS OPERATIONS

H-1. Authority to Negotiate, Execute, and Amend a Construction Manager-At-Risk Contract Related To Stephen F. Austin High School

<u>Speaker</u>
Mark Kerrisey

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**HISD Regular Meeting Board of Trustees – February 9, 2017**

H-2.    Approval to Amend and Increase the Design Contract for Evan Worthing High School

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

H-3.    Approval to Establish a Budget for Lead Testing

**Speakers**
Orell Fitzsimmons
Yvette Arellano
Ben Tecumseh DeSoto

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Anna Eastman, District I Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I.    **FINANCE**

I-1.    Approval of Vendor Awards For Purchases over $100,000 and Ratification of Vendor Awards for Purchases Under $100,000

- Purchasing Requests

*Approved by Consensus*

**Speaker**
Mark Kerrisey

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.392**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-2.      Approval to Contract with Linebarger, Goggan, Blair & Sampson, L.L.P., For Delinquent Tax Collection Services

**Speaker**
Sarah Becker

| RESULT: | APPROVED [5 TO 1] |
|---|---|
| MOVER: | Manuel Rodriguez, District III Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Flynn Vilaseca, Sung |
| NAYS: | Rodriguez |
| ABSTAIN: | Jones, Davila |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-3.      Approval of the 2016–2017 Midyear Budgetary Update

*Approved by Consensus*

| RESULT: | APPROVED [UNANIMOUS] |
|---|---|
| MOVER: | Michael L Lunceford, District V Trustee |
| SECONDER: | Diana Davila, District VIII Trustee |
| AYES: | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| ABSENT: | Skillern-Jones (RSJ left the meeting at the time of the vote) |

I-4.      Authority to Contract with First Southwest, a Division of Hilltop Securities Inc. For The Purpose Of Providing Financial Advisory Services

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

10

**Appx.393**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

*Approved by Consensus*

| | |
|---|---|
| **RESULT:** | **APPROVED [UNANIMOUS]** |
| **MOVER:** | Michael L Lunceford, District V Trustee |
| **SECONDER:** | Diana Davila, District VIII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Jones, Davila, Flynn Vilaseca, Sung |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**J.**    **OTHER**

   **J-1.**    Consideration and Approval of Term Contract Employment Areas for Reduction in Force

   • 2016–2017 School List

| | |
|---|---|
| **RESULT:** | **APPROVED [7 TO 1]** |
| **MOVER:** | Diana Davila, District VIII Trustee |
| **SECONDER:** | Anne Sung, District VII Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca, Sung |
| **NAYS:** | Jones |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

   **J-2.**    Consideration and Approval of Continuing Contract Teaching Fields for Reduction in Force

   • 2016–2017 School List

| | |
|---|---|
| **RESULT:** | **APPROVED [7 TO 1]** |
| **MOVER:** | Anna Eastman, District I Trustee |
| **SECONDER:** | Holly Maria Flynn Vilaseca, District VI Trustee |
| **AYES:** | Lunceford, Adams, Eastman, Rodriguez, Davila, Flynn Vilaseca, Sung |
| **NAYS:** | Jones |
| **ABSENT:** | Skillern-Jones (RSJ left the meeting at the time of the vote) |

**K.**    **POLICY**

**L.**    **SUPERINTENDENT'S INFORMATION ITEMS**

**ADJOURNMENT**

There being no further business to come before the Board at this Regular Meeting, the President declared the meeting adjourned at 10:35 p.m.

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

**Appx.394**

**HISD Regular Meeting Board of Trustees – February 9, 2017**

**<u>MINUTES APPROVED</u>**

The foregoing minutes of the Regular Meeting of the Board of Education of the Houston Independent School District held on February 9, 2017 in the Board Auditorium of the Hattie Mae White Educational Support Center of the Houston Independent School District, 4400 West 18th Street, Houston, Texas, were duly approved at a Regular meeting held on March 9, 2017.

**ATTEST**

_____          _____
Wanda Adams                               Rhonda Skillern-Jones
Board of Education, President             Board of Education, Secretary
Houston Independent School District       Houston Independent School District

Any supplemental information to Agenda Items may be found in the Meeting Folder of this date located in the Office of Board Services, Houston Independent School District.

12

**Appx.395**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 9

Houston ISD
101912

BOARD MEMBERS                                                                    BBE
AUTHORITY                                                                    (LOCAL)

| | |
|---|---|
| BOARD AUTHORITY | The Board has final authority to determine and interpret the policies that govern the schools and, subject to the mandates and limits imposed by state and federal authorities, has complete and full control of the District.  Official Board action shall be taken only in meetings that comply with the Open Meetings Act.  [See BE (LEGAL)] |
| TRANSACTING BUSINESS | When a proposal is presented to the Board, a discussion shall be held and a decision reached.  Although there may be dissenting votes, which are made a matter of public record, each Board decision shall be an action by the whole Board binding upon each member. |
| INDIVIDUAL AUTHORITY | Board members as individuals shall not exercise authority over the District, its property, or its employees; however, individual Board members shall have the right to seek information from District records and employees in accordance with this policy. |
| COMMITTING THE BOARD | An individual member may act on behalf of the Board only with the official express authorization of the Board.  Without such authorization, no individual member may commit the Board on any issue. |
| ACCESS TO RECORDS | Individual Board members, acting in their official capacity, have access to any records pertaining to District fiscal affairs, business transactions, governance, and personnel, including existing reports and internal correspondence that properly may be withheld from members of the general public in accordance with the Public Information Chapter of the Government Code.  [See GBA] |
| | Individual members have access to personally identifiable student records that properly may be withheld from members of the general public only on a need-to-know basis and in accordance with policies FL(LEGAL) and (LOCAL). |
| CONFIDENTIALITY | At the time Board members are provided access to confidential records, the Superintendent or other District employee shall advise them of their responsibility to maintain the confidentiality requirements. |
| REQUESTS FOR RECORDS | Individual members shall not direct or require District employees to prepare reports derived from an analysis of information in existing District records or to create a new record compiled from information in existing District records.  [See also BE(LOCAL)] |
| | Directives to the Superintendent regarding the preparation of reports shall be by: |
| | 1.    Board action; |

**Appx.397**

Houston ISD
101912

BOARD MEMBERS                                                              BBE
AUTHORITY                                                               (LOCAL)

2. Request of an individual Board member made in a Board meeting after discussion by the Board as a whole; or

3. Written request of an individual Board member.

REFERRING COMPLAINTS

If citizens bring concerns or complaints to an individual Board member, he or she shall refer them to the Superintendent, who shall proceed according to the appropriate complaint policy.  [See BED and GF]  Where the concern or complaint directly pertains to the Board's own actions or policy, for which there is no administrative remedy, it may also be appropriately considered for placement on the agenda.

COMPLAINT AGAINST A BOARD MEMBER

A person affected by any activity of a Board member may register a complaint with the President of the Board, or in the case of a complaint involving the President, with the First Vice-President of the Board.

The President or Vice-President shall act to resolve the complaint and may utilize the services of an experienced, trained mediator.

The person who initiated the complaint shall be advised of the resolution of his or her complaint.

**Appx.398**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 10

Houston ISD
101912

BOARD MEMBERS                                                    BBE
AUTHORITY                                                    (LEGAL)

**Board Authority**

The board members as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. *Education Code 11.151(b)*

A board may act only by majority vote of the members present at a meeting held in compliance with Government Code Chapter 551, at which a quorum of the board is present and voting. Unless authorized by the board, a member of the board may not, individually, act on behalf of the board. *Education Code 11.051(a-1)*

**Access to District Facility**

A district shall create a policy on visits to a district campus or facility by a member of the board.

**Access to Information**

When acting in the member's official capacity, a board member has an inherent right of access to information, documents, and records maintained by the district.

"Official capacity" means all duties of office and includes administrative decisions or actions.

The district shall provide the information, documents, and records to the board member without requiring the board member to submit a public information request under Texas Government Code Chapter 552 (Public Information Act) and without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.

The district may withhold or redact information, a document, or a record requested by a board member to the extent that the item is excepted from disclosure or is confidential under the Public Information Act or other law [see GBA].

A district shall provide a board member with information, documents, and records requested not later than the 20th business day after the date the district receives the request. The district may take a reasonable additional period of time, not to exceed the 30th business day after the date the district receives the request, to respond to a request if compliance by the 20th business day would be unduly burdensome given the amount, age, or location of the requested information. The district shall inform the board member of the reason for the delay and the date by which the information will be provided.

If a district does not provide requested information to a board member in the time required, the member may bring suit against the district for appropriate injunctive relief. A member who prevails in a suit is entitled to recover court costs and reasonable attorney's fees. The district shall pay the costs and fees from the budget of the superintendent's office.

DATE ISSUED: 11/14/2017                                          1 of 3
UPDATE 109
BBE(LEGAL)-P

**Appx.400**

Houston ISD
101912

BOARD MEMBERS                                                      BBE
AUTHORITY                                                       (LEGAL)

A board member shall maintain the confidentiality of information, documents, and records received from the district as required by the Family Educational Rights and Privacy Act of 1974 (20 U.S.C. 1232g) and any other applicable privacy laws. [See FL].

A district shall post, in a place convenient to the public, the cost of responding to one or more requests submitted by a board member under Education Code 11.1512(c) if the requests are for 200 or more pages of material in a 90-day period.

A district shall report annually to TEA not later than September 1 of each year:

1.  The number of requests submitted by a board member under Education Code 11.1512(c) during the preceding school year; and

2.  The total cost to the district for that school year of responding to the requests.

*Education Code 11.1512(c)–(f)*

**Access to Student Records**

Personally identifiable information in education records may be released, without the written consent of the student's parents, only to a school official who has a legitimate educational interest in the education records. *34 C.F.R. 99.31* [See FL]

**Responsibility for Records**

A person, including a board member, commits a criminal offense if the person:

1.  Knowingly or intentionally destroys, conceals, removes, or otherwise impairs the verity, legibility, or availability of a district record in contravention of Local Government Code Chapter 202. *Local Gov't Code 202.008; Penal Code 37.10*

2.  Willfully destroys, mutilates, alters, or removes public information without permission as provided by Government Code Chapter 552. *Gov't Code 552.351*

3.  Distributes information considered confidential under the Public Information Act. *Gov't Code 552.352*

**Protections for Acting on a Legislative Measure**

A board member may not be subject to disciplinary action or a sanction, penalty, disability, or liability for:

1.  An action permitted by law that the officer takes in the officer's official capacity regarding a legislative measure;

2.  Proposing, endorsing, or expressing support for or opposition to a legislative measure or taking any action permitted by law to support or oppose a legislative measure;

DATE ISSUED: 11/14/2017                                         2 of 3
UPDATE 109
BBE(LEGAL)-P

**Appx.401**

Houston ISD
101912

BOARD MEMBERS                                                                          BBE
AUTHORITY                                                                            (LEGAL)

3. The effect of a legislative measure or of a change in law pro-posed by a legislative measure on any person; or

4. A breach of duty, in connection with the board member's prac-tice of or employment in a licensed or regulated profession or occupation, to disclose to any person information, or to obtain a waiver or consent from any person, regarding the officer's actions relating to a legislative measure; or the substance, ef-fects, or potential effects of a legislative measure.

*Gov't Code 572.059*

**Board Member Immunities**

The statutory immunity detailed below is in addition to and does not preempt the common law doctrine of official and governmental immunity. *Education Code 22.051(b)*

State Law Immunities

A board member is not personally liable for any act that is incident to or within the scope of the duties of the board member's position and that involves the exercise of judgment or discretion. *Education Code 22.0511(a)*

Federal Law Immunities

Except as provided in 20 U.S.C. Section 7946(b), no board mem-ber shall be liable for harm caused by an act or omission of the board member on behalf of a district if the conditions of the Paul D. Coverdell Teacher Protection Act of 2001 are met. *20 U.S.C. 7943, 7946(a)* [See also DGC]

DATE ISSUED: 11/14/2017                                                              3 of 3
UPDATE 109
BBE(LEGAL)-P

**Appx.402**

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 11

# Texas Education Agency
# Special Investigations Unit

# Investigation Procedures

### Purpose

This document contains the procedures for investigations of school districts and charter schools conducted by the Special Investigations Unit (SIU) of the Texas Education Agency (TEA) pursuant to Texas Education Code (TEC) §§ 39.057 and 39.058.  These procedures supersede any former procedures issued by or covering the SIU and pertain to all current or future investigations as of the effective date of these procedures. These procedures do not apply to an on-site investigation conducted under TEC § 39.056.

### Mission

The mission of the SIU is to use a variety of investigative approaches to gather evidence related to alleged wrongdoing including but not limited to potential violations of state or federal law, rules and regulations, policies and procedures, and other abuses that may negatively impact a school district or charter school.

Investigations will focus on obtaining sufficient factual evidence to determine whether certain enforcement actions should be taken against the district or charter school.

### Authority

The authority to investigate school districts and charter schools is specified under Chapter 39 of the TEC. The Commissioner of Education or the Commissioner's designee authorizes the SIU to conduct special accreditation investigations (SAI) pursuant to TEC §§ 39.057 and 39.058.

### Procedures

Part I.  Initial Review

SIU investigates complaints referred by TEA's Complaints Management Division. SIU also accepts referrals from TEA program areas or executive management based on concerns identified through program area compliance monitoring functions or external referrals. Upon referral, SIU conducts a preliminary inquiry and review of the referral, which may include obtaining or requesting additional documents or information from complainants, witnesses, other agencies, and/or the school district or charter school.

After reviewing the referral, if the SIU determines an SAI is warranted, SIU makes a recommendation to the Commissioner of Education or the Commissioner's designee through the Director of Governance & Investigations for final approval of the SAI.

Part II.  Initial Notification

If an SAI is authorized by the Commissioner or the Commissioner's designee, a written notice of investigation is sent by SIU to the superintendent and board president of the school district or charter school.  This written notification will include:

- The statement of purpose, mission, and authority of the SIU;
- The allegation(s) or matter(s) under investigation;
- A copy of these procedures;
- Requests for information; and
- Contact information for the investigator(s) assigned to the investigation.


Part III.  Conduct of Investigation

Investigation Plan:

Upon opening an SAI, the SIU will develop an investigative plan.  The investigative plan may be revised at any time, as new information is received.  The investigative plan may include: a request for and review of records and data from the school district or charter school; interviews; the scheduling of an on-site investigation; and/or communication with other agencies outside of the TEA.

On-Site Investigation:

The SIU may determine an on-site investigation is required in order to conduct a thorough investigation of the allegations. Notice of an on-site will be made either in the original notice of investigation or at a later date. If SIU conducts an on-site investigation, the investigator(s) will conduct an entry meeting with the superintendent (or a designee) upon arriving at the district.  An overview of the investigative process will be discussed with the superintendent or a designee at that time.

While on-site, or before or after an on-site, interviews may be conducted with school district or charter school staff, parents, students, and other persons with direct and/or relevant knowledge related to a SAI. If SIU determines the need to interview a student, SIU will contact the parent or guardian of that student. Student interviews of a minor child require the written consent and presence of the parent or guardian. If the parent or guardian is unable to attend but gives written consent, the parent or guardian may designate a representative to be present during the interview.

Additional individuals may be identified during an on-site or throughout the course of an investigation. Interviews may be recorded electronically, with the consent of the interviewee. Any person being recorded may request a copy of the recording.  If consent is not given, the interview will be conducted without an electronic recording device.

Documents, records, and other relevant information may be identified during the course of the on-site SAI.  These items will be reviewed for investigative information which may be pertinent to determining the facts relative to a potential violation.  Information and data collected will be documented, organized, and maintained throughout the course of the investigation.

The SIU investigator(s) may meet with the superintendent (or a designee) before exiting the district. During the exit conference SIU staff will remind the superintendent the investigation is ongoing and will give the superintendent contact information for the SIU investigator(s).


Evidence:

Evidence substantiating allegations of non-compliance or a violation of state or federal law, rule, or regulation will be gathered and reported in a preliminary investigative report.  If the evidence confirms an allegation of wrongdoing, the evidence will be included as a part of the preliminary and final report submitted to the Commissioner of Education and may be referred to external entities.


Part IV.  Investigative Reports

Preliminary Report:

Upon completion of the SAI, the SIU will issue a preliminary report in accordance with Section 39.058 of the TEC and Chapter 157 of the TAC.  The preliminary report is a draft and audit working papers of the investigation.

The preliminary report will state the findings of fact and explain why the allegation is or is not substantiated.   The preliminary report will also include recommendations to the Commissioner of Education or the Commissioner's designee for any corrective or disciplinary action or interventions for the district.  The preliminary report will be provided to the district and to any person the TEA finds has violated a law, rule, or policy, and will include information for requesting an informal review of the report.

If the preliminary report finds no violation of law or rules, the TEA may issue this report as its final report. In addition, if the SIU finds no violations of law, rule, or policy, the SIU may administratively close the investigation without issuing a preliminary or final report. The district will receive notice if the SIU administratively closes the investigation. An administrative closure without preliminary report may be reopened by the SIU at any time, if it is determined to be necessary based on new or additional evidence, a new complaint, or review of data from another program area within TEA.

Informal Review:

The preliminary report will provide an opportunity to request an informal review of the findings to the school district, charter school, or person found to have violated a law, rule, or policy. The preliminary report will include a deadline by which the written request for an informal review must be received by the TEA. The request for an informal review must be in writing and include all information or documentation the school district, charter school, or individual would like the TEA to consider in the review. Following the informal review, a final report will be issued. If a request for informal review is not received by the TEA on or before the deadline, the report and the findings are final.

Final Report:

The TEA will issue a final report in accordance with Section 39.058 of the TEC and Chapter 157 of the TAC. The final report is a public document.  The final report will be issued to the district and to any person the TEA finds has violated a law, rule, or policy.  The final report will also be issued to the Governor's Office and any substantive Legislative committee, and TEA will provide any additional information to these entities as requested.  Any recommendations for sanctions or enforcement will be referred to the Division

of Enforcement Coordination. The Commissioner of Education or the Commissioner's designee will make the final determination regarding any sanctions.  Once the final report is issued, the findings in the report are final and no further appeals are available.

Part V.  Release of Information, Referrals, Procedural Matters

SIU may refer allegations, evidence, or investigative findings to other areas of the agency, to other state or federal agencies, or to appropriate law enforcement at any time during an investigation, including referring the final report at the conclusion of an investigation. If the report includes suspected criminal violations, the report and the underlying evidence may be submitted to the appropriate law enforcement authority, including the county district attorney.  Evidence that one or more educators violated a state or federal law may be referred to the Educator Investigations Division or to the Student Assessment Division for further review and determinations.

TEA complies with the Texas Public Information Act (TPIA) regarding the release of information in response to a request for public information. Information can only be kept confidential to the extent allowed by law. If audit working papers and drafts relating to the investigation are requested by the public, TEA will seek to withhold them from release through the Office of the Attorney General.

Inquiries received from the media will be directed to the TEA Office of Communications. Until a final report is issued, an investigation is ongoing and the SIU will not release any information regarding the investigation until it is final.

A copy of these procedures will be made available to the complainant, if possible, the school district or charter school, and the public.

SIU staff will be trained in the above-listed procedures and will follow these procedures in conducting SAI investigations.  These procedures align with the Offices of Inspector General Principles and Standards green book.

Any modifications to these procedures or the complaint resolution procedures may be ratified by the Commissioner or the Commissioner's designee at any time.

Effective date: September 2016

**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT**
**AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 12



**MICHELLE R. MORRIS**
Direct Dial: (713) 960-6009
mmorris@rmgllp.com

5718 WESTHEIMER ROAD, SUITE 1200
HOUSTON, TEXAS 77057
PHONE: (713) 960-6000  •  FAX: (713) 960-6025
**www.rmgllp.com**

May 18, 2015

***PRIVILEGED & CONFIDENTIAL***
***ATTORNEY-CLIENT COMMUNICATION***

*Via E-mail*
Ms. Monika Harris
Chief Procurement Officer, Interim
Houston Independent School District
4400 West 19th Street
Houston, Texas 77092-8501

Re:     Comments to Internal Audit of the Design and Selection Process for Job
         Order Contacts

Dear Ms. Harris

Per your request, this letter offers comments and recommendations in connection
with the District's plan to reissue a solicitation for job order contracting services. I have
had an opportunity to review the 2015 report issued by Internal Audit, the management
responses to the audit, and relevant procurement documents related to the Job Order
Contract solicitation issued on October 31, 2014. My comments to the auditor's findings
are set forth below, in the order presented by in the audit.

**Finding #1**

*Internal Audit found that all twenty-one (21) proposals were submitted on
or before the submittal deadline of 10:00 a.m. on November 25, 2014;
however, one (1) of the proposals was incomplete. One firm did not submit
its M/WBE package until November 25, 2014 at 3:32 p.m., which was after
the deadline. The package was accepted at the discretion of the
Procurement Sourcing Specialist. In addition, the two (2) proposals which*

Ms. Monika Harris
May 18, 2015
Page 2

*were submitted on November 19, 2014, did not include copies of all of the signed addendums.*

*The CSP contains conflicting language. Paragraph 1.11.6 "Late Proposals" states: "Responses submitted after the due date and time noted in this CSP shall not be considered and shall be returned to the Proposer(s), unopened, by United States Mail." ... "There shall be no exceptions to these requirements." Paragraph 3.4 states: "... Each proposal received will be analyzed to determine overall responsiveness and completeness as defined in the scope section and in the instructions on submitting a proposal. Failure to comply with the instructions or to submit a complete proposal may deem a proposal non-responsive and may at the discretion of the Evaluation Committee be eliminated from further evaluation.*

*According to paragraph 3.4 of the CSP, the Procurement Sourcing Specialist was allowed to accept the late M/WBE package. It is known that the failure to submit an M/WBE package timely is grounds for eliminating a proposal in the District's Construction Manager at Risk (CMAR) CSP selection processes. The CMAR CSP selection process is not consistent with the process followed for the JOC CSP selection process, which allowed a late submission. Although a case can be made for both positions, inconsistent treatment of issues like the late acceptance or waiver of missing supporting documentation between similar procurement processes can cause questions to be raised about the integrity of those processes and impact public confidence.*

**RMG Comments and Recommendations:**

The CSP language dictates that proposals submitted late will be returned to the proposer unopened, without exception. This language clearly refers to the initial sealed packet submission, in its unopened state. The completeness of a proposal cannot be determined until it is opened and evaluated for completeness. Once opened, the District should, and based on the CSP language does, retain discretion to determine whether the proposal is sufficiently complete. The CSP language states that lack of completeness *"may deem a proposal non-responsive and may at the discretion of the Evaluation Committee be eliminated from further evaluation."* This is a post-opening issue, distinct from submission of a late sealed proposal package prior to opening. The language does not therefore appear to conflict. As for the auditor's claim that failure to timely submit



**Appx.410**

Ms. Monika Harris
May 18, 2015
Page 3

an M/WBE package is "grounds" for elimination in a CMR process, the CSP language has the same effect. "Grounds" for elimination is not automatic – it sill leaves discretion. The JOC CSP, by using the word "may," creates the same discretion to make incompleteness grounds for elimination.  Again, I fail to se the conflict.

I do not recommend implementing an inflexible hard line rule that incomplete or late forms, no matter how immaterial to "best value," will lead to disqualification.  Such a blanket practice could subject the District to exposure.  Discretion should be exercised to determine the materiality of the omission, and whether late acceptance of missing proposal elements would cause competitive injury to other proposers.  The District also could, as part of the scoring process, penalize a proposer for submitting an incomplete proposer, rather than eliminating a potentially "best value" proposer from the process.

## Finding #2

> The CSP was issued on Friday, October 31, 2014.  On Tuesday November 4, 2014, HISD employees were notified by email that in accordance with the Code of Silence Policy, Board Policy CAA (Local), that a CSP that fell within their span of control had been issued.
>
> The evaluation committee was formed on October 31, 2014.  The Procurement Sourcing Specialist had each committee member outside of the Procurement Department sign a Confidentiality Agreement for "JOC General Construction – Major & Minor Projects" on  December 2, 2014, the day the committee met to evaluate the proposals.
>
> In accordance with District Policy, the notification about the Code of Silence should have been issued no later than the date of the issuance of the RFQ.  The Confidentiality Agreements should have been signed at the time the committee was formed, or on the date the RFQ was issued, whichever occurred first.  In this case both occurred on October 31, 2014.

## RMG Comments and Recommendations:

I agree that the Code of Silence directives should be issued the same day as the procurement release date, and evaluators should execute Confidentiality Agreements as soon as the committee is formed.



Ms. Monika Harris
May 18, 2015
Page 4

## Finding #3

*After reviewing the pre-determined criteria and weights in CSP #14-11-05 and reviewing the evaluation form used by the evaluation committee, Internal Audit determined that the Board approved criteria and weights for a CSP as listed in Board Item G-20 were not included in CSP #14-11-05, nor used in the evaluation process.   The criteria used in the process differed significantly from that approved by the Board.   The most significant difference was the reduction of the Quantitative Criteria (pricing) from 45% to 30%, which runs contrary to a recommendation made in the Audit Report issued by the Council of Great City Schools.  That recommendation was to "Provide a substantially higher value to* **"price"** *as a weighted factor."*

*It should be noted that the weight for the "Price (Coefficient)" in the 2008 RFP for the Supplemental Job Order Contract was 55%.  In the 2010 the weight for the "Pricing/Cost Coefficient" in the RFP for Job Order Contract Program for Repair, Rehabilitation, Minor Construction and Alteration of Facilities was 50%.*

*Minimizing the weighted value of the Quantitative Criteria (pricing) to 30% and increasing the weight of the Qualitative Criteria to 70% increased the amount of subjectivity in the process, and resulted in firms being recommended with pricing adjustment factors which were significantly higher than other firms which were not recommended.  It was noted that although the evaluation committee submitted a final Qualitative Criteria score sheet, they did not document the rationale for the scoring.  Because the qualitative evaluation was not documented, the only way to validate the qualitative scores would be to re-perform the evaluations.*

## RMG Comments and Recommendations:

Regardless of which version of Board-approved selection criteria is the correct applicable version, none of the selection criteria appear to be specifically applicable to a JOC CSP.  Rather, the CSP criteria referenced in the report seem to be intended for a traditional "CSP," where there is a defined project scope.  Certain factors relevant to "best value" on a defined project CSP, such as "proposed duration" and "subcontractor qualifications," are unknown, and unable to be determined at the time job order contractors are selected.  It would therefore be meaningless to include, and impossible to



Ms. Monika Harris
May 18, 2015
Page 5

score these criteria in a JOC CSP solicitation.  While the HSD Board may have approved selection criteria for certain delivery methods, the law does not require Board approval of selection criteria.   If there is a standing Board policy or prior action requiring Board approval of selection criteria (or revisions to selection criteria), then Board approval of selection criteria specific applicable to a JOC CSP should be sought.  If there is no such local mandate, than this legal authority rests with the Superintendent.

There is likewise no legal basis for the conclusion, as suggested by the auditor, that price must be weighted as a majority factor in order to pass legal scrutiny.  While price is a certainly a significant factor in the determination of best value, it need not be the majority factor.  A school district can realize significant financial loss by selecting a lowest price proposer who lacks sufficient qualifications and experience.  The evaluation of qualitative factors, which are also relevant to "best value," is unavoidably subjective to a certain extent.  This subjectivity is expressly permitted by law, as evidenced by the list of various permissible subjective evaluation criteria set forth in Texas Government Code Section 2269.055.

### Finding #4

*Quantitative Evaluation - Internal Audit reviewed the adjustment factor worksheet and noted that one (1) of the twenty-one (21) firms' adjustment factors were not carried over to the scoring sheet correctly . . .*

*In addition, six (6) of the twenty-one (21) firms had included Non Pre-priced adjustment factors which were not within the range specified in the CSP . . .*

*Qualitative Evaluation – Total weight given to all of the Qualitative Criteria was 70% of the total score.  The Qualitative Criteria excluding the M/WBE portion was weighted at 60% and the M/WBE criteria was weighted at 10%.  The evaluation committee was given the proposals (averaging over 1,800 pages of documents), and scored the Qualitative Criteria with the exception of the M/WBE portion for all twenty-one (21) firms in a single day.  According to members of the committee, they met, discussed each firm in relation to each criteria, verbally agreed on a score for each, and completed the single evaluation form, which they all then signed.  Although the sheet was populated and signed by each member of the committee, none of the members kept notes regarding each firm and*



Ms. Monika Harris
May 18, 2015
Page 6

> *why each score was assigned. The only way one can validate each score is to perform the entire evaluation again, but that process cannot guarantee the same results. Internal Audit has no reason to believe that the committee acted in any manner other than in the best interests of the District; however, the lack of documentation by the committee to support the reasoning behind the qualitative scoring can cause one to doubt the integrity of the process and impact public confidence . . .*

**RMG Comments and Recommendations:**

As it relates to Non Pre-priced adjustment factors (which only come into play for extraordinary items that cannot be found in the unit price book), I do not recommend dictating upfront an acceptable range of competitive pricing. Such a practice eliminates the opportunity for proposers to compete openly and offer additional discounts. If the District wishes to dictate the maximum markup it is willing to pay for certain items, I recommend handling this in one of two ways: (1) dictate the maximum allowable markup in negotiations, rather than inserting curbs to open competition at the outset; or (2) dictate in the CSP the exact markup the district is willing to pay for Non Pre-priced items, rather than a range.

With respect to the collective evaluation system employed by the committee, and its use of a single scoring sheet for the group, the law does not dictate whether evaluators must score proposals individually or collectively. Nor does the law require a minimum level of documentation, beyond the scores and rankings, to evidence evaluators' rationales for scores given in subjective scoring categories. Scoring procedures within a committee are within the discretion of the entity. While reasonable minds can differ on the best approach, use of a collective scoring sheet does not, in and of itself, render the procurement results unreliable or defective. That said, use of individual score sheets is typically employed a best practice to (1) prevent committee members from being influenced by other committee members, and (2) corroborate and validate the final results by showing the independent conclusions of each evaluator. I am not suggesting that evaluators should score proposers individually and in a vacuum, but at the end of the day, even after group discussion, each member should be entitled to submit his/her own perspective and conclusions towards the final result.

At HISD, the Board has expressly delegated the evaluation, scoring and ranking of proposers to the administration. So while it is left to the administration to determine which approach best serves the District's objectives and interests, the administration's approach should be aligned with the wishes of the Board, so that the Board is comfortable



**Appx.414**

Ms. Monika Harris
May 18, 2015
Page 7

relying on the administration's recommendations. I therefore recommend seeking direction from the Board on this issue, as the management response indicates in its Action Plan.

### Finding #5

> *The language in the CSP does not require that each respondent submit financial statements. Accordingly, of the twenty – one (21) proposals only two (2) contained financial statements. In addition, Internal Audit has found no evidence of a request for financial statements by Procurement, so a review of each firm's financial position was never part of the process. Although one (1) of the criteria is Bonding and Stability, that evaluation focused primarily on bonding capacity. It has been noted in other construction or construction related procurement processes that the submission of financial statements is a requirement in order for the respondent to demonstrate the "... Respondent's financial stability and ability to fulfill the obligations of the contract(s) that may be awarded with their submittal." The requirement for submission and evaluation of a proposing firm's financial records is an internal control to ensure that the District's interests are protected. The omission of a financial evaluation is a deficiency in the thoroughness of an evaluation process. Internal Audit believes that not requiring and evaluating financial statements of proposing firms puts the District at risk of contracting with a firm which is financially incapable of performing the contract requirements.*

### RMG Comments and Recommendations:

I agree with Management's response. Financial statements, while important when determining to whom to award a major construction project with a substantial duration, are not as critical in the selection of job order contractors. JOC projects, by nature, are minor in scope and value, and the HISD Board caps the maximum dollar value of each job order. As such, small businesses that compete in JOC solicitations may not be able to offer audited financial statements. By law, individual job orders exceeding certain dollar amounts require payment and performance bonds, and surety companies thoroughly evaluate the financial strength of companies and their principals when issuing bonds and setting a firm's bonding capacity. As the auditor points out, HISD evaluates each proposer's bonding capacity, which is in and of itself indicative of a company's financial strength. This practice, along with insurance verification, is sufficient to protect HISD



Ms. Monika Harris
May 18, 2015
Page 8

from the minimal financial risk associated with minor projects to be performed under HISD's JOC program.

### Finding #6

*Although Risk Management provided the required types of insurance coverage and minimum limits, Internal Audit has found no evidence that the insurance requirements in the CSP were a factor in the evaluation process. A review of the responses to the CSP found that out of the twenty-one (21) responses, twelve (12) included insurance certificates. Of those twelve certificates three (3) did not contain the required coverage. Nine (9) firms submitted responses with no insurance certificates at all. Of the thirteen (13) firms which were recommended for an award, only six (6) provided certificates in their responses, all of which contained adequate coverage.*

*Whether each firm's evidence of insurability was considered by the evaluation committee cannot be determined because the committee failed to keep notes on the evaluation process. Verification of insurability requires an independent confirmation of each contractor with their insurance carrier.*

*In order to determine if the insurance coverage was reviewed for each firm during the evaluation process, Internal Audit contacted Risk Management for documentation of their review of the insurance coverage. Risk Management could not find any evidence that Procurement had requested a review of insurability for the firms which responded to CSP 14-11-05 during the evaluation period. Although it is known that Risk Management reviews actual insurance coverage when contracts are executed, this evaluation process was not in compliance with Article 2.12.2 of the CSP requiring that each supplier submit evidence of insurability with the proposal. In addition, the acceptance of proposals without the required insurance certificates speaks to the issue of completeness of a proposal, as noted in the finding on timely submission above.*

### RMG Comments and Recommendations:

I recommend requiring the submission of insurance certificates as part of any construction solicitation, to evidence a firm's insurability in general. An owner may



**Appx.416**

Ms. Monika Harris
May 18, 2015
Page 9

assign scoring points for acceptable insurance certificates, but I do not recommend the practice. As for the auditor's conclusions, I do not agree that it is improper to make compliance with specific insurance limits a condition to contract award (as suggested by Management), rather than a condition for competing in the process (as recommended by the auditor). It would be unfair to require companies to incur the expense of purchasing insurance limits dictated by HISD prior to knowing if they will be awarded a contract. Either way, the CSP should be clear whether proof of acceptable insurance a contracting prerequisite, rather than a requirement for proposal consideration (or a scoring factor).

**Finding #7**

> *Each firm submitted statements of bonding capacity as part of the CSP response package, which was provided to the committee and was more than likely considered in the evaluation process. The evaluation of each firm's bonding capacity by the committee cannot be confirmed; however, because the committee failed to keep notes on the evaluation process. Verification of bonding capacity requires an independent confirmation of each contractor's capacity with the respective sureties. Currently, there is no evidence that the respective sureties were contacted. The committee members stated that they only considered what was in each package and Risk Management has stated that they were never requested to evaluate the sureties and review total and available bonding capacity limits for this CSP.*

**RMG Comments and Recommendations:**

Management's response was appropriate, and I would not recommend changes to the current practice. Statements contained in the audit recommending that bonds be provided and verified "at the time the contract is signed" and "immediately before each renewal" reveal the auditor's lack of understanding as to how bonding works in job order contracting. Job order contracts are not bonded upfront; rather, Texas Government Code Section 2269.411 requires job order contractors to provide bonds only as necessary for a particular job order, based on the amount or estimated amount of any job order. While bonding capacity should be evaluated upfront to ensure that, if and when needed, a vendor would be able to obtain bonds for the maximum potential amount of any single job order, formally issued bonds should not be requested at the time of contract award or renewal.



Ms. Monika Harris
May 18, 2015
Page 10

**Finding #8**

> The CSP did not require the proposing firms to submit reference
> information, so no formal reference contact process was performed. The
> lack of a formal reference verification process is a deficiency in the CSP
> process. The contacting of references is typically a part of a solicitation
> process for construction or construction related services intended as an
> internal control measure to protect the District's interests. It was included
> in the recent solicitations and evaluations of Architects, Project Managers,
> and Construction Managers-at-Risk by CFS. In soliciting construction
> services, the District has an obligation to make reasonable efforts to obtain
> an adequate level of information on each prospective vendor in order to
> make an informed evaluation. The potential benefits obtained from
> requesting of reference information and contacting the references
> outweighs the amount of effort it takes to do so.
>
> It should be noted that some firms provided letters of recommendation from
> past clients in their responses to support the "Qualifications" and
> "Relevant Experience" evaluation criteria. In discussing the evaluation
> process the committee members stated that they considered the letters as
> references "if they were provided", and also considered if a committee
> member had a prior experience with a proposing firm. The fact that not all
> responding firms included letters of recommendation with their submittals
> put those firms which did not at a disadvantage. The lack of a specific
> request for references in the CSP and a uniform reference verification
> process is a deficiency in the evaluation process.

**RMG Comments and Recommendations:**

I do not agree that HISD's failure to conduct a formal reference checking process
was "a deficiency in the CSP process," as suggested by the audit, especially given that
there was not a separate designated scoring criteria for "references." When owners create
a distinct scoring criterion for references, one would expect to see a survey questionnaire
distributed to references in order to evaluate responses and score the proposers
accordingly. Here, HISD evaluated "qualifications," in general. It appears that the CSP
specifically requested that vendors submit client references, not necessarily for the
purpose of providing contacts for a formal reference check, but to permit proposers to
demonstrate past experience. If HISD were to decide to assign specific weight to a

Ms. Monika Harris
May 18, 2015
Page 11

proposer's "references," (which is not mandatory), then I would recommend that HISD conduct and documented external reference checks for each proposer.

### Finding #9

> *In selecting the use of Gordian, HISD did not perform a cost benefit analysis of Gordian vs. R.S. Means or other available pricing methods. The fact that the estimated Gordian fees on the estimated annual value of JOC work range between $582,000 and $970,000, warranted such an exercise to protect the District's interests and demonstrate fiscal responsibility. A competitive procurement RFP process should have been issued for alternative pricing methods to ensure the District received best value and made the most informed decision.*

> *According to Procurement, Gordian was selected over R.S. Means because Gordian acquired R.S. Means and R.S. Means stated that they were not issuing additional licenses to accommodate HISD requirements going forward. It is known that entities still use R.S. Means for their Job Order Contracting. The fact that R.S. Means has stopped issuing licenses has not been verified, but even if it is the case, a public procurement of JOC pricing options would have brought transparency to the process of selecting Gordian.*

### RMG Comments and Recommendations:

Section 2269.404 of the Texas Government Code provides two, and only two, allowable methods for obtaining competitive unit prices for job order contracts: First, the governmental entity may "specify one or more published construction unit price books and the applicable divisions or line items." Proposers compete by offering coefficients (discounts) or multipliers (markups) to the published unit prices for each material or labor item. The law does not require any formal process to be conducted prior to the specification of the unit price book, nor does it require a determination that the selected price book represents a "best value." The price book designation merely sets a uniform baseline of data points against which proposers submit competitive coefficients or multipliers. There are several price book options from which owners may choose. RS Means unit price books are national estimate price books; however, the estimates are adjusted for local market conditions with the application of a "City Cost Index." The City Cost Index is automatically applied to unit prices prior to the application of the job order contractor's coefficient/multiplier. By contrast, the Gordian Group (which now owns the RS Means publications) offers its own customized unit price book product,



**Appx.419**

Ms. Monika Harris
May 18, 2015
Page 12

utilizing localized and specific data to create line item categories tailored to an owner's specific needs. Use of a customized Gordian price book results in an additional cost to the owner -- a percentage fee – charged by Gordian on each job order issued by the owner. Other unit price books exist throughout the United States, but for job order contracting purposes, RS Means and Gordian are the two prevailing price books, with RS Means being the designated price book for the majority of job order contracts in the United States. Other published unit price books or estimating tools are utilized for insurance claims adjustment, rather than job order contracting.

The second manner in which owners may establish job order contract unit prices, under Texas Government Code Section 2269.404, is by providing "a list of work items and requiring the offerors to propose one or more coefficients or multipliers to be applied to the price book or pre-priced work items as the price proposal." In other words, the governmental entity can create its own unit price book or price list, or hire a company such as Gordian, to create one. Given the amount of effort involved in creating a comprehensive unit price book/list, it may not be feasible for owners to create a book/list for anything other than limited scope job order contract solicitations (i.e., painting, roofing, etc.), without use of an outside consultant such as Gordian.

With respect to the findings of the auditor, I disagree that a competitive RFP process should be conducted to determine which unit price book offers the best value to an owner. Such a determination can be lawfully and practically made by internal due diligence. There is no competitive incentive to be offered by publishers, and the publishers cannot adjust the data for competitive purposes. The data is what it is, and the published unit price books can be obtained and compared without requiring a competitive submission by the publishers. The publishers' licensing or book purchase fees alone will not exceed $50,000 in a 12-month period, such that procurement would be required before selection of a unit price book. The auditor appears to question the Gordian option, due to the fees charged by Gordian for its customized unit price book service. Presently, Gordian is the only company that offers the service of creating customized unit price book for owners, and offers sole source documentation to this effect to governmental entities. Gordian's fees may be subject to negotiation, but a competitive process is not required to engage in such negotiations where the company providing the service is a sole source provider.

As correctly pointed out in the legal opinion provided by Sandy Hellums-Gomez of Thompson and Horton dated September 14, 2014, job order contracting is the only delivery method available to school districts wishing to select one or more vendors to call upon to perform future construction services of an indefinite scope or quantity. The two



Ms. Monika Harris
May 18, 2015
Page 13

options described above for setting job order contract prices are the only options currently permitted by the legislature.  Statutory revisions adopted in 2011 clarify that school districts may no longer list cost categories (without baseline unit prices) and allow proposers to submit their own "time and materials" pricing schedule/rates for future work.

**Finding #10**

"Article 16 Compensation" of the Sample Contract provided as Exhibit C with the CSP states that *"Payment for Work performed during (non) standard Working hours shall be based on the (Non) Standard Coefficient multiplied factor of X.XXXX multiplied times the sum of unit prices specified in R. S. Means, Facilities Construction Cost Data, multiplied by the City Cost Index (Houston)."*  The intent to use Gordian in the instructions for the CSP, while the Sample Contract (Exhibit C) attached references compensation will be based on the R. S. Means Facilities Construction Cost Data, is indicative of a process that was rushed with poor quality.

**RMG Comments and Recommendations:**

This appears to have been a clerical error, which will be corrected.

**Finding #11**

*The primary emphasis of this finding is not failure to comply with state law, but the amount and timing of the efforts the District expended to prepare for compliance with state law.  The District had from the end of the legislative session in 2011 to prepare for the state law change in contracting methodology.  Although existing contracts were grandfathered, research into the state law requirements and determining the pricing structure, the number of contractors required, and contractual terms which offered best value to the District should have been an ongoing process by Procurement since 2011.  By utilizing Contractors from state cooperatives, and the existing annual vendors and contract extensions, Procurement effectively avoided addressing the state law change until 2014.  While doing so, the Gordian vs. R.S. Means issue came to light and caused a*



Ms. Monika Harris
May 18, 2015
Page 14

*disruption in the process, resulting in the JOC CSP process which was rushed and contained shortcuts. The CSP was issued on October 31, 2014 and the recommendations had to be approved by the board on December 11, 2014. Even though Procurement did not start addressing this JOC Contract until 2014, once they ran into the Gordian issue the process should have been put on hold until the issue was properly researched and the method providing best value was determined. The District still had the option of using the co-operatives and it would have been the safer course to spend a few more months using the co-operatives than rushing the process and winding up with long term contracts which do not represent best value to HISD.*

**RMG Comments and Recommendations:**

    I disagree with the auditor's claim. In my experience representing the District, I have reviewed documents clearly demonstrating that HISD began the process of transitioning from "time and materials" contracts to job order contracts in 2012, not 2014.

    I hope these general comments are helpful to you as you finalize the 2015 JOC CSP solicitation. Please do not hesitate to contact me if you would like more elaboration or additional guidance on a particular subject, or if I can be of further assistance.

Very truly yours,

ROGERS, MORRIS & GROVER, LLP

Michelle R. Morris



**HOUSTON ISD'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

# Exhibit 13



June 14, 2016

Elneita Hutchins-Taylor
General Counsel
Houston Independent School District
Hattie Mae White Building
4400 West 18th Street
Houston, Texas 77092-8501

Re: Review of legal issues raised in HISD internal audit of Job Order Contracting

Dear Elneita Hutchins-Taylor:

## Introduction and Summary

On November 2, 2015, you engaged us to review the Internal Audit Report dated 9/4/2015, regarding "Job Order Contracting-Implementation and Execution" (the "Report") and to advise you, as the District's General Counsel, as to whether, in our opinion, the facts and other information recited in the Report demonstrate that violations of state procurement laws have or may have occurred. We have reviewed the Report and other related documents provided by you to us at our request or obtained by us from the District's website. Based upon our review of the facts and other information recited in the Report, we conclude that the Report misinterprets state law and erroneously concludes that violations of law occurred.

## Report Overview

The Report states that its purpose is, in part, to "determine that each job order was written in compliance with the contractual requirements, State Law and District Policy." Report at 4. The focus of the Report is "to review and test a sample selection of job orders for compliance with State law and District policy." Report at 4. The Report concludes that the "review found job orders which did not comply with State law." Report at 4. The Report further asserts that "single projects were broken up into multiple job orders to keep the value of each job order

below the $500,000 statutory value limitation."[1]

In the Report Detail ("Detail") that accompanies the Report, the auditors stated: "Currently, per State law ..., job orders can be issued for up to $500,000 per project, without Board approval. ...Job orders exceeding those limits can be issued; however, according to Section 2269.403 of the Texas Government Code, they must be individually approved by ... (the Board)." Detail, p. 7 [also referencing Texas Education Code § 44.032 pertaining to enforcement of purchase procedures]. Subsequently in the Detail, the Audit Team makes the following "recommendation(s)":

(1) "CFS should not divide the work to fit statutory limits, as component, separate or sequential purchases are a violation of the Texas Education Code." Detail, e.g., pp. 9, 14, 19; see also p. 18 ("job orders represent component, separate, or sequential purchases ... not permitted under the Texas Education Code").

(2) Further, CFS should perform work "under a single job order with special approval by the Board for exceeding the $500,000 contract limit." Detail, e.g., p. 9 (emphasis added).

In our opinion, the Report misinterprets state law by mistakenly applying the Education Code's restrictions on "component, separate or sequential purchases" to job order contracts made under the Government Code. Additionally, the Report appears to impose unnecessary Board approval requirements on job order contracts exceeding $500,000.

**Overview of Applicable Law**

**Legislative History of Competitive Procurement of Public Works
Contracts by School Districts**

Prior to 1995, public school districts, like other local governments, were required to utilize competitive bidding for the award of construction contracts. Tex. Loc. Gov't Code § 271.021 et seq. (competitive bidding on certain public works

---

[1] As noted in the Report Detail, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in the memorandum dated April 2, 2014. Detail at p. 9. The Procurement Department guidance is attached as Exhibit B.

2

contracts). State law required that local governments award construction contracts to the responsible bidder offering the lowest price based upon plans and specifications prepared by an architect or engineer for a public work requiring an expenditure of more than $10,000[2]. For projects over the expenditure limit, local governments were required to 1) give public notice of the project and 2) award the contract for the project to the lowest bidder.

Under the laws applicable to cities, counties and other local governments, including school districts, the Texas Legislature passed various statutes prohibiting governmental officers or employees from intentionally making separate, sequential and/or component purchases in order to avoid the competitive bidding statutes' monetary limitation. Tex. Rev. Civ. Stat. Art. 2368a.3 and 2368a.5 (now Tex. Loc. Gov't Code §§ 262.023(c) and 271.029(a); 252.001(2), (6) and (7) and 252.062(a) (separate, sequential or component purchases); see also Tex. Atty. Gen. Op. JM-725 (1987) (prohibits intentional circumvention of $5,000 limitation by separate, sequential, and/or component purchases by the same county officers, departments or institutions); Tex. Atty. Gen. Op. JM-783 (1987); Tex. Atty. Gen. Op. JM-1254 (1990) (county not precluded from making isolated spot purchases to meet county's requirements); Tex. Educ. Code § 44.032 (1995) (separate, sequential or component purchases limitation adopted for school districts). These statutes were adopted for the purpose of ensuring that the local governments gave the required public notice and awarded the contract to the lowest bidder.

Recently, however, "... statutes have evolved from fairly simple 'lowest bidder' requirements to laws that allow a local governing body to consider a number of factors." *GADV, Inc. v. Beaumont Indep. Sch. Dist.*, No. 1:11-CV-187 at 1 (E.D. Tex. Jun. 7, 2011)(mem. order). In 1995, the Texas Legislature rewrote the procurement requirements in Chapter 44 of the Texas Education Code with the enactment of Senate Bill 1. Act of May 30, 1995, 74th Leg. R.S., Ch. 260, § 1, 1995 Tex. Gen. Laws 2207. After Senate Bill 1, school districts were authorized to choose from the laundry list of permitted methods of procurement set out in Section 44.031 of the Texas Education Code. School districts were required to select the procurement method that provides the "best value for the district". The local government is no longer required to award the contract for a public works

---

[2] The dollar limitation requiring bidding increased from $2,000.00 in 1931 to $50,000 today. *Compare* Vernon's Ann. Civ. Stat. Art. 2368a (1934) *with* Tex. Educ. Code § 44.031. *See generally* D. Brooks, 36 Texas Practice, County and Special District Law § 13.03 Statutory Requirements for Competitive Bidding (2015).

project to the lowest bidder.

Similarly, the state laws now provide for broader participation in the procurement process by permitting interlocal agreements such as TCPN / National IPA. Cf. Texas Government Code Ch. 791; Texas. Local Government Code Ch. 271. Under these interlocal agreements, potential vendors may qualify to participate in public works opportunities for multiple governments or multiple projects. The public notice requirement may, accordingly, be accomplished by public bidding, by a competitive sealed proposal method, or through an interlocal agreement. *Id*; see also Tex. Gov't Code §§ 2269.405-.407.

Consistent with this evolution of the procurement law, the Legislature added former Texas Education Code Section 44.035 regarding competitive sealed proposals for construction services, and it provided in part:

> Except as otherwise provided by this subchapter, *a school district using competitive sealed proposals* to select a contractor for construction services, to select a construction manager, or *to award a job order contract for construction services shall base its selection or award on a combination of price and other factors that the district determines provides the best value to the district.* Act of May 27, 1997, 75th Leg., R.S, Ch. 1179, § 2, 1997 Tex. Gen. Laws 4533, 4534 (emphasis added).

The Legislature also added Section 44.041, Job Order Contracts for Facilities Repair, which provided for job order contracts. *Id.* at pp. 4538-4539.

In summary, from 1995 until 2011, most school district procurement laws for goods and services, including construction services, were set out in Chapter 44 of the Texas Education Code.

## Chapter 2269, Contracting and Delivery Procedures for Construction Projects

In 2011, the enactment of House Bill 628 moved school district construction procurement requirements (except interlocal contracts and energy saving performance contracts) to Chapter 2267 of the Texas Government Code. Construction procurement provisions formerly codified in Chapter 44 of the Education Code were repealed, including Sections 44.035 and 44.041 discussed

4

above. Act of May 28, 2011, 82nd Leg., R.S., § 2.02, 2.08 and 5.01, 2011 Tex. Gen. Laws 2900. One major purpose of House Bill 628 was to consolidate contracting and delivery procedures for construction projects for most local governmental entities into a single chapter of the Government Code. House Research Organization, Bill Analysis, Tex. H.B. 628, 82nd Leg., R.S. (1995).

In 2013, Texas Government Code Chapter 2267 was renumbered to Chapter 2269 with no substantive revisions. Act of May 2, 2013, 83rd Leg., R.S., § 22.001(23), 2013 Tex. Gen. Laws 622, 702. Consequently, while job order contracts have been permitted since 1997, the construction procurement law for school districts as currently codified in Chapter 2269 has only been in effect since 2011. The rules governing school district procurement of contracts for goods and services, other than public works contracts, are found in Education Code Chapter 44 while the rules related to school district procurement of contracts for public works are found in Government Code Chapter 2269.

In November 2013, HISD's legal counsel advised the Board of the changes in state procurement law effectuated by the Legislature's enactment of Chapter 2269. See Resolution Authorizing Determination of Construction Methods; April 8, 2013; CVF (LEGAL) issued 11/22/2013.

### The School District Authorized to Use Job Order Contracting for Public Works Contracts

As indicated above, the Texas Legislature authorized school districts to use job order contracts in 1997. Act of May 27, 1997, 75th Leg., R.S, Ch. 1179. Since at least 2000, the District has used job order contracts as permitted by the Texas Education Code. See, e.g., Board Minutes July 19, 2012, p. F-5 (approving job order contract).

Texas Education Code Section 44.031(a)(5) now provides that a school district may use a procurement method provided by Chapter 2269, Government Code, for construction services[3]. The District uses the "job order contracting" method in Subchapter I of Chapter 2269 of the Texas Government Code. Tex. Gov't Code §§ 2269.401-2269.411. Chapter 2269 provides that "(t)he governing

---

[3] Chapter 2269 provides that public works contracts may be procured by competitive bidding, competitive sealed proposals, the construction-manager-agent method, the construction manager at risk method, design build, or job order contracting. Tex. Gov't Code Ch. 2269.

**Appx.428**

body of a governmental entity that considers a construction contract using a method authorized by this chapter other than competitive bidding must, before advertising, determine which method provides the best value for the governmental entity." Tex. Gov't Code § 2269.056(a).[5]

As set forth in Chapter 2269, "job order contracting" is a procurement method used for maintenance, repair, alteration, renovation, remediation, or minor construction of a facility when the work is of a recurring nature but the delivery times, type, and quantities of work required are indefinite. This method only applies to a facility that is a building, the design and construction of which is governed by accepted building codes. Tex. Gov't Code § 2269.402. Job order contracts may be awarded for indefinite quantities and the tasks or purchase orders within the contract are awarded substantially on the basis of pre-described and pre-priced tasks. *Id.*, § 2269.403(a)(2).

Job order contracts must be publicly advertised or competitively bid. *Id.*, §§ 2269.405(a) and (b). The solicitation for proposed vendors should establish the maximum aggregate contract price when advertised. *Id.*, § 2269.403. The Board must approve "each job, task or purchase order" that exceeds $500,000. *Id.*, § 2269.403(c).

The base term for a job order contract may not exceed two years. *Id.*, § 2269.409. The District may renew the contract annually for not more than three additional years. *Id.* The District may award job order contracts to one or more job contractors in connection with each solicitation of proposals. *Id.*, § 2269.406.

### Summary of Job Order Contracts in Report

The Audit Team reviewed a sampling of job order contracts to prepare its Report. The Report describes 27 job orders issued under four job order contracts, or public notices (JOC10-01-05, JOC 5086, TCPN 5087, TCPN 5092). See Exhibit A. The subject job order contracts encompassed work at twelve different campuses. *Id.* The Report suggests that the job order contracts at eight of the District's campuses constituted "component" or "sequential" purchases made in violation of the Texas Education Code.

6

**Audit Team Misstates Applicability of Texas Education Code § 44.032 to Job Order Contracts**

As indicated above, the Texas Education Code provides that a district shall, for contracts for the purchase of goods and services valued at $50,000 or more, use the method that provides the best value for the district, which includes any method provided by Chapter 2269. Tex. Educ. Code § 44.031(a)(5). Section 2269.003 of the Texas Government Code expressly provides that Chapter 2269 prevails over any other law relating to a public works contract. Tex. Gov't Code § 2269.003. Although Chapter 2269 requires that a district "advertise or [provide] public notice of requests for bids, proposals or qualifications in a manner prescribed by law", there is no prohibition in Chapter 2269 of component, separate, or sequential purchasing. *Id*., §§ 2269.052(a) and (b).[4]

The Board may delegate its authority regarding any action required by Chapter 2269 to a designated representative, committee or other person. *Id*., Tex. Gov't Code § 2269.053. The Board may include the notice of delegation in either: 1) a rule adopted under Section 2269.051; or 2) in the request for bids, proposals or qualification or an addendum to them. Tex. Gov't Code §§ 2269.051, 2269.053(b).[5]

Job order contracting inherently involves bundling various tasks into one project or purchase order. For example, a restroom renovation may likely include demolition, framing, electrical wiring, plumbing, sheetrocking, tiling and other tasks that, because of complexity, size, specialization, or sequencing of the work, may properly be bundled together or separated. The very purpose of job order contracting is to permit a district to maintain, repair, alter, renovate, remediate or do minor construction on a facility where the work is recurring but delivery times and quantities are indefinite. Tex. Gov't Code § 2269.403. The statute permits an entity to piecemeal work at a facility to one or more contractors provided that the entity pre-qualifies such work through the job order contracting process. As noted

---

[4] An officer, employee, or agent of a school district who, with criminal negligence, makes or authorizes separate, sequential, or component purchases to avoid the requirements of Texas Education Code 44.031(a) or (b) commits a Class B misdemeanor offense. Tex. Educ. Code § 44.032(b). By contrast, a violation of Chapter 2269 may be corrected by declaratory or injunctive relief, including voiding the contract. Tex. Gov't Code §§ 2269.451-.452.

[5] See Resolution dated 04/08/13 providing for delegation of authority.

in the Report, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in (a) memorandum dated April 2, 2014." Detail at p. 9. The guidance recommended that the "overall work scope be assigned [to job order contracts] sequentially or by trades, rather than by division of similar work." Exhibit B.

The principal purpose of Texas Education Code Sections 44.031(purchasing contracts) and 44.032 (enforcement of purchase procedures/prohibition of separate, sequential or component purchases) is to ensure that contracts over $50,000 be let through a competitive (publicly advertised) bidding or proposal process. It is undisputed that the District gave notice and pre-qualified offerors for the job orders described in the Report.

In our opinion, Texas Education Code Section 44.032 only prohibits the use of component, sequential or separate purchases intentionally made to circumvent the $50,000 competitive bid requirement contained in Section 44.031. The Report improperly concludes that the employees or officers of the District violated Section 44.032 when bundling work for job contract orders under Chapter 2269 of the Government Code.

### Audit Team Misstates the Minor Construction Limitation

Similarly, the Audit Team misstates the scope of job orders permitted under Chapter 2269. The Audit Team asserts that "Job Order Contracts should only be used for minor construction, repairs and rehabilitation projects where the quantities and deliveries are indefinite." Report at p. 4. In doing so, the Audit Team uses the statutory language found in Texas Education Code Section 51.784, related to institutions of higher education (not school districts)[6]. Section 51.784 does not apply to the District.

It is possible that in writing Section 51.784 that the Texas Legislature borrowed language from the federal government's job order contracting regulations. Under federal procurement practice, "minor construction" means a project with a cost between $750,000 and $1,500,000. Cf. 10 U.S.C. § 2805

---

[6] Former Section 44.041 of the Texas Education Code authorized job order contracts for "minor repair, rehabilitation, or alteration of a facility. Tex. Educ. Code § 44.041 (1997) (repealed); compare Tex. Gov't Code 51.784 (related to higher education, "minor construction, repair, rehabilitation or alteration of a facility").

8

(authority to carry out unspecified minor construction projects).

Regardless, Chapter 2269 of the Texas Government Code, which is applicable to the job order contracts under review, provides that the contracts may be used for "maintenance, repair, alteration, renovation, remediation, or minor construction of a facility". Tex. Gov't Code § 2269.403(a). The statute permitting job order contracts is broader in two contexts than stated by the Audit Team: 1) the work is not restricted to "minor" work, and 2) the work is not restricted to a "project".

Chapter 2269 sets no monetary limitation on the scope of work permitted under a job order contract. Indeed, the statute contemplates that the maintenance, repair, alteration, renovation or remediation may be substantial in scale and may exceed $500,000 (since Board approval is necessary for jobs over $500,000). Cf. Tex. Gov't Code § 2269.403(c).

The only limitation imposed on job order contracts is that, with regard to new construction, the contracts should be used for "minor construction of a facility". Tex. Gov't Code § 2269.403(a). The construction of new facilities necessarily requires certain design considerations that may only be met by preparation of construction documents for the project. Cf. Tex. Gov't Code §§ 2269.152, 2269.205 and 2269.252 (use of architect or engineer); Tex. Occ. Code § 1051.606 (substantial alteration of public buildings requires architect). Accordingly the "minor" limitation on construction appears to be imposed by Chapter 2269 in the context of the "structural" changes to the building resulting from the work, not the monetary value of the work. There is no evidence cited in the Report, nor does it appear from the Report, that the job order contracts process was used to construct new public buildings or make substantial structural additions or changes to existing buildings that would have required the preparation of architectural or engineering plans.

The Audit Team misstates the law defining the scope of work permitted under job order contracts covered by Chapter 2269, and accordingly, misleadingly implies that the District permitted work not appropriate under that Chapter.

**The Audit Team Mistakenly Concludes that the District Executed
Job Order Contracts without Board Approval**

Texas Government Code Section 2269.403 provides that the Board is required to approve "each job, task, or purchase order" that exceeds $500,000. Tex. Gov't Code § 2269.403(c). The Audit Team alleges in its Report that "single projects were broken up into multiple job orders to keep the value of each job order below the $500,000 statutory value limitation." Report p. 5. In particular, the Audit Team focused on "job orders ... sequentially numbered for work at the same location". Audit Report p. 4; p. 8 (Job Orders KBR 20104 and 20105-North Forest HS); p. 9 (Job Orders KBR 20110, 20111, and 20112-Energy Institute HS); p. 10 (Job Orders KBR 30006 and KBR 30007-Kirby MS); p. 12 (Job Orders KBR 30008 and KBR 30009-Lakewood ES) and p. 13 (Job Orders KBR 30063 and KBR 300064). As noted above, the Audit Team appears to assume "sequential" purchases are presumptively prohibited by state law or that the Board was required to give some "individual" or "special" approval to any cumulative job order contracts at a particular site that totaled more than $500,000. Based upon our review of the Report, it appears that the Audit Team failed to understand the statutory requirement for Board approval.

Although Chapter 2269 generally references projects, with regard to job order contracts, the chapter requires that the Board approve "each job, task, or purchase order" over $500.000. As noted in the Report, "CFS procured multiple, concurrent job order contracts based upon Procurement Department guidance as contained in [a] memorandum dated April 2, 2014". Detail at p. 9; Exhibit B, attached. The guidance recognized that the terms job, task, purchase order and project are not defined by Chapter 2269. Although project and job are used repeatedly in the statute, the terms "task" and "purchase order" appear only in Section 2269.403. In the absence of a statutory definition, it is appropriate to use the terms' common meanings. Generally "project" would encompass several jobs or tasks. Cf. Tex. Loc. Gov't Code § 245.001(1) (project means endeavor for which one or more permits required). "Job" or "task" generally indicates a part of a project: "job-a task or piece of work". See Google Dictionary.

Unfortunately, the State law does not provide a bright line for what a "job" or "task" is. The "guidance" addressed the "work scope" permitted under a "job order contract" as a project, job or task, and recommended that work scope "be assigned sequentially or by trades, rather than by division of similar work." Exhibit B- Memorandum dated April 2, 2015. The Audit Team rejects that approach

10

without discussion, and adopts a conservative approach that the District not enter into any contract or contracts with a contractor for more than $500,000 without prior Board approval.

In our opinion, a court would review the award of a contract under Chapter 2269 under a rational basis test, i.e., did the District have a reasonable, articulable basis to bundle or unbundle various job(s), task(s) or purchase order(s) and, as properly bundled, did the board approve the bundles over $500,000? Similar to the federal acquisition regulations, factors that may affect the determination whether one or more "job(s), task(s) or purchase order(s)" are properly bundled together for purposes of applying the $500,000 limitation may include "the diversity, size and specialized nature of the elements of performance specified," "the aggregate dollar value of the award", and "the geographical dispersion of the contract". Cf. Federal Acquisition Regulation 2.101. Although the Audit Team appeared to consider some factors that might relate to proper bundling of jobs or tasks[7], the Audit Team failed to articulate a guideline and its objectivity in determining a rational basis for bundling tasks appears tainted by its mistaken conclusion that such bundling inherently constitutes "component, sequential or separate purchases" prohibited by Chapter 44 of the Texas Education Code.

It also appears from the Report that the Board did, in fact, approve job order contracts in excess of $500,000 for the various campuses as required by Texas Government Code Section 2269.403(c). See Exhibit A. Moreover, as noted in the Audit Report, the Board had approved an annual limit of $1,000,000 on job order contracts per campus. Audit Report 4. As promulgated, the Board's rules provide that the District may "aggregate contracts for an offeror" … "not to exceed $1,000,000 per annum per campus." Resolution Authorizing Determination of Construction Methods, April 8, 2013.

---

[7] See, e.g., Detail at p. 20- Fonwood ES-"Case can be made to justify them (chalkboard replacement, door replacement, and restroom renovation) as separate orders."

## Summary / Recommendations

In our opinion the Audit Team misinterpreted the state law applicable to job order contracting, which resulted in a flawed Audit Report. The Audit Team mistakenly assumed that "component, sequential or separate" purchases violate the job order contracting provisions of Chapter 2269 and that job order contracts are for "minor" projects only. The Audit Team's efforts were further hindered by the inherent ambiguity, and newness, of Chapter 2269. Admittedly, as a relatively new procurement method, the parameters of job order contracting are not well defined.

Given the ambiguity of the statute and the confusion that it has caused, we recommend that the Board consider amending its rules for the use of job order contracting under Chapter 2269 to establish guidelines for the bundling of jobs or tasks for purposes of determining when Board approval of purchase or requisition orders for job order contracts is required. The federal guidelines regarding the bundling of smaller contract into a single contract might serve as a basis for such rules.

If we can be of further assistance in this matter, please advise.

Olson & Olson, LLP

Scott Bounds

Exhibit A, attached (Summary of 27 JOC in Report)
Exhibit B, attached (Procurement Department Guidance, April 2, 2014)

12

**Appx.435**

Exhibit A

| | Campus | Job Order | Description | Amount | Issue Date | Notice | Bid Approval | CSS |
|---|---|---|---|---|---|---|---|---|
| 1 | North Forest HS | KBR 20104 | asbestos abatement | $480,000.00 | 6/11/2013 | 10-01-05 | 7/18/2013 | Component P. 9 |
| 2 | North Forest HS | KBR 20005 | demolition | $480,000.00 | 6/11/2013 | 10-01-05 | 7/18/2013 | Component P. 9 |
| 3 | Energy HS | KBR 20110 | canopy and concrete | $176,444.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 4 | Energy HS | KBR 20111 | classroom reno/gen plumbing | $362,156.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 5 | Energy HS | KBR 20112 | classroom reno/flooring, elec, doors | $271,416.00 | 6/17/2013 | 10-01-05 | 6/13/2013 | Component P. 10 |
| 6 | Kirby MS | KBR 30006 | demo | $324,600.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 10 |
| 7 | Kirby MS | KBR 30007 | abatement | $408,300.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 10 |
| 8 | Lakewood ES | KBR 30008 | abatement | $174,923.00 | 8/6/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 12 |
| 9 | Lakewood ES | KBR 30009 | demo | $330,116.00 | 8/7/2013 | TCPN 5087 | 7/18/2013 | Component Sequential P. 12 |
| 10 | Cage ES | KBR 30063 | architectural for principal's restrooms | $491,716.00 | 5/8/2014 | TCPN 5087 | <500K | Component Sequential P. 14 |
| 11 | Cage ES | KBR 30064 | electrical, plumbing, mechanical for p | $359,922.00 | 5/8/2014 | TCPN 5087 | <500K | Component Sequential P. 14 |
| 12 | Sutton ES | JLN 20124 | HVAC | $1,285,586.00 | 5/17/2013 | 10-01-05 | 3/7/2014 | no issue w/CSS P. 15 |
| 13 | Holland MS | JLN 20125 | HVAC line replacement | $472,680.38 | 5/21/2013 | 10-01-05 | 4/11/2014 | no issue w/CSS P. 15 |
| 14 | Burnet ES | JLS 30003 | roof repairs | $669,893.62 | 6/27/2013 | TCPN 5086 | 5/9/2013 | no issue w/CSS P. 15 |
| 15 | Sanchez ES | JLS 30079 | bathroom renos | $499,150.00 | 4/4/2014 | TCPN 5086 | <500K | Project continuation P. 18 |
| 16 | Sanchez ES | JLS 30148 | additional pipe and tile installation | $33,720.89 | 9/15/2014 | TCPN 5086 | <500K | Project continuation P. 18 |
| 17 | Fonwood ES | P2M 30000 | chalkboard replacement | $54,333.59 | 7/19/2013 | TCPN 5092 | 7/18/2013 | Seq., but no issue w/CSS P. 20 |
| 18 | Fonwood ES | P2M 30001 | replace doors and glass front | $282,827.14 | 7/19/2013 | TCPN 5092 | 7/18/2013 | Seq., but no issue w/CSS P. 20 |
| 19 | Fonwood ES | P2M 30002 | restroom renovations | $428,256.33 | 7/19/2013 | TCPN 5092 | 7/18/2013 | Seq., but no issue w/CSS P. 20 |
| 20 | Jones HS | P2M 30044 | reno of culinary arts, new admin area, | $381,758.96 | 6/10/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 21 | Jones HS | P2M 30045 | reno of welding, HVACR, cosmetology | $481,060.71 | 6/10/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 22 | Jones HS | P2M 30047 | canopy painting, upgrade lights | $484,475.00 | 6/5/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 23 | Jones HS | P2M 30048 | tennis courts, restroom reno, bus lane | $139,959.58 | 6/5/2014 | TCPN 5092 | 9/11/2014 | Component Sequential P. 23 |
| 24 | Jones HS | P2M 30054 | parking lot addition | $1,170,675.47 | 7/23/2014 | TCPN 5092 | 9/11/2014 | Single project P. 27 |
| 25 | Attucks MS | P2M 30046 | painting and chalkboard | $255,287.45 | 6/10/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 27 |
| 26 | Attucks MS | P2M 30051 | gym floor upgrade | $104,711.75 | 7/21/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 27 |
| 27 | Attucks MS | P2M 30052 | upgrade library bookshelves | $42,819.90 | 7/21/2014 | TCPN 5092 | 9/11/2014 | no issue w/CSS P. 30 |

13

**Exhibit B**



5444 Westheimer Rd, Suite 200,,
Houston, TX 77056
T 713.780.4100  F 713.780.0838
www.aecom.com

## Memorandum

Date:       **April 2, 2014**

To:         Meredith Smith, Senior Project Manager, CFS,

Houston ISD From:     Kenneth L English, Program Director

Subject:    HISD Job Order Contractor Contracts

The following is a summary of our meeting last week with Elvis Eaglin and Earl Finley regarding the limitations on JOC contracts set by state law.  Present in this meeting were:

- Dillon Brady, General Manager of Construction HISD CFS
- Elvis Eaglin, Procurement Manager, HISD,
- Earl Finley, Sr. Source Specialist, Procurement, HISD
- Meredith Smith, Senior Project Manager, HISD, CFS
- Bruce Green, Senior Project Manager, HISD, CFS
- Kenneth English, Program Director, AECOM

1. The direction received from procurement team members at this meeting regarding the use job order contracts is that we may proceed with multiple, concurrent job orders contracts, with one or more vendors, as long as the job order contracts do not exceed the limits established by the HISD Board. That is, no single job order contract may exceed $500,000 and the total aggregate of job order contracts per campus, per fiscal year, may not exceed $1,000,000.

2. To confirm this direction, we reviewed the HISD Board Resolution approved on April 11, 2013 regarding JOC contract limits and discussed the applicable state laws regarding the use of job order contractors by school districts.

3. While the statutes do not address how work scope may be assigned to job order contracts and do not define terms such as "projects", "jobs", or "tasks", the CFS team prefers that overall work scope be assigned sequentially or by trades, rather than by division of similar work.

14

**Appx.437**

- T E X A S   E D U C A T I O N   A G E N C Y -

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



# APPENDIX 2

1 7 0 1   N O R T H   C O N G R E S S   A V E
A U S T I N ,   T X   7 8 7 0 1



## FELDMAN & FELDMAN PC

CRISTEN D. FELDMAN
Cris.Feldman@feldman.law

CASEY T. WALLACE
Casey.Wallace@feldman.law

BENJAMIN W. ALLEN
Ben.Allen@feldman.law

GEORGE W. VIE III †
George.Vie@feldman.law
*Board Certified – Civil Appellate Law*
*Texas Board of Legal Specialization*

3355 WEST ALABAMA ST., SUITE 1220
HOUSTON, TEXAS 77098
TELEPHONE: 713-986-9471
FACSIMILE: 713-986-9472
WWW.FELDMAN.LAW

DAVID M. FELDMAN
David.Feldman@feldman.law
*Board Certified – Labor and Employment*
*Law Texas Board of Legal Specialization*

SHANNON R. SMITTICK ◊
Shannon.Smittick@feldman.law

WILLIAM X. KING ◊
Will.King@feldman.law

MORGAN L. KING
Morgan.King@feldman.law

† Licensed in Hawaii and Texas
◊ Licensed in California and Texas

August 26, 2019

**VIA EMAIL (Jason.Hewitt@tea.texas.gov)**
Jason Hewitt, Director
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment &Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

### TRUSTEE HOLLY MARIA FLYNN VILASECA'S RESPONSE TO TEA'S PRELIMINARY REPORT AND REQUEST FOR INFORMAL REVIEW

Dear Director Hewitt, Deputy Cottrill, and Texas Education Agency Legal Staff:

**Appx.439**

This letter is submitted in response to the Preliminary Special Accreditation Investigation Report (hereinafter "Preliminary SAI Report" or "Report") issued by the Texas Education Agency's Division of Governance on August 5, 2019 against the Houston Independent School District ("Houston ISD" or "District").

Trustee Vilaseca incorporates the response and request for informal review submitted by Houston ISD as if fully set forth herein, and submits this supplemental response and attached declaration solely to address findings of fact and conclusions specifically directed at her actions as a trustee of the Houston ISD Board of Education.

## Allegation I

The Report sets forth several findings of fact with respect to Trustee Vilaseca under Allegation I. Trustee Vilaseca sets forth facts and background surrounding these findings in her attached Declaration. Unfortunately, TEA investigators took Trustee Vilaseca's actions in conferring with and bouncing ideas off of her long-time trusted mentor, Dr. Saavedra and made a quantum leap to conclude that Trustee Vilaseca participated in a violation of the Texas Open Meetings Act (TOMA). Further issue is made regarding Trustee Vilaseca's inability to recall specifically why she handed Dr. Saavedra a copy of former Superintendent Carranza's contract at a gathering that occurred approximately six months prior to Trustee Vilaseca being interviewed. Trustee Vilaseca's Declaration clarifies that she handed Dr. Saavedra a copy of the contract because he had previously asked for it.

As further set forth in Houston ISD's response, no legal basis exists to conclude that Trustee Vilaseca or others violated the Texas Open Meetings Act with respect to the October 8, 2018 gathering. Still further, the facts in no way support an allegation that the Texas Open Meetings Act was violated.

As stated in Trustee Vilaseca's Declaration, she arranged for her long-time mentor, Dr. Saavedra to be available to speak with her and other trustees about their concerns on the Board. Dr. Saavedra's statement quoted in the Report further illustrates the purpose of such gathering. At no time during that gathering was the hiring of Dr. Saavedra as interim superintendent discussed. Further, at no point during that gathering was there ever any quorum present or any attempt made to take action on behalf of the HISD Board. The initial gathering with Dr. Saavedra took place with only four trustees present. When Trustee Davila arrived at the restaurant gathering, two other trustees had already left. Trustee Davila apparently had a long-time friendship with Dr. and Mrs. Saavedra, and the conversation when she was present was purely of a social nature.

Even assuming arguendo that the "walking quorum" prohibition contained in the TOMA, Tex. Gov't Code § 551.143, is still enforceable in any manner, which would not appear to be the case in light of *State v. Doyal*, 2019 WL 944022 (Tex. Crim. App. Feb. 27, 2019), reh'g denied (June 5, 2019), and *Hispanic Educ. Comm. v. Houston Indep. Sch. Dist.*, 886 F. Supp.

606, 608 (S.D. Tex. 1994), aff'd, 68 F.3d 467 (5th Cir. 1995), the direct evidence shows that no violation of § 551.143 occurred. Indeed, taken together, there was no "deliberation" amongst a quorum of Board members in the two gatherings that occurred on October 8, 2018, as defined in the TOMA, Tex. Gov't Code § 551.001(2).

## Allegation II

In Allegation II, TEA asserts that "HISD Board of Trustees acted individually on behalf of the board numerous times, exceeding the scope of their authority in violation of Tex. Educ. Code § 11.051." Under this allegation, in addition to the facts discussed in Allegation I above, TEA points to two email exchanges in 2017 from Trustee Vilaseca in its finding number 12. These emails are discussed in further detail in Trustee Vilaseca's Declaration attached hereto.

Neither of the email exchanges indicate Trustee Vilaseca took any action on behalf of Houston ISD or its board. In 2017, Mr. Richard Carranza was the superintendent of Houston ISD. As Superintendent, Mr. Carranza allowed and encouraged trustees to communicate directly with cabinet members to obtain information and work more efficiently. TEA Exhibit 2.24 illustrates Trustee Vilaseca going directly to the Chief of Human Resources to obtain information, while also copying the employee in Board Services responsible for entering referrals. This is an illustration of efficiency, rather than "board overreach."

Likewise, TEA Exhibit 2.25 documents Trustee Vilaseca simply forwarding a referral she sent to Board Services (after receiving an out-of-office response) to the Chief Operations Officer to alert him of a plumbing issue on a Friday afternoon. Another example of efficiently alerting officials of a potential problem prior to it possibly escalating over the weekend.

Texas Education Code § 11.051 prohibits individual board members from taking action on behalf of the board. The findings of fact related to this allegation set forth with respect to Trustee Vilaseca are clearly not a board member acting on behalf of the board, but instead illustrate a board trustee who is dedicated to the district in which she was elected and gathering and sending information through the proper channels.

Further, prior to concluding these mundane emails were a violation of law, TEA investigators failed to ask Trustee Vilaseca about these communications. Even without such input from the author of these emails, it is clear on their face that such communications do not violate Texas Education Code § 11.051 or Board Policy BBE(LOCAL) as found in the Report.

Trustee Vilaseca opposes the TEA's findings and requests an Informal Review of the Preliminary Report.

Respectfully submitted,

FELDMAN & FELDMAN, P.C.

David Feldman
david.feldman@feldman.law
Shannon Smittick
shannon.smittick@feldman.law

## DECLARATION OF HOLLY MARIA FLYNN VILASECA

1.      "My name is Holly Maria Flynn Vilaseca. My date of birth is December 12, 1980, and my address is 4400 West 18th Street, Houston, Texas 77092, United States.

2.      I represent District VI on the Houston Independent School District Board of Education ("HISD Board"). I have served as a trustee on the HISD Board since January 2017, when I was unanimously appointed to fill a vacant seat and was later elected to remain in that seat in November 2017.

3.      Prior to joining the HISD Board, I was involved in education as a teacher, including previously being employed by HISD as a bilingual pre-kindergarten teacher at Windsor Village Elementary School.

4.      Throughout my time in the education community, I have known and been personal friends with Dr. Abe Saavedra, going back approximately ten years. We have many things in common including a shared Alma Mater in the University of Michigan and a passion for serving students. I consider him a mentor and thought partner and he provided me guidance concerning graduate school, issues confronting education and challenges in Houston ISD.

5.      I have discussed my frustrations and concerns related to my position on the HISD Board with Dr. Saavedra on several occasions since being appointed as a trustee in 2017. At one point in time, I – individually – discussed with Dr. Saavedra whether he would have any interest in serving as an interim superintendent of HISD, if the situation was such that another interim superintendent was needed. In connection with that discussion, Dr. Saavedra asked to see a copy of Dr. Richard Carranza's superintendent contract.

6.      I arranged to meet with Dr. Saavedra at a local restaurant during a flight layover he had on October 8, 2018, so that I and other board members could discuss our feelings of

disenfranchisement and vulnerability based on actions and inactions of individual administrators, certain community members, and other trustees – over which the board had no control. I did this because I recognized the wealth of Dr. Saavedra's experience as well as his success as superintendent at South San Antonio ISD. In that district, Dr. Saavedra was able to collaborate with the Board and demonstrate that there was no longer a need for a TEA-imposed conservator.  A time frame was provided when Dr. Saavedra would be available so trustees could come and go depending on their schedules.

7.     The hiring of Dr. Saavedra was not the purpose of the October 8, 2018 gathering. And, neither myself nor any other trustee present conveyed to Dr. Saavedra an interest on the part of the Board to bring him on as interim superintendent. No deliberation of any kind occurred at such gathering.

8.     The initial gathering with Dr. Saavedra on October 8, 2018 was attended by four trustees. After two of those trustees left, Trustee Diana Davila arrived and, at the same time, Dr. Saavedra's wife, who had also been present at the restaurant but sitting at another table, came over to the table as Trustee Davila had apparently known both Dr. and Mrs. Saavedra for some time and they too were friends. The discussion that occurred with Trustee Davila present was purely social in nature.

9.     While being interviewed by the TEA in connection with its Special Accreditation Investigation, I could not recall why I gave Dr. Saavedra a copy of Dr. Carranza's contract at that time. I am certain now that I did so because Dr. Saavedra had previously asked for a copy of the contract. I handed a covered copy of the contract to him and no discussion, whatsoever, regarding the contract occurred at the October 8, 2018 meeting with Dr. Saavedra.

10.     When I joined the Board in January of 2017, Mr. Richard Carranza was the HISD Superintendent. Mr. Carranza expressly allowed and encouraged Board members to contact

**Appx.444**

cabinet members freely and directly with questions and concerns.

11.   Consistent with this procedure, on October 22, 2017, I sent the Chief of Human Resources, a member of the cabinet, an email requesting certain information regarding teacher and principal placement and turnover in District VI and Achieve 180 schools. I also copied Janet Conroy, of Board Services on the email. Ms. Conroy had the responsibility of entering referrals from the Board.

12.   On November 10, 2017, I forwarded an email to Brian Busby, Chief Operating Officer for HISD and a member of the cabinet, regarding plumbing issues that I had been made aware of at Askew Elementary, a school within District VI. I had previously sent an email to Ms. Conroy in Board Services, but I received an out-of-office reply, so I forwarded the information to Mr. Busby. I did not direct Mr. Busby in any manner, but simply made him aware of the issue ahead of the weekend.

13.   The email referenced in paragraphs 11 and 12 above, Exhibits 2.24 and 2.25 to the Preliminary SAI Report dated August 5, 2019, were not shown or discussed with me during my interview with the SIU.

14.   I declare under penalty of perjury that the foregoing is true and correct."

Executed in Harris County, Texas on the _26_ day of August, 2019.

_____
Holly Maria Flynn Vilaseca

- TEXAS EDUCATION AGENCY-

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



# APPENDIX 3

1701 NORTH CONGRESS AVE
AUSTIN, TX 78701



**FELDMAN & FELDMAN** PC

CRISTEN D. FELDMAN
Cris.Feldman@feldman.law

CASEY T. WALLACE
Casey.Wallace@feldman.law

BENJAMIN W. ALLEN
Ben.Allen@feldman.law

GEORGE W. VIE III †
George.Vie@feldman.law
*Board Certified – Civil Appellate Law*
*Texas Board of Legal Specialization*

3355 WEST ALABAMA ST., SUITE 1220
HOUSTON, TEXAS 77098
TELEPHONE: 713-986-9471
FACSIMILE: 713-986-9472
WWW.FELDMAN.LAW

DAVID M. FELDMAN
David.Feldman@feldman.law
*Board Certified – Labor and Employment*
*Law Texas Board of Legal Specialization*

SHANNON R. SMITTICK◊
Shannon.Smittick@feldman.law

WILLIAM X. KING ◊
Will.King@feldman.law

MORGAN L. KING
Morgan.King@feldman.law

† Licensed in Hawaii and Texas
◊ Licensed in California and Texas

August 26, 2019

**VIA EMAIL (Jason.Hewitt@tea.texas.gov)**
Jason Hewitt, Director
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment & Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

**TRUSTEE ANNE SUNG'S RESPONSE TO TEA'S PRELIMINARY REPORT
AND REQUEST FOR INFORMAL REVIEW**

Dear Director Hewitt, Deputy Cottrill, and Texas Education Agency Legal Staff:

**Appx.447**

This letter is submitted in response to the Preliminary Special Accreditation Investigation Report (hereinafter "Preliminary SAI Report" or "Report") issued by the Texas Education Agency's Division of Governance on August 5, 2019 against the Houston Independent School District ("Houston ISD" or "District").

Trustee Sung incorporates the response and request for informal review submitted by Houston ISD as if fully set forth herein, and submits this supplemental response and attached declaration solely to address findings of fact and conclusions specifically directed at her actions as a trustee of the Houston ISD Board of Education.

The Report specifically takes issue with Trustee Sung's actions with respect to two email exchanges outlined in Allegation II of the Report. [1] Under Allegation II of the Report, the "TEA finds that HISD Board of Trustees acted individually on behalf of the board numerous times, exceeding the scope of their authority in violation of Tex. Educ. Code § 11.051." It also identifies Trustee Sung as one who engaged in a "practice of monitoring, directing, influencing or interfering with administrative action ... in violation of Tex. Educ. Code § 11.051(a-1), Police BBE (LOCAL), and Policy BBE2(REGULATION)." Neither of the email exchanges pointed to with respect to Trustee Sung, however, indicate Trustee Sung did any such thing, but rather that Trustee Sung followed protocol by referring parent concerns to board services. This is especially true when such email exchange is viewed in its entirety and in conjunction with related email communications, something the TEA investigators failed to do.

The Report divides Finding of Fact number 12 of Allegation II into four separate sections based on the year of electronic communications reviewed. The findings with respect to Trustee Sung are found under "Electronic Communications from 2019," subpoints (c) and (e).

Trustee Sung would point out that, while she was interviewed by TEA investigators regarding her participation in the October 8, 2018 gathering with Dr. Saavedra, she was not shown, asked any questions about, or given the opportunity to provide any additional documentation (such as her own emails) with respect to the emails referenced in Allegation II of the Report. Had that been done during the course of the investigation, as the TEA's own procedures would dictate, the Special Investigation Unit (SIU) could not have concluded that she had violated Tex. Educ. Code § 11.051 in her exchange with the parent in question.

As can be expected as a trustee of Houston ISD Board of Education, parents and other members of District VII look to Trustee Sung for answers when they run into issues in their schools. That is to be expected in any school district, particularly one with single-member districts. As further outlined in Trustee Sung's declaration attached hereto, Trustee Sung did

---

[1] Trustee Sung is also mentioned in Allegation I of the Report. Her declaration speaks for itself in demonstrating that she in no manner violated the Texas Open Meetings Act.

**Trustee Sung** – Request for Informal Review                                              Page **3** of **3**
Preliminary SAI Report dated August 5, 2019
Response Due Date: August 26, 2019

not individually act on behalf of the Board, but rather followed protocol in addressing concerns brought to her attention by parents in District VII. Trustee Sung has provided additional email communications to show the complete history of the email relied upon by the TEA investigators to reach the erroneous conclusion that she engaged in "trustee overreach." It is clear Trustee Sung acted as a school board trustee should when contacted by members of the district she represents and did not act in violation of Tex. Educ. Code § 11.051. As addressed in her declaration, Trustee Sung cannot control what a parent may write in any email to her, including any embellishment as occurred here, which SIU could have discerned by proper investigation. Given all the facts, to conclude that Trustee Sung violated law or Board policy places basic tenets of sound boardsmanship on their head.

Trustee Sung opposes the TEA's findings and requests an Informal Review of the Preliminary Report.

Respectfully submitted,

FELDMAN & FELDMAN, P.C.

David Feldman
david.feldman@feldman.law
Shannon Smittick
shannon.smittick@feldman.law

**Appx.449**

**DECLARATION OF ANNE SUNG**

1.      "My name is Anne Sung. My date of birth is December 11, 1978 and my address is 4400 West 18th Street, Houston, Texas 77092, United States.

2.      I represent District VII on the Houston Independent School District Board of Education ("HISD Board"). I have served as a trustee on the HISD Board since January 2017.

3.      Mr. Richard Carranza was Superintendent of HISD from Fall 2016 through March 2018. Mr. Carranza expressly encouraged HISD Board members to contact cabinet members freely and told both the Board and cabinet members that no referral was necessary to do so.

4.      The Mandarin Immersion Magnet School is part of my district. In September 2018, I received an email from a parent at Mandarin Immersion Magnet School in which the parent asked me to call her. I called and spoke with the parent regarding her concerns with respect to her child. After that conversation, I forwarded the parent's previous email sent to various HISD personnel to Janet Conroy in Board Services and asked that she enter a referral for me. (Exhibit A). On October 4, the HISD Board received an email with the administrative response and closing the board referral of this matter. Over the following months, I was copied on several emails from this parent to the school principal and various HISD administrators, but I did not respond and took no individual action, nor did I speak with the principal or any district administrator regarding this matter. On April 15, 2019, I received an email from the same parent, on which she copied several individuals on the HISD Board and various government officials unrelated to HISD. I responded to that email by informing the parent of the October 4, 2018 administration response and offering to enter another board referral if she had further concerns that had not been addressed. (Exhibit B). On April 17, 2019, after learning that this parent may have an open grievance with HISD, I replied to the

parent's April 17, 2019 email informing her she should follow the grievance process for communication with the district and that I would not be responding to her emails outside of that process. (Exhibit C). Throughout this time, the only action I took was to submit a referral to HISD administration regarding the parent's concern, per HISD protocol. The parent's comments in the emails regarding my purported assistance were contrived and, perhaps, meant to impress others she was copying on the emails.

5.     During the time the TEA Special Investigative Unit ("SIU") was performing their investigation, I was not shown nor asked about the emails from this parent, nor was I asked to provide my own emails with the parent to the SIU.

6.     On October 8, 2018, I was present for a gathering with Dr. Abe Saavedra at a local Houston restaurant. I was interested in meeting Dr. Saavedra because I knew he had been the superintendent at South San Antonio ISD during a time when they also had a conservator in their district and they had been successful in convincing the TEA to remove the conservator. The October 8, 2018 gathering was not an interview of Dr. Saavedra, but rather a chance to sound out my ideas and concerns as a trustee and hopefully gain from his experience in various school districts.

7.     On May 1, 2019, I was copied on an email sent by Trustee Davila to Interim Superintendent Dr. Lathan, attached as Exhibit 2.39 to TEA's Preliminary Report. As mentioned above, Mandarin Immersion Magnet School is part of my trustee district. I neither solicited nor took any action with respect to this email.

8.     Throughout this time, I have been consistent in communicating to any Mandarin Immersion Magnet School parent who contacted me that I have no role in principal selection, as that responsibility is delegated by the HISD Board to the Superintendent.

9.    I declare under penalty of perjury that the foregoing is true and correct."


Executed in __HARRIS__ County, __TXAS__ on the __26__ day of August,

2019.


_Anne Sung_
_____
Anne Sung

Anne Sung

# EXHIBIT A

| | |
|---|---|
| **From:** | Sung, Anne K |
| **Sent:** | Wednesday, September 19, 2018 8:42 AM |
| **To:** | Conroy, Janet H |
| **Cc:** | Shawntel Broadus |
| **Subject:** | Fwd: 9/14 |

Can you please enter a referral for me? I spoke with Ms. Curtis this morning regarding her daughter. They have been through a lot this year and the family would appreciate help building relationships and support for ███████ at MIMS this year.

Thank you,
Anne

Sent from my phone

Begin forwarded message:

> **From:** Shawntel Broadus <███████████████████████>
> **Date:** September 18, 2018 at 6:15:35 PM CDT
> **To:** "Lyons, Caitlin C" <Caitlin.Lyons@houstonisd.org>
> **Cc:** "Gerard, Clara C" <CGERARD@houstonisd.org>, "Sung, Anne K" <Anne.Sung@houstonisd.org>, "████████████" <████████████████>, "████████████████████████", "████████████" <████████████████t>, "O'Dell-Thomas, Delesa M" <DTHOMAS1@houstonisd.org>, "Chang, Chaolin" <CCHANG@houstonisd.org>
> **Subject:** Re: 9/14
>
> Mr. Chang,
>
> Thank you for your correspondence. As you know, we are fully aware that a social worker is not a counselor, hence is the reason why we pay for a licensed counselor to work with ██████.
>
> I am aware that your composed plan will not be carried out this school year as you promised. We would have hoped that the school would have at least notified us of this change of plan before we invested thousands of dollars in initiating it and getting our family's buy in.
>
> Concerned,
>
> Shawntel Curtis
>
> Sent from my iPhone
>
>> On Sep 18, 2018, at 1:18 PM, Lyons, Caitlin C <Caitlin.Lyons@houstonisd.org> wrote:
>>
>> Good afternoon,

1

As Mr. Chang mentioned, ███ responded very well to Ms. Pett's redirection and Ms. Pett handled the situation appropriately. I will continue to support Ms. Pett with resources and check in on ███. I have attached a list of resources that provide individual, group, and family counseling, as well as methods to find alternative therapeutic agencies in case you'd prefer ones other than the ones listed.

We're all working together to help ensure ███ success.

Caitlin Lyons, LMSW

School Social Worker, Mandarin Immersion Magnet Program

713-295-5276 (school)

Caitlin.Lyons@houstonisd.org (email)

**CONFIDENTIALITY NOTICE: The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

-----Original Message-----

From: Chang, Chaolin

Sent: Monday, September 17, 2018 3:40 PM

To: Shawntel Broadus <███████████████>

Cc: Lyons, Caitlin C <Caitlin.Lyons@houstonisd.org>; Gerard, Clara C <CGERARD@houstonisd.org>; Sung, Anne K <Anne.Sung@houstonisd.org>; ████████████████████ k███████████████; O'Dell-Thomas, Delesa M <DTHOMAS1@houstonisd.org>

Subject: Re: 9/14

Dear Mrs. Curtis,

Thank you for bringing it up your concern to my attention. I am very proud of ███████ progress in responding to redirections.

Ms. Pett's sent you an email describing the incident you mentioned below at 5:09 pm last Friday. After consulted it with our Social Worker, Ms. Lyons, ███████ comment was considered red flag, but not crisis. Ms. Pett handled it appropriately and ███████ responded to the redirection well. Ms. Lyons will continue to support Ms. Pett to help ███████ by checking in on her. Although, based on her license, Ms. Lyons is unable to provide therapy to ███████, she will provide you a list of outside resources for ███████.

**Appx.455**

Please let us know how we can support ███████ better.

Sincerely,

**休士頓中文沉浸學校**

**校长 张兆麟 敬上**

Mr. ChaoLin Chang, Principal

Mandarin Immersion Magnet School (MIMS)

713-295-5276 (office) | 713-662-3527 (fax) cchang@houstonisd.org HOUSTON INDEPENDENT SCHOOL DISTRICT

5445 W Alabama | Houston, TX 77056

Keep up with the latest news from HISD: www.HoustonISD.org <http://www.houstonisd.org/site/default.aspx?PageID=1>

Follow us on Twitter: @HISD_MIMS

Follow HISD on Twitter: @HoustonISD

Like HISD on Facebook: www.facebook.com/HoustonISD <https://www.facebook.com/HoustonISD>

On 9/14/18, 8:50 PM, "Shawntel Broadus" <███████████████████> wrote:

Where was the social work intervention or write up on today's incident where ███████ stated that she hated herself?

Parent contact to my husband and myself? Luckily, my mother was on campus today to intervene.

Sent from my iPhone

On Sep 13, 2018, at 9:08 AM, Shawntel Broadus <███████████████████> wrote:

Thank you for your response. The district office has reached out for immediate resolution. My main concern is that the school year just started and it is alarming how much Ms. Lyons and potentially ███████ teachers are out of loop regarding the key points of our discussion from last year and aware of ███████ progression over the summer. We never received follow up from your team nor have the other paid professionals to whom have been coaching her throughout the summer break. Secondly, plans that your team suggested have not been fully rolled out. Thirdly, the 9/11 documentation Ms. Lyons provided is deeply concerning to several parties who were present

3

**Appx.456**

and/or involved. Lastly, our concerns regarding our daughters vocalized discomfort with another child went ignored.

At this time we would like the district to help resolve these issues expeditiously. Our concerns are not being taken seriously and we worked diligently over the summer to prep ████ for a successful school year and we incorporated all of your previously suggested parenting methods into our daily routine.

It almost seems as if our extensive meeting was meant to pacify a problem instead of resolving it.

> On Sep 12, 2018, at 8:34 PM, Chang, Chaolin <CCHANG@houstonisd.org> wrote:
>
> Dear Mrs. Curtis,
>
> I am sorry for the late notice. We are in the process to gather personnel you requested to discuss with you regarding this matter.
>
> I understand that you are unable to meet in person. We can schedule a meeting with Mr. Curtis and have a conference call with you.
>
> Since many individuals from different departments are involved, please provide us couple options next week so that they can adjust their schedules.
>
> Sincerely,
>
> 休士頓中文沉浸學校
>
> 校长 张兆麟 敬上
>
> Mr. ChaoLin Chang, Principal
>
> Mandarin Immersion Magnet School (MIMS)
>
> 713-295-5276 (office) | 713-662-3527 (fax)
>
> cchang@houstonisd.org
>
> HOUSTON INDEPENDENT SCHOOL DISTRICT
>
> 5445 W Alabama | Houston, TX 77056
>
> Keep up with the latest news from HISD:
> www.HoustonISD.org

Appx.457

<http://www.houstonisd.org/site/default.aspx?PageID=1>

Follow us on Twitter: @HISD_MIMS

Follow HISD on Twitter: @HoustonISD

Like HISD on Facebook:
www.facebook.com/HoustonISD
<https://www.facebook.com/HoustonISD>

On 9/11/18, 7:44 PM, "Shawntel Broadus"
< _____ > wrote:

Based upon the information that Ms. Lyons will present, I would like to have a meeting tomorrow afternoon at Memorial Hermann Hospital Memorial City tomorrow between 2pm-5pm to resolve this matter. I would like Ms. Lyons' chain of command to also be present.

Ms. Simpson, you assured me last year that this matter has yet to be resolved and I am displeased.

Regards,

Sent from my iPhone

> On Sep 11, 2018, at 6:46 PM, Shawntel
> Broadus
> 
> wrote:

> Ms. Lyons,

> Please document your account of what transpired today in the cafeteria so that it can be compared with the note I received this afternoon from a concerned parent. Please send this to me by or before 10 AM tomorrow morning. Please also provide our family with the contact information for the party to whom you report to at the district level (name, email, and telephone number).

5

**Appx.458**

Please also forward your current game plan of how you have used your expertise to assist our child given recent events that have been presented before you.

Regards,

S. Curtis

<Mental Health Agencies.docx>

Anne Sung

# EXHIBIT B

Begin forwarded message:

**From:** "Sung, Anne K" <Anne.Sung@houstonisd.org>
**Subject: FW: Board Referral #245 Shawntel Curtis parent re**
**support for daughter at MIMS 09-19-18**
**Date:** April 16, 2019 at 6:07:24 AM CDT
**To:** "███████████████"
<███████████████>

Dear Ms. Curtis,

This was the administrative response I received last October following our phone call in September. I hope that you and your daughter have had a good school year since! If you have further concerns that have not been addressed, please let me know and I will enter another referral requesting assistance.

Warm regards,
Anne Sung

---

**From:** Conroy, Janet H
**Sent:** Thursday, October 4, 2018 3:28 PM
**To:** Adams, Wanda <WADAMS2@houstonisd.org>; Davila, Diana D
<DDAVILA3@houstonisd.org>; Deigaard, Sue
<Sue.Deigaard@houstonisd.org>; FlynnVilaseca, Holly M
<Holly.FlynnVilaseca@houstonisd.org>; Jones, Jolanda
<JJONES57@houstonisd.org>; Lira, Sergio <Sergio.Lira@houstonisd.org>;
Santos, Elizabeth A <Elizabeth.Santos@houstonisd.org>; Skillern-Jones,
Rhonda R <RSKILLE2@houstonisd.org>; Sung, Anne K
<Anne.Sung@houstonisd.org>; Wanda Adams
<WandaEAdams@yahoo.com>
**Cc:** Grant, Shantell D <Shantell.Grant@houstonisd.org>; Trinh, Silvia A
<STRINH@houstonisd.org>; Perez, Oneida <OPEREZ@houstonisd.org>;
Lujan, Imelda A <ILUJAN@houstonisd.org>; Lathan, Grenita F
<GLATHAN@houstonisd.org>
**Subject:** Board Referral #245 Shawntel Curtis parent re support for
daughter at MIMS 09-19-18

Good afternoon, trustees.
Below is the administrative response closing the above referenced board
referral.
The email which prompted the referral is attached.
From SSO Delesa O'Dell Thomas:

Friday, September 28, 2018 at 10:36 AM, I spoke with Mrs. Curtis
regarding her concerns listed in the referral. Prior to this conversation , I
exchanged emails and phone conversations with Mrs. Curtis. She shared
concerns with not wanting her child to have any interaction with the
social worker at MIMS because she did not trust her due to lack of follow
through from a meeting that transpired last year. She further shared that
she wanted her child placed in another classroom to separate her from a
student who she considered a bully. Mrs. Curtis gave consent to move her
daughter to another class after consulting with her husband

Mrs. Curtis expressed concern about her daughter ingesting silicone.  I
shared the outcome of the investigation that was conveyed to me by
Principal Chang but the mother was still convinced that the child she
deemed as a "bully" coerced her daughter to ingest silicone although
there was an adult who witnessed the incident and interceded
immediately. Mrs. Curtis was okay with  the information I communicated.
 Mrs. Curtis would like to schedule a meeting with her husband, Principal
Chang and me. She will contact m with her availability to meet the week

of October 8 in order to discuss ways that MIMS staff can support her student in being successful and fostering a trusting relationship.

I met with Principal Chang September 28 and the following will be done:

- Goals will be posted in the corner of Student's desk;
- She was moved to Ms. Pett's room from Ms. Chen's;
- Principal Chang will ensure that someone is available to answer the phone during the after school program.

I look forward to meeting with Mr. and Mrs. Curtis and Principal Chang as soon as she provides a meeting date and time of her availability.

**Janet Conroy**
***Senior Writer, Board Services***
713-556-6111 (office) | 713-556-6115 (fax)
jconroy@houstonisd.org (email)
HOUSTON INDEPENDENT SCHOOL DISTRICT
Hattie Mae White Educational Support Center
4400 West 18th Street | Houston, TX 77092-8501
Keep up with the latest news from HISD: www.HoustonISD.org
Follow HISD on Twitter: @HoustonISD
Like HISD on Facebook: www.facebook.com/HoustonISD

Anne Sung

# EXHIBIT C

Begin forwarded message:

**From:** "Sung, Anne K" <Anne.Sung@houstonisd.org>
**Subject: Re: Follow Up: Curtis Grievance (Attn: Anne Sung)**
**Date:** April 17, 2019 5:56:24 PM CDT
**To:** Shawntel Broadus <████████████>

My apologies - I did not realize that you had filed a grievance related to this matter, or I would not have asked for you to email me again. Since you are utilizing the district s grievance process, I will ask that you please follow that process for communication with the district. Going forward since there is a grievance, I will not respond to emails or other communications outside of that process.

Best regards,
Anne Sung

Get Outlook for iOS

---

**From:** Shawntel Broadus <████████████m>
**Sent:** Wednesday, April 17, 2019 4:44 PM
**To:** Sung, Anne K
**Cc:** Employee Relations:████████; ████████; ████████; minnay marshall2@dfps state tx us; lynn beasley@tea texas gov; Hutchins-Taylor, Elneita; Skillern-Jones, Rhonda R; president@rice edu; mayor@houstontx gov; ████████; commissioner@tea texas gov; BoardServices; FlynnVilaseca, Holly M; ocr@ed gov
**Subject:** RE: Follow Up: Curtis Grievance (Attn: Anne Sung)

> **CAUTION**  This email originated from outside of Houston ISD.
> **Do not click links** or open attachments unless you recognize the sender and know the content is safe.

Hi Ms  Sung,

Again, thank you for assisting in the effort to resolve the ongoing issues at Mandarin Immersion  I read your attached email  The forms of resolution that you brought up in your discussion with Mr  Chang were not implemented and he later retaliated and formally went on record (I assume without consulting H I S D  s Legal Counsel) to discuss the ill feelings regarding this matter  Ms  Darcey Pett, Consuelo Godina, Chiwei Lin, Caitlin Lyons, and George Wong also carried out further retaliatory tasks under the consent of Mr  Chang  Each disregarded school district policies, federal laws, parental concerns, and the guidance of HISD Senior District Officials

Each boldly carried out senseless acts that were witnessed by two of HISD s highest charitable donors to whom are senior executives of organizations represented on the Fortune 500 list  Mr  Chang, strangely enough did not require all parties to whom participated via conference call to state their presence  I would also like to add that he might have not wanted to document or for the district to find out that one of the donors presides over a member on your board  I submitted some of their documentation as well as the documentation of Mr  Chang s subordinates and MIMS parents to whom have quietly come forward to assist our family in resolving this matter to Child Protective Services  As you have probably have seen on social media, several parents to whom support Mr  Chang have essentially supported my claim regarding his lack of professionalism by disclosing how he and his subordinates have disregarded FERPA laws by disclosing confidential information relating to targeted children that attend the school

To prove my claim, I have asked to formally ask you to ask Mr  Chang and Ms  Pett to supply proof that they carried out the three areas that you mentioned in your previous email  I would also like to convey that the district has only addressed two of our grievances and have disregarded the others  Like you, we care about the well being of our child, the other targeted children, the children whose parents pulled them from MIMS, and for the overall current student population  All children matter and we come to you in hope that you will do what is ethically right regardless of the circumstances

Ultimately, as you have seen thus far, the 6 aforementioned employees have repetitively demonstrated that they can act carelessly without seeking counsel and guidance from their leadership (S S O ), the district s legal counsel, human resources, the T E A , the Department of Education, and overall from us parents  We appreciate your assistance

Respectfully,


Shawntel Curtis
Email:████████████

PH: 832.499.8474

---

**From:** Shawntel Broadus
**Sent:** Monday, April 15, 2019 11 56 PM
**To:** Anne Sung@houstonisd org
**Cc:** employeerelations@houstonisd org; ███████████ ; ███████████ ; ███████████ ;
minnay marshall2@dfps state tx us; lynn beasley@tea texas gov; ehutchi1@houstonisd org; rskille2@houstonisd org; president@rice edu;
mayor@houstontx gov; ███████████ ; commissioner@tea texas gov; boardservices@houstonisd org;
holly flynnvilaseca@houstonisd org; ██████████
**Subject:** Follow Up: Curtis Grievance (Attn: Anne Sung)

Dear Ms. Sung,

Thank you for working closely with our family to resolve the issues at Mandarin Immersion pertaining to discriminatory and retaliatory practices that are being successfully spearheaded by Principal Chaolin Chang and key members of his team. Hopefully, the assistance and consistent communication that you have provided in support of our family will not jeopardize your voting power to negate any action pertaining to the future of Mandarin Immersion and the livelihood of the children to whom attend this school. At your earliest convenience, please provide follow up regarding your assistance in resolving this matter.

We value your assistance and thank you for offering a helping hand. Like you, we want to ensure that ALL children thrive at Mandarin Immersion Magnet School.

Respectfully,

Shawntel Curtis
Email: ███████████
PH: 832.499.8474

- T E X A S   E D U C A T I O N   A G E N C Y -

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



# APPENDIX 4

1 7 0 1   N O R T H   C O N G R E S S   A V E
A U S T I N ,   T X   7 8 7 0 1



Houston      Lisa R. McBride
Dallas       Partner
Austin

             (713) 554-6747 Office
             (713) 583-8371 Fax


             lmcbride@thompsonhorton.com

             Thompson & Horton LLP
             Phoenix Tower, Suite 2000
             3200 Southwest Freeway
             Houston, Texas  77027-7554

August 26, 2019

Jason Hewitt, Director                      *Via E-mail: Jason.Hewitt@tea.texas.gov*
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment &Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Re:   Trustee Wanda Adams's Response to TEA's Preliminary Report Dated August 5, 2019

Dear Director Hewitt and Texas Education Agency Staff:

Our firm has been retained by the Houston Independent School District to respond on behalf of certain trustees to the August 5, 2019 Preliminary Special Accreditation Investigation Report issued by your agency ("TEA" or "Agency"). This response is submitted on behalf of Trustee Wanda Adams.



Mr. Jason Hewitt
August 26, 2019
Page 2

**Legal Analysis of Findings of Fact, Analysis and Conclusions on Behalf of Trustee Adams**

In the "Analysis of Allegation Two" the Preliminary Report sets forth several statutes applicable to the conduct of school board trustees, both individually and as a body corporate.  For some unknown reason, the Preliminary Report fails to include or analyze the Texas Education Code, Section 11.1512(c), (c-1), (c-2), and (c-3).  These statutes were enacted by the Texas legislature in 2017.  These statutes describe in detail an individual school board member's right to request and obtain information, and even create a statutory cause of action for the individual board member if a school district improperly refuses to produce information.  Section 11.1512(c) states:

> A member of the board of trustees of the district, when acting in the member's official capacity, has an inherent right of access to information, documents, and records maintained by the district, and the district shall provide the information, documents, and records to the member without requiring the member to submit a public information request under Chapter 552, Government Code.  The district shall provide the information, documents, and records to the member without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.  The district may withhold or redact information, a document, or a record requested by a member of the board to the extent that the item is excepted from disclosure or is confidential under Chapter 552, Government Code, or other law.

Texas law gives an individual trustee an <u>inherent right</u> to request and receive appropriate information, so that the trustee may perform his or her oversight and policy role on behalf of the community.  But the law does not attempt to describe <u>how</u> an individual trustee exercises this inherent right to request and receive appropriate information.  The mechanism for a trustee to request and receive information is properly a matter of local policy, and may vary considerably from school district to school district.  In one district the process may be more informal; in another district it may by a more formal process.  And a school board may choose to change its procedure over time.  For example, the longstanding practice in Houston ISD is that individual trustees may contact the Superintendent of Schools or direct reports to the Superintendent.  HISD Administration has established in regulation a more formal referral process, but this administrative regulation must be implemented in a manner to support a Trustee's inherent right of access to information, not in a manner to limit or impair a Trustee's right to request information.

**Appx.469**



Mr. Jason Hewitt
August 26, 2019
Page 3

This distinction between an individual trustee's statutory inherent right to request and receive information, and the district's own process in policy adopted by the board to handle such requests, is important because there is absolutely no violation of any statute for a trustee to request information.  To the extent that the Preliminary Report string-cites selected examples when Trustees requested information, and then leap-frogs in the Analysis of Allegation Two to a conclusion that these requests somehow violate a statute governing the role of board members, that conclusion is unfounded and clearly legally erroneous.  The Analysis does not even mention or attempt to apply the proper statutes governing an individual trustee's inherent right to request and receive appropriate information.

The Preliminary Report incorrectly analyzes HISD Board policy and Administration regulation, and then incorrectly concludes that conduct by Trustee Adams violates policy and regulation.  Board Policy BBE (Legal) affirms the right of individual Trustees to request and receive appropriate information, and references Section 11.1512(c), (c-1), (c-2), and (c-3).  Board Policy BBE (Local) also affirms that "individual Board members shall have the right to seek information from District records <u>and employees</u> (underline added) in accordance with this policy."  The only limitation in Board Policy BBE (Local) is that an individual Trustee may not require employees to prepare reports or new records from District information.  Such reports or new analysis of information shall be initiated through Board action, individual Board member requests at a meeting, or "[w]ritten request of an individual Board member."   Policy BBE2 (Regulation) was not approved by the Board, but rather was developed by Administration as a means to implement Policy BBE (Legal) and Policy BBE (Local).  Importantly, Policy BBE2 (Regulation) was developed by Administration in 2013, before the enactment of Section 11.1512(c), (c-1), (c-2), and (c-3).  To the extent of any conflict or inconsistency between Texas law and Board policy, and an Administration regulation, the statute and Board policy clearly control over the regulation.

The Analysis of Allegation Two reflects a fundamental misunderstanding of how local policies and regulations operate.  Regulations are developed by Administration to implement statutes and policies, not to limit a Board member's rights under statute or Board policy.  To the extent that the Analysis asserts that Trustees "violated" an Administration regulation, that conclusion is legally erroneous.

**Appx.470**



Mr. Jason Hewitt
August 26, 2019
Page 4

With regard to the local policies that the HISD Board of Education has adopted to govern <u>how</u> an individual trustee may request and receive information, it is clearly established law that the Board is entitled to interpret its own policies.  This principle, that the Board may interpret its own policies, is established in reported cases and in decisions by the Texas Commissioner of Education.  In HISD, the current referral process is not established in Board Policy.  Rather, the referral process is in a regulation, BBE2 (Regulation), developed by the Administration.  The Commissioner, and certainly not the Agency's investigators, do not have the legal authority to interpret and find violations of locally adopted policies and regulations, particularly where the Board that adopted the policies in question have not been given an opportunity to interpret its own policies, or even change those policies if it chooses to do so.  Further, to the extent that the regulation developed by the Administration, which is not in a policy adopted by the Board, conflicts with Section 11.1512(c)'s inherent right to request and receive information, or conflicts with adopted Board policy, the statute must control over the regulation.

The Preliminary Report's list of occasions when individual Trustees requested information do not constitute a violation of any statute, and in fact the Preliminary Report has failed to analyze these requests for information under the proper statutes.  Therefore, all "Findings of Fact" that simply list occasions when individual Trustees requested information should be deleted from the report, and the Analysis of Allegation Two should be revised to remove any conclusion that any such request for information is a violation of statute or a violation of the proper role for board member.  And the Analysis of Allegation Two's conclusion that these requests for information violate policy adopted by the Board where the Agency's investigators do not have the authority or expertise to interpret the Board's own policies, also should be deleted or revised.  Further, the conclusions that requests for information by Board members violate an Administration regulation should be deleted or revised.

With regard to Trustee Adams, the Findings of Fact and the conclusions in the Analysis of Allegation Two should be deleted or revised as described in this response.  The so-called Findings of Fact do not support any conclusion that Trustee Adams engaged in any misconduct or did anything other than exercise her statutory inherent right to request and receive appropriate information.  Further, these Findings and the Analysis do not reflect a standard of conduct that the Agency is capable of nor should attempt to enforce and apply uniformly to all school districts and boards of trustees in Texas.



Mr. Jason Hewitt
August 26, 2019
Page 5

**Specific Factual Responses by Trustee Adams**

As a preliminary matter, the Findings of Fact for Allegation Two purport to be examples of individual trustees requesting information from the District's administration. As stated above, this in and of itself is not a violation of law or any agency rule. With respect to Trustee Adams specifically, the Findings of Fact for Allegation Two should be deleted from the Agency's Final Report because they are not proper findings of fact. They are not founded on basic investigative techniques. Trustee Adams was not interviewed by the Agency's investigators about the factual allegations relating to her in Findings of Fact Two or Three of the Preliminary Report. She is willing to be interviewed about and to discuss these issues.

Inexplicably, the Draft Report fails to recognize that for many of the cited communications between Trustee Adams and District administrators, Adams was serving as HISD's Board President and as such, she was endowed with unique responsibilities.[1]  As Board President, in addition to the duties required by law, Trustee Adams was responsible for:

- Presiding at all Board meetings unless unable to attend.
- Discussing, making motions and resolutions, and voting on all matters coming before the board.
- Securing the resolutions of complaints concerning Board members.
- Maintaining order at meetings and informing the audience that no demonstrations shall be permitted; recess any meeting to clear the Boardroom at any time if necessary to maintain order.
- Overseeing and reporting to the Board on the Superintendent's compliance with the monitoring system found in policy AF (Local).

*See* HISD Board Policy BDAA (Local). Additionally, as Board President, she was responsible for working with the Superintendent and the Superintendent's staff to prepare the agenda for all board meetings, which included ensuring "that any topics the Board or at least three Board members [requested] to be addressed [were] either on the agenda for the first regular meeting that [was] at least seven calendar days after the date the Board President receive[d] the request, or on the agenda for a special or emergency meeting if the Board President determine[d] that the

---

[1] Trustee Adams served as Board President from January 2017 to January 2018.



Mr. Jason Hewitt
August 26, 2019
Page 6

item require[d] immediate consideration …"  *See* HISD Board Policy BE (Local).  Simply put, while President, Trustee Adams *had* to communicate with the Superintendent and the Superintendent's staff to effectively and efficiently discharge her presidential responsibilities.

1.  On page 18 of the Agency's Preliminary Report, Finding of Fact "a" under "Electronic Communications from 2017" describes an email Trustee Adams forwarded to HISD's former Superintendent (Richard Carranza), HISD's former Deputy Superintendent (Samuel Sarabia) and HISD's former Chief of Human Resources (Gloria Cavazos).  The email contained a resume and a list of positions a bilingual applicant had applied for within HISD. Trustee Adams was never interviewed about this exchange by the Agency's investigators to the best of her recollection.

This email exchange is not at all what the Agency describes it to be.  In fact, Trustee Adams forwarded this email to HISD staff *at former Superintendent Carranza's request.* Trustee Adams informed Mr. Carranza that she had received information from a co-worker concerning an applicant's efforts to secure employment with HISD.  Trustee Adams asked Carranza what she should do with this information.  He instructed her to forward the information to HR because the District had a shortage of bilingual applicants at the time.  She did so.  Trustee Adams stated in her email that she did "not know the person."  To the extent this e-mail exchange is included in the Preliminary Report as an example of Trustee Adams improperly communicating with District staff, that conclusion or inference is not correct.  Trustee Adams was instructed to provide the information contained in the email to HR.

Finding of Fact "a" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

2.  On page 18 of the Agency's Preliminary Report, Finding of Fact "c" under "Electronic Communications for 2017" describes a report Trustee Adams received from former HISD Ethics and Compliance Officer, Debra Fincher, concluding that former HISD Superintendent Richard Carranza, Former HISD Chief of HR Gloria Cavazos, and former HISD Officer for Human Capital Jeffrey McCanna had committed Code of Silence violations.  Trustee Adams was not interviewed by the Agency's investigators about this e-mail, to the best of her recollection.

**Appx.473**



Mr. Jason Hewitt
August 26, 2019
Page 7

Trustee Adams received this email in her capacity as Board President.  Although Cavazos and McCanna did not directly report to the Board, Officer Fincher included the findings concerning their Code of Silence violations because, as recounted by Officer Fincher, "their actions came as a result from a directive from Mr. Carranza, who does report to the Board."

As Board President, Trustee Adams could not just "sit" on or ignore this information; she asked that the information be placed in each employee's personnel file and that all cabinet members, including those directly involved in the incident, receive training on ethics policies.

Finding of Fact "c" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

3.  On page 19 of the Agency's Preliminary Report, Finding of Fact "e" under "Electronic Communications from 2017" describes a single e-mail  Trustee Adams sent to board services and several senior HISD administrators transmitting a copy of a parent complaint she received.  Trustee Adams was not interviewed about this e-mail by the Agency's investigators.

Trustee Adams forwarded this information to HISD staff for staff to handle as they deemed necessary, which *is* the appropriate role of a board member. She did not direct that the complaint be resolved a particular way or attempt to resolve the complaint herself.

Finding of Fact "e" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

4.  On page 19 of the Agency's Preliminary Report, Finding of Fact "f" under "Electronic Communications from 2017" describes an e-mail Trustee Adams sent to HISD Chief Financial Officer, Rene Barajas, on June 1, 2017, asking him the impact to the District's budget if "we were to increase pay to 12.50 per hour."  Trustee Adams was not interviewed by the Agency's investigators about this e-mail, to the best of her recollection.

There is no indication that Trustee Adams did anything more here than ask for information—information that is squarely within her role as a board member (the District's



Mr. Jason Hewitt
August 26, 2019
Page 8

budget); she did not attempt to direct any action by the Administration. Moreover, at the time in question (October of 2017), Superintendent Carranza expected Trustees to send requests for information to him or his direct reports. Rene Barajas—the District's Chief Financial Officer—is a direct report to the Superintendent.

Finding of Fact "f" should be deleted from the Final Report because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

5. On page 19 of the Agency's Preliminary Report, Finding of Fact "a" under "Electronic Communications from 2018" describes an e-mail Trustee Adams sent HISD Chief Operations Officer Brian Busby on January 10, 2018, asking for an update on the construction of two schools. Trustee Adams was not interviewed by the Agency's investigators about this e-mail, to the best of her recollection.

There is no indication Trustee Adams did anything more here than ask for information; she did not attempt to direct any action by the Administration. Moreover, at the time in question (January of 2018), Superintendent Carranza expected Trustees to send requests for information to him or his direct reports. Brian Busby—the District's Chief Operations Officer—is a direct report to the Superintendent.

Finding of Fact "a" under Electronic Communications from 2018 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

6. On page 19 of the Agency's Preliminary Report, Finding of Fact "c" under "Electronic Communications from 2018" describes an e-mail Trustee Adams sent a Senior HISD Administrator with the names of three individuals who had confirmed their interest in serving on the principal selection committee for Madison High School. Trustee Adams was not interviewed by the Agency's investigators about this e-mail.

Under HISD Regulation DP2, the Chief School Officer is to notify the Board Member, in whose geographic district a principal vacancy is, of the vacancy as well as the selection process and the timeline for the vacancy. The selection process includes the formation of an interview



Mr. Jason Hewitt
August 26, 2019
Page 9

committee.  The email exchange described by the Agency on page 19 is consistent with the process outlined in HISD Regulation DP2—the Administration notified Trustee Adams of the principal vacancy at Madison High School (located in Adams's geographic district) as well as the interview and staffing timeline. What the Agency's Draft Report omits is that Trustee Adams *was asked by HISD Administration* to provide the names of three persons interested in serving on the Committee.  She did so.  After confirming their interest in serving on the Committee, Trustee Adams shared the *requested* names with HISD Administration, as captured by Exhibit 2.29.

Finding of Fact "c" under Electronic Communications from 2018 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

7.  On page 26 of the Agency's Preliminary Report, Finding of Fact "1" under "Findings of Fact for Allegation Three," the Agency describes an *underlined unsigned* October 12, 2015 report issued by former HISD Ethics and Compliance Officer Debra Fincher, which found that Trustee Adams had contact with a subcontractor to a vendor competing for the award of RFP No. 15-07-05, concerning RFP No. 15-07-05, in violation of the local HISD Code of Silence requirement.  The report also found that Adams disclosed "non-public information" in her communication with the subcontractor.

HISD's Code of Silence is not a requirement of statute or any TEA rule; it is a local requirement unique to HISD that TEA has no statutory authority to enforce.  Additionally, Trustee Adams was not interviewed by the Agency's investigators about this report.

Trustee Adams provides the following information to the Agency:  Trustee Adams was contacted by a vendor's "sub" to complain that the Administration had failed to comply with certain procurement laws and requirements with respect to RFP No. 15-07-05.   Adams forwarded this complaint to HISD Administration for handling, and also requested additional clarification; she did not attempt to direct any action by the Administration.  In fact, she very clearly stated that it mattered not to her who was ultimately awarded the contract.  *See* Exhibit 2, attached.  Her sole purpose in forwarding the communication to the Administration was to ensure that all laws and processes had been complied with.  Had Trustee Adams not alerted the Administration to the possibility of a procurement violation, the District could have been exposed to legal liability.  In fact, as it turns out, in response to the information provided by



Mr. Jason Hewitt
August 26, 2019
Page 10

Trustee Adams, the Administration pulled the item from the upcoming board meeting agenda so that they could further investigation matter. As to the "alleged" non-public document Trustee Adams purportedly shared with the subcontractor, that document was in fact the *final agenda* for the HISD Board meeting on September 10, 2015. HISD has two agenda print deadlines—a preliminary print deadline and a final print deadline. Changes can still be made to the agenda after the preliminary deadline, but they are not supposed to be made after the final print deadline, barring extenuating circumstances causing an item to be pulled or added. There is no law or HISD policy which prohibits Trustee Adams from sharing the final board meeting agenda with a member of the public. Trustee Adams did not share any of the backup materials for RFP No. 15-07-05 or any other internal materials typically provided by the Administration to trustees in advance of a board vote on a particular item. When Officer Fincher's report was shared with the Audit Committee, the Committee met with Trustee Adams and determined all that was warranted in response was a request to Trustee Adams that she not share the final board meeting agenda with members of the public until it is posted on-line. She has complied with this request.

Finding of Fact "1" under "Findings of Fact for Allegation Three" should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Adams, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas. Moreover, as it relates to the enforcement of a purely local requirement—HISD's Code of Silence—the Agency should not substitute its judgement for that of the body charged with enforcement of this local requirement (HISD's Audit Committee).

This response is supported by the affidavit of Trustee Adams, attached as Exhibit 1, as well as an additional email, attached as Exhibit 2. Should you have further questions or concerns, please do not hesitate to contact me.

Very truly yours,

Thompson & Horton LLP

*Lisa R. McBride*

Lisa R. McBride

**Appx.477**

-TEXAS EDUCATION AGENCY-

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



## APPENDIX 5

1701 NORTH CONGRESS AVE
AUSTIN, TX 78701



Houston    Lisa R. McBride
Dallas     Partner
Austin
           (713) 554-6747 Office
           (713) 583-8371 Fax


           lmcbride@thompsonhorton.com

           Thompson & Horton LLP
           Phoenix Tower, Suite 2000
           3200 Southwest Freeway
           Houston, Texas  77027-7554

August 26, 2019

Jason Hewitt, Director                        *Via E-mail: Jason.Hewitt@tea.texas.gov*
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment &Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Re:    Trustee Rhonda Skillern-Jones's Response to TEA's Preliminary Report Dated
       August 5, 2019

Dear Director Hewitt and Texas Education Agency Staff:

Our firm has been retained by the Houston Independent School District to respond on behalf of certain trustees to the August 5, 2019 Preliminary Special Accreditation Investigation Report issued by your agency ("TEA" or "Agency"). This response is submitted on behalf of Trustee Rhonda Skillern-Jones.

**Appx.479**



Mr. Jason Hewitt
August 26, 2019
Page 2

**Legal Analysis of Findings of Fact, Analysis and Conclusions on Behalf of Trustee Skillern-Jones**

In the "Analysis of Allegation Two" the Preliminary Report sets forth several statutes applicable to the conduct of school board trustees, both individually and as a body corporate. For some unknown reason, the Preliminary Report fails to include or analyze the Texas Education Code, Section 11.1512(c), (c-1), (c-2), and (c-3). These statutes were enacted by the Texas legislature in 2017. These statutes describe in detail an individual school board member's right to request and obtain information, and even create a statutory cause of action for the individual board member if a school district improperly refuses to produce information. Section 11.1512(c) states:

> A member of the board of trustees of the district, when acting in the member's official capacity, has an inherent right of access to information, documents, and records maintained by the district, and the district shall provide the information, documents, and records to the member without requiring the member to submit a public information request under Chapter 552, Government Code. The district shall provide the information, documents, and records to the member without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting. The district may withhold or redact information, a document, or a record requested by a member of the board to the extent that the item is excepted from disclosure or is confidential under Chapter 552, Government Code, or other law.

Texas law gives an individual trustee an <u>inherent right</u> to request and receive appropriate information, so that the trustee may perform his or her oversight and policy role on behalf of the community. But the law does not attempt to describe <u>how</u> an individual trustee exercises this inherent right to request and receive appropriate information. The mechanism for a trustee to request and receive information is properly a matter of local policy, and may vary considerably from school district to school district. In one district the process may be more informal; in another district it may by a more formal process. And a school board may choose to change its procedure over time. For example, the longstanding practice in Houston ISD is that individual trustees may contact the Superintendent of Schools or direct reports to the Superintendent. HISD Administration has established in regulation a more formal referral process, but this administrative regulation must be implemented in a manner to support a Trustee's inherent right

**Appx.480**



Mr. Jason Hewitt
August 26, 2019
Page 3

of access to information, not in a manner to limit or impair a Trustee's right to request information.

This distinction between an individual trustee's statutory inherent right to request and receive information, and the district's own process in policy adopted by the board to handle such requests, is important because there is absolutely no violation of any statute for a trustee to request information. To the extent that the Preliminary Report string-cites selected examples when Trustees requested information, and then leap-frogs in the Analysis of Allegation Two to a conclusion that these requests somehow violate a statute governing the role of board members, that conclusion is unfounded and clearly legally erroneous. The Analysis does not even mention or attempt to apply the proper statutes governing an individual trustee's inherent right to request and receive appropriate information.

The Preliminary Report incorrectly analyzes HISD Board policy and Administration regulation, and then incorrectly concludes that conduct by Trustee Skillern-Jones violates policy and regulation. Board Policy BBE (Legal) affirms the right of individual Trustees to request and receive appropriate information, and references Section 11.1512(c), (c-1), (c-2), and (c-3). Board Policy BBE (Local) also affirms that "individual Board members shall have the right to seek information from District records and employees (underline added) in accordance with this policy." The only limitation in Board Policy BBE (Local) is that an individual Trustee may not require employees to prepare reports or new records from District information. Such reports or new analysis of information shall be initiated through Board action, individual Board member requests at a meeting, or "[w]ritten request of an individual Board member." Policy BBE2 (Regulation) was not approved by the Board, but rather was developed by Administration as a means to implement Policy BBE (Legal) and Policy BBE (Local). Importantly, Policy BBE2 (Regulation) was developed by Administration in 2013, before the enactment of Section 11.1512(c), (c-1), (c-2), and (c-3). To the extent of any conflict or inconsistency between Texas law and Board policy, and an Administration regulation, the statute and Board policy clearly control over the regulation.

The Analysis of Allegation Two reflects a fundamental misunderstanding of how local policies and regulations operate. Regulations are developed by Administration to implement statutes and policies, not to limit a Board member's rights under statute or Board policy. To the

**Appx.481**



Mr. Jason Hewitt
August 26, 2019
Page 4

extent that the Analysis asserts that Trustees "violated" an Administration regulation, that conclusion is legally erroneous.

With regard to the local policies that the HISD Board of Education has adopted to govern how an individual trustee may request and receive information, it is clearly established law that the Board is entitled to interpret its own policies. This principle, that the Board may interpret its own policies, is established in reported cases and in decisions by the Texas Commissioner of Education. In HISD, the current referral process is not established in Board Policy. Rather, the referral process is in a regulation, BBE2 (Regulation), developed by the Administration. The Commissioner, and certainly not the Agency's investigators, do not have the legal authority to interpret and find violations of locally adopted policies and regulations, particularly where the Board that adopted the policies in question have not been given an opportunity to interpret its own policies, or even change those policies if it chooses to do so. Further, to the extent that the regulation developed by the Administration, which is not in a policy adopted by the Board, conflicts with Section 11.1512(c)'s inherent right to request and receive information, or conflicts with adopted Board policy, the statute must control over the regulation.

The Preliminary Report's list of occasions when individual Trustees requested information do not constitute a violation of any statute, and in fact the Preliminary Report has failed to analyze these requests for information under the proper statutes. Therefore, all "Findings of Fact" that simply list occasions when individual Trustees requested information should be deleted from the report, and the Analysis of Allegation Two should be revised to remove any conclusion that any such request for information is a violation of statute or a violation of the proper role for board member. And the Analysis of Allegation Two's conclusion that these requests for information violate policy adopted by the Board where the Agency's investigators do not have the authority or expertise to interpret the Board's own policies, also should be deleted or revised. Further, the conclusions that requests for information by Board members violate an Administration regulation should be deleted or revised.

With regard to Trustee Skillern-Jones, the Findings of Fact and the conclusions in the Analysis of Allegation Two should be deleted or revised as described in this response. The so-called Findings of Fact do not support any conclusion that Trustee Skillern-Jones engaged in any misconduct or did anything other than exercise her statutory inherent right to request and receive appropriate information. Further, these Findings and the Analysis do not reflect a standard of

**Appx.482**



Mr. Jason Hewitt
August 26, 2019
Page 5

conduct that the Agency is capable of nor should attempt to enforce and apply uniformly to all school districts and boards of trustees in Texas.

**Specific Factual Responses by Trustee Skillern-Jones**

As a preliminary matter, the Findings of Fact for Allegation Two purport to be examples of individual trustees requesting information from the District's administration. As stated above, this in and of itself is not a violation of law or any agency rule. With respect to Trustee Skillern-Jones specifically, the Findings of Fact for Allegation Two should be deleted from the Agency's Final Report because they are not proper findings of fact. They are not founded on basic investigative techniques. Trustee Skillern-Jones was not interviewed by the Agency's investigators about the factual allegations relating to her in Findings of Fact Two of the Preliminary Report. She is willing to be interviewed about and to discuss these issues.

Inexplicably, the Draft Report fails to recognize that for many of the cited communications between Trustee Skillern-Jones and District administrators, Skillern-Jones was serving as HISD's Board President and as such, she was endowed with unique responsibilities.[1] As Board President, in addition to the duties required by law, Trustee Skillern-Jones was responsible for:

- Presiding at all Board meetings unless unable to attend.
- Discussing, making motions and resolutions, and voting on all matters coming before the board.
- Securing the resolutions of complaints concerning Board members.
- Maintaining order at meetings and informing the audience that no demonstrations shall be permitted; recess any meeting to clear the Boardroom at any time if necessary to maintain order.
- Overseeing and reporting to the Board on the Superintendent's compliance with the monitoring system found in policy AF (Local).

---

[1] Trustee Skillern-Jones served as Board President from January 2015 to January 2016, and again from January 2018 to January 2019.



Mr. Jason Hewitt
August 26, 2019
Page 6

*See* HISD Board Policy BDAA (Local).  Additionally, as Board President, she was responsible for working with the Superintendent and the Superintendent's staff to prepare the agenda for all board meetings, which included ensuring "that any topics the Board or at least three Board members [requested] to be addressed [were] either on the agenda for the first regular meeting that [was] at least seven calendar days after the date the Board President receive[d] the request, or on the agenda for a special or emergency meeting if the Board President determine[d] that the item require[d] immediate consideration …"  *See* HISD Board Policy BE (Local).  Simply put, while President, Trustee Skillern-Jones *had* to communicate with the Superintendent and the Superintendent's staff to effectively and efficiently discharge her presidential responsibilities.

1.      On page 7 of the Agency's Preliminary Report, the Agency identifies Trustee Skillern-Jones use of some of the funds contained in her Trustee allocation to support projects requested by the Administration and/or the community at schools located within her geographic district as an example of board-member over-reach.   Trustee Skillern-Jones was never interviewed about the statements on page 7 by the Agency's investigators to the best of her recollection.  Prior to Trustee Skillern-Jones arrival to the Board, the Board voted to allocate bond proceeds to trustees in the form of individual trustee allocations, to be spent in each Trustee's geographic District.  The Administration provided Trustee Jones with a list of projects at schools within her district she could choose to support with her trustee allocation, and asked her to make selections.  She did so.  Trustee Skillern-Jones did not violate state law or Board Policy.

The statements contained in page 7 concerning Trustee Skillern-Jones use of her Trustee Allocation to support school projects in her trustee district cannot be relied upon because the statements were not properly investigated, the Preliminary Report itself does not rely on these statements for any conclusions or analysis, the statements do not show any misconduct by Trustee Skillern-Jones, and the statements do not reflect any standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.  The inclusion of these statements in the Preliminary Report only serves to unfairly question Trustee Skillern-Jones's reputation and conduct as a Board member.  These statements should be deleted from the Final Report, or modified as to Trustee Skillern-Jones.

2.  On page 17 of the Agency's Preliminary Report, Finding of Fact "d" under "Electronic Communications from 2016" describes an email exchange between Trustee Skillern-

**Appx.484**



Mr. Jason Hewitt
August 26, 2019
Page 7

Jones and HISD's former Chief Communications Officer wherein Trustee Skillern-Jones makes certain requests concerning an upcoming meeting in her trustee district. Trustee Skillern-Jones was never interviewed about this exchange by the Agency's investigators, to the best of her recollection.

At the time in question (September of 2016), Superintendent Carranza expected Trustees to send requests to him or his direct reports. The Chief Communications Officer is a direct report to the Superintendent. To the extent this e-mail exchange is included in the Preliminary Report as an example of Trustee Skillern-Jones improperly communicating with District staff, that conclusion or inference is not correct. It does not reflect any clearly established legal standard, nor is it a standard that the Agency is capable of or should attempt to enforce and apply uniformly to all public school districts in Texas.

Finding of Fact "d" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

3. On page 18 of the Agency's Preliminary Report, Finding of Fact "h" under "Electronic Communications for 2016" describes an email exchange between Trustee Skillern-Jones and former HISD Chief Student Support Officer, Mark Smith, concerning an upcoming North Forest community meeting. Trustee Skillern-Jones was not interviewed by the Agency's investigators about this e-mail to the best of her recollection.

There is no indication that Trustee Skillern-Jones did anything more here than ask for information she could share with the community at her meeting; she did not attempt to direct any action by Administration. Moreover, at the time in question (May of 2016), the then Superintendent expected Trustees to send requests to him or his direct reports. The Chief Student Support Officer was a direct report to the Superintendent.

Finding of Fact "h" under Electronic Communications from 2016 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.



Mr. Jason Hewitt
August 26, 2019
Page 8

4. On page 18 of the Agency's Preliminary Report, Finding of Fact "b" under "Electronic Communications for 2017" describes an email exchange between Trustee Skillern-Jones and former HISD Chief of HR, Gloria Cavazos, regarding a former employee's inquiry concerning her eligibility for rehire. Trustee Skillern-Jones was not interviewed by the Agency's investigators about this e-mail to the best of her recollection.

Trustee Skillern-Jones forwarded the former employee's inquiry to the District's Chief HR Officer to handle as the Chief deemed necessary, which is the appropriate role of a board member. She did not direct that the inquiry be resolved a particular way or attempt to resolve (or answer) the inquiry herself. Moreover, at the time in question (May of 2017), former Superintendent Carranza expected Trustees to send requests to him or his direct reports. The Chief of Human Resources is a direct report to the Superintendent.

Finding of Fact "b" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

5. On page 19 of the Agency's Preliminary Report, Finding of Fact "k" under "Electronic Communications from 2017" describes a single e-mail that Trustee Skillern-Jones sent to HISD Chief Operations Officer, Brian Busby, requesting a list of HISD's vacant properties. Trustee Skillern-Jones was not interviewed about this e-mail by the Agency's investigators.

There is no indication that Trustee Skillern-Jones did anything more than ask for information—information that is squarely within her role as a board member (the disposition of District property); she did not attempt to direct any action by the Administration. Moreover, at the time in question (December of 2017), Superintendent Carranza expected Trustees to send requests for information to him or his direct reports. Brian Busby—the District's Chief Operations Officer—is a direct report to the Superintendent.

Finding of Fact "k" under Electronic Communications from 2017 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.



Mr. Jason Hewitt
August 26, 2019
Page 9

6.  On page 20 of the Agency's Preliminary Report, Finding of Fact "f" under "Electronic Communications from 2018" describes a single e-mail that Trustee Skillern-Jones sent to the District's Chief Operations Officer, Brian Busby, on August 24, 2018, asking whether there was "a way to have the parking at Nat Q. Henderson open for parking" for her.  Trustee Skillern-Jones was not interviewed by the Agency's investigators about this e-mail to the best of her recollection.  In this exchange, Trustee Skillern-Jones asks whether parking can be made available for her at a student event she was hosting at a school.  Simply put, she made an inquiry; she did not direct the Administration to do anything.  Brian Busby—the District's Chief Operations Officer—is a direct report to the Superintendent.

Finding of Fact "f" should be deleted from the Final Report because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

7.  On page 20 of the Agency's Preliminary Report, Finding of Fact "a" under "Electronic Communications from 2019" describes an email exchange between Trustee Skillern-Jones and Interim Superintendent Grenita Lathan in March of 2019.  Trustee Skillern-Jones was not interviewed by the Agency's investigators about this e-mail to the best of her recollection.

In the exchange, Trustee Skillern-Jones explains to Interim Superintendent Lathan that a vendor's request for meeting did not emanate from her.  She explains she never told the vendor that she (Skillern-Jones) would set up a meeting with District staff nor did she ask the vendor to set up a meeting with staff on her behalf.  She further explains that she did not discuss any RFP with the vendor.  Trustee Skillern-Jones next provides a list of the questions she posed at a recent budget workshop which were not answered by Administration.  Trustee Skillern-Jones requests a response, but before sending her request, seeks the advice of Board counsel concerning whether her requests are within the proper governance lane.

This exchange demonstrates *appropriate* Board behavior, not inappropriate Board behavior—referral of vendor concerns to the Administration for processing, a request for answers to questions posed by the board member at a public meeting (which were not answered at that meeting), and consultation with Board counsel to ensure board member conduct is within the appropriate governance lane.



Mr. Jason Hewitt
August 26, 2019
Page 10

Finding of Fact "a" under Electronic Communications from 2019 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Skillern-Jones, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

This response is supported by the affidavit of Trustee Skillern-Jones, attached as Exhibit 1.  Should you have further questions or concerns, please do not hesitate to contact me.

Very truly yours,

Thompson & Horton LLP

Lisa R. McBride

Lisa R. McBride

- T E X A S  E D U C A T I O N  A G E N C Y -

# HOUSON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



APPENDIX 6

1 7 0 1  N O R T H  C O N G R E S S  A V E
A U S T I N ,  T X  7 8 7 0 1



|  |  |
|---|---|
| Houston | J. David Thompson |
| Dallas | Partner |
| Austin |  |
|  | (713) 554-6752 Office |
|  | (713) 583-8118 Fax |
|  | dthompson@thompsonhorton.com |
|  | Thompson & Horton LLP |
|  | Phoenix Tower, Suite 2000 |
|  | 3200 Southwest Freeway |
|  | Houston, Texas |
|  | 77027-7554 |

August 21, 2019

Jason Hewitt, Director                                    *Via E-mail: Jason.Hewitt@tea.texas.gov*
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment &Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

    Re:    Trustee Sue Deigaard's Response to TEA's Preliminary Report Dated August 5, 2019

Dear Director Hewitt and Texas Education Agency Staff:

    Our firm has been retained by the Houston Independent School District to respond on behalf of certain trustees to the August 5, 2019 Preliminary Special Accreditation Investigation Report issued by your agency ("TEA" or "Agency"). This response is submitted on behalf of Trustee Sue Deigaard.



Jason Hewitt
August 21, 2019
Page 2

**Specific Factual Responses by Trustee Deigaard**

Trustee Deigaard does not recall being interviewed by the Agency's investigators about many of the factual allegations relating to her in the Preliminary Report. She is willing to be interviewed about and to discuss these issues.

1. On page 10 of the Agency's Preliminary Report, Fact Finding No. 14 is not a proper finding of fact and should be deleted from the Final Report, or modified as to Trustee Deigaard. This so-called Fact Finding is not founded on basic investigative techniques, and it does not reflect a legal standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

The first portion of Fact Finding No. 14 simply quotes a statement made by Trustee Santos at a Board meeting on August 1, 2019. Trustee Deigaard is mentioned in passing in Trustee Santos' statement, with the assertion that Trustee Deigaard was "going to make a motion" at some prior Board meeting. It is important to note that Trustee Santos did not say that Trustee Deigaard actually made a motion; Trustee Santos simply stated that she believes that Trustee Deigaard might have considered making a motion. It does not appear that the Agency investigators made any effort to determine the details about Trustee Santos' statement or to determine the truth of the statement. The Agency investigators did not interview Trustee Deigaard about this statement, to be best of her recollection. Trustee Santos' statement about Trustee Deigaard cannot be relied on for the truth of the matter stated, at least not without further proper investigation. The weakness of Finding of Fact No. 14 is reflected in the Agency's "Analysis of Allegation 1" on pages 12-15 of the Preliminary Report. Although the Analysis refers to and draws conclusions based on every other Finding of Fact for Allegation One, the Analysis is completely silent with regard to Finding of Fact No. 14.

In summary, Finding of Fact No. 14 cannot be relied on for the truth of the statement as to Trustee Deigaard because it was not properly investigated, the Preliminary Report itself does not rely on Finding of Fact No. 14 for any conclusions or analysis, it does not show any misconduct by Trustee Deigaard, and it does not reflect any standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas. The inclusion of this Finding of Fact in the Preliminary Report only serves to unfairly question Trustee Deigaard's reputation and conduct as a Board member. Finding of Fact No. 14 should be deleted from the Final Report, or modified as to Trustee Deigaard.

2. On page 19 of the Agency's Preliminary Report, Finding of Fact "b" under "Electronic Communications from 2018" describes an e-mail exchange between the District's Chief of Staff and



Jason Hewitt
August 21, 2019
Page 3

Trustee Deigaard on February 22, 2018.  Trustee Deigaard was never interviewed about this exchange by the Agency's investigators, to the best of her recollection.  As the Preliminary Report and exhibit recognizes, the Chief of Staff initiated the e-mail exchange with Trustee Deigaard to alert her about an alleged firearm incident at a middle school in Trustee Deigaard's trustee area.  Trustee Deigaard responded to the Chief of Staff that this was the school her younger daughter attended, to which the Chief of Staff responded by asking if there was anything she could do.  Trustee Deigaard then responded to this inquiry by the Chief of Staff by asking that the high school her older daughter attended be alerted to the firearm incident and that the doors be secured because they were not usually locked.

To the extent this e-mail exchange is included in the Preliminary Report as an example of Trustee Deigaard improperly communicating with District staff, that conclusion or inference is not correct.  It does not reflect any clearly established legal standard, nor is it a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.  The e-mail exchange was initiated by the Chief of Staff, and the Chief of Staff asked what she could do when Trustee Deigaard stated that the firearm incident occurred at her daughter's school.  When asked by the Chief of Staff what she could do, Trustee Deigaard simply replied as a parent and asked that the school her older daughter attended be notified and secured.  Given the many current concerns about school safety and firearms at school, Trustee Deigaard's response to the Chief of Staff's inquiry was both appropriate and reasonable.  It is worth noting that this exchange initiated by the Chief of Staff about a firearm incident occurred one week after the school shooting at Marjory Stoneman Douglas High School in Parkland, Florida, and three months before the school shooting at Santa Fe High School in Santa Fe, Texas.

Finding of Fact "b" under Electronic Communications from 2018 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Deigaard, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

3.  On page 20 of the Agency's Preliminary Report, Finding of Fact "d" under "Electronic Communications for 2018" describes an e-mail on February 27, 2018, in which Trustee Deigaard asked the Chief of Student Support for information about the number of students in a program, including how many students from each trustee district and from each middle school.  Trustee Deigaard was not interviewed by the Agency's investigators about this e-mail, to the best of her recollection, and she does not know whether the Chief of Student Support was interviewed.  There is no indication that Trustee Deigaard did any more than ask for information; she did not attempt to direct any action by Administration.



Jason Hewitt
August 21, 2019
Page 4

Finding of Fact "d" under Electronic Communications from 2018 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Deigaard, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

4.   On page 20 of the Agency's Preliminary Report, Finding of Fact "e" under "Electronic Communications from 2018" describes a single e-mail that Trustee Deigaard sent to "an HISD Senior Administrator" describing an unsafe turn that Trustee Deigaard personally observed by an HISD school bus.   Trustee Deigaard was not interviewed about this e-mail by the Agency's investigators.   Finding of Fact "e" conveniently omits the portion of Trustee Deigaard's e-mail in which she stated that she was sending it to the Senior Administrator because she did not know to whom the information should be directed.   Also, Trustee Deigaard did not expect or demand any action or even a reply; she simply passed along information that she personally witnessed so that HISD Administration could address the matter appropriately.   Trustee Deigaard was not interviewed about this e-mail by the Agency's investigators, to the best of her recollection.

Finding of Fact "e" under Electronic Communications from 2018 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Deigaard, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

5.   On page 20 of the Agency's Preliminary Report, Finding of Fact "h" under "Electronic Communications from 2018" describes a single e-mail that Trustee Deigaard sent to "an HISD Senior Administrator" on October 23, 2018, asking him where to find the District's quarterly investment reports, after Trustee Deigaard was unable to locate them online.   Trustee Deigaard was not interviewed by the Agency's investigators about this e-mail, to the best of her recollection, and she does not know whether the District's CFO was interviewed.

Finding of Fact "h" should be deleted from the Final Report because it was not properly investigated, it does not reflect any misconduct by Trustee Deigaard, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.

6.   On page 20 of the Agency's Preliminary Report, Finding of Fact "g" under "Electronic Communications from 2018" describes a single e-mail that Trustee Deigaard sent to an employee in Board Services on August 28, 2018, asking for clarification of the Administration's preference in handling the large volume of complaints that Trustees were receiving about the significant changes in the District's



Jason Hewitt
August 21, 2019
Page 5

transportation system.  Later that same day, the Board Services employee sent Trustee Deigaard the following response:

> "I am sure all of you are receiving a large number of emails and phone calls from parents and caregivers who are having issues with transportation.  After consulting with Chief Busby, the following is some guidance on how to respond.
>
> Email the info to Chief Busby (you can also cc Heather Babb, his executive admin. asst.)
> Direct the parent to the 24/7 Customer Care Line at 713-556-9400 and/or
> Notify me to enter a referral if you feel the parent's issue merits tracking.
>
> Just a reminder that under current practice, Board Services staff are to direct parent concerns to either the proper administrative department or to the parent center rather than entering a referral, unless a trustee specifically requests a referral.  I am happy to enter referrals upon your request (see attached email.)"

Significant changes in the District's transportation system at the beginning of the 2018-2019 school year resulted in hundreds of parent complaints to the District and to Trustees.  In Trustee Deigaard's e-mail referenced in Finding of Fact "g" she does not attempt to direct the District's Administration to take any particular action to deal with these voluminous complaints.  Trustee Deigaard was not interviewed by the Agency's investigators about this transportation problem, to the best of her recollection.  She only asks Board Services - and hopefully the Agency understands that the purpose and function of Board Services is to assist the Board and individual Board members - for the Administration's preferred way to handle these complaints.  Board Services obtained the useful information and provided it not only to Trustee Deigaard but to all Board members.  This Finding of Fact "g" does not reflect any misconduct or violation of any established law or policy by Trustee Deigaard.  Rather, it demonstrates Trustee Deigaard properly performing her role when presented with scores of parent complaints about transportation at the start of a school year.  Trustee Deigaard asked Board Services for the Administration's preferred way to handle the complaints, and did not make any attempts to direct or control how Administration handled the complaints.

Finding of Fact "g" under Electronic Communications from 2019 should be deleted because it was not properly investigated, it does not reflect any misconduct by Trustee Deigaard, and it does not reflect a standard that the Agency is capable of nor should attempt to enforce and apply uniformly to all public school districts in Texas.



Jason Hewitt
August 21, 2019
Page 6

**Legal Analysis of Findings of Fact, Analysis and Conclusions on Behalf of Trustee Deigaard**

In the "Analysis of Allegation Two" the Preliminary Report sets forth several statutes applicable to the conduct of school board trustees, both individually and as a body corporate.  For some unknown reason, the Preliminary Report fails to include or analyze the Texas Education Code, Section 11.1512(c), (c-1), (c-2), and (c-3).  These statutes were enacted by the Texas legislature in 2017.  These statutes describe in detail an individual school board member's right to request and obtain information, and even create a statutory cause of action for the individual board member if a school district improperly refuses to produce information.  Section 11.1512(c) states as follows:

"(c) A member of the board of trustees of the district, when acting in the member's official capacity, has an inherent right of access to information, documents, and records maintained by the district, and the district shall provide the information, documents, and records to the member without requiring the member to submit a public information request under Chapter 552, Government Code.  The district shall provide the information, documents, and records to the member without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting.  The district may withhold or redact information, a document, or a record requested by a member of the board to the extent that the item is excepted from disclosure or is confidential under Chapter 552, Government Code, or other law."

It is important to note that statute gives an individual trustee an <u>inherent right</u> to request and receive appropriate information, so that the trustee may perform his or her oversight and policy role on behalf of the community.  But the statute does not attempt to describe <u>how</u> an individual trustee exercises this inherent right to request and receive appropriate information.  The mechanism for a trustee to request and receive information is properly a matter of local policy, and may vary considerably from school district to school district.  In one district the process may be more informal; in another district it may by a more formal process.  And a school board may choose to change its procedure over time.  For example, the longstanding practice in Houston ISD is that individual trustees may contact the Superintendent of Schools or direct reports to the Superintendent.  HISD Administration has established in regulation a more formal referral process, but this Administration regulation must be implemented in a manner to support a Trustee's inherent right of access to information, not in a manner to limit or impair a Trustee's right to request information.

This distinction between an individual trustee's statutory inherent right to request and receive information, and the district's own process in policy adopted by the board to handle such requests, is important because there is absolutely no violation of any statute for a trustee to request information.  To



Jason Hewitt
August 21, 2019
Page 7

the extent that the Preliminary Report string-cites selected examples when Trustees requested information, and then leap-frogs in the Analysis of Allegation Two to a conclusion that these requests somehow violate a statute governing the role of board members, that conclusion is unfounded and clearly legally erroneous. The Analysis does not even mention or attempt to apply the proper statutes governing an individual trustee's inherent right to request and receive appropriate information.

The Preliminary Report incorrectly analyzes HISD Board policy and Administration regulation, and then incorrectly concludes that conduct by Trustee Deigaard violates policy and regulation. Board Policy BBE (Legal) affirms the right of individual Trustees to request and receive appropriate information, and references Section 11.1512(c), (c-1), (c-2), and (c-3). Board Policy BBE (Local) also affirms that "individual Board members shall have the right to seek information from District records and employees (underline added) in accordance with this policy." The only limitation in Board Policy BBE (Local) is that an individual Trustee may not require employees to prepare reports or new records from District information. Such reports or new analysis of information shall be initiated through Board action, individual Board member requests at a meeting, or "[w]ritten request of an individual Board member." Policy BBE2 (Regulation) was not approved by the Board, but rather was developed by Administration as a means to implement Policy BBE (Legal) and Policy BBE (Local). Importantly, Policy BBE2 (Regulation) was developed by Administration in 2013, before the enactment of Section 11.1512(c), (c-1), (c-2), and (c-3). To the extent of any conflict or inconsistency between Texas law and Board policy, and an Administration regulation, the statute and Board policy clearly control over the regulation.

The Analysis of Allegation Two reflects a fundamental misunderstanding of how local policies and regulations operate. Regulations are developed by Administration to implement statutes and policies, not to limit a Board member's rights under statute or Board policy. To the extent that the Analysis asserts that Trustees "violated" an Administration regulation, that conclusion is legally erroneous.

With regard to the local policies that the HISD Board of Education has adopted to govern how an individual trustee may request and receive information, it is clearly established law that the Board is entitled to interpret its own policies. This principle, that the Board may interpret its own policies, is established in reported cases and in decisions by the Texas Commissioner of Education. In HISD, the current referral process is not established in Board Policy. Rather, the referral process is in a regulation, BBE2 (Regulation), developed by the Administration. The Commissioner, and certainly not the Agency's investigators, do not have the legal authority to interpret and find violations of locally adopted policies and regulations, particularly where the Board that adopted the policies in question have not been given an opportunity to interpret its own policies, or even change those policies if it chooses to do so. Further, to the extent that the regulation developed by the Administration, which is not in a policy adopted by the

**Appx.496**



Jason Hewitt
August 21, 2019
Page 8

Board, conflicts with Section 11.1512(c)'s inherent right to request and receive information, or conflicts with adopted Board policy, the statute must control over the regulation.

The Preliminary Report's list of occasions when individual Trustees requested information do not constitute a violation of any statute, and in fact the Preliminary Report has failed to analyze these requests for information under the proper statutes. Therefore, all "Findings of Fact" that simply list occasions when individual Trustees requested information should be deleted from the report, and the Analysis of Allegation Two should be revised to remove any conclusion that any such request for information is a violation of statute. And the Analysis of Allegation Two's conclusion that these requests for information violate policy adopted by the Board, where the Agency's investigators do not have the authority or expertise to interpret the Board's own policies, also should be deleted or revised. Further, the conclusions that requests for information by Board members violate an Administration regulation should be deleted or revised.

With regard to Trustee Deigaard, the Findings of Fact and the conclusions in the Analysis of Allegation Two should be deleted or revised as described in this response. The so-called Findings of Fact do not support any conclusion that Trustee Deigaard engaged in any misconduct or did anything other than exercise her statutory inherent right to request and receive appropriate information. Further, these Findings and the Analysis do not reflect a standard of conduct that the Agency is capable of nor should attempt to enforce and apply uniformly to all school districts and boards of trustees in Texas.

This response is supported by the affidavit of Trustee Deigaard, attached as Exhibit 1. Should you have further questions or concerns, please do not hesitate to contact me.

Very truly yours,

Thompson & Horton LLP

J. David Thompson

JDT:ld

**Appx.497**

- T E X A S   E D U C A T I O N   A G E N C Y -

# HOUSTON

## INDEPENDENT SCHOOL DISTRICT

SPECIAL ACCREDITATION INVESTIGATION



# APPENDIX 7

1 7 0 1   N O R T H   C O N G R E S S   A V E
A U S T I N ,   T X   7 8 7 0 1



Houston
Dallas
Austin

Lisa R. McBride
Partner

(713) 554-6747 Office
(713) 583-8371 Fax

lmcbride@thompsonhorton.com

Thompson & Horton LLP
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, Texas  77027-7554

August 19, 2019

Jason Hewitt, Director                                    *Via E-mail: Jason.Hewitt@tea.texas.gov*
Division of Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Jeff Cottrill
Deputy Commissioner for Assessment &Governance
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Von Byer, General Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Christopher Jones, Senior Legal Counsel
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

    Re:    Trustee Jolanda Jones' **Amended and Supplemental** Response to TEA's Preliminary
              Report Dated August 5, 2019

Dear Director Hewitt and Texas Education Agency Staff:

    Our firm has been retained by the Houston Independent School District ("HISD" or "District") to respond on behalf of certain trustees to the August 5, 2019 Preliminary Special Accreditation Investigation Report issued by your agency ("TEA" or "Agency").  This response is submitted on behalf of Trustee Jolanda Jones.



Jason Hewitt
August 19, 2019
Page 2

## General Response on Behalf of Trustee Jones

In the "Analysis of Allegation Two", the Preliminary Report sets forth several statutes applicable to the conduct of school board trustees, both individually and as a body corporate. For some unknown reason, the Preliminary Report fails to include or analyze the Texas Education Code, Sections 11.1512(c), (c-1), (c-2), and (c-3). These statutes were enacted by the Texas Legislature in 2017. These statutes describe in detail an individual school board member's right to request and obtain information, and even creates a statutory cause of action for the individual board member if a school district improperly refuses to produce information. Section 11.1512(c) states:

> A member of the board of trustees of the district, when acting in the member's official capacity, has an inherent right of access to information, documents, and records maintained by the district, and the district shall provide the information, documents, and records to the member without requiring the member to submit a public information request under Chapter 552, Government Code. The district shall provide the information, documents, and records to the member without regard to whether the requested items are the subject of or relate to an item listed on an agenda for an upcoming meeting. The district may withhold or redact information, a document, or a record requested by a member of the board to the extent that the item is excepted from disclosure or is confidential under Chapter 552, Government Code, or other law.

Texas law gives an individual trustee an <u>inherent right</u> to request and receive appropriate information, so that the trustee can perform his or her oversight and policy role on behalf of the community. But the law does not attempt to describe <u>how</u> an individual trustee exercises this inherent right to request and receive appropriate information. The mechanism for a trustee to request and receive information is properly a matter of local policy or practice, and may vary considerably from school district to school district. In one district the process may be more informal; in another district it may be a more formal process. And a school board may choose to change its procedure over time. For example, the longstanding practice in Houston ISD was that individual trustees could contact the Superintendent of Schools or direct reports to the Superintendent. HISD Administration has established in regulation a more formal referral process, but this administrative regulation must be implemented in a manner to support a Trustee's inherent right of access to information, not in a manner to limit or impair a Trustee's right to request information.

This distinction between an individual trustee's statutory inherent right to request and receive information, and the district's own process to handle such requests, is important because there is absolutely no violation of any statute for a trustee to request information. To the extent that the Preliminary Report string-cites selected examples when trustees requested information, and then leap-frogs in the Analysis of Allegation Two to a conclusion that these requests somehow violate a statute governing the role of board members, that conclusion is unfounded and clearly legally erroneous. The

**Appx.500**



Jason Hewitt
August 19, 2019
Page 3

Analysis does not even mention or attempt to apply the proper statutes governing an individual trustee's inherent right to request and receive appropriate information.

The Preliminary Report incorrectly analyzes HISD Board policy and Administration regulation, and then incorrectly concludes that conduct by Trustee Jones violates policy and regulation. Board Policy BBE (Legal) affirms the right of individual Trustees to request and receive appropriate information, and references Sections 11.1512(c), (c-1), (c-2), and (c-3). Board Policy BBE (Local) also affirms that "individual Board members shall have the right to seek information from District records and employees (underline added) in accordance with this policy." The only limitation in Board Policy BBE (Local) is that an individual Trustee may not require employees to prepare reports or new records from District information. Such reports or new analysis of information shall be initiated through Board action, individual Board member requests at a meeting, or "[w]ritten request of an individual Board member." HISD Regulation BBE2 was not approved by the Board, but rather was developed by Administration as a means to implement Policy BBE (Legal) and Policy BBE (Local). Importantly, HISD Regulation BBE2 was developed by Administration in 2013, before the enactment of Sections 11.1512(c), (c-1), (c-2), and (c-3). To the extent of any conflict or inconsistency between Texas law and Board policy, and an Administration regulation, the statute and Board policy clearly control over the regulation. An administrative regulation is proper to implement statute and Board policy, but it is not proper to limit or impair an individual Trustee's "inherent right" under statute and Board policy.

With regard to the local policies that the HISD Board of Education has adopted to govern how an individual trustee may request and receive information, it is clearly established law that the Board is entitled to interpret its own policies. This principle, that the Board may interpret its own policies, is established in reported cases and in decisions by the Texas Commissioner of Education. In HISD, the current referral process is not established in Board Policy. Rather, the referral process is in a regulation, BBE2 (Regulation), developed by the Administration. The Commissioner, and certainly not the Agency's investigators, does not have the legal authority to interpret and find violations of locally adopted policies and regulations, particularly where the Board that adopted the policies in question has not been given an opportunity to interpret its own policies, or even change those policies if it chooses to do so. Further, to the extent that the regulation developed by the Administration, which is not in a policy adopted by the Board, conflicts with Section 11.1512(c)'s inherent right to request and receive information, the statute must control over the regulation.

The Preliminary Report's list of occasions when individual Trustees requested information do not constitute a violation of any statute, and in fact the Preliminary Report has failed to analyze these requests for information under the proper statutes. Therefore, all "Findings of Fact" that simply list occasions when individual Trustees requested information should be deleted from the Report, and the Analysis of Allegation Two should be revised to remove any conclusion that any such request for information is a violation of statute or a violation of the proper role for board member. And the Analysis of Allegation Two's conclusion that these requests for information violate policy adopted by the Board, or an administrative regulation, where the Agency's investigators do not have the authority or



Jason Hewitt
August 19, 2019
Page 4

expertise to interpret the Board's own policies, or the District's regulations, also should be deleted or revised.

### Specific Factual Responses by Trustee Jones

On page 17 of the Agency's Preliminary Report (Finding of Fact 11, Allegation No. 2), and again on page 25 (Analysis of Allegation No. 2), you conclude that Trustee Jones, along with other trustees, violated HISD Regulation BBE2 "by requesting information but failing to make this referral through board services." In support of this conclusion, you reference Exhibit 2.5 to the Draft Report, which contains printouts from the District's internal board referral tracking system from February 2018 to April 2018, including examples of requests for information Trustee Jones originally sent directly to District administrators rather than board services.

HISD Regulation BBE2 provides in relevant part:

> For the purposes of this regulation, a referral is any verbal or written communication received from a Trustee or the Superintendent that requires action, such as requesting information or resolution of an issue. … Additionally, referrals may also include a request by a Trustee for data or a specific report. …Trustees should submit all requests to the Board Services Team Lead or designee.

As a preliminary matter, your Agency has failed to provide Trustee Jones due process in connection with this allegation. During their interviews of Trustee Jones, your investigators not once notified Trustee Jones of this allegation or afforded her the opportunity to respond the allegation prior to it being submitted in the Preliminary Report. Second, BBE2 is an administrative regulation. Regulations are administrative procedures developed by school administration to assist with the implementation of policy; they are not board policy nor are they adopted by the Board. This fact notwithstanding, each request for information Trustee Jones initially sent to a District administrator contained in Exhibit 2.5 was appropriately re-routed through the referral tracking system, as documented by the system itself. Third, Trustee Jones took office in January of 2016. Trustee Jones was not on-boarded concerning the procedures contained in HISD Regulation BBE2. Therefore, she used the only experience she had for making requests for information while in elected office: her experience from the City of Houston, wherein councilmembers communicated directly with department directors and other high-level administrators. Trustee Jones used this process during the interim superintendency of Kenneth Huewitt and the superintendency of Richard Carranza, neither of whom informed her of the requirements of HISD Regulation BBE2 or that she should be making requests for information in a different way. It was not until sometime ***after*** the appointment of Dr. Grenita Lathan as HISD's interim superintendent that Dr. Lathan informed Trustee Jones of the board services referral system process.[1]

---

[1] In fact, Trustee Jones was not aware that HISD Regulation BBE2 predated Dr. Lathan's tenure as interim superintendent until TEA's Preliminary Report.



Jason Hewitt
August 19, 2019
Page 5

After that Trustee Jones complied with the referral process and further yet, discontinued making requests for information directly to District staff.

Trustee Jones, therefore, respectfully requests that all references to her contained in Finding of Fact 11, Allegation No. 2 and in the Analysis of Allegation No. 2 be removed. The so-called Findings of Fact and Analysis of Allegation No. 2 do not support any conclusion that Trustee Jones engaged in any misconduct or did anything other than exercise her statutory inherent right to request and receive appropriate information. Further, these Findings and the Analysis do not reflect a standard of conduct that the Agency is capable of nor should attempt to enforce and apply uniformly to all school districts and boards of trustees in Texas.

This response is supported by the affidavit of Trustee Jones, and the affirmation of Dr. Grenita Lathan, attached as Exhibits 1 and 2. Should you have further questions or concerns, please do not hesitate to contact me.

Very truly yours,

Thompson & Horton LLP

Lisa L. McBride

Lisa R. McBride

LRM/sc

# EXHIBIT 1

STATE OF TEXAS § 
§
COUNTY OF HARRIS §

## AFFIDAVIT OF TRUSTEE JOLANDA JONES

BEFORE ME, the undersigned Notary Public, this day personally appeared Jolanda

Jones, who being by me duly sworn on her oath, deposed and stated the following:

1. My name is Jolanda Jones. I am over eighteen (18) years of age, fully competent to testify to the matters stated in this Affidavit, and have never been convicted of a felony or a crime of moral turpitude. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2. I am the District IV Trustee for the Board of Education of the Houston Independent School District.

3. I have reviewed "Trustee Jolanda Jones' Response to TEA's Preliminary Report Dated August 5, 2019" and hereby certify that the factual assertions contained therein are true and correct, and are to the best of my personal knowledge.

_____
Jolanda Jones

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 15th day of August 2019.

_____
Sharon R Chiles
Notary Public in and for
The State of T E X A S
Name: SHARON R CHILES
My Commission Expires: Sept. 12, 2022

SHARON R CHILES
2140515
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPTEMBER 12 2022

# EXHIBIT 2

**Lisa McBride**

| | |
|---|---|
| **From:** | Lathan, Grenita F <GLATHAN@houstonisd.org> |
| **Sent:** | Thursday, August 15, 2019 4:09 PM |
| **To:** | Lisa McBride |
| **Subject:** | Re: CONFIDENTIAL: TIME SENSITIVE |

I agree that once I notified Trustee Jones of the referral process, she followed it.

Grenita Lathan

Get Outlook for iOS

**From:** Lisa McBride <lmcbride@thompsonhorton.com>
**Sent:** Thursday, August 15, 2019 4:05 PM
**To:** Lathan, Grenita F
**Subject:** CONFIDENTIAL: TIME SENSITIVE

**CAUTION:** This email originated from outside of Houston ISD.
**Do not click links** or open attachments unless you recognize the sender and know the content is safe.

Dr. Lathan,

Please review and respond to the attached response from Trustee Jones concerning TEA's Preliminary Report Dated August 5, 2019.

Thank you.

Lisa

Lisa R. McBride, Partner | vcard
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
T: 713.554.6747 | F: 713.583.8371
lmcbride@thlaw.com | www.thompsonhorton.com



CONFIDENTIALITY STATEMENT: This message and all attachments are confidential and may be protected by the attorney-client and other privileges. Any review, use, dissemination, forwarding, printing, copying, disclosure or distribution by persons other than the intended recipients is prohibited and may be unlawful. Please delete this message and any copy of it (in any form) without disclosing it. If you believe this message has been sent to you in error, please notify the sender by replying to this transmission. Thank you for your cooperation.

**Appx.507**



**Texas Education Agency**

Commissioner Mike Morath

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

Certified Mail
& Regular Mail

101-912
2019-2020

November 6, 2019

Dr. Grenita Lathan, Superintendent
Ms. Diana Davila, Board President
Houston Independent School District
4400 W. 18th St.
Houston, TX 77092

RE:    Appointment of Board of Managers Due to Special Accreditation Investigation and
Lowered Accreditation, Campus Performance Ratings, and the Conservator
Appointment

Dear Dr. Lathan and Ms. Davila:

The purpose of this correspondence is to provide Houston Independent School District ("ISD" or
"district") with official notification regarding my determination to lower the district's 2018-2019
accreditation status based on the results of a Special Accreditation Investigation.  This action is
authorized by Texas Education Code (Tex. Educ. Code) §§39.052(d) and 39.057(d), and 19 Texas
Administrative Code (Tex. Admin. Code) §§97.1055, 97.1057, and 97.1059.  Specifically, Houston
ISD's 2018-2019 accreditation status will be lowered to **Accredited-Warned**.

This letter also provides the district notice of my appointment of a board of managers to Houston
ISD to exercise the powers and duties of the district's board of trustees, and of my appointment of
a superintendent based on the results of the Special Accreditation Investigation, the lowered
accreditation status, the unacceptable performance of a district campus, and the length of the
conservator appointment. See Tex. Educ. Code §§39.052(d), 39.057(d), 39A.004, 39A.006
39A.111, 39A.201, 39A.202, 39A.906, and 19 Tex. Admin. Code §§97.1057, 97.1059, 97.1073.

**Special Accreditation Investigation**

In response to multiple complaints received by the Texas Education Agency (TEA or agency)
alleging violations with laws relating to governance of an Independent School District and
compliance with the Texas Open Meetings Act, TEA issued a Notice of Special Accreditation

**Appx.508**

Investigation (SAI) on January 22, 2019, and due to concerns reported by Houston ISD staff, issued an amended Notice of SAI on March 24, 2019, to include alleged violations of contract procurement. On August 5, 2019, the Agency issued a Preliminary Report and provided the district and its trustees an opportunity to respond. After conducting an informal review of the responses, the Agency issued a Final Report on October 30, 2019, which documented the following findings:

- A quorum of the board of trustees deliberated and exercised decision making powers outside of a public meeting held in compliance with the Texas Open Meetings Act in violation of Tex. Educ. Code §11.051(a-1);
- Members of the board of trustees acted individually on behalf of the board, exceeding the scope of their authority in violation of Tex. Educ. Code §11.051(a-1) Governance of Independent School District
- Members of the board of trustees violated contract procurement rules while the district was selecting a vendor/contract as well as attempting to tamper with contracts that had been awarded in violation of Tex. Educ. Code §§44.031 and 44.031(a)(1).

Based on these findings, the Final Report recommended lowering the district's accreditation status and appointing a conservator and a board of managers to ensure appropriate governance of the district and implementation of policies and procedures to address the issues raised in the Final Report.

**Accreditation Status and Appointment of a Board of Managers and Superintendent**

Pursuant to Tex. Educ. Code §§39.052(d) and 39.057(d), and 19 Tex. Admin. Code §§97.1055(a)(4), 97.1055(a)(8), 97.1055(b)(2)(B), and 97.1055(b)(3), a school district's accreditation status may be raised or lowered and an accreditation sanction may be issued based on the results of a special accreditation investigation. I have evaluated and considered the issues documented in the Final Report relating to the inability of the board of trustees to carry out its power and duties in Tex. Educ. Code §§11.151 and 11.1511, and 19 Tex. Admin. Code §97.1073(e)(8) as demonstrated by its failure to address the long-standing academic deficiencies at Wheatley High School.   Specifically, the report makes findings of fact identifying serious and persistent instances where individual board members exercise decision-making authority in violation of Texas Open Meetings Act and violated laws relating to contracting.

These findings compel me to lower the district's 2018-2019 accreditation status to **Accredited-Warned** and appoint a board of managers because the district exhibits serious or persistent deficiencies that may lead to the probation or revocation of the district's accreditation if not addressed because the breakdown in governance may impact academic and financial performance. See 19 Tex. Admin. Code §97.1055(b)(2)(B)(ii).   These actions are necessary because the district has failed to comply with the requirements related to purchasing as set forth in Subchapter B, Chapter 44 of the Education Code. See Tex. Educ. Code §§ 39.052(b)(2)(A)(iii) and 7.056(e)(3)(E), and 19 Tex. Admin. Code §§97.1055(b)(2)(A)(v) and 97.1055(e).

Given the inability of the board of trustees to govern the district, these sanctions are necessary to protect the best interests of the district's current and future students.   See 19 Tex. Admin. Code §97.1057(f).   The findings demonstrate that individual members of the board of trustees acted on behalf the board outside of a meeting that complied with the Texas Open Meetings Act resulting in an inefficient or ineffectual use of district funds or property. See 19 Tex. Admin. Code

§97.1057(f)(1). The board members should have focused on implementing effective change to improve the performance of students in the district's low performing campuses. See 19 Tex. Admin. Code §97.1057(f)(4). The board of trustees failed to do so.

The findings in the Final Report demonstrate material deficiencies that are serious and extensive. See 19 Tex. Admin. Code §97.1059(b)(1)(E). The findings also demonstrate that the district's governing problems are long-standing and have recurred over time. See 19 Tex. Admin. Code §97.1059(b)(2). The deficiencies cited in the Final Report demonstrate a substantial and imminent threat to the welfare of the district's students and to the public interest because the board of trustees is unable to govern the district, as demonstrated by its inability to address the long-standing academic deficiencies at Wheatley High School. See 19 Tex. Admin. Code §97.1059(b)(4).

As stated above, I have reviewed the Final Report and determined that the findings contained therein compel me to lower the district's accreditation status. For the same reasons cited above, these findings also compel me to appoint a board of managers to exercise the powers and duties of the board of trustees. This is authorized because the district's accreditation rating has been lowered to Accredited-Warned. See Tex. Educ. Code §39A.004(1). This intervention is also authorized because the findings in the Final Report warrant the intervention. See Tex. Educ. Code §39.057(d). This intervention is in the best interests of the students. See 19 Tex. Admin. Code §97.1057(f)(1) and (f)(4). This intervention is needed to prevent imminent and substantial harm to the welfare of the district's students or to the public interest, because the deficiencies identified in the Final Report warrant the appointment of a board of managers, and because a failure of governance has resulted in an inability of the board to carry out the powers and duties of the board as outlined in Tex. Educ. Code 11.151 and 11.1511, as demonstrated by its inability to address the long-standing academic deficiencies of Wheatley High School. See 19 Tex. Admin. Code §§97.1073(e)(4), (e)(7), and (e)(8), and 97.1059(b)(1)(E) and (b)(4).

These actions are necessary to achieve the purposes of the accreditation system. See Tex. Educ. Code §§39.051, 39.052, and 19 Tex. Admin. Code §97.1053(a), 97.1055(b)(3), 97.1057(a), 97.1057(e), and 97.1059(a). These actions are necessary to inform stakeholders of the district's poor compliance performance. See 19 Tex. Admin. Code §97.1053(a)(1). These actions will encourage the district to comply with the Texas Open Meetings Act and the purchasing laws, and will allow stakeholders the ability to assist future board members in complying with the Texas Open Meetings Act and the purchasing laws. See 19 Tex. Admin. Code §97.1053(a)(2-3). These actions will also encourage other districts to improve their compliance performance in order to avoid similar action and to retain their accreditation. See 19 Tex. Admin. Code §97.1053(a)(4). Finally, these actions will improve the Texas public school system by eliminating poor compliance performance by the district. See 19 Tex. Admin. Code §97.1053(a)(5).

**Campus Performance Ratings**

In 2011, Wheatley High School was assigned a final academic accountability rating of *Academically Unacceptable*. This was the campus' first unacceptable rating following a 2010 rating of Academically acceptable. The rating of Academically Unacceptable was the lowest rating in the accountability system. The campus was required to prepare a targeted improvement plan.

In 2012, no campus ratings were issued due to transition from the TAKS to the STAAR test.  Under this transition, 2011 and 2013 ratings were treated as consecutive. See 19 Tex. Admin. Code §97.1055(a)(9).

In 2013, Wheatley High School was assigned a final academic accountability rating of *Improvement Required*.  This was the campus' second consecutive unacceptable rating. The campus submitted its targeted improvement plan and a targeted reconstitution plan.

In 2014, Wheatley High School was assigned a final academic accountability rating of *Improvement Required*.  This was the campus' third consecutive unacceptable rating. The campus was designated a Texas Title 1 Priority School (TTIPS) and received the TTIPS Cycle 3 Grant.  As a condition of that grant, the campus submitted quarterly progress reports, staff and Principal effectiveness submissions, and end of year reports.

In 2015, Wheatley High School was assigned a final academic accountability rating of *Improvement Required*.  This was the campus' fourth consecutive unacceptable rating.  The campus continued to implement its plan associated with the TTIPS Cycle 3 grant.

In 2016, Wheatley High School was assigned a final academic accountability rating of *Improvement Required*.  This was the campus' fifth consecutive unacceptable rating. Under prior law, this district and campus would have been ordered to repurpose the campus, select alternative management, or close the campus.[1]  However, due to the passage of H.B. 1842, a new set of sanctions was authorized.  H.B. 1842 included a transition plan for campuses such as Wheatley. Under the transition provisions, Wheatley was essentially treated as having three consecutive failed ratings following the 2016 rating, rather than five.  For such a campus, the sanctions authorized by Tex. Educ. Code §39A.111 (board of managers or campus closure) for campuses with five consecutive failed ratings would apply to Wheatley following its seventh consecutive failed rating.

In 2017, Wheatley High School was assigned a final academic accountability rating of *Improvement Required*.  This was the campus' sixth consecutive unacceptable rating.

In 2018, Wheatley High School had student performance that would have led to its seventh consecutive failed rating.  However, due to the Hurricane Harvey waiver, Wheatley was not issued a rating of Improvement Required.  Instead the campus was not rated. The Hurricane Harvey waiver made it clear that for campuses that were not rated due to Hurricane Harvey, the 2017 and 2019 ratings would be considered to be consecutive.[2]

In 2019, Wheatley High School was issued a final academic accountability rating of *F*. This was the campus' seventh consecutive unacceptable rating. On September 3, 2019, I notified the district that if the unacceptable 2019 preliminary academic performance rating assigned to the Wheatley High School became a final rating, I would be required to order either the appointment of a board of managers to govern the district as provided by Tex. Educ. Code §39A.202 or closure of the campus. The district appealed the preliminary performance rating assigned to Wheatley High School and, on November 5, 2019, the district was notified of the appeal denial and that Wheatley High School

---

[1] See Tex. Educ. Code §39.107(e)(2014).

[2] See *2018 Accountability Manual*, Chapter 10- Hurricane Harvey, School Districts and Open-Enrollment Charter Schools.

received a final 2019 academic performance rating of *F*, the seventh consecutive unacceptable rating assigned to the campus[3].  Consequently, I am required to take action pursuant to Tex. Educ. Code §§39A.906 and 39A.111, and I am ordering the appointment of a board of managers.

The long-standing failure of the board of trustees to provide better educational opportunities to the students of this campus, compel me to appoint a board of managers pursuant to Tex. Educ. Code §§39A.111(1), 39A.906(b) and 19 Tex. Admin. Code §97.1061(g).  This action is necessary because the Agency's systems for campus accountability have identified the board of trustees' material deficiencies and inability to implement effective change to improve the performance of students assigned to the campus.  See 19 Tex. Admin Code §§ 97.1057(f)(4) and 97.1059(b)(1)(G). These deficiencies have been persistent and long-standing.  The HISD Board of Trustees has allowed this campus to operate with unacceptable ratings since 2011, earning 7 consecutive unacceptable ratings, and demonstrate an ongoing failure of the board of trustees to address previously identified deficiencies and establish a pattern of recurring deficiencies.  See 19 Tex. Admin. Code §97.1059(b)(2).[4]

This action is necessary to achieve the purposes of the accreditation system.  See Tex. Educ. Code §§39.051, 39.052, and 19 Tex. Admin. Code §97.1053(a), 97.1057(a), 97.1057(e), and 97.1059(a). This action is necessary to inform stakeholders of the district's poor campus academic performance.  See 19 Tex. Admin. Code §97.1053(a)(1). This action will encourage the district to improve its academic performance, and will allow stakeholders the ability to assist future board members in improving the district's poor campus academic performance.  See 19 Tex. Admin. Code §97.1053(a)(2-3).  This action will also encourage other districts to improve their campus academic performance in order to avoid similar action. See 19 Tex. Admin. Code §97.1053(a)(4). Finally, these actions will improve the Texas public school system by appointing a board of managers to address the campus' poor academic performance. See 19 Tex. Admin. Code §97.1053(a)(5).

**Length of the Conservator Appointment**

On September 2, 2016, I appointed Dr. Doris Delaney as a conservator. At the time of this appointment, Kashmere High School had the most consecutive years of unacceptable performance of any campus in the state. The commissioner may appoint a board of managers if a conservator has been assigned to the district in any part of two consecutive school years, including the current school year. See Tex. Educ. Code §39.006(b) and 19 Tex. Admin. Code §97.1057(d). Dr. Delaney's period of appointment has included four consecutive school years including most of the 2016-17 school year, the entire 2017-18 school year, the entire 2018-19 school year, and part of the current 2019-20 school year. Under the conservator's direction, Kashmere High School has earned an acceptable rating.  If the board of trustees had been more responsive to current intervention, the board should have made similar efforts to improve its other low-performing campuses.

Pursuant to my authority under Tex. Educ. Code 39A.006(b), I am appointing a board of managers to oversee the district. This appointment is necessary due the district's inability to implement

---

[3] An unacceptable performance rating includes ratings of *Academically Unacceptable*, *Improvement Required*, and *F*. See *2019 Accountability Manual* Chapter 9, page 91.
[4] The commissioner can consider the entire ratings history of the campus when assigning accreditation statuses or issuing an accreditation sanction.  See 19 Tex. Admin. Code §97.1053(b).

effective change to improve the performance of students at its campuses. See 19 Tex. Admin. Code §97.1057(f)(4).

**Public Notification: Accreditation Status**

Districts that are assigned a status of **Accredited-Warned** must take specific actions to notify the parents of students enrolled in the district and property owners in the district. The requirements for public notification are specified in 19 Tex. Admin. Code §97.1055(f), and a template that reflects the required format and language for the public notice is posted at http://tea.texas.gov/accredstatus/. Houston ISD must complete the notification requirement **no later than December 9, 2019**. Houston ISD also must send by certified mail, return receipt requested, documentation showing compliance with the notification requirement. This documentation may be addressed as follows:

Division of Accreditation
Texas Education Agency
1701 North Congress Avenue
Austin, Texas 78701
Fax: (512) 475-3665

Districts with an accreditation status below Accredited may be subject to additional accreditation sanctions as referenced in 19 Tex. Admin. Code Chapter 97, Planning and Accountability, Subchapter EE. Questions related to the public notification requirements may be addressed to accred@tea.texas.gov or (512) 463-5899.

**Appointment of Board of Managers and Superintendent**

Given the critical nature of the findings, I am appointing a board of managers to the district to exercise the powers and duties of the district's board of trustees under the authority of Tex. Educ. Code §§39.057(d),39A.004, 39A.006, and 39A.111(1) and 19 Tex. Admin. Code §§97.1057, 97.1059, and 97.1073(e).

A majority of the board of managers will consist of members of the Houston ISD community who are committed to service on behalf of the students of the district and the community. The members of the board of managers will be responsible for overseeing the management of the Houston ISD, including oversight of the district's efforts to address and correct identified deficiencies, and implementation of effective structural and procedural improvement strategies for long-term positive change. Texas Education Code §39A.202 also requires that I appoint a superintendent. I will announce my appointments in future correspondence.

**Conservator Appointment**

The appointment of the previously appointed conservator will remain in effect and will not be impacted at this time. The district is directed to cooperate and comply with the directives given by the conservator.
Please note that the appointment of a conservator does not relieve the district and its governing board of the responsibility to, at all times, operate the district in compliance with all applicable statutes and rules. The cost of the conservator's services will be paid by the district in accordance

with Tex. Educ. Code §39A.903. The conservator's fee shall be $85 per hour plus necessary travel expenses not to exceed the state per diem rate. Failure to make timely payments to the conservator may result in appropriate amounts being deducted from Foundation School Program (FSP) funds. The agency reserves the right to implement all available interventions and sanctions under Tex. Educ. Code, Chapter 39 and 39A, and Title 19, Tex. Admin. Code, Chapter 97, to address the current, or any future, deficiencies identified for the district.

**Parent Petition**

If the superintendent submits to the Commissioner a petition that the superintendent has certified as a valid petition on or before **December 2, 2019[5]**, and reflects that the parents of a majority of the students enrolled at Wheatley High School request that I either close the campus or install of board of managers, I must order the action requested. See Tex. Educ. Code §39A.112(b). However, if authorized by a majority of the board of trustees in a meeting conducted in compliance with the Texas Open Meetings Act, the board may request that the commissioner take a different action than the action requested in the parent petition. If the board takes such an action, it must provide a written explanation of the basis for the board's request to the commissioner no later than **December 16, 2019[6]**. See Tex. Educ. Code §39A.112(c). If the parent petition and the board request call for different actions, the commissioner may order either a board of managers or campus closure. See Tex. Educ. Code §39A.112(c).

**Review Process**

The district has a right to a formal review regarding the assignment of a board of managers and assignment of the lowered accreditation status of **Accredited-Warned**. 19 Tex. Admin. Code §157.1131. However, this formal review shall be provided only if the district submits a written request for formal review no later than **November 20, 2019. See** 19 Tex. Admin. Code §157.1133(1). Written information must also be submitted by the required deadline for requesting a formal review. See 19 Tex. Admin. Code §157.1133. If no formal review is requested by the deadline, a final decision may be issued without formal review. See 19 Tex. Admin. Code §157.1133(5). Pursuant to Tex. Educ. Code §39A.116 and 19 Tex. Admin. Code §157.1136, the Commissioner's decision related to the lowered accreditation status and appointment of the board of managers is final and may not be appealed.

A request for review and any written response and documentation **must be received by the TEA no later than November 20, 2019**, and should be sent to:

> Division of Enforcement Coordination
> Texas Education Agency

---

[5] 19 Tex. Admin. Code §97.1065(d)(1)(C) provides that if the petition was determined to be valid, it must be submitted by the district superintendent to the commissioner not later than December 1. However, as December 1, 2019 falls on a Sunday, the deadline was extended to Monday, December 2, 2019 per the Parent Petition for Action Guidance Document.

[6] 19 Tex. Admin. Code §97.1065(d)(3) provides for a deadline of no later than December 15, however as December 15, 2019 falls on a Sunday, the deadline was extended to Monday, December 16, 2019 per the Parent Petition for Action Guidance Document.

1701 North Congress Avenue
Austin, Texas 78701
Fax: (512) 475-3665
EnforcementCoordination@tea.texas.gov

Should the district wish to appear in person at the review or attend via telephonic conference, the district must give such notification within its request for review no later than **November 20, 2019,** and subsequent notification from TEA will be issued scheduling the review.  The district is not required to attend the review; however, if the district requests a review and chooses not to attend, the review will proceed, and a final decision will be made based upon the documentation that was submitted by the district, if any, with its request for review.  If no formal review is requested by the deadline, a final decision may be issued without review. See 19 Tex. Admin. Code §§157.1123(d), 157.1133(5).

**Compliance and Cooperation**

The board of managers, once installed, will keep me apprised of the conditions in the district and the agency will continue to monitor the district's performance and its cooperation with the agency's interventions. I will appoint a board of managers comprised of a majority of members of the Houston ISD community because I believe the community is in the best position to effectuate long-term, positive change for the district.  It is my sincere desire that all parties work together in a cooperative and productive manner to address the issues within the district.

The agency reserves the right to implement all available interventions and sanctions under Tex. Educ. Code, Chapter 39, 39A, and 19 Tex. Admin. Code Chapter 97, to address the current, or any future, deficiencies identified for the campus and district.

Any questions regarding this correspondence may be addressed to the Division of Enforcement Coordination at (512) 463-5899 or EnforcementCoordination@tea.texas.gov.

Any questions regarding the accreditation status may be addressed to the Division of Accreditation at (512) 463-5899 or by email at accred@tea.texas.gov.

Any questions regarding the appointment of a board of managers, superintendent, and conservator may be addressed to Jason Hewitt in the Division of Monitors, Conservators & Investigations at (512) 936-5962 or by email at Jason.Hewitt@tea.texas.gov.

Sincerely,

Mike Morath
Commissioner of Education

MM/lm

cc: Dr. Pam Wells, Executive Director, Region 4, Education Service Center
    Jeff Cottrill, Deputy Commissioner, Governance & Accountability, TEA
    Kelvey Oeser, Deputy Commissioner, Educator Support
    Mike Meyer, Deputy Commissioner, Finance, TEA
    Leo Lopez, Associate Commissioner/Chief School Finance Officer, TEA
    Cory Green, Associate Commissioner, Grants and Compliance Oversight, TEA
    Joe Siedlecki, Associate Commissioner, Innovation & Charters, TEA
    Von Byer, General Counsel, TEA
    Christopher Jones, Senior Legal Counsel, TEA
    Lizette Ridgeway, Director, School Improvement, TEA
    Jason Hewitt, Director, Monitors & Conservators, TEA

2011 Campus Accountability+Table                    https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&...

**Texas Education Agency | Performance Reporting**

November 2011                                    TEXAS EDUCATION AGENCY
                            2011 CAMPUS ACCOUNTABILITY DATA TABLES - STANDARD PROCEDURES

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                    Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                     Grade Span: 09 - 12

Analysis groups used to determine ratings are highlighted in BLUE.
Accountability standards are shown in parentheses.
Reasons for Academically Unacceptable rating are highlighted in ORANGE.
Special formats ('*', >99%, <1%) are used to protect student confidentiality.

TEXAS ASSESSMENT OF KNOWLEDGE AND SKILLS (TAKS) TABLE

|  |  |  |  |  | | | | | Required Improvement | | | | Status by Measure | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | |------------- 2011 -------------| | |--------- 2010 ---------| | |----- Improvement -----| | |----- by Measure | |
| Performance Results | Number Met Std | Number Taking | Pct Met Std | Stu Grp % | Number Met Std | Number Taking | Pct Met Std | Met Min Size | Act Chg | RI | Met RI? | STD | RI | EXCP |
| **Reading/ELA (70%/80%/90%)** | | | | | | | | | | | | | | |
| All Students | 491 | 655 | 75% | 100% | 508 | 652 | 78% | Yes | -3 | 1 | No | AA | - | - |
| African Amer | 317 | 409 | 78% | 62% | 326 | 406 | 80% | Yes | -2 | 0 | No | AA | - | - |
| Hispanic | 165 | 236 | 70% | 36% | 179 | 243 | 74% | Yes | -4 | ** | No | AA | - | - |
| White | * | * | * | * | * | * | * | | * | | | - | - | - |
| Econ Disadv | 428 | 573 | 75% | 87% | 448 | 576 | 78% | Yes | -3 | 1 | No | AA | - | - |
| **Writing (70%/80%/90%)** | | | | | | | | | | | | | | |
| All Students | * | * | * | * | * | * | * | | * | | | - | - | - |
| African Amer | * | * | * | * | * | * | * | | * | | | - | - | - |
| Hispanic | * | * | * | * | * | * | * | | * | | | - | - | - |
| White | * | * | * | * | * | * | * | | * | | | - | - | - |
| Econ Disadv | * | * | * | * | * | * | * | | * | | | - | - | - |
| **Social Studies (70%/80%/90%)** | | | | | | | | | | | | | | |
| All Students | 316 | 376 | 84% | 100% | 327 | 366 | 89% | | -5 | | | RE | - | - |
| African Amer | 204 | 250 | 82% | 66% | 213 | 240 | 89% | | -7 | | | RE | - | - |
| Hispanic | 106 | 120 | 88% | 32% | 112 | 124 | 90% | | -2 | | | RE | - | - |
| White | * | * | * | * | * | * | * | | * | | | - | - | - |
| Econ Disadv | 271 | 321 | 84% | 85% | 288 | 320 | 90% | | -6 | | | RE | - | - |
| **Mathematics (65%/80%/90%)** | | | | | | | | | | | | | | |
| All Students | 342 | 629 | 54% | 100% | 404 | 646 | 63% | Yes | -9 | 1 | No | AU | - | - |
| African Amer | 230 | 400 | 58% | 64% | 266 | 398 | 67% | Yes | -9 | -1 | No | AU | - | - |
| Hispanic | 106 | 216 | 49% | 34% | 135 | 245 | 55% | Yes | -6 | 5 | No | AU | - | - |
| White | * | * | * | * | * | * | * | | * | | | - | - | - |
| Econ Disadv | 295 | 551 | 54% | 88% | 353 | 569 | 62% | Yes | -8 | 2 | No | AU | - | - |
| **Science (60%/80%/90%)** | | | | | | | | | | | | | | |
| All Students | 219 | 383 | 57% | 100% | 231 | 381 | 61% | Yes | -4 | -1 | No | AU | - | - |
| African Amer | 156 | 254 | 61% | 66% | 163 | 243 | 67% | Yes | -6 | ** | No | AA | - | - |
| Hispanic | 60 | 123 | 49% | 32% | 66 | 136 | 49% | Yes | 0 | 6 | No | AU | - | - |
| White | * | * | * | * | * | * | * | | * | | | - | - | - |
| Econ Disadv | 188 | 327 | 57% | 85% | 200 | 332 | 60% | Yes | -3 | 0 | No | AU | - | - |

** Met the minimum size requirement, but did not meet the 75% floor for Recognized.

ENGLISH LANGUAGE LEARNERS (ELL) PROGRESS INDICATOR TABLE (na/60%/60%)

| Reading/ELA | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ELL Students | 52 | 92 | 57% | | 50 | 87 | 57% | Yes | 0 | 2 | No | AA | - | - |

COMMENDED PERFORMANCE TABLE (na/15%/25%)

| Performance Results | Number at Commended | Number Taking | Pct at Commended | Stu Grp % |
|---|---|---|---|---|
| **Reading/ELA** | | | | |
| All Students | 43 | 655 | 7% | 100% |
| Econ Disadv | 36 | 573 | 6% | 87% |
| **Mathematics** | | | | |
| All Students | 36 | 629 | 6% | 100% |
| Econ Disadv | 30 | 551 | 5% | 88% |

*** Summary column: The final outcome for this measure after use of RI and exceptions (if applicable).

November 2011                                    TEXAS EDUCATION AGENCY
                            2011 CAMPUS ACCOUNTABILITY DATA TABLES - STANDARD PROCEDURES

**Appx.517**

2011 Campus Accountability+Table                    https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&..

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                        Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                         Grade Span:  09 - 12

Analysis groups used to determine ratings are highlighted in BLUE.
Accountability standards are shown in parentheses.
Reasons for Academically Unacceptable rating are highlighted in ORANGE.
Special formats ('*', >99%, <1%) are used to protect student confidentiality.

EXCEPTIONS TABLE

| Number Msrs Evaluated | Number Allowed | Number Needed | Floor(s) Met? | Msr(s) Used in 2010? | Exceptions Applied |
|---|---|---|---|---|---|
| 16 | 4 | 7 | N/A | N/A | N/A |

COMPLETION RATE I TABLE (Gr. 9-12) (75.0%/85.0%/95.0%)

|  | Class of 2010 | | | | | Class of 2009 | | | Required Improvement | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | # Com-pleters | # Dropouts | # in Class | Comp Rate | Stu Grp % | # Com-pleters | # in Class | Comp Rate | Met Min Size | Act Chg | RI | Met RI? |
| All Students | 239 | 35 | 274 | 87.2% | 100% | 247 | 287 | 86.1% | | 1.1 | | |
| African Amer | 164 | 22 | 186 | 88.2% | 68% | 184 | 209 | 88.0% | | 0.2 | | |
| Hispanic | 73 | 13 | 86 | 84.9% | 31% | 63 | 78 | 80.8% | Yes | 4.1 | 2.1 | Yes |
| White | * | * | * | * | 0% | 0 | 0 | - | | * | | |
| Econ Disadv | 211 | 19 | 230 | 91.7% | 84% | 192 | 213 | 90.1% | | 1.6 | | |

ANNUAL DROPOUT RATE TABLE (Gr. 7-8) (1.6%)

|  | 2009-10 | | | | 2008-09 | | | Required Improvement | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | # Dropouts | # 7-8 Graders | Dropout Rate | Stu Grp % | # Dropouts | # 7-8 Graders | Dropout Rate | Met Min Size | Act Chg | RI | Met RI? |
| All Students | - | - | - | - | - | - | - | - | | |
| African Amer | - | - | - | - | - | - | - | - | | |
| Hispanic | - | - | - | - | - | - | - | - | | |
| White | - | - | - | - | - | - | - | - | | |
| Econ Disadv | - | - | - | - | - | - | - | - | | |

Dropout data not evaluated for your accountability rating due to grade span, small numbers, or no data.

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                        Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                         Grade Span:  09 - 12

Analysis groups used to determine acknowledgment are highlighted in BLUE.
Special formats ('*') are used to protect student confidentiality.

                    Summary of Gold Performance Acknowledgments

Earned 0 acknowledgment(s) out of 12 evaluated.

| Advanced Courses | NQ | Commended Reading/ELA | NQ |
|---|---|---|---|
| AP/IB | NQ | Commended Mathematics | NQ |
| Attendance Rate | NQ | Commended Writing | |
| College-Ready | NQ | Commended Science | NQ |
| RHSP/DAP | NQ | Commended Social Studies | NQ |
| SAT/ACT | NQ | TSI ELA | NQ |
| CI:  Reading | | TSI Mathematics | NQ |
| CI:  Mathematics | | | |

++ = Acknowledged; NQ = Does Not Qualify; Blank = Not Applicable

Advanced Course/Dual Enrollment Completion (2009-10):   DOES NOT QUALIFY

| Student Groups | Number w/Credit for an Advanced Course | Number w/Credit for Any Course | Student Group Percent | Percent w/Credit for Advanced Courses |
|---|---|---|---|---|
| All Students | 132 | 1,018 | 100% | 13.0% |
| African American | 101 | 640 | 63% | 15.8% |
| Hispanic | 29 | 371 | 36% | 7.8% |
| White | * | 3 | 0% | * |

**Appx.518**

2011 Campus Accountability+Table                    https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&..

| | | | | |
|---|---|---|---|---|
| Economically Disadvantaged | 109 | 845 | 83% | 12.9% |

AP/IB Results (2009-10):   DOES NOT QUALIFY

| Student Groups | Number Taking AP and/ or IB | Number of 11th and 12th Graders | Student Group Percent | Percent Taking AP and/ or IB | Number Scoring At or Above Criterion | Number Taking AP and/ or IB | Percent Scoring At or Above Criterion |
|---|---|---|---|---|---|---|---|
| All Students | 66 | 366 | 100% | 18.0% | 0 | 66 | 0.0% |
| African American | 51 | 235 | 64% | 21.7% | 0 | 51 | 0.0% |
| Hispanic | 15 | 130 | 36% | 11.5% | 0 | 15 | 0.0% |
| White | * | * | 0% | * | * | * | * |

November 2011                          TEXAS EDUCATION AGENCY                          PAGE 4
        2011 CAMPUS GOLD PERFORMANCE ACKNOWLEDGMENT (GPA) DATA TABLES - STANDARD PROCEDURES

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                    Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                     Grade Span:  09 - 12

Analysis groups used to determine acknowledgment are highlighted in BLUE.
Special formats ('*') are used to protect student confidentiality.

Attendance Rate (2009-10):   DOES NOT QUALIFY

| Student Groups | Total Days Present | Total Days Absent + Total Days Present | Student Group Percent | Attendance Rate |
|---|---|---|---|---|
| All Students | 155,837 | 173,934 | 100% | 89.6% |
| African American | 96,122 | 107,497 | 62% | 89.4% |
| Hispanic | 58,646 | 65,277 | 38% | 89.8% |
| White | * | 528 | 0% | * |
| Economically Disadvantaged | 134,310 | 149,488 | 86% | 89.8% |

Attendance Rate standard for your acknowledgment is 95.0%.

College-Ready Graduates (Class of 2010):   DOES NOT QUALIFY

| Student Groups | Number Scoring At or Above Criteria on Both ELA & Math | Number Taking Both ELA & Math | Student Group Percent | Percent Scoring At or Above Criteria on Both ELA & Math |
|---|---|---|---|---|
| All Students | 28 | 174 | 100% | 16% |
| African American | 20 | 119 | 68% | 17% |
| Hispanic | 8 | 54 | 31% | 15% |
| White | * | * | * | * |
| Economically Disadvantaged | 23 | 163 | 94% | 14% |

Commended on Reading/ELA:   DOES NOT QUALIFY

| Student Groups | Number Commended | Number Taking | Student Group Percent | Percent Commended |
|---|---|---|---|---|
| All Students | 43 | 655 | 100% | 7% |
| African American | 27 | 409 | 62% | 7% |
| Hispanic | 15 | 236 | 36% | 6% |
| White | * | * | * | * |
| Economically Disadvantaged | 36 | 573 | 87% | 6% |

Reading includes second administration results for Student Success Initiative students
tested at the same campus.

November 2011                          TEXAS EDUCATION AGENCY                          PAGE 5
        2011 CAMPUS GOLD PERFORMANCE ACKNOWLEDGMENT (GPA) DATA TABLES - STANDARD PROCEDURES

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                    Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                     Grade Span:  09 - 12

Analysis groups used to determine acknowledgment are highlighted in BLUE.
Special formats ('*') are used to protect student confidentiality.

Commended on Mathematics:   DOES NOT QUALIFY

| Student Groups | Number Commended | Number Taking | Student Group Percent | Percent Commended |
|---|---|---|---|---|
| All Students | 36 | 629 | 100% | 6% |

**Appx.519**

2011 Campus Accountability+Table                 https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&..

| | | | | |
|---|---|---|---|---|
| African American | 22 | 400 | 64% | 6% |
| Hispanic | 13 | 216 | 34% | 6% |
| White | * | * | * | * |
| Economically Disadvantaged | 30 | 551 | 88% | 5% |

Mathematics includes second administration results for Student Success Initiative students tested at the same campus.

Commended on Writing:   NOT APPLICABLE

| Student Groups | Number Commended | Number Taking | Student Group Percent | Percent Commended |
|---|---|---|---|---|
| All Students | * | * | * | * |
| African American | * | * | * | * |
| Hispanic | * | * | * | * |
| White | * | * | * | * |
| Economically Disadvantaged | * | * | * | * |

Writing data not evaluated for your acknowledgment due to grade span, small numbers, or no data.

Commended on Science:   DOES NOT QUALIFY

| Student Groups | Number Commended | Number Taking | Student Group Percent | Percent Commended |
|---|---|---|---|---|
| All Students | 14 | 383 | 100% | 4% |
| African American | 9 | 254 | 66% | 4% |
| Hispanic | 4 | 123 | 32% | 3% |
| White | * | * | * | * |
| Economically Disadvantaged | 13 | 327 | 85% | 4% |

November 2011                      TEXAS EDUCATION AGENCY                      PAGE 6
     2011 CAMPUS GOLD PERFORMANCE ACKNOWLEDGMENT (GPA) DATA TABLES - STANDARD PROCEDURES

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                 Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                  Grade Span:  09 - 12

Analysis groups used to determine acknowledgment are highlighted in BLUE.
Special formats ('*') are used to protect student confidentiality.

Commended on Social Studies:   DOES NOT QUALIFY

| Student Groups | Number Commended | Number Taking | Student Group Percent | Percent Commended |
|---|---|---|---|---|
| All Students | 44 | 376 | 100% | 12% |
| African American | 28 | 250 | 66% | 11% |
| Hispanic | 15 | 120 | 32% | 13% |
| White | * | * | * | * |
| Economically Disadvantaged | 37 | 321 | 85% | 12% |

Comparable Improvement:   NOT APPLICABLE

| | Total Number of Matched Students | Quartile |
|---|---|---|
| Reading | - | ^ |
| Mathematics | - | ^ |

Data not evaluated for CI acknowledgment due to no matched students or small numbers.

^ Does Not Meet Minimum Size Requirement.

There is no CI Report for Your Campus.

Recommended High School Program (RHSP)/DAP (Class of 2010):   DOES NOT QUALIFY

| Student Groups | Rec. HS Pgm. Graduates | Total Graduates | Student Group Percent | Percent Completing Rec. HS Pgm. |
|---|---|---|---|---|
| All Students | 188 | 233 | 100% | 80.7% |
| African American | 132 | 158 | 68% | 83.5% |
| Hispanic | 55 | 74 | 32% | 74.3% |
| White | * | * | 0% | * |
| Economically Disadvantaged | 172 | 207 | 89% | 83.1% |

**Appx.520**

2011 Campus Accountability+Table                    https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&..

```
     The count of RHSP graduates includes Distinguished Achievement Program (DAP) graduates.
_____
November 2011                          TEXAS EDUCATION AGENCY                      PAGE 7
          2011 CAMPUS GOLD PERFORMANCE ACKNOWLEDGMENT (GPA) DATA TABLES - STANDARD PROCEDURES

DISTRICT NAME: HOUSTON ISD
CAMPUS NAME: WHEATLEY H S                          Campus Rating:  Academically Unacceptable
CAMPUS NUMBER: 101912018                           Grade Span:  09 - 12

Analysis groups used to determine acknowledgment are highlighted in BLUE.
Special formats ('*') are used to protect student confidentiality.
_____

SAT/ACT Results (Class of 2010):    DOES NOT QUALIFY
```

| Student Groups | Number Taking SAT and/ or ACT | Number of Non-Special Education Graduates | Student Group Percent | Percent Taking SAT and/ or ACT | Number Scoring At or Above Criterion | Number Taking SAT and/ or ACT | Percent Scoring At or Above Criterion |
|---|---|---|---|---|---|---|---|
| All Students | 97 | 190 | 100% | 51.1% | 3 | 97 | 3.1% |
| African American | 68 | 129 | 68% | 52.7% | 2 | 68 | 2.9% |
| Hispanic | 28 | 60 | 32% | 46.7% | 1 | 28 | 3.6% |
| White | * | * | 1% | * | * | * | * |

```
Texas Success Initiative (TSI) ELA:   DOES NOT QUALIFY
```

| Student Groups | Number Scoring At or Above Standard | Number Taking Exit-level ELA | Student Group Percent | Percent Scoring At or Above Standard |
|---|---|---|---|---|
| All Students | 42 | 160 | 100% | 26% |
| African American | 33 | 98 | 61% | 34% |
| Hispanic | 8 | 61 | 38% | 13% |
| White | * | * | * | * |
| Economically Disadvantaged | 33 | 141 | 88% | 23% |

```
Texas Success Initiative (TSI) Mathematics:   DOES NOT QUALIFY
```

| Student Groups | Number Scoring At or Above Standard | Number Taking Exit-level Mathematics | Student Group Percent | Percent Scoring At or Above Standard |
|---|---|---|---|---|
| All Students | 72 | 154 | 100% | 47% |
| African American | 51 | 98 | 64% | 52% |
| Hispanic | 20 | 54 | 35% | 37% |
| White | * | * | * | * |
| Economically Disadvantaged | 65 | 135 | 88% | 48% |

---

**Performance Reporting | TEA Home**

---

*This request took 0.87 seconds of real time (v9.4 build 1509).*

**Appx.521**

# TEXAS EDUCATION AGENCY
## 2013 Accountability Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

## Accountability Rating

### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - NONE | - Student Achievement |
| | - Student Progress |
| | - Closing Performance Gaps |
| | - Postsecondary Readiness |

## Distinction Designation

### Academic Achievement in Reading/ELA

Percent of Eligible Measures in Top Quartile
1 out of 7 = 14%

**DOES NOT QUALIFY**

### Academic Achievement in Mathematics

Percent of Eligible Measures in Top Quartile
1 out of 7 = 14%

**DOES NOT QUALIFY**

### Top 25 Percent Student Progress

**DOES NOT QUALIFY**

## Performance Index Report



| | Index 1 | Index 2 | Index 3 | Index 4 |
|---|---|---|---|---|
| | 48 | 16 | 53 | 71 |
| | Student Achievement (Target Score=50) | Student Progress (Target Score=17) | Closing Performance Gaps (Target Score = 55) | Postsecondary Readiness (Target Score = 75) |

## Campus Demographics

| | |
|---|---|
| Campus Type | High School |
| Campus Size | 886 Students |
| Grade Span | 09 - 12 |
| Percent Economically Disadvantaged | 83.7% |
| Percent English Language Learners | 15.3% |
| Mobility Rate | 34.2% |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 1,366 | 2,840 | 48 |
| 2 - Student Progress | 288 | 1,800 | 16 |
| 3 - Closing Performance Gaps | 527 | 1,000 | 53 |
| 4 - Postsecondary Readiness | 499.8 | 700 | 71 |

## System Safeguards

### Number and Percent of Indicators Met

| | |
|---|---|
| Performance Rates | 9 out of 30 = 30% |
| Participation Rates | 12 out of 12 = 100% |
| Graduation Rates | 1 out of 5 = 20% |
| **Total** | **22 out of 47 = 47%** |

For further information about this report, please see the Performance Reporting Division web site at http://ritter.tea.state.tx.us/perfreport/account/2013/index.html

# TEXAS EDUCATION AGENCY
## 2014 Accountability Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

## Accountability Rating

### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - NONE | - Student Achievement |
| | - Closing Performance Gaps |
| | - Postsecondary Readiness |

## Performance Index Report



## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 598 | 1,265 | 47 |
| 2 - Student Progress | N/A | N/A | N/A |
| 3 - Closing Performance Gaps | 466 | 1,600 | 29 |
| 4 - Postsecondary Readiness | | | |
| STAAR Score | 2.5 | | |
| Graduation Rate Score | 19.2 | | |
| Graduation Plan Score | 19.5 | | |
| Postsecondary Indicator Score | 8.4 | | 50 |

## Distinction Designation



| Academic Achievement in Reading/ELA |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Mathematics |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Science |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Social Studies |
|---|
| NO DISTINCTION EARNED |

| Top 25 Percent Student Progress |
|---|
| NOT ELIGIBLE |

| Top 25 Percent Closing Performance Gaps |
|---|
| NO DISTINCTION EARNED |

| Postsecondary Readiness |
|---|
| NO DISTINCTION EARNED |

## Campus Demographics

| | |
|---|---|
| Campus Type | High School |
| Campus Size | 848 Students |
| Grade Span | 09 - 12 |
| Percent Economically Disadvantaged | 82.1% |
| Percent English Language Learners | 15.2% |
| Mobility Rate | 41.7% |

## System Safeguards

### Number and Percent of Indicators Met

| | |
|---|---|
| Performance Rates | 11 out of 22 = 50% |
| Participation Rates | 2 out of 12 = 17% |
| Graduation Rates | 0 out of 5 = 0% |
| **Total** | **13 out of 39 = 33%** |

For further information about this report, please see the Performance Reporting Division web site at http://ritter.tea.state.tx.us/perfreport/account/2014/index.html

# TEXAS EDUCATION AGENCY
## 2015 Accountability Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

## Accountability Rating

### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - Postsecondary Readiness | - Student Achievement |
| | - Student Progress |
| | - Closing Performance Gaps |

In 2015, to receive a Met Standard or Met Alternative Standard rating, districts and campuses must meet targets on three indexes: Index 1 or Index 2 and Index 3 and Index 4.

## Performance Index Report



| | | | |
|---|---|---|---|
| 46 | 14 | 26 | 58 |
| Index 1 | Index 2 | Index 3 | Index 4 |
| Student Achievement (Target Score=60) | Student Progress (Target Score=15) | Closing Performance Gaps (Target Score=31) | Postsecondary Readiness (Target Score=57) |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 573 | 1,233 | 46 |
| 2 - Student Progress | 109 | 800 | 14 |
| 3 - Closing Performance Gaps | 414 | 1,600 | 26 |
| 4 - Postsecondary Readiness | | | |
|    STAAR Score | 3.8 | | |
|    Graduation Rate Score | 18.3 | | |
|    Graduation Plan Score | 18.8 | | |
|    Postsecondary Component Score | 17.2 | | 58 |

## Distinction Designation

| Academic Achievement in Reading/ELA |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Mathematics |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Science |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Social Studies |
|---|
| NO DISTINCTION EARNED |

| Top 25 Percent Student Progress |
|---|
| NO DISTINCTION EARNED |

| Top 25 Percent Closing Performance Gaps |
|---|
| NO DISTINCTION EARNED |

| Postsecondary Readiness |
|---|
| NO DISTINCTION EARNED |

## Campus Demographics

| | |
|---|---|
| Campus Type | High School |
| Campus Size | 775 Students |
| Grade Span | 09 - 12 |
| Percent Economically Disadvantaged | 84.9 |
| Percent English Language Learners | 16.5 |
| Mobility Rate | 31.7 |

## State System Safeguards

### Number and Percent of Indicators Met

| | |
|---|---|
| Performance Rates | 4 out of 23 = 17% |
| Participation Rates | 12 out of 12 = 100% |
| Graduation Rates | 1 out of 5 = 20% |
| **Total** | **17 out of 40 = 43%** |

For further information about this report, please see the Performance Reporting Division website at http://ritter.tea.state.tx.us/perfreport/account/2015/index.html

# TEXAS EDUCATION AGENCY
## 2016 Accountability Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

## Accountability Rating

### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - Student Progress | - Student Achievement |
| | - Closing Performance Gaps |
| | - Postsecondary Readiness |

In 2016, to receive a Met Standard or Met Alternative Standard rating, districts and campuses must meet targets on three indexes: Index 1 or Index 2 and Index 3 and Index 4.

## Performance Index Report



| | Index 1 | Index 2 | Index 3 | Index 4 |
|---|---|---|---|---|
| | 50 | 19 | 28 | 56 |
| | Student Achievement (Target Score=60) | Student Progress (Target Score=17) | Closing Performance Gaps (Target Score=30) | Postsecondary Readiness (Target Score=60) |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 761 | 1,533 | 50 |
| 2 - Student Progress | 189 | 1,000 | 19 |
| 3 - Closing Performance Gaps | 455 | 1,600 | 28 |
| 4 - Postsecondary Readiness | | | |
| STAAR Score | 4.4 | | |
| Graduation Rate Score | 17.1 | | |
| Graduation Plan Score | 15.3 | | |
| Postsecondary Component Score | 19.2 | | 56 |

## Distinction Designation

**Academic Achievement in ELA/Reading**
NO DISTINCTION EARNED

**Academic Achievement in Mathematics**
NO DISTINCTION EARNED

**Academic Achievement in Science**
NO DISTINCTION EARNED

**Academic Achievement in Social Studies**
NO DISTINCTION EARNED

**Top 25 Percent Student Progress**
NO DISTINCTION EARNED

**Top 25 Percent Closing Performance Gaps**
NO DISTINCTION EARNED

**Postsecondary Readiness**
NO DISTINCTION EARNED

## Campus Demographics

| | |
|---|---|
| Campus Type | High School |
| Campus Size | 761 Students |
| Grade Span | 09 - 12 |
| Percent Economically Disadvantaged | 69.4 |
| Percent English Language Learners | 13.4 |
| Mobility Rate | 31.5 |

## System Safeguards

### Number and Percentage of Indicators Met

| | |
|---|---|
| Performance Rates | 7 out of 24 = 29% |
| Participation Rates | 12 out of 12 = 100% |
| Graduation Rates | 3 out of 5 = 60% |
| **Total** | **22 out of 41 = 54%** |

For further information about this report, please see the Performance Reporting Division website at /perfreport/account/2016/index.html

# TEXAS EDUCATION AGENCY
## 2017 Accountability Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

## Accountability Rating

### Improvement Required

| Met Standards on | Did Not Meet Standards on |
|---|---|
| - Student Progress | - Student Achievement |
| - Closing Performance Gaps | - Postsecondary Readiness |

In 2017, to receive a Met Standard or Met Alternative Standard rating, districts and campuses must meet targets on three indexes: Index 1 or Index 2 and Index 3 and Index 4.

## Performance Index Report



| | Index 1 | Index 2 | Index 3 | Index 4 |
|---|---|---|---|---|
| Score | 52 | 18 | 30 | 47 |
| | Student Achievement (Target Score=60) | Student Progress (Target Score=17) | Closing Performance Gaps (Target Score=30) | Postsecondary Readiness (Target Score=60) |

## Performance Index Summary

| Index | Points Earned | Maximum Points | Index Score |
|---|---|---|---|
| 1 - Student Achievement | 754 | 1,454 | 52 |
| 2 - Student Progress | 177 | 1,000 | 18 |
| 3 - Closing Performance Gaps | 473 | 1,600 | 30 |
| 4 - Postsecondary Readiness | | | |
|    STAAR Score | 7.2 | | |
|    Graduation Rate Score | 17.0 | | |
|    Graduation Plan Score | 10.1 | | |
|    Postsecondary Component Score | 12.6 | | 47 |

## Distinction Designation

| Academic Achievement in ELA/Reading |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Mathematics |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Science |
|---|
| NO DISTINCTION EARNED |

| Academic Achievement in Social Studies |
|---|
| NO DISTINCTION EARNED |

| Top 25 Percent Student Progress |
|---|
| NO DISTINCTION EARNED |

| Top 25 Percent Closing Performance Gaps |
|---|
| NO DISTINCTION EARNED |

| Postsecondary Readiness |
|---|
| NO DISTINCTION EARNED |

## Campus Demographics

| Campus Type | High School |
|---|---|
| Campus Size | 827 Students |
| Grade Span | 09 - 12 |
| Percent Economically Disadvantaged | 69.9 |
| Percent English Language Learners | 18.0 |
| Mobility Rate | 29.9 |
| Percent Served by Special Education | 21.3 |
| Percent Enrolled in an Early College High School Program | 0.0 |

## System Safeguards

### Number and Percentage of Indicators Met

| Performance Rates | 9 out of 24 = 38% |
|---|---|
| Participation Rates | 12 out of 12 = 100% |
| Graduation Rates | 2 out of 5 = 40% |
| **Total** | **23 out of 41 = 56%** |

For further information about this report, please see the Performance Reporting website at /perfreport/account/2017/index.html

**Appx.526**

2018 Accountability: Overall                    https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_



Accountability Data      Performance      Participation      Attendance and Graduation

Postsecondary Readiness      Profile      KG Readiness      Postsecondary Outcomes

Finance Data      Search

### Texas Education Agency
### 2018 Accountability Ratings Overall Summary
#### WHEATLEY H S (101912018) - HOUSTON ISD

|  | Component Score | Scaled Score | Rating |
|---|---|---|---|
| Overall |  | 52 | Not Rated: Harvey Provision |
| Student Achievement |  | 50 | Improvement Required |
| STAAR Performance | 26 | 52 |  |
| College, Career and Military Readiness | 13 | 45 |  |
| Graduation Rate | 73.2 | 55 |  |
| School Progress |  | 62 | Met Standard |
| Academic Growth | 57 | 62 | Met Standard |
| Relative Performance (Eco Dis: 73.9%) | 20 | 50 | Improvement Required |
| Closing the Gaps | 0 | 30 | Improvement Required |

Notes:
- This campus was directly affected by Hurricane Harvey and did not receive an overall rating.

### Distinction Designations

| | |
|---|---|
| ELA/Reading | Not Eligible |
| Mathematics | Not Eligible |
| Science | Not Eligible |
| Social Studies | Not Eligible |
| Comparative Academic Growth | Not Eligible |
| Postsecondary Readiness | Not Eligible |
| Comparative Closing the Gaps | Not Eligible |

11/6/2019, 9:01 A

**Appx.527**

2019 Accountability: Overall

https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_



Accountability Data    Performance    Participation    Attendance and Graduation

Postsecondary Readiness    Profile    KG Readiness    Postsecondary Outcomes    Finance Data

Search

## Texas Education Agency
## 2019 Accountability Ratings Overall Summary
### WHEATLEY H S (101912018) - HOUSTON ISD

**Accountability Rating Summary**

|  | Component Score | Scaled Score | Rating |
|---|---|---|---|
| **Overall** |  | 59 | F |
|  |  |  |  |
| **Student Achievement** |  | 57 | F |
| STAAR Performance | 30 | 56 |  |
| College, Career and Military Readiness | 26 | 60 |  |
| Graduation Rate | 73.6 | 55 |  |
|  |  |  |  |
| **School Progress** |  | 68 | D |
| Academic Growth | 61 | 68 | D |
| Relative Performance (Eco Dis. 93.8%) | 28 | 59 | F |
|  |  |  |  |
| Closing the Gaps | 7 | 50 | F |

* This campus received an F rating in three of the four areas: Student Achievement; School Progress, Part A: Academic Growth; School Progress, Part B: Relative Performance, or Closing the Gaps, and the Student Achievement domain rating is an F; therefore, the overall score is limited to a 59.

**Identification of Schools for Improvement**

This campus is a comprehensive support and improvement reidentified school.

**Distinction Designations**

| | |
|---|---|
| ELA/Reading | Not Earned |
| Mathematics | Not Earned |
| Science | Not Earned |
| Social Studies | Not Earned |
| Comparative Academic Growth | Not Earned |
| Postsecondary Readiness | Not Earned |
| Comparative Closing the Gaps | Not Earned |

Texas Education Agency | Governance and Accountability | Performance Reporting

August 2019

11/6/2019, 8:56 A

**Appx.528**



**Texas Education Agency**

**Commissioner Mike Morath**

1701 North Congress Avenue • Austin, Texas 78701-1494 • 512 463-9734 • 512 463-9838 FAX • tea.texas.gov

November 5, 2019

Dr. Grenita Lathan, Interim Superintendent
Houston Independent School District
4400 W. 18th St.
Houston, TX 77092

Dear Dr. Lathan:

Thank you for your letters dated September 12, 2019, and September 13, 2019, appealing the accountability ratings of T.H. Rogers School and Wheatley High School. Each appeal has been carefully considered, along with information provided by staff and the recommendations of an independent, three-person appeals panel. The decision for each appeal follows.

The basis of your appeal for T.H. Rogers School is that the campus serves three, distinct special programs. The campus houses a gifted and talented program, Regional Day School for Pervasively Deaf or Hard of Hearing, and the Preparing Students for Independent Living (PSI) for severely and multiply impaired and medically fragile high school students. Your appeal provides supporting documentation showing that the only high school students on the campus are the 25 students in the PSI program. Your appeal requests the exclusion of the College, Career, and Military Readiness (CCMR) components from the accountability calculations for this campus. As this campus serves a unique and diverse population, the agency agrees that the limited number of high school students served by this special program has had a disproportionate impact on accountability outcomes. As such, the agency will evaluate T.H. Rogers School as an elementary school type for 2019 and 2020 accountability purposes. Houston Independent School District should seek options to resolve this unusual situation before 2021 accountability, such as requesting a unique campus number for the students served in the PSI program. Using the elementary school type targets and weights improves the campus's overall scaled score to a 94 or a rating of A. For this reason, your appeal for T.H. Rogers School (101912039) is granted.

When a district or campus rating is changed as the result of an appeal, the data and calculations, on which the original rating was based are not changed; only the rating itself is changed. Accountability reports for the 2018–19 school year will include the same data and calculations as do the original reports. However, the overall rating for T.H. Rogers School will be changed to an A.

The agency will update its website and accountability products in November 2019 after resolving all appeals. You are welcome to share the result of your appeal with your community before then.

Notwithstanding a changed rating, a campus identified for comprehensive support and improvement, targeted support and improvement, or additional targeted support must implement the applicable Texas Accountability Intervention System (TAIS) requirements. Questions regarding TAIS requirements may be directed to the School Improvement Division at (512) 463-5226.

The basis of your appeal for Wheatley High school is twofold. First, the appeal contends that as graduation rates and CCMR indicators are lagging, these components include students who were impacted by Hurricane Harvey. Second, the appeal requests the agency modify the methodology for calculating overall campus ratings found in Chapter 5 of the *2019 Accountability Manual*. This step states:

> If an *F* rating is received in three of the four areas of Student Achievement; School Progress, Part A: Academic Growth; School Progress, Part B: Relative Performance; or Closing the Gaps, the highest scaled score a campus can receive for the overall rating is a 59. In order for this provision to be applied, the campus must be evaluated in all four areas. If the Student Achievement domain rating is a *D* or higher, this provision will not be applied.

Your appeal requests Wheatley High School either receive a *Not Rated* or *Not Rated: Hurricane Harvey* label. Please be aware that in order to preserve its intent and integrity, the accountability system, as prescribed each year in the accountability manual, must be applied to all districts consistently. The requests described above to modify accountability indicators and an accountability methodology constitute a request to modify indicators and a methodology that are applied to all districts and campuses. Consequently, the rating for Wheatley High School cannot be changed, and your appeal is denied. The overall rating for Wheatley High School (101912018) remains an *F*.

Please direct any questions to the Performance Reporting Division at (512) 463-9704 or performance.reporting@tea.texas.gov.

Sincerely,

Mike Morath
Commissioner of Education

cc: Jeff Cottrill, Deputy Commissioner, Governance and Accountability
    Jamie Crowe, Executive Director, Performance Reporting

# Chapter 10—Hurricane Harvey

When Hurricane Harvey made landfall near Rockport on August 25, 2017, its direct impact was felt by many Texas school districts and charter schools, which were forced to suspend classes, some for an extended period.

Forty-seven Texas counties were identified by a Presidential Disaster Declaration as eligible for categories of public assistance through the Federal Emergency Management Agency: Aransas, Austin, Bastrop, Bee, Brazoria, Burleson, Caldwell, Calhoun, Chambers, Colorado, Comal, DeWitt, Fayette, Fort Bend, Galveston, Goliad, Gonzales, Grimes, Guadalupe, Hardin, Harris, Jackson, Jasper, Jefferson, Jim Wells, Lavaca, Lee, Liberty, Madison, Matagorda, Milam, Montgomery, Newton, Nueces, Orange, Polk, Refugio, Sabine, San Augustine, San Jacinto, San Patricio, Tyler, Victoria, Walker, Waller, Washington, and Wharton.

On September 12, 2017, the commissioner of education asked superintendents to submit data through the Texas Student Data System (TSDS) Summer 1 collection by close of business every Friday when enrolling students with a Crisis Code 05. On October 5, 2017, the commissioner informed superintendents that the Texas Education Agency (TEA) made modifications to TSDS Crisis Code reporting for students affected by the hurricane for the 2017–18 data submissions. The new crisis code information serves various purposes by identifying the number of students impacted by Hurricane Harvey. The following chart shows the Hurricane Harvey TSDS Crisis Code values used in 2017–18 data submissions.

## TSDS Crisis Code Values

| Crisis Code | Meaning |
|---|---|
| 00 | Student Was Not Affected By A Health Or Weather Related Crisis |
| 5A | This specific code indicates a student was enrolled or was eligible to enroll in an LEA impacted by Hurricane Harvey, and the student enrolled in a different LEA during the 2017–2018 school year. |
| 5B | This specific code indicates a student was enrolled or was eligible to enroll in an LEA impacted by Hurricane Harvey, and the student enrolled in another campus in the same LEA during the 2017–2018 school year. |
| 5C | This specific code indicates a student is identified as homeless because of Hurricane Harvey but has remained enrolled in their home campus during the 2017–2018 school year. |

## TSDS Weekly Crisis Code Report Final Submission

On February 8, 2018, the commissioner announced final crisis code data needed to be submitted by March 9, 2018. Crisis code data submitted through March 9, 2018, in conjunction with other information submitted to TEA, is used to inform decisions related to the impact of Hurricane Harvey for the purpose of accountability adjustments.

**Appx.531**

# Hurricane Harvey Provision

School districts, open-enrollment charter schools, and campuses directly affected by Hurricane Harvey will be eligible for special evaluation if they meet the following criteria.

## Campuses

Campuses will be evaluated under the Hurricane Harvey Provision if they meet at least one of the following criteria:

a) The campus identified 10 percent or more of enrolled students in either the October snapshot data or in weekly crisis code reports finalized on March 9, 2018, with crisis codes 5A, 5B, or 5C. Campus enrollment is based on October snapshot data.

b) The campus reported 10 percent or more of its teachers experienced homelessness due to Hurricane Harvey, as reported in the Homeless Survey announced February 14, 2018.

c) The campus was reported to TEA as closed for ten or more instructional days due to Hurricane Harvey.

d) The campus was reported to TEA as displaced due to Hurricane Harvey either because the student population was relocated to another geographic location at least through winter break or the student population was required to share its own campus facility with the students of another campus closed as a direct result of Hurricane Harvey at least through winter break.

Under the Hurricane Harvey Provision, 2018 accountability data and ratings will be generated for eligible campuses using available data. If a campus meets at least one of the Hurricane Harvey criteria described above and receives an *Improvement Required* rating, the campus will be labeled *Not Rated*.

## School Districts and Open-Enrollment Charter Schools

School districts and open-enrollment charter schools are eligible to be labeled *Not Rated* under the Hurricane Harvey Provision if all campuses within the school district or open-enrollment charter school are eligible for the Hurricane Harvey Provision.

Additionally, if 10 percent or more of the school district or open-enrollment charter school's students were reported on the October snapshot as enrolled in a campus eligible for the Hurricane Harvey Provision, the school district or open-enrollment charter school is eligible to be labeled *Not Rated*.

Under the Hurricane Harvey Provision, 2018 accountability data and ratings will be generated for eligible districts using available data. If a district or open-enrollment charter school meets at least one of the district and open-enrollment charter school Hurricane Harvey criteria described above and receives a *B, C, D,* or *F* rating, the district or open-enrollment charter school will be labeled *Not Rated*.

For purposes of counting consecutive years of ratings, 2017 and 2019 will be considered consecutive for school districts, open-enrollment charter schools, and campuses receiving a *Not Rated* label in 2018 due to hurricane-related issues.

## Appeals

Any hurricane-affected school district, open-enrollment charter school, or campus not identified as eligible for this provision may appeal under the accountability appeals process. The commissioner-adopted criteria detailed in this chapter are final. Therefore, requests for exceptions to the rules for a school district, open-enrollment charter school, or campus are viewed unfavorably and will most likely be denied. See "Chapter 8—Appealing the Ratings."

**Appx.532**

# Hurricane Harvey and the Public Education Grant (PEG) Program Campus List

Campuses receiving a *Not Rated* label in 2018 due to Hurricane Harvey provisions will be excluded from the list of 2019–20 PEG campuses released on August 15, 2018. For more information about the PEG program, please see Chapter 9 and the PEG webpage on the TEA website at https://tea.texas.gov/PEG.aspx.

**Appx.533**